IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| MATHIS KEARSE WRIGHT, JR., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:14-CV-42 (WLS) |
| | : | |
| SUMTER COUNTY BOARD OF | : | |
| ELECTIONS AND REGISTRATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

Before the Court are Defendant Sumter County Board of Elections and Registration's Motion for Summary Judgment, Motion for a Hearing, and Motion to Exclude Portions of Plaintiff's Expert's Report and Testimony at Trial. (Docs. 40, 41, 42.) The Court finds that a hearing on the Motion for Summary Judgment is unnecessary, and therefore **DENIES** Sumter County's Motion for a Hearing (Doc. 41). For the following reasons, Sumter County's Motion for Summary Judgment (Doc. 40) is **GRANTED**. Finally, Sumter County's Motion to Exclude Portions of Wright's Expert's Report at Trial (Doc. 42) is **DENIED as moot**.

## PROCEDURAL HISTORY

In this case, Plaintiff Mathis Kearse Wright, Jr. challenges the method of electing the two at-large members of the Sumter County Board of Education and the high concentration of African American voters in voting Districts 1 and 5 under Section 2 of the Voting Rights Act of 1965 ("Section 2"). Wright seeks injunctive relief against Sumter County and entry of an order to redraw the Sumter County voting district lines in a manner that complies with Section 2. Wright filed his Complaint and Motion for Preliminary Injunction on March 7, 2014. (Doc. 1.) On April 3, 2014, the Court denied Wright's Motion for Preliminary Injunction. (Doc. 17.) On January 12, 2015, Sumter County filed its Motion for Summary Judgment, Motion for a Hearing, and Motion to Exclude. (Docs. 40, 41, 42.) On February

1

2, 2015, Wright filed his Response to the Motion for Summary Judgment. (Doc. 44), and on February 17, Sumter County filed a Reply (Doc. 46). Sumter County's Motion for Summary Judgment (Doc. 40) is now ripe for review.

Additionally, on March 13, 2015, Wright filed a Motion for Summary Judgment sixty days after the dispositive motion deadline. (Doc. 47.) Sumter County moved to strike the motion as untimely, and on July 14, 2015 the Court granted that motion and struck Wright's Motion for Summary Judgment from the record. (Doc. 61.)

## SUMMARY JUDGMENT STANDARD

### I. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See*

*Celotex*, 477 U.S. at 322-24.  Once the movant has met its burden, the non-moving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'"  *Matsuhita*, 475 U.S. at 586 (citations omitted).  Instead, the non-movant must point to record evidence that would be admissible at trial.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form").  Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant.  *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether that evidence could reasonably sustain a jury verdict.  *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.  However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

**II.    Local Rule 56**

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried.  Response shall be made to each of the movant's numbered material facts.  All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.  Here, Sumter County properly filed a summary judgment motion with a statement of undisputed facts, as required by the Federal Rules of Civil Procedure and the Local Rules of this Court.  (Docs. 40, 40-2.)  Wright failed to file a response to Sumter County's statement of undisputed facts along with his response to the Motion for Summary Judgment.  Upon noting this, the Court ordered Wright to file a response to Sumter

3

County's statement of undisputed facts that complied with Local Rule 56, and Wright complied. (Docs. 49, 51.)

## FACTUAL FINDINGS

The Court makes the following findings of fact based on Sumter County's statement of material facts (Doc. 40-2), Wright's response to Sumter County's statement of material facts (Doc. 51), and the evidentiary materials in the record.

### I. Sumter County Demographics and Board of Education Electoral Process

According to the 2010 Census, Sumter County, Georgia's total population is 32,819 residents, 51.8% of whom are African American. (Doc. 40-2 at ¶ 1.) Sumter County's voting age population is 48.1% African American and 5.2% Hispanic or Latino. Because the Parties refer to the voting age population as "black" and "non-black" and because no Party asserts cross-over or correlation between African American and Hispanic/Latino eligible voters, the Court will henceforth use the term "non-black" to refer to voters who are not African American but who may be Hispanic/Latino, white, or some other race or ethnicity. (*Id.* at ¶ 2.) Because much of the relevant case law uses the terms "minority" and "majority," the Court herein also uses "minority" interchangeably with "black" and "majority" interchangeably with "white." As of August 2014, there were 7,279 registered African American voters and 7,266 registered white voters in Sumter County. (*Id.* at ¶ 3; Doc. 38-3 at 2-3.)

The Sumter County Board of Education is composed of seven members, five who are elected from single-member districts and two who are elected at-large. (Doc. 40-2 at ¶ 4.) Wright seeks a voting plan by which the seven Board members are elected from single-member districts drawn in compliance with Voting Rights Act. (Docs. 40-2 at ¶ 5; 51 at 2-3.)

### II. Statistical Evidence

Wright's expert, Dr. Frederick McBride, performed a statistical analysis of twelve Sumter County Board of Education elections. McBride employed three methods of statistical analysis: (1) Goodman Single-Equation Ecological Regression, (2) double-equation regression analysis (BERA), and (3) Ecological Inference, or King's Method. (Doc. 40-2 at ¶ 9.) King's Method is generally regarded as the most accurate of the three methods. (Docs.

4

40-2 at ¶ 11; 51 at 2.) McBride compiled the following statistics, which Sumter County does not dispute except to the extent that the statistical calculations are clearly erroneous (i.e. totaling greater than 100%):

| Election | Candidate | % by Race Black | Non-Black | BVAP* | Notes |
|---|---|---|---|---|---|
| March 18, 2014, BOE 6 GE | **Mock** | 55.7% (BERA) 58% (KING) | --- (BERA) 95.4% (King) | 28% | Non-black voter King statistics exceed 100% |
| | Pride | 44.3% (BERA) 41.7% (King) | --- (BERA) 5% King | | |
| May 20, 2014 BOE 1 GE | **Green** | 99.3% (BERA) 87.9% (KING) | 11.3% (BERA) 26.2% (King) | 62.7% | Non-black voter King statistics exceed 100% |
| | Lockhart | 8% (BERA) 8% (King) | 14.8% (BERA) 14.6% (King) | | |
| | Smith | --- (BERA) 2.2% (King) | 73.5% (BERA) 60.6% (King) | | |
| May 20, 2014 BOE 2 GE | Byrd | 14.3% (BERA) 25.1% (King) | 32.6% (BERA) 30.2% (King) | 30.3% | Non-black voter King and BERA statistics exceed 100% |
| | **Krenson** | --- (BERA) 8% (King) | 73.3% (BERA) 60.2% (King) | | |
| | Pride | --- (BERA) 50.5% (King) | --- (BERA) 13% (King) | | |
| May 20, 2014 BOE 3 GE | Fitzpatrick | --- (BERA) 56.3% (King) | 6.8% (BERA) 26.8% (King) | 36.2% | Black voter King statistics exceed 100% |
| | **Reid** | --- (BERA) 52.1% (King) | 93.2% (BERA) 71.8% (King) | | |
| May 20, 2014 BOE 5 GE | **Green** | 78% (BERA) 66.4% (King) | --- (BERA) 19.9% (King) | 70.6% | |
| | Griggs | 21.9% (BERA) 33.2% (King) | --- (BERA) 81.1% (King) | | |
| May 20, 2014 BOE 2-Year At-Large GE | Coley | 86% (BERA) 68.2% (King) | 5.3% (BERA) 14% (King) | 48.1% | Because no candidate received a majority of the votes, the two most successful proceeded to a runoff election. |
| | Kitchens | 1.4% (BERA) 7.8% (King) | 32.5% (BERA) 29.4% (King) | | |
| | Roland | 7.7% (BERA) 30.9% (King) | 54.9% (BERA) 40.5% (King) | | |
| | Taft | 4.9% (BERA) 5.7% (King) | 7.3% (BERA) 6.7% (King) | | |
| July 22, 2014 BOE 2-Year At-Large Runoff | Coley | 94.3% (BERA) 65.6% (King) | 6.6% (BERA) 23.5% (King) | 48.1% | |
| | **Roland** | 5.7% (BERA) 35.4% (King) | 93.4% (BERA) 76.2% (King) | | |
| May 20, 2014 BOE 4-Year At-Large GE | **Busman** | 9.5% (BERA) 27.6% (King) | 93.7% (BERA) 84.4% (King) | 48.1% | |
| | Pless | 90.5% (BERA) 72.9% (King) | 6.3% (BERA) 15.5% (King) | | |
| 2010 BOE 3 GE | Minich | --- (BERA) .4% (King) | 73.6% (BERA) 60.8% (King) | 48.4% | |
| | **Pless** | --- (BERA) | 26.3% (BERA) | | |

5

| | | 99.5% (King) | 38.9% (King) | | |
|---|---|---|---|---|---|
| 2008 BOE 1 GE | McCook | 6.7% (BERA) 10.1% (King) | 54% (BERA) 50.7% (King) | 49.5% | |
| | **Whitehead** | 93.3% (BERA) 96.9% (King) | 46% (BERA) 43.1% (King) | | |
| 2006 BOE 3 GE | Harris | 86% (BERA) 93.4% (King) | 13.32% (BERA) 32.2% (King) | 48.5% | Black voter King and BERA statistics exceed 100% |
| | **Munich** | --- (BERA) 0.5% (King) | 80% (BERA) 57.7% (King) | | |
| | Seay | 18% (BERA) 43.6% (King) | 6.8% (BERA) 8.8% (King) | | |
| 2002 BOE 3 GE | Harris | 22.7% (BERA) 35.4% (King) | 41.2% (BERA) 49.4% (King) | 44.5% | |
| | **Munich** | 30.8% (BERA) 41% (King) | 44% (BERA) 43.7% (King) | | |
| | Seay | 46.5% (BERA) 24.3% (King) | 15% (BERA) .5% (King) | | |

\* Black Voting Age Population
Election winners in **bold**.

Based on those statistical findings, McBride made an assessment of racial polarization in each of the twelve elections and determined which candidates were preferred by black voters and non-black voters. Sumter County submitted a report by its own expert, Dr. Karen Owen, who did not perform any of her own calculations but contested some of McBride's conclusions based on McBride's own calculations. (Doc. 40-4.) The Court herein makes further factual findings based on McBride's calculations in its discussion of the second and third *Gingles* preconditions.

## DISCUSSION

### I. Applicable Voting Rights Law

In this case, Wright claims that the Sumter County Board of Education composition, five members from single-member districts and two at-large members, violates Section 2 of the Voting Rights Act of 1965. Specifically, Wright argues that the election of two at-large Board members and the packing of African American voters in single-member Districts 1 and 5 dilute African Americans' voting strength. (Doc. 44 at 9.)

Section 2 prohibits an election plan that

> [d]ivid[es] the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the

6

> fragmented minority group will be unable to muster sufficient votes in any
> district to carry its candidate to victory.

*Colleton Cnty. Council v. McConnell*, 201 F.Supp.2d 618, 633 (D. S.C., 2002). Section 2 also prohibits "packing" where minority voters are all placed in one single member district. *Id.* "[T]he critical question in a § 2 claim is whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 63 (1986) (citations omitted).

In *Thornburg v. Gingles*, the United States Supreme Court set forth three preconditions that a plaintiff must prove in order for a Section 2 claim to go forward. *Gingles,* 478 U.S. at 50-51; *see also Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (holding that a "plaintiff cannot obtain relief unless he or she can establish" each of the three *Gingles* preconditions). The Court in *Gingles*, 478 U.S. at 47, spoke specifically of multi-member voting districts and at-large voting schemes, but in *Growe v. Emison*, 507 U.S. 25, 40 (1993), the Court extended the applicability of the *Gingles* preconditions to vote fragmentation (also known as vote-packing or gerrymandering) challenges to single-member districts.[1] The three *Gingles* preconditions are: (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority preferred candidate." *Id.* (citations omitted).

Each of the three *Gingles* preconditions, or prongs, must be established before a reviewing court can proceed to consider the "Senate Factors," a non-exhaustive and non-exclusive list of factors set forth in a Senate Judiciary Committee Majority Report that accompanied an amendment to Section 2, which aid courts in assessing the totality of the circumstances surrounding challenged voting schemes. *Id.* at 37-38 (citing S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177 [hereinafter "Senate Factors"]). Some of the

---

[1] Two types of claims can be raised under Section 2: vote denial claims and vote dilution claims. Proof of *Gingles* preconditions is not required for vote denial claims, but Wright does not appear to make such a claim here and has not argued that his claim is not properly subject to *Gingles. See Brown v .Detzner*, 895 F.Supp.2d 1236, 1249-50 (11th Cir. 2012) (considering a vote denial challenge to a state's early voting statute); *Johnson v. Gov. of State of Fla.*, 405 F.3d 1214, 1237-38 (11th Cir. 2005) (considering a vote denial challenge to a state's felon disenfranchisement law).

7

Senate Factors may have a direct bearing on the three *Gingles* preconditions, but none of the Senate Factors *must* be present in order to satisfy the *Gingles* threshold; however, "they must be examined when determining whether, considering all of the circumstances in the case, the plaintiffs are entitled to section 2 relief." *Nipper*, 39 F.3d at 1526-27.  The Senate Factors include:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 44-45 (citing S. Rep. No. 97-417 at 28-29).

In this case, Sumter County moves for summary judgment, arguing that Wright cannot meet his burden of establishing the second and third *Gingles* preconditions.  (Doc. 40-1 at 1.)

## II.   Second *Gingles* Precondition

Sumter County argues that based on the undisputed material facts, Wright cannot establish the second *Gingles* precondition. (Doc. 40-1 at 13-16.)  The second precondition requires a Section 2 plaintiff to establish that the minority group is politically cohesive. *Gingles*, 478 U.S. at 51. "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim . . . and consequently establishes minority bloc voting within the context of § 2." *Id.* at 56 (citations omitted). *Gingles* does not require that the minority group *always* vote for the same candidate but does require that the minority group *usually* or *consistently* vote for the same candidate, a standard which this Court finds, as other courts have found, demands more frequency than a *more often than not* standard but less

8

frequency than an *always* standard. *Id.* at 48, 56. Courts have found political cohesion among minority communities where:

- minority support for a single candidate ranged from 71% to 92% in eleven out of sixteen primary elections and from 87% to 96% in general elections, *Gingles*, 478 U.S. at 58;

- minority support for a single candidate ranged from 74.7% to 100% in four out of six elections, *Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012, 1019 (11th Cir. 1990) (per curiam);

- minority support for a single candidate exceeded 50% in ten out of eleven elections and in seven of those ten elections, the minority-preferred candidate was clearly established where he or she received over 66% of the minority vote, *Johnson v. Hamrick*, 155 F.Supp.2d 1355, 1370 (N.D. Ga. 2001), *aff'd Johnson v. Hamrick*, 296 F.3d 1065 (11th Cir. 2002).

- minority support for a single candidate was at least 80% in seven out of twelve elections and at least a majority of black voters supported the same candidate in eleven out of twelve elections and in an analysis of twenty-four homogenous precinct elections, over 80% of black voters supported the same candidate in twelve elections and a majority of black voters supported the same candidate in twenty-one of twenty-four elections, *Cofield v. City of LaGrange, Ga.*, 969 F.Supp. 749, 774 (N.D. Ga. 1997); and

- in an analysis of two at-large elections, minority support for a single candidate was 92% in one and 65% in the other, *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F.Supp. 1459, 1465 (M.D. Ala. 1988).

Sumter County argues that Wright has failed to establish that African American voters are politically cohesive in Sumter County. Specifically, Sumter County argues that in four of the elections analyzed by Dr. McBride, African American voters were not politically cohesive. (Doc. 40-1 at 15; Doc. 40-4 at 6-8.)

Sumter County does not dispute that African American voters were politically cohesive in eight out of twelve elections. (Doc. 40-1 at 15-16.) Therefore, the Court will consider each

9

of the four election analyses contested by Sumter County. First, the Court agrees with Sumter County that where McBride found estimates of African American voting percentages that exceeded 100%, those estimates cannot be considered as evidence of minority political cohesion even construing the evidence in the light most favorable to Wright. McBride attempts to explain this error in his report in response to Sumter County's expert Dr. Owen's report. (Doc. 38-5 at 8.) McBride explains, in relation to the 2006 District 3 General Election, one of the elections in which his statistical calculations totaled over 100%:

> This contest presents a rare, but possible occurrence in statistics where large standard errors yield inconsistent results. It is unlikely that both Harris and Seay can have large and significant shares of minority support. Literature suggests that these unlikely occurrences may be due to aggregation bias, sample size, number of precincts involved, etc. Nevertheless, estimates must be viewed with caution and possibly additional analysis, but not merely dismissed.

*Id.* Indeed, it is not only *unlikely* that Harris and Seay could have both gained over 50% of the African American vote but *impossible*. The Court notes also that McBride's statistics must truly be phenomenal since the "rare" occurrence of statistics totaling over 100% occurred at least nine times in the BERA and King-method statistical analyses he performed for twelve elections. Neither McBride nor Wright provide any explanation for why these errors occurred in McBride's data beyond stating that additional analysis may be needed. Without more, the Court cannot regard the statistical calculations totaling more than 100% as reliable evidence.

Thus, the May 20, 2014 District 3 General Election, the May 20, 2014 Two-Year At-Large General Election, the 2008 District 1 General Election, and the 2006 District 3 General Election King-method statistics cannot be considered as evidence of minority political cohesion because they inexplicably total over 100%, which is clearly erroneous. However, where less accurate but nevertheless acceptable BERA-method statistics are also provided and are not clearly and inexplicably erroneous, the Court will consider them.[2] Thus,

---

[2] The Parties agree that King-method statistical estimates are more accurate than BERA-method estimates. (Docs. 40-1 at 4; 44 at 4.) Therefore, where both King-method and BERA-method estimates are provided, the Court will rely principally on the King-method statistics; however, in recognition of the Court's responsibility to view the evidence in the light most favorable to Wright, where King-method estimates are

the Court determines that the May 20, 2014 District 3 General Election and the 2006 District 3 General Election are altogether excluded as evidence of minority political cohesion because the King-method statistics for the African American community are erroneous and no BERA-method statistics or similarly erroneous BERA-method statistics were provided. The Court, however, will consider the BERA-method statistics for the May 20, 2014 Two-Year At-Large General Election and the 2008 District 1 General Election.

Additionally, the Court agrees with Sumter County that the 2002 District 3 General Election where the African American vote was split three ways does not demonstrate a clear minority-preferred candidate because no candidate was preferred by at least 50% of African American voters. The Court therefore will not consider that election as evidence of minority political cohesion.

However, the Court does not agree with Sumter County's argument that the 2014 District 2 General Election is not evidence of minority political cohesion because the minority-preferred candidate received only 50.5% of the African American vote according to King estimates. The Court disagrees, noting that other courts have considered evidence that at least 50% of a minority community supported a single candidate as evidence of political cohesion. *E.g.*, *Hamrick*, 155 F.Supp.2d at 1370 (N.D. Ga. 2001), *aff'd Hamrick*, 296 F.3d 1065 (11th Cir. 2002).

Based on those determinations, the Court finds that of the twelve elections analyzed by Dr. McBride, one election did not produce a clearly minority-preferred candidate and the minority preferences in two elections are unknown since the statistics provided were clearly erroneous. In the remaining nine elections, a single candidate was preferred by at least 50.5% of the African American vote and by at least 86% of the African American vote in six elections. Therefore, in at least nine of twelve, or 75%, of the elections analyzed by McBride, the majority of African American voters preferred a single candidate. This evidence supports a finding that in Sumter County, the African American community usually and consistently votes for the same candidate. The Court finds, therefore, that Wright has established minority political cohesion, the second *Gingles* precondition.

---

clearly erroneous, the Court will rely on BERA-method estimates if they are available and are not also clearly erroneous

11

**III.    Third *Gingles* Precondition**

Sumter County also argues that Wright cannot establish the third *Gingles* precondition. (Doc. 40-1 at 10-13.) The third *Gingles* precondition requires a Section 2 plaintiff to establish that "the white majority votes sufficiently as a bloc to enable it –in the absence of special circumstances, such as the minority candidate running unopposed, . . . usually to defeat the minority preferred candidate." *Gingles,* 478 U.S. at 51.  In order to establish both the second and third *Gingles* preconditions, a plaintiff must establish racially polarized (or bloc) voting; in other words, a plaintiff must establish that African Americans and white individuals "*consistently* prefer different candidates." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002). "A white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56. Where minority-preferred candidates prevail equally as often as they are defeated, the third prong of *Gingles* may not be established. *Hamrick*, 296 F.3d at 1081.

    **A. White Bloc Voting**

The Court concludes that non-black voters in Sumter County consistently prefer the same candidate. In determining whether Wright has demonstrated that white voters usually vote as a bloc in Sumter County, the Court excludes erroneous statistical evidence as it did in its analysis of minority voter cohesion. (*See supra* at 10.) The Court finds no reliable statistical evidence for the March 18, 2014 District 6 General Election and the May 20, 2014 District 2 General Election because the percentages provided total greater than 100%. The Court further finds that no candidate received over 50% of the non-black vote according to the more reliable King estimates in either the May 20, 2014 Two-Year At-Large General Election or the 2002 District 3 General Election and therefore the evidence does not support a finding that there was a clear majority-preferred candidate in those elections. However, the Court finds that non-black voters voted as a bloc in eight out of twelve, or 66%, of the elections analyzed by McBride. And in five of those eight elections, non-black voters preferred a single candidate by more than 73%. The Court finds, therefore, that Wright has provided evidence that non-black voters in Sumter County usually prefer the same candidate.

12

Additionally, in six of the elections in which there was a clear non-black-preferred candidate there was also a clear minority-preferred candidate. In all six of those elections, the non-black preferred candidate was different from the minority-preferred candidate. Thus, in at least six of twelve elections, non-black voters clearly preferred a candidate different from the one clearly preferred by minority voters. For those reasons, the Court finds that Wright has demonstrated that non-black voters consistently prefer the same candidate and that the candidate preferred by non-black voters is usually different from the black-preferred candidate.

### B. Success of Minority-Preferred Candidates versus Majority-Preferred Candidates

The Court concludes for the following reasons that Wright has not established that non-black-preferred candidates normally defeat black-preferred candidates.

#### 1. *Statistical Evidence*

Sumter County argues that Wright's expert, Dr. McBride, originally concluded that, in the twelve elections he analyzed, the minority-preferred candidate was not defeated in six. (Doc. 40-1 at 11 (citing Doc. 40-3 at 24-26).) Sumter County also argues that in his deposition, McBride "backtracked" on this finding, concluding that the minority-preferred candidate was successful in at least five of eleven elections and as many as seven of twelve elections. (*Id.* (citing Doc. 38 at 129-130).) In McBride's report in response to Dr. Owen's report, McBride concluded that in five of twelve elections, the minority-preferred candidate won. (Doc. 38-5 at 13.)

There were nine elections for which Wright has provided statistical evidence of a minority-preferred candidate. (*See supra* at 11.) One of those nine elections, the May 20, 2014 Two-Year At-Large Election, resulted in a run-off between the minority-preferred candidate and the non-black-preferred candidate. The Parties disagree as to whether this election should be counted as a win or loss for the minority-preferred candidate. For the purposes of determining the success of black- and non-black-preferred candidates, the Court will disregard that election since it was essentially a "draw" that went on to a run-off. (Doc. 40-3 at 47 (reporting that the minority-preferred candidate received 1584 votes and candidate Roland received 1575 votes).) This decision is made in light of the Court's obligation to

13

view the evidence in the light most favorable to Wright because if the Court were to consider this election, the Court would have to find that, based purely on the data reported, the minority-preferred candidate won since he received more votes than any other candidate.

Therefore, of the eight elections where there was a clear winner and a clear minority-preferred candidate, Wright's evidence indicates that a minority-preferred candidate won five, or 62.5%: May 18, 2014 District 6 General Election; May 20, 2014 District 1 General Election; May 20, 2014 District 5 General Election; 2010 District 3 General Election; and 2008 District 1 General Election. The Court notes that even if it counted the May 20, 2014 Two-Year At-Large Election as a loss for the minority-preferred candidate, as Wright argues it should be, the minority-preferred candidate would still have won five of nine elections, or 55.5%.

There were eight elections for which Wright has provided statistical evidence of a non-black-preferred candidate.  (*See supra* at 12.)  Of those eight elections, Wright's evidence indicates that a non-black-preferred candidate won four, or 50%: May 20, 2014 District 3 General Election; May 20, 2014 Two-Year At-Large Runoff Election; May 20, 2014 Four-Year At-Large General Election; and 2006 District 3 General Election. The Court finds, therefore, that Wright's statistical evidence demonstrates that black-preferred candidates, who prevail at least 62.5% of the time when there is a clear minority-preferred candidate, prevail more than equally as often as non-black-preferred candidates, who prevail 50% of the time when there is a clear non-black-preferred candidate.  Where this is the case, a plaintiff cannot establish the third prong of *Gingles*. *Hamrick*, 296 F.3d at 1081.

The Court, however, notes that Wright challenges the two at-large positions on the Board of Education as well as the packing of black voters into Districts One and Five.  The Court finds it necessary to consider Wright's evidence (or lack thereof) of the ability of African American voters to elect their candidates of choice in the at-large elections in particular. With regard to the at-large elections, a plaintiff must demonstrate "that submergence in a white multimember district impedes [the minority group's] ability to elect its chosen representative." *Gingles*, 478 at 51.

The Court disagrees with Wright's argument that the evidence supports a finding that where whites are the majority, they elect the candidate of their choice. (Doc. 44 at 7-9.)

14

McBride stated in his deposition that as of August 2014, there are more registered African American voters in Sumter County than registered white voters. (Doc 38 at 50-51.) Therefore, although the 2014 at-large elections occurred a few months prior to when the voter registration data viewed by McBride was acquired, the data had to have been similar if not identical barring an unusual post-election voter registration push in the black community. The Court finds, therefore, that in the at-large elections won by the non-black preferred candidate in 2014, whites likely did not make up the majority of registered voters.

Furthermore, the Court finds that McBride's evidence indicates that in the 2010 District 3 General Election and the 2008 District 1 General Election, the black voting age populations were 48.4% and 49.5%, not much greater than the 48.1% black voting age population in the 2014 at-large elections, and in those elections the black-preferred candidates won. Thus, the evidence indicates that in districts with similar voter make-up as the at-large voting population, minority-preferred candidates can and have won. Furthermore, the evidence indicates minority-preferred candidates have won even in districts where black voters were clearly the minority, such as in the 2014 District 6 General Election where McBride reported the black voting age population was only 28%.

The Court notes that "special circumstances" must be considered when determining whether a majority voting bloc "usually" defeats the minority-preferred candidate. *Gingles*, 478 U.S. at 57. Such special circumstances include incumbency, lack of opposition, single-shot voting, or "a temporary effect resulting from the filing of the vote dilution suit itself." *Id.* Neither Party points to any of these special circumstances as reasons to assign less or more weight to any particular election's results.

In determining whether Wright has established the second and third *Gingles* prongs, the Court must also consider whether Wright has established racial polarization over time. "The concern [with racial polarization] is necessarily temporal and the analysis historical because the evil to be avoided is subordination of minority groups in American politics, not the defeat of individuals in particular elector contests." *Thornburg v. Gingles*, 478 U.S. 30, 57 (1986) (quoting Howard M. Shapiro, Note, *Geometry and Geography: Racial Gerrymandering and the Voting Rights Act*, Yale L. J. 189, 200 n. 66 (1984)).

Wright does not, however, provide any statistical data for at-large elections aside from the 2014 elections. Although the Board of Education election scheme challenged in this action is new, Sumter County has had at-large positions on the Board of Education in the past, according to Wright. (Doc. 44 at 10-14.) Wright states that it is a "fact that no black candidate has ever been elected to an at-large position on the Board of Education," though he does not cite to any evidence establishing this "fact." (Doc. 44 at 9.) The Court notes also that Wright does not provide evidence to support a finding that no black-*preferred* candidate has ever been elected to an at-large position on the Board of Education. The Court notes that, under *Gingles*, the race of the candidate is not determinative –it is the ability of the minority community to elect the candidate of its choosing. *Nipper*, 39 F.3d at 1539 (quoting *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503 (5th Cir. 1987) ("*Gingles* is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter –but only within the context of an election that offers voters the choice of supporting a viable minority candidate.").

As the Court has already discussed, Wright does provide statistical data from other years' elections with similar voter demographics as the at-large demographics. That data supports a finding that in single-member districts with demographics similar to Sumter County's at-large voting population, minority-preferred candidates can and have been successful over time.

### 2. *Historical Evidence*

Wright relies heavily on the Senate Factors in arguing that he has established the existence of racial polarization and vote dilution in Sumter County over time. (Doc. 44 at 10-20.) If any one of the *Gingles* factors is not proven by the plaintiff, the Court need not consider the "totality of the circumstances" or the Senate Factors because a Section 2 violation cannot be established without proof of *all three Gingles* factors. *Hamrick*, 296 F.3d at 1073-74 (quoting *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997).). However, some of the Senate Factors may have a direct bearing on the *Gingles* prongs. *Nipper*, 39 F.3d at 1526-27. Likewise, non-statistical, anecdotal evidence should be considered in determining whether the third *Gingles* precondition has been established. *S. Christian Leadership Conf. of Ala. v. Sessions*, 56 F.3d 1281, 1292 (11th Cir. 1995) ("The [district]

16

court appropriately considered all of the circumstantial evidence –both statistical and anecdotal –that was offered.").

Wright provides a long and detailed history of efforts to reform the Sumter County Board of Education election plan and of black voter suppression in Sumter County and in Georgia generally.  Sumter County has moved to exclude the portions of McBride's expert report that address socioeconomic conditions in Sumter County on the basis that McBride has admitted that he is not an expert on that topic.  However, even considering McBride's opinions on the socioeconomic conditions in Sumter County together with Wright's other evidence of the history of voter suppression and systemic racism in Sumter County, the Court finds that Wright has failed to establish the third *Gingles* prong.  While evidence of the history of voter suppression and systemic racism in Sumter County is certainly relevant and compelling, here, Wright's own expert agrees that black voters now make up a majority of the registered voters in Sumter County and that black-preferred candidates have been able to succeed in districts where the voter make-up is very similar to that of the at-large voting population. In weighing the undisputed evidence, the Court finds that, although Wright has established a history of voter suppression generally, Wright has not established the current scheme denies black voters an equal opportunity to elect the candidate of their choice.

### 3. *Conclusion*

Wright's statistical evidence does not establish that black-preferred candidates prevail less often than non-black-preferred candidates nor does it establish that the white bloc vote normally defeats the combined strength of minority support plus white "crossover" votes in the challenged at-large elections.  For those reasons, the Court finds that Wright has failed to establish the third prong of *Gingles*.  Because the Court finds that Wright has not established one of the *Gingles* preconditions, the Court need not consider the totality of the circumstances or whether Wright has established the first *Gingles* precondition.

## **CONCLUSION**

Supreme Court and Eleventh Circuit precedent makes clear that the plaintiff in a Voting Rights Act Section 2 lawsuit bears the burden of establishing the three preconditions set forth in *Thornburg v. Gingles* before a Court can proceed to considering the "totality of the circumstances."  Here, Plaintiff Wright has put forth a mountain of historical evidence but

has simply failed to establish that the three *Gingles* preconditions exist currently. The Court finds no genuine issue of material fact remains and that Defendant Sumter County Board of Elections and Registration is entitled to judgment as a matter of law. For the foregoing reasons, Sumter County's Motion for Summary Judgment (Doc. 40) is **GRANTED** as to Wright's sole claim, and its Motion for a Hearing (Doc. 41) and Motion to Exclude (Doc. 42) are **DENIED as moot**. The Clerk is directed to enter judgment in favor of Defendant Sumter County Board of Elections and Registration.

**SO ORDERED**, this 14th day of July, 2015.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**