```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF GEORGIA
2                        ALBANY DIVISION

3                      _____

   MATHIS KEARSE WRIGHT, JR.    :
4  PLAINTIFF,                   : Case No. 1:14-CV-42(WLS)
                                :
5  V.                           :  March 14, 2014
                                :  Albany, Georgia
6  SUMTER COUNTY                :
   BOARD OF ELECTIONS,          :
7                DEFENDANT :
   _____
8
                  PRELIMINARY INJUNCTION HEARING
9
             BEFORE THE HONORABLE W. LOUIS SANDS
10          UNITED STATES DISTRICT JUDGE, PRESIDING

11 APPEARANCES:

12 FOR THE PLAINTIFF:     MATHIS KEARSE WRIGHT, JR.
                          PRO SE LITIGANT
13

14 FOR THE DEFENDANT:     WILLIAM DALLAS NESMITH, JR.
                          ATTORNEY AT LAW
15                        P.O. BOX 295
                          AMERICUS, GA 31709
16

17

18

19

20         Transcribed from Audio Recording by

21

22
   _____
23
              SALLY L. GRAY, CCR, RPR, USCR
24               201 W. BROAD AVENUE
                  ALBANY, GA 31701
25
                  (478-787-3905)
```

```
1              INDEX TO PROCEEDINGS

2                 March 14, 2014

3
```

```
4      MATHIS KEARSE WRIGHT, JR.                    29

5      CROSS EXAMINATION BY MR. NESMITH             38

6      DIRECT EXAMINATION BY MR. WRIGHT             56

7      CROSS EXAMINATION BY MR. NESMITH             69

8      WILLA FITZPATRICK                            81

9      DIRECT EXAMINATION BY MR. WRIGHT             81

10     CROSS EXAMINATION BY MR. NESMITH             90

11     REDIRECT EXAMINATION BY MR. WRIGHT           101

12     MITA CRINSON                                 104

13     DIRECT EXAMINATION BY MR. NESMITH            104

14     CROSS EXAMINATION BY MR. WRIGHT              115

15     ROBERT BRADY                                 119

16     DIRECT EXAMINATION BY MR. NESMITH            119

17     CROSS EXAMINATION BY MR. WRIGHT              124

18

19

20  CERTIFICATE OF COURT REPORTER/TRANSCRIBER       164
```

```
21

22

23

24

25
```

1          **P R O C E E D I N G S**

2    **March 14, 2014**

3              **THE COURT:**  All right.  Good morning.

4              **COUNSEL:**  Good morning.

5              **THE COURT:**  All right.  We are here in the

6    matter of Mathis Kearse Wright, Jr. versus Sumter

7    County Board of Elections and Registration.  This is

8    case number 1:14-CV-42.

9         Upon considering the filing, the Court interpreted

10   it as a request, as a part of the request, was a

11   preliminary junction with regard to the election

12   scheduled for, I believe, May -- March 18th of 2004.

13        So we're here, not on the ultimate merits of the

14   matter, but whether or not there's a basis for

15   injunction with regard to that election.

16        All right, let's see who's -- Mr. Wright, you're

17   present.

18              **MR. WRIGHT:**  Yes, sir.

19              **THE COURT:**  All right.  And who's present for

20   the Board of Elections?

21              **MR. NESMITH:**  Your Honor, Bill NeSmith on

22   behalf of Sumpter County Board of Elections and Voter

23   Registration.

24              **THE COURT:**  All right.  Are there any

25   preliminary comments to be made?

1          **MR. WRIGHT:**  Yes, sir.

2          **THE COURT:**  You may make them.

3          **MR. WRIGHT:**  All right.  Good morning, sir.

4          **THE COURT:**  Good morning.

5          **MR. WRIGHT:**  What is -- the issue is, one,

6    that the Sumpter County Board of Elections and the

7    supervisors did not have the authority to call the

8    election when they called it.  Simply because the bill,

9    HB H 36, had not been passed through the General

10   Assembly.  It had not even been signed at that point

11   when the election was called.

12        Furthermore, they have also violated the state

13   rule of 144 feet by being in the area while voting is

14   going on.  There is early voting in the courthouse

15   right now while supposedly candidates were steady going

16   in qualifying for an election that's going to take

17   place in May.  So that's a violations of the rules.

18   So, Sumter County --

19        **THE COURT:**  A violation of what rule?

20        **MR. WRIGHT:**  Of the rule of 144-foot rule for

21   a candidate --

22        **THE COURT:**  I know the state law used to

23   be -- that's not a federal issue, is it?

24        **MR. WRIGHT:**  Well, it's an issue that is

25   being violated to show that the election that is

1    scheduled to take place was just in violation because

2    it is being ran at the same time another election for

3    the same seats on -- when I say same seats, or the

4    Sumter County Election Board is having two elections

5    almost simultaneously.

6            THE COURT:  I understand what you're saying,

7    Mr. Wright, but what I'm getting at is, if that's true,

8    isn't that a question for the Superior Court of Sumter

9    County?  What does that have to do with federal law?

10           MR. WRIGHT:  All right.  Well, then it may

11   not -- then you may not have jurisdiction over that.  I

12   stand corrected.  So --

13           THE COURT:  I'm not assuming that, but I'm

14   asking you the question because it would appear that if

15   those are mechanical issues with regard to the proper

16   way that the election is proceeding or not under state

17   law --

18           MR. WRIGHT:  Uh-huh.

19           THE COURT:  -- that would not necessarily be

20   a federal question.  That's my point.

21           MR. WRIGHT:  All right.  And so before you

22   then, is that there is a law that was in 1974 that was

23   passed through federal courts in the Middle District,

24   and then it was so ordered in 1988 that is still

25   standing as we speak today where the injunction was put

1    in place to prevent such things from happening that is

2    happening now, where a majority board is being taken

3    out of their seats, not by the vote of the constituents

4    which they represent.  And so, if the new plan that is

5    that is proposed to go in effect, that plan will

6    violate Section 2 of the Voting Rights Act of 1965.

7    And that's --

8           THE COURT:  Any further comments?

9           MR. WRIGHT:  That's it for now.

10           THE COURT:  All right.  Thank you.  And for

11    the defendant, any preliminary comments?

12           MR. NESMITH:  Yes, Your Honor.  I really

13    guess I thought that you were going to ask about

14    something a little bit different.  We did want to

15    invoke the rule if there are witnesses present.

16           THE COURT:  All right.  Let's see.  Mr.

17    Wright, what witnesses do you have present, and then

18    I'll ask the same thing of the defendants?

19           MR. WRIGHT:  Your Honor, they are present,

20    but I don't plan to call them.

21           THE COURT:  Well, if they might be called --

22           MR. WRIGHT:  Well, I have Alice Green --

23           THE COURT:  If you all could stand when your

24    name is called, please?

25           MR. WRIGHT:  -- Edith Ann Green, Carolyn

1    Whitehead, Donnie Smith, and Andrea Wright.

2         **THE COURT:**  All right.  And are there other

3    witnesses who will be called by the defense?

4         **MR. NESMITH:**  Just Mr. Robert Brady, who is

5    the Board of Elections supervisor.  Robert E. Brady.

6         **THE COURT:**  All right.  Well, those persons

7    who just stood, I'm going to ask you to wait in the

8    waiting room for witnesses until you are called.  If we

9    determine you will not be called, then we'll let you

10    come back in the courtroom.  All right.  Thank you.

11    You may be seated.

12         **MR. NESMITH:**  Thank you, Your Honor.  If I

13    may, what I will do is I would like to address the

14    first two things that Mr. Wright said, and then I will

15    give you a short preliminary statement.

16     What Mr. Wright is saying is that the Board of

17    Elections did not have the authority to proceed because

18    House Bill 836 had not been signed, but the Sumter

19    County Board of Elections did not call this election

20    based on House Bill 836.  Instead, they called the

21    election based on Senate Bill 4EX, which this Court

22    declared in its order was the law of the state of

23    Georgia.

24     Now, the flaw with the past one is because of the

25    phase-in, the 4EX Bill, the phase-in was not feasible,

1    and that's what 836 sought to correct, which it would

2    correct in the -- really in the May election.  So the

3    authority, the law that the Board of Elections used to

4    call this was not House Bill 836, but was Senate Bill

5    4EX.

6         Now, not only that, we also, we being the Board of

7    Elections, have two letters from the school board's

8    lawyer who said that it was the duty of the Board of

9    Elections to call the election.  It was not the duty of

10   the Board of Education to ask for the call, but there

11   was an election that needed to be had, and I've got

12   those letters, that it was the Board of Education's --

13   I mean, excuse me, Board of Elections' duty to do that,

14   and the Board of Elections took that advice and moved

15   forward with it.

16        Now, as to the 144 feet, the state law, it is

17   state law, Judge, it's not federal law, and I don't

18   know that there's been any allegation that would take

19   it to -- make it a federal question.  At this point,

20   it's a -- as you said, a mechanical issue with the

21   Secretary of State's office or a superior court judge.

22        And there certainly are investigators for the

23   Secretary of State's office, and they do come down, and

24   they come quickly.  And if that allegation was made to

25   them, they will come down, and if there is an

1      violation, they'll correct it.  And I just don't see at

2      this point it has arisen to a federal level.

3              THE COURT:  Now, this -- that 144 feet has to

4      do with a -- how far candidates or how close

5      campaigning activities can take place to the actual

6      election site, is that -- am I correct that that's what

7      it references to?

8              MR. NESMITH:  That's correct.  I don't recall

9      it being 144 feet, but --

10             THE COURT:  I mean, what I'm --

11             MR. NESMITH:  Yeah, that's right.

12             THE COURT:  I know there's some rule

13     about how --

14             MR. NESMITH:  That's correct.

15             THE COURT:  -- they have to be.

16             MR. NESMITH:  Yes, sir.  That's exactly

17     correct, Judge.  You can't campaign within a certain

18     distance of the polling place, and a candidate cannot

19     be within -- they can come and they can vote,

20     obviously, but once they vote, they got to leave and

21     they can't hang around.  And so I think what

22     possibly -- well, whatever this allegation is, it is a

23     purely a matter of state law and it has no federal

24     standing at all at this point as far as I can tell

25     based on what Mr. Wright is saying.  He's just talking

1    about it being crossing an imaginary line or a stated

2    line by state law.

3         **THE COURT:**  He also made some reference about

4    qualifying for two elections -- I guess I should ask

5    Mr. Wright to clarify what he meant, but I just

6    recalled that there was a question in my mind.  This is

7    the election set for the 18th, next Tuesday, is it a

8    primary, or is it an election to a position?

9         **MR. NESMITH:**  It's an election to a position

10   because these are nonpartisan, and so there doesn't

11   have to be a primary, and so what this is is this

12   election will fill the four vacant seats on the nine

13   district board.  There are four -- when the lawsuit was

14   filed, as the Court I'm sure remembers, and that --

15   everything was stayed, there were four members whose

16   terms expired on December 31st of 2012, and so once the

17   Court lifted its injunction, and then we started trying

18   to ask questions of the school board through their

19   attorney how they wish to proceed, the attorney said it

20   was up to Board of Elections to make that call, and

21   that was when the decision was made to go forward with

22   it.  And it's based under -- what we have to do, as we

23   understand from the legislative counsel and from the

24   Secretary of State, is we must phase in people, and so

25   that's what this is an attempt to do is to allow those

1    four members who have been serving on a Board of

2    Education since December of 2012, without being elected

3    by the people, to stay in that election and then to be

4    immediately or almost immediately installed as board

5    members, and then they'll finish out those terms, and

6    then we'll have to run again under House Bill 836,

7    which has a May election, which, again, is a federal

8    requirement that that election be in May.

9         Now, these are not state requirements; they're

10   federal requirements.  That's why these are so close,

11   back to back.  These are, as the Court I'm sure is

12   aware, when there used to be July elections, those now

13   have been pushed back because of the soldiers and

14   sailors --

15             THE COURT:  The time needed for a run off.

16             MR. NESMITH:  Yes, sir, that's correct.

17             THE COURT:  Okay.  So the same four persons

18   will be running again in the May, so they're running

19   two elections; is that correct?

20             MR. NESMITH:  Some are not running again.

21   Some have chosen not to run again, and some, of course,

22   are opposed and some are not.

23             THE COURT:  But, in effect, though, there are

24   two elections.

25             MR. NESMITH:  Yes, that's correct.  And if,

1    whoever is elected in the March election can certainly

2    run in the May election, which that seat won't take --

3    that will not take effect until January 1st of 2015.

4         THE COURT:  Okay.  So now, so the four

5    positions that are up for election next week are the

6    four seats on a nine-member board.

7         MR. NESMITH:  That's correct.

8         THE COURT:  The election in May is for a what

9    number of board?

10        MR. NESMITH:  That's for five plus two, which

11   is the plan that this Court said was the law of state

12   of Georgia.

13        THE COURT:  That's under the Bill 4EX.

14        MR. NESMITH:  That's -- well, it would have,

15   Your Honor, but what we did, or what, I say we, the

16   General Assembly did, what we're here about, is House

17   Bill 846, took that bill that you said was the law of

18   the state and had to correct the phase-in part, because

19   part of the law was -- could not be done because the

20   dates had already passed.

21        THE COURT:  Okay.

22        MR. NESMITH:  And so what they did is they

23   cleaned that part of it up to make it -- it's the same

24   exact bill, just the phase-in has been updated.

25        THE COURT:  Okay.  If you will remind me --

1    and, of course, if Mr. Wright has a different

2    understanding, he'll have an opportunity to say so --

3    the previous case that was in the court --

4         MR. NESMITH:  Yes, sir.

5         THE COURT:  -- was one asserting that there

6    was a violation of the one-person-one-vote rule because

7    the nine seats were out of balance.

8         MR. NESMITH:  That's correct.

9         THE COURT:  All right.  And the Court heard

10   some evidence on that, and I think ultimately

11   determined that they were, in fact, out of balance.

12        MR. NESMITH:  That's correct.

13        THE COURT:  And the parties had different

14   opinions as to how that should be corrected.

15   Ultimately, the Court decided that it would redraft

16   those nine --

17        MR. NESMITH:  Correct.

18        THE COURT:  -- so they would be in balance.

19        MR. NESMITH:  Yes, sir.

20        THE COURT:  One of the issues, as I recall

21   it, was that the previous senate bill had been

22   submitted to the legislation, had been passed by the

23   legislation, I believe, a senate bill --

24        MR. NESMITH:  Right.

25        THE COURT:  -- and signed by the governor.

1        **MR. NESMITH:**  That's correct.

2        **THE COURT:**  At that time, though, section

3    five of the voter's right act was in place --

4        **MR. NESMITH:**  Right.

5        **THE COURT:**  -- and there was a question of

6    whether or not it had been properly pre-cleared by the

7    Department of Justice.

8        **MR. NESMITH:**  That's right.

9        **THE COURT:**  And it had been submitted and

10   then withdrawn, as I understood it.

11       **MR. NESMITH:**  That's correct.

12       **THE COURT:**  So the Court determined, then,

13   that there was no pre-cleared bill under the new bill

14   that had been passed by the senate and adopted by the

15   governor, so therefore we were under the old nine --

16       **MR. NESMITH:**  The --

17       **THE COURT:**  -- so therefore the Court needed

18   to do the redraft.

19       **MR. NESMITH:**  That's right.

20       **THE COURT:**  In the meantime, the Supreme

21   Court tripped section five.

22       **MR. NESMITH:**  That's right.

23       **THE COURT:**  Meaning there was no longer a

24   necessity to preclear the senate bill.

25       **MR. NESMITH:**  That's correct.

1           THE COURT:  Which is why the Court

2     determined, after asking for some responses from the

3     parties, that that put us back at a place where the

4     effective law would be that that was passed and adopted

5     by the legislation and signed by the governor --

6           MR. NESMITH:  Yes, sir.

7           THE COURT:  Which would be the five --

8           MR. NESMITH:  With a phase in of the nine.

9           THE COURT:  -- the five, right.  And what had

10    happened was those under -- had already passed, is what

11    you're saying?

12          MR. NESMITH:  Yes.

13          THE COURT:  All right.  Okay.  All right.  I

14    want to make sure I was --

15          MR. NESMITH:  You got it, Judge, a lot better

16    than I think I remember it, but --

17          THE COURT:  It's been very complicated, as I

18    remember it.

19          MR. NESMITH:  Yeah, it is.

20          THE COURT:  But, in effect, with the new five

21    member board taking place, that mooted the issue about

22    the disproportionality of the nine.

23          MR. NESMITH:  That --

24          THE COURT:  In effect.

25          MR. NESMITH:  Yes, I would agree.

1           **THE COURT:**  That's what -- all right.

2           **MR. NESMITH:**  So, I mean, and, of course,

3    what it -- it's a five plus two at-large.

4           **THE COURT:**  Right, right, right.

5           **MR. NESMITH:**  And what we were -- and, of

6    course, what the bill that the Court said was the law

7    of the state of Georgia, retroactive 2011, did have a

8    phase-in provision, but, unfortunately, because of the

9    way that the dates were constructed, that's why we

10   thought that it would be a better way for it to be

11   clean, and the General Assembly stepped in and said, we

12   can fix that, which they did, and so what we did is

13   proceed under the old law to have the authority to call

14   it and go ahead and fill those four seats, and then we

15   could move forward with whatever House Bill 836 says.

16          **THE COURT:**  All right.  So I guess I need to

17   address Mr. Wright and get a clarification then.

18      So, are you saying that both the election of the

19   four to complete the nine member service and the

20   subsequent May election, you're saying that both of

21   those are in violation of Section 2?

22          **MR. WRIGHT:**  Of Section 2.

23          **THE COURT:**  Well, how -- how would the nine

24   be in violation since that's essentially --

25          **MR. WRIGHT:**  Because of what happened, and as

```
 1          Mr. NeSmith said, that the Secretary of State would
 2     come and investigate, but I stand to differ with him.
 3     I have six complaints here that was made from February
 4     to this date, and they have never responded.  I have
 5     the --
 6               THE COURT:  But --
 7               MR. WRIGHT:  But, but -- but what I'm saying
 8     is --
 9               THE COURT:  Don't get ahead of me now.  Don't
10     get ahead of me now.
11               MR. WRIGHT:  I'm not --
12               THE COURT:  I'm trying --
13               MR. WRIGHT:  Well, let me ask you a
14     question --
15               THE COURT:  I'm trying to figure out what
16     your claim is.
17               MR. WRIGHT:  All right.
18               THE COURT:  I thought that, from reading your
19     complaint, that the election on Tuesday had to do with
20     the five member --
21               MR. WRIGHT:  No, it has to do with the nine,
22     and what makes it --
23               THE COURT:  Then, how is that a violation --
24               MR. WRIGHT:  And what makes it important
25     is --
```

1          **THE COURT:**  Just a minute, just a minute.

2          **MR. WRIGHT:**  Okay.

3          **THE COURT:**  You were basically saying, keep

4    the nine districts as they are, so how would that be a

5    violation if that's only going to be a vote as to the

6    nine?

7          **MR. WRIGHT:**  Because the incumbent seat in

8    district one, which is Ms. Carolyn Whitehead, who had

9    been a member of the board for 20 years, her

10   employer -- and she's an incumbent.  Her seat is being

11   ran unopposed in that particular district right now by

12   a white male, and Ms. Whitehead's position is that she

13   did not rerun --

14         **MR. NESMITH:**  Your Honor, I'm going to -- I'd

15   like to object to that.  I don't -- he can't -- I don't

16   think that Mr. Wright, as a non-attorney, can put

17   forward someone else's position in this way.

18         **THE COURT:**  Well, I was going to ask about

19   that.  I saw that in his complaints.  I'll let him

20   comment on it, and I'll ask the question --

21         **MR. WRIGHT:**  And that is the only reason I

22   included that particular one is --

23         **THE COURT:**  What's the reason?

24         **MR. WRIGHT:**  That I included the March 18th,

25   because it is under the nine, but because that seat is

1    in a predominant black population in Sumter County

2    and --

3              THE COURT:  But that doesn't mean a white

4    person couldn't run for the seat, though.

5              MR. WRIGHT:  No, but it doesn't -- but the --

6    but a white person has never won that seat in Sumter

7    County.

8              THE COURT:  Yeah, but --

9              MR. WRIGHT:  But -- but what I'm saying is

10   that when she was prevented from qualifying --

11             THE COURT:  How was she prevented from

12   qualifying, by whom?

13             MR. WRIGHT:  By her employer.

14             THE COURT:  Well, that's -- that would be her

15   complaint, if it is a complaint.

16             MR. WRIGHT:  But she brought it to me, who's

17   is president of GAP and now president of the Sumter

18   County local NAACP.  That's one of the complaints that

19   we have made with the DJJ.

20             THE COURT:  Yeah, but that would be a

21   personal violation punitively, I guess, of her right.

22             MR. WRIGHT:  Right, but that's why -- then,

23   it violated her right, true, and --

24             THE COURT:  Well, but she --

25             MR. WRIGHT:  But it also violated --

1          THE COURT:  She's not asserting that, though.

2     She's not asserting that.

3          MR. WRIGHT:  But it -- but -- say that again.

4          THE COURT:  She's not asserting such a thing.

5          MR. WRIGHT:  She's not?

6          THE COURT:  No, she's not.

7          MR. WRIGHT:  Well, she brought --

8          THE COURT:  She's not a party to a lawsuit in

9     this court saying that her right to run --

10          MR. WRIGHT:  Well, I mean, but what we are

11     saying in this is that we want that election stopped so

12     that -- and clarified, so that she can run for that

13     seat.

14          THE COURT:  But what is -- what law is

15     preventing her from running?

16          MR. WRIGHT:  Well, there is not a particular

17     law that's been prevented her running.

18          THE COURT:  No, what I'm getting at -- and

19     I'm not making -- I'm not discounting the point you're

20     trying to make, but I'm trying to get back to what the

21     legal argument is.  If -- is there any legal mechanism

22     on the part of Board of Elections of some official of

23     Sumter County that's preventing her from qualifying to

24     run for that office?

25          MR. WRIGHT:  Well, I would say the official

1    would have to be her boss in DJJ.

2            THE COURT:  But is her boss a government

3    official, someone who has a -- you know, how can I

4    enjoin her -- I mean, how is her boss --

5            MR. WRIGHT:  Well, he's a state employee, so,

6    you know, exactly how that would fall into the legal

7    realms of it, I mean, I really don't know the answer to

8    that, but, I mean, but --

9            THE COURT:  Okay.  Well, I'm going to tell

10   you -- I'll tell you, generally speaking -- and I'm not

11   giving you legal advice.  Generally speaking, if a

12   person's right is violated under the law --

13           MR. WRIGHT:  Uh-huh.

14           THE COURT:  -- then they can assert that

15   right.

16           MR. WRIGHT:  Uh-huh.

17           THE COURT:  Generally speaking, somebody else

18   can't assert a right that's personal on their behalf.

19           MR. WRIGHT:  And -- and -- and the steps have

20   been taken on that side of it to assert those rights

21   through, what you say, the EEOC and those areas, so

22   those things are already being done at the same time

23   the complaint has been made with the State Department

24   of Juvenile Justice Service.  I do know that they came

25   to do an investigation.  I don't know the outcome of it

1    yet.  But it certainly would change the makeup of the

2    Sumter County School Board district as it relates to

3    the seating of the nine members.

4              **THE COURT:**  All right.  I get your point --

5              **MR. WRIGHT:**  Because, you know, there are

6    people who have voted for her for 20 years, was the

7    pride of her, because she basically needs her job, and

8    that's what she said, that she needs her job, so she

9    wasn't going to go against her and stand to be fired.

10             **THE COURT:**  Well, I don't know the details --

11             **MR. WRIGHT:**  I'm just saying, you know, I

12   mean, but that's what the complaint says, though.

13             **THE COURT:**  But that's not a complaint of

14   hers in this court.

15             **MR. WRIGHT:**  Right.  But what --

16             **THE COURT:**  That's --

17             **MR. WRIGHT:**  But what we're saying to you is

18   that it violates Section 2 in that election because

19   it's going to change where the constituents in that

20   area will not have an opportunity to vote for the

21   candidate of their choice.

22             **THE COURT:**  I understand what you are saying

23   as a conclusion, but the Board of Elections, based on

24   what you are saying to me, has not prevented that

25   person or anybody else from qualifying to run in the

1    election.

2         **MR. WRIGHT:**  I'll agree with that.

3         **THE COURT:**  So there is no state actor, as I

4    understand it, that's done something that's a violation

5    of a right under Section 2, as I understand it, that's

6    my point.  I think you are arguing to me an effect, an

7    effect of her not running is that people who normally

8    would have voted for her would not have her to vote for

9    if --

10        **MR. WRIGHT:**  Correct.

11        **THE COURT:**  -- if things are as you say they

12   are.

13        **MR. WRIGHT:**  Yes, sir.

14        **THE COURT:**  But she has not challenged the

15   election by saying that she was deprived, improperly,

16   of the opportunity to serve, again, by, I guess,

17   re-announcing or qualifying.

18        **MR. WRIGHT:**  But she has.  She challenged it

19   through the Secretary of State office.

20        **THE COURT:**  Well, then that's a matter for

21   the Secretary of State.

22        **MR. WRIGHT:**  Okay.  All right, but -- but I'm

23   saying, but it has been challenged.

24        **THE COURT:**  Yeah.  I understand, I

25   understand.  I'm not saying she has not challenged it.

1    What I'm getting to is, in other words, there has to

2    be -- the fancy term for it is, it has to be a

3    justiciable issue.  There has to be a valid legal issue

4    in the court for this court to address, and what I'm

5    suggesting to you is I don't understand --

6          **MR. WRIGHT:**  I understand what you're saying.

7          **THE COURT:**  -- how her situation, even taken

8    for true --

9          **MR. WRIGHT:**  Okay.

10         **THE COURT:**  -- makes it a justiciable issue

11   in this court on the complaint that you made.  That's

12   my point, and I wanted to clarify those matters.  All

13   right.  Thank you, Mr. Wright.

14       Do you have anything else you wanted to say?

15         **MR. NESMITH:**  Well, the only thing I was

16   going to say is -- and I think the Court did it better

17   than I could.  But I was going to say that the relief

18   sought in the March election, if the Court granted it,

19   is contrary to what he's asking for, which is what the

20   Court -- which is the nine person.  And the problem

21   with that is that Mr. Wright has no standing to

22   challenge the drawing of the districts.

23       First off, this is relief that the Board of

24   Elections cannot give.  The Board of Elections cannot

25   redraw lines.  You know, and ultimately he is asking to

1    stop the election, but he's also wanting the -- you to,

2    first off, to take the Board of Elections, return them

3    to nine, which is contrary to your order.  So, he was

4    a -- he was an intervenor in the last case, and that

5    was all litigated, and he's coming in here and

6    attempting to relitigate that again, the order of this

7    Court, and then on top of --

8         **THE COURT:**  Did the Court decide anything on

9    Section 2 under the --

10        **MR. WRIGHT:**  No, sir, you did not.  You did

11   not on that, but you did decide that the five plus two

12   was the proper plan.  Now, whether it violates Section

13   2, that's a different thing.

14        **THE COURT:**  That's a different question.

15        **MR. WRIGHT:**  But what I'm saying is what he's

16   asking this Court to do I don't know if can be done,

17   the Board of Elections cannot redraw lines, and he's

18   also asking that the Sumter County Board of

19   Commissioners lines be redrawn to nine, which has been

20   in place for quite some time, at least since the 2010

21   census and -- I mean, the 2000 census and in the 2010

22   and it's been approved by the U.S. Department of

23   Justice before, you know, Section 5 was removed and had

24   got the full approval of the U.S. Department of

25   Justice.

1          And so, you know, I could -- I can go through all

2     through the *Gingles* tests and everything else, but what

3     I'm saying is I don't believe he has standing to move

4     here at this time for what he's asking, at least on the

5     March 18th.

6               THE COURT:  All right.  I just wanted to get

7     some clarification of what each person's position --

8     each side's position is at this time.

9               MR. NESMITH:  Okay.  All right.

10              THE COURT:  So unless you have some other

11     comments, I'm going to give Mr. Wright the opportunity

12     to --

13              MR. NESMITH:  That will be fine.

14              THE COURT:  -- present any evidence he might

15     wish to present.

16              MR. NESMITH:  Okay.

17              THE COURT:  All right.  On the issue of

18     preliminary junction.

19              MR. NESMITH:  I'm sorry --

20              THE COURT:  On the issue of whether a

21     preliminary injunction should be granted regarding the

22     March 18th of 2014's election.

23              MR. NESMITH:  All right.  Thank you.

24              THE COURT:  All right.  Mr. Wright, you may

25     present any evidence you wish to present on the issue

1      of the preliminary injunction.

2              **MR. WRIGHT:**  Your Honor --

3              **THE COURT:**  I think it's --

4              **MR. WRIGHT:**  That's fine.

5              **THE COURT:**  I don't -- just call what you can

6      without -- all right.  Just remember that I think I saw

7      some of your submissions in the record; is that right?

8              **MR. WRIGHT:**  Yes, sir.

9              **THE COURT:**  All right.

10             **MR. WRIGHT:**  Your Honor, Sumter County has

11     never had in a countywide election a black African

12     American to win in a race.  If the current --

13             **THE COURT:**  Let me slow you down for a minute

14     now.

15             **MR. WRIGHT:**  Okay.

16             **THE COURT:**  This is the evidence phase.

17             **MR. WRIGHT:**  Yes, sir.

18             **THE COURT:**  Not the argument phase.

19             **MR. WRIGHT:**  Right.

20             **THE COURT:**  So if you have a statement you

21     wish to present as evidence, I'll let you be sworn in

22     and make that statement and whatever admissible

23     documents you want to present, you can do.

24             **MR. WRIGHT:**  Right.

25             **THE COURT:**  Because I have to give

1    Mr. NeSmith the opportunity to cross examine.

2              **MR. WRIGHT:**  Okay.

3              **THE COURT:**  And if this is an argument, that

4    can't be done.

5              **MR. WRIGHT:**  Well, then I think you probably

6    need to swear me in.

7              **THE COURT:**  All right.  Then, if you would

8    come up, then, if you would get your documents and come

9    up to the chair here and be sworn, and then you may --

10   I think, Mr. NeSmith, the proper thing to do is just

11   for him just to state what information he believes he

12   has --

13             **MR. NESMITH:**  Yes, Your Honor, I agree.

14             **THE COURT:**  -- and without -- in other words,

15   you're not going to ask yourself questions.

16             **MR. WRIGHT:**  All right.

17             **COURTROOM DEPUTY:**  Do you solemnly swear or

18   affirm that the testimony you are about to give in the

19   case now before the Court will be the truth, the whole

20   truth, and nothing but the truth?

21             **MR. WRIGHT:**  Yes, ma'am.

22             **THE COURT:**  All right.  You can get your

23   documents and come back up.

24             **MR. NESMITH:**  May I ask as a preliminary

25   matter, Your Honor, all of -- we are going to confine

```
 1    all evidence and testimony only to the nine board --
 2         THE COURT:  It's on the nine board because
 3    that's the election that's at issue.
 4         MR. NESMITH:  Well, because what I believe
 5    what Reverend Wright was starting off with had to do
 6    with at-large elections, which would have nothing to do
 7    with the nine.
 8         THE COURT:  All right.  We'll see, as we get
 9    through it.  All right.  Now, Reverend Wright, before
10    you begin, because I'm going to allow you just to give
11    your information as a statement, without -- because you
12    are not being questioned by anybody, but I'll
13    probably -- I might interrupt you on occasions -- that
14    this is not the time to argue the effect of the
15    evidence, but for you to state what evidence you
16    believe supports your position for a preliminary
17    injunction.
18              MR. WRIGHT:  Right.
19              THE COURT:  All right.
20              MR. WRIGHT:  Okay.
21              THE COURT:  You may proceed.
22                   MATHIS KEARSE WRIGHT, JR.
23      Having first been duly sworn, testified as follows:
24              MR. WRIGHT:  Well, Your Honor, I believe that
25    the evidence is the election was called and that the
```

1    senate bill, the SC EX, was not a bill that was voted

2    on by the local election board, nor has Bill HB 836

3    been voted on by the election board, and they would

4    need to have voted on that --

5          THE COURT:   When you say the election board,

6    are you referring to the Board of Elections?

7          MR. WRIGHT:   I mean -- I mean, I'm sorry, the

8    Board of Education.  I'm referring to the Board of

9    Education.  Okay.  That they had not voted on either

10   those bills and adopted those bills as something that

11   they would do.  Certainly under the current nine

12   district seating, the maps show that if this proposed

13   change take place, that there would only be two African

14   Americans left seated on the Sumter County School

15   Board; that, the map shows that with the configuration

16   of the new five district plan, all the seats -- all the

17   black African Americans would be immediately

18   eliminated, except for Ms. Alice Green and Edith Ann

19   Green.

20         So, that, to us, is a violation of Section 2,

21   which where they have -- in respect, they -- that's a

22   dilution of the vote, it's a splitting of the vote, and

23   especially when -- in district one, for when it's a --

24   has 65 percent black African Americans, and in district

25   five has 72 percent African American.  So, then the

1    other three districts is 34, 38, and 47, and then also

2    you have to take into account that a large percentage

3    of those are not voting age.

4        So, immediately, if you go to the five district

5    plan, just looking at the numbers themselves, the

6    numbers themselves says that there's no way that the --

7    that the minority population would ever be able to seat

8    more than two candidates on the new configuration --

9    configurated school board.  Wherein, now, with nine

10   districts it is usually 4/4 with one swaying district,

11   and usually it basically goes between who gets out the

12   votes the best.  And certainly in any fair justice or

13   democracy, and certainly the two bills that has gone

14   through are subject to even when in the -- in the

15   complaint they are designed to dilute the black

16   population in their voting strengths.

17       So, it's -- we are here, and I'm here to the Court

18   asking for the injunction that justice do prevail, and,

19   again, from the legal perspective, the -- Sumter County

20   has also been challenged in the *Edge versus Sumter*

21   *County District* about the two at-large seats, and that

22   was an issue that was brought up and that the Court

23   ruled that Mr. Edge was correct, and --

24            **THE COURT:**  Which court ruled that, and when

25   are we talking about?

1            **MR. WRIGHT:**  This is <u>Edge versus Sumter</u>

2       <u>County District</u>, and it was civil action CIV 80-20,

3       Americus, Middle District of Georgia, and it was in

4       1982.

5            **THE COURT:**  Okay.

6            **MR. NESMITH:**  Your Honor --

7            **THE COURT:**  So I would assume then that any

8       subsequent makeup of the board either complied with

9       that ruling or whatever the law was at the time the

10      latest configuration was established.

11           **MR. WRIGHT:**  Right, the nine districts.

12           **THE COURT:**  But, no, I -- you were talking

13      about the five.  I think you said something about five

14      in the case under *Edge*.

15           **MR. WRIGHT:**  Yes, sir, that is.

16           **THE COURT:**  They --

17           **MR. WRIGHT:**  Right.  That if they went to the

18      five, which is the proposed plan --

19           **THE COURT:**  Yeah, but I was trying to

20      understand what the meaning of the *Edge* case had to do

21      with what the situation --

22           **MR. WRIGHT:**  What's going on now.  Is that it

23      was challenging -- and because in this new plan it has

24      five single districts and then it has two at-large

25      seats, and in the *Edge* case it was challenging at-large

1    seats in Sumter County.

2             THE COURT:  Okay.  But -- and what happened?

3             MR. WRIGHT:  Sir?

4             THE COURT:  What happened?

5             MR. WRIGHT:  Is that the court sided with

6    Mr. Edge, ruling in Mr. Edge's favor, that the -- that

7    the at-large seats were not acceptable in Sumter

8    County.

9             THE COURT:  Yes, but that -- the previous

10   matter was an all at-large vote, was it not?

11            MR. WRIGHT:  From my understanding of reading

12   it, and, again, I'm not a legal mind, I didn't -- I

13   didn't -- I didn't interpret it that way.

14            THE COURT:  I don't know.  I'm just asking.

15   Mr. NeSmith, just to save some time, do you know?

16            MR. NESMITH:  Well, yes, Your Honor, I --

17   it's actually an Eleventh Circuit decision.  It started

18   in the Middle District, and it was -- what it was, it

19   was challenging a one at-large seat, and everything

20   wasn't at-large, it was -- instead of single member

21   districts, and when the -- the Middle District went

22   ahead and approved a particular plan, and the only

23   thing that the Eleventh Circuit said was, you can't do

24   that without considering Section 2.  And so they

25   remanded it.  They didn't really side with anybody, the

1       Eleventh Circuit anyway, they just said that it's

2       improper for the Middle District to look at five, look

3       at four, but ignore two, and that was -- and I have

4       that case if you would like.

5               THE COURT:  We can find it, but --

6               MR. NESMITH:  All right.

7               THE COURT:  But the point is, at some time

8       subsequent there was some district seats and some at-

9       large seats; is that right?

10              MR. NESMITH:  I think they were all at-large.

11              THE COURT:  They were all at-large.

12              MR. NESMITH:  They were all at-large.

13              THE COURT:  But after that --

14              MR. NESMITH:  They became single member

15      districts.

16              THE COURT:  Single member district.  All

17      right.

18              MR. NESMITH:  That's right.

19              THE COURT:  And there are no at-large seats

20      on the commissioners now?

21              MR. NESMITH:  Not at the county commission

22      level, no.

23              THE COURT:  All right.  That was my question.

24              MR. NESMITH:  And that wasn't the -- the

25      reason -- just for clarification for the Court, the

1      reason there're at-large seats with the Board of

2      Education is because that's what the Georgia law says.

3      Georgia law says you can mimic your county commission

4      and have up to two at-large seats.  That's why

5      that's --

6               THE COURT:  All right.  I just wanted to get

7      a historical context of the issue.

8               MR. NESMITH:  Yes, sir.

9               THE COURT:  All right.  Do you have any

10     different --

11              MR. WRIGHT:  Well, yes, and he said what I

12     was about to say, as long as it been -- interfere and

13     violates Section 2, and that's what we are claiming is

14     that it violates Section 2.

15              THE COURT:  All right.  All right.

16              MR. WRIGHT:  I'm ready for cross if he has

17     some questions.

18              THE COURT:  All right.  I had one question I

19     want to ask you ahead of time so -- even if you've got

20     something to say to follow up what my question is.

21          The election set for the 18th, though, is still

22     based on a nine-district matter, so how is that a

23     violation of Section 2, because you are essentially

24     saying the nine is what it should be?

25              MR. WRIGHT:  Well, because of what you have

1    outlined for me earlier, then that nine-seat

2    configuration is something that -- and that particular

3    seat or, say, argument or complaint, is something that

4    is not before you.  So what's before you is, basically,

5    is that then I would not object to the nine to that

6    particular race, but that then the -- then the

7    objection would be for the May 20th race, that that

8    May 20th race is in violation of Section 2.

9         THE COURT:  All right.  Okay.  Have you got

10   cross examination, Mr. NeSmith?

11        MR. NESMITH:  Well, Your Honor, did I

12   understand that he withdrew his objection and --

13        THE COURT:  I think he is basically saying

14   that that -- I don't want to say he's agreeing with the

15   Court because the Court is not an advocate for either

16   side.

17        MR. NESMITH:  Yes, sir.

18        THE COURT:  But I was just pointing out

19   earlier, the issue of the person who is not qualified,

20   has not qualified, sought to qualify.  It's not an

21   issue properly before this Court --

22        MR. NESMITH:  Correct.

23        THE COURT:  -- to be addressed by way of Mr.

24   Wright's complaint, and otherwise, I don't think

25   there's any other bases suggesting that the election

1    for Tuesday, which has to do with the nine member

2    district, would be one he would be challenging.  Am I

3    misstating what your --

4              MR. WRIGHT:  No, sir.  You said it correctly.

5    In other words, May -- I mean, March 18th election is

6    under the nine district configuration.  So certainly

7    then, because that's what we want, then that is not

8    what we want you to, let's say, rule on at this point

9    because you, like I said earlier, you explained that

10   that's not before you.  So what we would want you to

11   rule on is in -- that's in your order that you made,

12   that what was before you was about the one-man-one-vote

13   principle, and certainly in this particular proceeding

14   what I am bringing before you is that the May 20th

15   election violates Section 2 of the Voting Rights Act.

16             THE COURT:  Was there a prayer for injunctive

17   relief in your petition?

18             MR. WRIGHT:  Yes, sir, for the May 20th.  I

19   think it's the last entry on the relief page.

20             THE COURT:  I read it all.  I just did not

21   remember specifically.

22             MR. NESMITH:  It asks for both.

23             THE COURT:  All right.  That's fine.  You may

24   proceed.  So I guess what we are really talking about

25   is May.

1          **MR. NESMITH:**  Okay.  All right, sir.

2          **THE COURT:**  Which is not quite as tight at

3    the 18th of March.

4          **MR. NESMITH:**  That's good.  That's right,

5    Your Honor.  All right, so just a couple of questions.

6    I think the Court pretty much said most of it.

7                        **CROSS EXAMINATION**

8    BY MR. NESMITH:

9    **Q.**   I'm just asking you about -- I'm so sorry, I'm

10   used to staying in the -- let me get back here so it's

11   well recorded.  I'm used --

12         **THE COURT:**  I have a general two-foot rule, I

13   give everybody a little, as long as you speak loud

14   enough.

15         **MR. NESMITH:**  This suits me just fine.

16         **THE COURT:**  I could never quite stand in one

17   place myself.

18         **MR. NESMITH:**  Yeah.  I'm used to pacing so.

19   BY MR. NESMITH:

20   **Q.**   All right.  Well, Mr. -- Reverent Wright, one of

21   the complaints, and I'm just talking about the five

22   plus two, the May 20th election, you said that the --

23   that this was not voted on by the Board of Education;

24   is that correct?

25   **A.**   Yes, that's what I said.

1   Q.   Okay.  And, in other words, the Board of Elections

2   -- I'm sorry, education.  That's going to be hard for

3   me to keep those apart.  The Board of Education --

4   A.   Me too.

5   Q.   The Board of Education should have voted on

6   whether or not to go to a five plus two, and they were

7   not given that opportunity, is that what you're saying?

8   A.   Yes.  I haven't seen any of the -- I looked at

9   minutes, and I went through them, and I didn't find

10  anywhere in the minutes that they had been voted on.

11          **MR. NESMITH:**  If I may approach?

12          **THE COURT:**  You may.

13  **BY MR. NESMITH:**

14  Q.   Mr. Wright, what I have is a letter from Gatewood,

15  Skipper, and Rambo, dated January 19th of 2012.  I

16  think, as you know, Mr. Jimmy Skipper was the school

17  board attorney at that time.

18  A.   Uh-huh.

19  Q.   Okay.  This is a letter that he wrote to the

20  United States Department of Justice on January 19th of

21  2012, concerning preclearance of the new five plus two

22  school board.

23  A.   Uh-huh.

24  Q.   And in here, he indicates that on November 11,

25  2010, a motion was made by Mr. Goodnan, seconded by

1    Ms. Fitzpatrick to pursue a resolution to reduce the

2    board to seven members, motion carried unanimously.

3    And then, on 12/9/2010, a motion was made by

4    Mr. Goodnan, seconded by Ms. Brinson to approve the

5    resolution to introduce local legislation providing for

6    a reduction in the number of board members, the motion

7    carry unanimously.

8    **A.**    And that was in -- what month and year that that

9    vote took place?

10   **Q.**    January 19th, 2012.

11   **A.**    That's the date of the letter, but the date when

12   the actual event took place.

13   **Q.**    November 11th, 2010, and December 9th, 2010.

14   **A.**    Thank you.  Also, you failed to mention that after

15   the seating of the new board -- that is correct -- and

16   when the board changed and the black African American

17   came on that replaced Ms. Minic in the swaying

18   district, there was another vote taken, and in that

19   vote -- and no board is governed by the previous board,

20   and that board voted to not do the 7/2.  That board

21   voted for nine.

22   **Q.**    Do you have that document with you?

23   **A.**    I may have it, or it may be still at the office,

24   but if the Court needed, I do have that document.

25   **Q.**    So you do agree, though, that there was a vote to

1    go to a five plus two?

2    **A.**   Yes, there was one, and there was also one to keep

3    nine.

4    **Q.**   Yeah.  After -- after --

5        **THE COURT:**  I'm sorry, I just need a

6    clarification.  So when was the vote for the -- when

7    was second vote for the nine?

8        **MR. NESMITH:**  I don't have -- I don't know

9    anything about it.  All I know, Your Honor, is that

10   after they withdrew their submission from the

11   Department of Justice at some point, either right

12   before or right after, there was a vote to proceed as a

13   nine person board instead of a five plus two, which had

14   already been passed by the General Assembly.

15       **THE COURT:**  That's what I'm trying to find

16   out.  Was the vote not to support a reduced board made

17   prior to it being addressed by the legislation?

18       **MR. NESMITH:**  No, sir.

19       **THE COURT:**  Do you know anything different

20   than that, Mr. Wright?

21       **MR. WRIGHT:**  Well, the only thing different

22   that I know, and that the board members could testify

23   to, is that Mr. Skipper, who was representing them at

24   that time, failed to disclose to them that there was

25   a -- there was a grandfather clause that was in there

1    that said that you didn't have to do it if you had nine

2    as of June 1st, 2010, and that if they had -- and the

3    testimony was that if they had've known that, because

4    he presented it to them as that they didn't have a

5    choice.

6            THE COURT:  Yeah, I understand that, but I'm

7    just asking whether there was a vote to withdraw the

8    resolution going to a five plus two prior to the

9    legislature actually acting on it and adopting that,

10   such a resolution.

11           MR. WRIGHT:  No, sir.

12           THE COURT:  That's what I needed.  You may

13   continue, Mr. NeSmith.

14           MR. NESMITH:  Okay.  And there is one other

15   thing here, if I just may approach again.

16           THE COURT:  You may.

17   BY MR. NESMITH:

18   Q.    Again, with Mr. Skipper's letter, if you could

19   look down here under section B?

20   A.    For some reason I'm having a problem seeing it.

21   Could you read it?

22   Q.    Sure, I'll be glad to.  Section B, which is

23   talking about the Official Code of Georgia Annotated

24   20-2-52, and this is a letter that was, of course, was

25   a carbon copy to -- the superintendent of the Sumter

1    County Board of Education at that time was Dr. Roy

2    Brooks.  And what it says:  It should also be pointed

3    out that during the time frame in 2010 that the Board

4    of Education was discussing and considering the

5    reduction in size, the Georgia General Assembly adopted

6    and the governor signed into law an amendment to

7    O.C.G.A. 20-2-52, which provides that:  It is the

8    policy of the state of Georgia the local school boards

9    have no more than seven members on the board.  While

10   this statute does contain what is essentially a

11   grandfather clause as to Georgia local school boards

12   that have wanted the seven members as of July 2010,

13   this statute does not express the State's policy

14   regarding the optimum number of school board members.

15   In other words, the letter to the superintendent

16   specifically says, grandfather clause?

17   A.    Uh-huh.  And -- but they would have to vote it in.

18   They would have to take a vote on it, right?

19   Q.    Your statement to the Court was they were unaware

20   of it because their lawyer kept it from them.  I'm

21   showing you a piece of paper that shows that's not

22   true.

23   A.    And I can produce a minute that's in that same --

24   the meeting before that where the chairman of the

25   school board told Mr. Skipper that before he submitted

1    anything else to the justice department, they needed to
2    read it before he submitted it, and that was the same
3    night that I appeared before the school board, and that
4    was when I made it clear and I challenged Mr. Skipper
5    on that very issue, that he had withheld that
6    information.  And then you also note that in the very
7    next day after he was asked to start letting them read
8    the information prior to him sending any more
9    information to the justice department, he resigned.
10           MR. NESMITH:  Your Honor, that was a
11   tremendous freight train of hearsay, which I'll object
12   to.
13           MR. WRIGHT:  That wasn't hearsay.  I was
14   present.  I'm speaking from what I was present to hear.
15   That's not hearsay.
16           THE COURT:  Well, we don't want to get into a
17   fight about --
18           MR. NESMITH:  Okay.
19           THE COURT:  -- about the niceties of hearsay.
20           MR. NESMITH:  That's right.
21           THE COURT:  Hearsay is basically attributing
22   someone else's statement who is not present here to
23   testify about it.
24           MR. NESMITH:  And be asked.
25           THE COURT:  That's what it's about.  But I

1    have a further question to get a clarification --

2            MR. NESMITH:  Sure.

3            THE COURT:  -- because some of the issues are

4    coming back to me because we spent quite a bit of time

5    on, I think it was the Byrd case was the name of the

6    plaintiff.

7            MR. NESMITH:  That's correct, Your Honor.

8            THE COURT:  Was that, when you are speaking

9    of contact with the Department of Justice, this was for

10   preclearance purposes --

11           MR. NESMITH:  That is correct.

12           THE COURT:  -- which means that the

13   legislation itself would have already been passed and

14   signed; is that correct?

15           MR. NESMITH:  That is correct.

16           THE COURT:  All right.

17           MR. NESMITH:  That is correct, but --

18           THE COURT:  What became moot with the --

19           MR. NESMITH:  And I understand there's -- I

20   don't have anything that says what may have been said

21   before the submission was done, but, nevertheless, you

22   know, the board unanimously voted to do what they did,

23   and that's really the point, before the General

24   Assembly acted.  Unless I -- can move on if the

25   Court --

1          THE COURT:  Yeah, you can move on.  I'm just

2     trying to keep the --

3          MR. NESMITH:  Timeline.

4          THE COURT:  -- matters in mind.

5          MR. NESMITH:  Got you.  Perfect.

6          MR. WRIGHT:  But, Your Honor, because Section

7     5 and 4 was in place, so because it -- because it was

8     in place, then that particular proceeding and that

9     particular law still would be subject to it, even

10    though it got removed later, would it not be?

11         THE COURT:  I don't want to make any rulings,

12    but as I remember from the Byrd case, it was under

13    consideration by the Department of Justice, and the

14    current board withdrew their request that it be

15    precleared.

16         MR. NESMITH:  That's correct.

17         THE COURT:  That's my memory.

18         MR. NESMITH:  That's correct.

19         MR. WRIGHT:  And that they --

20         THE COURT:  That -- affect then, if under the

21    law it was not preventing it from being considered.  I

22    don't know what purposes were.  But that's my memory,

23    was that -- was that was why the Court initially

24    established its decision to redraw the nine so that

25    they would be in balance because there was not a

1      precleared legislation for the five plus two.

2              MR. NESMITH:  That's correct.

3              THE COURT:  And that was the case because the

4      board had withdrawn it, but then the supreme court

5      decided it wasn't necessary.

6              MR. NESMITH:  That's right --

7              THE COURT:  That how we get to, partially

8      where the case -- what the Court's last ruling was

9      based on.

10             MR. NESMITH:  Right, that's correct.

11             MR. WRIGHT:  May I, Your Honor?

12             THE COURT:  Yes, sir.

13             MR. WRIGHT:  And then, that's why we are

14     here, because what we're asking you to rule on is

15     whether or not the proposed plan will violate Section 2.

16             THE COURT:  Yeah, I understand.  I

17     understand.  I understand your point.  All right.  But

18     today we're here with regard to, not to ultimately

19     decide those -- the merits of your assertion, but

20     whether or not there's a basis that the Court should

21     take the extraordinary act of preventing the election

22     from happening at all.  All right.  Do you have further

23     questions, Mr. NeSmith?

24             MR. NESMITH:  Yes, I do.

25     BY MR. NESMITH:

1    Q.    Okay.  Well, let me ask you something, Reverend

2    Wright.  I understand that from your complaint and what

3    you're saying is that your real interest is truly in

4    the children of the school system of Sumter County;

5    isn't that correct?

6    A.    Correct.

7    Q.    And that you believe that for these children to

8    succeed and thrive in society that they must have good,

9    solid education; is that correct?

10   A.    Correct.

11   Q.    And you would agree with me that if the

12   accreditation of the Sumter County School System was

13   removed, that would be a devastating event to the

14   children of Sumter County, correct?

15   A.    No.

16   Q.    So losing accreditation of your high school and

17   not being able to enter to college would not be

18   devastating?

19   A.    Not from SACS, because I have complained to SACS

20   in 2008, and the documents over there will support it,

21   about the exact same complaints that they were -- acted

22   on now, and they said that the then majority white

23   school board was not subject to them intervening and

24   interposing any rule that they had voted on.  But now,

25   those same SACS people, that in a majority of

1    80 percent black students, say they care more about

2    them than I do.  And I say that that's a lie because

3    the documents that I have that when we made those same

4    complaints that are being made now to SACS, SACS

5    ignored us.  They even ignored us to the point where

6    there was a school teacher had abused black students

7    that got a true bill, and they still didn't come help.

8    They ignored us when we proved that the justice

9    department came in and did an investigation and found

10    that they were changing black students grades with the

11    then majority white board.  And then you're going to

12    tell me that they care about those students more than I

13    do?  How is it that they can come now when a -- when

14    they are white people complaining.  When we were

15    complaining, it fell on deaf ears.  The evidence is

16    there on the desk, all the way back to 2008.  The

17    justice department came in and did an investigation and

18    found that for eight years, eight years they were

19    changing black students grades to assure that they

20    always had a white valedictorian.  That was given to

21    SACS.  That was taken to the then majority school

22    board.  That was the Robert E. Seaberg scholarship that

23    they would never let black students qualify for.  That

24    was given to SACS.  SACS never came.  It was given to

25    Mike Cheokas.  Mike Cheokas never came.  It was given

1    to then Senator George Hooks.  He never came.  Sanford

2    Bishop, John Lewis, and the list go on.  The only

3    somebody came was the justice department, and then the

4    school system, under the white majority board, entered

5    into a voluntary agreement to fix it.  But the people

6    that were doing it they -- they never came in under any

7    type of accreditation violation.  But now, because you

8    say stakeholders can't talk at meetings, the Sunshine

9    Act, can't do -- those same complaints were made.  So

10   that's why I said, no, not SACS, because they have

11   proved by the facts that they don't have our best

12   interest at heart.  They don't have the black

13   children -- but the school system is a good system.  I

14   don't have nothing because I graduated, my kids went

15   through, I have a son that went to West Point,

16   graduated.

17            **THE COURT:**  Mr. Wright, now.

18            **MR. WRIGHT:**  But what I'm saying is --

19            **THE COURT:**  Just a minute now.  You made a

20   long talk about your points, but the issue, as I

21   understood the question, was whether or not the lack of

22   accreditation would have, I guess, a negative impact on

23   students in the system, whatever you may think about

24   SACS, whether the loss of accreditation would have any

25   negative impact on the students.

1          MR. WRIGHT:  It would.

2          THE COURT:  That's the question as I

3     understood it.

4          MR. WRIGHT:  It would, but I had to get that

5     out.

6          THE COURT:  I let you get it out, but I had

7     to stop you.

8          MR. NESMITH:  And I did too.

9          THE COURT:  All right.  Okay.

10          MR. NESMITH:  All right, Your Honor, thank

11     you.

12     BY MR. NESMITH:

13     Q.   Well, Mr. Wright, on December the 3rd -- if I may

14     approach again?

15          THE COURT:  Yes, sir.

16     BY MR. NESMITH:

17     Q.   -- on 2013, the superintendent of the Sumter

18     County School System receive a letter from Ms. Annette

19     Bohling, the chief accreditation officer for SACS, who

20     said that if the school board does not have an election

21     on the five plus two as ordered by the federal court,

22     that there's a great danger of losing accreditation,

23     correct?

24     A.   But it's my understanding that federal court --

25     Q.   If I could get you just to answer first and then

1    explain.

2           **THE COURT:**  Yeah, that would be the proper

3    way to do, Mr. Wright, if you can answer the question

4    as he asked you and then if you need to explain.

5    **BY THE WITNESS:**

6    **A.**   Well, I haven't seen this document, but I'll take

7    you at your word that's what it says.  And so if that's

8    what it says, then so be it, but then I would also say

9    that SACS do not have any jurisdiction to dictate to

10   any board about what they are supposed to do and how

11   they are supposed to do it.  I think SACS is outside of

12   their scope of what they're supposed to do.  They're

13   not supposed to dictate about how we or how the board

14   redistrict themselves.  It's supposed to be about the

15   quality of the education that the students are

16   receiving, and certainly with this document and they

17   are saying that, well, from what I understand that the

18   school board also got accreditation from another system

19   that said that they were good, that wasn't SACS.

20          **THE COURT:**  All right.  Do you have another

21   question?

22          **MR. NESMITH:**  Let me see.

23   **BY MR. NESMITH:**

24   **Q.**   Yeah, there is one last thing.  One of the things

25   that you did mention is you said that in the *Edge*

1    decision that -- and I'm just talking about voting, and

2    I do understand the differences in state, federal, and

3    local election.  So if I can just get you to answer my

4    question, you would agree that Congressman Sanford

5    Bishop has run for election and Sumter County is in his

6    congressional district, correct?

7    **A.**    Yes.

8    **Q.**    And you would agree that he has quite handedly won

9    election in Sumter County every single time he's run

10   but twice, correct?

11   **A.**    I don't know that, and I haven't kept up with it

12   like that.  I know he's won, but what counties he won,

13   I don't know.

14   **Q.**    Okay.  Would it surprise you to know that he has

15   won very handedly in Sumter County every single time

16   except for twice, the first time he ran and one other

17   time?

18   **A.**    Knowing Sanford, no, it don't surprise me.

19   **Q.**    Okay.  And are you -- you would agreed that Mike

20   Cheokas, who is a white candidate, ran last time and

21   was opposed by a African American candidate from Marion

22   County, are you aware of that?

23   **A.**    Yes.

24   **Q.**    And are you aware that at-large Mr. Cheokas lost

25   in Sumter County to the African American challenger?

1  **A.**   That's correct.

2  **Q.**   Okay.  And --

3  **A.**   May I --

4  **Q.**   No, just until I get through with my questions,

5  and if --

6  **A.**   Okay.

7  **Q.**   -- you can explain all you like, if that's pleases

8  the Court.

9       **THE COURT:**  That's my point.

10 **BY MR. NESMITH:**

11 **Q.**   Okay.  And then the last one is that in the

12 president election you would agree that President

13 Obama, who was challenged by a white challenger,

14 carried Sumter County very handedly?

15 **A.**   Correct.

16 **Q.**   Which means, if you look at the statistics, that

17 white people had to vote for Mr. Bishop, had to vote

18 for President Obama, and had to vote against Mike

19 Cheokas, correct?

20 **A.**   Probably so.

21 **Q.**   Okay.  That's the questions that I have.

22       **THE COURT:**  All right.  Now, Mr. Wright, we

23 can do this, based on any question that he asked you,

24 you need to respond to, you do that now.

25       **MR. WRIGHT:**  Okay.

1          **THE COURT:**  I know you've made some responses

2     already, you don't have to repeat them.

3          **MR. WRIGHT:**  All right.

4          **THE COURT:**  But if there's something you have

5     to say in response to those questions that you have not

6     already had the opportunity to say.  I'm not suggesting

7     that you do, I'm just want to make sure that you have

8     that opportunity if you wish to respond.

9          **MR. WRIGHT:**  No, I don't need to respond.

10         **THE COURT:**  All right.  Then you may step

11    down.

12         **MR. NESMITH:**  I could stay right here --

13         **THE COURT:**  We'll find out from Mr. Wright if

14    he has any evidence he wishes to present.

15         **MR. NESMITH:**  That's right.

16         **THE COURT:**  All right.  Mr. Wright, you've

17    given your testimony, is there any other witness or

18    evidence that you wish to present in support of your

19    motion -- of your motion?

20         **MR. WRIGHT:**  One minute, sir.  At this time,

21    Your Honor, there is nothing else that I want to enter

22    at this time, and I guess at this point I could proceed

23    with calling witnesses if I need to?

24         **THE COURT:**  Yeah, that's -- when I say

25    evidence that's what I --

1    **MR. WRIGHT:**  Okay.  At this time, if it

2    pleases the Court, I'd like to call Ms. Edith Green.

3         **THE COURT:**  Edith Green.

4         **MR. WRIGHT:**  Edith Ann Green.

5         **THE COURT:**  All right.  You need to let her

6    know.  She should be out there.

7         Ms. Green, if you would come forward and -- where

8    the officer is standing and be sworn please.

9         **COURTROOM DEPUTY:**  Do you solemnly swear or

10   affirm that the testimony you are about to give in the

11   case now before the Court will be the truth, the whole

12   truth, and nothing but the truth?

13        **THE WITNESS:**  Yes, I do.

14        **THE COURT:**  All right.  You may proceed, Mr.

15   Wright.

16                    **DIRECT EXAMINATION**

17   BY MR. WRIGHT:

18   Q.   Ms. Green, are you a member of the Sumter County

19   Board of Education?

20        **THE COURT:**  If you would, just for our

21   record, would you have her state her full name for the

22   record?

23        **MR. WRIGHT:**  All right, sir.

24   BY MR. WRIGHT:

25   Q.   Will you state your full name for the record?

1     **A.**   Edith Ann Green.

2            **THE COURT:**  All right.  You may go ahead with

3     your questions.

4     **BY MR. WRIGHT:**

5     **Q.**   And are you a member of the Sumter County school

6     board?

7     **A.**   Yes, I am.

8     **Q.**   And are you the chairperson of the Sumter County

9     School?

10    **A.**   Yes, I am.

11    **Q.**   How long have been the chairperson of Sumter

12    County School Board?

13    **A.**   This is my fourth year.

14    **Q.**   So you became chairperson when?

15    **A.**   2011.

16    **Q.**   '11.  At that particular time -- and I want to

17    take you back to a time in December of 2011, if you can

18    remember, where a vote was presented to you all or came

19    on the floor that -- about the 5/2 redistricting plan.

20    Do you remember that?

21    **A.**   2011?

22    **Q.**   Or -- was it 2011 when the -- well, when did you

23    all first become aware of the 5/2 plan?

24    **A.**   I first became aware of it probably -- and let me

25    get it straight.  The 5/2 plan, that was the -- the one

1    that written.  Is that what your asking?

2    Q.    Yes.  I'm asking when did you become aware of the

3    5/2 plan, the new proposal of the redistricting?

4    A.    The new proposal?

5    Q.    Yes, ma'am.

6    A.    There have been two, now.  So I'm a little

7    confused.

8    Q.    All right.  When --

9    A.    The first, the initial one, that one came around

10   in April after it was signed into law.

11   Q.    In April of what year?

12   A.    Probably 2011.

13   Q.    All right.  And who made you aware of that plan?

14   A.    Hmm, the governor's assistant contacted us,

15   contacted me, and ask if I was in agreement with it --

16   if that's the one you're talking about now.

17   Q.    Okay.  Well, I just want to know about when you

18   became aware of the 5/2 plan and who made you aware of

19   it?

20   A.    The governor's assistant.

21   Q.    All right.  After that, was there a conversation

22   ever with the school board's attorney about the 5/2

23   plan?

24   A.    We did have a conversation, not about the plan, as

25   such, but there were some other things that took

1    place -- I'm confused.

2    Q.   Well, tell us then, the Court, what are those

3    little things that took place?

4    A.   Well, after that 5/2 plan had been become law, I

5    guess -- we didn't know about it initially.  The school

6    board did not know about it.  After it became law, I

7    and another school board member went to the attorney

8    and asked questions about it, and we found out some

9    things about it.  But prior to that, we did not know

10   about the plan.

11   Q.   Now, let's back up a little.  When was that

12   meeting with the attorney?

13   A.   I met with the attorney in April.

14   Q.   Of what year?

15   A.   I believe 2011, because I was the chairman, and I

16   met with him again, maybe in July of the same year.

17   Q.   Okay.

18   A.   But prior to then, we had not met with the

19   attorney or discussed that plan.

20   Q.   Okay.  And in December do you recall a vote being

21   taken to adopt the 5/2 plan?

22   A.   Not to adopt the 5/2 plan.  We voted to work out

23   the details.

24   Q.   Say that again?

25   A.   We voted to work out the details for a plan, if it

1    was 5/2 or whatever, but we never adopted the 5/2 plan,

2    I recall.

3    Q.    Okay.  After that particular vote in December of

4    2011, did the board change its look or face, did

5    someone replace anyone?

6    A.    Now, in 2011, January of 2011, we did have a new

7    board member to come on.

8    Q.    And who was that?

9    A.    Kelvin Pless.

10   Q.    So he came on in 2011?

11   A.    In '11, and we also had another new board member,

12   Mr. Lopez, I believe.  I think Mr. Lopez, and this was

13   after the election.  There were two board members.

14   Q.    Well, you said that you and another board member

15   went to see Attorney Skipper?

16   A.    We did.

17   Q.    And what was that meeting about?

18   A.    It was about the 5/2 plan that had been passed by

19   the governor.

20   Q.    And what was discussed in that meeting?

21   A.    We discussed how we would go from nine board

22   members to seven, what would take place, how it would

23   happen, because we were not familiar.

24   Q.    Say that again?

25   A.    We were not familiar --

1    Q.   Okay.

2    A.   -- with what was to take place.  We had not seen

3    the legislation that went up.

4    Q.   So, when -- let me get something clear.  The vote

5    that you all took in December that year, before Pless

6    came aboard, were you aware of the plan then?

7    A.   No.  No.

8         THE COURT:  All right, now, I understand that

9    Pless or somebody came on in January of 2011.

10        MR. WRIGHT:  Right.

11        THE WITNESS:  '11, uh-huh.

12        MR. WRIGHT:  Right, but the vote was

13   December 2010, before Pless came.

14        THE COURT:  I don't know about 2010.  She

15   mentioned December of 2011.

16        MR. WRIGHT:  I might have -- an error, it was

17   '10; it's not '11.

18        THE COURT:  All right.  Well, you need to ask

19   the witness that.

20        MR. WRIGHT:  Okay.  I'm sorry.  But I'm just

21   going by what I have in the notes.  I misquoted the

22   year.

23   BY MR. WRIGHT:

24   Q.   So let's back up.  Was there a vote taken in

25   December 2010, when you all first voted on it when --

1    before Mr. Pless came aboard?

2    **A.**    I'm not sure about the date before he came.

3    **Q.**    Okay.

4    **A.**    I can't be sure about the date.  But what we were

5    voting for was to take a look at the plan, at any plan,

6    in fact.  We never voted on the legislation itself.

7    **Q.**    Okay.  And at some point did the board submit a

8    plan to the justice department?

9    **A.**    We did.

10    **Q.**    And the plan that was submitted, were you involved

11    in the -- putting that plan together?

12    **A.**    Well, wait a minute.  What we submitted the

13    justice department was withdrawing the submission.

14    **Q.**    I know that, but I'm trying to find out about the

15    plan itself now.

16    **A.**    The plan itself?

17    **Q.**    Right.  Now, the plan that went to the justice

18    department, you being chairman of the board, were you a

19    part of the process of what was submitted and prepared

20    to be submitted?

21    **A.**    No.

22    **Q.**    And when did you find out about what had been

23    submitted?

24    **A.**    We --

25              **MR. NESMITH:**  Your Honor, can I interrupt for

1    just one second quickly?

2         THE COURT:  Yes.

3         MR. NESMITH:  In light of this testimony

4    there is somebody in this room that I am going to need

5    to testify that I had no idea, and we have invoked the

6    rule, and so I would have to at this point ask with the

7    Court's indulgence to have this person step out to be

8    able to testify, which is going to be a direct rebuttal

9    to what's being said.

10        THE COURT:  Okay.  Who is that witness?

11        MR. NESMITH:  That would be Ms. Crinson.

12        THE COURT:  All right.  If Ms. Crinson will

13   step out of the courtroom.

14        MR. NESMITH:  Thank you, Your Honor.

15        THE COURT:  All right.  You may continue.

16   And do not discuss anything that you've heard with

17   anybody else.

18        THE WITNESS:  Yes, sir.

19   BY MR. WRIGHT:

20   Q.   At what point did you learn about the plan that

21   had been submitted?

22   A.   To the justice department?

23   Q.   Yes, ma'am.

24   A.   It was between April and July, I believe, on that,

25   2010.

1    Q.   And what made the board decide to withdraw the

2    plan?

3    A.   After we looked at the plan and tried to make some

4    sense of it because we didn't understand it, we

5    realized that we were in violation of some part of the

6    Voting Rights Act.

7    Q.   And --

8    A.   When we knew -- well, we were in violation of

9    Section 2 of the Voting Rights Act.

10   Q.   And at any time after that plan was withdrawn, or

11   before it was withdrawn, did the board vote to have

12   nine districts?

13   A.   Yes, after the plan was -- yes.

14   Q.   And do you recall when that might have been?

15   A.   I cannot give you dates.  I don't have those in

16   front of me.

17   Q.   After the plan was withdrawn, did you --

18          THE COURT:  Well, the plan wasn't withdrawn,

19   was it?  It was the preclearance that --

20          THE WITNESS:  Right.

21          THE COURT:  -- the preclearance request that

22   was withdrawn.

23          MR. WRIGHT:  Yes, sir.  The preclearance

24   request.

25          THE COURT:  The Board of Education wouldn't

1    have the authority to withdraw a state passed law,

2    would they, not just by them voting?

3         MR. WRIGHT:  Well, I guess that's why it was

4    kind of hard for me to say based on a letter that I

5    received from the governor in 2009, in that particular

6    letter -- which was then Governor Sony Purdue -- in

7    that particular letter, that's what he indicated to me

8    what I approached him about some of the issues we were

9    having, he sent me back to the board and said that they

10   had the authority to make local legislation.

11        THE COURT:  Yeah, they can propose, as I

12   understand the rule, that there are certain things even

13   though it's local, since it's an arm of the state, the

14   state has to pass a law, but it arises from the local

15   suggestion that this is a change that you want to make,

16   and then it goes up and can be adopted or not by the

17   state.  But once the state law is passed, the simple

18   vote of a local board can't change that law, as I

19   understand it, would not be able to change the -- in

20   other words, if 5/2 passed the state, the Board of

21   Education couldn't simply say, now we want it to be

22   nine in derogation of the law as passed by the state.

23   It doesn't say they can't challenge it, but I'm just

24   saying, a simple vote by the board would not change it

25   back to a nine-member board as I understand it.

1          **MR. WRIGHT:**  No, sir, I can --

2          **THE COURT:**  Is that your --

3          **MR. WRIGHT:**  I can -- I can understand that.

4          **THE COURT:**  Okay.  Let us do this.  It's

5    already 12:30, and we need to go ahead and break for

6    lunch, and we'll return at 2 o'clock to continue the

7    evidence.  All right.  We're in recess.

8    *(RECONVENED; ALL PARTIES PRESENT, at 2:25 p.m.)*

9          **THE COURT:**  All right.  Mr. Wright, you may

10   continue.  You may continue with your questions.

11         **MR. WRIGHT:**  Thank you, Your Honor.

12   **BY MR. WRIGHT:**

13   **Q.**   Ms. Green, at -- when the plan that was submitted

14   to the justice department, was that plan approved?

15   **A.**   No.  Your Honor, may I?

16         **THE COURT:**  If you need to explain your

17   answer, you may do so.

18         **MR. WRIGHT:**  Yes.

19         **THE COURT:**  But otherwise, I let the lawyers

20   ask the questions.

21         **THE WITNESS:**  Okay.

22   **BY MR. WRIGHT:**

23   **Q.**   If you need to explain it, yes.

24   **A.**   No.  It was never approved by the Board of

25   Education.

1    Q.   But I want to know was it ever -- was it ever

2    approved by the justice department?

3    A.   Oh, I'm sorry.  No.  It was not.

4    Q.   All right.

5    A.   The submission was withdrawn, and we withdrew the

6    submission because we realized we violated Section 2 of

7    the Voting Rights Act.  When we studied it, we saw that

8    we were in violation of Section 2.  Also, we found out

9    that the justice department had been asking for

10   additional information, and that information was being

11   sent without our knowledge or our consent as well.  And

12   so, we knew -- and some of the information was

13   erroneous, and we felt like -- and we withdrew our

14   submission.  But the board never, never voted on

15   either -- on the two local legislations that were

16   introduced, and the records will show that.

17   Q.   So the justice department wrote back that there

18   were some problems with what had been submitted?

19   A.   Yes.  They did.  Twice -- three times we know

20   about, and we asked our attorney to not send any more

21   information that we were not made aware of.

22   Q.   And when you asked the attorney not to submit

23   information without making the board aware, what

24   happened?

25   A.   He resigned.

1  **Q.**  Do you recall what were the issues that the

2  justice department had with the submission?

3  **A.**  I believe the issues were the percentage of

4  voting -- voting age people -- I'm not sure, but I

5  think maybe percentage of voting age and diluting the

6  black vote, and whether or not even blacks had ever won

7  a countywide or a citywide election in Sumter County or

8  local election, local, county-city.

9  **Q.**  All right.

10  **MR. WRIGHT:**  Your Honor, I have no further

11  questions of at this time for this witness.

12  **THE COURT:**  Cross examination, Mr. --

13  **MR. WRIGHT:**  But I do have to ask you one

14  other thing.  I didn't know that she was here until we

15  took lunch.  There is another person that's in the

16  courtroom.  I don't know how long she's been here.  But

17  I hadn't made contact with her, but I would like to

18  have her sequestered if it's not too late.

19  **THE COURT:**  Was she subpoenaed?

20  **MR. WRIGHT:**  Ma'am -- sir?

21  **THE COURT:**  Was she subpoenaed?

22  **MR. WRIGHT:**  No, sir.

23  **THE COURT:**  Well, we've got limited time.

24  **MR. WRIGHT:**  Okay.

25  **THE COURT:**  Just as a precaution, I don't

1    want to pre-decide anything, but I understand there

2    were five or six people who had been subpoenaed and

3    we've got limited time for me to hear the issues.

4          **MR. WRIGHT:**  All right sir.

5          **THE COURT:**  Which -- identify who the person

6    is?

7          **MR. WRIGHT:**  She's a current board member of

8    the -- and it's Willa Fitzpatrick.

9          **THE COURT:**  All right.  Ms. Fitzpatrick, if

10   you will wait outside just in case you might be called.

11   All right.  Mr. NeSmith?

12                    **CROSS EXAMINATION**

13   **BY MR. NESMITH:**

14   **Q.**   Ms. Green, my name is Bill NeSmith, and I'm

15   representing the Sumter County Board of Elections who

16   have been sued in the lawsuit, and I have a few

17   questions for you.  I want to make sure I'm clear on

18   this, when were you first elected to the Board of

19   Education?

20   **A.**   1994 was the first time I was elected to the

21   Americus city board, and in '95 to the Sumter County

22   board.  But prior to that, I served on the Americus

23   city board as an appointed board member.

24   **Q.**   So in 2010, you were on the Board of Education?

25   **A.**   I was.

1   Q.   Okay.  All right.  And you said that the plan,

2   which was to reduce -- there's two out there, and I

3   want to make sure we're clear about that.  There were

4   two bills, one that reduced the size of the school

5   board from nine members to seven, which would be with

6   two at-large, and then there was another, which was the

7   actual districting plan.  One was plan 154, and the

8   other was 4EX, both of these are senate bills.  Are you

9   familiar with that?

10  A.   I'm familiar with two plans.

11  Q.   Okay.  And -- well, one is to reduce the size of

12  the school board?

13  A.   Uh-huh.

14  Q.   Okay.  And you're saying that you never voted or

15  your board never voted to approve that?

16  A.   I'm saying we never voted to approve it.

17  Q.   Okay.

18  A.   In fact, we didn't know that it existed until

19  after it had been signed into law by the governor.

20  Q.   Okay.  So what you're saying is that the school

21  board attorney, Jimmy Skipper, went out on his own and

22  got the General Assembly to past legislation on his own

23  without the permission of the school board?

24  A.   I don't know if Jimmy Skipper did it, or somebody

25  else did it, but the school board never voted on that

1    legislation.

2    Q.   Okay.

3    A.   And the records will show that.  We never voted on

4    the legislation.

5    Q.   All right.

6    A.   We voted to look into reducing the size of the

7    school board.  We never had Mr. Skipper come to us and

8    say anything to us about it, even though we asked.  I

9    was not the chairman at that time, but when I became

10   chairman and when I found out that this bill had been

11   passed, I went to Mr. Skipper and that was the first

12   time that I knew about anything of that bill.

13   Q.   Okay.  So he or somebody just went out and did it

14   on their own?

15   A.   Yes.

16   Q.   Okay.  And then you were told, or you said you

17   became aware, that the plan was in violation of the

18   Voting Rights Act?

19   A.   When we read the plan, we realized it was.

20   Q.   Okay.  And who realize -- how did you realize

21   that?

22   A.   By reading the at-large votes.  At-large votes,

23   and we looked at the Voting Rights Act, I did.

24   Q.   What does the Voting Rights Act say then?

25   A.   About Section 2, in a nutshell, that at-large

1    districts in our area are in violation.

2    Q.    Okay.  So the --

3    A.    Because that was done in the 60s, '65 when black

4    people were -- didn't have and still don't have the

5    resources or the influence to carry at-large districts.

6    We still don't.

7    Q.    You mean --

8    A.    And a lot of things indicate that's what happened

9    here.

10   Q.    Don't have enough voters, is that what you're

11   saying?

12   A.    And don't have the influence or the money or the

13   resources.

14   Q.    So what you're saying is, is if there's -- there's

15   not sufficient enough African American voters to be

16   able to elect someone at-large, and that as such then

17   only white people are going to get elected?

18   A.    And that's from the history of our local

19   community, sir.

20   Q.    Yeah, but --

21   A.    That's the history of my local community, and I

22   believe that to be so.  The federal government thought

23   it so all those years ago, and it's still in existence.

24   Q.    You got anything from the federal government that

25   shows that?

1    **A.**    No, I don't have anything in my hand to show that,
2    but that is the law.
3    **Q.**    Okay.  Would it surprise you to know that in July
4    of 2013, which is closer in time to when we were doing
5    all of this, that there were 7,807 active, not
6    inactive, but active African American voters in Sumter
7    County.  Would that be surprising?
8    **A.**    Yes.
9    **Q.**    Okay.  What would you think, it would be more or
10   less?
11   **A.**    Less.  And how many white votes were there?
12   **Q.**    7,726.
13   **A.**    7,726 black active voters, but what I --
14   **Q.**    No, ma'am.  I said black active voters are 7,807.
15   **A.**    Okay.
16   **Q.**    White active voters are 7,726.
17   **A.**    Okay.
18   **Q.**    Does that surprise you?
19   **A.**    Yes, it does.
20   **Q.**    And it can vary.  It can go up and down as people
21   move in and out, in and out in the things that they do.
22   Some people become inactive, so it's a moving target,
23   does that make sense?
24   **A.**    Yes, it does.
25   **Q.**    Okay.

**A.**   But still those numbers -- the history in Sumter
County, local precedent on the black lanes has one
election at-large in Sumter County.

**Q.**   How many times has that happened?  How many
at-large elections have happened in Sumter County where
African Americans were not voted in?

**A.**   Well, I can tell you Mary Kay Finch Bell ran for
justice of the peace some time ago.

**Q.**   When was that?  Because we hadn't had a justice of
peace in --

**A.**   I know she ran, and she was defeated.

**Q.**   Okay.

**A.**   William Halston ran for sheriff, was defeated.

        **MR. WRIGHT:**  Answer the question.

**BY THE WITNESS:**

**A.**   Nelson Brown ran, was defeated.  All of those are
blacks who have run local races in Sumter County and
were defeated.  So our history has shows --

**BY MR. NESMITH:**

**Q.**   How many is that -- I'm sorry, because in the
middle of that Mr. -- Reverend Wright --

**A.**   I gave him three names.

**Q.**   Three names.  Okay.

**A.**   Of people I know.

**Q.**   Somebody that was a justice of peace, so that

1    would have been back in maybe the 60s?

2    A.    Uh-huh, maybe.

3    Q.    Okay.  And then we had Mr. Brown and who else?

4    A.    William Halston.

5    Q.    Okay.  So three people have run and were defeated?

6    A.    And they all were all defeated and they all were

7    African Americans.

8    Q.    Okay.  Now, one thing that you said is that --

9    that the -- when you started looking at Section 2, you

10   were saying that there were some problems with the U.S.

11   Department of Justice, they were saying there were

12   issues with it, that they had a lot of problems with

13   those districts, those five districts, plus the

14   at-large districts, isn't that correct?  Isn't that

15   what you said?

16   A.    I said at-large, in particular.

17   Q.    Yeah, but they -- they had problems with all of

18   it?

19   A.    Okay.

20   Q.    Isn't that what you said?

21   A.    I said at-large in particular.

22   Q.    I understand that part.  So are you saying the

23   justice department had no problem with the five

24   districts?

25   A.    I said they had problems with at-large in

1    particular for the Board of Education.

2    **Q.**    I understand that.  And here's my question.

3    **A.**    Okay.

4    **Q.**    What I want to know is, did the U.S. Department of

5    Justice have no problems at all with the five

6    districts, not the at-large, just the five-one-person,

7    you know, one-member district?

8    **A.**    I know that they kept writing for information.

9    I'm not on that --

10   **Q.**    So you don't know if they had a problem or not?

11   **A.**    I think they did.  Yes, they did have a problem

12   with that.

13   **Q.**    Okay.  And those were identical to the Sumter

14   County Board of Commissioner districts, are they not?

15   **A.**    Yes, they are.

16   **Q.**    And those were approved by the U.S. Department of

17   Justice, correct?

18   **A.**    That's fine.

19   **Q.**    Okay.  So let me ask you this, do you think that

20   it would be in the public interest if the Sumter County

21   board of schools lost their SACS accreditation?

22   **A.**    Do I think it would be what now?

23   **Q.**    Well, do you think it would be in the best public

24   interest for Sumter County schools to lose their SACS

25   accreditation?

1    **A.**    I think Sumter County Board of Education would

2    like to keep their SACS accreditation, but I also know

3    that we have a dual accreditation.  But this is a

4    community problem that we're facing here.

5    **Q.**    Well, that's -- I understand what your opinion is,

6    but, now, here is my question, again.  I just want to

7    be sure.  Do you think it's in the best interest of the

8    public for the Sumter County schools to lose their

9    accreditation with SACS?

10   **A.**    No, I don't think it's in the best interest of the

11   public, but, also, I think it's not in the best

12   interest of the public for us to hold an illegal

13   election just to hold accreditation with SACS.

14   **Q.**    Okay.

15   **A.**    We have to obey -- we have to have a legal

16   election, and when we put things out in our community

17   that are not, and it's going to affect our community

18   for years, our students have been -- for years.

19   **Q.**    The election --

20   **A.**    So I think it's in the best interest to get it

21   right now.

22   **Q.**    Of the election that's being held, there was an

23   order from this court that said that that was the law

24   of state of Georgia, therefore -- you'd agree that's

25   legal election, wouldn't you not, if the Court said so?

**A.**   I don't understand your question, Mr. NeSmith.

**Q.**   Well, the Court had an order that said that the five plus two was the law of the land and that it was retroactive back to September of 2011, which means it's the law.  If it's the law, then it's not illegal, is it?

**A.**   Well, I think it's because it wasn't challenged in this particular matter.

**Q.**   You mean it wasn't challenged as it is now under Section 2?

**A.**   Right.

**Q.**   Okay.  But your saying it's illegal, that's just your opinion, is it not?

**A.**   Well, Mr. NeSmith, when local legislation is written that the school board knew nothing about that concerns the school board, I don't think that's what we should be adhering to.  And local legislation was written with an effective date after it becomes a law, but it was implemented before it became a law.

**Q.**   What was implemented before it became to be a law? I don't know what you're saying.

**A.**   The local legislation that was presented recently that the Board of Education did not know about.

**Q.**   The -- okay.  You're talking about the local legislation that was introduced by Representative

1    Cheokas?

2    **A.**    Right.

3    **Q.**    Okay.  And the local delegation can do that and

4    can provide legislation to the General Assembly just

5    as -- there are a lot of laws that are passed in the

6    state, you would agree, that we all don't have

7    knowledge of until after they're passed?

8    **A.**    I'll agree with that, but when it's local

9    legislation concerning the Board of Education, we

10    should at least have been made aware of it.

11    **Q.**    Well --

12    **A.**    And not only that part about the election, there

13    were some other things in that local legislation that

14    affected only the Board of Education that we had no

15    knowledge of.

16    **Q.**    Okay.

17    **A.**    We didn't have any knowledge of the first -- we

18    didn't have knowledge on the first legislation that was

19    presented, so we could not oppose two at-large seats or

20    any of it.

21    **Q.**    Do you know Doug Goodnan *(phonetic)* is?

22    **A.**    I do know who Doug Goodnan is.

23    **Q.**    Was he serving on the Board of Education in say,

24    2010?

25    **A.**    Yes.

1          MR. NESMITH:  That's all I have.

2          THE COURT:  All right.  Any redirect

3     examination?

4          MR. WRIGHT:  No, sir.

5          THE COURT:  All right.  You may step down.

6          THE WITNESS:  Thank you.

7          THE COURT:  Is there any reason this the

8     witness cannot be excused?

9          MR. NESMITH:  Not on my part, Your Honor.

10         THE COURT:  All right, then you may remain in

11    court if you wish or leave if you wish.  All right.

12    You may call your next witness.

13         MR. WRIGHT:  I'd like to have Ms. Willa

14    Fitzpatrick.

15         THE COURT:  And who is Ms. Fitzpatrick?

16         MR. WRIGHT:  That was the one that just left.

17         THE COURT:  Any objection, Mr. NeSmith?

18         MR. NESMITH:  No, Your Honor, I don't object.

19    That'll be fine.

20         THE COURT:  All right.  The Court's point

21    earlier was since the witness had not been identified

22    or subpoenaed, the Court had no ability to cause the

23    witness not to be present in violation of the rule.

24    That's what that was about.

25         MR. NESMITH:  Yes, Your Honor.  I don't -- I

1    mean, I'm just trying to make things move along as

2    quickly as possible.

3         **THE COURT:**  I don't have a problem with the

4    witness's testimony.  I'm just saying that's a -- by

5    deciding after the fact --

6         **MR. NESMITH:**  Right.

7         **THE COURT:**  -- to call the witness, in

8    effect, avoids the rule.  So I don't know long the

9    witness had been in court, but otherwise, since there

10   is no objection, there is no problem.  I just wanted to

11   explain what the Court's concern was.

12        **MR. NESMITH:**  Yes, Your Honor.

13        **THE COURT:**  All right.

14        **COURTROOM DEPUTY:**  Do you solemnly swear or

15   affirm that the testimony you are about to give in the

16   case now before the Court will be the truth, the whole

17   truth, and nothing but the truth?

18        **THE WITNESS:**  Yes.

19        **THE COURT:**  All right.  You may proceed.

20                   **WILLA FITZPATRICK**

21    **Witness, having first been duly sworn, testified on**

22                   **DIRECT EXAMINATION**

23   BY MR. WRIGHT:

24   Q.   Would you please state your name for the record,

25   please?

1    **A.**   My name is Willa Fitzpatrick.

2    **Q.**   Ms. Fitzpatrick, are you a member of the Sumter

3    County School Board?

4    **A.**   Yes, sir.  I have been for seven years now.

5    **Q.**   How many years?

6    **A.**   Seven.

7    **Q.**   And in the year of 2010 --

8    **A.**   Yes, sir.

9    **Q.**   -- was there a point in time when the board was

10   approached about a new legislation that was being

11   produced in the Georgia General Assembly?

12   **A.**   Not in 2010, we were not approached by -- about

13   any legislation in 2010.  We were -- that was the year

14   that was built up to 2011, when we were later in 2011

15   approached with legislation.

16   **Q.**   All right.  In -- in December 2010, was there any

17   type of discussion or a vote taken about the possible

18   legislation of being changing from 9 to 5 singles and

19   two at-large?

20   **A.**   No.  But can I have a chance to explain exactly

21   took place?

22   **Q.**   Yes.

23   **A.**   What took place was in June of that year, it had

24   actually been brought up in a board meeting, and at

25   that time, you know, there were questions asked, you

1    know, were we ready for this, why were we at nine, you

2    know, because the city and the county had combined, and

3    you know, we had been at nine for so long.  And at that

4    time nobody was ready to vote.  We said we would think

5    about it and see what we would come up with.  In

6    November of 2010, it was brought up to us again.  At

7    that time we were still not ready to vote.  We knew

8    there would be a change in the board in January.

9    Because at that point Donnie Minic was about to step

10   down off the board, Kevin Pless was about to step up on

11   the board, you know, and we asked at that time of the

12   board, you know, we're fixing to change over, it's the

13   end of the year, what can we do.  But in December of

14   2010, it came back in front of us again.  At that point

15   the decision that was made and what we voted on -- and

16   we can pull the minutes because I kind of went back

17   over by myself.  We voted on at that point, if we were

18   to go to seven, we need to have a discussion on how we

19   are to get there and decide on a process of converting

20   from 9 to 7.  It was never the 5/2 plan.  It was just,

21   how do we get to seven if we are going to do this.  If

22   we are going to lose two members, how do we get there.

23   And after 2010, I think that vote, I think that's when

24   everything just kind of went awry, if that explains to

25   what you're asking me.

1    Q.    All right.  So what I'm really asking then --

2    A.    Uh-huh.

3    Q.    -- to best of your recollection, and -- is that

4    there was never a vote to prove the plan in December --

5    A.    There was never a vote not to approve the plan.

6    Q.    -- in 2010?

7    A.    What there was a vote on is, if we're going to

8    seven, how are we to get there.  We need to have

9    discussion on how to get there, and we voted that we

10   would go to seven, but with the process of us deciding

11   how we are to get there.  Never was there ever a vote

12   for anybody to produce any legislation to take us from

13   9 to 7.  That happened after that off key.

14   Q.    Okay.  We, move forward to 2013 -- I mean, 2011.

15   A.    Okay.

16   Q.    In 2011, was a plan submitted to the justice

17   department?

18   A.    There was a plan submitted to the justice

19   department.  The same plan that had been submitted to

20   our Georgia legislatures, and by the time we knew about

21   it, it had already been approved, but at that point,

22   you know, it automatically goes over to the Department

23   of Justice.  And it was -- went to the Department of

24   Justice.  And I think the way we really found out about

25   that, we got a couple of calls to the -- some of the

1    people that were on the board, you know, asking

2    questions, and then that's when we got interested in

3    calling and finding out, do you already have this, and

4    we found out that they did.

5    **Q.**   So you're saying that the school board attorney

6    never approached the board, the full board about what

7    was going on in the legislation?

8    **A.**   No.  The way we found out what was going on in the

9    legislation, hmm, we actually went to Jimmy Skipper's

10   office to ask questions, because we had seen a copy of

11   something that somebody had told us had been

12   introduced, and when we got there, he said it had been

13   introduced, and it told us exactly how we were to go

14   from 9 to 7, and that was the input we needed because

15   we needed -- when you on a school board, you have to go

16   from 9 to 7 in a systematic manner, you don't want all

17   your knowledge to disappear in one swipe.  That's not

18   fair to the children of Sumter County.  So, when we did

19   find out about it, we went and ask questions, who made

20   this, who decided on this, and it was like, well, when

21   we put it forth, this is what we put forth, and Jimmy

22   Skipper had already sent that forth.  Now, Dr. Brooks

23   our superintendent got it, we never saw it as a full

24   board to say, you know what, this is a go, I think we

25   can -- you know, what you would like in a situation

1    like that, knowing that you're going down is the

2    opportunity for everybody to look at it and say, you

3    know what, this is a go, we can do this, it looks

4    logical, then we had never seen that.  So that's where

5    all our miscommunication started taking effect at that

6    point.

7    **Q.**   So the plan that was submitted to the justice

8    department, was it approved?

9    **A.**   It wasn't and -- it wasn't approved, and we did

10   withdraw the preclearance, our preclearance, and the

11   reason that we did so, was simply we had gotten two

12   letters that we never saw as a board, from --

13   **Q.**   Say that again, two letters?

14   **A.**   We had gotten two letters that we had never seen

15   as a board to discuss, you know, what they were talking

16   about.  In those letters they asked us things like,

17   hmm, did we put it in the paper when we going from 9 to

18   7, you know, did we have any community involvement, how

19   many times did we meet with the community about what we

20   were doing, hmm, they asked, did we take any kind of

21   consequences to make sure we were not diluting any --

22   the African American or the minority votes.  They asked

23   questions, hmm, and some of them were about, you know,

24   what are the percentages in these districts and

25   different stuff like that.  And I -- two of the

1    letters, I think, somebody had actually sent my answers

2    to -- and I'm thinking, I'm almost positive our

3    attorney because we asked for the letters and stuff

4    later, but it was too late then.  They had went back.

5    But in that time frame we received a third letter.

6    Then, you know, when you get three letters from the

7    Department of Justice that what you're doing needs to

8    be looked at, you sit up and you pay attention, you

9    know what I mean, so we started -- when we paid

10   attention to that third letter and we started pulling

11   the other letters, and we've never had a community

12   meeting, we never put it in the paper about us as a

13   board going from 9 to 7.  We never did any of that.  So

14   we talked as a board, a full board in the open, and we

15   asked Attorney Skipper, please let us see this other

16   letter before you send it back because that was

17   erroneous information in the first two letters that you

18   sent, and as a board you are representing us, we want

19   to make sure what you said was correct.  So at that

20   point, as has already been discussed, he resigned.  But

21   also in that time limit we started looking at the

22   letter, and when we get that letter to withdraw our

23   preclearance, we said at that point, let's stop it and

24   let's do it right.  Let's do what these letters are

25   telling us, let's have community involvement, let's see

1    what they want, you know what I mean, let's make sure

2    that these two at-large districts were not diluting the

3    vote.  You know, there was time to do that and do it

4    right because we knew whatever we set in place, for ten

5    years it's out there.  If it was incorrect, we've

6    messed up our voters for at least ten years.  So it was

7    just important to us that we stop it and make sure it

8    was done right.  I hope I answered your question.

9    Q.    You did.  Are you aware that the number of, let's

10   say, black African Americans and white people that are

11   eligible to vote is about the same in Sumter County?

12   A.    I'm not aware of that.  And I think with this --

13   and I hope I'm not elaborating too much.  I think with

14   the 5/2 plan, it's not exactly -- it's not -- it's the

15   way it's drawn.  The way it was drawn has difficulties,

16   for me.  I'm just going to take me for example.  The

17   election I'm running in March 18th, the districts are

18   pretty much all right.  But when you go to the May 2nd

19   election, we have five districts.  My district, for one

20   is, I'm district number three, I have, I'm going to say

21   right at 70 percent Caucasian voting.  I have

22   30 percent African American.  We have another district

23   that's the same thing.  We have two other districts

24   that's 70 percent in the other direction, but you're

25   not going to tell me that as a county we can't draw

1    those lines any better where anybody -- any district

2    has a chance to win any election, and I think that's my

3    biggest problem with what we have.

4    **Q.**   So, in other words, you're saying that the

5    minority voter has been split?

6           **MR. NESMITH:**  Your Honor, that's extremely

7    leading.

8           **THE COURT:**  All right.

9           **MR. WRIGHT:**  Well, I'm asking did she --

10          **THE COURT:**  You were making a statement, not

11   asking a question.

12          **MR. WRIGHT:**  I'm sorry.

13          **THE COURT:**  The witness has to state the

14   information, not be in the form of your question.

15          **MR. WRIGHT:**  Yes, sir.

16   **BY MR. WRIGHT:**

17   **Q.**   Have the voting strength in your district been

18   split?

19   **A.**   Oh, of course.

20   **Q.**   Has it been diluted?

21   **A.**   Oh, of course.

22   **Q.**   And --

23   **A.**   My last district -- go ahead, I'm sorry.

24   **Q.**   No, so you can go ahead.

25   **A.**   Naw, you go ahead.  I don't mean to get ahead of

1    you, go ahead.

2            **THE COURT:**  Well, you ask a question, Mr.

3    Wright.

4            **MR. WRIGHT:**  All right.  I rest.

5            **THE COURT:**  All right.  Cross examination?

6                        **CROSS EXAMINATION**

7    BY MR. NESMITH:

8    **Q.**   Ms. Fitzpatrick, I'm Bill NeSmith, and I'm

9    representing the Sumter County Board of Elections who

10   have been sued in the this lawsuit by Mr. Wright.

11   **A.**   Uh-huh.

12   **Q.**   And I have a few questions for you.

13   **A.**   Sure.

14   **Q.**   How long have been on the board?

15   **A.**   Seven years.

16   **Q.**   Okay.  So, in the seven years that you've been in,

17   how many times have you participated in a preclearance

18   with the United States Department of Justice?

19   **A.**   You know what, I never have.  It was an

20   interesting process.

21   **Q.**   Okay.  So the questions that the Department of

22   Justice asks in those letters would it surprise you to

23   know they're very typical questions?

24   **A.**   It would, because if I got anything from anybody

25   asking me whether I'm diluting the vote and I send them

1    back something and say I'm not, and I know I have not

2    had a chance to look into that, it would really

3    interest me because I want to tell the Department of

4    Justice the truth if I can.

5    **Q.**    I understand what you're saying, but what I'm

6    saying, would it surprise you to know those are typical

7    questions of the Department of Justice?

8    **A.**    It probably would, but with three letters asking

9    the same questions, no, it wouldn't, not three letters.

10   One, yeah, you know, cause -- asking me for my answers,

11   but when you send me back the same thing three times, I

12   got to take note of what you're asking me.

13   **Q.**    Okay.  Would it surprise you to know that it's not

14   unusual to get as many as a half a dozen letters and a

15   half a dozen phone calls from the Department of

16   Justice?

17   **A.**    No, it wouldn't.  But I wonder did we get that

18   many on the preclearance for our regular commission or

19   districts.

20   **Q.**    I would say probably as least six phone calls.

21   **A.**    But how many letters did we get?

22   **Q.**    I would say on the letters, at least two but --

23   **A.**    Okay.

24   **Q.**    But I -- maybe more than that.

25   **A.**    Okay.

1    Q.   But that's something, and I really don't need to

2    answer a question here, but since it's informational,

3    you know, that's -- it's a very typical process for

4    Department of Justice to ask these questions because

5    they're very careful and very thorough.

6    A.   I think we needed to be careful and more thorough

7    with the answers that we gave them and tell them the

8    truth and that's --

9    Q.   That's right.

10   A.   -- what we tried to do.

11   Q.   So, in other words, what you were saying is you

12   really don't have any problem with the five plus two,

13   just as long as it's done right, correct?

14   A.   I think I have a problem with the five plus two

15   because they did ask about the at-large districts in

16   two of their letters.  Now, I would feel better with

17   just seven, if we just drew seven districts.  If we

18   don't want to go back to nine, which we already have,

19   which is working fine, because we have a very large

20   county, and the nine districts have worked for us with

21   combining two -- a city and a county school system,

22   that's why we had nine representatives.  We weren't

23   just a city anymore, and we weren't just a county, and

24   those nine representatives have did well up until this

25   point.  Now, if we just couldn't go back to nine and we

1    had to go back to seven, I would feel better taking two

2    at-large districts out and just drawing seven definite

3    districts, and I think we could distribute our vote and

4    our representation much better.

5    Q.    Okay.  You also gave out some sort of numbers

6    about your district.

7    A.    Uh-huh.

8    Q.    Your district is probably a little bit more closer

9    to 40 percent African American, 60 percent white; isn't

10   that correct?

11   A.    No.  Because the last thing that I looked at from

12   the 2010 census, and this is what you gave us, and you

13   gave it to us at a meeting that we came to when y'all

14   were drawing the lines for the county commissioners.  I

15   was about 30 -- I was about 34/35 percent African

16   American, and then I had some Hispanics on the side,

17   about four percent, and then I had my Caucasians.

18   There is a big discrepancy in the representation of

19   Caucasians and African Americans in my district.

20   Q.    So what you're saying is you're relying on

21   four-year old numbers?

22   A.    I'm not really relying on four-year old numbers.

23   Well, we are all relying on the census when we draw the

24   lines, unless you have a new census for us to go on.

25   Q.    No.  I'm talking about today.

1    **A.**   I'm talking about today.

2    **Q.**   We're talking -- we're talking about the -- what

3    you're doing is there's a challenge to this districting

4    today.

5    **A.**   Okay.  But the lines that were drawn were drawn

6    when?

7    **Q.**   Well, they were drawn in 2011, and then put into

8    place -- well, actually 2010 and put into place in

9    2011.

10   **A.**   Right, and those are the lines --

11   **Q.**   But my question to you was this, today --

12   **A.**   Uh-huh.

13   **Q.**   -- wouldn't it be true that your district is more

14   like 40 percent/60 percent?

15   **A.**   The only thing I have to go on is the numbers that

16   were given.  And even if they were 40/60, there still

17   is a discrepancy when you got another district that's

18   probably 70.  We can draw these lines better.  No

19   matter how many percentages you throw around, we can do

20   better.

21   **Q.**   Okay.  So let me ask you this one final question.

22   **A.**   Sure.

23   **Q.**   Is that -- this is -- and what we've really been

24   discussing here really has to do with whether people

25   politically don't like the makeup of the districts

1    because if it's -- you think there's a lesser chance

2    for you to be elected -- you don't?  You think you'll

3    be elected just fine?

4    **A.**    Let me explain that to you.  I think there is a

5    lesser chance, but that's why I qualified again,

6    because I'm going to take that chance and get out

7    there, and if I lose, I still got to fight for the

8    children of Sumter County.  Now, you know there's a

9    lesser chance with the numbers than I do, cause you

10   know how we vote in Sumter County.  We vote by race.

11   That's not a secret.  You can go back election after

12   election after election and see that.  So the question

13   that you just asked me is not that I think I have a

14   lesser chance because I got more responsibility than

15   myself, but by the numbers, we all know I have a lesser

16   chance.  That's not a secret.

17   **Q.**    And that's only because it's a local election?

18   **A.**    You know if -- for one, of course, because it's

19   just Sumter County.  You know, I think maybe if we were

20   going countywide or -- well, not countywide -- we were

21   going -- and Schley County, you might have a better

22   chance.  You need to look at the numbers there also and

23   make sure that the districts that you draw are proper.

24   That's all.

25   **Q.**    What you're saying is that the people are going to

1    vote down racial lines in Sumter County?

2    **A.**   We do.  And we all know that.

3    **Q.**   And --

4    **A.**   They normally vote down those racial lines.

5    **Q.**   So how do you explain Sanford Bishop winning so

6    many times with such a huge majority?

7    **A.**   I would explain that by saying, look at what kind

8    of man you have in Sanford Bishop.

9    **Q.**   Okay.  So you don't --

10   **A.**   You know he's going to take both.  And when I see

11   what kind of man you have in Sanford Bishop, he's on a

12   national level.  He's not down where we are locally,

13   and we all know locally what the problems are.  So

14   that's not even a comparison.  President Obama, before

15   you say it, is not a comparison in what would happen to

16   us locally in an election.  And if you bringing up

17   Kevin Brown, we all know Mr. Cheokas, and we all know

18   why Kevin T. Brown took -- almost took Sumter County

19   and even --

20   **Q.**   He did take Sumter County.

21   **A.**   Well, we know why.  We all know why.  So that's

22   not a secret, so, I mean --

23          **THE COURT:**  I don't know why.  This is about

24   racial balance and --

25          **THE WITNESS:**  Right.

1          THE COURT:  And not about particular

2    politics.  It's not about the quality of any particular

3    person as a candidate.  It's not about by a party of a

4    person.  So the only issue this court has is as to

5    whether there is some constitutional violation with

6    regard to voting that would have a merit in this court.

7    So when you say if a person was elected countywide, he

8    was black, and you excuse it for some nonracial reason,

9    then it seems to go against your argument.

10         THE WITNESS:  I'm not excusing it.

11         MR. NESMITH:  My memory, he lost --

12         THE COURT:  No, I'm talking about anybody.  I

13   mean, in other words, it's either, if race counts, it

14   counts whoever is elected.

15         MR. NESMITH:  That's right.

16         THE COURT:  You can't discount it and say it

17   because of who that person is --

18         MR. NESMITH:  I agree.

19         THE COURT:  -- or some other reason.

20         MR. NESMITH:  I --

21         THE WITNESS:  And -- I agree too.

22         THE COURT:  If that's true, then race has

23   nothing to do with it.

24         THE WITNESS:  And when I say what I said

25   about that, this is exactly what I mean, Kevin T. Brown

1    won because he actually is more well known, probably --

2    I'm not going to say well known in our area.  He put up

3    a fight against Cheokas and which we all would put up a

4    fight against him, but we all know historically that,

5    if he was running again, it probably would never happen

6    again.  That would never again, Judge, and like I

7    said --

8                THE COURT:  Well, how can you say --

9                THE WITNESS:  I'm not saying I can say that,

10   you know, and he uses that --

11               THE COURT:  I'm not accusing you of being a

12   fortune teller or anything, but simply, how can any of

13   us ever --

14               THE WITNESS:  He uses that at --

15               THE COURT:  -- for certain --

16               THE WITNESS:  He uses that Kevin T. Brown

17   because that was just something that happened in that

18   moment.  And I think, you know, probably more people in

19   the way that we vote in our county got out and probably

20   voted in another direction, but we vote

21   directionalized.  An at-large district stands no chance

22   for us in our county, and that's -- you know, he can

23   use Kevin T. Brown all day, but that's -- that's --

24   don't fall for that one.

25               THE COURT:  All right.  Any further

1    questions?

2         **MR. NESMITH:**  I do, just a couple more.

3    BY MR. NESMITH:

4    **Q.**   Would you agree that if the election is stayed in

5    May that it's going to cost the taxpayers of Sumter

6    County a greet deal of money?

7    **A.**   I think this is causing the taxpayers of Sumter

8    County a great deal of money.  And I think we could

9    have -- we could have not been going through this.

10   Just like the March 18th election, we could have did it

11   properly.  We did as a Board of Education a declaratory

12   to the superior court to answer all the questions that

13   we're coming now answering now.  On Friday, the last

14   day of qualification in an election that meant so much,

15   we're calling counties asking them which at-large seat

16   are you running for, whether you running for the two or

17   the four-year.  That should be have been decided way

18   before the election even happened.  It may even decided

19   how people would have qualified.  You know we rushed,

20   we rushed, and that's why we're here.  It's costing the

21   taxpayers money because we just don't take the time to

22   sit back and look at what we got --

23        **MR. NESMITH:**  Your Honor, this is just

24   nonresponsive to what I asked.  It's not an

25   explanation.  It's --

1          **THE WITNESS:**  -- of course, any --

2          **MR. NESMITH:**  -- it's a diatribe.

3          **THE COURT:**  Just a minute now, we're in a

4     court now, this is not a political debate.

5          **MR. NESMITH:**  I agree.

6          **THE COURT:**  All right.  Restate your

7     question, the witness may answer the question, and if

8     you need to explain your answer, you may do so, but

9     first answer the question.  Ask it again.

10    BY MR. NESMITH:

11    **Q.**   The question I want to know is, don't you agree

12    that if the election is stayed it will cause the

13    taxpayers a lot of money?

14    **A.**   Any election would cause the taxpayers money, but

15    if it's done wrong, it'll probably cost them more down

16    the long run because this would not be over.  The lines

17    need to be drawn correctly, and then we can have an

18    election, even if we can get them drawn before

19    May 20th.

20    **Q.**   All right.  Now, would you also agree that the

21    lost of accreditation by SACS would be devastating to

22    the general public and to the children?

23    **A.**   Devastating?  It would be crucial.  That's why

24    we've taken so much time to make sure that we got our

25    accreditation back.  And now that we have our

1   accreditation back, the letter that you brought up

2   earlier to Mat Wright, the lady called because we had

3   made a vote, she sent that letter, but the thing about

4   that is, we're not going to do --

5          THE COURT:  Just one minute.  See, that's the

6   problem, Mr. Wright, with a witness being in the

7   courtroom, because she's answering things that were

8   presented that were outside of the witness's

9   testimony --

10         MR. NESMITH:  I understand.

11         THE COURT:  -- in response to a position

12  that's raised by the other side.  And that's --

13         MR. NESMITH:  I agree.

14         THE COURT:  But let's get to another

15  question.

16         MR. NESMITH:  Okay.

17         THE WITNESS:  And I won't even say anything

18  about the matter.

19         MR. NESMITH:  I'm done, Your Honor.

20         THE COURT:  All right.  Mr. Wright, do you

21  have any further questions?

22         MR. WRIGHT:  Just one question.

23         THE COURT:  All right, you may ask.

24                    REDIRECT EXAMINATION

25  BY MR. WRIGHT:

1   Q.   Mr. NeSmith asked you about Kevin Brown winning

2   Sumter County?

3   A.   Uh-huh.

4   Q.   And do you know whether or not the district line

5   that he ran in encompassed all of Sumter County or just

6   a portion of Sumter County?

7   A.   No, I don't really know, because, you know, that

8   spreads all the way up through Schley County.  I have

9   no idea.

10  Q.   Thank you.

11          THE COURT:  Just for my information, if a

12  county -- doesn't countywide mean all the districts?

13          MR. WRIGHT:  Well, Representative Cheokas'

14  line don't take in all of Sumter County.

15          THE COURT:  You mean for representative of

16  the state house?

17          MR. WRIGHT:  Right, Cheokas, who actually

18  introduced the bill --

19          THE COURT:  I wasn't sure who the candidate

20  was or what office they were running for.

21          MR. WRIGHT:  Right.  And Kevin Brown

22  challenged him in the last election.  So much has been

23  said about him winning Sumter County, but he didn't win

24  -- the vote wasn't in all of Sumter County.  It was

25  just only in the top portion of Sumter County.  So

1    Brown won where it was more heavily black people.

2          THE COURT:  Well, I don't know -- all right.

3          MR. WRIGHT:  Okay.  But -- I just wanted to

4    clarify that.  Okay.

5          THE COURT:  That's fine.  I have a better

6    understanding that it was -- that that portion of

7    Sumter County is a part of another -- of a

8    representative district that is shared with other

9    counties.

10          MR. WRIGHT:  Right, that Representative Ryder

11    has the other part of it.

12          THE COURT:  All right.  Okay, I understand

13    now.  Any further questions from the defense?

14          MR. NESMITH:  No, Your Honor.

15          THE COURT:  All right.  You may step down.

16    Any objection to the witness being excused?

17          MR. WRIGHT:  I rest, so I have no other

18    witnesses that I'm going to call today.

19          THE COURT:  All right.  What I'm saying is so

20    she can remain in the court if she wishes is all I'm

21    saying.

22          MR. NESMITH:  I have no objection.

23          THE COURT:  If she's excused, she can stay or

24    leave as she wishes.

25          THE WITNESS:  Thank you.

1          **THE COURT:**  All right.  The plaintiff has

2     rested.  Mr. NeSmith, any witnesses to be presented by

3     the defendant?

4          **MR. NESMITH:**  Yes, Your Honor.  Let's see.

5     I'll go ahead and call meet Nita Crinson.

6          **THE COURT:**  You need to step out there

7     yourself and get her.

8          **MR. NESMITH:**  Okay.  All right.

9          **COURTROOM DEPUTY:**  Do you solemnly swear or

10    that the testimony you are about to give in the case

11    now before the Court will be the truth, the whole

12    truth, and nothing but the truth?

13          **THE WITNESS:**  I do.

14          **THE COURT:**  All right.  You may proceed.

15                         **MITA CRINSON**

16    **Witness, having first been duly sworn, testified on**

17                     **DIRECT EXAMINATION**

18    BY MR. NESMITH:

19    Q.   Ms. Crinson, would you please introduce yourself

20    to the Court and give your full name?

21    A.   My name is Mita DuBois Crinson.

22    Q.   And, Ms. Crinson, do you currently serve with the

23    Sumter County Board of Elections?

24    A.   Education.

25    Q.   I said it.  I've done that three times.

1    Education.

2    **A.**    Yes, sir.

3    **Q.**    All right.  And how long have you served with the

4    Board of Education?

5    **A.**    I was appointed in May of 2010, and then I -- they

6    had a special election to fill the seat that I was

7    appointed to and I ran unopposed and my term was

8    supposed to have been up in 2012.

9    **Q.**    Okay.

10            **MR. NESMITH:**  If may approach, Your Honor?

11            **THE COURT:**  You may.

12   **BY MR. NESMITH:**

13   **Q.**    All right, Ms. Crinson, I'm going to ask you to

14   take a look at what has been marked as Defendant's

15   Exhibit 5 and tell me if you recognize that?

16   **A.**    Yes, sir.  This is a copy of the submittal that

17   Mr. Jimmy Skipper was going to -- was sending in to the

18   justice department, or was going to send in to the

19   justice department.  I'm not -- yeah, it's the

20   preclearance letter.

21   **Q.**    Okay.  And if you'll look on the second page.

22   **A.**    Uh-huh.

23   **Q.**    And right down here where it has date and

24   description, where it has November 11th, 2010, can you

25   please read that to the Court?

1    A.    Yes, sir.  On November 11th, 2010, a motion was

2    made by Mr. Goodnan, seconded by Ms. Fitzpatrick, to

3    pursue a resolution to reduce the board to seven

4    members.  Motion carried unanimously.

5    Q.    And right below that where it has --

6    A.    12 --

7    Q.    December --

8    A.    Okay.

9    Q.    Yes, what's that date there?

10    A.    December 9th, 2010, a motion was made by

11    Mr. Goodnan, seconded by Ms. Crinson to approve a

12    resolution to introduce local legislation providing for

13    a reduction in the number of board members.  Motion

14    carried unanimously.

15    Q.    Do you have a specific recollection of those two

16    votes?

17    A.    Yes, I do.

18    Q.    And did they actually occur?

19    A.    Yes, sir.

20    Q.    Now I hand you what has been marked as Defendant's

21    Exhibit 4 and ask you to take a look at that.

22    A.    Uh-huh.

23    Q.    Do you recognize what that is?

24    A.    Yes, it's a report from Advance Ed, which everyone

25    sort of calls SACS because no one is familiar with the

1    Advance Ed terminology, and it's a monitoring visit

2    report from when they came in December 11th to 13th,

3    2012, to do kind of an investigative visit.

4    **Q.**   Okay.  And I'm going to show you what has been

5    marked as Defendant's Exhibit 3 and ask you if you

6    recognize that?

7    **A.**   Yes.  This is -- oh, I'm sorry, I was looking at

8    the date.  This is another Advance Ed or SACS

9    monitoring review report when they came a year later in

10   December 15th through 17th, 2013.

11   **Q.**   And I'm also going to show you what has been

12   marked Defendant's Exhibit 2 and ask you if you

13   recognize that?

14   **A.**   Yes.  This is a Advance Ed or SACS report of the

15   special review team for Sumter County Schools, when --

16   the review dates were April 9th through 11th, 2012.  I

17   think that's when they responded to some allegations

18   that had been sent to them.  Yeah.

19   **Q.**   And what response did they give?

20   **A.**   They came -- well, they went into a lot of detail

21   about the different, hmm, complaints that were made and

22   referenced them back to their different, what they call

23   indicators, it's kind of little rules that you agree to

24   when you sign up with SACS.

25   **Q.**   To be accredited?

**A.**    To be accredited, right, yes.  That's sort of the
accreditation requirements, and then they put us -- as
to where they announced that they were putting us on
probation, and then they gave us some required actions
which we became very familiar with.  There were five
required actions that we had to --

**Q.**    What are those requirements?

**A.**    The first one was -- do you want me to read the
whole thing or just summarize it?

**Q.**    Just summarize it.

**A.**    Summarize it.  Okay.  The first one was that the
board had to devise and implement a comprehensive plan
for unity, for unifying the board.

**Q.**    Has that been done?

**A.**    Yes, we -- pretty much.

**Q.**    Okay.  The second one?

**A.**    The second one was that the superintendent and the
Board of Education had to devise and implement a
written plan for redistricting the board membership to
comply with applicable laws and approved board
policies.

**Q.**    Has that happened?

**A.**    Well, that's what we're sort of in the midst of
now.  Yes, there has been a redistricting plan that was
passed by the legislature, and then I had to kind of

1    just redo it where you're supposed to have an election

2    to comply with it.

3    Q.   If the district -- the board has been redistricted

4    and if there is an election, will you be in compliance

5    with that particular part of the SACS?

6    A.   Yes, yes.  Because when they're talking about

7    applicable laws, they were referring back to the Senate

8    Bill 154 and 4EX at the time.

9    Q.   What's the next one?

10    A.   The third required action was develop a written

11    plan for establishing a communications team and using

12    that team to communicate with what they call

13    stakeholders, which is the -- not only those faculty,

14    staff, but also the general public.

15    Q.   Has that happened?

16    A.   Yes, that's happened.

17    Q.   And the last one?

18    A.   No, the fourth one.  There's two more.  Yeah, the

19    fourth one is we have to immediately ensure that all

20    actions and decisions of the board are consistent with

21    approved policies and procedures and all applicable

22    laws, regulations, and standards.

23    Q.   Do you know if you're in compliance with that?

24    A.   If we follow the law on the election thing, yes,

25    yeah.

1    Q.    Okay.  And now the last one?

2    A.    The fifth one was, we must implement -- or review

3    all board policies and -- to increase awareness and

4    understanding of the policies that govern our work.

5    Q.    And have you done that?

6    A.    Yes, we did do that.  We actually had a consultant

7    come in and redo them, and then we had some training

8    sessions.

9    Q.    And now I'm going to approach with what's been

10   marked as Defendant's Exhibit 1.

11   A.    Yes.

12   Q.    Do you recognize this?

13   A.    Yes.  It's a letter from the Advance Ed chief

14   accreditation officer, her name is Annette Bohling,

15   dated December 3rd, 2013.

16   Q.    Okay.  So that's just been a few months ago?

17   A.    Yes.  This actually came -- we saw it for the

18   first time the day that SACS was here in December, and

19   we were allowed to read it before we went in to meet

20   with SACS.

21   Q.    Now, all of these documents, which are Exhibits 1

22   through 5, are these documents that you've kept in

23   ordinary course of your business as a board member for

24   the Board of Education?

25   A.    Yes.

1   **Q.**  And are they -- were these documents, were they
2   copied and made close in time to whenever these events
3   happened?
4   **A.**  Yes, uh-huh.  Yes, sir.
5   **Q.**  Are they -- to best of your knowledge are they
6   exact copies of the originals?
7   **A.**  Yes.
8          **MR. NESMITH:**  At this time we tener Exhibits
9   1 through 5 to the Court.
10         **THE COURT:**  All right.  Mr. Wright, any
11  objection to the Exhibits 1 through 5 for the
12  defendant?
13         **MR. WRIGHT:**  No, sir.
14         **THE COURT:**  All right.  They are each
15  admitted without objection.
16         **THE WITNESS:**  Do you want me to say what the
17  letter said?
18  **BY MR. NESMITH:**
19  **Q.**  Yes, that's my next question.
20  **A.**  I'm sorry.  Okay.
21  **Q.**  I just wanted to move back, so I'd be back over
22  and it'd be easier for everybody to hear me?
23  **A.**  Yeah, okay, okay.  Uh-huh.
24  **Q.**  Okay.  So what is the import of the defendant's
25  Exhibit 1, which is the letter you were just

1  describing?

2  A.   The accreditation officers is telling

3  Superintendent Smith that she's read an article in the

4  Times Recorder that reported that the board had voted

5  to go ahead with drawing a nine-member district map, in

6  spite of the recent federal court ruling requiring

7  compliance with Senate Bill 154 and Senate Bill 4EX.

8  Q.   Okay.  My question is, your understanding of this

9  with SACS, is that if the Board of Education does not

10  hold an election or violates those terms, is the

11  accreditation for the Sumter County Public School

12  System in jeopardy?

13  A.   Yes.  Because it says right here, failing to

14  comply with the required action could result in a

15  change in the district's accreditation status.

16  Q.   Okay.  Would the loss of accreditation of the

17  public schools be a devastating event?

18  A.   It would be very -- I think it would be very

19  devastating.  It would harm the students because you're

20  depending on getting Hope scholarships.  You have to

21  come from an accredited school, and I think every

22  college requires a high school diploma from an

23  accredited high school.  And I would think that any

24  industries looking to move to Americus or Sumter County

25  would be very concerned about their employees's

1    children not being able to go to an accredited school

2    system.

3    Q.    But you have a local accreditation, don't you?

4    A.    Well, after SACS put the system on probation,

5    Superintendent Smith pursued other avenues of getting a

6    different kind of accreditation, and he found something

7    called the Georgia Crediting Commission, or -- it's

8    called GAC, G-A-C, and they came and visited for a day

9    or two and we paid a fee, and we're accredited by GAC.

10   Q.    All right.  Now, does that allow a student in the

11   Sumter County schools to attend a college or universe

12   outside of the state of Georgia, to your understanding?

13   A.    It's -- I'm -- it's kind of vague because I know

14   when GAC first started it only covered schools in

15   Georgia, colleges in Georgia, and as late as 2008, I

16   found something on the Internet that said they were

17   working on trying to spread their reach.

18   Q.    To your knowledge, have they spread their reach?

19   A.    I think they had to some point, but I'm not sure

20   how far -- how far they've gotten.  I can't find it

21   written anywhere.  They don't have it anywhere on their

22   website how far they reach.

23   Q.    So you don't know?

24   A.    So I don't know, huh-uh.

25   Q.    So basically, your understanding of this

1    accreditation system, if a child graduates from Sumter

2    County public schools, would that child be able to

3    attend, say, Harvard university?

4    A.   I would be concerned about that.  To me, if

5    they -- if they really were nationwide, it would say it

6    on their website.

7    Q.   And could they -- what about, as far as you know,

8    would they have difficulty getting in, say, just,

9    University of Wisconsin, any place?

10   A.   I would say -- I can say for sure that it would be

11   much better to have SACS accreditation to assure that.

12   Q.   Doesn't SACS allow also to attend schools in

13   Europe?

14   A.   SACS is worldwide.

15   Q.   Okay.  So to lose accreditation would be adverse

16   to the public interest, would that be a fair statement?

17   A.   Yes, it would.

18   Q.   Okay.

19   A.   And can I volunteer something here?

20   Q.   I --

21            THE COURT:  The witness --

22   BY MR. NESMITH:

23   Q.   Yeah, only if it has to do with what I'm saying,

24   if you're explaining the answer.

25   A.   Well, I don't know.  I just -- I know that the --

1    some members of the school board and the superintendent

2    have been told that you can't shop for accreditation to

3    get away from having to appear before the state board.

4    Q.   Well, let me ask you a question, one last question

5    Ms. Crinson, what is your understanding of why the

6    school board attorney, Jimmy Skipper resigned?

7    A.   He was asked to withdraw his -- withdraw and not

8    send anymore submittals into the Department of Justice

9    about pre-clearing the new five plus two districting.

10   And he said that that -- the law said that you shall

11   submit the plan to the Department of Justice, and he

12   felt that ethically he couldn't refuse to do what his

13   client asked to do and break the law at the same time.

14           MR. NESMITH:  That's all I have, Your Honor.

15           THE COURT:  All right.  Cross examination,

16   Mr. Wright?

17                     CROSS EXAMINATION

18   BY MR. WRIGHT:

19   Q.   Ms. Crinson --

20   A.   Yes.

21   Q.   -- with the new accreditation, do you know of any

22   student in Sumter County that has been refused from

23   being admitted in any school?

24   A.   It actually hasn't come up yet because they're --

25   it's a little early to be hearing back from colleges,

1    and this is the first year we've been in this

2    situation.

3    Q.   Ms. Crinson, is the minutes that you referred

4    to --

5    A.   Yes.

6    Q.   -- are the minutes accurate, or are the minutes

7    summary of what's said?

8    A.   Well, I would say they're an accurate summary of

9    what happened.  It doesn't -- our minutes don't say

10   every word that was said, but if there is an action

11   taken or a motion taken, it says what the motion is,

12   and if it's unanimous, that means everyone there voted

13   for it.  And at the top of the minutes it'll say who

14   was present.  If it was not unanimous, it always says

15   so and so, so and so, and so and so for voted for, and

16   so and so, and so and so, and so and so voted against,

17   so.

18   Q.   So, in other words, the minutes from you all's

19   boards are summaries?

20   A.   Yes.

21   Q.   Of what was said?

22   A.   Yes, sir.

23   Q.   So then what's actually here may not be totally

24   accurate to what was actually said?

25   A.   Well, if it says a motion was made to approve a

1    resolution to introduce local legislation providing for

2    a reduction in the number of board members, that's what

3    the person said is their motion.

4    **Q.**   With SACS, do they have judicial power to -- that

5    you read there -- to tell the board that they must

6    change to five or -- districts to -- in order to get

7    accreditation?

8           **MR. NESMITH:**  Your Honor, I think that asks

9    her -- is asking her to state a legal conclusion, which

10   she is not qualified to do.

11          **THE COURT:**  Well, I think he can ask her to

12   what knowledge she might have, if any.  I won't accept

13   it as being a legal opinion, but any understanding she

14   might have.

15   **BY THE WITNESS:**

16   **A.**   Okay.  You're asking --

17   **BY MR. WRIGHT:**

18   **Q.**   Well, what I'm asking you is, he had you to read

19   from a document --

20   **A.**   Uh-huh.

21   **Q.**   -- that said that if the board don't do this or

22   that, that the accreditation would be in jeopardy.  Is

23   that correct?

24   **A.**   Yes.  Because there are certain, I call them

25   rules -- that's a simple word.  Let me see what they're

1    called -- directives that are numbered that when you

2    are under SACS accreditation you're suppose to comply

3    with these different areas of, you know, governance,

4    and, you know, there's different categories, and one of

5    them is that you're supposed to follow all pertinent

6    laws and regulations and policies and things.

7    Q.   Okay.  And have you at any point on this

8    particular board not followed any laws?

9    A.   I actually have tried very hard to follow all

10   laws, and if it's -- hmm -- if I feel something is

11   against the law, then I will bring it up and vote

12   against it or not participate.

13           MR. WRIGHT:  One second, Your Honor.  Your

14   Honor, I have no further questions for this witness.

15           THE COURT:  All right.  Any further questions

16   from the defense?

17           MR. NESMITH:  No, Your Honor.

18           THE COURT:  All right.  You may step down.

19   Any objection to the witness being excused?

20           MR. NESMITH:  I do not anticipate needing her

21   again, Your Honor.

22           THE COURT:  All right, then, you may step

23   down and you may remain or leave if you wish.

24           THE WITNESS:  Who do I do with this stuff?

25           MR. NESMITH:  She's got the exhibits.  Then

1    I'll call Mr. Brady, and I'll go get him right now,

2    Mr. Robert Brady.

3              **THE COURT:**  All right.

4              **COURTROOM DEPUTY:**  Do you solemnly swear or

5    affirm that the testimony you are about to give in the

6    case now before the Court will be the truth, the whole

7    truth, and nothing but the truth?

8              **THE WITNESS:**  I do.

9              **THE COURT:**  All right.  You may be seated.

10             **THE WITNESS:**  Okay.

11                          **ROBERT BRADY**

12    **Witness, having first been duly sworn, testified on**

13                       **DIRECT EXAMINATION**

14    **BY MR. NESMITH:**

15    **Q.**   Mr. Brady, would you please introduce yourself to

16    the Court and state your full name for the record?

17    **A.**   Yes.  My name is Robert Brady, excuse me, I'm

18    Supervisor of Elections for Sumter County.

19    **Q.**   Okay.  And how long have been the Supervisor of

20    Elections for Sumter County?

21    **A.**   A little over two years.

22    **Q.**   Okay.  Now, it's going to be a pretty obvious

23    question, but you're familiar with an election

24    that's -- that's to take place May 20th, 2014?

25    **A.**   Yes, sir.

1    **Q.**    And that election was called by your office?

2    **A.**    Yes, sir.

3    **Q.**    And that election was called pursuant to -- what

4    reason?

5    **A.**    Our portion of that election was called based on

6    HB House Bill 154 and Senate Bill 4EX.

7    **Q.**    Well, I'm talking about the second election, not

8    the first election.

9    **A.**    The second election then was called based on House

10   Bill 836.

11   **Q.**    Okay.  And all of the calls of the election,

12   though, are provided for in Senate Bill 154 and 4EX; is

13   that correct?

14   **A.**    Yes, sir, that is correct.

15   **Q.**    All right.  Now, did you ever receive any

16   correspondence or any kind of letters or copies of

17   letters from the attorney for the school board?

18   **A.**    I'm not sure I understand.

19   **Q.**    All right, well --

20          **MR. NESMITH:**  May I approach, Your Honor, to

21   refresh his memory?

22          **THE COURT:**  You may.

23   **BY MR. NESMITH:**

24   **Q.**    Look at those and see if that refreshes your

25   memory.

1    **A.**   Ah, yes.  Yes, sir, I did.

2    **Q.**   Okay.  And those letters, would you agree in

3    essence tell you that it is your responsibility to call

4    the election for the school board?

5    **A.**   Yes, sir.  These -- I interpreted these to be

6    desire of this attorney that I call a school board

7    election.

8    **Q.**   And he identifies himself as the school board

9    lawyer, correct?

10   **A.**   Yes, he does.  *(Clearing voice)*.  I apologize.

11   **Q.**   Now, as a supervisor of elections do you have to

12   operate within a budget frame work?

13   **A.**   Yes, sir, I do.

14   **Q.**   And in operating with a budget frame work, do you

15   budget for elections?

16   **A.**   Yes, sir, I do.

17   **Q.**   And do you submit that budget to the Sumter County

18   Board of Commissioners?

19   **A.**   Yes, sir, I do.  It has to be submitted for

20   approval.

21   **Q.**   And once the -- it's approved, it's your

22   responsibility to operate with inside your budget?

23   **A.**   Yes, sir, as much as is possible.

24   **Q.**   Okay.  So let me ask you, if the election is

25   stayed by the Court by injunction and has to be held at

1    a different time, is this going to be a substantial

2    cost to the taxpayers of Sumter County?

3    **A.**   Yes, sir, it is.

4    **Q.**   Okay.  What would you approximate would be the

5    cost of the taxpayers should this election have to be

6    held again?

7    **A.**   Somewhere in the vicinity of 14 to $15,000.

8    **Q.**   Are you also familiar with what VAP means?  The

9    voting age?

10   **A.**   It's my understanding that stands for a voting age

11   person.

12   **Q.**   Okay.  Or population?

13   **A.**   Ah, okay.  Then, no, sir, I wasn't.

14   **Q.**   All right.  And are you familiar with the number

15   of active and inactive voters in Sumter County?

16   **A.**   Yes, sir, I am.

17   **Q.**   And does that number fluctuate as often as even

18   month to month?

19   **A.**   Yes, sir, actually it does.

20   **Q.**   Okay.  And if I told you that in July of 2013 that

21   the active African American voters -- these are the

22   people that are registered to vote, not voting age

23   persons, but actually registered voters -- was 7,807,

24   does that number ring true to you?

25   **A.**   Could I have just one second to confirm?

1    Q.   Sure.

2    A.   I'm sorry, what was that number again?

3    Q.   7,807.

4    A.   7,807, yes, sir.

5    Q.   And active white voters would be 7,726?

6    A.   Yes, sir.

7    Q.   And so today that number has flipped, correct?

8    A.   Yes, sir, that has changed, again, because of the

9    variation of the -- the variation of the population of

10   voters.

11   Q.   And that is not unusual, correct?

12   A.   No, sir, it is not.

13   Q.   But who you -- would it be fair to say, without

14   getting into an absolute percentage, that the active

15   voters in Sumter County, black and white, stay

16   somewhere around 50/50?

17   A.   Yes, sir, that would be an accurate statement.

18   Q.   Give or take a little bit?

19   A.   There's about a --

20   Q.   From month to month?

21   A.   About a four percent fluctuation either way.

22   Q.   Four percent?

23   A.   Approximately, yes, sir.

24   Q.   You've been conducting early voting; is that

25   correct?

1    **A.**   Yes, sir, I have.

2    **Q.**   Did you set a goal for how many votes you wanted

3    to be cast in early voting?

4    **A.**   Yes, sir.

5    **Q.**   And what was that goal?

6    **A.**   I had -- had hopes of acquiring 250 votes.

7    **Q.**   How many votes have you gotten to date?

8    **A.**   As of 10 o'clock this morning, we hit our 250

9    mark.

10   **Q.**   And you expect more today?

11   **A.**   Yes, sir, I do.

12   **Q.**   So voting is progressing along in a proper

13   fashion?

14   **A.**   It's moving smoothly and relatively efficient.

15   **Q.**   Now, have you had any complaints about the way

16   that the districts are drawn or that there's any

17   problems with the election?

18   **A.**   No, sir.  I've not had any comments at all.

19          **MR. NESMITH:**  That's all I have, Your Honor.

20          **THE COURT:**  All right.  Cross examination?

21          **MR. NESMITH:**  I'm sorry?

22          **THE COURT:**  Cross examination for Mr. Wright.

23                    **CROSS EXAMINATION**

24   **BY MR. WRIGHT:**

25   **Q.**   Mr. Brady, the current district lines that exist,

1    are they equally -- those 7,800 voters, are they

2    equally distributed through those districts?

3    A.    Excuse me, sir, you're referring to the current

4    school board districts as they exist?

5    Q.    No, sir.  I'm referring to the question that

6    Mr. NeSmith asked you about, he said it was 7,807

7    active black voters and 7,726 active white voters.

8    A.    Yes, sir.

9    Q.    So my question is, are they equally distributed

10   among the five districts?

11   A.    Yes, sir, of course.

12   Q.    And why do you say they are equally distributed?

13   A.    I would say that because great efforts were

14   expended in the redistricting process last taken place

15   were made to make the districts be as uniform, both

16   black and white as far as voters are concerned, as

17   possible is why I believe that to be the case.

18   Q.    How many total voters are or what's the -- how

19   many total voters are in each district?

20   A.    Give me a second while I confirm.  I have that

21   information.

22   Q.    Yes.

23   A.    And you are concerned with the five county

24   commission districts is what you're asking me about; is

25   that correct?

1   Q.   That's correct.

2   A.   Okay.  Okay, sir, ask me again, if you would

3   please.  I want to make sure I'm answering what you're

4   asking.

5   Q.   How many active voters are in each district?

6   A.   In each district?

7   Q.   Well, in the five districts, you've got five

8   districts.

9   A.   Total.  The total number of current active voters?

10  Q.   Yes, sir.

11  A.   Currently that would be 16,536.  Oh, excuse me,

12  you said active voters, not total voters.  The first

13  time it was total.

14  Q.   Okay.  Well, total?

15  A.   Total voters is 16,536.

16  Q.   All right.  In district one how many of those

17  active voters in district one black and how many of

18  those are white?

19  A.   Let me see.  In district one African American

20  voters are 1857.  1-8-5-7.  Caucasian voters are 1,023.

21  Q.   District two?

22  A.   African American is 1,001.  Caucasian are 3,062.

23  Q.   District three?

24  A.   African American voters are 1,246.  Caucasian

25  voters are 1,846.

1    Q.   District four?

2    A.   African American voters are 1,181, Caucasian

3    voters are 1200 -- or excuse me, 1,320.

4    Q.   What was the last number?

5    A.   1320.

6    Q.   District five?

7    A.   African American voters are 1,885, Caucasian

8    voters are 772.

9    Q.   Well, now, your earlier testimony was that it was

10   equally distributed.  Now, based on the numbers you

11   just gave there, it doesn't look like they're equally

12   distributed.  Would you not say that two of the

13   districts are the only two districts that blacks have

14   the actual number?

15   A.   Again, sir, you're asking about apples and

16   oranges.  You asked me about active voters.  You didn't

17   ask me about total voters.

18   Q.   Well -- okay.  Well, on the numbers you just

19   gave --

20   A.   Uh-huh.

21   Q.   -- how many districts do black have the majority?

22   A.   Again, sir, with active voters, there are two.

23   Q.   Well, I'm just -- I'm just asking you for the

24   numbers you just gave.

25   A.   Those were the numbers that I just gave you.

1    **Q.**   And numbers you just gave, do blacks have the

2    majority in three districts, two districts, one

3    districts?

4    **A.**   Of active voters it appears they have them in two.

5    **Q.**   Okay.  It appears?  I mean, these numbers are not

6    accurate?

7    **A.**   It appears that from moment to moment the number

8    of active to inactive voters changes.

9    **Q.**   Okay.  Let's look into the school board.  In

10   district one, how many black voters is it?

11            **THE COURT:**  For my information, when we say

12   district one, are we talking about --

13            **MR. WRIGHT:**  About the nine districts now.

14            **THE COURT:**  Is that the one where the

15   election is being held for Tuesday the 18th?

16            **THE WITNESS:**  I'm sorry, sir?

17            **THE COURT:**  Is that the 18th vote?

18            **THE WITNESS:**  Yes, sir, for March 18th, we

19   will have voters for nine districts, yes, sir.

20            **THE COURT:**  All right.  I just wanted to be

21   sure which one was being asked about so for my notes.

22   All right.  You may go ahead.

23   **BY THE WITNESS:**

24   **A.**   Okay.  Sir, and you're asking me for a breakdown

25   by school board district?

BY MR. WRIGHT:

Q.    Yes, sir.

A.    Okay.  In district one, there are 738 white
voters, 883 African American voters.  There are 312
African American in district 2, 1305 Caucasian voters.
In district three, there are 799 African American
voters and 641 Caucasian voters.  In district four,
there are 894 African American voters, 425 Caucasian
voters.  In district five, there are 280 African
American voters and 1492, that's 1,492, Caucasian
voters.  In district six, there are 553 African
American voters and 1504 Caucasian voters.  In district
seven, there are 783 African American voters and 951
Caucasian voters.  In district eight, there are 1,249
African American voters and 119 Caucasian voters.  In
district nine, there are 1,562 African American voters
and 78 Caucasian voters.  Which --

Q.    Go ahead, sir.

A.    Which, incidentally, works out to be African
American voters to be 42 percent of the voters and
Caucasian to be 41.6 percent of the voters, total.

Q.    When you look at those numbers, which one of the
two sets of numbers you gave out gives equal
representations to all people?

        THE COURT:  Wait, what kind of question is

1    that?

2         MR. WRIGHT:   Well, it is -- and the question

3    is, the fourth set of numbers, the numbers that he gave

4    have two districts that is predominantly black African

5    Americans and three districts that is predominantly

6    white, and what he just gave for the nine districts

7    seats, he has --

8         THE COURT:   You didn't ask them what those

9    were.

10        MR. WRIGHT:   Okay.  So anyway, I withdraw

11   that question.

12   BY MR. WRIGHT:

13   Q.   There was a question about money and what it would

14   cost, but which is more important, the cost or justice?

15        MR. NESMITH:   I object to that question, Your

16   Honor.

17        THE COURT:   Go ahead and answer it if you

18   can.

19        MR. NESMITH:   Okay.

20        THE WITNESS:   Do you want me to answer that?

21        THE COURT:   His opinion, actually.

22        MR. WRIGHT:   Right.

23        THE COURT:   Well, I mean, do you have an

24   opinion?

25   BY THE WITNESS:

1     **A.**   Yes, sir, I do actually.  You're discussing apples

2     and oranges.  Justice is an intangible that has no

3     price, but at the same time there is a physical cost

4     that's associated with every action that we take by a

5     government.  That government is funded by the people.

6     So there is where you have to decide which is it.  Is

7     it the people paying for whatever they perceive to be

8     justice, or are you looking at justice in a

9     philosophical fashion?  That's not an answerable

10    question, sir.

11            **MR. WRIGHT:**  No further questions.

12            **THE COURT:**  All right.  Any redirect?

13            **MR. NESMITH:**  No, Your Honor.

14            **THE COURT:**  All right.  Any objection to this

15    witness being excused?

16            **MR. NESMITH:**  No, sir.

17            **THE COURT:**  All right.  You may remain or

18    leave, however wish.  All right.  Is there another

19    witness for defendant?

20            **MR. NESMITH:**  I'm sorry.  We rest.

21            **THE COURT:**  All right.  Do you have any

22    rebuttal evidence you wish to present, Mr. Wright?

23            **MR. WRIGHT:**  Your Honor --

24            **THE COURT:**  Yes, sir.

25            **MR. WRIGHT:**  -- simply, the issue before you,

1    this court --

2            **THE COURT:**  Before you argue, what I'm saying

3    is --

4            **MR. WRIGHT:**  No, I don't have any that I want

5    to leave with you.

6            **THE COURT:**  All right.  That's fine.  All

7    right.  You may make your argument, and I'll allow

8    Mr. NeSmith to argue, and then you may make a brief

9    reply.

10           **MR. WRIGHT:**  All right.

11           **THE COURT:**  Yes, sir.

12           **MR. WRIGHT:**  -- is whether or not the new

13   proposed plan violates Section 2 of the Voting Rights

14   Act of 1965.  As we just went through the numbers, and

15   the numbers speak clearly and loud and ringing for

16   themselves, if the new plan goes into effect, it will

17   certainly pack the majority votes into two districts.

18   The numbers was just read before this Court, and

19   there's no disputing that issue.

20        The numbers came from an accurate report of the

21   data that he brought today that he says is accurate.

22   He went through the nine district seating, which we are

23   saying is the -- is what we need in Sumter County,

24   Georgia in order to be assured that every person have

25   the opportunity to vote for the candidate of their

1    choice, and that their vote has -- and that the new

2    plan will simply just dilute and split and crack the

3    black up, even though we may have a slight majority in

4    the overall number.  But that overall number is diluted

5    so badly so you could never get in to ever gain a 3/2

6    majority with that current set up.  And so, as speaks

7    to at-large, it has been challenged with Mr. Edge that

8    we talked about earlier in 1974, and that it just

9    simply goes away from what Section 2 was put in place

10   to prevent.

11        So even in -- they keep saying about your order.

12   Your order plainly said that the issue of

13   discrimination, that the issue about whether or not it

14   violated Section 2 was not before you, and you could

15   not rule on it.  Well, that is what's before you today

16   is whether or not the new plan will cause -- will cause

17   a hurt to the community that cannot be reversed.

18        **THE COURT:**  Let me ask you this, Mr. Wright.

19   Now, of course, you obviously have some knowledge of

20   title two.  Did you understand the level of proof in

21   title two is -- in Section 2, rather, of the voters

22   right act is pretty strict, it's a pretty high hurdle.

23   You are not suggesting to the Court just because there

24   is not an exact number of balance between the races

25   that that necessarily means that there's a violation of

1    the voters right act?

2              MR. WRIGHT:  No.  What I'm saying is that the

3    majority group is significantly large and

4    geographically concentrated to make up a majority in a

5    single member district, that they have concentrated --

6              THE COURT:  Say that again.  I got lost.  It

7    sounded thoughtful but I got lost on it.

8              MR. WRIGHT:  They have taken the area of

9    black people with the new plan and put them into a one

10   geographically or two geographically locations, which

11   is part of what you have to show the Court is -- or

12   that did take place.  And that whether or not there is

13   a political cohesiveness.  It has been testified to

14   today that in Sumter County, Georgia black people vote

15   one way, and white people vote one way.

16             THE COURT:  That's been the opinion given by

17   certain people --

18             MR. WRIGHT:  I know, but --

19             THE COURT:  -- but I don't have any

20   statistical evidence before me that that's the case.

21             MR. WRIGHT:  Yes, sir.

22             THE COURT:  I don't discredit the opinions of

23   people's views, but just like I don't think anybody

24   would have guessed that the numbers today are

25   approximately equal in Sumter County, Georgia.  I think

1    most people would have been surprised by that number.

2         But, again, what I'm getting at, the difference

3    between actual and empirical evidence supporting an

4    opinion, the Court is not going to allow that empirical

5    evidence thus far in this case.  We're just at the

6    beginning.  The case is -- the Court won't be deciding

7    whether there is a violation of the voters right act

8    today.  This is going to the question as to whether or

9    not there should be an injunction against the election

10   while this case is pending.

11        **MR. WRIGHT:**  Right, and that's what we

12   believe should happen is that an injunction should be

13   to prevent the May 20th election.

14        **THE COURT:**  Okay.  Is there anything on the

15   merits, and I know, again, just like I just said,

16   you're not here to prove your case fully today.  I

17   note, just looking at the numbers for the districts for

18   commissioner purposes, you agree that those have been

19   approved --

20        **MR. WRIGHT:**  Yes, sir.

21        **THE COURT:**  -- as proper districts?

22        **MR. WRIGHT:**  Uh-huh.

23        **THE COURT:**  And based on the numbers that

24   were given just a few moments ago it would appear that

25   one -- that two of those districts would be majority

1    black and -- on the numbers, and the other three would

2    be Caucasian, but of those other three, one of them

3    have about -- let's see, there is -- the difference is

4    only about 140 voters, roughly.  So you've got -- so

5    you say you really have -- you could argue that there

6    are two and two with one that could easily swing one

7    way or the other.

8            MR. WRIGHT:  Uh-huh.

9            THE COURT:  It could be sometimes three and

10   sometimes two.  And my question is really this.

11   Assuming that that is a fair distribution based on the

12   voting distribution in Sumter County, why would that

13   not be proper under -- for the Board of Education?  Why

14   would that something to be unfair?

15           MR. WRIGHT:  And in the document that's

16   before the Court that we brought we raised that very

17   issue, is that -- is that it probably should have been

18   challenged before now, that it is in violation, and

19   that it had been something -- and I don't know why it

20   hadn't been challenged before now, and it just hadn't

21   been challenged before now.

22           THE COURT:  It could be argued that it's not

23   challenged because didn't anyone think they could do it

24   successfully.

25           MR. WRIGHT:  I know, but at the same time

1    once we looked at it and then we looked at the impact

2    of the change and the makeup of the school board, then

3    that's when it became more clear and apparent that

4    sometimes you see some things and you don't necessarily

5    see them at that time, but once that became apparent,

6    then you looked that you had nine members and then what

7    would happen with that makeup of that nine member

8    board, and then you started to really look at the

9    numbers, and then you realized that that should have

10   also been challenged under Section 2.

11        **THE COURT:**  But we have to say, though, at

12   some point, though, in the past those -- that five

13   member board was approved after a census, wouldn't it?

14        **MR. WRIGHT:**  Yes, sir.  It was approved by

15   someone, and, again, not to let's say, beat up

16   Mr. Skipper and he's not here, but I believe that --

17   and this is just my own opinion, again -- that if they

18   had not asked him to show them what he was going to

19   submit prior to the submission and his other

20   submissions were not accurate, that even you, if I

21   present you some documents that says I have a 6/3

22   board, why are you objecting to it when six blacks will

23   say they want this change.  So I don't know if that's

24   what happened in the past, and in 2000 I don't even

25   know if Attorney NeSmith could answer that because he

1    wasn't their attorney then.  I don't believe he was.

2    I'm not sure who the county attorney was in 2000.  So I

3    don't know how that plan was submitted.

4         **THE COURT:**  But it would have had to go

5    through DOJ review at the, unlike the new --

6         **MR. WRIGHT:**  Right, I'll agree with that.

7    So, you know --

8         **THE COURT:**  Is there any reason to suggest

9    they would not have been just as careful with their

10   review then as they would apparently as it's being

11   suggested about 2012?

12        **MR. WRIGHT:**  No, I'm not suggesting that they

13   would not.  But what I am suggesting is is that

14   whatever you send back and whatever answers you give

15   them would affect the decision that they make.

16        **THE COURT:**  All right.  I didn't have to

17   reach that question.  Really, there's no basis for me

18   to reach that question, and I didn't in the prior

19   litigation, but a question I did have and it was not

20   asked of either the witnesses and that wasn't

21   necessary.  And that is along this line -- yeah, there

22   was somewhat of an explanation of it.  But it appears

23   that the recommendation was withdrawn, the request for

24   review was withdrawn by the board --

25        **MR. WRIGHT:**  Uh-huh.

1    **THE COURT:**  -- while it was under review by

2    the Department of Justice without them giving any

3    ultimate opinion about whether they thought it was a

4    good or bad and --

5    **MR. WRIGHT:**  Well, again --

6    **THE COURT:**  And the question I would have is

7    if what they think is so important would have made

8    sense for them to complete the process and exactly say

9    whether they thought it passed muster or not.

10   **MR. WRIGHT:**  Well, I can't speak to what

11   their attorney recommendations at that point when

12   Mr. Skipper resigned.  I know that they hired new

13   counsel, but I can't really speak it to it because I

14   wasn't involved in their executive sessions and exactly

15   why they decided to make that withdrawal, you know, one

16   of them would have to be more inclined to answer that,

17   but I do agree that if it had stayed with them we

18   probably wouldn't even be here today because I believe

19   because of the three letters that I have seen since

20   that time that they would have rejected the plan

21   because they were not satisfied with what had been

22   presented to them.

23   **THE COURT:**  Well, I don't think they ever

24   said they were dissatisfied.  They were just asking

25   some questions, weren't they?

1              **MR. WRIGHT:**  Well, from the language of my

2     interpretation of the letter, it was clear that they

3     was dissatisfied.  That was my interpretation.

4              **THE COURT:**  I mean, that's your

5     interpretation and I'm not saying that's a bad

6     interpretation.  I'm saying it wasn't none of them

7     saying, we are dissatisfied with this proposal, and we

8     have these questions.  It says, we have these questions

9     about these proposals.

10             **MR. WRIGHT:**  Right.

11             **THE COURT:**  Is the latter more accurate?

12             **MR. WRIGHT:**  Right, the latter is more

13    accurate to the language that they used.

14             **THE COURT:**  And it could very well have meant

15    that they were dissatisfied.

16             **MR. WRIGHT:**  Right.

17             **THE COURT:**  But they never used the

18    terminology.

19             **MR. WRIGHT:**  And which is the same thing

20    about the letters earlier that he had Mr. Brady testify

21    to because my interpretation of those two letters were

22    different from his, is that, what I interpreted, it

23    wasn't telling him that he was to actually hold -- it

24    didn't spell out -- it didn't make it clear, like what

25    you're saying now.

1          **THE COURT:** I understand.  Let me ask this

2     question.  Of course, one of the things you have to

3     show here is that there's a likelihood of success on

4     the merits.  Another thing that you have to show is

5     that there is some irreparable injury that would occur

6     by allowing the May election to go forward, and that

7     there is no other way to fix this if the vote goes

8     forward.  And it further is in the best interest of the

9     public that it be allowed, and that it's not more

10    harmful to the other party than it would be by not

11    doing so.  So do you want to tell me about how your

12    case meets the standards for granting of injunctive

13    relief preliminarily as you are requesting?

14         **MR. WRIGHT:** Well, Your Honor, it meets the

15    standard because if the proposed change goes through

16    and the election takes place on May 20th, the minority

17    black people in Americus and Sumter County, Georgia

18    would be just taken back to 1965 at the time when the

19    Voting Rights Act was put in that --

20         **THE COURT:** What I'm asking you -- I

21    understand what you're saying.  Obviously if what you

22    say is true, they would be harmed at some stage.  But

23    what I'm asking about is why the Court needs to take

24    the extraordinary action of stopping an election now

25    because isn't it correct that if the Court heard this

1    case and ultimately agreed with you, it could revoke

2    any election that had taken place beforehand and cause

3    a corrected districting to be made.  In other words,

4    your case doesn't end with today if I deny injunctive

5    relief.

6            MR. WRIGHT:  Uh-huh.

7            THE COURT:  In other words, injunctive relief

8    is pretty much saying that this is of such -- the

9    impact is so great that the only way to preserve what

10   should be a -- almost a clear way in the end --

11           MR. WRIGHT:  Uh-huh.

12           THE COURT:  -- is by stopping this now.  But

13   isn't it true that this could be corrected later if it

14   turned out that you've established your case?

15           MR. WRIGHT:  Well, I don't believe it could

16   be corrected later.

17           THE COURT:  Why not?

18           MR. WRIGHT:  Because once it occurs, then it

19   has already happened, and that, you know, I don't want

20   it to be the old additive that if an egg broke, don't

21   fix it.

22           THE COURT:  That's not what I'm saying.

23           MR. WRIGHT:  But, I mean, what I'm saying is,

24   is that if it goes through, it can't help but hurt

25   because, I mean, you're fixing to take six voting in

1    black board members and basically undo them and then

2    they will, out of their seats, the people with whom

3    they were representing no longer have the ability to

4    really vote on the candidate of their choice.

5          **THE COURT:**  Well, this Court's order last

6    year kept -- maybe the year before last time now --

7    kept four people who had been voted on in March, it

8    stopped the vote all together, it froze everything.

9          **MR. WRIGHT:**  I didn't -- say that again.

10         **THE COURT:**  The Court's order froze

11   everything the last time.

12         **MR. WRIGHT:**  Uh-huh.

13         **THE COURT:**  And out of that and through some

14   other matters that happened, this matter comes back up

15   for voting again.

16         **MR. WRIGHT:**  Correct.

17         **THE COURT:**  And so what I'm trying to

18   understand is why could not an action by the Court in

19   the future correct anything that may prove to be wrong.

20         **MR. WRIGHT:**  Well, I guess you could do it in

21   the future, but we would hope that the Court would

22   indulge in fixing it, you know, or helping us fix it at

23   this point in time.

24         **THE COURT:**  I have another question for you

25   too, and I'm not trying to keep you from making your

1       argument, but I think I understand your argument, but I

2       want to make sure you have an opportunity to answer the

3       questions that I have.

4              MR. WRIGHT:  Yes, sir.

5              THE COURT:  This situation has been known for

6       some period of time because it was first raised as a

7       one man, one person, one vote issue that even with the

8       nine that they were disproportionate, which this Court

9       found, and stayed the election for that reason.  And

10      the Court was taking action to redistrict --

11             MR. WRIGHT:  True.

12             THE COURT:  -- with nine in a way that would

13      have been appropriate and not be disproportionate, and,

14      of course, the law changed through the Supreme Court's

15      ruling and that became unnecessary.  And so when the

16      Court asked for further briefing, I think late last

17      year, I think it was, and got the responses and the

18      Court issued its final order.  So it's pretty clear

19      from that time forward that the -- at some point in

20      time there was going to be new elections based on the

21      5/2 and because of the issue with the soldiers having

22      the opportunity to vote in runoffs, the legislature had

23      to push the votes back into early, rather than later

24      and get this -- this was filed late last week within

25      two weeks of the time that this election was to occur.

1    The first one is kind of off the table now.

2         MR. WRIGHT:  Yes, sir.

3         THE COURT:  But the one in May is not very

4    far out.  It's maybe about a month and half out from

5    now, and one of the factors the Court can take into

6    account in whether or not to grant injunctive relief is

7    the timeliness of the issue being raised in nearness to

8    the election.

9         MR. WRIGHT:  Yes, sir.

10        THE COURT:  So what is the reason this is

11   filed so close to the anticipated election?

12        MR. WRIGHT:  Just frank -- Mr. McDonald

13   basically lied.  He said he was going to do it.  We

14   kept waiting for him to do it, it never happened.

15        THE COURT:  Well, I appreciate your frankness

16   with the Court.

17        MR. WRIGHT:  And so at that point -- I have

18   the letter in the correspondence if you want me to --

19        THE COURT:  No, I take your word for it.

20        MR. WRIGHT:  -- when we discussed it

21   immediately after you made your order, in the

22   discussion that we had, he said he was going move

23   forward on it, and we kept waiting, and we kept

24   waiting.

25        THE COURT:  You're telling me you expected --

1          **MR. WRIGHT:**  Right, because we -- and then it

2     got dragged on and it was like, well, I'm working on

3     it, we're getting it done, until it got down to the

4     wire to where, if we don't move now, then it's just

5     going to go, and then nothing happened.

6          **THE COURT:**  Okay.  I understand.  Again, I

7     appreciate you being straightforward with the Court in

8     response to the Court's question.  Also, you've heard

9     it mention that it would be some cost to the county to

10    reorder these at this time.

11         **MR. WRIGHT:**  Sir?

12         **THE COURT:**  To reorder the --

13         **MR. WRIGHT:**  Oh, yes, sir.  Well, I mean,

14    definitely it's cost for the county.  I mean, this

15    is -- I mean, not only the cost, it's cost to me

16    because I'm in that county.  I mean, it's a cost today

17    to the county.  So it is a cost involved in it, but,

18    again, in the order of justice -- I mean, justice, like

19    it says, should have no price, should have no cost.

20         **THE COURT:**  I thought it was a pretty good

21    answer myself.  I don't think anybody really disagreed

22    with that.

23         **MR. WRIGHT:**  Okay.

24         **THE COURT:**  Well, what about the 250 people

25    or plus who have already voted?

```
1          MR. WRIGHT:  Well, again --

2          THE COURT:  In a way the Court would be

3    saying your vote is null and void.

4          MR. WRIGHT:  Well, again, as when I was on

5    the witness stand and as we discussed then, that the

6    March 18th configuration, if the Court indulged, we

7    don't have an argument about the nine because it is

8    nine seats.  So we say, you know, if that's your

9    ruling, it is no objection on our part.  The actual

10   plan that we are arguing is the plan of May 20th.

11         THE COURT:  Anything else you want to tell

12   me?  I know I interrupted you several times, so.

13         MR. WRIGHT:  No, you did a good job of

14   telling you the rest of what I had to tell you.

15         THE COURT:  That was the idea, for you to get

16   to -- to tell me what I needed to hear.

17         MR. WRIGHT:  Thank you.

18         THE COURT:  All right.  Mr. NeSmith?

19         MR. NESMITH:  All right.  Your Honor, I'm

20   going to try and be just as brief as I can.  I know

21   it's late in the day.

22         As the Court previously spoke, and I'm quoting

23   from United States of America versus Alabama, which is

24   691 F.3d 269 at page 289 -- 281, pardon me, a 2012

25   decision where it says:  A preliminary injunction may
```

1      be granted to a moving party who establishes, number

2      one, a substantial likelihood of success on the merits;

3      number two, irreparable injury to be suffered unless an

4      injunction issues; three, threatened injury and the

5      movant outweighs whatever damage the proposed

6      injunction may cause the opposing party; and if issued,

7      the injunction will not be adverse to public interest.

8           Now, this decision came after, I believe after

9      Winters, which was a 2008 decision.  Winter.  I said

10     Winters.  Winter versus National Resource Defense

11     Council, which is 555 U.S. 7.  It's a 2008 decision

12     reversing the Ninth Circuit where the Supreme Court

13     said:  Issuing a preliminary injunction based only on

14     the possibility of irreparable harm is inconsistent

15     with our characterization of injunctive relief as an

16     extraordinary remedy that may only be awarded upon a

17     clear showing that the plaintiff is entitled to the

18     relief.

19          So, as the Court I think very appropriately

20     stated, it is a high burden to invoke the equitable

21     powers of this court to stop something, especially

22     something as precious to the United States of America's

23     rights of voting.

24          What we would say in response to those four

25     traditional tests for determining whether to grant a

1    preliminary junction, the substantial likelihood of

2    success on the merits which, of course, we don't

3    believe exists at this point because we do have -- we

4    are talking about a district that mirrors a

5    pre-approved district, approved by the United States

6    Department of Justice after strict scrutiny by them.  I

7    don't mean court scrutiny.  But their way of looking at

8    things, which the Department of Justice generally does

9    not leave too many stones unturned, and what we're

10   talking about more than anything else I think may be

11   the two at-large districts which do operate throughout

12   the state of Georgia, and we're standing in one right

13   now.  The school board here has at-large seats to my

14   understanding, Dougherty County.

15        So to me the likelihood of success is not

16   substantial.  There may be a likelihood.  Maybe once

17   there's a regrouping or maybe arguments are honed and

18   perfected, that will change, but today, as we stand

19   here today, I believe there is no substantial

20   likelihood of success on the merits.

21        Number two, the irreparable injury will be

22   suffered unless the injunction issues.  Well, first, we

23   just don't know that.  Once this -- once the May

24   election comes, what if the two candidates -- and let

25   me tell you this, we've got two people running for the

1   four-year seat.  They had to be staggered by law.  One

2   is African American, one is white.  And then on the

3   two-year, we've got four people, two are white and two

4   are African American.  What if we come back here after

5   May and we have two at-large black members.  Doesn't

6   that somehow negate this argument.  Or what if we have

7   one white and one black.  We don't know what's going to

8   happen.  I think that this is too much of a crystal

9   ball to try and decide what irreparable injury would be

10  suffered.  We just simply don't know that.  I mean,

11  what we got to have here is a situation that's very

12  similar to this county and several others that have

13  at-large elections as has been -- and I know you didn't

14  have empirical data, but I think the Court can

15  certainly take notice that Sanford Bishop is still a

16  U.S. Congressman, that President Obama is still the

17  president of the United States, and while Mike Cheokas

18  still sits on the General Assembly and was author of

19  this bill that's being argued -- or being complained

20  about, House Bill 836, everyone -- it was undisputed

21  that he was defeated in Sumter County, you know, by a

22  black candidate which is an at-large.

23      Now, if -- he doesn't have the entire county.  I

24  don't know what percentage he has, but it's not

25  impossible is what I'm telling you for someone to run.

1    If you look at the people that have run, you know, it

2    will be clear that obviously it can't be purely African

3    American votes because as you heard statistically

4    there's just not enough, the percentages are just too

5    close.  So, obviously there's got to be -- one has got

6    to swing to the other.

7        The threatened injury to the movant outweighs

8    whatever damage the proposed injunction may cause the

9    opposing party.  Well, you've already heard, it's going

10   to cost the taxpayers, and we're in a -- you know,

11   Sumter County is not a wealthy county.  Sumter County

12   had to do furloughs.  It's just -- first year coming

13   out of furlough, and it's workers, and, I mean, quite

14   frankly, you know, Sumter County has been carried on

15   the back of the taxpayer and on the back of their own

16   employees, and the $15,000 is certainly not, it's not

17   the most money in the world, but it still something the

18   county doesn't have and the taxpayers are going to have

19   to pay that, and whatever money is paid, whether it's a

20   dollar or 1500 or 15,000 or 15 million, it's got to

21   come from somewhere.

22       But more importantly is the possibility of the

23   loss of SACS accreditation.  Those children deserve --

24   I mean, they deserve to be in an accredited high

25   school.  And they don't deserve to have that pulled

1     away from them and not be able to go to the college or
2     university of their choice.
3          One of the things that was mentioned was about, if
4     you're not accredited that you don't qualify for Hope
5     scholarship.  Well, the Hope scholarship affects
6     children from all over.  I mean, hopefully, it's going
7     to affect mine if she'll keep her grades up, but if it
8     doesn't, it affects children who work hard enough and
9     whether they're rich or whether they're poor and Hope
10    gives people just that, hope.  And without
11    accreditation, the hope disappears from Sumter County,
12    and if it disappears, we've got children that aren't
13    going to college.  If we have children that aren't
14    going to college, think of the irreparable harm,
15    irreparable harm.  Those children can't have a do over.
16    They can't say I'm going to go back to the eighth grade
17    and start over or the seventh grade, or, you know, they
18    can't do that.  They're stuck.  Whatever it is is
19    whatever it is.  They lose accreditation.  Even if
20    accreditation is brought back the next year, those
21    children that graduate without accreditation there's
22    nothing that I can think of this Court can even do
23    about that.  Once it's gone, it's gone.
24         Now, can the Court come back and correct any
25    Section 2 problems later on, certainly.  There's no

1    problem with the Court coming back if the evidence

2    warrants that there is a problem with the way these

3    districts are drawn or if there is some sort of racial

4    imbalance or there's been any packing, cracking, or all

5    the things that are the *Gingles*' criteria, then it

6    would be, not only possible for this court to do it,

7    it's something this court would do.  This court would

8    step in, it would correct it, and we would have to have

9    different elections, and that's just what we have to

10   do, and we would do what the Court orders us to do.

11        That's what Sumter County Board of Elections is

12   trying to do now, is to follow, not only the order of

13   this court, but also the law of the state of Georgia

14   signed into law by Governor Nathan Deal twice.

15        Now, would it be adverse to the public interest.

16   I can't imagine that it will be -- anything could be

17   positive to the public interest of causing taxpayer

18   burdens and children to lose accreditation.  I don't

19   see how the public interest could even possibly be

20   served.  I don't think the public interest is

21   necessarily being served today, but nevertheless, you

22   know, it was said that, yes, this is costing money

23   today, but the county is not here voluntarily.  They

24   county is here because the county got sued.  And so we

25   understand that that's going to happen and that's part

1    of government, but the public interest, what the people

2    want, are elections, and that's all they want.  They

3    just want elections, and if the Court finds out later

4    on they're not appropriate, then, you know, by all

5    means, Judge, reverse them and start over again, and

6    we'll do exactly what you tell us to do.

7        I think if the Court remembers when we were

8    talking about the Byrd decision and you were asking

9    everybody what their position was, I came right up here

10   and I stood there and I told you that, Your Honor, we

11   don't care if it's five plus two, 9 or 90 districts.

12   We don't care what it is as long as you tell us they're

13   fair and square, or the Department of Justice, at that

14   time they could, approves those, and all we want to do

15   is proceed with a fair election which is according to

16   the law, and if there is anything that is wrong with

17   those districts, then now is not the time to be

18   stopping all those folks, all the people who have taken

19   the time and the effort to get out, and there are signs

20   all over the county, there are people actively

21   politicking for these positions, and to stop all of

22   that would be quite a slap to some of these candidates.

23       Now, the Thornburg versus Gingles.  I say it's

24   *Gingles*.  It's *Gingles* or *Gingles.*  I don't know

25   whether it's a hard G or a soft G.  But in Thornberg

1    <u>versus Gingles</u>, which, let's see, I believe that 478

2    U.S. 30, it's a 1986 decision.  And in that decision

3    the United States Supreme Court was saying to prove a

4    Section 2 violation that what you got to do is you got

5    to prove very much -- this was what you were saying and

6    it sounded pretty thoughtful.

7        What he was reading is purely what comes from the

8    *Gingles*'s decision.  It says:  First, the minority

9    group must be able to demonstrate that -- a

10   sufficiently large geographic impact to constitute a

11   majority in a single member district.

12       What that means is if you are at a county like

13   Fayette County -- Fayette County was -- had five

14   commission districts, and they were all at-large, all

15   five of them.  Their demographics were 80 percent white

16   and 20 percent African American and other.  There was

17   really no way, at an at-large, if people vote down

18   racial lines, that the black people in Fayette County

19   had any voice, and the courts stopped that, and they

20   said, under the *Gingles*'s decision, if you got -- if

21   can you find an area, if you can draw lines and if you

22   can find an area and create single member districts and

23   in those single member districts you can create

24   districts where the minority in your county can vote

25   for the candidate of their choice, then you've got an

1    obligation to do that.  And that's what Fayette County

2    had to do.  We've got another county not too far north

3    of us in that same position which is probably going to

4    have to make a decision like this as well.

5         And it says that you have to show the minority

6    group is politically cohesive, and that's a difficult

7    one to do because it's hard to know how a person votes.

8    But what the court said is you've got to show that

9    minority group tends to vote for people of their own

10   race.

11        We have been talking about a lot of voting down

12   racial lines, and I think I said this also in the Byrd

13   case, is that I really -- I don't like the way that

14   sounds.  It almost sounds like it's very racist on

15   either side, but what it boils down to is we vote for

16   who we know.  We hang with people we know, we are

17   friends with people that we know.  If the

18   communities -- people live where they live.  And

19   there's something that we can't really do about that.

20   That doesn't mean that the government can say, you

21   know, we've got to relocate you people over here or

22   these people to this place.  People live where they

23   live, and they get to choose to live where they live,

24   and we're not allowed to gerrymander districts to make

25   them where they would have numbers that some people may

1    want.

2         So what you have to show, just under the *Gingles*'s

3    decision, is that if you've got a single member

4    district -- these are single member districts.  So that

5    part of the *Gingles* doesn't apply.

6         The second part, the minority group must show it's

7    politically cohesive.  I mean, you know, I suppose

8    that's probably true, but I can show you instances

9    where obviously white citizens of Sumter County had to

10   vote for black candidates, the president of United

11   States, others.

12        The third, it says, the minority must be able to

13   demonstrate that the white majority vote sufficiently

14   block to enable it.  And there got to be some special

15   circumstances of the minority candidate running

16   unopposed and usually defeat the minority's preferred

17   candidate.  There's no evidence to the Court whatsoever

18   on that third prong that there's been any white

19   majority block voting.

20        Basically what we have is we have two districts,

21   one for the Board of Elections, one for the Board of

22   Commissioners.  They mirror each other.  One went

23   through the Department of Justice.  It went through

24   with scrutiny, it came out without any problems, and

25   was approved, and has been operating successfully since

1     that time.  And two of the districts have been occupied

2     by African American candidates for quite some time and

3     continue to be that way.

4         There was another decision in <u>Bartlett versus</u>

5     <u>Strickland</u> and the Supreme Court ruled on the first

6     prong of the *Gingles*'s test.  In *Bartlett*, it said,

7     it's been argued that Section 2 requires drawing

8     district lines in such a manner to allow minority

9     voters to join with other voters to elect a minority's

10    group preferred candidate even when the minority group

11    comprises less than 50 percent of the voting age

12    population.

13        But rejecting that argument, the court said, that

14    Section 2 does not grant special protection to minority

15    groups that need to form a political coalition to elect

16    candidates of their choice.  And this is the Supreme

17    Court saying this, it's not me saying this.  It's the

18    Supreme Court saying this.

19        And what the third prong of the *Gingles*'s test

20    requires, that minority be able to demonstrate that the

21    majority vote sufficiently has to block, in a block to

22    enable it to defeat minority preferred candidates.

23    There's just no -- there's just nothing before this

24    court at all dealing with that.

25        So I don't want to go too far into the merits of

1    the case.  I think that's for something later on.  But

2    I do want to bring this out because of the first prong

3    about the substantial likelihood on the merits.  As it

4    stands today the substantial likelihood on the merits

5    doesn't exist.  Now, it might exist after May, but

6    today before the Court the substantial likelihood of

7    being successful on the merits, it just isn't there.

8         And I believe that the argument has failed on all

9    four points that our Eleventh Circuit has said this is

10   the way that we have to do it.  And -- as the Court

11   pointed out.  I appreciate your time, Your Honor, and

12   that's all that I have.

13        **THE COURT:**  All right.  Mr. Wright, as I

14   said, you have an opportunity to make any brief reply

15   you wish to make.

16        **MR. WRIGHT:**  Your Honor, there is evidence in

17   2006 in Sumter County, Georgia that on the merits we

18   could meet that standard.  And so certainly that would

19   be up to the Court to decide, but there was an election

20   took place in Sumter County in 2006 that involved

21   Wright versus Howard.  So we believe that that

22   particular election and that we would be able to

23   present the Court evidence that -- that we could meet

24   and carry that burden.

25        Accreditation, certainly they say SACS, but the

1   Sumter County School System is accredited by another

2   organization, and in our research we have not found

3   where any student have ever been rejected at any of the

4   schools, and they are also into national, according to

5   the information that we interviewed and that we

6   researched and find.

7       The issue of money coming up, but the issue about

8   money should be really, as the Court would call it, a

9   moot, if that's what you call it, that it should be

10  about whether or not the black community would actually

11  be packed into two districts and never have an

12  opportunity to actually have the majority on the Sumter

13  County School Board.

14      And then also the issue about President Obama and

15  Mr. Bishop being elected.  It doesn't necessarily mean

16  that the white community voted for them.  They

17  certainly could go into the booth and just skip it and

18  not even vote, so, you know, you -- and when you look

19  at the exit polls on the -- on the national networks

20  and if you listen to the people that said who they

21  voted for or didn't vote for, so certainly that would

22  give some merits to -- many of them go in there and

23  don't even -- don't even, you know, vote for them.  So

24  then that distorts the number.

25          **THE COURT:**  Well, that could be determined,

1    couldn't it?

2         **MR. WRIGHT:**  Sir?

3         **THE COURT:**  You don't have to rely on

4    guessing on that.  We can determine, in fact, how many

5    people actually voted.

6         **MR. WRIGHT:**  Well, yeah, you can determine

7    how they voted, and then you can also -- which goes

8    back to 2006, when that's why we think we can meet that

9    standard because we have that data.  Hmm, and, you

10   know, history just says that in Sumter County, Georgia

11   that if the new proposal goes into effect that it's

12   going to affect the black community in a way that will

13   send it back to 1965.

14        **THE COURT:**  All right.  Thank you.  Of

15   course, first all, Mr. Wright, I just want to say

16   you've handled yourself well here as a pro se litigant.

17        **MR. WRIGHT:**  Thank you.

18        **THE COURT:**  You've been very forthright with

19   the Court and you've presented your arguments and

20   things to the Court clearly.  Now, with that having

21   been said, I will say a court is a -- can be a complex

22   situation and a demanding situation for skills.  As I

23   suggested earlier in the area of title, rather, Section

24   2 of the voters right act, it's a very heavy burden,

25   and it's a very complex and fact-intensive endeavor to

1    establish.  So I'm not criticizing you at all.  Of

2    course, if at some time you are able to acquire counsel

3    to assist you, the Court will, as I will always do,

4    encourage you to do so so that it has its best

5    opportunity to have all the facts and evidence

6    established presented that you intend to in the case

7    that you bring.  Of course, the case won't be decided

8    today.  We're just doing preliminary matters.  Of

9    course, the case is set to proceed, and you'll have the

10   opportunity to get some assistance if you want to do

11   that, but I encourage that you do so.

12       Now, the first issue, the Court is going to issue

13   a written order, but I think since we've got an

14   election that's coming up Tuesday on the 18th of March

15   it's better the Court give an earlier decision on that

16   as it possibly can so there's really some expectation

17   on the part of the citizens, the voters, as well as the

18   candidates who are going to be involved in that

19   election.

20       Since that is for the nine-member board as was

21   indicated, as Mr. Wright has agreed, then that's not

22   inconsistent with what relief he wants, and therefore,

23   consensually, does not press for an injunction as far

24   as that election being held, and the Court further

25   finds at this late time, it would not be appropriate to

1    prevent it, in any case.

2        So the Court will decline and deny an injunction

3    preliminarily with regard to the May -- rather the

4    March 18th, 2014, election.  And I will take the other

5    matter under advisement.  I want to think about some

6    things and read some things, and then I will issue a

7    written order very soon with regard to the May 20th,

8    2014 matter as sought by the plaintiffs.  All right.

9            MR. WRIGHT:  Yes, sir.

10           THE COURT:  Thank y'all very much.

11           MR. NESMITH:  Your Honor, may I ask one

12   question?

13           THE COURT:  Yes, sir.

14           MR. NESMITH:  Do you want both sides to go

15   ahead do the disclosures under Rule 26?  Since we're --

16           THE COURT:  What I normally do is I will wait

17   for the answer to be filed and then issue an order, a

18   Rule 16/26 order.

19           MR. NESMITH:  Okay.

20           THE COURT:  Directing you all to confer and

21   then suggest to the Court a discovery schedule, and as

22   a part of that discovery schedule there is usually an

23   agreement for me to rule as to when you might exchange

24   your disclosures.  At the same time now, I never

25   discourage counsel, the parties, from doing things

1    earlier if they agree to do so.  But as far as being

2    required by the Court, you would not be required to

3    begin.

4            MR. WRIGHT:  Sure.

5            THE COURT:  Also that gives Mr. Wright -- Mr.

6    Wright, you know as representing your party, you are

7    required to --

8            MR. WRIGHT:  Yes, sir.

9            THE COURT:  -- meet with Mr. NeSmith.

10           MR. WRIGHT:  Yes, sir, I know about that.

11           THE COURT:  You have two roles.  You are the

12   client and you're the lawyer.  So you've got to lawyer-

13   lawyer with him, and otherwise, when necessary, act as

14   a client so.  And, of course, if there is any

15   additional person as a licensed lawyer, I want you to

16   make Mr. NeSmith and the Court know that as soon as

17   possible.

18           MR. WRIGHT:  Yes, sir.

19           THE COURT:  All right.  Thank you very much.

20   We are adjourned.

21   _____

22       *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
     *TRANSCRIPT TO THE BEST OF MY ABILITY FROM THE AUDIO*
23   *RECORDING OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER THIS*
     *5th DAY OF DECEMBER 2017.*
24
         *TRANSCRIBER:*
25       *s/SALLY L. GRAY, USCR,*
         *U.S. DISTRICT COURT, MIDDLE DISTRICT OF GEORGIA*