1          IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
2                      ALBANY DIVISION

3                  _____

     MATHIS KEARSE WRIGHT, JR., :  Case No. 1:14-CV-42-WLS
4                               :
                 PLAINTIFF      :
5    vs.                        :    December 11, 2017
                                :     Albany, Georgia
6    SUMTER COUNTY BOARD OF     :
     ELECTIONS AND REGISTRATION,:
7                               :     Volume 1 of 4
                 DEFENDANT. :
8    _____

9                      BENCH TRIAL
            BEFORE THE HONORABLE W. LOUIS SANDS
10          UNITED STATES DISTRICT JUDGE, PRESIDING

11   APPEARANCES:
     FOR THE PLAINTIFF:         BRYAN L. SELLS
12                              P.O. BOX 5493
                                ATLANTA, GA 31107
13
                                LAUGHLIN MCDONALD
14                              2700 INTERNATIONAL TOWER
                                229 PEACHTREE ST NE
15                              ATLANTA, GA 30303

16                              AKLIMA KHONDOKER
                                P.O. BOX 77208
17                              ATLANTA, GA 30309

18   FOR THE DEFENDANT:         KATHERINE L. MCKNIGHT
                                E. MARK BRADEN
19                              RICHARD RAILE
                                1050 CONNECTICUT AVE NW
20                              STE 1100
                                WASHINGTON, DC 20036-5403
21
                                KIMBERLY A. REID
22                              P.O. BOX 5005
                                CORDELE, GA 31010
23   _____
                    SALLY L. GRAY, USCR
24            201 W. BROAD ST, SECOND FLOOR
                    ALBANY, GA 31701
25
                    (478)787-3905

*INDEX TO PROCEEDINGS*

*DECEMBER 11, 2017*

*VOLUME 1 of 4*

*PRETRIAL CONFERENCE*                                    *3*

*OPENING STATEMENTS*                                    *7*

   *FREDERICK GLEN MCBRIDE*

      *DIRECT EXAMINATION BY MR. SELLS*          *22*

      *CROSS EXAMINATION BY MS. MCKNIGHT*        *148*

      *REDIRECT EXAMINATION BY MR. SELLS*        *212*


   *CERTIFICATE OF COURT REPORTER*               *223*

```
 1              P R O C E E D I N G S
 2   December 11, 2017
 3              THE COURT:  Good morning.
 4              MR. SELLS:  Good morning, Your Honor.
 5              MS. MCKNIGHT:  Good morning, Your Honor.
 6              THE COURT:  All right.  The Court scheduled
 7   last week a -- I guess a final pretrial hearing on
 8   matters pending before we begin the actual trial.
 9        Of course, for the record this is the matter
10   Mathis Kearse Wright, Plaintiff, versus Sumter Board of
11   Education and Registration, which is case 1:14-42(WLS).
12        Let's see.  Let's start with the plaintiffs as to
13   those matters, if any, at this time that remain that we
14   need to resolve prior to beginning the trial.
15              MR. SELLS:  Well, Your Honor, I think the
16   matters that remain outstanding are the Daubert
17   challenges that have been incorporated.  I don't know
18   that they need to be ruled on prior to the beginning of
19   trial.
20              THE COURT:  Well, the Court will not revisit
21   any Daubert rulings it's already made as to a matter,
22   but if there are matters outside of what the Court
23   ruled on, those matters will be addressed at that time.
24              MR. SELLS:  Okay.  The only thing I'd like to
25   point out in that regard, Your Honor, is that after our
```

1   pretrial conference, the parties submitted a proposed

2   pretrial order, and in that order the defendant's

3   statement of the case, they suggested Dr. Owen is going

4   to testify that the plaintiff's expert, Dr. McBride,

5   has not run his statistics correctly.  That is in their

6   proposed pretrial order, and I think that goes outside

7   the scope of what this Court has already ruled.  And so

8   at the appropriate time we would ask the Court to limit

9   Dr. Owen's testimony in accordance with this Court's

10  previous ruling.

11          THE COURT:  All right.  We'll reserve that to

12  be raised at the appropriate time.

13          MR. SELLS:  Okay.

14          THE COURT:  All right, for the defense?

15          MS. MCKNIGHT:  Yes, good morning, Your Honor.

16          THE COURT:  Good morning.

17          MS. MCKNIGHT:  The only outstanding issues we

18  have, I believe you would probably like to address at

19  the time, they relate to particular exhibits, and, of

20  course, the Daubert motion that's also pending.

21          THE COURT:  As I stated to the plaintiff

22  about Daubert, the matters the Court has already ruled

23  on with regard to Daubert, that stands, but only a new

24  circumstance or application that the Court has not

25  addressed are reserved for the time that it's relevant

1 to raise it.

2   **MR. MCKNIGHT:**  Thank you, Your Honor.  And

3 just one more point because plaintiff's counsel -- and

4 we conferred this weekend.  We have been able to

5 withdraw some of our objections after plaintiff's

6 counsel provided updated versions of exhibits.  So some

7 objections have been resolved.  Other objections, I

8 don't know if the Court would like to address

9 defendant's objection which relates to over 200

10 exhibits that plaintiffs have proposed that are legal

11 authority.  I don't know if you would like to address

12 that now or as it comes up.

13   **THE COURT:**  I think we'd be better do that as

14 it comes up, or we won't finish this week.

15   **MS. MCKNIGHT:**  Okay.  Thank you, Your Honor.

16   **MR. SELLS:**  Your Honor, I have one item of

17 new business.

18   **THE COURT:**  Yes.

19   **MR. SELLS:**  And that is regarding one of the

20 plaintiff's exhibit.  It is Exhibit Number 265, and

21 Exhibit 265 is a copy of a voter list from Sumter

22 County, and the reason I bring it up is because we

23 believe that it has sensitive information in it,

24 however, not private information that would have to be

25 redacted under Rule 5.2.  So I've conferred with Ms.

1  McKnight and their team, and I have asked them to

2  consent to a protective order under Rule 5.2(e),

3  limiting electronic access to that exhibit over the

4  Internet.  Rule 5.2(e) provides specifically for this

5  type of scenario.  In other words, material that is

6  sensitive, but not required to be redacted, and so we

7  would ask the Court to, you know, again, without

8  objection to enter that order.

9          THE COURT:  Is there an agreement to that

10  effect?

11          MS. MCKNIGHT:  Yes, Your Honor, there is.

12          THE COURT:  That's fine.  Just give me the

13  specifics of it, and the Court will enter an order to

14  that effect to allow that to be the case.

15          MR. SELLS:  Thank you, Your Honor.

16          THE COURT:  There's no need to make anything

17  available that need not be -- or does not serve any

18  party's purpose.

19          MR. SELLS:  Right.

20          THE COURT:  All right.  Thank you.  Is it

21  that it?  All right, then.  I'm surprised.  Okay.  If

22  there any summary opening the plaintiff would like to

23  make at this time before going to the evidence, I'll

24  hear from the plaintiff and then the defendant and then

25  we'll hear the evidence.

1          **MR. SELLS:**  Yes, Your Honor.  May it please

2     the Court and counsel.  We are here today because the

3     Sumter Board of Education has written another chapter

4     in its long history of discrimination against African

5     Americans.  It is a history that, of course, includes

6     segregated schools.  Sumter County fought integration

7     ferrously and today more than 60 years after *Brown*

8     *versus Board of Education*, it remains one of the very

9     few school districts in the entire nation that has yet

10     to achieve unitary or fully desegregated status.  But

11     it is a history that also includes dogged efforts to

12     deny African Americans full and equal representation on

13     the board itself.  It took almost two decades of

14     litigation in this very court to integrate the school

15     board, a struggle that did not end until 1986 when the

16     board finally agreed to an election plan that would

17     open the door to black representation.

18          Over time African Americans in Sumter County won

19     representation on the board that began to approach

20     proportionality with their approximately 50 percent

21     share of the county's voting age population.  In a

22     nine-member redistricting plan adopted in 2002, African

23     American voters were able to elect four members of the

24     board and white voters controlled five.  Then, in 2010

25     the unthinkable happened, an African American candidate

1    Kelvin Pless upset the white incumbent in district

2    three.  His election meant that African Americans would

3    occupy five seats on the board and white voters would

4    only control four.  But before Pless could even take

5    his seat, white members of the board began pushing a

6    plan to change the method of electing its members.

7    Three months later the general assembly adopted local

8    legislation reducing the size of the Board of Education

9    from nine to seven members, with five to be elected

10   from single-member districts and two to be elected

11   at-large from within the county.

12        The board's attorney submitted the new plan to the

13   Department of Justice for preclearance under Section 5

14   of the Voting Rights Act, but in January 2012 the

15   Department of Justice reached the conclusion that the

16   information submitted by the board was insufficient to

17   permit the attorney general to determine whether the

18   change had neither the purpose nor will have the effect

19   of denying or bridging the right to vote on account of

20   race, color, or membership in a language minority group

21   as required by Section 5.

22        The department asked the board to submit

23   additional information, including election returns and

24   the factual basis for the board's assertion that the

25   changes would not result in a retrogression in the

1    level of minority voting strength in this school

2    district.  Because the Department of Justice refused to

3    preclear the new plan, the 2012 elections had to be

4    canceled and the new plan remain in limbo when, in

5    2013, the Supreme Court effectively struck down Section

6    5 of the Voting Rights Act in *Shelby County versus*

7    *Holder*.

8        Then, at its very next session the general

9    assembly adopted House Bill 836, the law at issue in

10   this case, which re-implemented the 5/2 plan that the

11   Department of Justice had refused to preclear and it

12   also moved the date of the school board election from

13   November to May.

14       Over the next two election cycles, House Bill 836

15   has had its intended and expected effect.  There have

16   now been three elections held for the at-large seats,

17   and the candidate preferred by African American voters

18   has been defeated by the candidate preferred by white

19   voters in all three.

20       Let me say that again.  Black voters are 0 for

21   three in the at-large elections under House Bill 836.

22   Black votes have been able to elect candidates of

23   choice in the overwhelmingly black districts one and

24   five, and white voters have controlled the heavily

25   white districts two, three, and four.  The result is

1    that African Americans voters are able to elect

2    candidates of their choice to only two of the board's

3    seven seats.

4         Plaintiff Mathis Kearse Wright, Jr., an African

5    American resident and registered voter in Sumter County

6    alleges that this result violates Section 2 of the

7    Voting Rights Act.  More specifically, Wright contends

8    that the current election plans two at-large seats had

9    high concentration of African American voters in

10   districts one and five dilute African American voting

11   strength in violation of Section 2.

12        Section 2 prohibits all forms of voting

13   discrimination on the basis of race, color, or

14   membership in a language minority, including what is

15   known as vote dilution.  As the Supreme Court explained

16   in *Thornburg versus Gingles*, the theoretical basis for

17   a vote dilution claim is that where majority and

18   minority voters consistently prefer different

19   candidates, the majority, by virtue of its numerical

20   superiority, will regularly defeat the choices of

21   minority voters.

22        Not only does voting along racial lines deprive

23   minority voters of their preferred representatives in

24   these circumstance, it also allows those elected to

25   ignore minority interest without fear of political

1    consequences, leaving the minority effectively

2    unrepresented, or in this case, underrepresented.

3         To prove a claim of vote dilution under Section 2,

4    a plaintiff need not show that a law was enacted with a

5    discriminatory purpose, rather it is sufficient to show

6    that it has a discriminatory effect, and the Supreme

7    Court in *Gingles* identified three preconditions for a

8    vote dilution claim under Section 2.

9         First, the minority group must be able to

10   demonstrate that it is sufficiently large and

11   geographically compact to constitute a majority in a

12   single member district.  Second, the minority group

13   must be able to show that it is politically cohesive.

14        Third, the minority must be able to demonstrate

15   that the white majority votes sufficiently as a block

16   to enable it in the absence of special circumstances,

17   such as the minority candidate running unopposed,

18   usually to defeat the minority's preferred candidate.

19        If a plaintiff meets that initial threshold, the

20   Court must then determine based on a review of the

21   totality of circumstances whether the challenged

22   practice results in unequal electoral opportunity for

23   minority voters.

24        In this case the Court has already ruled in

25   Wright's favor on the first *Gingles* factor, and we will

1    prove the second and third Gingles factors with the

2    results of a racial block voting analysis performed by

3    Dr. Frederick McBride.  That analysis shows that

4    African American voters have been highly cohesive in

5    elections for the at-large seats and that white voters

6    who regularly constitute a majority of the voters in

7    countywide elections have voted sufficiently as a block

8    to enable them to defeat the candidates preferred by

9    African American voters in all three of the elections

10   that are the focus of this case.

11        Now, the defendant is going to invite this Court

12   to look past those most relevant elections and to focus

13   instead on less probative ones.  Elections, for

14   example, in majority black districts where black

15   voters, not white voters were in the majority, aha,

16   they will say, these elections show that black voters

17   have an opportunity to win, but it is frankly

18   unsurprising that African American voters are able to

19   elect candidates in a district that is 70 percent

20   black, and those wins shed no light on whether African

21   Americans have an opportunity to elect candidates of

22   their choice to the at-large seats.

23        The Eleventh Circuit has already recognized the

24   error in that analysis, and this Court should decline

25   the defendant's invitation to repeat it.

1          After finding that Wright can satisfy the second

2     and third *Gingles* factors, this Court will then have to

3     turn to the totality of circumstances.  A plaintiff

4     need not prove any particular circumstance or even that

5     a majority of the familiar ones listed in what is known

6     as the Senate Report are on its side.

7          In this case, we will show that elections in

8     Sumter County are highly polarized, that African

9     Americans suffer from depressed socioeconomic status

10    and depressed political participation, but what is

11    looming like a dark cloud over the totality of

12    circumstances here is Sumter County's sorry history of

13    discrimination against African Americans.

14         Astonishingly, the defendant denies in its

15    pleadings that a history of discrimination even exists.

16    But it does exist, and so we will produce witness after

17    witness and exhibit after exhibit to show that this

18    history is real, that this history is painful, and that

19    it is ongoing.

20         At the conclusion of the evidence, Your Honor, we

21    will ask you to intervene as this court did in 1986 to

22    order the Sumter County Board of Education to implement

23    an election plan that gives African American voters a

24    meaningful and equal opportunity to elect candidates of

25    their choice, including in the 2018 elections which are

1    just around the corner.  Thank you.

2         **THE COURT:**  All right.  Let's see, who will

3    make the opening statement for the defendant?

4         **MR. BRADEN:**  Good morning, Your Honor.  Mark

5    Braden for the defendant.

6         **THE COURT:**  Good morning.

7         **MR. BRADEN:**  The only issue before this court

8    is whether or not the present method of electing

9    individuals to the Sumter County Board of Education

10   provides less opportunity to the African American

11   community, does it discriminate against them in

12   comparison to the other racial communities or groups in

13   Sumter County.

14        What's not in dispute before this court and we

15   will not dispute, the ugly sordid history of Georgia

16   discrimination against the African American community,

17   and we're not going to dispute or pretend that Jim Crow

18   didn't exist and that blacks weren't regularly denied

19   an equal opportunity to participate in elections in

20   Georgia.  And that same sordid, ugly history in Georgia

21   certainly occurred in Sumter County.  We don't for a

22   moment dispute the history of racism and the effects of

23   racism on continuing economic disparities recognized in

24   the various census data showing different education and

25   income levels in Sumter County between the black

1    community and white community.  Those absolutely exist,

2    and we in no way dispute those.

3         There will be a lot of nonmaterial arguments made

4    to this court I believe, looking at the witnesses.

5    What's not material to this court is whether or not the

6    past school board functioned well or was dysfunctional,

7    whether they violated various open meeting

8    requirements, whether issues regarding whether or not

9    the county was close to being -- the school system was

10   closed to losing its accreditation.

11        The quality of the Sumter school system is vitally

12   important to the students of Sumter County and to, more

13   importantly, to their parents and the whole Sumter

14   County community both white and black and the Hispanic

15   communities in Sumter County, vitally important to the

16   quality of the Sumter County School System, but that's

17   not material to this discussion in this courtroom.

18   It's important to them, but it's not important to this

19   court's decision.

20        What's in dispute in this court is, does the five

21   districts and two at-large provide an equal opportunity

22   to the African American community to elect its

23   candidates of choice.

24        You might have heard I'm using slightly different

25   terminology than the plaintiff's counsel and frankly

1    slightly different terminology than you usually hear in

2    Section 2 cases, and the reason for that is simple,

3    Sumter County's most recent census numbers came out

4    last week.  Sumter County is 42 percent white and

5    52 percent black.

6        A majority of the registered voters in Sumter

7    County are black, and a majority of the citizens'

8    voting age population of Sumter County is black.

9        So this is not a question of discrimination

10   against the minority group in Sumter County.  The black

11   community is an absolute majority of the electorate.

12   Now, does that answer any questions?  Not completely.

13       The next question is, can that community elect its

14   candidates of choice, and we will present this Court

15   election after election after election where that

16   community elects its candidates of choice.  You're

17   going to look at the most recent election, 2016, an

18   African American is elected countywide, clerk of court.

19       You can just go election after election after

20   election.  Does the African American candidate of

21   choice usually win, and the answer to that is

22   absolutely yes.  Is there some doubt about some races,

23   yes, occasionally.  Does the African American

24   candidates lose countywide, and the answer is probably

25   yes, although in reality we don't know the answer to

1      that.

2          This data is so overwhelming.  Most of these cases

3      are disputes between experts, as this Court may know,

4      and you bring on experts and they do various types of

5      analyses to show you how the various communities vote,

6      polarization and block voting, and those -- we have

7      experts in this case, and we're very confident of their

8      analysis.

9          So I would suggest to this Court that based upon

10     matters that don't involve any significant statistical

11     analysis this Court can make that determination.  The

12     black community is a majority of the electorate without

13     a doubt.  The black community regularly elects the

14     candidates of its choice in numerous elections.  Their

15     suggestion that you should look at simply the Board of

16     Elections' elections and narrow your focus on that and

17     try to analyze the impact on those elections is way too

18     narrow.

19         The expert report provided by plaintiffs is deeply

20     flawed.  It's a classic example of the cherry picking

21     of data and misuse of methodology, and frankly, the

22     elections involve so few data points that it's really

23     not possible to make the conclusions that they make,

24     and our expert will absolutely take that position.

25         But let's assume for purposes of this argument

1     that their expert is correct, that there's

2     significantly polarized voting and the white community

3     always votes as a block to defeat them.  Let's look at

4     what they propose this Court to do.  Their proposal is

5     for seven districts, which according to their expert,

6     will elect two black candidates of choice and maybe a

7     third one.

8          Their proposed remedy to this court locks the

9     black community into a permanent minority on the school

10    board based upon the analysis of their expert.  A

11    permanent minority.  They pack the districts to create

12    that.  You can't draw these districts in a manner that

13    would advantage the black community versus the at-large

14    districts because of the concentration of the black

15    community is in Americus, the largest population

16    center.  It cannot be.  It cannot be, that the Voting

17    Rights Act requires a remedy that results in a

18    permanent minority for the black community under their

19    own analysis on the school board in that county.  That

20    can't be what the law requires.

21         We can look through the various requirements under

22    *Gingles*, but that can't be the right result.  It is

23    clear based upon numerous elections, not just the most

24    recent elections, but we will bring in the registrar,

25    and we will -- however much time the Court is willing

1      to permit us, we will go election by election by

2      election.  The numbers are overwhelming.

3          The way to assure the black community to have a

4      majority on the school board is the 5/2 plan.  Thank

5      you, Your Honor.

6              THE COURT:  All right.  We're ready to

7      proceed.  The plaintiff may call its first witness.

8              MR. SELLS:  Your Honor, we'd like to ask for

9      a rule on witnesses before we begin.

10             THE COURT:  All right.  I guess the better

11     way to do it is for the plaintiff to identify its

12     witnesses it expects to call, then the defense do

13     likewise, and the will give its instruction to counsel

14     and to any witness present.

15             MR. SELLS:  Sure.  We expect to call the

16     plaintiff, Reverend Wright.  Dr. McBride.  Let's see.

17     Mike Coley, Kelvin Pless, Sam Mahone, Dr. John

18     Marshall --

19             THE COURT:  Are any of those person present?

20             MR. SELLS:  -- Edith Green and Alice Green.

21             THE COURT:  Are any of those persons present

22     now?

23             MR. SELLS:  I don't believe so.  Well,

24     Reverend Wright is here, the Plaintiff.

25             THE COURT:  All right.  And for the defendant

1      that you are aware of at this time?

2           **MS. MCKNIGHT:**  Your Honor, just a question on

3      the limitation of the rule on witnesses.  As we

4      understand that, expert witnesses will be able to be

5      present during the other expert witness testimony; is

6      that correct?

7           **THE COURT:**  Unless there is some reason that

8      the Court is unaware of, those witnesses will be

9      excused from the rule for the reason they are

10     testifying from their expert positions as opposed to a

11     fact witness.  Other witnesses known to the defendant,

12     other than your expert?

13          **MS. MCKNIGHT:**  Who are here today in the

14     courtroom?

15          **THE COURT:**  Yeah, who you expect so we have

16     some idea so everybody is on notice who to look out

17     for.

18          **MS. MCKNIGHT:**  I understand.

19          **THE COURT:**  I'm not holding you to it, but

20     just a general expectation.

21          **MS. MCKNIGHT:**  I understand.  Thank you, Your

22     Honor.  Right, as of today we anticipate calling, of

23     course, our expert, Dr. Owen, who we anticipate will be

24     excluded from this rule.  We also anticipate calling

25     Mr. Brady, Dr. Busman, and a Ms. Roland.

1          **THE COURT:**  All right.  So counsel is given

2     this instruction, in addition to those witnesses who

3     are present, the witnesses shall wait outside of the

4     courtroom until they are called.  I think there's

5     couple of rooms out there that the officers of the

6     court can show them, where they can remain out of

7     court.  You are not to discuss your testimony after

8     testifying with anyone until you are excused by the

9     Court.  The experts which have been identified on

10    either side, or both sides previous, are excused from

11    the rule.  All right.  Anything else that either

12    parties believe the Court should address as a part of

13    the rule?

14          **MR. SELLS:**  No.  Thank you, Your Honor.  That

15    covers it.

16          **THE COURT:**  And in advising counsel, you

17    should assure that when you do bring witnesses who are

18    not identified or who may not have been present to be

19    instructed that they are so instructed, and they are

20    not allowed inadvertently be present in the courtroom

21    until they are called as witnesses.

22          **MR. SELLS:**  We'll do that, Your Honor.

23          **THE COURT:**  All right.  You may call your

24    first witness.

25          **MR. SELLS:**  Thank you, Your Honor.  The

1    plaintiffs calls Dr. McBride to the stand.

2         **COURTROOM DEPUTY:**  Do you solemnly swear or

3    affirm the testimony you are about to give in the case

4    now before the Court will be the truth, the whole

5    truth, and nothing but the truth?

6         **THE WITNESS:**  I do.

7         **THE COURT:**  Just for the record, any there

8    any other witnesses in the courtroom other than the

9    expert?  All right.  If not, you may proceed,

10   Mr. Sells.

11        **MS. MCKNIGHT:**  Pardon, Your Honor, we

12   understand that plaintiff is in the courtroom, and they

13   anticipate calling him as a witness.  Is he also

14   excluded --

15        **THE COURT:**  I would expect a party -- a

16   direct party would be excused also.

17        **MS. MCKNIGHT:**  I understand.  Thank you, Your

18   Honor.

19        **THE COURT:**  I didn't mean to imply the

20   immediate parties should not be present.  You may go

21   ahead.

22              **FREDERICK GLEN MCBRIDE**

23   **Witness, having first been duly sworn, testified on**

24              **DIRECT EXAMINATION**

25   BY MR. SELLS:

1    Q.   Good morning, Dr. McBride.

2    A.   Good morning.

3    Q.   Would you please state your full name for the

4    record?

5    A.   My name is Frederick Glen McBride.

6    Q.   What do you do for a living, Dr. McBride?

7    A.   I am a political scientist teaching predominantly

8    American Government classes.

9    Q.   Do you have any specialities within the field of

10   government?

11   A.   Well, in politics -- race and politics.

12   Q.   Okay.  And you were asked to analyze racial voting

13   patterns and demographics for the plaintiff in this

14   case, correct?

15   A.   Yes, I was.

16   Q.   Great.  Now, before we dig into your analyses in

17   this case, let's find out what you've done to become an

18   expert in this area.  Dr. McBride, how did you become a

19   political scientist?

20   A.   I earned a PhD in political science from Clark

21   Atlanta University.

22   Q.   Do you have any other advanced degrees?

23   A.   I have a master's degree in public administration.

24   Q.   From where?

25   A.   From Southern University.

1    **Q.**   What was the focus of your studies for that

2    degree?

3    **A.**   For the master's degree?

4    **Q.**   Yes.

5    **A.**   The master's degree, the focus was public policy

6    analysis and evaluation, and I did a thesis on poverty

7    and education in Louisiana.

8    **Q.**   And what was the focus of your study for your PhD?

9    **A.**   The focus of my study was alternative election

10   systems and voting patterns overall minority electoral

11   success.

12   **Q.**   Do you have any other specialized training that

13   was helpful to you as you analyzed racial voting

14   patterns and demographics in this case?

15   **A.**   Specifically I participated in a census

16   redistricting workshop by -- well, actually it was

17   sponsored by the United States Census Bureau.

18   **Q.**   And what did you learn in that workshop?

19   **A.**   It was basically designed to explore and

20   understand the various statistical methods and the

21   methodology used by the census bureau.

22   **Q.**   Dr. McBride, tell us about your work experience.

23   **A.**   I have predominantly worked basically in-house for

24   the American Civil Liberties Union, as well as the

25   Southern Coalition for Social Justice, doing

1    demographic analysis, drawing electoral districts,

2    basically mapping, and performing statistical studies

3    on racial voting behavior.

4    **Q.**    Have you ever published in these areas?

5    **A.**    Yes.  I've published in several peer reviewed

6    journals and articles -- journals.

7    **Q.**    Have you ever presented at a professional

8    conference on these topics?

9    **A.**    Yes.  I've been ask to present at several

10   conferences throughout my career.

11   **Q.**    Have you ever been asked to analyze racial voting

12   patterns and demographics in any other voting cases?

13   **A.**    Yes, I've -- I've done about four voting cases

14   where I was asked to do those types of analysis.

15   **Q.**    And how about when you were in-house?

16   **A.**    And in house, both at the American Civil Liberties

17   Union, as well as the Southern Coalition for Social

18   Justice, I performed those studies.

19   **Q.**    And just to be clear, when you say in house, do

20   you mean in house political scientist?  Explain what

21   you mean by that.

22   **A.**    In-house working for the organization doing those

23   particular levels of analysis.

24   **Q.**    Now, have you ever testified as an expert witness

25   in any voting case?

**A.**   Deposition and written testimony, but this is my first trial.

**Q.**   All right.

     **MR. SELLS:**  Ms. King, if we could turn over control to our trial tech, Mr. Bean.  I'd like to show the exhibit, show Dr. McBride what has been marked as Plaintiff's Exhibit 1.

     **THE COURT:**  Are you about to go into the substance of his testimony?

     **MR. SELLS:**  We are still doing background, Your Honor.

     **THE COURT:**  All right.  I just wanted to be sure.  All right.

**BY MR. SELLS:**

**Q.**   Dr. McBride, is that your CV?

**A.**   Yes, it is.

**Q.**   And how current is that CV?

**A.**   I updated it about a month ago.

     **MR. SELLS:**  Okay.  Your Honor, we offer Exhibit 1 into evidence.

     **THE COURT:**  Any objection to Exhibit 1?

     **MS. MCKNIGHT:**  No, Your Honor.  We understand it only relates to his experience and his trying to establish his experience for the Daubert motion.

     **THE COURT:**  All right.  Exhibit 1 is admitted

1     without objection.

2     **BY MR. SELLS:**

3     Q.    Now, Dr. McBride, over the course of your entire

4     career so far, how many times would you say you've

5     performed analyses similar to those that you've

6     performed in this case?

7     A.    Oh, hundreds of times.

8     Q.    How many times have you drawn redistricting plans

9     similar to those that you've drawn in this case?

10    A.    Hundreds.

11    Q.    How many times have you performed demographic

12    analysis?

13    A.    Hundreds.

14    Q.    How many times have you analyzed racial voting

15    patterns?

16    A.    It's too many to count.

17          **MR. SELLS:**  Your Honor, at this point we

18    tender Dr. McBride as an expert witness in the field of

19    political science and particularly as an expert in

20    redistricting demographic analysis and the analysis of

21    racial voting patterns.

22          **THE COURT:**  All right.  Does the defendant

23    wish to voir dire the witness?

24          **MS. MCKNIGHT:**  No, we rest on our papers.  We

25    believe that they show that Dr. McBride is not

1    qualified to be expert in this case.  Thank you.

2         **THE COURT:**  All right.  Any further argument

3    from the plaintiff as to the qualifications of the

4    witness?

5         **MR. SELLS:**  Your Honor, we also rest on our

6    papers in this case.

7         **THE COURT:**  All right.  Well, the witness is

8    permitted to testify as an expert as designated.  The

9    defendant's objection is overruled.  You may proceed.

10        **MR. SELLS:**  Thank you.

11   **BY MR. SELLS:**

12   **Q.**   Dr. McBride, what were you asked to do in this

13   case?

14   **A.**   Initially I was asked to analyze the election plan

15   under House Bill 836.  Specifically I was asked to

16   address whether the at-large election system and the

17   high concentration of African Americans in districts

18   one and five dilute minority voting strength.

19   **Q.**   And what did you do to address that question?

20   **A.**   First, using -- well, with mapping software, I was

21   asked to determine whether African Americans are

22   geographically -- are represented numerous -- by

23   numerous enough, I'm sorry, to constitute a majority in

24   a minority district and whether they are also

25   geographically compact to do this.  Secondly, I was

1  asked to use, well, through the use of statistical

2  techniques, I was asked to determine whether -- to

3  determine through the use of estimates, the voting

4  behavior patterns of African Americans and others in

5  Sumter County.  Thirdly, I was asked to determine

6  whether white voters vote as a block to defeat the

7  minority preferences, the candidates preferred by

8  minority voters.  I think that was third.  Fourth, I

9  was asked to determine if voting was highly polarized

10  or if it was polarized.  Fifth, I was asked to utilize

11  or look at census data to determine whether

12  socioeconomic factors hinder African American's ability

13  to effectively participate in the political process.

14  And, lastly, I was asked, based on the issues raised by

15  the Eleventh Circuit, I was asked to determine if

16  African Americans -- or if a district -- if African

17  Americans are afforded an opportunity to elect

18  candidates of choice in a district plan utilizing seven

19  single member districts.

20  Q.   What were you asked to analyze on that last issue

21  in response to the Eleventh Circuit?

22  A.   In response to the Eleventh Circuit I was asked to

23  determine if African Americans could of -- well, if a

24  district plan could -- excuse me, I'm sorry.  I was

25  asked by the -- based on the Eleventh Circuit I was

asked to look -- speak to the question of remedy and if African Americans could have elected candidates of choice in a redistricting plan utilizing seven single member districts.

**Q.**   Did you prepare a written report setting forth your analysis of those issues?

**A.**   I prepared several.  An original report and a rebuttal to defense counsel's expert, and then after 2014, I submitted a supplemental report and a rebuttal report in response to the defense counsel's expert testimony -- well, not testimony, but their expert report, and, finally, I submitted a corrected version of that report.

**Q.**   You submitted a corrected version of which report? Your supplemental or --

**A.**   The supplemental report.

**Q.**   And why did you submit a corrected version of that report?

**A.**   There were a couple of minor errors that I wished to address or clean up in the corrected version.

**Q.**   What were those errors?

**A.**   One a minor mathematical error involving turnout, and just the use of a wrong dominator, and the other in the supplemental report, I identified -- I actually identified 12 elections but I somehow forgot in haste

1    of preparing the expert report, I reported 11 instead

2    of 12, but the 12 are in the report.

3    **Q.**    You mentioned that the first area you identified

4    involved mathematical error in the denominator of your

5    turnout estimates.

6    **A.**    Yes.

7    **Q.**    Can you elaborate on that, please?

8    **A.**    I -- in using turnout, I didn't add the correct

9    total population.  I only used the population of black

10    and white voters, not other, and I went back and

11    corrected that.

12    **Q.**    So your corrected version includes in the

13    denominator, black voters, white voters, and voters of

14    some other race?

15    **A.**    That is correct.

16    **Q.**    Whereas your original supplemental report included

17    in the denominator only black and white voters?

18    **A.**    That is correct.

19    **Q.**    How big of an error was that?

20    **A.**    It was minor.  It was less than one percent.

21    **Q.**    Did the corrected numbers change your conclusion

22    in any way?

23    **A.**    Not at all.

24    **Q.**    All right.  Let me make sure I understand the

25    second error you mentioned.  This was the 11 versus 12

1   elections.  Your original supplemental report actually

2   analyzed 12 elections, but your report said 11?

3   **A.**   That is correct.

4   **Q.**   How did that happen?

5   **A.**   Just a mistake.  In haste, to meet the deadline,

6   and I just incorrectly did 11, but there were 12 always

7   in that report.

8   **Q.**   Do you remember which election it was that you had

9   overlooked?

10  **A.**   It was the special election in March 18, 2014.

11  **Q.**   Now, did this error affect your conclusions at

12  all?

13  **A.**   No.

14  **Q.**   And, in fact, the March 2014 election was in your

15  original supplemental report?

16  **A.**   That is correct.

17         **MR. SELLS:**  Your Honor, we would like to

18  offer Plaintiff's Exhibits 6 and 17, which are Dr.

19  McBride's corrected supplemental report and his

20  supplemental rebuttal report.

21         **THE COURT:**  It is Plaintiff's 6 and 17?

22         **MR. SELLS:**  Yes.

23         **THE COURT:**  Which is six?

24         **MR. SELLS:**  Six is the corrected supplemental

25  report, and 17 is the rebuttal report in 2016.

1          **THE COURT:**  All right.  Ms. McKnight?

2          **MS. MCKNIGHT:**  Yes, Your Honor, there is no

3     pending objection to Plaintiff's Exhibit 17, that is

4     Dr. McBride's rebuttal report dated December 16, 2016.

5     There is a standing objection to Plaintiff's 6.  That

6     is the --

7          **THE COURT:**  Excuse me, just a moment.  Just

8     for the record, then we'll deal with 17, it is admitted

9     without objection.  Let's hear about number six.

10          **MR. SELLS:**  Thank you.

11          **MS. MCKNIGHT:**  Thank you, Your Honor.  And

12     there is a standing objection to Plaintiff's Exhibit 6.

13     This is Dr. McBride's supplemental report parens

14     corrected.  That's the title of the report.  This

15     supplemental report was served after the due date for

16     the supplemental report, and why that has meaning is

17     because it was also submitted after the due date for

18     defendant's expert witness to submit her expert report.

19     So edits made to this McBride supplemental report,

20     including these math edits and the identification of 12

21     elections, were not identified for our expert until

22     after the due date for her report.

23          **MR. SELLS:**  Your Honor, Dr. McBride's

24     corrected report was unquestionably timely under Rule

25     26(e).  As this Court is no doubt aware, Rule 26(e)

1    obligates Dr. McBride to make corrections when he

2    becomes aware of an error.  As the Court just heard,

3    the nature of the correction in the March issue was, in

4    fact, a correction, and Rule 26 required him to make

5    that -- make that supplement, and it would have been

6    sanctionable had he not done that, and the timing under

7    Rule 26, I believe it's Rule 26(a)(3), actually imposes

8    a deadline on supplements, and the deadline for

9    supplements or corrections is actually the time of

10   pretrial disclosures, which in this case was about a

11   week ago.  And so from Dr. McBride's correction was

12   unquestionably timely according to those rules.

13       Now, probably more important than the

14   technicalities of whether it was timely or untimely,

15   Dr. McBride's report was issued to -- served on

16   defendant's counsel on March 8th.  That was before Dr.

17   McBride was deposed on March, I believe it was the

18   20th.  So they had about two weeks to review it.  And

19   they, in fact, asked Dr. McBride about his corrected

20   report and the corrections that were contained in it.

21   And at the time it was served, defendant's counsel said

22   we will show it to our expert and let you know if we

23   want to supplement.  They never asked to supplement Dr.

24   Owen's report.  We would not have objected if she had

25   issue a supplemental rebuttal, you know, questioning

1    his corrections, but they did not because the

2    corrections, frankly, are minor, and if this court

3    would prefer to base its opinion on turnout that has

4    the wrong denominator and a report where Dr. McBride

5    says 11, but actually analyzed 12, I think we can go

6    forward with that, but I don't think that serves any

7    purpose whatsoever.

8              **THE COURT:**  All right.  Ms. McKnight, as I

9    understand your objection to be one that the supplement

10   was received after the time of your expert's deadline?

11             **MS. MCKNIGHT:**  That's correct, Your Honor.

12             **THE COURT:**  Is that the extent of the

13   objection?

14             **MS. MCKNIGHT:**  That's the extent of the

15   objection except that we've only heard testimony from

16   Dr. McBride about the seriousness of the changes made

17   to the report, meaning that we must rely only on his

18   testimony that the edits are somehow minor.

19             **THE COURT:**  Okay.  All right.  The Court

20   thinks, as I understand the errors to have been

21   described that they were ones that we should expect on

22   either side to address without any great difficulty,

23   and since the substance of the report was timely, I

24   think there was a requirement and is a requirement to

25   supplement, and I don't believe that there was any

1    great prejudice, if any, to the defendants as to the

2    supplement being issued prior to the deadline for the

3    defendant's response since it's clear that the changes

4    were limited, and I think that those are ones that can

5    be addressed.  I have not heard that there was an

6    inability for the defendants's expert to take those

7    matters into account, but more that they didn't get the

8    information by a certain time.  So the Court does not

9    see a prejudice here that would prevent it being

10   admitted, so Exhibit 6 is admitted over objection.

11              **MR. SELLS:**  Thank you, Your Honor.

12   **BY MR. SELLS:**

13   **Q.**   Dr. McBride, I'm going to ask you for more detail

14   about your analyses.  But first I want to ask you about

15   your conclusions.  Did you reach any conclusions as a

16   result of your analysis in this case?

17   **A.**   Yes, I did.

18   **Q.**   Okay.  Would you please summarize or list what

19   those conclusions are?

20   **A.**   First, I conclude, or I concluded that African

21   Americans are sufficiently numerous and geographically

22   compact to constitute a majority in three out of the

23   seven district single member districts.  Two, I

24   concluded, based on estimates derived from statistical

25   methods, I concluded that African American voters in

1  Sumter County are cohesive in their preferences or vote

2  preferences or candidate preferences.  I conclude also,

3  thirdly, that voters -- the voting in Sumter County is

4  highly polarized.  I conclude, fourth, that

5  socioeconomic factors have hindered African Americans'

6  ability to participate in the political process, and I

7  also conclude, lastly, that African Americans can

8  constitute a majority in three of the seven single

9  member districts allowing them to effectively

10 participate in the political process.

11 Q.   Okay.  Did you reach any conclusion with respect

12 to the third *Gingles*'s factor?

13 A.   Yes.  That voting is highly polarized in the

14 at-large elections.

15 Q.   All right.  So let's turn to your analyses.  We're

16 going to skip over the first *Gingles*'s factor because

17 the Court has already ruled on that and go straight to

18 your election analyses, okay?

19 A.   Okay.

20 Q.   So tell us what you did.

21 A.   In my election analysis I utilized election

22 returns.  Those are not like the returns you see

23 scrolling at the bottom of a screen.  It's election

24 returns based on precinct data.  I used that data to

25 derive estimates for racial voting patterns.

1    Q.    When you say estimates, what do you mean by

2    estimates?  Why do we have to estimate racial voting

3    patterns?

4    A.    Well, the statistical methods give us a -- the

5    courts have asked for specific numbers related to

6    cohesion and polarized voting, and the statistical

7    methods allow us to arrive at a percentage, a

8    percentage for how voters, based on race, participated

9    or who their candidate preferences were.

10   Q.    Why can't you -- why do you need statistics?  Why

11   can't you just look at election returns?

12   A.    Because you also need to know the composition, the

13   racial composition of the particular electorate.

14   Q.    All right.  What statistical methods did you apply

15   in your election analysis in this case?

16   A.    I always use three.  I use homogenous precinct

17   analysis or what's also know as extreme case analysis.

18   In that analysis you determine if some precincts are,

19   the level I use is 90 percent homogenous, meaning, most

20   of the voters are -- 90 percent of the voters are from

21   a particular race or ethnicity.  I also use, the second

22   measure I use is ecological regression.  That is a

23   technique used to understand or look to understand the

24   relationship between two variables.  In this particular

25   case, the composition of -- the racial composition of

1    the electorate or in this case the precinct and how

2    that relates to the voter preferences for individuals

3    in that precinct.  And, thirdly, ecological inference

4    developed by Gary King is a technique that expands on

5    ecological regression by incorporating a method of

6    bounds so we'll know somewhat of a floor and ceiling of

7    how voters in a particular precinct, what their minimum

8    and maximum votes could be in a particular precinct,

9    along with inferential methods to arrive and pick the

10   best area of estimates that could explain what

11   particularly happened with voters in that particular

12   precinct.  So it's homogenous precinct analysis,

13   ecological regression, and ecological inference,

14   sometime called the King method.

15   Q.    Okay.  Let me ask one follow-up question on

16   homogenous precinct analysis.  Were there any

17   homogenous precincts in Sumter County?

18   A.    In some of the elections, yes.

19   Q.    And were they homogenous white or homogenous

20   black?

21   A.    They were homogenous white.

22   Q.    Were there any homogenous black precincts?

23   A.    No.

24   Q.    Okay.  The three techniques that you used,

25   homogenous precinct analysis, ecological regression,

1    and ecological inference, have they been approved by

2    the courts?

3    **A.**    Yes, they have.  The first two, homogenous

4    precinct analysis and ecological regression, have been

5    used since *Thornburg v Gingles* in 1986.  Ecological

6    inference by Gary King was developed in the late 90s

7    and has become somewhat of the gold standard now in

8    terms of this type of analysis.

9    **Q.**    And has it been relied on by courts?

10   **A.**    Yes, it has.

11   **Q.**    Why did you use three techniques, why not just

12   one?

13   **A.**    I prefer to use all three, one, to see -- I

14   believe the estimates can tell a story, and in telling

15   that story if I see all three showing cohesion or

16   polarization or lack thereof in a way it serves as a

17   check on each other.

18   **Q.**    Any other reason why you used three analyses and

19   not just one?

20   **A.**    I think that using three affords me greater

21   reliability in the estimates.

22   **Q.**    Okay.  Which technique is best?

23   **A.**    I'd rather not say best, but I would say that the

24   one that probably rises above the others is ecological

25   inference.

1   Q.   What data did you use for your racial block voting

2   analysis?

3   A.   I used data derived from election returns.

4   Q.   And where did you get that data?

5   A.   From the Georgia Secretary of State's office.

6   Q.   I'd like to show you Plaintiff's Exhibit 21.  And

7   I'm going to ask you, is this the election data that

8   you used?

9   A.   Yes.

10  Q.   Can you briefly explain what we're looking at

11  here?

12  A.   I think I can write on the screen.

13  Q.   Yes.

14  A.   In this particular November 2nd, 2004 general

15  election, in the race for sheriff, we see that there

16  are -- well, on this first page, Pete Smith and James

17  Driver are two of the candidates.  I know there's a

18  third candidate in this race, it's just not on this

19  particular page, and we see the precincts.  In 2004

20  there should be ten precincts, the total votes cast,

21  and the votes for each particular candidate.

22  Q.   Okay.  Let me ask you, are the precincts over on

23  the left side of the page as we're looking where I just

24  drew?

25  A.   Yes.

1    Q.    Okay.  So it says, for example, American Legion

2    Post 558, that's a precinct, right?

3    A.    That's correct.

4    Q.    Okay.

5    A.    I will add that this also lists absentee and

6    provisional ballots, which at the time of this

7    particular election they were not reallocated back to

8    their precincts so those could not be included in the

9    calculation.

10   Q.    Okay.  And this is, in fact, one of the elections

11   that you analyzed in your supplemental report?

12   A.    That is correct.

13        MR. SELLS:  Your Honor, the plaintiffs offer

14   Exhibit 21, which is Dr. McBride's election data.

15        THE COURT:  Any objection?

16        MS. MCKNIGHT:  No objection, Your Honor.

17        THE COURT:  All right.  Number 21 is admitted

18   without objection.

19   BY MR. SELLS:

20   Q.    All right, Dr. McBride, did you use any data other

21   than election data?

22   A.    I had to use precinct level turnout data to arrive

23   at the racial composition of the precincts.

24   Q.    What is precinct level turnout data?

25   A.    In Georgia the Secretary of State, when you

1    register for -- register to vote in Georgia some racial

2    data is included in the application, and the Secretary

3    of State's office compiles a voter database that lists

4    those registered, identifies them with a registration

5    number, and the particular race of that particular

6    voter.  This does not happen in every state.  There are

7    only maybe five or six states where this occurs.

8    Q.   Let me show you Plaintiff's Exhibit 24.  Now, can

9    you identify this document, as soon as we blow it up a

10   little so you can see it?

11   A.   I know what it is -- while you still doing that.

12   Q.   Okay.

13   A.   That's going to be the precinct level turnout

14   data.  I can't see the particular time period, though.

15        MR. SELLS:  Mr. Bean, can we zoom in on the

16   right-hand side of the header?  I think the date is up

17   there.

18   A.   That's the May 24, 2016.

19   Q.   And this is the turnout in the Democrat primary

20   election, correct?

21   A.   That's correct.

22   Q.   Okay.  Thank you.  And I'd like to zoom in on this

23   area, if we could, just to see how the turnout data is

24   arranged.  Can you describe what we're seeing here?

25   A.   Yes.  And as I write on the screen, we can see the

1    particular precinct identification.  Then -- well,

2    that's going to be by number and the name of the

3    precinct.  And if you look at this third and fourth

4    column under black male, that's the number in each

5    precinct of African American males that registered, and

6    to the right of that number is the number of African

7    American males that voted.  And you can do this for all

8    of the particular racial categories mentioned in the

9    return -- or in the precinct level return -- turnout.

10   **Q.**   Okay.  And how do you get the estimate, or excuse

11   me, the turnout for black voters if it's divided into

12   black male and black female?

13   **A.**   Well, you would have to add for all of those

14   particular precincts, and then use that as one of the

15   variables in your estimation methodology.

16   **Q.**   Okay.

17   **A.**   And, of course, you've got to -- to the right, to

18   the far right of this particular turnout data it's

19   going to be totals for the entire county and precinct.

20   **Q.**   And the header that we saw a moment ago indicated

21   that this was turnout in a Democratic primary, but, of

22   course, elections for the school board are nonpartisan.

23   So how do you get racial turnout data at the precinct

24   level for the school board elections?

25   **A.**   Well, since this is the Democrat, you would also

1    use the turnout data, there's another file for the

2    Republicans in every county, so you're going to have to

3    combine both of those.

4    **Q.**   So, for example, to get total black turnout, you

5    add up black male turnout and black female turnout in

6    the Democratic primary and black male turnout and black

7    female turnout in the Republican primary?

8    **A.**   That is correct.

9         **MR. SELLS:**   Your Honor, the plaintiffs offer

10   Exhibits 24 and 23 which are the racial turnout data

11   that Dr. McBride used.

12        **THE COURT:**   Any objection?

13        **MS. MCKNIGHT:**   No objection, Your Honor.

14        **THE COURT:**   They are each admitted without

15   objection, Plaintiff's 23 and 24.

16        **MR. SELLS:**   Thank you, Your Honor.

17   **BY MR. SELLS:**

18   **Q.**   Now, Dr. McBride, were you able to use precinct

19   level racial turnout data from the Secretary of State

20   for all of your analyses?

21   **A.**   No.  That -- the data is not available for every

22   one of the elections that I analyzed.

23   **Q.**   Explain what you mean, why not?

24   **A.**   These particular -- or that particular election --

25   well, what -- the turnout data that you just showed,

1    because it lists the number for the entire precinct,

2    the at-large elections, because that entire precinct is

3    going to vote in the at-large election, so using that

4    methodology I just described would work for that one,

5    but the single member districts under HB 836 are

6    districts comprised of split precincts.  So one of

7    those particular, let's say Reeves Park precinct isn't

8    going to be -- it could be split between two or three

9    different school board districts.  So you would have to

10   utilize a different methodology to arrive at the racial

11   composition.

12   Q.   Okay.  I'd like to explore what you mean by split

13   precincts a little further, and to try to do that I'd

14   like to show you a side by side of Sumter County's

15   precincts and Sumter County's Board of Education

16   districts.

17   A.   Okay.

18   Q.   Both of which were provided to the plaintiff by

19   the defendant in this case, and they are Exhibits 18

20   and 19.

21          MR. SELLS:  Mr. Bean, can we show those side

22   by side?

23   Q.   Okay.  Dr. McBride, do you see Exhibits 18 and 19

24   on the screen in front of you?

25   A.   I do.

1    Q.    Okay.  And the image on the left is Exhibit 18 and

2    the heading is Voting Precinct Districts.  Do you see

3    that?

4    A.    Yes, I do.

5    Q.    And the image on the right has the heading Board

6    of Education Districts.  Do you see that?

7    A.    Yes, I do.

8    Q.    And that's Exhibit 19.  So can you explain, using

9    these images, what you mean by split precincts and why

10   they prevent you from using precinct level racial

11   turnout data when you conducted some of your racial

12   block voting analyses?

13   A.    Okay.  As I write on the voting precinct district

14   map, this is district 15.  Now, district 15, a large

15   portion of it is in district three, but there is a

16   portion, and as I'm drawing on the screen, of district

17   15 that is actually in district three.  It's a little

18   small so I may not get it exactly.  But this, for

19   example, this particular area can be in district three,

20   but that turnout data that I just showed you shows the

21   number of voters for that particular precinct, but if

22   this area is in district three, I've got to utilize a

23   method to count these voters that are in district

24   three, but that are also in district 15, which is in

25   district four.

1  Q.   Okay.  I want to try to clean that up because I

2  think you use district to refer to a precinct.

3  A.   Well, precinct -- okay.  Go ahead.

4  Q.   So let me ask you.  The image on the left is

5  precincts, and you're talking a precinct 15, right?

6  A.   I'm talking about precinct 15, and as I write, I

7  circled this.  Okay.  That shaded area in the southeast

8  of Sumter County.

9  Q.   And we can see that from the map on the right that

10  precinct 15 is split by the district line between

11  districts three and four for the Board of Education

12  that we see on the right?

13  A.   That is correct.

14  Q.   Okay.  So if you were to look at racial turnout

15  data for precinct 15, it wouldn't separately identify

16  the turnout in the district three portion of the

17  precinct or the district four portion of the precinct,

18  right?

19  A.   That is correct.  That is correct.

20       MR. SELLS:  Your Honor, at this point we'd

21  like to offer Plaintiffs 18, 19, and 20, which are maps

22  provided to us by the defendant.

23       THE COURT:  All right.  Objection to either

24  of those?

25       MS. MCKNIGHT:  No objection, Your Honor.

1           THE COURT:  Plaintiff's 18, 19, and 20 are

2      admitted without objection.

3      BY MR. SELLS:

4      Q.    So, Dr. McBride, when you encountered an election

5      that involved split precincts, what data did you use as

6      a measure of the racial composition of the electorate?

7      A.    With these particular districts that utilize split

8      precincts you have to rely on another method where the

9      Secretary of State's office has a voter history file,

10     and this vote history file lists all of the voters that

11     participated in any particular election in a -- at any

12     given time.

13     Q.    Okay.  I'd like to show you Plaintiff's

14     Exhibit 22-B.  Can you tell us what this is?

15     A.    This is a voter history file from March 18, 2014,

16     or a portion of the voter history file from March 18,

17     2014.

18     Q.    How do you know that?

19     A.    Because in looking at the particular file, I know

20     from the work I've done in Sumter County, Sumter

21     County's key code is 129, as I write on the screen,

22     there's 129, and if you look a little bit further over

23     to the right you see the year 2014 0318.  That's

24     March 18 which is the date of that particular election.

25     So 0318 2014.

1   Q.   Okay.  What are the numbers in between the 129 and

2   the date?

3   A.   The numbers in between are the particular voter's

4   registration number.

5   Q.   And this is a voter who turned out in the

6   March 18th, 2014 election?

7   A.   That is correct.

8   Q.   So what do you do with a voter file to help you

9   generate racial turnout data?

10  A.   Well, the state of Georgia also -- after an

11  election, from time to time, the state of Georgia will

12  produce a voter registration file after an election,

13  and it will tell you the more specific data, like

14  address information of a particular voter that's

15  registered at that specific given time that the state

16  has produced this report.

17  Q.   So just to be clear, we're looking at

18  Exhibit 22-B, and Exhibit 22-B alone doesn't tell you

19  the race of the voter who turned out in that election,

20  right?

21  A.   No, no.  There is no racial identification measure

22  in this photo history file.

23  Q.   Okay.  I'd like to show you Plaintiff's 265.  Can

24  you identify this document?

25  A.   Yes.  That is a voter registration file.

1    Q.    And is this the voter registration file that you

2    used?

3    A.    This is the 2016 -- yes, it is.

4    Q.    Does the voter registration list tell you where

5    the voter lives?

6    A.    Yes, it does.  I think it's going to be over to

7    the right.  There's the street name, city, and zip

8    code, as I write on the screen, for that particular

9    registered voter.

10   Q.    Does it contain information on the race and gender

11   of the voter?

12   A.    Over to the right, there's the racial information,

13   as I circle, and there's gender that matters, but

14   there's gender.

15   Q.    Does it contain information on whether the voter

16   actually voted in the 2014 school board election?

17   A.    No.  That's where you need the voter history file

18   from the previous exhibit that you showed.

19   Q.    Okay.  So tell us how you matched the two files?

20   A.    Well, the key is to use -- and I don't see it

21   here.  From the voter history file and from this file,

22   there's a voter registration number and the key is to

23   use the location and race data and to match it by that

24   voter registration number to compile the particular

25   voters for that particular election from the voter

1    history file.

2    **Q.**    Okay.  I'm drawing on the screen right now, am I

3    circling the voter registration number?

4    **A.**    Yes.

5    **Q.**    And that's the key to match the two files, right?

6    **A.**    Yes.

7    **Q.**    So essentially what you do is you use that key to

8    add racial information to the voter turnout file?

9    **A.**    Basically, yes.

10   **Q.**    Once you have racial information on the voters who

11   turned out, what do you do next?

12   **A.**    It's a bit easier with mapping software now, but

13   you have to match that particular data and then you are

14   going to aggregate those numbers and those individuals

15   based on their location to a particular precinct level

16   map that you have on your mapping software, and with

17   that aggregation method, you will be able to compile

18   the racial information you need, the composition of a

19   particular precinct, in order to conduct your analysis.

20   **Q.**    So what does the mapping software help you do?

21   **A.**    It helps me aggregate -- or taking the address

22   information from this, once they are matched, that is

23   going to be coded into a map of Sumter County, and if

24   that map has a layer for the precincts it's going

25   aggregate those voters to their respective precincts

1    such that I can arrive at how many -- for example, how

2    many white voters, how many white voters, how many

3    Hispanic voters, whatever category we're looking at.

4    **Q.**    So that map can then identify the voters who lived

5    within precinct 15, let's say, but who live on one side

6    of the line between district three and district four?

7    **A.**    Yes, yes.  You can utilize that methodology to

8    deal with a whole precinct or any split precincts.

9    **Q.**    Okay.  Is this a novel technique?

10    **A.**    It's not new.  It's well known with particular

11    demographers and others engaging redistricting and

12    other types of mapping work.

13    **Q.**    Is this technique generally accepted by political

14    scientists?

15    **A.**    Yes, it is.

16    **Q.**    Is it reliable?

17    **A.**    If it's done properly.

18    **Q.**    What do you mean by that?

19    **A.**    Well, that most voter registration file, for

20    example, if I were to try to use a 2016 file for a 2002

21    race, the chances are I may not capture a significant

22    enough number of those particular individuals because

23    2002 was, one, a long time ago and a lot of those

24    voters may have relocated or moved or died, and in that

25    instance I refer or we refer to that as decay.  So the

1    longer you go back, if you don't have a voter

2    registration file that is somewhere close to the year

3    that you're analyzing you may be dealing with a great

4    -- or a significant deal of decay.

5    Q.   Was that an issue for you in this case?

6    A.   Yes.

7    Q.   How so?

8    A.   Prior to -- I was able to use the voter

9    registration file from the 2016 vote registration

10   information.  I was able to use that for the 2014 races

11   and the 2010, but I was not successful in that -- in

12   that matching process for elections prior to 2010.

13   Q.   And that was because of decay?

14   A.   I -- yes.

15            MR. SELLS:  Your Honor, at this point the

16   plaintiffs offer Exhibits 22-A, 22-B, 22-C, 22-D, which

17   are the voter history files that Dr. McBride used, and

18   Exhibit 265, which is the voter registration file that

19   Dr. McBride used.  And, again, for the record we have

20   asked for and received a protective order with regard

21   to the sensitive information and public release of

22   Exhibit 265.

23            THE COURT:  Okay.  Did you also say 22-C?

24            MR. SELLS:  Yes, Your Honor.  It's A, B, C,

25   and D.

1          **THE COURT:**  All right.  Any objection?

2          **MS. MCKNIGHT:**  No objection, Your Honor.

3          **THE COURT:**  They're each admitted without

4   objection, and 265 under the order of -- protected as

5   agreed to by the parties -- or restricted.  You may

6   continue.

7          **MR. SELLS:**  Thank you, Your Honor.

8   BY MR. SELLS:

9   **Q.**    Now, Dr. McBride, you mentioned voter list

10   matching as a solution to analyzing elections that have

11   split precincts.  Did you have to use voter list

12   matching for any other elections in this case?

13   **A.**    I used them for the split precincts.  The 2016

14   at-large elections, the state provided that file, along

15   with an election I looked at in 2004, the 2004 sheriff

16   race, but there wasn't -- data wasn't made available

17   for the 2014 races, so I know I used it for the 2014.

18   **Q.**    Just to be clear.  You used voter list matching

19   for the 2014 at-large races as well?

20   **A.**    Yes, yes.  Yes, that is correct.  The at-large

21   races for 2014, there was -- the state didn't provide a

22   turnout file for those races, so I had to use them for

23   the 2014 at-large, that is correct.

24   **Q.**    And the process for using voter list matching in

25   an at-large race is any different from the process for

1    using voter list matching in a split precinct race?

2    **A.**    No, the process doesn't change with reference to

3    any particular jurisdiction.

4    **Q.**    So what did you do if you can't use precinct level

5    racial turnout data or voter list matching to measure

6    the composition of the electorate?

7    **A.**    Well, the general standard is to use data

8    available from census bureau, which would be the voting

9    age population data.

10    **Q.**    Okay.  How does that work?

11    **A.**    The census bureau provides, of course, racial, as

12    well as all other information necessary in mapping

13    procedures.  So you would use the -- in a way similar

14    to what I just described, but you can use the census

15    bureau's website to access the data, which would then

16    be aggregated or applied to your particular county or

17    precinct or whatever jurisdiction that you're looking

18    at to comprise a number for voters in that particular

19    precinct.

20    **Q.**    When you say voters, do you mean people who

21    actually turned out to vote?

22    **A.**    No.  That's the entire voting age population.  Or

23    you could do the total population, but here

24    interestingly, we're interested in, of course, in both,

25    but the census bureau has just a variety of different

1    data depending on what your -- what your interest is or

2    what it is you're actually try to do.

3    Q.    Did you use voting age population data for any of

4    your analyses in this case?

5    A.    Yes, I used voting age population data for the --

6    in the original report, voting age population was used.

7    Q.    So, if I understand you correctly, your racial

8    block voting analyses in this case used precinct level

9    racial turnout data provided by the Secretary of State

10   for some elections?

11   A.    Correct.

12   Q.    It used voter list matching for some elections and

13   voting age population data for some elections; is that

14   right?

15   A.    That's correct.

16   Q.    Okay.  Which one of those three is the most

17   reliable?

18   A.    Turnout data is regarded as the most reliable

19   data.

20   Q.    Why is that?

21   A.    Because that's the actual voters who actually -- I

22   hate to say the word turned out -- who actually came

23   and voted and participated in that particular election.

24   Q.    What would your second choice be?

25   A.    Voting age population data typically, if I can't

1    get turnout data.

2    **Q.**    Well, would you use voting age population data

3    over voter list matching?

4    **A.**    No.  No.  Voter list matching gets me the turnout

5    data.

6    **Q.**    Let me ask you this.  Were you able to get the

7    data that you feel you needed in order to produce

8    reliable estimates of racial voting patterns in Sumter

9    County?

10    **A.**    Yes.

11    **Q.**    So I've asked you about the methods and the data

12    you used for your racial block voting analyses, what

13    elections did you choose to analyze?

14    **A.**    Well, I chose to analyze the most probative

15    elections, the at-large elections, first, because the

16    at-large elections basically go to the issue, and all

17    of the school board races, including the single member

18    districts under HB 836.

19    **Q.**    Why did you choose those elections?

20    **A.**    They're the most probative elections, as well as,

21    I chose elections that involve a chance to present an

22    equal opportunity for minority voters, basically

23    elections that had a black candidate because there's a

24    choice, there's a racial choice in those, and those are

25    going to be much more probative in terms of assessing

1    or determining racially polarized voting and cohesion.

2    Q.    Did you analyze any other elections?

3    A.    Based on the opinion in the Eleventh Circuit, I

4    looked at the at-large election in 2004, that was a

5    sheriff race, and in 2016 there was an additional

6    at-large election for the school board and I -- that

7    was an additional one from the original report.

8    Q.    Did you add any other elections in response to

9    Eleventh Circuit's opinion?

10   A.    The Eleventh Circuit, Judge Tjoflat, also wanted

11   to know how each district in the 2014 elections

12   performed, and there was a white versus white election,

13   school district four was a -- where it was two white

14   candidates, and I added that based on the Eleventh

15   Circuit's concurrent opinion, Judge Tjoflat's

16   concurring opinion.

17   Q.    So the two elections you added in response to

18   Judge Tjoflat's opinion was the white-white contest in

19   district four from 2014 and the 2004 sheriff's race

20   which was an at-large election in Sumter County,

21   correct?

22   A.    That is correct.

23   Q.    Were you able to find any other at-large elections

24   involving black candidates that you could analyze?

25   A.    I was not.

1    Q.    How would you respond to criticism you've cherry

2    picked the elections that you've chosen to analyze in

3    order to slant the results in the plaintiff's favor?

4    A.    I would find that criticism unfounded because any

5    prudent researcher, of course, is going analyze

6    endogenous elections.  Those are the school board

7    races, the at-large and the district races.  And I

8    analyzed all of them, all of them dating back to 2002.

9    Secondly, as I just mentioned, Judge Tjoflat in his

10   concurring opinion suggested that the at-large

11   elections, ones that I could find, needed to be

12   explored, as well as the school board district four

13   election that involved two white candidates.  So those

14   two were added based on the concurring opinion of Judge

15   Tjoflat.  All of the other elections were those

16   endogenous elections that were also included in the

17   original report.  So I have difficulty understanding

18   how I could be deemed as cherry picking when, if you're

19   going to pursue some sort of investigation about a

20   school board election, you, one, have to look at school

21   boards, and then -- well, school boards.  School board

22   races.  And then, secondly, when there is a circuit

23   court opinion that is suggesting something and I do it,

24   I have trouble understanding how that's cherry picking.

25   Q.    Well, what about the criticism that you

1    inexplicitly omitted three elections from your

2    supplemental report, those being the older elections?

3    A.    I think defense expert is speaking of the pre-

4    2010 races, the 2002, 2006, and 2008.  As I mentioned

5    earlier, I could not use a voter list matching method

6    to arrive at turnout data for those elections.  So

7    there was nothing new.  There was nothing to supplement

8    in my supplemental report because I didn't have the

9    data to do the analysis.

10   Q.    Well, do you stand by those earlier analyses based

11   voting age population?

12   A.    I do.

13        MR. SELLS:  Your Honor, I just want to check

14   in.  I'm at a stopping point if you'd like to take a

15   break, but I'm happy to continue.

16        THE COURT:  Well, let's take advantage of

17   your offer.  We'll be in recess for 15 minutes.

18   (RECONVENED; ALL PARTIES PRESENT 10:04 a.m.)

19        THE COURT:  All right.  Before you continue,

20   let me just say this so we'll all be on schedule for --

21   you'll have some predicted schedule.  In the future

22   we'll start at 8:30 in the morning, and we'll take our

23   break about 10:00, or at 10:00, since we started a

24   little bit later than we did this morning.  And take

25   our lunch at 12 to 1:30, and have our afternoon break

```
1    at 3:30 so as to allow everyone to kind of plan your
2    witnesses to meet that schedule.  All right.
3            MR. SELLS:  And, Your Honor, how late do you
4    expect to go each day?
5            THE COURT:  Five.
6            MS. MCKNIGHT:  Your Honor, just one
7    procedural note regarding the rule excluding witnesses.
8    I've conferred with plaintiff's counsel and reviewed
9    Rule 615 on excluding witness, and we would like to
10   invite Mr. Brady in to remain in the courtroom as he is
11   a party's representative.  He is a representative of
12   defendant, Sumter County Board of Elections, so under
13   Rule 15(b) he is excluded from the rule excluding
14   witnesses.  I have plaintiff's counsel consent to
15   including him.
16           MR. SELLS:  That's correct.
17           THE COURT:  I think that's appropriate.
18           MS. MCKNIGHT:  Thank you, Your Honor.
19           THE COURT:  So noted for the record.  All
20   right.  You may continue, Mr. Sells.
21           MR. SELLS:  Thank you, Your Honor.
22   BY MR. SELLS:
23   Q.   All right, Dr. McBride, let's dig into the results
24   of your racial block voting analysis.  I'd like to show
25   you Plaintiff's Exhibit 10, and I'm going to ask you,
```

1    can you tell me what this is?

2    **A.**    That is the estimate of -- well, this is Sumter

3    County at-large elections under HB 836.  This

4    particular election is the May 24, 2016 four-year

5    election between Michael Coley and Sylvia Roland.  The

6    second column indicates the percent of votes received

7    for each candidate, and then the estimates of voting

8    percentage for each candidate.  EI, is the ecological

9    inference method, BERA, bivariant ecological regression

10   analysis, and HPA is homogenous precinct analysis, and

11   it is divided by the white voters and the black voters

12   based on the racial composition of that particular --

13   precincts in that particular election.

14   **Q.**    Okay.  This exhibit is identified as Plaintiff's

15   Exhibit 10.  It says table four.  Is this table four

16   from you supplemental corrected report?

17   **A.**    Yes, it is.

18   **Q.**    Now, why did you gather these particular elections

19   in a separate table?  Why not just put them, all of

20   your results in one table?

21   **A.**    Well, I wanted to designate the particular

22   elections basically because the issue and question for

23   us here is the at-large elections.  So I wanted to

24   separate the at-large elections from the district

25   elections and -- as well as the other elections that I

was asked to analyze.  So it's basically a

categorization with, again, particular emphasis on

getting at the at-large election first because those

are the most probative for this particular case.

Q.    All right.  Now, I'm going to ask you a series of

questions about each election in your analysis, and

I'll have to beg your forgiveness if these begin to

sound repetitive, but I think it's important to be

clear and to get this information on the record.  Are

you ready?

A.    Yes.

Q.    Okay.  What is the first election in table four?

A.    The first election is the May 24, 2016 four-year

election.

Q.    Was this an election for the same office at issue

in this case?

A.    The same office, the at-large election, yes.

Q.    Does this election involve a racial choice?

A.    Yes, it does.

Q.    And how so?

A.    Michael Coley is an African American candidate,

and so that gives voters a racial choice.  Sylvia

Roland is a nonminority or a white candidate.

Q.    Does this election involve the same electorate as

the office at issue in this case?

1   **A.**   Yes.  That would be the at-large election -- or

2   the at-large election system.

3   **Q.**   Can you explain why it might be important to look

4   at elections that have the same electorate?

5   **A.**   Because this is going to -- it's best to look at

6   this election because it involves the entire

7   electorate, rather than base all of your inferences on,

8   for example, a district election, which is only a piece

9   or a portion of the electorate.

10  **Q.**   Now, is this election held at the same time as the

11  election for the office at issue in this case?

12  **A.**   Yes.  It is a May election.

13  **Q.**   And why is that important?

14  **A.**   Turnout rates can differ based on races or based

15  on the election times.  For example, presidential

16  election years can have increased voter turnout, so the

17  turnout rates can differ.

18  **Q.**   Okay.  Were the white voters a majority of the

19  electorate in this election?

20  **A.**   Yes.

21  **Q.**   How do you know that?

22  **A.**   Based on the turnout analysis that we discussed

23  earlier.

24  **Q.**   And is the turnout in this election reported in

25  your supplemental report?

1    **A.**    Yes.

2    **Q.**    Are your estimates of white voting preferences

3    reliable?

4    **A.**    Yes.

5    **Q.**    How do you know that?

6    **A.**    Based on the methods employed by, first of all,

7    not just reliance on one method, but the ecological

8    regression and the homogenous precinct analysis and the

9    methodology that we discussed earlier, I find these

10   estimates reliable.  As well as the method used to

11   obtain the racial composition of the districts.

12   **Q.**    Which candidate was preferred by white voters in

13   this election?

14   **A.**    White voters -- and I'm going to circle this

15   preferred Sylvia Roland.

16   **Q.**    Are your estimates of black voting preferences

17   reliable?

18   **A.**    Yes, they are.

19   **Q.**    And how do you know that?

20   **A.**    I know that, one, again, based on the methodology

21   and also in speaking with reference to reliability that

22   number in parenthesis is a standard error which is a

23   measure of variability, and the lower you are, the more

24   confident you can be in your estimates.

25   **Q.**    I see a .01 and a .02, as the standard errors for

1  this particular election, are those low in your view?

2  **A.**  Yes, they are.

3  **Q.**  Which candidate was preferred by black voters in

4  this election?

5  **A.**  Black voters preferred Michael Coley.

6  **Q.**  Were black voters cohesive in support of that

7  candidate?

8  **A.**  Yes, they were cohesive.

9  **Q.**  Was this election racially polarized?

10  **A.**  Yes, it was.

11  **Q.**  How do you know that?

12  **A.**  The difference in black support for Michael Coley

13  versus white support for Sylvia Roland, there's very

14  little crossover vote for the black candidate by white

15  voters.  There's a difference in the racial pattern --

16  there's a difference in the voting preference of these

17  white and black voters.

18  **Q.**  Which candidate would have been elected if this

19  election were held only amongst white voters?

20  **A.**  Sylvia Roland.

21  **Q.**  And which candidate would have been elected if

22  this election were held only amongst black voters?

23  **A.**  Michael Coley.

24  **Q.**  How polarized was this election?

25  **A.**  Highly polarized.

1    Q.    What makes you say that?

2    A.    Because 93.6, that particular estimate, and 84.7

3    for Michael Coley and 84.7 for Sylvia Roland is an

4    extreme level of polarization.

5    Q.    Were there any special circumstances of which you

6    are aware?

7    A.    No, not that I'm aware of.

8    Q.    Did the white majority in this election vote

9    sufficiently as a block to defeat the minority

10   preferred candidate?

11   A.    Yes, they did.

12   Q.    Can we turn to the next page of this table?  Which

13   election do we have on the screen now?

14   A.    That's the May 20, 2014 two-year election.

15   Q.    And was this election for the same office at issue

16   in this case?

17   A.    Yes.  It is an at-large election.

18   Q.    For the school board?

19   A.    Yes.

20   Q.    Was there a racial choice in this election?

21   A.    Yes.  Michael Coley and Patricia Taft are African

22   American candidates.

23   Q.    And what about David Kitchens and Sylvia Roland?

24   A.    David Kitchens and Sylvia Roland are nonminority

25   or white candidates.

1    **Q.**   Does this election involve the same electorate as
2    the elections that are at issue in this case?
3    **A.**   Yes.  It is an at-large election.
4    **Q.**   Was this election held on the same election day as
5    the elections at issue in this case?
6    **A.**   Yes.  It's a May election.
7    **Q.**   Was there a white majority in this election?
8    **A.**   Yes.
9    **Q.**   Is your estimate of white voting preference
10   reliable?
11   **A.**   Yes, it is.
12   **Q.**   How do you know that?
13   **A.**   Again, and I'll circle one in particular -- well,
14   several -- these are low standard errors in this
15   particular case.
16   **Q.**   Who was the white preferred candidate in this
17   election?
18   **A.**   The white preferred candidate was Sylvia Roland.
19   **Q.**   Who was the black preferred candidate in this
20   election?
21   **A.**   The black preferred candidate was Michael Coley.
22   **Q.**   And is your estimate of black voting reliable in
23   this case?
24   **A.**   Yes, it is.
25   **Q.**   Was voting in this election racially polarized?

1    **A.**    Yes, it was.

2    **Q.**    How polarized was it?

3    **A.**    Highly polarized as Michael Coley receives 89 --

4    an estimate of 89.1 percent by black voters.

5    **Q.**    Which candidate would have been elected if this

6    election were held only amongst white voters?

7    **A.**    Sylvia Roland.

8    **Q.**    Which candidate would have come in second if this

9    election were held only among white voters?

10    **A.**    David Kitchens.

11    **Q.**    Which candidate would have won if this election

12    were held only amongst black voters?

13    **A.**    Michael Coley.

14    **Q.**    Which candidate would have come in second if this

15    election were held only among black voters?

16    **A.**    Possibly, here -- okay.  Could you repeat your

17    question, please?

18    **Q.**    Yes.  Which candidate would have come in second if

19    this election were held only amongst black voters?

20    **A.**    Likely, Sylvia Roland.

21    **Q.**    Were there any special circumstances present in

22    this election?

23    **A.**    No, not that I'm aware of.

24    **Q.**    And did the white majority in this election vote

25    sufficiently as a block to defeat the minority

1    preferred candidate?

2    **A.**    Yes.

3    **Q.**    I want you to explain what you mean by that last

4    answer, they voted sufficiently as a block to defeat

5    the African American preferred candidate in this

6    election.

7    **A.**    The white majority, and based on the estimate,

8    Sylvia Roland obtaining 53 percent of the vote, David

9    Kitchens -- from white voters, David Kitchens received

10   32.7 percent.  Combined that is some 85.7 percent of

11   the vote, detailing that when whites vote as a

12   majority, they can usually defeat the minority

13   preferred candidate.

14   **Q.**    Was any candidate elected to office as a result of

15   this election?

16   **A.**    Sylvia -- Oh, I'm sorry.  This election led to a

17   runoff.  This is the election that led to the runoff.

18   **Q.**    Okay.  Does that lead you to change any of your

19   previous answers?

20   **A.**    I don't -- I can't remember a lot of the questions

21   that you previously asked.  It doesn't change the

22   minority -- or the preferences among the white or the

23   black voters, so, no.

24   **Q.**    Can we see the next page of this exhibit?  All

25   right.  What election is this?

1    **A.**    This is the May 20, 2014 four-year election.

2    **Q.**    And is this an election for same office that's at

3    issue in this case?

4    **A.**    Yes, it is.

5    **Q.**    And does this election offer a racial choice?

6    **A.**    Yes, it does.

7    **Q.**    How do you know that?

8    **A.**    Kelvin Pless is the African American candidate,

9    and Michael Busman is the white candidate.

10   **Q.**    Does this election involve the same electorate as

11   the office involved in this case?

12   **A.**    Yes.  It's an at-large election.

13   **Q.**    Does this election take place on the same day as

14   the office at issue in this case?

15   **A.**    Yes, it does.

16   **Q.**    Were white voters a majority of the electorate in

17   this case?

18   **A.**    Yes, they were.

19   **Q.**    How do you know that?

20   **A.**    Based on previous turnout data.

21   **Q.**    Is your estimate of white voting reliable?

22   **A.**    Yes, it is.

23   **Q.**    How do you know that?

24   **A.**    Again, very low standard errors based on the

25   ecological inference estimates.

1   Q.   Who was the white preferred candidate?

2   A.   The white preferred candidate was Michael Busman.

3   Q.   Is your estimate of black voting reliable?

4   A.   Yes, it is.

5   Q.   How do you know that?

6   A.   Again, low standard errors.

7   Q.   Who was the black preferred candidate?

8   A.   The black preferred candidate was Kelvin Pless.

9   Q.   Was voting racially polarized?

10  A.   Yes, it was.

11  Q.   How polarized was it?

12  A.   Highly polarized.

13  Q.   And what makes you say that?

14  A.   Again, the numbers are in the mid-nineties white

15  support for Busman, who is the white candidate, African

16  American support for Kelvin Pless, 96.7 is the estimate

17  based on black voters.

18  Q.   Were there any special circumstances present in

19  this election?

20  A.   No, not that I'm aware of.

21  Q.   And did the white majority vote sufficiently as a

22  block to defeat the black preferred candidate?

23  A.   Yes, they did.

24  Q.   Can we look now at the final page of this exhibit.

25  Okay.  The final page of Exhibit 10 shows which

1    election, Dr. McBride?

2    **A.**   The July 22lnd, 2014, two-year election that

3    resulted in a runoff.

4    **Q.**   This is the election that resulted in a runoff?

5    **A.**   Yes.  The at-large election from May, that two

6    months prior, that resulted in the runoff.

7    **Q.**   Oh, so this is the runoff?

8    **A.**   This is the runoff -- that -- this is the runoff,

9    yes.

10   **Q.**   I just want to be clear for the record.

11   **A.**   Yes.

12   **Q.**   And was this election for the same office at issue

13   in this case?

14   **A.**   Yes, it was.

15   **Q.**   Was there a racial choice?

16   **A.**   Yes.  Michael Coley is the African American

17   candidate.  Sylvia Roland is the white candidate.

18   **Q.**   Did this electorate -- did this election involve

19   the same electorate as the office at issue in this

20   case?

21   **A.**   Yes.

22   **Q.**   Did it take place on the same election day as the

23   elections for the office at issue in this case?

24   **A.**   Well, being in July, it was a runoff, so it's a

25   different day, but it's an election based on the May

1    election that no candidate was secured -- I mean, no

2    winner was secured in that election.

3    **Q.**    I understand.  Were white voters a majority of the

4    electorate in this election?

5    **A.**    Yes, they were.

6    **Q.**    And how do you know that?

7    **A.**    Based on the turnout data.

8    **Q.**    Is your estimate of white voting preference

9    reliable?

10   **A.**    Yes, it is.

11   **Q.**    How do you know that?

12   **A.**    With reference to white voters, I have a standard

13   error of basically zero -- of zero.

14   **Q.**    And who was the white preferred candidate?

15   **A.**    Sylvia Roland.

16   **Q.**    Is your estimate of black voting pattern reliable?

17   **A.**    Yes, it is.

18   **Q.**    How do you know that?

19   **A.**    The, again, low standard errors for the preference

20   of black voters.

21   **Q.**    And who was the black preferred candidate?

22   **A.**    Michael Coley.

23   **Q.**    Was voting in this election racially polarized?

24   **A.**    Yes, it was.

25   **Q.**    How polarized was it?

1   **A.**   Highly polarized.

2   **Q.**   Were there any specific circumstances?

3   **A.**   Not that I'm aware of, no.

4   **Q.**   Did the white majority in this election vote

5   sufficiently as a block to defeat the black preferred

6   candidate?

7   **A.**   Yes, they did.

8   **Q.**   Let's move on to Plaintiff's Exhibit 11.  Can you

9   tell us what we're looking at?

10   **A.**   This is the May 20, 2014, district one election.

11   **Q.**   Let's start with the table.

12   **A.**   Table five, Sumter County General Elections Under

13   HB 836.

14   **Q.**   Does this table include all general elections,

15   including the at-large elections?

16   **A.**   No.  No, this is a district election.

17   **Q.**   Okay.  So focusing on the first election in table

18   five, was this election for the same office at issue in

19   this case?

20   **A.**   It's a district election, so that's different from

21   the at-large election.

22   **Q.**   Okay.  Was there a racial choice in this election?

23   **A.**   Yes.  Alice Green is the African American

24   candidate.

25   **Q.**   Does this election involve the same electorate as

1    the elections for the office at issue in this case?

2    **A.**    No.  This is the election specifically for the

3    single member district, district one.

4    **Q.**    So how is the electorate different in this

5    district election versus the at-large election?

6    **A.**    The at-large election is the entire electorate.

7    The single member district elections are portions of

8    that electorate.

9    **Q.**    Was this election held on the same day as the

10   elections for the office at issue in this case?

11   **A.**    Yes, it was.

12   **Q.**    Now, was there a white majority among the voters,

13   i.e., turnout in this election?

14   **A.**    For district -- I'm sorry, I'm trying to remember

15   the turnout table.  For district one --

16   **Q.**    Would it refresh your recollection if we showed

17   you the --

18   **A.**    Yes, it would.

19   **Q.**    -- turnout table?

20   **A.**    Yes, it would.

21   **Q.**    I know there are a lot of numbers in this case.

22           **MR. SELLS:**  So if we could go back to

23   Plaintiff's Exhibit 6 for a moment.  And let's scroll

24   down until we find table ten, probably about a three

25   quarters of the way through.  It's going to be much

1    farther down.  Can we jump to Bates 150?  All right.

2    That's too far, one up.  Let's pull up Plaintiff's

3    Exhibit 16, please.

4    **Q.**    All right.  Dr. McBride, can you identify

5    Plaintiff's Exhibit 16?

6    **A.**    That's participation rates by race in select

7    Sumter County elections, and whites were a slight

8    majority in that district one.

9    **Q.**    Okay.  I'd like you to circle where you're looking

10   to identify that.

11   **A.**    *(Witness complies).*

12   **Q.**    So according to your analysis of turnout in the

13   May 20th, 2014, district one election, whites were --

14   turned out at 9.4 percent versus 8.6 percent for black

15   voters, correct?

16   **A.**    Correct.

17   **Q.**    All right.  So let's go back to Exhibit 11, and

18   we're looking at the May 20th, 2014 election for

19   district one, and, Dr. McBride, was there a white

20   majority based on turnout in this election?

21   **A.**    Yes.

22   **Q.**    Is your estimate of white voting reliable?

23   **A.**    Yes.

24   **Q.**    Who was the white preferred candidate?

25   **A.**    The white preferred candidate was Allen Smith.

1    Q.    Is your estimate of black voting reliable?

2    A.    Yes.

3    Q.    Who was the black preferred candidate?

4    A.    The black preferred candidate was Alice Green.

5    Q.    Was voting racially polarized?

6    A.    Yes, it is.

7    Q.    How polarized was it?

8    A.    Highly polarized as black voters overwhelmingly

9    supported Alice Green.

10   Q.    Were there any special circumstances present?

11   A.    No, not that I'm aware of.

12   Q.    And looking at the percentage of votes received,

13   did the white majority in this election vote

14   sufficiently as a block to defeat the minority

15   preferred candidate?

16   A.    No, they did not.

17   Q.    All right.  Can we look at the next page of this

18   exhibit?  Let's focus on the next election that you've

19   presented.  Tell us what that is.

20   A.    That May 20, 2014, district two election.

21   Q.    Was this election for the same office at issue in

22   this case?

23   A.    No, this is -- this, too, a single member district

24   election.

25   Q.    Does this election involve a racial choice?

1    **A.**    Yes, it does.  Sara Pride is the African American

2    candidate.  Meta Krenson and Everett Byrd are white

3    candidates.

4    **Q.**    Does this election involve the same electorate as

5    the election at issue in this case?

6    **A.**    No.  Again, it is a single -- it is a district

7    election.

8    **Q.**    Was there a white majority in this election?

9    **A.**    Yes, there was.

10   **Q.**    Is your estimate of white voting reliable?

11   **A.**    Yes, it is.

12   **Q.**    Who was the white preferred candidate?

13   **A.**    The white preferred candidate is Meta Krenson.

14   **Q.**    Is your estimate of black voting reliable?

15   **A.**    Yes.  As black voters overwhelming supported Sara

16   Pride.

17   **Q.**    Who was the black preferred candidate?

18   **A.**    Sarah Pride.

19   **Q.**    Was voting racially polarized?

20   **A.**    Yes, it was.

21   **Q.**    How polarized was it?

22   **A.**    Highly polarized.

23   **Q.**    Were there any special circumstances in this case?

24   **A.**    No, not that I'm aware of.

25   **Q.**    Did the white majority vote sufficiently as a

1    block in this election to defeat the minority preferred

2    candidate?

3    **A.**   Yes, they did.

4    **Q.**   And let's look at the next election in this table.

5    What's the next election?

6    **A.**   This is the May 20, 2014, district three election.

7    **Q.**   Was this election for the same office as the

8    elections at issue in this case?

9    **A.**   No.  Again, it is a district election.

10   **Q.**   Does this election involve a racial choice?

11   **A.**   Yes, it does.  Willa Fitzpatrick is the African

12   American candidate.  J.C. Reid is the white candidate.

13   **Q.**   Does this election involve the same electorate as

14   the elections at issue in this case?

15   **A.**   No.  Again, it is a district election.

16   **Q.**   Did this election take place on the same election

17   day as the elections for the office at issue in this

18   case?

19   **A.**   Yes, it did.

20   **Q.**   Was there a white majority of the voters in this

21   election?

22   **A.**   Yes.

23   **Q.**   Is your estimate of white voting preference

24   reliable?

25   **A.**   Yes, it is.

1   Q.   Who was the white preferred candidate?

2   A.   The white preferred candidate is J.C. Reid.

3   Q.   Is your estimate of black voting reliable?

4   A.   Yes, it is.

5   Q.   Who was the black preferred candidate?

6   A.   The black preferred candidate is Willa

7   Fitzpatrick.

8   Q.   Was voting racially polarized?

9   A.   Yes, it was.

10   Q.   How polarized was it?

11   A.   Highly polarized.

12   Q.   Were there any special circumstances present in

13   this election?

14   A.   Not that I'm aware of.

15   Q.   Did the white majority vote sufficiently as a

16   block in this election to defeat the minority preferred

17   candidate?

18   A.   Yes, they did.

19   Q.   There's another election on the same screen.

20   Let's move on to that one.

21   A.   That's the May 20, 2014, district five election.

22   Q.   And is this election for the same office at issue

23   in this case?

24   A.   Again, it is a district election.

25   Q.   Is there a racial choice in this election?

**A.**   Yes.  Edith Green is the African American

candidate, and Mark Griggs is the white candidate.

**Q.**   Does this election involve the same electorate as

the elections for the office at issue in this case?

**A.**   No.  It is a district election.

**Q.**   Does this election take place on the same election

day?

**A.**   It does.

**Q.**   Okay.  Was there a white majority in this

election?

**A.**   Not in district five.

**Q.**   Is your estimate of white voting reliable?

**A.**   Yes, it is.

**Q.**   Who was the white preferred candidate?

**A.**   The white preferred candidate is Mark Griggs.

**Q.**   Is your estimate of black voting reliable?

**A.**   Yes, it is.

**Q.**   Who was the black preferred candidate?

**A.**   The black preferred candidate is Edith Green.

**Q.**   Was voting racially polarized?

**A.**   Yes, it was.

**Q.**   How polarized was it?

**A.**   Highly polarized.

**Q.**   Were any special circumstances?

**A.**   Not that I'm aware of.

1    Q.   And you said that there was not a white majority

2    in this election, correct?

3    A.   Correct.

4    Q.   So the white majority did not vote sufficiently as

5    a block to defeat the minority preferred candidate, did

6    it?

7    A.   That is correct.

8    Q.   Okay.  Can we move to the next exhibit,

9    Plaintiff's Exhibit 13.

10        THE COURT:  What exhibit did you say?

11        MR. SELLS:  13, Your Honor.

12        THE COURT:  13.

13   Q.   And, Dr. McBride, which table is this?

14   A.   This is table seven, Sumter County other at-large

15   general elections that included black candidates.

16   Q.   And, again, this is a table from your corrected

17   supplemental report?

18   A.   That is correct.

19   Q.   What is the first election on this table?

20   A.   The first election is the November 2nd, 2004,

21   sheriff race or election.

22   Q.   Now, was this an election for the same office at

23   issue in this case?

24   A.   It's an at-large election, but it is an exogenous

25   race, so that would not be the same office.

1    **Q.**    Does this election offer voters a racial choice?

2    **A.**    Yes, it does, as Nelson Brown is the African

3    American candidate, and James Driver and Pete Smith are

4    white candidates.

5    **Q.**    Does this election involve the same electorate as

6    elections for the offices at issue in this case?

7    **A.**    Yes, because it is an at-large election.

8    **Q.**    Does this election take place on the same election

9    day as the elections at issue in this case?

10    **A.**    No.  It's a November race.

11    **Q.**    Was there a white majority among the electorate

12    for this election?

13    **A.**    Yes.

14    **Q.**    And, again, how do you know that?

15    **A.**    The turnout data from the previous, I think that

16    was table ten.

17    **Q.**    Is your estimate of white voting reliable?

18    **A.**    Yes, it is.

19    **Q.**    Okay.  Who is the white preferred candidate?

20    **A.**    The white preferred candidate is Pete Smith.

21    **Q.**    Is your estimate of black voting reliable?

22    **A.**    Yes, it is.

23    **Q.**    Who was the black preferred candidate?

24    **A.**    The black preferred candidate is -- was Nelson

25    Brown.

1    Q.    Was this voting -- was voting racially polarized

2    in this election?

3    A.    Yes.

4    Q.    How polarized was it?

5    A.    Highly polarized.

6              THE COURT:  I have a question.

7              MR. SELLS:  Yes.

8              THE COURT:  It's noted here that that was a

9    write-in.  Does that make a distinction in terms of

10   regularity of the race?

11             THE WITNESS:  No.  Voters -- he was a

12   write-in candidate that still received a significant

13   level of support from the minority voters.

14             THE COURT:  What I'm asking, that would not

15   be a significant variable for your purpose of your

16   analysis because it was a write-in rather than a

17   regular on the ballot vote?

18             THE WITNESS:  No, it doesn't change the

19   outcome, no.

20             THE COURT:  I just wanted a clarification.  I

21   saw that.  You may continue.

22             MR. SELLS:  Yes.  Well, Your Honor, I was

23   going to ask my next question, I think, right along

24   those lines --

25             THE COURT:  I apologize, since there's no --

1    I would not have done that if a jury was here.  I have

2    that fear if I don't ask a question when it's on my

3    mind, I'll forget it, but --

4            **MR. SELLS:**  Your Honor, ask away.  Ask away.

5    This is your courtroom.

6            **THE COURT:**  Okay.  You may proceed, Mr.

7    Sells.

8    **BY MR. SELLS:**

9    **Q.**   So, Dr. McBride, my next question was going to be,

10   are there any special or unusual circumstances about

11   this election?

12   **A.**   The fact that it's a write-in, I would deem -- I'm

13   not sure if the courts consider that a special

14   circumstance, but that is different from the other

15   elections, yes.

16   **Q.**   Now, in all of the hundreds of elections that

17   you've analyzed over the course of your career so far,

18   have you ever seen a write-in candidate get such a

19   large share of either the white or black vote?

20   **A.**   It is highly unusual, and in all of the elections

21   that I've done over the years most of the write-in

22   candidates are people like Daffy Duck and Lucy Loo, and

23   they get a very small amount, maybe two or three votes.

24   So this was highly unusual.

25   **Q.**   In this election did the white majority vote

1   sufficiently as a block to defeat the candidate

2   preferred by African Americans?

3   **A.**   Yes, they did.

4   **Q.**   Okay.  I think we move now to Plaintiff's

5   Exhibit 14.  First, would you read the heading on the

6   exhibits please, Dr. McBride?

7   **A.**   This table eight, Sumter County General Elections

8   By District Under Plan -- Under Prior Plan That

9   Included Black Candidates.

10  **Q.**   And this is from your supplemental report?

11  **A.**   That is correct.

12  **Q.**   So tell us what election we're looking at here?

13  **A.**   This is the November 2nd, 2010, district three

14  election.

15  **Q.**   And is an election for the same office at issue in

16  this case?

17  **A.**   It is a school board election.  It's not a -- --

18  it's a district election, so I would think that's --

19  that's different from the at-large elections, yes.

20  **Q.**   It's a school board election, but not an at-large

21  election?

22  **A.**   It's not an at-large election, that's correct.

23  **Q.**   Okay.  Does this election offer voters a racial

24  choice?

25  **A.**   Yes, it does.  Kelvin Pless is the African

1    American candidate and Donna Minich is the white

2    candidate.

3    Q.    Does this election involve the same electorate as

4    the elections at issue in this case?

5    A.    No.  Again, this is a district election.

6    Q.    Does this election take place on the same election

7    day as the elections for the office at issue in this

8    case?

9    A.    No, it does not.

10   Q.    Was there a white majority in this election?

11   A.    Yes.

12   Q.    And, again, how do you know that?

13   A.    The turnout table -- I'm sorry, table from table

14   ten.

15   Q.    Okay.  Is your estimates of white voting reliable?

16   A.    Yes.

17   Q.    Who was the white preferred candidate?

18   A.    The white preferred candidate is Donna Minic.

19   Q.    And is your estimate of black voting reliable?

20   A.    Yes, it is.

21   Q.    And who was the black preferred candidate?

22   A.    The black preferred candidate is Kelvin Pless.

23   Q.    Was voting racially polarized?

24   A.    Yes, it was.

25   Q.    How polarized was it?

**A.**   Highly polarized.

**Q.**   Were there any special circumstances of which you're aware?

**A.**   No.

**Q.**   And did the white majority vote sufficiently as a block to defeat the black preferred candidate in this election?

**A.**   No, they did not.

**Q.**   And, lastly, I want to turn to Plaintiff's Exhibit 15.  What is the heading on this table?

**A.**   That is table nine, Sumter County Special Election By Districts Under the Prior Plan That Included Black Candidates.

**Q.**   Was this an election for the same office at issue in this case?

**A.**   No.  It is a district election.

**Q.**   Does this election offer a racial choice?

**A.**   Yes, it does.  Sara Pride is the African American candidate.  Michael Mock is the white candidate.

**Q.**   Does this election involve the same electorate as the elections for the office at issue in this case?

**A.**   No, it does not.

**Q.**   Does this election take place on the same election day as elections for the office at issue in this case?

**A.**   No, it does not.

1    **Q.**   Was there a white majority among the electorate in

2    this election?

3    **A.**   Yes.

4    **Q.**   Is your estimate of white voting reliable?

5    **A.**   Yes.

6    **Q.**   Who was the white preferred candidate?

7    **A.**   The white preferred candidate is Michael Mock.

8    **Q.**   Is your estimate of black voting reliable?

9    **A.**   Yes.

10   **Q.**   You hesitated.  Explain why.

11   **A.**   There's a higher standard error for Sara Pride,

12   and the estimates -- well, there is a higher standard

13   error for Sara Pride.

14   **Q.**   And what does that lead you to conclude, if

15   anything, about your estimates for black voting

16   patterns in this election?

17   **A.**   That the estimates are less reliable than the

18   previous elections that we've gone through for this

19   March 18, 2014 election.

20   **Q.**   Okay.  Was -- who was the black preferred

21   candidate?

22   **A.**   Sarah Pride received a bit more, but -- more

23   preference among black voters, but the estimates are

24   revealing more than 50 percent for both of them.

25   **Q.**   And so how does that affect your analysis of this

1    election?

2    **A.**    In sum, it doesn't really characterize Sarah Pride

3    being the outright minority preferred candidate of

4    choice, and in -- and when you come across instances

5    like this at times, researchers may often throw out or

6    discount the election.  I left the -- of course, I

7    didn't discount any.  I left the election in and showed

8    the estimates as I derived them.  They're just not as

9    conclusive as the previous ones that you've shown here.

10   **Q.**    To what, if anything, do you attribute that lack

11   of conclusively for this election?

12   **A.**    It could be a number -- the number of precincts,

13   or the fact in this particular race Sarah Pride

14   received 92 votes out of, I think, over some -- close

15   to 300 or 292, somewhere in that neighborhood of votes.

16   And perhaps that particular method just isn't as

17   reliable in this race as it has been in other races.

18   There could be a number of explanations.  That's just a

19   few of them that come to mind.

20   **Q.**    Okay.  Were you able to draw any conclusions about

21   whether this election was racially polarized?

22   **A.**    Well, there's no question who white voters seemed

23   to support; the question is the support amongst black

24   voters.

25   **Q.**    Now, I note that this was a special election, but

1     other than that, were they're any special elections --

2     excuse me, were there any special circumstances of

3     which you are aware?

4     **A.**    And in mentioning that, I thought a special

5     circumstance could be the fact that it was a special

6     election, and this particular seat does not exist any

7     longer.

8     **Q.**    Did the white majority vote sufficiently as a

9     block to defeat the minority preferred candidate in

10    this election?

11    **A.**    Yes.

12            **MR. SELLS:**  Your Honor, at this time the

13    plaintiffs would like to offer Exhibits 10 through 15.

14    These are the ones that we have just been discussing.

15            **THE COURT:**  Any objection to 10 through 15?

16            **MS. MCKNIGHT:**  No objection, Your Honor.

17            **THE COURT:**  They are each admitted without

18    objection.

19            **MR. SELLS:**  And I should throw in Plaintiff's

20    Exhibit 16 since we also mentioned that to refresh Dr.

21    McBride's recollection.

22            **THE COURT:**  Any objection to 16?

23            **MS. MCKNIGHT:**  No objection, Your Honor.

24            **THE COURT:**  It's also admitted without

25    objection.

BY MR. SELLS:

Q.   Now, Dr. McBride, I'd like to return your table
four for just a moment.  And this is Plaintiff's 10,
and I'd like to look at page two of that exhibit, which
is Bates number 164.  And I'd like to turn your
attention first on the column I am circling here, which
is your EI estimate of black support.  Do you see that?

A.   Yes, I do.

Q.   Now, if I've done my math correctly, your EI
estimates of black support for the four candidates in
that race total about 105 percent.  Now, that's clearly
erroneous, isn't it?

A.   That's incorrect.

Q.   Why not?

A.   Because ecological inference does not constrain
the numbers to sum to a hundred.  Ecological inference
establishes bounds for individual candidates, and those
bounds, as a part of the ecological inference program,
and here I use the EzI software, they constrain the
candidate to a number between zero and 100, not the sum
of the numbers.  And if I can add, unlike ecological
regression, where you'll note on the screen -- and I'm
doing this -- David Kitchens -- ecological -- I'm
sorry, ecological regression can give you extremes
above a hundred and below zero for candidates, EI does

1    not for individual candidates, and none of my estimates

2    are individual candidates below zero or above a

3    hundred.

4    Q.    So if you had an EI estimate, not an ecological

5    regression estimate, but an EI estimate that was below

6    zero or above a hundred, that would be a red flag for

7    you, correct?

8    A.    Yes, it would.

9    Q.    But your EI estimates that sum to 105 do not set

10   off red flags for you?

11   A.    No, they do not.  And, again, because no

12   particular individual candidate receives above a

13   hundred or below zero, there are no red flags, and to

14   add to that, these are all estimates.  This is not a

15   procedure where you apply an algorithm and

16   automatically state what the exact voting preference of

17   certain candidates are.  They are estimates.

18   Q.    Does the fact that they total over a hundred mean

19   that they are less reliable in your view?

20   A.    Absolutely not.

21   Q.    Are EI estimates that total above a hundred a

22   particular issue in any kind of election?

23   A.    No.

24   Q.    I mean -- let me rephrase that question.  Are EI

25   estimates that total over a hundred more commonly found

1    with particular kind of elections?

2    **A.**    They are more -- in my experience, you are likely

3    to find, and particularly using the EzI software, in

4    elections that involve more than two candidates.

5    **Q.**    Can you explain why that is the case?

6    **A.**    The iterative process in EzI takes candidate A and

7    runs the analysis through noncandidate A.  So it's

8    basically a two-by-two table.  It's not a program --

9    under EzI, it's not a program that does this

10   calculation with all three at the same time.  One

11   particular individual is matched against all of the

12   others one at a time.

13   **Q.**    Okay.  So can you -- I'm not sure I understand

14   what you mean by iterative process and candidate A.

15   Can you explain or illustrate using the actual

16   candidates on the screen in front of you?

17   **A.**    Okay.  So, for example, I'm writing Michael Coley,

18   the EzI program is going to run the analysis for

19   Michael Coley against these three individuals

20   *(indicating)*.  For David Kitchens, it's going to run

21   them against these three individuals.  You do that for

22   all of them.  In my experience with EzI when there are

23   more than a two-by-two table, which is two candidates

24   and racial preferences, when that happens, when you

25   have more than two, that process has generated in many

1    instances that I've seen estimates over a hundred.  A

2    little -- a lot less likely in a two-by-two table.

3    Q.   Okay.  What about your ecological regression

4    analysis over here?  Do you see that minus .58 estimate

5    of black support for David Kitchens?

6    A.   I do.

7    Q.   That's clearly erroneous, right?

8    A.   No, it is not.  That's the method of ecological

9    regression.

10   Q.   And why would you come up with a number like minus

11   5.8 percent using ecological regression?

12   A.   Regression -- these estimates are derived from --

13   if I can simplify this.  The slope of the regression

14   line can go outside the bounds or the axis and can

15   produce extremes.  It is very common in ecological

16   regression where this happens.  Oftentimes for

17   individuals like me sitting on a trial stand, I cannot

18   say that David Kitchen received negative 5.8 percent of

19   black votes.  Some researches equalize those out to

20   zero, or anything over a hundred, 100.  I being, if you

21   will, about face about this approach, I put the

22   estimates in there as they were because it's known

23   amongst us that these extremes can happen.  It does not

24   mean the regression was done incorrectly; it's the

25   slope of the regression line or the coefficients that

1    is going to produce these estimates.  It's standard.

2    It's just not -- it's not used a lot by social

3    scientists because they have to stand on a -- on a --

4    stand at trial and talk to you about these extremes,

5    which, again, makes one think that, oh, they must have

6    done something wrong, but this is how regression works.

7    And it's one of the reasons why Gary King came up with

8    ecological inference to deal with this particular issue

9    that has been going on since the late -- mid to late

10   80s.

11   Q.   Well, let me ask you this.  Focusing first on EI,

12   do other experts in the field use EI under

13   circumstances where it generate estimates that total

14   above 100?

15   A.   Yes.  I've seen them.

16   Q.   Can you give me any examples?

17   A.   There's a *Euclid versus Ohio* case with a well

18   known social scientist, Lisa Handley, and I've seen her

19   reports and read the court opinions where some of her

20   estimates -- and lot of them were in races that involve

21   more than two candidates, those estimates -- those EI

22   estimates summed over a hundred.  We were discussing

23   EI, correct, right?

24   Q.   Yes.

25   A.   -- not regression.  Okay.  Yes, those estimates

1    total over a hundred.

2    Q.    And did the court in that *Euclid* case rely on Dr.

3    Handley's work?

4    A.    Yes, they did.

5    Q.    How about the ecological regression, have you even

6    other experts in the field present results, like the

7    ones you have here, that go out of bounds?

8    A.    It's a little less likely, but if you go back to

9    court cases since *Thornburg*, particularly up until

10   ecological inference, you rarely see it, and there is

11   debate in the literature over whether to continue to

12   use it, or, as I mentioned earlier, some social

13   scientists will single out a negative number for zero

14   or a number above a hundred for a hundred to avoid the

15   negatives.  They are still extremes.  They are still

16   extremes.  But when you have that negative number, in

17   my expert opinion, all you're doing is demonstrating

18   high polarization.

19   Q.    Now, how do you interpret results like these when

20   your EI estimates total over a hundred?

21   A.    I still look -- it's all case by case.  It doesn't

22   matter to me that the EI estimates total over a hundred

23   as long as one particular candidate doesn't total over

24   a hundred or under a hundred.  The program isn't

25   designed to work that way.  So when EI totals over a

1    hundred, again, as stated earlier, it is not unusual

2    because EI does not constrain the sum to a hundred.

3    The estimate does not work that way, and to be quite

4    honest, I've never been involved or read or seen a

5    discussion at any of the conferences or any of the

6    social sciences -- social scientists that I work with

7    that engage in a lengthy debate about the EI estimates

8    over one hundred.  They probably came up out of these

9    kinds of situations, I'm sure.  But we all understand

10   the nature of the estimation procedure; it's an

11   estimate.

12   Q.    Okay.  Dr. McBride, I'd like to ask you about one

13   other criticism of your work in this case.

14   A.    Okay.

15   Q.    Are you aware that the defendant's expert, Dr.

16   Karen Owen, has said that there are, quote,

17   inconsistencies, end quote, between some of the

18   estimates you generated with voting age population data

19   in your original report and the estimates you produced

20   with turnout data in your supplemental report?

21   A.    I am aware, yes.

22   Q.    And what is your response to that criticism?

23   A.    I think defendant's expert failed to understand

24   that the supplemental report is based on turnout data,

25   from a discussion earlier this morning as to how I

1    arrived at the turnout data.  Those estimates are based

2    on turnout data generated from the voter history file

3    and the voter registration file and the methodology

4    that I explained earlier, unlike the original report

5    that the estimates were derived from census data.  It's

6    two different data sets.  So, running estimates on two

7    different data sets aren't going to replicate the

8    estimates; they were different numbers.  But even with

9    different numbers, in a majority of these cases they

10   still tell the same story.

11   **Q.**   What do you mean by that?

12   **A.**   The estimates derive from the census data in

13   comparison to the estimates derived from the turnout

14   data are not that different.  It's indicated in defense

15   expert's rebuttal to my supplemental report that one

16   particular estimate, I don't remember which one, one

17   particular estimates was 4 or 5 percentage points off.

18   It's not the same data.  It's not going to be a

19   replication of the census data, but even with 4 or 5

20   percentage points off, defense expert never claims that

21   the concept of who minority voters preferred changed.

22   Even with the 4 or 6 percent it still didn't change.

23   As I mentioned earlier when we went through the list of

24   elections, a lot of these elections, if not most of

25   them, are highly polarized.  That 4 or 5 percent

1   differential or variability based on a different set of

2   numbers, a different data set does not equate to some

3   mis-specified variable or some erroneous calculation in

4   the methodology.

5   Q.   Were there any elections where the better turnout

6   data that you used led you to a different substantive

7   conclusion about who was either the white preferred

8   candidate or the black preferred candidate?

9   A.   If I remember correctly, the May 20th, 2014,

10  district three race involving Willa Fitzpatrick, and I

11  want to say maybe J.C. Reid or Michael Busman, I can't

12  remember.  But the race involving Willa Fitzpatrick,

13  the -- what I derived from the turnout data was

14  different from the census voting age population data,

15  and with the turnout data, which I believe to be better

16  data, it showed not only racially polarized voting and

17  Willa Fitzpatrick lost that race, but it showed a

18  degree of -- a high degree of cohesion amongst minority

19  voters for Willa Fitzpatrick.  I recall, and I think

20  that's all I recall, that being different from the

21  voting age population data.

22  Q.   Can you explain why turnout data would lead to a

23  different result than VAP, or voting age population

24  data?

25  A.   The number of voters who turn out is going to be

1    different, of course, from the number of voters

2    utilized in the racial composition and what have you,

3    from the census data.  Again, they are different data

4    sets.  There is no feasible way I can imagine where you

5    would replicate the exact same results, just as in,

6    when you see consistency between homogenous precinct

7    analysis and regression analysis and ecological

8    inference, when they all seem to tell the same story,

9    those estimates are within the same neighborhood, if

10   you will, but they don't have to be exact.  Your

11   ecological regression estimate is not going to be the

12   exact to tenth percentage point that your EI estimate

13   is.  But to answer your question, it was different

14   data.

15   Q.   Okay.  So with respect to the one election where

16   the better data led you to identify a different black

17   preferred candidate, that being the May 2014 election

18   for district three involving Willa Fitzpatrick, how do

19   you resolve the discrepancy between your turnout data

20   results and your VAP data results?

21   A.   I'm going to rely -- I'm going to rely heavier on

22   the turnout data.  That's voters who actually

23   participated in the election.

24   Q.   Okay.  Why would you prefer turnout over VAP?

25   A.   Because, again, it is voters who actually

1    participated in the election, i.e., why it's called

2    turnout, where voting age population data is just the

3    census data based on how many voters there were and

4    using that against the election returns.  The turnout

5    data are the people who participated in the election.

6    I think that is going to be more meaningful.

7    **Q.**    Okay.  Dr. McBride, I want to return now to

8    conclusions you've drawn from your racial block voting

9    analysis.

10   **A.**    Yes.

11   **Q.**    Based on the results of your analysis, did you

12   reach any conclusion about whether African American

13   voters are politically cohesive in elections for the

14   at-large seats on the school board?

15   **A.**    For the at-large seats, African American voters

16   are cohesive in their voter preferences, and with

17   reference to the at-large elections, those elections

18   are highly polarized.

19   **Q.**    On what do you base that conclusion?

20   **A.**    The estimates derived from the methodology that

21   I've used and the reliability on the estimates, the low

22   level of standard errors, the methodology itself.

23   **Q.**    And which elections do you focus on in reaching

24   that conclusion?

25   **A.**    Which elections do I focus on?  I don't --

1    **Q.**    And --

2    **A.**    Could you explain?

3    **Q.**    Yes.  Which elections do you focus on as the basis

4    for your conclusion that African American voters are

5    highly cohesive in elections for the at-large seats on

6    the school board?

7    **A.**    The more recent elections, those would be the

8    recent 2016 at-large election, the school board

9    elections, the at-large elections in 2014, are going to

10   be more probative.  They're going to be more probative,

11   given how recent they were, in comparison to some races

12   that may have been in this early 2000s.

13   **Q.**    How do you weigh the district elections in

14   reaching your conclusion with regard to political

15   cohesion?

16   **A.**    Again, I think the weight is on the at-large

17   elections.  With reference to the district elections, I

18   viewed them -- they're school board elections, they're

19   recent, and they are probative, but those district

20   elections are a portion of the electorate, unlike the

21   at-large elections, which constitutes the entire

22   county.  So I would weigh the at-large elections,

23   although the district elections have some value as

24   well.

25   **Q.**    What value do you ascribe, if any, to the other

1    elections that you analyzed in your racial block voting

2    analysis?

3    **A.**   The November 2nd, 2014 sheriff race was an

4    at-large election, and I explained earlier why we took

5    on -- why I took on, or I was asked to take on that

6    particular election, although exogenous, it is an

7    at-large election.  The May 20, 2014, district four

8    race that was the race involving two white candidates,

9    in my opinion that race is going to be somewhat less

10   probative because there is no racial choice in that

11   election.

12   **Q.**   Can you explain why racial choice matters?

13   **A.**   Racial choice matters because voters -- voters --

14   the idea is for voters to obtain a level of equal

15   opportunity, and with that equal opportunity that

16   particular -- a race involving a racial choice is a

17   type of race that can determine who these voters

18   selected, and with the race incorporated in that we

19   would know if minority voters supported the minority

20   candidate.  In that district four race, those are two

21   white voters.  Who's to say that minority voters even

22   cared?  I don't know.  That's somewhat substantive.

23   But the literature and political science and all of

24   these studies often suggest, in order to determine

25   things like polarization and cohesion, how can you

1    effectively do that without a minority candidate in the

2    race.  So those, in my opinion, are much more

3    probative.

4    Q.   Did you reach any conclusion about whether white

5    majorities vote sufficiently as a block to enable them

6    to defeat the minority preferred candidates in

7    elections for the at-large seats on the school board?

8    A.   Yes.  For at-large seats, white majorities vote

9    significantly -- the white majority votes significantly

10   as a block to defeat the election of the minority

11   preferred candidate.  In the at-large elections no

12   minority candidate under HB 836 has won any of those

13   elections.  In the at-large elections, black voters or

14   black candidates are zero out of three elections.

15   Q.   How do you account for the runoff in reaching that

16   conclusion?  You said zero out of three, but your table

17   four included four elections.

18   A.   The runoff election is the result of a majority

19   vote requirement.  So the individual in question, the

20   minority candidate in question at that race, had to --

21   had to be placed in a runoff with a white candidate

22   because of the majority vote requirement.  Ultimately,

23   the race demonstrates that white majorities can vote in

24   significant number to either create a situation where

25   the minority preferred candidate makes it to the runoff

1    because of the majority vote requirement, and then, in

2    that runoff they can vote significantly as block to

3    defeat that minority candidate.  That is what happened

4    in May and July of 2014.  And to add to that, it's not

5    an issue of double counting; it's not an issue of

6    counting them twice.

7    **Q.**   What do you mean by that?

8    **A.**   It's not an issue of referring to the minority

9    preferred candidate as winning an election that results

10   in a runoff or something -- it's not counting that

11   candidate's winning twice to add to some numerical

12   calculation.

13   **Q.**   Well, why isn't the appropriate analysis that

14   black voters are one for four instead of 0 for three?

15   **A.**   Because then I would be counting a race that

16   ultimately didn't end with a winner or loser.  It's

17   sort of -- the runoff is unusual because it takes a

18   race and it sets it to the side until it's -- or it's

19   decided at a later date.  I would say, however, he --

20   the individual in question did not win the race as that

21   has been asserted.  I don't understand that analysis at

22   all.

23   **Q.**   Did your -- did you base your conclusion with

24   regard to the third *Gingles* factor on any elections

25   other than the at-large elections?

**A.**     In terms of polarized voting, as we discussed, I did look at the district elections, and we added the white versus white district four election and the sheriff race.  So those were additional elections. They are weighted, in my opinion, less and -- they are weighted less.

**Q.**   Well, in those elections where there was a white majority, were white majorities able usually to defeat the black preferred candidate?

**A.**     Yes.

**Q.**   And how do you weigh the older elections in your conclusion with respect to the third *Gingles* factor?

**A.**     There are less probative, simply because they are older elections.  We went back as far as 2002.  That's when the prior plan was put in place.  It is a less probative election, it's an older election, and the electorate somewhat different today than it was before, but basically it's an older election.  I think significant weight should, one, be applied to the at-large elections, but, two, to the most recent ones.

**Q.**   Have you reached any conclusions about the extent to which voting is racially polarized in elections for the at-large seats on the school board?

**A.**     And based on our depiction of all 12 of those races racially polarized, voting is high polarized in

1    Sumter County, at-large elections.

2    Q.    If you look at other elections -- scratch that.

3    How do you weigh other elections in your analysis of

4    whether voting is racially polarized in Sumter County?

5    A.    Other elections --

6    Q.    Other than the at-large elections?

7    A.    Other than the at-large elections.  I think they

8    bear a slightly different weight, less weight than the

9    at-large election because, again, as stated earlier the

10   district elections are a piece or a portion of the

11   electorate, and the previous elections, 2002, the early

12   2000s, mid-2000s, those are older elections.  So,

13   again, I weight them differently than the at-large

14   election.

15   Q.    And how would you characterized the extent of

16   racial polarization in voting in Sumter County?

17   A.    Again, highly polarized.

18   Q.    All right.  Dr. McBride, I'd like to turn your

19   analysis of census data in this case.

20   A.    Yes.

21   Q.    Tell us what you did with respect to census data.

22   A.    The census has a particular data set called the

23   American Community Survey.  The American Community

24   Survey is aggregate data depending on the jurisdiction.

25   It could be a year, 3 years, or 5 years.  From that

1    aggregate data -- it used to be the 2000 long form.

2    Now, a select group of individuals are given a form

3    that -- where they're asked a variety of questions,

4    anything from your household size, to your income, to

5    your education level, those kinds of things.  With that

6    are a lot of socioeconomic indicators that I looked at

7    to determine, as I stated earlier, if there are

8    disparities between whites and blacks in Sumter County,

9    and if those disparities hinder African Americans from

10   effectively participating in -- well, hinders them from

11   effective political participation.

12   **Q.**   What do you mean by hinders them from effective

13   political participation?

14   **A.**   Probably with reference to that, a depressed voter

15   turnout rate or lower voter turnout rate.

16   **Q.**   And what's the connection between the lower

17   socioeconomic status and depressed voter participation

18   rates?

19   **A.**   Well, it's well known and basically a standard in

20   literature that certain economic variables, i.e.,

21   poverty, household size, all of these different types

22   of variables can be used to explain why people or

23   groups of people are less inclined to participate in

24   politics or basically to turn out and vote.  It's

25   pretty established in the political science literature.

1   Q.   Okay.  You mentioned the American Community Survey

2   or ACS, which ACS data set did you use for your

3   analysis in this case?

4   A.   For the original report that was the 2008, 2014,

5   ACS study.  For the supplemental, it was the 2012 to --

6   2010, 2014, I think it was.  But it was the one updated

7   after the first report was submitted.  I think it was

8   2010, 2014.

9   Q.   Which socioeconomic indicators did you examine?

10  A.   I examined a number of them.  Some that come to

11  mind are median household income, educational level,

12  household size, those who have a vehicle, home

13  ownership.  It was an extensive table or it -- it was a

14  lot of tables.

15  Q.   Let's put those tables on the screen.

16       MR. SELLS:  Can we see Plaintiff's Exhibit 4,

17  please?

18  Q.   Can you identify Plaintiff's Exhibit 4, Dr.

19  McBride?

20  A.   That's the selected socioeconomic data, Sumter

21  County, Georgia, African American and white alone, and

22  that's the 2008-2012 American Community Survey.

23  Q.   Okay.  So based on the date of the data set, can

24  you say which report this exhibit came from?

25  A.   That's the original report.

1          **MR. SELLS:**  Your Honor, plaintiffs offer

2    Exhibit 4 into evidence.

3          **THE COURT:**  Exhibit 4?

4          **MR. SELLS:**  Yes.

5          **THE COURT:**  Any objection to number four?

6          **MS. MCKNIGHT:**  No objection, Your Honor.

7          **THE COURT:**  It's admitted without objection.

8    You may proceed.

9          **MR. SELLS:**  Thank you.

10   BY MR. SELLS:

11   **Q.**   I'd like to look at the next page of this exhibit

12   very quickly.

13         **MR. SELLS:**  Jump to the first page on which

14   we have a chart, a bar graph.  There we go.

15   **Q.**   So, Dr. McBride, can you briefly explain what

16   we're looking at here?

17   **A.**   Based on the American Community Survey that's the

18   population by race, and you'll see the racial

19   categories, white, black African American, American

20   Indian.  And then if you go over, after native Hawaiian

21   and other Pacific islander, there's some other race,

22   two races, all of that.  And these graphs are

23   percentages for Sumter County.

24   **Q.**   And this represented total population by race,

25   correct?

1   **A.**   Yes.  Based on the ACS data.

2   **Q.**   Okay.  I think we're done with exhibit four for

3   now.  Did you reach any conclusions from your analysis

4   of socioeconomic disparities between African American

5   and white residents of Sumter County?

6   **A.**   Yes.  There are markedly different -- or there are

7   disparities between blacks and whites in Sumter County

8   and a number of those socioeconomic variables that I

9   had mentioned earlier, like median income level and

10  education, just a number of them where, for example,

11  median income level for whites is higher than blacks

12  and those kinds of analyses.

13  **Q.**   And did you, in fact, find lower participation

14  rates among African American voters?

15  **A.**   Yes.

16  **Q.**   Tell us about that.

17  **A.**   Well, based on, I think that was table ten, from

18  the report, you can see a lower participation rate

19  among African Americans as compared to white Americans

20  in all of those races with the exception of district

21  five, if I remember correctly.

22  **Q.**   I'd like to show you what has been marked as

23  Plaintiff's Exhibit 25.  Dr. McBride, can you explain

24  what we're looking at in Exhibit 25?

25  **A.**   The Participation Rates By Race in Select Sumter

1    County Elections Based on Turnout.

2    **Q.**   Let me ask you first, did you prepare this table?

3    **A.**   Yes.

4    **Q.**   Okay.  Is this table included in your report?

5    **A.**   Yes, it is.

6    **Q.**   Are you sure about that, Dr. McBride?

7    **A.**   Yes.

8           **MR. SELLS:**  Let's do a side by side, if we

9    could, Mr. Bean, of Exhibit 25 and Exhibit 16.

10   **A.**   Oh, I'm sorry.  This -- the one on the right is

11   from my report.

12   **Q.**   Okay.  Can you explain what the difference is

13   between the one on the right, which is Exhibit 16, and

14   the one on the left, which is Exhibit 25?

15   **A.**   The one on the right, the turnout is based on

16   voting age population, and the one on the left, Sumter

17   County, is based on the actual turnout data.

18   **Q.**   Can you explain to us a little bit more what you

19   mean by actual turnout data?  What is the numerator in

20   the turnout rate on the left-hand side that's

21   Exhibit 25?

22   **A.**   The voters -- the total voters who participated in

23   the election.

24   **Q.**   That's the numerator?

25   **A.**   Oh, I'm sorry, not the numerator.  That's the

1    denominator.  The particular -- the white and black

2    voters.

3    **Q.**    Okay.  So the numerator on the left is the number

4    of white and black voters who actually turned out in

5    the election?

6    **A.**    Correct.

7    **Q.**    Okay.  What is the numerator in the table ten on

8    the right from Exhibit 16?

9    **A.**    The numerator in the table ten on the right are

10   the voters who -- the white and black voters who

11   turned -- let's me see, participation rates -- who

12   turned out to vote.

13   **Q.**    So it's same numerator, correct?

14   **A.**    Yes, yes.

15   **Q.**    Okay.  What is the denominator in table ten?  I

16   think we've already talked about this earlier, but --

17   **A.**    Total turnout numbers.  Total -- table ten, I'm

18   sorry, the right side --

19   **Q.**    Yes, let's back up.

20   **A.**    -- that's going to be the voting age population.

21   **Q.**    The voting age population?

22   **A.**    Based on census data.

23   **Q.**    Okay.  What is the denominator of the

24   participation race on the left-hand side of your

25   screen, which is Exhibit 25?

1   **A.**   Total voters -- voters who participated, their

2   total.

3   **Q.**   Okay.  So these are both tables of actual turnout

4   in these elections, right?

5   **A.**   Yes.

6   **Q.**   It's just expressed as a fraction--

7   **A.**   It's expressed differently, yes.

8   **Q.**   Was the table on the left included in your report

9   that's Exhibit 25?

10   **A.**   I'm trying to remember the report.  I know the

11   table on the left was used in a calculation toward the

12   end of the report.  And I'm -- I'm not -- actually I'm

13   not sure if I put this in the report.

14   **Q.**   Okay.  That's fine.  Let me ask you, let's look at

15   the first election on the left of table -- Exhibit 25.

16   Do you see that?

17   **A.**   Yes.

18   **Q.**   So, can you express in words what the 63.5 percent

19   means and the 36.4 percent means?

20   **A.**   In the May 24, 2016 four-year election, the

21   percent of white voters based on turnout was 63.5, and

22   the percent of black voters based on the black voters

23   who participated in that particular election was 36.4.

24   Both of those categories are based on the total

25   turnout, not the voting age population.

1    **Q.**   Okay.  Would it be -- I want to make sure that I

2    understand what you're saying.  Would it be the same

3    thing to say that white voters were 63.5 percent of the

4    voters who turned out in that at-large election and

5    black voters were 36.4 percent of the voters who turned

6    out in that election?

7    **A.**   I don't understand.  Would it be the same thing?

8    **Q.**   Is that what you just said?

9    **A.**   No.  I mean, would it be the same thing?  I don't

10   understand.

11   **Q.**   Okay.  Let me ask you this question, Dr. McBride.

12   What percentage of the voters who turned out in the

13   May 24th, 2016 at-large election were white?

14   **A.**   63.5.

15   **Q.**   What percentage of the voters who actually turned

16   out in the May 24th, 2016 at-large election were black?

17   **A.**   36.4.

18   **Q.**   And is the black turnout percentage higher or

19   lower than their share of the voting age population?

20   **A.**   It's lower.

21          **MR. SELLS:**  Can we look at entire table, 25?

22   Have that one on the screen alone.

23   **Q.**   Dr. McBride, does this table indicate which

24   elections in your analysis had a majority of white

25   voters, if you look at this column here?

1    **A.**   Yes, yes.

2    **Q.**   And how could you tell?

3    **A.**   How could I tell that white voters are the

4    majority?

5    **Q.**   That a majority of the voters who turned out were

6    white?

7    **A.**   Based on -- well, the turnout figures are listed.

8    So, I'm sorry, I'm not following the question.

9    **Q.**   So if it's above 50 percent, white voters were a

10   majority in that particular election, correct?

11   **A.**   Yes, and that's in all but district five.

12   **Q.**   The May 20 --

13   **A.**   May 20, 2014, district five race.

14         **MR. SELLS:**  I believe we've already offered

15   Exhibit 16, but the plaintiffs offer at this time

16   Exhibit 25.

17         **THE COURT:**  All right.  Any objection to 25?

18         **MS. MCKNIGHT:**  Yes, Your Honor, and on this

19   exhibit we have a standing objection.  This particular

20   exhibit was not included in any of Dr. McBride's

21   reports.  It involves calculations as were just

22   described.  It was produced for first time last week

23   without any indication of the source of those numbers

24   or the method of the calculation and defendant's expert

25   has not had an opportunity to calculate -- recalculate

1    and replicate these numbers on her own.  In fact, it

2    was just today hearing this description do we

3    understand how it was prepared.

4          THE COURT:  Mr. Sells?

5          MR. SELLS:  Yes, Your Honor, this does not

6    represent any opinion work from Dr. McBride.  We have

7    other evidence in the record that shows virtually the

8    same thing unrelated to Dr. McBride, but we think there

9    is no absolutely no prejudice in this because it's

10   essentially the same table to which they didn't object

11   that appears in Exhibit 16 and just has a different

12   denominator.

13         THE COURT:  But is it correct this was only

14   produced last week, I mean, this is recent?

15         MR. SELLS:  Well, it was only exchanged as

16   part of the exhibits, yes, Your Honor.

17         THE COURT:  Is this a part of the

18   calculations that the witness performed as a part of

19   his opinion as discussed earlier?

20         MR. SELLS:  Well, I can explore that with the

21   witness.  He certainly used the calculation that

22   appears in table ten, which is Exhibit 16 and is

23   already in the record and was part of Dr. McBride's

24   report, but I can explore that question.

25         THE COURT:  25, I would need to know what

1    role it played, if any, in his opinion or his

2    calculations because that's what I understand the

3    objection to be, that it wasn't produced.

4           **MR. SELLS:** Right. Well, then I'll ask a few

5    questions along those lines, and we'll see where it

6    goes.

7           **THE COURT:** All right.

8    **BY MR. SELLS:**

9    **Q.** So, Dr. McBride, did you rely on this particular

10   calculation of turnout for any of the analyses

11   presented in your report?

12   **A.** I did use it, yes.

13   **Q.** Okay. Where in your report did you use it?

14   **A.** In my -- in my report in calculating that, the

15   table ten lists the voting age population data. Later

16   on in the report, there is information regarding how

17   districts would perform later and there's a

18   calculation, it's basically an algebraic expression

19   where some of this data is incorporated.

20   **Q.** Okay.

21          **MR. SELLS:** In that case we'll withdraw the

22   exhibit, Your Honor.

23          **THE COURT:** All right. So number 25 is

24   withdrawn. All right. So noted for the record.

25          **MR. SELLS:** Since we're at this point in this

1     record, Your Honor, I think it's appropriate at this

2     time to offer Plaintiff's Exhibit 32, which is divided

3     into subparts A through V, and Plaintiff's Exhibit 33,

4     which is a summary of Exhibit 32.  Exhibit 32 has

5     turnout --

6              **THE COURT:**  Start again.  I lost you at some

7     point.  So that I am clear.

8              **MR. SELLS:**  I'll start again.  Okay.  Because

9     we are at this point in the record talking about

10    turnout, I would like to offer Plaintiff's Exhibit

11    32 --

12             **THE COURT:**  Okay.

13             **MR. SELLS:**  -- which consists of racial

14    turnout data from the Secretary of State's website, and

15    we can put that on the screen if you'd like to look at

16    it, but it is unrelated to Dr. McBride's report.

17             **THE COURT:**  All right.  Any objection to

18    number 32?

19             **MS. MCKNIGHT:**  No objections to number 32,

20    Your Honor.

21             **THE COURT:**  32 is admitted without objection.

22    You may continue.

23             **MR. SELLS:**  Okay.  And then, if we could put

24    Exhibit 33 on the screen, I think it would help.

25    **BY MR. SELLS:**

1    Q.   So Exhibit 33 is a summary of Exhibit 32, and so

2    let's turn first to the second page of Exhibit 33.

3         MR. SELLS:   And to save this Court and

4    opposing counsel from having to go through Exhibit 32,

5    subparts A through V, and do the kinds of calculations

6    of turnout that Dr. McBride explained earlier, we have

7    summarized that turnout figure here in this chart.  You

8    could see that the source is indicated there,

9    Exhibit 32.  And you can see in -- Your Honor, in these

10   elections that are identified here, they correspond to

11   the elections that appear in Exhibit 32.  Black turnout

12   rate is exhibited as a percentage there, and white

13   turnout rate is exhibited as a percentage in that

14   column.  If we then look at the first page of Exhibit

15   33, those same numbers are placed on a graph which

16   shows the black turnout and the white turnout in Sumter

17   County at-large in each of those elections.  And so the

18   plaintiffs offer Exhibit 33 into the record at this

19   time because we're talking about turnout, and I think

20   it's an appropriate place to do it.

21        THE COURT:   This is where you're going to be

22   talking to the witness about?

23        MR. SELLS:   We are not going to be talking to

24   Dr. McBride.  We are done talking about turnout with

25   Dr. McBride, but since we have been talking about

1    turnout and Exhibit 25 was withdrawn, and I just want

2    to put a marker in the record and insert these turnout

3    figures as to which I think there's no objection.

4            THE COURT:  All right.  Any objection to

5    number 33?

6            MS. MCKNIGHT:  No objection, Your Honor.  Our

7    only objection was that we wanted to ensure that the

8    source was identified on the exhibit, and we do have

9    that source.  We do not object to summary exhibits

10   being provided in this case.

11           THE COURT:  All right.  Number 33 then is

12   admitted without objection.  You may proceed.

13           MR. SELLS:  Okay.  Your Honor, I'm wrapping

14   up.  I'm not sure I'm going to finish by 12 minutes

15   from now, but I'll try, and we're nearing the end of

16   direct questioning.

17           THE COURT:  All right.

18           MR. SELLS:  Just if you want to cut me off or

19   let me go, it's your discretion.

20           THE COURT:  We'll go until 12 noon.

21           MR. SELLS:  Okay.

22   BY MR. SELLS:

23   Q.   So, Dr. McBride --

24   A.   Yes.

25   Q.   -- I'd like to turn now to your analysis of

1    whether there is an alternative redistricting plan that

2    would increase African American membership on the Board

3    of Education.

4    **A.**   Okay.

5    **Q.**   Okay.  First of all, tell us again why you

6    conducted that analysis?

7    **A.**   I was asked, first, to determine if African

8    American voters have an opportunity to elect candidates

9    of choice in three out of seven single member

10   districts.  I was also asked, after the Eleventh

11   Circuit's decision, to determine how African Americans

12   would vote in the illustrative plan which consists of

13   those seven member districts.

14   **Q.**   Okay.  What prompted that -- this second part of

15   that?

16   **A.**   It was Judge Tjoflat's concurring opinion in the

17   Eleventh Circuit where he laid out three bullet points

18   that he asked plaintiffs to demonstrate or evaluate or

19   consider.

20   **Q.**   All right.  And I'd like to put Judge Tjoflat's

21   opinion on the screen if we could, and if we can, put

22   pages 7 and 8 side by side.  Do you recognize this as

23   Judge Tjoflat's opinion?

24   **A.**   I do.

25   **Q.**   Okay.  So when you were asked to determine whether

1    there's an alternative redistricting plan that would

2    increase African American membership on the board, what

3    part of this opinion were you responding to?

4    **A.**    It's -- it's the second paragraph, second line:

5    However, Wright has failed to show how his alternative

6    plan whereby all seven members of the board are elected

7    from single member districts -- I'm sorry, I lost my

8    place -- single member districts would increase African

9    American membership on the board.  And I'm circling

10   that section in that concurring opinion.

11   **Q.**    So your analysis is an attempt to address that

12   issue identified by Judge Tjoflat, correct?

13   **A.**    That is correct.

14   **Q.**    What about the bullet points that are down below

15   on page seven and at the top of page eight?

16   **A.**    Okay.  He identified three bullet points.  The

17   first one:  How each district in the current 5/2 plan

18   voted in the May 24th at-large election.  I don't

19   really -- I did not understand this particular bullet

20   point because it basically asks the researcher to infer

21   or basically a hypothetical situation of how the

22   districts would have voted in the at-large election.

23   Secondly:  How each district in the current 5/2 plan

24   would be likely to vote in a proposed seven district

25   plan.  And I addressed that later in that report.  And

1    then, thirdly:  How African Americans have previously

2    performed in at-large elections.  That is why the

3    November 2nd, 2004 sheriff race was placed into this

4    analysis.

5    **Q.**   Okay.  I want to go back and ask you about the

6    first bullet point again to get you to explain a little

7    bit more.  I believe you said you didn't understand

8    exactly what he's referring to.

9    **A.**   Yes.

10   **Q.**   Can you explain that a little bit more?  Why did

11   it confuse you when Judge Tjoflat asked how each

12   district in the current 5/2 plan voted in the at-large

13   election?

14   **A.**   Well, it basically presents somewhat of a

15   difficult situation to assess how the district would

16   have voted or how they voted in the at-large election.

17   The at-large election is the entire precinct and given

18   that, it would just -- it appeared complicated to just

19   infer, based on this small level of data, to infer that

20   district one would have voted a certain type of way in

21   an at-large election when they've only voted in the

22   single member districts.

23   **Q.**   So let's put some names and faces on it.  Would it

24   be possible for you to determine whether Michael Coley

25   carried the third district in that at-large election?

1    **A.**   Well, I imagine, if you look at the voting

2    estimates, you could possibly infer, but you're not

3    doing in it a statistical measure.  You are just

4    basically inferring that all of these voters would have

5    voted this way if the election were at-large, and it

6    just seemed somewhat problematic.

7    **Q.**   Can you do it from the election returns

8    themselves?

9    **A.**   Determine how that particular district would have

10   voted in an at-large election?  I imagine that could be

11   possible, but, again, it's all based on an extreme

12   hypothetical situation.  Taking a piece, a district

13   election and pointing it or placing it into an at-large

14   election.  The at-large elections are all precinct

15   level.

16   **Q.**   Okay.  So why is that problematic in identifying

17   how a district voted?

18   **A.**   It's -- in attempting to say how district one

19   would vote in the at-large election or scheme, I just

20   -- I don't have a method in mind to arrive at that --

21   at that level of analysis that he asked for.

22            **THE COURT:**  Just so I understand, because of

23   the tense that this is being expressed in, was Judge

24   Tjoflat's question being read as what were things in

25   2014, as opposed to him stating before 2014, what

1    things would have been projected to be by districts?  I

2    think are we looking at a historical fact, however

3    difficult or easy it might be, or are we looking at a

4    projection fact.  That's what I want to be clear about

5    so I make sure I'm listening to the answer in

6    connection with what the witness is intending to

7    present.

8           **MR. SELLS:**  I think you're right on point,

9    Your Honor, and I'm going to try to clarify that in my

10   next series of questions.

11          **THE COURT:**  All right.

12          **MR. SELLS:**  So, Mr. Bean, I'd like to put

13   back up Exhibits 18 and 19 side by side.  Okay.

14   **BY MR. SELLS:**

15   **Q.**   Dr. McBride, do you see Exhibits 18 and 19 on your

16   screen?

17   **A.**   I do.

18   **Q.**   I want to imagine back to the 2014 at-large

19   elections that Judge Tjoflat asked about in his first

20   bullet point.

21   **A.**   Okay.

22   **Q.**   Okay.  So, would it be possible using election

23   returns to determine how the voters of district three

24   that I am circling here, voted, let's say between

25   Michael Coley, David Kitchens, Patricia Taft, and

1    Sylvia Roland?

2    **A.**   I'm sorry, I thought you were still talking.

3    Would it be possible to do election returns -- that's

4    the part I heard.

5    **Q.**   Could you, using election returns, identify how

6    the voters of district three and only district three

7    voted amongst Michael Coley, Sylvia Roland, David

8    Kitchens, and Patricia Taft in that at-large election?

9    **A.**   Only the voters in district -- only the voters in

10   the at-large district three through election returns?

11   I don't understand your question.

12   **Q.**   Okay.  So let me ask you this way.  Which

13   precincts would you need to add together in order to

14   determine how district three voted in the at-large

15   election?

16   **A.**   Well, that would require a number of these

17   precincts that are included in district three.  That

18   would be a number of them.

19   **Q.**   Okay.  So you would include the election results

20   for precinct end 26?

21   **A.**   Yes.

22   **Q.**   You would include the precinct, I think it's

23   0026 --

24   **A.**   Yes.

25   **Q.**   -- up in Plains?

1    **A.**   Yes, yes.

2    **Q.**   Would you include precinct 17?

3    **A.**   For district three, if that portion, and I'm going

4    to draw here, that precinct -- that portion of the

5    precinct, which I think is like that, it's a little

6    different.  That portion of the precinct.

7    **Q.**   So where on the election returns would you look to

8    find how a portion of a precinct voted?

9    **A.**   It's not there.  It's the precinct.  It's the

10   entire precinct.  So, no, you couldn't use an election

11   return to do that.

12   **Q.**   Let me ask you, again, how would you determine on

13   the election returns how that slice of district three

14   voted in the 2014 at-large election?

15   **A.**   You can't determine that from the election

16   returns.

17   **Q.**   Why?

18   **A.**   The election returns are based on whole -- the

19   entire precinct.

20           **THE COURT:**  All right.  Let's go ahead and

21   stop right here.

22           **MR. SELLS:**  Thank you, Your Honor.

23           **THE COURT:**  It's an appropriate place to

24   stop, and we'll be back I believe I said an hour and a

25   half, we'll be back at 1:30.

1          **MR. SELLS:**  That's fine, Your Honor.

2          **THE COURT:**  We are in recess.

3     *(RECONVENED; ALL PARTIES PRESENT, 1:40 p.m.)*

4          **THE COURT:**  All right.  I trust everyone had

5     a little sunshine.  It's a lot warmer than it was this

6     morning.  All right.  Mr. Sells, you may continue with

7     your direct examination.

8          **MR. SELLS:**  Thank you, Your Honor.  My

9     colleague informed me I apparently don't know how to

10    count to 15.  And so I like to show the plaintiff

11    Plaintiff's Exhibit 12, which I believe I may have

12    skipped over in my series of questions earlier.

13    **BY MR. SELLS:**

14    **Q.**   So we're going back to that checklist of

15    questions, Dr. McBride I asked you earlier.

16    **A.**   Okay.

17    **Q.**   Okay.  So you have now in front of you Plaintiff's

18    Exhibit 12, which I did offer into evidence, but we did

19    not discuss.  So I'd like you to start by looking at

20    the header and telling us what we're looking at here?

21    **A.**   This is table six, Sumter County General Elections

22    Under HB 836 That Did Not Include Black Candidates.

23    **Q.**   Okay.  And why did you include this election in

24    your analysis?

25    **A.**   Again, based on the concurring opinion by Judge

1    Tjoflat from the Eleventh Circuit, he asked plaintiffs

2    to look at all of the single member districts ran in

3    2014.

4    **Q.**    Okay.  So to go over the checklist then.  Was this

5    an election for the same office that is at issue in

6    this case?

7    **A.**    No, it's a district election.

8    **Q.**    Was there a racial choice in this election?

9    **A.**    No.  Both candidates are white candidates.

10   **Q.**    Did this election involve the same electorate as

11   the elections for the office at issue in this case?

12   **A.**    No.

13   **Q.**    Did this election take place on the same election

14   day as elections for the office at issue in this case?

15   **A.**    Yes, it did.

16   **Q.**    Now, was there a white majority among the voters

17   in this particular election?

18   **A.**    Yes.

19   **Q.**    Is your estimate of white voting reliable?

20   **A.**    Yes, it is.

21   **Q.**    Who was the white preferred candidate?

22   **A.**    The white preferred candidate is Rick Barnes.

23   **Q.**    Is your estimate of black voting reliable?

24   **A.**    Yes, it is.

25   **Q.**    Who was the black preferred candidate?

1    **A.**    Also Rick Barnes.

2    **Q.**    Was this election racially polarized?

3    **A.**    No.

4    **Q.**    Were there any special circumstances in this

5    election that you are aware of?

6    **A.**    None I'm aware of.

7    **Q.**    And did the white majority vote sufficiently to

8    defeat the minority preferred candidate in this

9    election?

10   **A.**    No.

11   **Q.**    Thank you.  And I think that completes our tour of

12   your 12 elections.  I'd like to go back to where we

13   were before the lunch break and to show you Exhibit 6,

14   Bates number 144, just to reorient you to where we

15   were.

16   **A.**    Okay.

17   **Q.**    Exhibit 6 is your corrected supplemental report

18   that is already in evidence -- no, I don't need a

19   blow-up of table ten.  Okay.  And we're going to be

20   talking, Dr. McBride, about section -- the analysis

21   contained in section six of your supplemental report.

22   Do you see that?

23   **A.**    Yes, I do.

24   **Q.**    Now, why did you perform the analysis that's in

25   section six?

1   **A.**   Going back to the concurring opinion in -- from

2   the Eleventh Circuit, the second prong from -- or the

3   second bulleted item from Judge Tjoflat asked if

4   African American could win seats in the illustrative

5   plan.

6   **Q.**   Okay.  Let's go ahead put up Judge Tjoflat's

7   opinion back up on the screen.  We looked at that

8   earlier.  And we want to see page 7 and 8.  And you're

9   saying section six of your report responds to the

10  second bullet point; is that right?

11  **A.**   That is correct.

12  **Q.**   So your section six is forward looking as to --

13  scratch that question.  Can you tell how each district

14  in the current plan would vote in a seven-member plan?

15  I'm not sure I understand that.

16  **A.**   The first bulleted item you're asking?

17  **Q.**   No, the second one.

18  **A.**   How African Americans have previously performed in

19  at-large elections.

20  **Q.**   No, I'm sorry.  The way we've called it out is

21  confusing on the screen.  So just leave it as page 7

22  and 8.

23  **A.**   Okay.

24  **Q.**   Judge Tjoflat's second bullet point is the first

25  one on page eight of his opinion.

1   **A.**   Okay.

2   **Q.**   So this asks you how the districts in the current

3   plan would vote in a seven district plan?

4   **A.**   Correct.

5   **Q.**   Is that possible to do with election returns?

6   **A.**   No, not with the election returns.

7   **Q.**   But your section six is an attempt to address this

8   bullet point?

9   **A.**   Yes.

10   **Q.**   Okay.  So tell us what you did to address this

11   bullet point.

12   **A.**   There's a conceptual framework developed by

13   Bernard Grofman, Lisa Handley, and David Lublin which

14   addresses how, using cohesion, crossover voting, and

15   turnout, it's a statistical measure to determine how

16   each vote -- how each district would likely vote, and

17   in this case, how the illustrative plan would work

18   based on past elections.

19   **Q.**   When you say how it would work, do you mean how it

20   would work in future elections?

21   **A.**   In future elections, yes.

22   **Q.**   Because no elections have actually been held under

23   the illustrative plan?

24   **A.**   Exactly.

25   **Q.**   You mentioned three names, Bernard Grofman, Lisa

1    Handley, and David Lublin, can you tell me who they

2    are?

3    **A.**   They are well-known political scientists and

4    expert witnesses working in, mainly in the field of

5    voting rights and very well respected in their fields,

6    in this field.

7    **Q.**   Has the framework set out in their article that

8    you mentioned ever been approved by any court?

9    **A.**   As I recall, it was discussed by Justice O'Connor

10   in *Georgia v Ashcroft*, and Justice Souter in *LULAC v*

11   *Perry.*

12   **Q.**   Okay.  Would you please try to explain how the

13   framework works?

14   **A.**   It's a method, a statistical method, used to

15   determine turnout, cohesion, and crossover voting based

16   on a previous election.  It's more about mathematics

17   and basically an algebraic formula.  Using those

18   previous -- those prior elections, it is going to

19   estimate at what percentage the district should be in

20   order for minorities to elect a particular preferred

21   candidate at 50 percent.

22   **Q.**   When you say elect at 50 percent, what do you mean

23   by that?

24   **A.**   That presents an -- at 50 percent, it's not --

25   it's right at the level where minority -- where the

1    district needs to be in order to attain an outcome

2    where the minority voters -- the candidate receives

3    50 percent of the vote.

4    **Q.**   The minority preferred candidate?

5    **A.**   The minority preferred candidate, yes.

6    **Q.**   All right.  Let me finish my question.  You're

7    saying that the -- at the 50 percent level means that

8    the minority preferred candidate gets at least

9    50 percent of the vote?

10   **A.**   Based on the analysis.

11   **Q.**   Okay.  Where do you get the turnout cohesion and

12   crossover numbers that go into the Grofman, Handley,

13   and Lublin framework that you've applied?

14   **A.**   From the previous elections, and if I remember

15   correctly, I think there's a table.  But from the

16   previous elections, the turnout rates, and that was --

17   I think that was table ten from my report.

18   **Q.**   Okay.  Well, so, tell us how you applied the

19   framework in this case, what did you do?

20   **A.**   There is a statistical method used to apply those

21   three variables, cohesion, turnout, and crossover

22   voting.  In using that particular framework that was

23   developed by those three individuals mentioned earlier,

24   you can arrive at an estimate of what the voting age

25   population should be or needs to be, I should say, for

1     all of the respective districts.

2     **Q.**   Okay.  And is that analysis reflected in a table

3     in your supplemental report?

4     **A.**   Yes, it is.  I just -- I don't remember the table

5     number.

6     **Q.**   Can we turn back to Dr. McBride's supplemental

7     report, that's Exhibit 6, and for the record we need to

8     look at Bates number 146.  Dr. McBride, is this the

9     table you were referring to?

10    **A.**   Yes, it is.

11    **Q.**   Okay.  Tell us what we're looking at in table 12.

12    **A.**    In table 12, percent needed for black candidates

13    to win, incorporating cohesion and crossover.  You'll

14    see the seat to the left of the screen, those

15    percentage of white and black participation taken from

16    table ten, and then the formula used to calculate the

17    percent of black votes for black candidates -- that's

18    the cohesion -- or, not the formula, but that's

19    derived.  The percent white votes for black candidate,

20    that's the crossover votes, and the percent black

21    needed given cohesion and crossover, that's the formula

22    that's derived from the percent black votes for black

23    candidates, the cohesion and the crossover.  So that's

24    the statistical method use to arrive at the percent

25    black needed, given cohesion and crossover.

```
1    Q.   Okay.  Let me see if we can take that in smaller

2    bites.  What are the rows in this table?

3    A.   Those are the -- the seats, districts 1, 2, 3, and

4    5.

5    Q.   Okay.  And in the second column has the heading

6    Percent White Participation, do you see 9.4, and then

7    the 20.7 below that?

8    A.   Yes.

9    Q.   Okay.  Where did those numbers come from?

10   A.   Those numbers are from table ten in the report.

11   Q.   They appear in table ten in your report?

12   A.   Yes.

13   Q.   And that's also true of the black participation

14   numbers, right?

15   A.   Correct.

16   Q.   So that's participation as a percentage of voting

17   age population, if I remember correctly, right?

18   A.   Yes.

19   Q.   Now, this third column is Percent Black Votes For

20   Black Candidates, and in parentheses, Cohesion.  Do you

21   see those numbers I've circled?

22   A.   Yes.

23   Q.   What do those numbers represent?

24   A.   The black support for those particular candidate

25   -- black candidates in those races.
```

1    Q.    And do these numbers come from a table elsewhere

2    in your report?

3    A.    The 12 elections that we went through.  Well,

4    here, I'm only using districts 1, 2, 3, and 5.

5    Q.    The next column is Percent White Votes For the

6    Black Candidate, and in parenthesis, Crossover.  I've

7    just drawn a box around those numbers.  Do you see

8    that?

9    A.    Yes, I do.

10   Q.    Okay.  What is the crossover?

11   A.    That's the number or percentage of white voters

12   that supported that particular black candidate in the

13   race.

14   Q.    Okay.  That's white support for the black

15   candidate?

16   A.    Yes, it is.

17   Q.    Okay.  And do these numbers appear elsewhere in a

18   table in your report?

19   A.    Under the section for the white voters.

20   Q.    And then the last column is Percent Black Needed

21   Given Cohesion and Crossover.  Do you see that?

22   A.    Yes.

23   Q.    Okay.  And where do these numbers come from in

24   that column?

25   A.    That's the framework, the conceptual framework,

1   the statistical measures used, it's basically an

2   algorithm, that derives these methods.

3   Q.   Okay.

4   A.   I mean, derives these estimates, I'm sorry.

5   Q.   Right.  So I want to talk about the first one in

6   that column, 47.1.  Can you explain what 47.1 means in

7   the context of the 2014 district one election?

8   A.   That is the percent black needed -- given these

9   two variables, cohesion and crossover, that's the

10  percentage the district needs to be in order for a --

11  the minority group in question to elect a candidate at

12  the 50 percent level.

13  Q.   Now, is that percent black in voting age

14  population or registration or turnout?  Black

15  percentage of what?

16  A.   Turnout -- I'm sorry.  Voting age population.

17  Voting age population.

18  Q.   So if black voters were 47.1 percent of the

19  population in district one, given the turnout rates and

20  cohesion and crossover, whoever was the black preferred

21  candidate in that race would have still been

22  victorious?

23  A.   It's predictive, but -- high probability.  It's --

24  we can't predict with absolute certainty.  Yes.

25  Q.   Right.  So, what did you find when you applied

1    this framework and came up with these numbers?

2    **A.**    What do I -- did I find?

3    **Q.**    Yeah.

4    **A.**    I find that in -- if I look at, say, district two

5    and district three, I see low black participation

6    rates.  There is higher white participation rates and

7    high levels -- actually in all four of them -- high

8    levels of cohesion, but smaller levels in two and three

9    of crossover votes, meaning white voters voting for

10   black candidates in districts two and three, as

11   compared to districts one and five, which are majority

12   African American in voting age population.

13   **Q.**    Okay.  So districts one and five are majority

14   black.  Districts two and three are majority white?

15   **A.**    Right.

16   **Q.**    -- in voting age population?

17   **A.**    Correct.

18   **Q.**    And do they have similar numbers of black

19   percentage needed given cohesion and crossover?

20   **A.**    Yes.  If you note, district one, as I'm circling,

21   and district five, as I'm circling, there are -- the

22   percent black needed given the cohesion and crossover

23   rates are below 50 percent at 47.1 percent and 44.1

24   percent, respectively, but the majority white

25   districts, for example, districts two and three, as I'm

1    drawing on the screen, it takes a higher percentage of

2    black voters needed for minority voters to elect a

3    candidate of choice at 50 percent.

4    **Q.**    Okay.  So white majority districts seem to perform

5    differently than black majority districts?

6    **A.**    That's exactly correct.

7    **Q.**    Okay.  Well, let me ask you this.  Does this table

8    and the results of your application of the Grofman,

9    Handley, and Lublin framework help to you answer Judge

10   Tjoflat's question?

11   **A.**    It does help me to answer that question.  If you

12   see here, in majority black districts, minority

13   preferred candidates have been elected at 47.1 and

14   44.1 percent -- percent needed in order for them to be

15   successful, or for the minority preferred candidates to

16   win those elections in districts one and two.

17   Districts two and three needed, of course, a higher

18   percentage of black voters, as well as in districts --

19   I'm sorry, I'm losing my train of thought -- as well as

20   in districts two and three -- I'm sorry, could you

21   repeat the last part of your question again?

22   **Q.**    Well, let me move on to -- because I think you

23   actually answered my question.  Your illustrative plan

24   has three majority black districts, correct?

25   **A.**    Yes.

**Q.**   Okay.  And what is lowest black voting age

population percentage of your three majority black

districts?

**A.**   The lowest at district six, I think it is, is

54.1 percent.  So that is sort of a middle range.  It's

above the 47.1 and 44.1 percentage needed.

**Q.**   So what's your bottom line, would your

illustrative plan increase African American membership

on the board?

**A.**   Yes.  It's -- there is no way to predict the

future outcome of elections in this manner, but based

on cohesion and crossover as demonstrated with previous

elections, the illustrative plan provides an

opportunity for African Americans to elect their

candidates of choice in three of the seven single

member districts.

**Q.**   Okay.  I'd like to go back to Judge Tjoflat's

opinion at pages 7 and 8.  And I want to return to the

first bullet point which was at the bottom of page

seven, and I think we were just discussing that before

the lunch break.  Okay.  Would you read me that bullet

point, please?

**A.**   How each district in the current 5/2 plan voted in

the May 2014 at-large elections.

**Q.**   Okay.  It's asking how each district in the

1    current plan voted in a past election, that election

2    being the May 2014 at-large elections?

3    A.   Yes.

4    Q.   Okay.  So now I would like to look at Plaintiff's

5    Exhibit 21 and starting at Bates 205.  This is already

6    in evidence, and you've already identified this exhibit

7    as containing the election returns that you looked at

8    in performing your analysis.

9    A.   Yes.

10   Q.   So tell us which election we're looking at on the

11   screen right now?

12   A.   We are looking at the May 24, 2014 Sumter County

13   Board of Education at-large election, that's the

14   four-year at-large election.

15   Q.   And these are the precinct returns?

16   A.   Those are the 11 precincts, yes.

17   Q.   Okay.  Identify, if you would, the 11 precincts by

18   writing on the screen.

19   A.   C-127, C-227, C-327, E-27 and 26, 026, W-27, 15,

20   27, 28, 29.

21   Q.   Okay.  The first column and each row -- the first

22   column identifies the precinct, and what does each row

23   indicate?

24   A.   Each row indicates votes for, in this case, and

25   I'm circling, Michael Busman, Kelvin Pless, and then

1    their total vote for that particular precinct.

2    **Q.**   Okay.  So these are the precinct return --

3    **A.**   Yes.

4    **Q.**   -- for the at-large election between Michael

5    Busman and Kelvin Pless in 2014?

6    **A.**   Correct.

7    **Q.**   Now, can you tell me how I could determine from

8    these precinct results whether Michael Busman or Kelvin

9    Pless carried Board of Education district one?

10   **A.**   You can't from the at-large.  Those single member

11   districts at-large are split precincts.  There is no

12   way to indicate how many in, I'm going to say, for

13   example, district two, how many of those voters in

14   C-127 voted for Michael Busman or how many of them

15   voted for Kelvin Pless.  The precinct totals are --

16   they're exact totals, but as mentioned earlier, the

17   single -- the district elections are split precincts.

18   You can't derive that information from this election

19   return.

20   **Q.**   Okay.  To use the example I think you drew on the

21   screen earlier, you identified precinct 15 as one of

22   the precincts that was a split, correct?

23   **A.**   Yes.

24   **Q.**   Okay.  And I've just circled the vote report for

25   Michael Busman, 264.  Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    And Kelvin Pless in precinct 15 got 168 votes.  Do

3    you see that?

4    **A.**    Yes.

5    **Q.**    And you can't tell me, can you, how many of that

6    264 votes Michael Busman got in one side of the split

7    precinct or the other side of the split precinct?

8    **A.**    There is no way to do that, no.

9    **Q.**    Dr. McBride, have your analyses in this case led

10   you to any conclusions about whether the House Bill 836

11   plan gives African American voters in Sumter County an

12   equal opportunity to elect candidates of their choice

13   in school board elections?

14   **A.**    Yes, I've -- yes.

15   **Q.**    And what is your conclusion?

16   **A.**    I conclude that the 5/2 plan under House Bill 836

17   does not afford African American voters a realistic

18   opportunity to elect candidates of choice.

19   **Q.**    Thank you.  Those are my questions for now.

20            **THE COURT:**  All right, cross examination?

21                      **CROSS EXAMINATION**

22   **BY MS. MCKNIGHT:**

23   **Q.**    Good afternoon, Dr. McBride.

24   **A.**    Good afternoon.

25   **Q.**    I'd like to start out by asking you some questions

1     about how you calculated -- pardon me, what data you

2     used for race in your analysis.

3     **A.**   Okay.

4     **Q.**   Now, as I understand it, your reports use data for

5     race for black alone; is that correct?

6     **A.**   That is correct.

7     **Q.**   And so your reports excluded from calculations any

8     persons who reported they were, say, a combination of

9     black with any other race.  Is that fair to say?

10    **A.**   Yes.

11    **Q.**   So if an individual considered herself to be a

12    member of the black community in Sumter County, but she

13    had reported on the census she was black and some other

14    race, your calculations would not include her in the

15    African American numbers; is that right?

16    **A.**   No.  Because with the census data, black and

17    another race could still be included under the black

18    category.  There are 126 different variations.

19    **Q.**   I understand.  So could that individual still be

20    included under the category black alone?

21    **A.**   Probably -- no, no, not under the category black

22    alone.

23    **Q.**   And I understood from your answer to my first

24    question that in your reports you use data for race for

25    black alone; was that right?

1    **A.**   Are we -- if -- for the turnout data provided by

2    the state file, they don't list a lot of those

3    categories, they just list black.

4    **Q.**   Okay.  So when you were using census data in your

5    reports, did you use any other category to capture the

6    African American community other than the number for

7    black alone?

8    **A.**   I remember using black alone.

9    **Q.**   So to ask this question again so that it's here

10   for the Court.  When you use census data, your

11   calculations would not include that individual I

12   described earlier who had reported to the census that

13   she was both black and some others race, she would not

14   be included in your calculations for the African

15   American voting age population; is that right?

16   **A.**   That is -- that is correct.

17   **Q.**   And now, your report used 2010 census data for all

18   races dated after 2004; is that right?

19   **A.**   The -- no.  The 2004 used the 2000 census data.

20   **Q.**   So your report used 2010 census data for all races

21   dated after 2004, correct?

22   **A.**   I believe that's correct.  2006, '8.

23   **Q.**   And '14 and '16?

24   **A.**   '14 and '16 -- not '16.  There were two reports.

25   Some of those were from the original report.  The

1    original report used the census data.

2    **Q.**    And how did the data differ that you used in your

3    second report?

4    **A.**    The second report is the turnout data that was

5    described earlier.  The first report was the census

6    data.  But two census periods, 2010.  2010 wasn't used

7    for those 2002 and 2004 estimates.

8    **Q.**    That's right.  Now, you did not use any American

9    Community Survey, or ACS data estimates for any races

10   dated after 2010; is that right?

11   **A.**    For which report?  For the first report?  I'm

12   sorry, I --

13   **Q.**    It's okay.  Let's take them one at a time.

14   **A.**    Okay.

15   **Q.**    Let's start with the first report.  You did not

16   use ACS data estimates for any race dated after 2010;

17   is that right?

18   **A.**    For the first report the ACS data was the 2008

19   through 2012 ACS data in the socioeconomic section.

20   **Q.**    So I'm asking about races, electoral races.  Did

21   you use any ACS data when you were studying the

22   elections?

23   **A.**    The ACS data for the elections?  I'm sorry, I'm

24   confused.

25   **Q.**    That's okay.  I'll take another go at it.  I

1    appreciate my question may be not clear.  Did you use

2    ACS data for any races, so any elections, dated after

3    2010 in your analysis?

4    A.    The polarized voting and cohesion analysis?  I

5    don't understand, because in studying the elections, I

6    didn't use ACS data to study the elections.

7    Q.    That answers my question.  Thank you.

8    A.    Okay.

9    Q.    Now, ACS data postdating to the 2010 census is

10   available for your use in these analysis; is that

11   right?

12   A.    Currently now, yes.

13           MR. SELLS:  Your Honor, I apologize, but I've

14   got to interject an objection to the form of the

15   question.  She's talking about one analysis, and it's

16   has been well established now that Dr. McBride did

17   three or four different things, and I'm afraid the

18   record is going to get all mudded up by use of one word

19   analysis.  I mean, I can redirect until the cows come

20   home, but I'm standing up because I hope to avoid to

21   have to do that.

22           THE COURT:  Well, you may have to.  The

23   witness is on cross examination.  I'm unwilling to

24   direct counsel in its cross examination.  The objection

25   is overruled.  Of course, that does not mean that the

1    witness may not ask for clarification if the witness

2    needs clarification.  I think that's for the witness to

3    determine.

4    **BY MS. MCKNIGHT:**

5    **Q.**    So I just asked you a series of questions about

6    the data you used in analyzing the elections in Sumter

7    County.

8    **A.**    Yes.

9    **Q.**    And I understood you to say that you did not use

10   any data provided by the ACS when you analyzed those

11   elections, correct?

12   **A.**    When I analyzed the polarized voting and cohesion,

13   but with reference to socioeconomic factors, I looked

14   at the ACS.  I cannot incorporate the ACS in a cohesion

15   or racially polarized voting study.

16   **Q.**    Do you know that the ACS census data was released

17   last week?

18   **A.**    That's the latest one.

19   **Q.**    And have you reviewed that data?

20   **A.**    I -- in a week, no.

21   **Q.**    Now, your report shows that under the 2010 census

22   the Hispanic or Latino of any race, total population

23   was 5.2 percent; is that right?

24   **A.**    From what I can remember from the table, that's

25   sounds about right.

1    Q.   Well, let's make sure we have a clear record.

2         MS. MCKNIGHT:   If we wouldn't mind putting up

3    -- pardon me, Your Honor.  Mr. Connor, can you put up

4    Plaintiff's Exhibit 2, please, and we'll turn to page

5    four.  Oh, maybe we need to switch the connection.

6         THE COURT:   Do you have a problem with the

7    connections?

8         MS. MCKNIGHT:   Yes, Your Honor, it appears

9    so.

10        THE COURT:   Is this a document that was used

11   in the plaintiff's --

12        MS. MCKNIGHT:   Yes.  It's plaintiff's

13   exhibit, and I believe he's just brought it up so maybe

14   that will --

15        THE COURT:   All right.  I was going to say

16   that may you some save time.

17        MS. MCKNIGHT:   Yes.  Thank you for the

18   suggestion.

19        THE COURT:   Since anyone's electronic is

20   liable to go haywire at any time, it's best to have a

21   mutual share philosophy.

22        MS. MCKNIGHT:   Great when you need it, right.

23   BY MR. MCKNIGHT:

24   Q.   So, this, again, would be Plaintiff's Exhibit 2 at

25   page four.

1          **MS. MCKNIGHT:**   Pardon us, Your Honor, and

2     thank everyone for your patience.

3     **Q.**   I think we have Plaintiff's Exhibit 2, and we're

4     going to page four?

5          **THE COURT:**   All right.

6     **Q.**   And do you see the last sentence in the first

7     paragraph?

8     **A.**   Yes.  Yes.

9     **Q.**   And does that refresh your recollection about your

10    report showing that under the 2010 census, the Hispanic

11    or Latino of any race total population was 5.2 percent;

12    is that right?

13    **A.**   Yes.

14    **Q.**   And you did not include this population in any of

15    your estimates in your report, correct?

16    **A.**   It's included in the total count.

17    **Q.**   Okay.

18    **A.**   It's included in the total count.

19    **Q.**   In the total count.  And you did not analyze the

20    voting patterns of this Hispanic portion of the

21    population, did you?

22    **A.**   I was not asked to do that.

23    **Q.**   I understand.  Thank you.  Now, I'd like to put up

24    Plaintiff's Exhibit 4 on page 45, please.  So page 45

25    of Plaintiff's Exhibit 4.  Now, Dr. McBride, you

1    provided testimony about this exhibit earlier today, do

2    you remember that?

3    A.    Not entirely.

4    Q.    Do you remember testifying about it?

5    A.    About some of the data, yes.

6    Q.    Okay.  And so, just so I understand it, when you

7    talk about which racial groups were excluded from your

8    analysis of election results, those groups are

9    indicated in the columns on the -- starting with the

10   fourth column from the left all they way through to the

11   right in this PX-4, page 45; is that right?

12   A.    Correct.

13   Q.    And with the recent ACS data release, would you be

14   surprised to know that this black or African American

15   population percentage has increased?

16   A.    I wouldn't be surprised of an incremental

17   increase.

18   Q.    And with this recent ACS data release, would you

19   be surprised to know that this white population

20   percentage has decreased?

21   A.    I would not be surprised at an incremental

22   decrease in the white population.

23   Q.    Now, what do you mean by incremental?

24   A.    Very minor percent changes.  It has not been a

25   drastic percent change.  I did look at the projections

1    that the census bureau provides when I was doing my

2    analysis.  The overall population for the entire county

3    is not going to drastically increase.

4    **Q.**   And what is the percentage that you considered to

5    be incremental as opposed to drastic?

6    **A.**   A few tenths, maybe one.  Certainly less than two,

7    and a based on what I recall, I don't recall some

8    enormous African American increase in population, nor a

9    great decrease in the white population.  It's

10   relatively stable to be quite honest.

11   **Q.**   And so would you be surprised to know that these

12   other races, other than white or black or African

13   American, that their population percentages have

14   increased?

15   **A.**   I would -- again, I would not be surprised at

16   incremental increases, particularly when the American

17   Indian and Alaskan native population is zero, or the

18   Asian alone is 1.4.  I would not be surprised at small

19   increases.

20        **MS. MCKNIGHT:**  Could we go back to

21   Plaintiff's Exhibit 2 on page four, please?

22   **Q.**   Now, I'd like to ask you about the African

23   American population of Sumter County as reported by the

24   census bureau.  I'll ask you about voting age

25   population in a little bit.  For now, your report shows

1   that under the 2010 census, 51.8 percent of persons in

2   the Sumter County -- in Sumter County identified

3   themselves as black or African American alone, correct?

4   **A.**   Yes.

5   **Q.**   And by 2013 this percentage had increased to

6   52.5 percent; is that right?

7   **A.**   That sounds correct.

8   **Q.**   And now for voting age population.  In 2010,

9   according to the census, 48.1 percent of persons in

10  Sumter County were black voting age population; isn't

11  that right?

12  **A.**   That is correct.

13  **Q.**   Do you know what the citizens voting age

14  population was at that time?

15  **A.**   I don't recall, no.

16  **Q.**   And do you know what the citizens voting age

17  population is today?

18  **A.**   No, I don't.

19  **Q.**   Wouldn't citizens voting age population be a more

20  useful number under the voting rights analysis than,

21  say, just voting age population?

22  **A.**   It could be, but in my experience I have used and

23  have known others to mainly use the citizen voting age

24  population when dealing with redistricting or lawsuits

25  involving Hispanic voters.  I don't discount its

1    importance.

2    **Q.**    And now, by the end of 2016, considering the

3    recent ACS data release, would it surprise you to know

4    that the black voting age population has increased

5    since the figure you identified here in 2010?

6    **A.**    No, it would not surprise me.

7    **Q.**    And would it surprise you to know that the black

8    voting age population as part of the citizens voting

9    age population is greater than this 48.1 percent

10   figure?

11   **A.**    Surprised?  You're ask would I be surprised to

12   know that?

13   **Q.**    Yes.

14   **A.**    Not -- not really, no.

15   **Q.**    Okay.  So it makes sense to you?

16   **A.**    It -- sure.

17   **Q.**    And at any point in your analysis of Sumter County

18   did white population outnumber black population in the

19   voting age bracket?

20   **A.**    Overall for the county, or are we talking

21   districts?

22   **Q.**    The county.

23   **A.**    And can you ask your question again, I'm sorry?

24   **Q.**    Absolutely.  So at any point in your analysis of

25   Sumter County as a whole did whites outnumber blacks in

1    voting age population?

2    **A.**   Not that I'm aware.

3    **Q.**   And based on recent census data that discrepancy

4    is increasing, correct?

5    **A.**   Slightly.

6    **Q.**   So is it fair to say that African Americans

7    constitute a majority of the voting age population in

8    Sumter County?

9    **A.**   I would not say a majority.  I would say a

10   plurality of the voting age population.

11   **Q.**   And you said you hadn't had a chances to review

12   the recent ACS data in order to confirm whether or not

13   African Americans make up a majority citizens voting

14   age population, have you?

15   **A.**   You said it's about a week old?  No, I have not.

16   **Q.**   Okay.

17         **MS. MCKNIGHT:**  Can we go to PX-10?  I think

18   the Bates number is 164.

19   **Q.**   Now, Dr. McBride, I heard you give testimony

20   earlier on this exhibit.  Do you remember looking at

21   this exhibit and talking with plaintiff's counsel about

22   it?

23   **A.**   I do.

24   **Q.**   And as I understood, you said that you used the

25   EzI software program for your EI estimates; is that

1    right?

2    **A.**    That's correct.

3    **Q.**    And earlier today you explained that a limitation

4    of EzI is that it compares candidate A to all other

5    candidates and does not compare all four candidates,

6    say in this election, against each other in the same

7    race; is that right?

8    **A.**    That is correct.

9    **Q.**    And so, in a race like this, the May 20, 2014

10   two-year at-large election, in a race where you have

11   more than two candidate, using EzI you can come up with

12   some absurd results, meaning it's not possible for more

13   than 100 percent of the electorate to cast votes in

14   this election, right?

15   **A.**    I don't understand that.  No.  And maybe I don't

16   understand your question.  So if you could repeat it?

17   **Q.**    Sure, absolutely.  Using this exhibit, this is

18   PX-10, page two.  I am looking at the sixth column

19   over.

20   **A.**    Okay.

21   **Q.**    You explained earlier that using EI and EzI you

22   had created a vote share, an estimated vote share for

23   these candidates; is that right?

24   **A.**    That's correct.

25   **Q.**    And does this column identify that estimated vote

1    share?

2    **A.**   For the black voters, if I marked that

3    correctly -- the sixth you said?

4    **Q.**   Yes.

5    **A.**   Yes.

6    **Q.**   And so plaintiff's counsel had said, look, if I do

7    my math right and I add up all these numbers, meaning

8    if I add 89.1, 9.7, 6.2, the figure come out to over

9    100?

10   **A.**   Correct.

11   **Q.**   Right?

12   **A.**   Correct.

13   **Q.**   So getting back to my questions for you about EzI,

14   it seems that using EzI and the limitations that you

15   describe earlier with Mr. Sells, that when you have a

16   race with more than two candidates like this one you

17   can come up with this absurd result where the vote

18   shares, when you add them all up, exceeds 100?

19   **A.**   And are you --

20   **Q.**   Is that right?

21   **A.**   I cannot say that is correct because I never

22   referred to this particular race or any of the EI

23   calculations under EzI as absurd.  What I said was no

24   individual candidate can receive below zero or above a

25   hundred, and I also articulated that it is not unusual

1    to come up with a sum over a hundred.  So I can't

2    conclude when you use word absurd.

3    **Q.**   I see.  Now, you testified earlier today that EI

4    is bound for individual candidates, right, from zero to

5    a hundred?

6    **A.**   Yes.

7    **Q.**   But not for all candidates, did I understand you?

8    **A.**   Not for the sum of all candidates, correct.

9    **Q.**   But that's different than what you said at your

10   deposition in 2014, isn't it?

11   **A.**   I don't remember in 2014.

12   **Q.**   I understand.  Well, would it help refresh your

13   recollection?

14   **A.**   It -- certainly.

15          **MS. MCKNIGHT:**  Mr. Connor, could you put up

16   the deposition of Dr. McBride, page 95?

17   **Q.**   And, Dr. McBride, I'll ask you to look at these

18   questions, look at this page of the transcript, take

19   your time, and then I'll ask you some questions about

20   it.

21   **A.**   The page that's on the screen, correct?

22   **Q.**   That's right.

23   **A.**   I mean, the page that's on the screen currently?

24   **Q.**   Correct.

25   **A.**   Okay.

1    **Q.**   So back in 2014 you agreed that the King method or

2    the EI method had bounds between 100 and 0, right?

3    **A.**   For the individual candidate.

4    **Q.**   And when you were asked for all candidates, when

5    you were asked:  Is there ever a situation where your

6    King number on a race would be above 140 percent, for

7    example, for all the candidates?  You answered:  Not

8    with King.  King has a -- they call it a Duncan Davis

9    method that he uses that bounds you to 0 to 100.

10   **A.**   I see.  And that obviously is a mistake, or I

11   misunderstood the question, because it's -- my

12   knowledge and use of EzI is individual estimates.

13   **Q.**   Now, could we go back to Plaintiff's 10, page 2.

14   Now, we're back to this table, Dr. McBride, and back to

15   some questions I had about EzI and its limitations.

16   **A.**   Okay.

17   **Q.**   You would agree, right, that it's not possible for

18   over 100 percent of the population of the electorate to

19   vote in an election, right?

20   **A.**   Correct.  Are you referring to an individual

21   candidate, or we summing them again?

22   **Q.**   So I'm talking about in an election, an entire

23   election, whether it's two candidate, one candidate, or

24   four candidates, it's not possible for over 100 percent

25   of the electorate to vote in that election?

1    **A.**   Correct.  That's correct.

2    **Q.**   Okay.  And now by using EzI, numbers were

3    calculated that add up to over a hundred percent; isn't

4    that right?

5    **A.**   That's correct.

6    **Q.**   Okay.  But there are methods for running an EI

7    analysis that include all four candidates as against

8    each other, right?

9    **A.**   Correct.

10   **Q.**   And those other methods, such as the program R,

11   would have prevented this result you see in PX-10, page

12   2, where there's an estimate that over 100 percent of

13   the electorate appeared and voted in the election?

14   **A.**   Using R, yes.

15   **Q.**   Because if run properly, using the program R,

16   adding up voter support for the different candidates

17   would not have exceeded 100 percent of the electorate

18   right?

19   **A.**   Correct.

20   **Q.**   But you did not use program R or any other method

21   like it for you EI analysis; is that right?

22   **A.**   I did not.

23   **Q.**   Okay.  I'd like to turn to Plaintiff's Exhibit 16.

24   Now, Dr. McBride, this shows participation rates by

25   race in select Sumter County elections; is that right?

1    **A.**    Correct.

2    **Q.**    And now, by my read of this list of elections,

3    only two of them involved single district black

4    majority districts as drawn; is that right?  And by

5    that, just for reference, I mean district one and

6    district five.

7    **A.**    Yes.

8    **Q.**    And the only election on this sheet where black

9    turnout exceeded white turnout was the May 20, 2014,

10   D-5, district five election; isn't that right?

11   **A.**    Correct.

12   **Q.**    And that district was drawn at 71 percent B-VAP,

13   correct?

14   **A.**    Correct.

15   **Q.**    And the other majority African American district

16   where black voting age population was drawn at over

17   62 percent -- is that right?

18   **A.**    Yes.

19   **Q.**    -- black voter turnout was lower than white

20   turnout, correct?  And that's in D-1?

21   **A.**    Correct.

22   **Q.**    Could you highlight that also for the Court?  And

23   when I'm talking about turnout being exceeding or being

24   lower, I'm comparing the turnout between black and

25   white, is that a fair understanding?

1  **A.**  Yes.

2  **Q.**  Now, we'll get to more details about your

3  illustrative plan a little later, but I understood that

4  the new majority African American district that you

5  propose in that illustration is drawn at 54 percent

6  B-VAP; is that right?

7  **A.**  Yes.

8  **Q.**  And just mathematically that's lower than

9  62 percent, right?

10  **A.**  Correct.

11  **Q.**  Now, you did not propose a 70 or 71 percent B-VAP

12  level district as a remedial district in this case,

13  right?

14  **A.**  Correct.

15  **Q.**  I'd like to turn to Plaintiff's Exhibit 21, page

16  1.  Now, Dr. McBride, I recall you looking at this

17  exhibit and testifying about it earlier today, and I

18  have a few specific questions now.  I'll have some

19  others down the road.  When you were testifying about

20  this exhibit, I recall you describing that for the

21  sheriff's race, you talked about allocating votes to

22  precincts in order to make estimates about racial

23  voting patterns; is that right?

24  **A.**  For the 2014 at-large elections, not for the 2004

25  sheriff's race.

1    Q.   Now, in this race, absentee votes as I see them --

2    I've circled a figure there that reads 4,065.  As you

3    read this chart, is that the number of absentee votes

4    cast in the sheriff's election in November 2, 2004?

5    A.   Yes.

6    Q.   And the total votes for the sheriff's election in

7    November 2, 2004, was about 11,068, right?  I'll circle

8    it.

9    A.   Yes.

10   Q.   Now, 4,065 is a substantial portion of the 11,068

11   votes, would you agree?

12   A.   Yes.

13   Q.   And how did you account for those absentee votes

14   in any analysis you did for the sheriff's race in

15   November of 2004?

16   A.   You can't account for absentee.

17   Q.   So you did not perform any kind of analysis to try

18   to trace those absentee voters back to a precinct, say?

19   A.   That didn't occur with the state until after 2010.

20   Q.   Okay.  Staying with this race, but I'd like to

21   show you a different exhibit, Plaintiff's Exhibit 13.

22   Now, Plaintiff's 13 illustrates your analysis done on

23   this race, correct?

24   A.   Correct.

25   Q.   Now, understanding you performed -- these numbers

1    show that you performed an analysis, three types of

2    analyses on this election; is that right?

3    **A.**    That is correct.

4    **Q.**    And was it possible for you to know the race of

5    the absentee voters who cast a ballot in the sheriff's

6    election in 2004?

7    **A.**    I'm sorry.  Could you repeat that question?

8    **Q.**    Was it possible for you to know the race of the

9    absentee voters in this election in 2004?

10   **A.**    No.

11   **Q.**    So those 4,000 absentee voters out of the 11,000

12   total that we were just looking at, they are not

13   included in this analysis, are they?

14   **A.**    No.

15   **Q.**    Okay.  Now, earlier today you discussed how

16   unusual it was for a write-in candidate to earn so many

17   votes.  Do you remember saying that?

18   **A.**    I remember.

19   **Q.**    Do you know whether a write-in candidate has ever

20   won in Sumter County?

21   **A.**    I don't know historically, no, I don't.

22   **Q.**    And do you know if Nelson Brown was a certified

23   write-in candidate in this election?

24   **A.**    I would assume that he was, but I don't know for a

25   fact.

1    Q.    And how do you know that all of the votes that are

2    included in the write-in were cast for Nelson Brown and

3    not a combination of Nelson Brown and some other

4    write-in candidates?

5    A.    Based on information obtained from the Georgia

6    Secretary of State as well as the Georgia State

7    Archives, they provided some information, additional

8    supplemental information to this 2004 race.  And I do

9    recall, if I remember correctly, a sheet that does

10   indicate that Nelson Brown was certified, but there was

11   an additional supplemental information not provided by

12   the Secretary of State, but at the Georgia State

13   Archives.

14   Q.    And do you know if that was produced in this

15   matter?

16   A.    I'm not -- I'm not sure of all of the discovery

17   requests so I can't answer.

18   Q.    But you used that information to prepare your

19   report?

20   A.    I -- I have the information.  It doesn't

21   differ from -- it didn't change my analysis.  But I had

22   some additional or supplemental information about

23   Nelson Brown.  It's no more than a couple of sheets

24   from the Division of Elections or the Secretary of

25   State's office.

1    **Q.**   I see.  Okay.

2    **A.**   Some sheets, and I have it for some other races,

3    where they signed off on the elections, the state has.

4    **Q.**   And so that extra information you just described,

5    you identified that information in a response to a

6    question I had for you about how could you be certain

7    that the write-in votes were all for Nelson Brown and

8    not for other write-in candidates.

9    **A.**   Because as I recall it, some of that supplemental

10   information had the vote totals for Nelson Brown.

11   Nelson Brown, this was a new race, so, as you know, it

12   wasn't included in the original one, so there was

13   additional questions.

14   **Q.**   And did that supplemental information identify the

15   other write-in candidates?

16   **A.**   I don't recall, I don't remember it doing that.  I

17   don't remember any number of -- or any additional

18   information about other write-in candidates that could

19   offset the number of votes that he received.

20   **Q.**   So I understand you used this information to make

21   a determination about the votes cast for Nelson Brown

22   in your report; is that right?

23   **A.**   Correct, because he was a write-in candidate.

24   **Q.**   But you did not produce that information along

25   with your report in this matter, is that your

1    understanding?

2    **A.**    I didn't -- I didn't see the need to produce it.

3    **Q.**    Did you have any other information you used to

4    narrow down the write-in vote number to ensure that it

5    only included votes for Nelson Brown?

6    **A.**    Nothing other that the additional information

7    received from the Georgia State Archives.

8          **MS. MCKNIGHT:**  Your Honor, how would you like

9    to handle an objection to this portion of Dr. McBride's

10   report where he clearly relied on information to make a

11   calculation that he -- they rely on in this case, and

12   they have identified as responsive to the request on

13   remand -- that he has not provided that information

14   along with his report when it was provided?

15         **MR. SELLS:**  Dr. McBride identified all of his

16   -- all of the data that he relied on in his report in

17   his report.  The problem here is that the defendant's

18   attorneys never asked us to produce the public record

19   election data that she's now complaining about.  Ms.

20   McKnight and their prior counsel could have downloaded

21   the data from the Secretary of State's website, just as

22   Dr. McBride did.  They could have gone to the state

23   archives, just as Dr. McBride got information from the

24   state archives, or because the defendant is the Sumter

25   County Board of Elections, they might have looked in

1    their own files for this very information.  There is

2    absolutely no basis for --

3          THE COURT:  All right.  Let me do it this

4    way.  Since fortunately this is a bench trial, the

5    objection I think -- I think the important thing to do

6    is to finish the witness's testimony, and then I'll

7    allow either side to object to portions of that

8    testimony as provided based on the allegation that you

9    suggest, and then hear from everybody, I think the

10   better way to do.  That will be the most efficient way

11   to do it.  So I'll let you reserve your objection, but

12   I don't think we can get through it if we try to go

13   that way first.

14         MS. MCKNIGHT:  I understand, Your Honor.  I

15   appreciate the guidance.  Thank you.

16         THE COURT:  All right.  Let's go ahead and

17   take our break.  I think I may have said 3:30 but that

18   obviously was not a good call if I did say that.  I

19   think 3 o'clock is a better time for our afternoon

20   break.  All right, we'll be in recess.

21   *(RECONVENED; ALL PARTIES PRESENT, 3:27 p.m.)*

22         THE COURT:  All right.  Ms. McKnight, you may

23   continue.

24         MS. MCKNIGHT:  Thank you, Your Honor.

25   BY MS. MCKNIGHT:

1    Q.   I'd like to start where we left off with

2    Plaintiff's Exhibit 13.  Now, Dr. McBride, I understood

3    from your earlier testimony your analysis in PX-13

4    regarding the 2004 sheriff's election, your testimony

5    was that absentee ballots cast in this election were

6    not a part of the analysis shown on Plaintiffs 13; is

7    that right?

8    A.   That's correct.

9         MS. MCKNIGHT:   And could we switch to

10   Plaintiff's Exhibit 21, please?

11   Q.   And now, looking at the official and complete

12   election results for that election, it appears to me

13   that that means that in the column write-in votes for

14   sheriff, all the way toward the bottom, for the entry

15   for absentee ballots that 1,164 write-in votes that

16   were cast by absentee ballots were not part of your

17   analysis PX-13; is that right?

18   A.   That is correct.

19   Q.   Now, regarding the write-in candidate, Nelson

20   Brown, nothing in your analysis shows what would have

21   happened had Nelson Brown run on the ballot, right?

22   A.   That is correct.

23   Q.   Okay.  So it's possible that if Nelson Brown had

24   run on the ballot maybe he could have won, but you

25   can't say yes or no for certain, right?

1    **A.**   I cannot.

2    **Q.**   Now, in your report -- I'd like to pull up

3    Plaintiff's Exhibit Number 6 at page 2.  Now, there at

4    the top of the page you state:  Despite high levels of

5    minority cohesion, black candidates have lost in every

6    at-large election held under the challenged plan.  Is

7    that right?

8    **A.**   Yes.

9    **Q.**   And, in fact, when you talk about the black

10   candidates who have lost, you're really only talking

11   about two black candidates of choice, aren't you?

12   Michael Coley and Kelvin Pless?

13   **A.**   There was also Willa Fitzpatrick in district

14   three.

15          **MS. MCKNIGHT:**  And could we pull up

16   Plaintiff's Exhibit 10 and turn to page two?  And

17   pardon me, we can zoom out of this page, and could you

18   go to the first page, please?

19   **Q.**   So on page -- I'm looking at table four of your

20   report, it's introduced in as a separate exhibit,

21   Plaintiffs Exhibit 10.  On page one, the candidate of

22   choice in that election is Michael Coley, correct?

23   **A.**   Correct.

24          **MS. MCKNIGHT:**  Could you turn to page two?

25   **Q.**   And page two in this election May 20, 2014, the

1    two-year election, Michael Coley was candidate of

2    choice; is that right?

3    **A.**    Correct.

4            **MS. MCKNIGHT:**  Could you turn to page three?

5    **Q.**    In this election, May 20, 2014, the four-year

6    election, Kelvin Pless was the candidate of choice for

7    the black community; is that right?

8    **A.**    Correct.

9    **Q.**    And then -- do we have any more pages in this

10   exhibit?  And on the last page of this exhibit we have

11   one more election, the runoff July 22, 2014 two-year,

12   and Michael Coley was the candidate of choice for the

13   African American community, correct?

14   **A.**    Correct.

15   **Q.**    So by my count in your table four, Sumter County

16   at-large elections under the challenged plan we are

17   talking about two candidates of choice for the African

18   American community, that is Mr. Coley and Mr. Pless; is

19   that right?

20   **A.**    For the at-large elections, correct.

21   **Q.**    Now, Dr. McBride your report, as you were asked to

22   do, focused on race as a factor in why certain

23   candidates are elected over others, correct?

24   **A.**    Focused on race?  I need you to explain that focus

25   on race.

1    Q.    Okay.  Fair enough.  Let me ask it a different

2    way.  When you performed your statistical analyses in

3    these charts as we see them -- you have EI, you have

4    BERA, and, pardon me, the third is the --

5    A.    Homogenous analysis.

6    Q.    Homogenous.  Exactly.  Thank you, Dr. McBride.

7    When you perform those analyses you were focused on

8    race as a factor in why certain candidates were elected

9    over others; isn't that right?

10   A.    Focus?  If you want to use racial composition to

11   determine if whites and blacks votes differently, then,

12   yes, focus.

13   Q.    Okay.  And you would agree that there are factors

14   other than race that can play a role in whether a

15   candidate is elected, right?

16   A.    In some instances, perhaps.

17   Q.    Such as whether a candidate's platform is

18   appealing to the electorate?

19   A.    In some instances someone -- some may look into

20   qualitative measures.  It's case by case actually.

21   Q.    So these qualitative measures also include things

22   like qualifications, correct?

23   A.    They could play -- they could play a role.

24   Q.    What about background and knowledge of the

25   community, could that play a role?

1          **MR. SELLS:**  Objection.  This line of

2    questioning is completely irrelevant under *Thornburg*

3    *versus Gingles*.  It's completely irrelevant to a

4    Section 2 inquiry.

5          **MS. MCKNIGHT:**  Your Honor, this has to do

6    with the limitations of his analysis.  He has not

7    performed any kind of analysis about -- his report --

8    whether it's relevant -- whether plaintiff believes

9    it's relevant or not, does not include any of these

10   qualitative factors.  If that's his position, I'd just

11   like to get his testimony as much.

12         **THE COURT:**  As I understand the questions,

13   they are allowed.  The objection is overruled.  I'm not

14   saying they will ultimately matter, but I think it's

15   fair to examine the basis of his analysis and what he

16   considered and what he did not.

17   BY MS. MCKNIGHT:

18   Q.   Now, you referred to these as qualitative factors.

19   Other than the number of votes cast for a candidate,

20   your analysis does not pick up on these types of

21   qualitative factors, right?

22   A.   It's not incorporated into -- there's no way to

23   incorporate it into the statistical methodology, no,

24   but it can be considered, but there's no way to

25   incorporate it into estimates.

1    Q.    And one more question, another qualitative factor,

2    could that be how much elbow grease a candidate put

3    into the campaign?  They knocked on a ton of doors,

4    they sent out a ton of letters, they attended a ton of

5    events compared to another candidate that was not as

6    active, is that a qualitative?

7    A.    I imagine it could be, yes.

8    Q.    And, again, that's the type of qualitative factor

9    that is not included in the analysis in your report,

10   right?

11   A.    It is not included in any estimates, no.

12   Q.    Okay.  And just one more question on this for

13   plaintiff.  This -- in reading your report we could not

14   know if a candidate lost because of their race or

15   because of some flaw in any of these qualitative

16   factors; is that right?

17   A.    That is correct, because I cannot -- I don't

18   understand certain rationale that would go into

19   explaining beyond what the estimates suggest.

20   Q.    Now, you agree that in determining the black

21   community's candidate of choice, it is the status of

22   the candidate as the chosen representative of a

23   particular group, not the race of the candidate that is

24   important, right?

25   A.    Can you define status of the candidate?

1    **Q.**   Sure.

2          **MS. MCKNIGHT:**   Could we put up Defendant's

3    Exhibit 8, page 19.  Page 19, please.  Pardon me, it's

4    PX-8.  Pardon me, Mr. Conner.  Pardon me, Your Honor,

5    and thank you for your patience.  What I'm having put

6    up is PX-2 page 19.

7    **Q.**   Dr. McBride, I'm looking at the second paragraph,

8    and I'll highlight an excerpt for you to read.

9    **A.**   Okay.  You want me to read where you just

10   highlighted?

11   **Q.**   You can read it to yourself if possible, and I'll

12   have a question when you're ready.

13   **A.**   Yes, I'm ready.

14   **Q.**   So you would agree that in determining the black

15   community's candidate of choice it is the status of the

16   candidate as the chosen representative of a particular

17   group, not the race of that candidate that is

18   important, right?

19   **A.**   I would agree with that, along with other factors,

20   right, correct.

21   **Q.**   And indeed this is a quote from Justice Brennen in

22   the *Gingles* opinion that you quote in your report,

23   right?

24   **A.**   Yes.

25   **Q.**   Now, you would also agree that as between a

1    republican and a democratic, the candidate of choice

2    among the black community would be the Democrat,

3    correct?

4    **A.**    Yes.

5    **Q.**    So sometimes a white Democrat is the black

6    community's candidate of choice in Sumter County,

7    correct?

8    **A.**    In my analysis I can't answer that question.

9    **Q.**    Do you know if Hilary Clinton won the majority of

10   vote in Sumter County in the 2016 election?

11   **A.**    Honestly, I doubt it, but I don't know for sure.

12   **Q.**    Do you know -- in the 2016 presidential election

13   is it your belief that Hilary Clinton was the candidate

14   of choice for the black community in Sumter County?

15   **A.**    That would be a guess.  I don't know.

16   **Q.**    And are you saying you don't know because you

17   haven't looked at the specific numbers?

18   **A.**    I have not looked at the presidential race in

19   Sumter County.

20   **Q.**    I understand.  In your analysis of voting in

21   Sumter County have you ever found that a republican is

22   the black community's candidate of choice?

23   **A.**    Because the races are nonpartisan, I don't know.

24   **Q.**    Now, I understood that in your supplemental report

25   you added that 2004 sheriff's race?

1    **A.**    Yes.

2    **Q.**    Where the candidate of choice for the black

3    community was the write-in candidate, correct?

4    **A.**    Correct.

5    **Q.**    But in your supplemental report you did not

6    include a 2016 race for the superior court clerk, did

7    you?

8    **A.**    I wasn't aware of that particular election.

9         **MS. MCKNIGHT:**    Could we put up DX-1 at 1440,

10    please?

11    **Q.**    Now, Dr. McBride, DX-1 contains election data

12    pulled from the Secretary of State's website.  This is

13    the data pulled for the 2016 superior court clerk

14    primary in Sumter County.  This was a three-way

15    primary.  Two candidates were white, that's candidate

16    Cromer and candidate, Harry.  The third candidate,

17    candidate Barthell was African American, is African

18    American, and candidate Barthell is the candidate who

19    won.  Now, by factors identified by plaintiff during

20    his direction of you, I'd like to go through some of

21    those factors with you.

22    **A.**    Okay.

23    **Q.**    Because this was an election for the superior

24    court clerk for the county of Sumter County, do you

25    agree it is the same electorate for at-large seats in

1    the current plan for the Board of Education?

2    A.   I'm counting the precincts.  So if it's an

3    at-large election, yes.  But, no, I can't say the same

4    -- yes, the same electorate, yes.

5    Q.   And you would agree that a 2016 race is more

6    recent than, say, a 2004 race?

7    A.   Yes.

8    Q.   And you would agree that based on your review of

9    this data from the Secretary of State, this election

10   does not include the special circumstances existing in

11   the 2004 sheriff's race where you had a large write-in

12   vote?

13   A.   Not to my knowledge.

14   Q.   Now, this was a countywide election, the type of

15   election the Eleventh Circuit was looking for, but you

16   did not include it in your analysis, why not?

17   A.   I wasn't aware of this race, or I don't remember

18   if this is Ms. or Mr. Barthell.  I'm not aware of this

19   particular election.

20   Q.   Are you comfortable saying that -- understanding

21   that candidate Barthell, the only black candidate in

22   the field, that she won, are you comfortable saying

23   that the candidate of choice for the black community

24   won in this election?

25   A.   No, I'm not comfortable stating that.

1    Q.    Why not?

2    A.    Because there are no estimates of any polarized

3    voting study, there's no pattern of racial -- there's

4    no pattern of how voters, white or black voters, voted.

5    So I didn't run the election, and I didn't see any

6    report from the defendant experts on this election.  I

7    don't know if blacks were cohesive behind Barthell or

8    not, I don't know, nor do I know if it was polarized.

9    I don't know.

10   Q.    So it's your testimony that it's possible that a

11   2016 election countywide in Sumter County is not

12   polarized in the way your analyses show in your report?

13   A.    There's a range of possibilities.  Again, I don't

14   know.  I did not run this election.  I don't know.

15   Q.    So it's your testimony that it's possible that

16   candidate Cromer, the white candidate could have been

17   the black community's candidate of choice?

18   A.    Anything you state is going to be possible.  So I

19   don't know how I can answer that question.

20   Q.    I understand.  Thank you.  Now, I understood your

21   testimony as between a Republican and a Democrat the

22   black community's candidate of choice would be the

23   Democrat, right?

24   A.    Possibly.  I think you asked that a short while

25   ago.  Possibly.  It's a hypothetical, so possibly.

1    **Q.**   Isn't it more likely that the Democrat is the

2    candidate of choice than the Republican?

3    **A.**   Based on race and party identification in that

4    instance, yes.  It's well established in the political

5    science literature, more than possibly 92 percent of

6    African Americans support the Democratic party, so I

7    can't argue against that particular hypothetical

8    situation you presented.

9    **Q.**   I appreciate your answer, and that's -- that's

10   some information that I was looking for and I

11   appreciate you giving it.

12        **THE COURT:**  I may be getting ahead of

13   everybody, but, again, I have a question.  I know that

14   the Board of Educations elections are not partisan.  Is

15   this a nonpartisan race also to anyone's knowledge?  I

16   guess that may be supplied later, I'm just asking.

17        **MS. MCKNIGHT:**  Well, it's -- this race is a

18   Democratic primary, so in a way it's nonpartisan in

19   that it's Democrats.

20        **THE COURT:**  All right.  You can see that

21   better that I can see it.  Okay.

22        **MS. MCKNIGHT:**  And I'm sure plaintiff's will

23   have an opportunity to redirect, if you'd like.

24        **THE COURT:**  All right.  I was just asking

25   whether that was a factor -- whether that was known or

1    not.  I just wanted to make sure I was apples and

2    apples and not apples and bananas.

3              **MR. SELLS:**  Well, I think I have to object to

4    the record that opposing counsel is misleading this

5    Court by calling this a nonpartisan race.  This is the

6    definition of a partisan race.  It is a partisan

7    primary.

8              **THE COURT:**  I'll let you all argue about it.

9    But the witness is on cross examination.  You can all

10   can argue about who is correct in your delineation of

11   words and descriptions.

12             **MR. SELLS:**  I appreciate that, Your Honor.

13             **THE COURT:**  All right.

14             **MS. MCKNIGHT:**  Thank you, Your Honor.

15             **THE COURT:**  If that's an objection, it's

16   overruled for the reason I stated.  You may continue.

17   The Court didn't mean to invite any objections by its

18   questions.  I thought I kind of laid a quiet foundation

19   for my question while I was asking it without

20   interrupting too greatly.

21   **BY MS. MCKNIGHT:**

22   **Q.**   Dr. McBride, you would agree that small samples

23   sizes can result in less reliable analyses?

24   **A.**   The greater the sample size, greater the

25   reliability.  Yes, I can state that.

1    Q.   Okay.  But It seem to me that the elections you

2    analyzed -- we talked before about table four and how

3    it was limited to two black candidates of choice,

4    Mr. Coley and Mr. Pless, right?

5    A.   Correct.

6    Q.   Are you comfortable testifying that that is a

7    small sample size?

8    A.   The -- that particular election with the 11

9    precincts, the at-large election -- I don't know if you

10   could pull it up.

11   Q.   Sure.  This is exhibit -- Plaintiff's Exhibit 10.

12   A.   That's an at-large election with 11 precincts, so

13   I don't consider that small as in small referring to

14   some of the district elections.  It's all of the

15   precincts in the county.

16   Q.   Let me ask a little bit differently.  I understand

17   my question wasn't clear.  Looking at the elections you

18   did in table four, I think there were four, maybe five

19   elections and only two candidates of choice?

20   A.   Okay.  Yes.

21   Q.   As far as analyzing elections go, is that a small

22   sample size, or is it large sample size?

23   A.   It's small in the context of how many elections I

24   analyze, but in terms of inferential statistics, no,

25   those are all of the elections that have taken place

1     since HB 836.  There are no more.  In ten years there

2     will be more, but from the time the plan was adopted to

3     now, those election are what's out there, and that's

4     what we have to infer.

5     Q.    I understand.  So regardless of how many different

6     elections there will be in 10 years, 20 years, 30

7     years, what you have at your hands today or what you

8     had at your hands to do this to perform your analyses

9     in your report would be a small sample size.  Is that

10    fair to say?

11    A.    It would be a limited number or a small number of

12    elections to analyze.  I wouldn't consider it a small

13    sample size in reference to discussing sample sizes and

14    statistics.

15              MS. MCKNIGHT:  Could we put up page four

16    of PX-6?

17    Q.    On this page is a table in your report showing the

18    racial composition of the districts as they are

19    currently drawn, correct?

20    A.    Correct.

21    Q.    And as a reminder, this only includes two races,

22    white alone and black alone to the exclusion of other

23    races, correct?

24    A.    Correct.

25    Q.    It does not include any indication of Hispanic

1   votes, correct?

2   **A.**   In the total population.

3   **Q.**   Right.  The total population would capture them,

4   but this chart does not pull out percentages for

5   Hispanic voters, does it?

6   **A.**   No.

7   **Q.**   Now, you write on this page that, quote -- and

8   pardon me looking down.  Quote:  I find that the HB 836

9   plan contains two majority black seats.

10   **A.**   Correct.

11   **Q.**   And you write that, quote:  The other three

12   districts and the at-large seats are majority white in

13   both population and voting age population.  But that's

14   wrong, isn't it?

15   **A.**   Yes, and it was corrected.

16   **Q.**   In which version of the report was it corrected?

17   **A.**   I think it was the portion that was argued this

18   morning.  It was the corrected version.  The corrected

19   supplemental report, I think March 14th, or something.

20   **Q.**   March 8, 2017?

21   **A.**   Yes.

22   **Q.**   So March 8, 2017, does that sound right?

23   **A.**   Yes.  It has:  Parenthesis, corrected.

24   **Q.**   I see.  So that would be Plaintiff's Exhibit 6.

25   Will you put up Plaintiff's Exhibit 6.  I believe this

1    is it.  And go back to page four, please.  So is this

2    --

3         **MS. MCKNIGHT:**  Pardon me, Mr. Connor, can you

4    go back to the cover?

5    **Q.**   So is this Plaintiff's Trial Exhibit 6 here, Dr.

6    McBride?

7    **A.**   Yes.  It says Plaintiff's Trial Exhibit 6.

8    **Q.**   And at the top is this your corrected version

9    dated March 8, 2017?

10   **A.**   Yes, it is.

11   **Q.**   Okay.

12        **MS. MCKNIGHT:**  And could we turn to page four

13   of this exhibit?

14   **Q.**   And so where it says:  The other three districts

15   and the at-large seats are majority white in both

16   population and voting age population.  You recognize

17   that that's incorrect, right?

18   **A.**   The other three districts and the at-large

19   seats -- yes.

20   **Q.**   Okay.  Because first, district four, black

21   population forms the majority of population -- sorry.

22        **MS. MCKNIGHT:**  Mr. Connor, if you could zoom

23   out?

24   **Q.**   District four black population -- pardon me,

25   strike that.  First, district four, white population is

1    not the majority in district four; is that right?

2    **A.**    That's right.

3    **Q.**    Is there a majority population in district four?

4    **A.**    There's not a majority.

5    **Q.**    Correct.  And what is there?

6    **A.**    There's plurality white, 18 plus -- well, are we

7    talking about total population or voting age?

8    **Q.**    Total population.

9    **A.**    44.8 and 47.7.

10    **Q.**    And then, so not only does the white population

11    not make up the majority, but most of the population in

12    district four is black; isn't that right?

13    **A.**    Plurality wise -- yes.

14    **Q.**    More critically, in the two at-large seats, not

15    only does the white population not form the majority,

16    but the black population forms the majority in both the

17    four-year at-large seat and the two-year at-large seat,

18    correct?

19    **A.**    For --

20    **Q.**    Black population.

21    **A.**    For a total population, yes.

22    **Q.**    Correct.  And white voting age population does not

23    form a majority of the population in the two at-large

24    seats, does it?

25    **A.**    Correct.

1  Q.   And, in fact, black voting age population exceeds

2  the amount of white voting age population in both of

3  those at-large districts, correct?

4  A.   Yes.

5  Q.   And when I talk about at-large districts, I'm

6  really talking about the county, right?

7  A.   Yes.

8  Q.   Now, one more question on this.  These figures in

9  this table they're based on 2010 census data, correct?

10  A.   Correct.

11  Q.   Okay.  And earlier today I understood you to say

12  that you expected these numbers to increase

13  incrementally over the years; is that right?

14  A.   Between the black and white estimates, the black

15  estimate increased incrementally and the white

16  estimate, I think decreased incrementally, if I

17  remember correctly.

18  Q.   Yes, that sounds right.  Thank you.  So your

19  testimony about black population or black voting age

20  population forming a plurality could, in fact, be

21  different today, and today those populations could form

22  a majority; is that right?

23  A.   It's a possibility.

24  Q.   Now, I'd like to go to this same exhibit

25  Plaintiff's Exhibit 6, page 7, please.  Dr. McBride,

1   I'm looking at the middle paragraph, and in there you

2   state:  I was also asked by the plaintiff's attorneys

3   to see if I could draw three compact majority black

4   districts in the 5/2 plan with five single member

5   districts and two at-large seats.  I was unable to do

6   so.  Right?

7   A.   Correct.

8   Q.   I'd like to put up Plaintiff's Exhibit 8, please.

9   And, Dr. McBride, I'm going to ask you some questions

10  about plaintiff's illustrative plan that you prepared.

11  A.   Okay.

12  Q.   Now, I believe we're looking at table two from

13  your supplemental report.  It may have been in your

14  earlier report, too, I believe it was.  But table two

15  from your supplemental report, and it shows,

16  plaintiff's illustrative plan, population summary; is

17  that right?

18  A.   That's correct.

19  Q.   And this data and this chart is from the 2010

20  census, correct?

21  A.   That is correct.

22  Q.   And this does not account for the decrease in

23  percentage of white population identified by recent ACS

24  data, correct?

25  A.   Correct.

1    Q.    And we can't derive from this summary any

2    indication of how -- of the level of the Hispanic

3    community in these districts, correct?

4    A.    I'm sorry, repeat your question.

5    Q.    Sure.  And we can't derive from table two any

6    information about the size of the Hispanic community in

7    your illustrative plan?

8    A.    That or any of the other racial or ethic groups,

9    correct.

10   Q.    Thank you.  And now, in this plan plaintiff

11   proposes that district six be drawn as a third majority

12   minority district, correct?

13   A.    Yes.

14   Q.    And it is your opinion that district six should be

15   drawn at 54.5 percent black voting age population?

16   A.    In the illustrative plan for the third remedial

17   district, that is what I proposed, yes.

18   Q.    But you also opined in your report that you can't

19   say for certain that this district six could elect the

20   black community's candidate of choice, right?

21   A.    Correct.  I can't predict the future.

22   Q.    But based on your analysis of past elections, you

23   calculated this figure?

24   A.    Yes.

25   Q.    And deemed it sufficient to form a majority

1    minority district number six, correct?

2    A.    A district where African American are given an

3    equal opportunity, yes.

4    Q.    Now, in creating district six at this level, even

5    though you're saying that you can't predict the future,

6    in a sense you were trying to predict that this figure,

7    54.5 percent, would provide an opportunity for blacks

8    to elect their candidates of choice in future

9    elections, right?

10   A.    I wasn't predicting when I drew this plan.  When

11   this plan was drawn, before that table that was

12   discussed a few hours ago, when this plan was drawn, it

13   was drawn with the mindset of a third district after

14   all other redistricting principles are applied.  So it

15   wasn't drawn with the intended effect to secure that an

16   African American would win that district.  This was the

17   illustrative plan creating that opportunity.

18   Q.    I understand.  So you did not assess the likely

19   performance of this district, district six; is that

20   right?

21   A.    In the illustrative plan originally, no.  I drew

22   -- I drew three.  I was able, applying all

23   redistricting principles, to draw three districts where

24   American Africans were above -- voting age population

25   was above 50 percent.

1    Q.   I understand.  Now, in response to my question you

2    focused on your initial report.  So let me ask a

3    broader question.  Did you ever assess whether this

4    54.5 percent B-VAP in district six would ensure that

5    district six could perform as a community, as a

6    district electing the black community's candidate of

7    choice?

8    A.   Originally, no.

9    Q.   And part of me, Dr. McBride, I don't mean to beat

10   a dead horse, but both times you've gone back to say

11   originally.  And I'm trying to get that broader

12   question of, did you ever analyze and assess whether

13   this district could be a performing district for the

14   black community?

15   A.   After the Eleventh Circuit's decision and Judge

16   Tjoflat's concurring opinion, I did the analysis that

17   was discussed earlier.  But, originally, and I know I'm

18   going back and forth --

19   Q.   That's okay.

20   A.   -- but when I drew the plan out of a seven single

21   member district, applying equal population,

22   compactness, contiguity, communities of interest, I was

23   able to draw three districts where African American

24   comprised a majority in the voting age population, and

25   I did not look to see, well, is a black candidate going

1    to win, for example, in district six.  That framework,

2    that statistical method that we discussed earlier

3    today, that came in the supplement.  This plan was

4    already part of the original report, and the plan

5    itself did not change.  I did not introduce another

6    seven single member district plan.

7    Q.   I understand.  So you drew this plan in your

8    original report, and then I understood from you that

9    you performed some analyses after the Eleventh Circuit

10   opinion, right?  Any of the analyses you performed

11   after the Eleventh Circuit opinion came back, did any

12   of those analyses show you that district six in the

13   illustrative plan could be a performing district,

14   meaning a district where the black community can elect

15   its candidate of choice at this level, at 54.5 percent

16   B-VAP?

17   A.   Yes.  Based on that framework allowing for

18   cohesion and crossover voting, I think for African

19   American voters to have an equal opportunity to elect

20   candidates of choice it was 54 percent -- I can't

21   remember the tenth percentage point.  I remember it

22   being around 54 percent for district six.

23   Q.   You would agree that in your supplemental report,

24   which followed the Eleventh Circuit opinion -- so

25   whatever analyses you performed that you just described

1    are included in this statement -- in your supplemental

2    report, you stated:  None of these estimates can

3    predict with precision how the illustrative plan

4    district six is likely to perform in future elections

5    with its 54.5 percent black voting age population.

6    A.    With precision, yes.

7    Q.    Okay.  What about without precision?

8    A.    Well, no matter how you draw it, you are still

9    predicting and guessing.  Honestly, it's absolute

10   guesswork based on whatever statistical methods that

11   you use to arrive at the estimates.  Who's to say what

12   is going to happen in the next election, but using the

13   data that you have available and statistical measures

14   that you trust, then it's probably easier to say that I

15   trust that these three can effectively elect minority

16   candidates of choice, but I cannot say with absolute

17   certainty.  There is no way to do that with absolute

18   certainty.

19   Q.    Staying with PX-8, in your proposed district six,

20   it appears that the proposed white voting age

21   population was 38.8 percent; is that right?

22   A.    Yes.

23   Q.    And is it your opinion that this level of white

24   voting age population would not prevent the black

25   community from electing its candidate of choice?

1   **A.**   Based on the measure involving crossover vote and

2   cohesion, I do believe that this district -- district,

3   I'm sorry, six can allow, or at least, again, it will

4   give minority voters in Sumter County an equal

5   opportunity to elect a candidate.  Again, I cannot say

6   with absolute certainty this district is going to do

7   that.  I can't say about that about any of these

8   districts.

9   **Q.**   Now, this illustrative plan offers seven single

10  member districts with three districts having black

11  voting age population over 50 percent, right?

12  **A.**   Correct.

13  **Q.**   And those three districts are district one,

14  district five, and district six, right?

15  **A.**   Correct.

16  **Q.**   Now, for the other districts, district two, three,

17  four, and seven, the four remaining districts in your

18  seven district plan, did anything in your analyses show

19  that any of those districts could perform, could

20  provide the black community an equal opportunity to

21  elect its candidates of choice?

22  **A.**   I would have to say more than likely, no, but I

23  didn't draw this plan with race predominating my

24  process, and outside of districts one, five, and six,

25  which honestly is a bulk of the Americus city where the

1    majority of the minority population is, when you leave

2    that center of Americus, you don't find a lot of

3    African American voters surrounding Americus out in the

4    other communities.  And, again, I didn't draw a plan

5    using race first.

6    Q.    So thank you for that explanation.  And just to

7    summarize, as I understand it, your analysis does not

8    support a finding that proposed districts in the

9    illustrative plan number two, three, four, and seven

10   could provide the black community an opportunity to

11   elect its candidate of choice, right?

12   A.    It's a very difficult question to answer because

13   I'm asking -- I'm being asked to guess.  And I can't

14   say, aside from the statistical measure that I used,

15   and with your indication that the African American

16   population is growing, then if district seven by the

17   2020 census increases in black population well over the

18   2,070, then that percentage would raise.  I don't know.

19   There are so many factors I can place into that

20   discussion, but to just come out and say that out of

21   seven districts, four of them will never elect an

22   African American candidate so you're doing African

23   American voters a dis-justice by just giving them

24   three.  It's altogether problematic for me to make a

25   statement like that.

1   Q.   And, pardon me, I think you may have misunderstood

2   my question.

3   A.   Okay.

4   Q.   I was not asking whether the black community in

5   these districts could never elect their candidates of

6   choice, but I was focused on the same analysis you've

7   been focused on.  Do they have an equal opportunity?

8   A.   At those four districts that you mentioned, the

9   opportunity or -- the opportunity for African Americans

10  to elect candidates of choice in those districts are

11  far less than the three that are proposed.

12  Q.   Are they less than the opportunity that exists?

13  A.   Based on my analysis, yes.

14  Q.   Pardon me, what question did you think I was going

15  to ask?

16  A.   I said based on analysis.  I'm lost here.

17  Q.   With the electorate in districts two, three, four,

18  and seven, you just described that they have a lower

19  opportunity or less of an opportunity to elect their

20  candidates of choice?

21  A.   Correct.

22  Q.   -- right?  Less than what?

23  A.   Less than the model I used at 50 percent.  So I

24  guess I'm answering your question now.

25  Q.   I appreciate it.

1    **A.**    Okay.

2    **Q.**    And thank you for your patience.  So is it your

3    opinion that if black voting age population reaches

4    50 percent, then there would be an opportunity to elect

5    a candidate of choice?

6    **A.**    I can't -- I can't say that.  I think what I

7    mentioned earlier was the unknown of what will happen

8    after the next census.  But I can't really answer that

9    question if it reaches 50 percent.  You mean the county

10   population, the voting age population reaches

11   50 percent?  I'm back to guessing again.

12   **Q.**    So then why did you use 50 percent in your model?

13   **A.**    That was the framework, as I mentioned, developed

14   by three leading social scientists.  I used that model

15   to comply with what Judge Tjoflat suggested.  I'm not

16   arguing against the model.  I just feel as if I'm being

17   sort of closed in on saying that African Americans,

18   where they're absolutely going to win, and I'm not

19   comfortable with that.

20   **Q.**    I understand.  Thank you.  I'd like to turn to

21   page 23 in Plaintiff's Exhibit 6.  Now, in your

22   report -- and I'd like to leave table 12 up so the

23   Court can see it -- I am going to read you some quotes

24   from the very next page in your report.  Do you need

25   some water, by the way?

1    **A.**   No, I'm good.  Thank you.

2    **Q.**   But I think it'd useful to look at the table while

3    I read these statements.  If you have any doubt about

4    them we can open up -- we can pull up the pages.  In

5    your report you state:  Table 12 shows that the black

6    voting age population needed in a district for a black

7    candidate to win in past elections under the HB 836 has

8    ranged from 44.1 percent in district five to

9    77.8 percent in district two.  Right?

10   **A.**   Correct.

11   **Q.**   And as we discussed earlier:  None of these

12   estimates can predict with precision how the

13   illustrative plan's district six is likely to perform

14   in future elections with its 54.5 black voting age

15   population.  Right?

16   **A.**   Correct.

17   **Q.**   But the estimates indicate that district six is

18   above where other majority minority districts have

19   needed to be to elect black candidates under 836.

20   Right?

21   **A.**   Correct.

22   **Q.**   So as I understand it, you're identifying the

23   range and you're identifying the figure 54.5 percent as

24   being within that range and above the lowest number of

25   that range.  Is that fair?

1    A.    That's fair.

2    Q.    Is it fair to say that 48.1 percent is a level of

3    B-VAP that is within the range and above the lowest

4    percentage in the range?

5    A.    Possibly.  But this table is analyzing the past

6    the electoral performances in these districts.  We

7    can't do that with district six.  It doesn't -- it

8    doesn't exist -- yeah, it doesn't exist.  So, again,

9    that statement in there, with precision, goes, but that

10   54 is within that range, but without cohesion and

11   crossover, I can't say that that 48 percent district

12   would elect.  I can't say that.  I don't have a model

13   or something that I can use to factor into the cohesion

14   and the crossover statistical measure.

15   Q.    But didn't you just say that you don't have a

16   model for district six because it doesn't exist and

17   therefore you relied on your analyses in table 12 to

18   determine that it was within the range?

19   A.    Yes.  And that's based on past elections in those

20   districts.  They exist.  One, two, three, and five.

21   That's how I was able to get cohesion and crossover,

22   but to state -- again, that 54 percent district is

23   within this range, but I think you stated earlier,

24   well, what about a district that -- at 48 percent.

25   Then that's well below 54.  Even though it's within the

1    range, it's still well below 54.  And it is a majority

2    minority district.

3    Q.   So you would agree that it would be more useful to

4    have cohesion and crossover information for a district

5    before you try to identify the percentage of B-VAP that

6    would be necessary to make it a performing district for

7    the black community?

8    A.   I can't make that statement.  I don't have a

9    problem with the methodology that I used with Grofman

10   and Handley's table or the courts, the two that I

11   mentioned using it.  I don't have a problem.  That

12   seems to be something that's a standard now in these

13   particular instances.  So I'm not going to criticize

14   that method and say I can't do this until there's a

15   district.  This lawsuit is about that district, or the

16   possibility for that district, I should say.

17   Q.   So you also state in your report that the

18   illustrative plan provides black preferred candidates

19   an opportunity for victory in three districts, right?

20   A.   That's correct.

21   Q.   But you can't say with certainty that this third

22   district, district six, would increase the number of

23   African American preferred candidates on the school

24   Board of Education, correct?

25   A.   There's very little I can state about this with

1    absolute certainty.  I think perhaps likelihood may be

2    a better choice of words, but certain -- but to say

3    with absolute certainty is without any doubt.  And I

4    don't know how I can make that statement about future

5    elections.

6    Q.    So it's possible that a district could elect, or

7    the county could elect the black community's candidate

8    of choice at, say, a 50 percent B-VAP level, but you're

9    not in a position to opine about that; is that right?

10   A.    That is -- the possibility is broad, but to opine

11   about it and say with certainty, I cannot do that.

12   Q.    Just as you cannot say that a district or a county

13   drawn at, say, 50 percent B-VAP or even 49 percent

14   B-VAP could not elect the candidate of choice for the

15   African American community, correct?

16   A.    Could you repeat that, please?

17   Q.    Sure.  You were talking about certainty.

18   A.    Okay.

19   Q.    And by the same token you cannot say with

20   certainty that a district or a county drawn with

21   50 percent B-VAP or even 49 percent B-VAP could not

22   elect the African American community's candidate of

23   choice.

24   A.    I can't say with certainty.  I cannot say it

25   can't.

1        **MS. MCKNIGHT:**   Plaintiff's Exhibit 6, page

2   23, please.   Could we enlarge table 12?

3   **Q.**   Now, you said that white majority districts behave

4   differently than black majority districts in your

5   testimony earlier today.   Do you remember that?

6   **A.**   Yes, I do.

7   **Q.**   And you also said you need higher B-VAP in white

8   majority districts for the black community to elect its

9   candidate of choice, right?

10   **A.**   Yes.

11   **Q.**   But Sumter County as a whole is not majority

12   white, correct?

13   **A.**   Correct.

14   **Q.**   And that's using numbers of as 2010, and we know

15   the figure has only grown -- has only decreased for

16   white population.   And we also know that the at-large

17   districts were drawn at a B-VAP level that is higher

18   than both of the lowest two scores on this chart,

19   correct?

20   **A.**   This at-large districts, in the --

21   **Q.**   We know that the county -- the B-VAP level in the

22   county is larger than both of the lowest percentages on

23   this chart, meaning that there's a greater B-VAP

24   percentage in the county overall, using 2010 census

25   data, than the B-VAP percentages in the D-1 and D-5.

1    **A.**    Lower, yes.

2    **Q.**    And, pardon me, I misstated that.  So you'll bear

3    with me one more time.

4    **A.**    Okay.

5    **Q.**    You identified in district one and district five

6    that they only needed 47.1 and 44.1 percent black

7    voting age population to be performing districts; is

8    that right?

9    **A.**    That's correct.

10   **Q.**    And we know that the county has at least

11   48.1 percent B-VAP, correct?

12   **A.**    Correct.

13   **Q.**    And that's according to outdated data, correct?

14   **A.**    The 2010 census, yes.

15   **Q.**    And we believe that B-VAP number in Sumter County

16   has only increased since that 2010 census, correct?

17   **A.**    Slightly increased.

18        **MS. MCKNIGHT:**   Could we turn to PX-7, please?

19   **Q.**    I'm going to run through a few numbers, Dr.

20   McBride, if you don't mind, and then I'll ask you a

21   summary question.

22   **A.**    Okay.

23   **Q.**    PX-7 shows the racial composition of the board

24   districts as they are drawn now, but using 2010 census

25   data, right?

1    **A.**    Correct.

2    **Q.**    And according to 2010 census data, district one

3    had 65.9 percent black population, correct?

4    **A.**    Correct.

5    **Q.**    And 62.7 black voting age population, correct?

6    **A.**    Correct.

7    **Q.**    And district five had 72.8 percent black

8    population?

9    **A.**    Yes.

10    **Q.**    And 70.6 black voting age population?

11    **A.**    Yes.

12    **Q.**    Now, I'd like to turn to PX-8.  In your proposed

13    district one, it has 68 percent black population,

14    correct?

15    **A.**    Yes.

16    **Q.**    And 64.4 percent black voting age population,

17    correct?

18    **A.**    Correct.

19    **Q.**    And your proposed district five has 77.4 percent

20    black population, correct?

21    **A.**    Correct.

22    **Q.**    And 75.4 percent B-VAP, right?

23    **A.**    Correct.

24    **Q.**    Now, the compliant in this case included a claim

25    that black population was improperly concentrated or,

1    quote, unquote, packed in districts one and five as

2    drawn.  That was PX-7 that we just looked at.

3    **A.**    Yes.

4    **Q.**    But black population has higher concentrations in

5    districts one and five in your proposed plan shown in

6    PX-8; isn't that right?

7    **A.**    Yes.

8    **Q.**    Earlier today you provided testimony regarding the

9    Eleventh Circuit's opinion in this case.  And you

10   focused on Judge Tjoflat's concurrence.  Could you tell

11   the Court what from the majority opinion in that case

12   guided your supplemental report?

13   **A.**    There wasn't really descriptive.  It was more of a

14   -- from what I remember about that discussion or that

15   opinion, it was more about the remand, and I don't --

16   there weren't bullets laid out the way Judge Tjoflat

17   did, from what I remember.  And there was a discussion

18   about the runoff election.  It was more of a summary

19   about the entire case.  The concurrent opinion laid out

20   specific in those three bullet points we discussed

21   earlier.

22   **Q.**    So as we sit here today you can't specify what

23   from the majority opinion guided your supplemental

24   report.  Is that fair?

25   **A.**    That's fair.

1    Q.   Okay.  Now, the third bullet point that you

2    discussed with plaintiff's counsel, the point was, how

3    have African Americans previously performed in at-large

4    elections.  Do you remember that bullet point?

5    A.   I do.

6    Q.   Okay.  And when asked, you said, this was why you

7    included the 2004 sheriff's race, that write-in race,

8    correct?

9    A.   Correct.

10   Q.   And what other races in your analysis addressed

11   this question?

12   A.   The district four election -- well, he asked for

13   two.  The -- all of the single member districts in the

14   Board of Education.  That's how district four came, and

15   then he suggested all of the at-large elections.  The

16   at-large election that I found was the sheriff race

17   with a black candidate.

18   Q.   So to address the question of how African

19   Americans have previously performed in at-large

20   elections, is that 2004 sheriff's race the only race

21   included in your report that addresses that point?

22   A.   With a black candidate, that was the only one I

23   found.

24   Q.   Now, Dr. McBride, did you review Dr. Karen Owen's

25   report in this matter?

1    **A.**   I did.

2    **Q.**   And you understand that she is defendant's expert

3    witness?

4    **A.**   I understand that.

5    **Q.**   Okay.  And you agree that Dr. Owen is an expert in

6    statistics and the Voting Rights Act, correct?

7    **A.**   I have no reason to disagree.

8    **Q.**   Okay.  Thank you very much, Dr. McBride.  I

9    appreciated your time.  I'm done, Your Honor.

10             **THE COURT:**  All right.  Redirect, Mr. Sells?

11             **MR. SELLS:**  Yes, Your Honor.  I would be

12   happy to begin.  I don't -- I can't guarantee we'll

13   finish by five.

14             **THE COURT:**  Well, it has to be redirect now.

15             **MR. SELLS:**  Yes, I understand.

16             **THE COURT:**  All right.  Okay.

17             **MR. SELLS:**  I understand that, Your Honor.

18   Let's see.  Ms. King, have we switched over to

19   Mr. Bean?  And, Mr. Bean, can you put up Defendant's 1

20   at page 1440, please.

21             **THE COURT:**  Page 1440 you said?

22             **MR. SELLS:**  Yes, sir.

23                     **REDIRECT EXAMINATION**

24   **BY MR. SELLS:**

25   **Q.**   Dr. McBride, we're going to talk a little bit

1    about the Cynthia Barthell race that you discussed with

2    Ms. McKnight.

3    **A.**    Okay.

4    **Q.**    Do you see that on there?

5    **A.**    Yes, I do.

6    **Q.**    And do you recall that discussion?

7    **A.**    Yes.

8    **Q.**    Okay.  I want to go over some of those checklists

9    questions that we went over before, but that Ms.

10   McKnight in particular did not ask you.  So, first of

11   all, was this a school board election?

12   **A.**    No.

13   **Q.**    Okay.  Was this an election in which there was a

14   racial choice?

15   **A.**    Yes.

16   **Q.**    And how do you know that?

17   **A.**    I think Cynthia Barthell was identified as an

18   African American.

19   **Q.**    Now, was -- let me back up.  What election is it

20   that we're looking at here?

21   **A.**    This is the superior court clerk.

22   **Q.**    And on what date was it?

23   **A.**    May 24th, 2016.

24   **Q.**    And is this a general election or a primary?

25   **A.**    I see that it's a primary.

1    Q.    And is it the Democratic or the Republican?

2    A.    It's the Democratic primary.

3    Q.    Okay.  Thank you.  I just want to get that on the

4    record.  So in this Democratic primary was it the same

5    electorate as would vote in the elections for the

6    office at issue in this case?

7    A.    No.

8    Q.    Why not?

9    A.    Because it is a portion of the electorate.  It's

10   only those voters identified as Democrat.

11   Q.    So what about the other portion?

12   A.    I don't -- the primary candidates for the

13   Republican voters, I don't have any information there.

14   Q.    Okay.  So, in other words, some voters in Sumter

15   County voted in the Democratic primary and some voted

16   in the Republican primary?

17   A.    Correct.

18   Q.    Okay.  Did this election occur on the same day as

19   the elections for the office as issue in this case?

20   A.    May 24 -- yes.

21   Q.    Okay.  Now, was there a white majority among the

22   turnout in the Democratic primary?

23   A.    I don't -- I don't have any information on that.

24        **MR. SELLS:**  Well, Mr. Bean, can we put up

25   Exhibit 32-U, which is already in the record.

1    Q.   And, Dr. McBride, do you have a calculator?

2    A.   No, I don't.

3    Q.   Okay.  Let's see.

4         MR. SELLS:  Your Honor, I'm going to ask Dr.

5    McBride to do a little math.  Can we supply him with a

6    calculator, or we could do it probably on pad and paper

7    if the Court prefers.

8         THE COURT:  I guess each iPhone here has a

9    calculator on it, so someone objects, I would suggest

10   using that just to save time.

11        MS. MCKNIGHT:  We don't object, Your Honor.

12        MR. SELLS:  Then I'm going to --

13        THE COURT:  As long as he is able to say that

14   that's a calculator that he feels appropriate to use.

15        MR. SELLS:  Okay.  I can't guarantee this is

16   an iPhone because it's not.

17        THE WITNESS:  I'm fine.

18        THE COURT:  What I mean, whatever these

19   devices are that you have these things.

20        MR. SELLS:  All right, I'm going to hand

21   you --

22        THE COURT:  I do realize that they are more

23   than just a phone these days.

24   BY MR. SELLS:

25   Q.   And, Dr. McBride, I am also going to give you, if

1    it's all right with the Court a piece of paper to write

2    on because you're going to need to write down some of

3    these numbers.

4         **MR. SELLS:**  Now, Mr. Bean, can we zoom in on

5    the header so we can see what Exhibit 32-U is?

6    **Q.**   Do you see that?

7    **A.**   Yes.

8    **Q.**   Dr. McBride?

9    **A.**   I do.

10   **Q.**   This is the turnout by precinct in that election,

11   isn't it?

12   **A.**   Yes.

13   **Q.**   And when I say that election, I mean the Cynthia

14   Barthell election the Democratic primary.

15   **A.**   Yes.

16   **Q.**   Okay.  So, I'd like for you to tell me whether

17   black voters or white voters were a majority of the

18   turnout in the Democratic primary on May 24th, 2016?

19   **A.**   Can you enlarge this?  I can't read it.

20   **Q.**   Yes, we can.  And the part we need to see first is

21   what I've just encircled.  So you described the process

22   for doing this a little earlier, but would you tell us

23   again and then do the addition?

24   **A.**   Okay.  Tell you what again?

25   **Q.**   So, let's first figure out what the black turnout

1    was in this Democratic primary.

2    **A.**   Okay.  So you want to add these numbers?

3    **Q.**   Yes, please.  But before you do that, tell us what

4    numbers you're going to add?

5    **A.**   The numbers voted.

6    **Q.**   You're going to add the numbers of black male

7    voters who --

8    **A.**   Right.

9    **Q.**   -- voted in each of the 11 precincts --

10   **A.**   Female and then --

11   **Q.**   -- by the black female voters.

12   **A.**   And then the white male and white female.

13   **Q.**   We're going to figure what the black percentage of

14   the total turnout is.

15   **A.**   1,793 black voters.

16   **Q.**   Okay.  And what percentage of the total turnout is

17   that?

18   **A.**   I would -- I'm going to have to get the total

19   numbers.

20   **Q.**   Okay.  So we're going to need to do some more

21   addition?

22   **A.**   Yes.

23          **MR. SELLS:**  All right.  Mr. Bean, can we

24   scroll the page to right and see the end columns.

25   **Q.**   And for the record, Dr. McBride, what numbers are

1    you going to add up on this exhibit?

2    **A.**    Total voters, right here.  2,189.

3    **Q.**    2,189.  Now, to get the black percentage of the

4    turnout in this Democratic primary in which Cynthia

5    Barthell won the nomination, what math do we have to

6    do?

7    **A.**    You have to divide -- what was that -- 1793 by

8    2189.

9    **Q.**    Okay.  And would you please do you that

10   calculation?

11   **A.**    81.9 percent.

12   **Q.**    Okay.  So black voters in the Cynthia Barthell

13   election were 81.9 percent?

14   **A.**    Correct.

15   **Q.**    --- of the voters who actually turned out?

16   **A.**    In this particular primary election.

17   **Q.**    And in any election for the school board that

18   you've analyzed in this case, were black voters ever

19   81.9 percent of the total turnout?

20   **A.**    No.

21   **Q.**    Is it at all surprising to you that an African

22   American candidate might win if African American voters

23   are 81.9 percent of the turnout?

24   **A.**    No.

25   **Q.**    Why is that?

1    **A.**    If there is significant racially polarized voting,

2    then that does not come as a surprise.

3    **Q.**    And --

4    **A.**    Based on the other elections I looked at.

5    **Q.**    Okay.  Let's get back to the checklist because I

6    was asking you, was there a white majority in the

7    Barthell election.  What's your answer now?

8    **A.**    No.

9    **Q.**    In your opinion, Dr. McBride does doctor -- excuse

10   me, does Cynthia Barthel's victory in the Democratic

11   primary shed any light whatsoever on the inquiries that

12   you were asked to perform in this case?

13   **A.**    It appears that black voters were cohesive in

14   their support for Cynthia Barthell.

15   **Q.**    Can you draw any other conclusions from --

16   **A.**    Without -- having run the estimates and based on

17   previous elections in Sumter County and that 2016 Board

18   of Election -- Board of Election race, it would also

19   appear that -- well, first of all, the black voters are

20   cohesive and that likely the white vote was possibly

21   split between the other -- I think it was two

22   candidates.

23   **Q.**    Let me ask you this --

24   **A.**    Two white candidates.

25   **Q.**    Well, let me ask you this.  Does the Cynthia

1    Barthell result in this Democratic primary give you any

2    indication of how a black preferred candidate is likely

3    to fair in an at-large school board election?

4    **A.**    I'm sorry, could you ask that question again?

5    **Q.**    I'll withdraw the question.  That was very poorly

6    phrased.  But I want to ask you whether this sheds any

7    light on whether a white majority in an at-large school

8    board election can defeat the black preferred

9    candidate?

10   **A.**    Yes.  Because in this particular election there

11   wasn't a white majority to defeat Cynthia Barthell, but

12   as evidenced through the other at-large elections for

13   the school board, the white majority had been

14   successful in those 2014 and 2016 races.

15   **Q.**    We're done with this exhibits for right now.  In

16   my just a few minutes of remaining time I want to try

17   to clear up what I think is an ambiguity.  You told Ms.

18   McKnight that there were two African American preferred

19   candidates Pless and Coley.

20   **A.**    Right.

21   **Q.**    Do you remember that testimony?

22   **A.**    Yes, yes, yes.

23   **Q.**    But just to be clear for the records how many

24   elections were there for at-large seats on the school

25   board that you analyzed?

1    **A.**    Three.

2    **Q.**    Okay.  And was one of the candidates, who was a

3    minority preferred candidate, a candidate in more than

4    one of those elections?

5    **A.**    I think Michael Coley.  Yes.

6    **Q.**    Okay.  So when you said that there were only two

7    minority preferred candidates, you mean two actual

8    individuals, right?

9    **A.**    Yes.

10   **Q.**    Okay.  Dr. McBride, what is a census block?

11   **A.**    It is the lowest level of geography for a

12   particular area or jurisdiction.

13   **Q.**    Okay.  What is a block group?

14   **A.**    That is --

15            **MS. MCKNIGHT:**  I just object as beyond the

16   scope of cross.

17            **THE COURT:**  I think so.  I think those

18   definitions were not gone into on cross, and they were

19   not gone into on direct.

20            **MR. SELLS:**  Well, Your Honor, Ms. McKnight

21   asked Dr. McBride extensively about his use of census

22   data and the ACS, and these are mere foundational

23   questions to get into redirect to clarify what Ms.

24   McKnight was asking him.

25            **THE COURT:**  Well, I'll let you go directly to

1    what you want to cross examine.  I tell you what, let's

2    go ahead and stop at this time and you might want to

3    reconsider how you want to ask the question, but the

4    particulars of block voting meant or didn't mean was

5    not gone into by either side, although apparently the

6    effects of whatever it is was gone into on direct and

7    cross.

8              **MR. SELLS:**  Well, I will take your suggestion

9    to think about it overnight and come up --

10             **THE COURT:**  -- is the Court's recollection.

11   So if you think about it overnight, you might find that

12   you can make your point without violating that rule.

13             **MR. SELLS:**  All right.

14             **THE COURT:**  All right.  Okay.  Is there

15   anything we need to take up that might slow things down

16   tomorrow?  I think we're moving along.  All right,

17   fine.  We'll see you back at 8:30 tomorrow morning,

18   it's 8:30 tomorrow morning not 8 o'clock.

19             **MR. SELLS:**  Thank you, Your Honor.

20             **THE COURT:**  All right, we're adjourned.

21             **MS. MCKNIGHT:**  Thank you, Your Honor.

22             **THE COURT:**  We're adjourned until 8:30 in the

23   morning.

24   _____

25              *CERTIFICATE OF OFFICIAL REPORTER*

1          I, Sally L. Gray, Federal Official Court Reporter,
   in and for the United States District Court for the Middle
2   District of Georgia, do hereby certify that pursuant to
   Section 753, Title 28, United States Code that the
3   foregoing is a true and correct transcript of the
   stenographically reported proceedings held in the
4   above-entitled matter and that the transcript page format
   is in conformance with the regulations of the Judicial
5   Conference of the United States dated this 20th day of
   December, 2017.

6
                              /s/ SALLY L. GRAY
7                             SALLY L. GRAY, CCR, RPR
                              FEDERAL OFFICIAL COURT REPORTER
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25