1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF GEORGIA
2                        ALBANY DIVISION

3                     _____

    MATHIS KEARSE WRIGHT, JR., :   Case No. 1:14-CV-42-WLS
4                              :
                  PLAINTIFF    :
5    vs.                       :     December 12, 2017
                               :       Albany, Georgia
6    SUMTER COUNTY BOARD OF    :
     ELECTIONS AND REGISTRATION,:
7                              :      Volume 2 of 4
                  DEFENDANT. :
8    _____

9                       NON-JURY TRIAL
                BEFORE THE HONORABLE W. LOUIS SANDS
10          UNITED STATES DISTRICT JUDGE, PRESIDING

11   APPEARANCES:
     FOR THE PLAINTIFF:         BRYAN L. SELLS
12                              P.O. BOX 5493
                                ATLANTA, GA 31107
13
                                LAUGHLIN MCDONALD
14                              2700 INTERNATIONAL TOWER
                                229 PEACHTREE ST NE
15                              ATLANTA, GA 30303

16                              AKLIMA KHONDOKER
                                P.O. BOX 77208
17                              ATLANTA, GA 30309

18   FOR THE DEFENDANT:         KATHERINE L. MCKNIGHT
                                E. MARK BRADEN
19                              RICHARD RAILE
                                1050 CONNECTICUT AVE NW
20                              STE 1100
                                WASHINGTON, DC 20036-5403
21
                                KIMBERLY A. REID
22                              P.O. BOX 5005
                                CORDELE, GA 31010
23   _____
                       SALLY L. GRAY, USCR
24              201 W. BROAD ST, SECOND FLOOR
                        ALBANY, GA 31701
25
                       (478)787-3905

1                       INDEX TO PROCEEDINGS
                         DECEMBER 12, 2017
2                         VOLUME 2 OF 4

3

         FREDERICK MCBRIDE
4            CONTD REDIRECT EXAMINATION BY MR. SELLS    3
             RECROSS EXAMINATION BY MS. MCKNIGHT       28
5

         MICHAEL COLEY
6            DIRECT EXAMINATION BY MR. SELLS           32
             KELVIN PLESS                              60
7            DIRECT EXAMINATION BY MR. MCDONALD        60
             CROSS EXAMINATION BY MR. BRADEN           80
8            REDIRECT EXAMINATION BY MR. MCDONALD      81
             RECROSS EXAMINATION BY MR. BRADEN         82
9

         MICHAEL MAHONE
10           DIRECT EXAMINATION BY MR. MCDONALD        83

11       JOHN MARSHALL
             DIRECT EXAMINATION BY MR. MCDONALD       109
12

         ALICE GREEN
13           DIRECT EXAMINATION BY MR. SELLS          122
             CROSS EXAMINATION BY MS. MCKNIGHT        149
14           REDIRECT EXAMINATION BY MR. SELLS        153
             RECROSS EXAMINATION BY MS. MCKNIGHT      160
15

         EDITH GREEN
16           DIRECT EXAMINATION BY MR. SELLS          162
             CROSS EXAMINATION BY MS. MCKNIGHT        182
17           CROSS EXAMINATION BY MR. BRADEN          228
             REDIRECT EXAMINATION BY MR. MCDONALD     232
18

19

         CERTIFICATE OF COURT REPORTER                236
20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2   December 12, 2017
 3            THE COURT:  All right.  Good morning.
 4            COUNSEL:  Good morning, Your Honor.
 5            THE COURT:  All right.  Mr. Sells, I believe
 6   you were completing your redirect; is that right?
 7            MR. SELLS:  Yes, sir, I was.
 8            THE COURT:  All right.  You may continue.
 9            MR. SELLS:  Thank you.
10                  FREDERICK MCBRIDE
11     Witness, having previously been sworn, testified on
12             CONTINUED REDIRECT EXAMINATION
13   BY MR. SELLS:
14   Q.   Good morning, Dr. McBride.
15   A.   Good morning.
16   Q.   I'd like to begin this morning by asking you a few
17   follow-up questions about the 2004 sheriff's race that
18   you analyzed.  Do you remember Ms. McKnight asking you
19   a few questions about that?
20   A.   I do.
21   Q.   Okay.  Let's start by looking at Plaintiff's
22   Exhibit 21 and let's zoom in on that a little bit.  So
23   as you can see there are a large number of write-in
24   votes, and I believe Ms. McKnight asked you how you
25   know that those were cast for Nelson Brown.  Do you
```

1    remember that?

2    **A.**    I do.

3    **Q.**    And you mention seeing some election returns that

4    may have come from the state archives?

5    **A.**    Correct.

6    **Q.**    I would like to show you Plaintiff's Exhibit 31-C.

7    Do you recognize this document?

8    **A.**    I do.

9    **Q.**    What is it?

10   **A.**    It is the Consolidated Municipal County

11   Certification of Returns.

12   **Q.**    For which election?

13   **A.**    The November 2nd, 2004, Sumter County sheriff --

14   well, I see Nelson Brown, sheriff, and write-in votes.

15   I assume they are write-in votes.  Yes, they are

16   write-in votes for Ralph Nader.

17   **Q.**    Okay.  So this document reflects that Nelson Brown

18   received write-in votes for Sumter County sheriff,

19   right?

20   **A.**    Correct.

21   **Q.**    Do these returns indicate that anyone other than

22   Nelson Brown received write-in votes in the sheriff

23   race?

24   **A.**    No, they don't.

25   **Q.**    Do these returns indicate how many write-in votes

1    Nelson Brown received in each precinct?

2    **A.**   No, they don't.

3    **Q.**   Don't you need precinct level election returns in

4    order to conduct your racial block voting analysis?

5    **A.**   I do.

6    **Q.**   Well, let's go back to Plaintiff's Exhibit 21.

7    Does this exhibit contain the precinct level election

8    returns that you used for your racial block voting

9    analysis for the 2004 sheriff's race?

10   **A.**   They do.

11   **Q.**   Now, Ms. McKnight asked you about the large number

12   of absentee ballots cast in this election.  Do you

13   remember that?

14   **A.**   I do.

15   **Q.**   And I think I heard you say that Georgia did not

16   begin allocating absentee votes back to the voters

17   precinct until 2010.  Did I get that right?

18   **A.**   Correct.

19   **Q.**   So let me make sure I understand what that means.

20   Before 2010, if I'm a voter in the Andersonville

21   precinct in Sumter County, and I cast an absentee

22   ballot, where does my vote show up in the election

23   returns?

24   **A.**   On the line item that states absentee.

25   **Q.**   Could you point that out on the screen, please?

1    **A.**    I'm sorry, I don't have my stylus, but I'll use my

2    finger.  Well --

3    **Q.**    Okay.  So before 2010, if I'm an Andersonville

4    voter and I cast an absentee ballot, it is aggregated

5    in this absentee ballot precinct, right?

6    **A.**    Correct.

7    **Q.**    Now, after 2010, if I am a voter in the

8    Andersonville precinct and I cast an absentee ballot,

9    where does my vote show up in the election returns?

10   **A.**    It would then show, after 2010, on the line item

11   for -- I think you said Andersonville -- Andersonville.

12   **Q.**    What is the racial composition of the voters in

13   the absentee ballot precinct in Exhibit 21?

14   **A.**    The racial composition?

15   **Q.**    Yes.  Do we know?

16   **A.**    No, I wouldn't know.

17   **Q.**    Is this issue of absentee ballot precincts unique

18   to Georgia?

19   **A.**    No.

20   **Q.**    Do you know how other experts in the field deal

21   with absentee ballot precincts?

22   **A.**    We can't -- when you don't know where they're

23   aggregated to, we can't include them in the analysis.

24   So it was fortunate that the state passed that law.

25   **Q.**    In 2010?

1    **A.**    In 2010.

2    **Q.**    That changed the way that absentee ballots are

3    treated?

4    **A.**    Exactly.

5    **Q.**    Okay.  So how did you deal with absentee ballot --

6    with the absentee ballot precincts in your analysis of

7    the 2004 general election for sheriff?

8    **A.**    I could not include it in the summary analysis for

9    polarized voting or cohesion.  I couldn't include it in

10   the analysis.

11   **Q.**    Could any other expert, say, Lisa Handley, Bernie

12   Grofman, David Lublin, some of them that you've

13   mentioned during your testimony, could they have done

14   anything different?

15   **A.**    No.

16   **Q.**    Does excluding the absentee ballot precinct under

17   undermine your confidence in the racial block voting

18   estimates that you produced using EI for this contest?

19   **A.**    They do not.

20   **Q.**    Why not?

21   **A.**    Well, one, I can't -- I have no way to determine

22   what kind of effect -- I can only use what -- the data

23   that's provided, the data that we have.  I can

24   speculate, but I can't put -- I can't speculate and

25   write that into my report.

1    Q.   Dr. McBride, I'd like to ask you some follow-up

2    questions now about the data that you used in your

3    analyses.  If I understood her question correctly, Ms.

4    McKnight asked you at one point whether you had used

5    demographic data from the American Community Survey

6    rather than the 2010 census data in any of your racial

7    block voting analyses.  Do you remember that?

8    A.   I do.

9    Q.   Now, both the American Community Survey and the

10   2010 census will tell you the voting age population of

11   Sumter County, right?  They will give you a number for

12   voting age population?

13   A.   Yes.  Yes.

14   Q.   How is data from the 2010 census derived?

15   A.   Data from the 2010 census is derived from the

16   census bureau after April 1st every ten years, and so

17   that's the methodology used by the census to count

18   everyone in any jurisdiction in the country.

19   Q.   And how is data from the American Community Survey

20   derived?

21   A.   Data from the American Community Survey is

22   aggregate data over a certain time period.  This

23   particular jurisdiction, the five-year estimates are

24   the -- probably the best estimates.  Larger cities,

25   they're done every year, but it is survey data, so it

1  randomly selects certain numbers of people and from

2  that sampling, it derives these estimates because

3  that's what they are.

4  Q.   Thank you.  Now, when you used voting age

5  population data from the 2010 census in your racial

6  block voting analysis, what level of census geography

7  did you use to determine the racial composition of

8  Sumter County's voting precincts?

9  A.   I use census block.

10 Q.   Census block?

11 A.   The block, yes.

12 Q.   Can you explain what a census block is?

13 A.   It is a designated area.  It's the lowest level of

14 geography for the census.  And you use that to build to

15 higher levels.  For example, block groups, census

16 tracts, and those can be confined within particular

17 jurisdictions, sometimes extending outside.  But the

18 census block is the lowest level.  It's basically, in

19 my opinion, the building block when drawing districts.

20 Q.   You mentioned the census block group and a census

21 tract, can you explain briefly what those two things

22 are?

23 A.   A collection of census blocks in a particular area

24 would be the block group, and a collection of those

25 groups will take you to the next level, which would be

1    the tract.  It's going to have greater population, more

2    people as you extend toward the very next level.  So

3    they're like building blocks, if you will.

4    **Q.**   It's a hierarchy?

5    **A.**   Yes, it is.

6    **Q.**   Now, does the American Community Survey report

7    voting age population at the census block level?

8    **A.**   It does not.

9    **Q.**   At what level does the American Community Survey

10   report voting population data?

11   **A.**   At the block group level.

12   **Q.**   Could you have used block group data to determine

13   the racial demographics of Sumter County's voting

14   precincts?

15   **A.**   One could.  I don't know anyone who does, because

16   it's going to be less reliable because they're groups,

17   and then you would have to aggregate or attempt to

18   aggregate those groups into blocks, and that's somewhat

19   complicated, but it is not going to give you a high --

20   a more reliable estimate than if you use the actual

21   census data, which isn't an estimate.

22   **Q.**   Do block group boundaries follow the boundaries of

23   Sumter County's voting precincts?

24   **A.**   Not necessarily, no.

25   **Q.**   So there could be split block groups?

1    **A.**    Absolutely.

2    **Q.**    And how would you deal with a split -- with a

3    block group that split a precinct if you were trying to

4    use block group data to determine voting age

5    population?

6    **A.**    Well, we do that, particularly when the

7    methodology requires something like census voting -- I

8    mean citizen voting age population.  You would do that

9    if you were assessing Hispanic voters and the citizen

10   voting age population of that.  You have to use black

11   groups.  It's a complicated process, and in the end

12   you're aggregating -- or you're attempting to aggregate

13   to the block -- the census block level.  But because in

14   some particular issues you do need that citizen voting

15   age population, you have to do that extra step and do

16   it properly to get the most reliable estimates.  And

17   it's a -- there's a methodology involved, it's just not

18   necessary if you are drawing the district because it's

19   better to just use the census data.

20   **Q.**    So in this case using data from the census at the

21   block level produced more reliable estimates of voting

22   age population in your view than the American Community

23   Survey would have?

24   **A.**    Yes.  That is -- that is the best estimate if

25   you're going to use census data.

1    Q.    Ms. McKnight also asked you about whether you had

2    analyzed the voting behavior of Sumter County's

3    Hispanic population.  Do you remember that?

4    A.    I remember.

5    Q.    According to my notes, I think you said that the

6    Hispanic population of Sumter County is about

7    5.2 percent?  Does that sound about right?

8    A.    It does.

9    Q.    And I think you said that you weren't asked to

10   analyze Hispanic voting behavior in this case; is that

11   right?

12   A.    That is correct.

13   Q.    Have you ever tried analyzing the voting behavior

14   of a racial or ethnic group that constitutes only

15   5.2 percent of the larger population?

16   A.    I have not.

17   Q.    Would it be possible to do that?

18   A.    One could do it and then argue over their

19   methodology and how significant their results are.

20   But, again, I have done this analysis with Hispanic

21   voters, naive American voters, but no one has ever had

22   a percentage that low.

23   Q.    Ms. McKnight showed you a graphic that listed a

24   lot of different ethnic groups in Sumter County, some

25   of which were .1 percent for naive Hawaiians, let's

1    say.  I'm just making that up, but if you had a

2    population that small, would it make any sense to try

3    to estimate the voting behavior of those two or three

4    people?

5    A.   You wouldn't be able to derive reliable estimates,

6    nor would you be able to really conduct the

7    methodology.  You would have a lot of precincts with no

8    Hispanic voters or Asian voters or native American

9    voters in them.

10   Q.   Now, Dr. McBride, I want to turn to table 12 from

11   your supplemental report, which is Plaintiff's Exhibit

12   6 at page 23.  Ms. McKnight asked you a few questions

13   about whether your analysis here actually indicates

14   that African American voters have an opportunity to

15   elect candidates to the at-large seats in the existing

16   plan in future elections.  Do you remember those

17   questions?

18   A.   I do.

19   Q.   Does your analysis reflected in table 12 identify

20   any differences between how districts perform for

21   African American candidates when the district is

22   majority black, compared to when it is not majority

23   black?

24   A.   Yes.

25   Q.   And what factors shown by your analysis here lead

1    to that different performance?

2    **A.**   Well, it's the white and black participation

3    rates, and, moreover, it's the cohesion and crossover

4    rates.

5    **Q.**   Can you explain what you mean?  How are those

6    three things different in majority black districts

7    versus not majority black districts?  Can you indicate

8    on the screen what you're looking at?  Let's start with

9    white participation.

10   **A.**   The white participation is greater in districts

11   two and districts -- there we go -- districts two and

12   districts three, and the crossover or the rate of

13   crossover is lower in those two particular districts,

14   two and three, but a bit higher in districts one and

15   districts five.

16   **Q.**   And how does black participation compare in

17   majority black districts versus non-majority black

18   districts?

19   **A.**   In the majority black districts, the African

20   American participation rates are higher -- I can't

21   write on here -- are higher than, again, in the

22   districts that are majority white.

23   **Q.**   Now, is the at-large district at issue in this

24   case majority black in voting age population or not

25   majority black in voting age population?

1    **A.**    It's not majority black in voting age population.

2    **Q.**    And based on your racial block voting analysis of

3    the 2014 and 2016 elections has the at-large district

4    performed more like these majority black districts in

5    table 12 or more like the districts in table 12 that

6    are not majority black?

7    **A.**    More like the districts in table 12 that are not

8    majority black.

9    **Q.**    Okay.  I'd like to look at that a little bit more

10   closely.  And let's focus first on the white turnout

11   rates or the white political participation rates.

12   We're going to put side by side on the screen your

13   table 12 from your report with table ten from your

14   report, which is Plaintiff's Exhibit 16 -- can we

15   shrink down the blow-up?  There we go.  Can you see

16   those numbers?

17   **A.**    I can.

18   **Q.**    Dr. McBride?

19   **A.**    I can.

20   **Q.**    All right.  So I'd like you to compare first the

21   -- well, let's do it this way.  On table ten would you

22   identify the white turnout rates in the at-large

23   elections that you analyzed?

24   **A.**    In the 2016 race, the white participation turnout

25   rate is 14.3, and the 2014 two-year it's 11.1 and the

1    four-year is 11.2, and the runoff race in July, the

2    white participation is 8.2.

3    **Q.**    Okay.  Sticking with the general instead of the

4    runoff, these three numbers here, how does white

5    political participation compare to white political

6    participation in the majority black districts in your

7    analysis in table 12?

8    **A.**    In the at-large races the white participation or

9    turnout rate is higher than those in districts one and

10   district five which are majority African American

11   districts.

12   **Q.**    Okay.  Let's look at cohesion and crossover.

13   Well, actually let's stick with that one.  Go back to

14   the previous one because we didn't look at black

15   political participation rates.  So, how do black -- how

16   does black political participation in the at-large

17   general elections compare to black political

18   participation in the black majority districts?

19   **A.**    They mirror, for example, the 2016 race at 8.4 and

20   district one, 8.6, and -- well, the rate between 6.7

21   and 8.4, and in table 12, 8.6 and 9.3.  So they are --

22   the participation rate is somewhat similar.

23   **Q.**    6.7 is about 20 percent lower than 8.4, though,

24   isn't it?

25   **A.**    Yes, yes, yes, yes.

1    Q.    Now, let's look at the cohesion and crossover

2    rates.  And I'd like to put your table 12 side by side

3    with Plaintiff's Exhibit 10, which your racial block

4    voting analysis of the at-large race -- races.  Do you

5    see that?

6    A.    I do.

7    Q.    Which at-large race are we looking at here, for

8    example?

9    A.    That's the May 20, 2014 four-year at-large race.

10   Q.    Okay.  Now, how do the black votes for the black

11   candidate, in other words, cohesion compare between

12   this at-large race and the races on table 12?

13   A.    On table 12, if you look at district two, the

14   cohesion -- I'm sorry, did you ask me about cohesion or

15   crossover?

16   Q.    I'm asking you first about cohesion.

17   A.    The black cohesion, 99.3, 96.7.  That's not a very

18   significant difference.  And in district five it's 85.3

19   and 96, a bit more of a difference, but not highly

20   significant enough to make it not significant or not

21   somewhat similar.

22   Q.    Okay.  And now let's look at white crossover

23   voting in your table 4, which is Exhibit 10.

24   A.    So looking at district two in white crossover

25   voting, that's 5.8, and the white support for Kelvin

1   Pless is 5.8, and in district -- well, in doing

2   district five 13.9 is a bit higher than 5.8, but

3   district two and the white crossover rate in the table

4   to the right are practically the same.

5   **Q.** So, how does the white crossover for the black

6   candidate in the at-large election compare to white

7   crossover for the black candidate in the majority black

8   districts that led you to conclude that a number in the

9   40s might be enough to give African American voters an

10  opportunity to elect in your district six in the

11  illustrative plan?

12  **A.** Okay. Can you state it again? It got a little

13  longer in the end.

14  **Q.** Sure. I'd like you to compare white crossover in

15  the at-large race to white crossover in the majority

16  black districts in table 12.

17  **A.** There is, in the majority black districts, the

18  crossover is a little -- somewhat higher than in

19  districts two and district three, for example. But I'm

20  not sure all that you're asking.

21  **Q.** Okay. Let me -- we have a lot of writing on the

22  screen. Let me clear it. What I'd like you to compare

23  is white crossover for Kelvin Pless in the at-large

24  election with white crossover for the black candidate

25  in the majority black districts.

1    **A.**    In the majority black districts, the crossover

2    rate is significant higher.

3    **Q.**    And how does that affect black voters' ability to

4    elect their candidates of choice?

5    **A.**    There is some degree, perhaps significant enough,

6    of white support for the black candidate that helps

7    enable that black candidate to win in those two

8    districts.

9    **Q.**    Now, based on your estimates of white turnout,

10   black turnout, black cohesion, and white crossover

11   voting in the at-large elections held under House Bill

12   836, do you have any reason to believe that the voting

13   age population in the at-large district is sufficient

14   to give African American voters a meaningful and

15   realistic opportunity to elect candidates of their

16   choice in future elections?

17   **A.**    In the current system, correct?

18   **Q.**    Let me ask my question again.

19   **A.**    Okay.

20   **Q.**    Based on your estimates of white turnout, black

21   turnout, black cohesion, and white crossover voting in

22   the at-large elections held in the past under House

23   Bill 836, do those numbers give you any reason to think

24   that the voting age population in the at-large district

25   under House Bill 836 would allow African American

1    voters to elect candidates of their choice in the

2    at-large seats in future elections?

3    **A.**   No, no.

4         **MR. SELLS:**  Your Honor, that concludes my

5    redirect, but I would like to offer two exhibits at

6    this point.  We referred to Exhibit 31-C.  I'd like to

7    offer all of Exhibit 31, and I'd also like to offer

8    Exhibit 33.

9         **THE COURT:**  You said all of 31, and then you

10   say 31-C?

11        **MR. SELLS:**  33.  Your Honor, Exhibit 31 is a

12   multipart exhibit, and we only looked at one of those

13   parts, but the remaining parts are a complete set of

14   Sumter County election returns, and I think there's no

15   objection to them.

16        **THE COURT:**  When you mentioned 31-C, though,

17   31-C a part of 31?

18        **MR. SELLS:**  Yes.

19        **THE COURT:**  And 33 is the other?

20        **MR. SELLS:**  33 is a summary of the election

21   returns that we've produced.

22        **THE COURT:**  All right.  Ms. McKnight?

23        **MS. MCKNIGHT:**  Yes, Your Honor, the objection

24   on 31-C, we have no objection to the exhibit itself,

25   but we will have an objection to the way it's been used

1   in testimony today as it relates to Dr. McBride's

2   report which is another exhibit.  I don't believe

3   plaintiff's counsel has offered Dr. McBride's expert

4   report as an exhibit yet.  The point on that, if he

5   intends not to offer his PX-6, his expert report as an

6   exhibit, the problem comes back to what we were

7   discussing yesterday about the data that was provided

8   in response to, not only discovery requests, but also

9   the disclosure requirement under the federal rules for

10  Dr. McBride's expert report.  I'd like to go into issue

11  now because I believe Exhibit 31 includes some data

12  that Dr. McBride claims support his assertions in his

13  expert report and assertions he's made on the stand.

14  The issue here is that, first, it's nice that

15  plaintiffs have provided this document 31-C as an

16  exhibit at trial.  That's what you saw on the screen a

17  few moments ago.  The Consolidated Municipal County

18  Certification of Returns.  This is Plaintiff's Trial

19  Exhibit C-31.  But it only underscores the fact that

20  plaintiffs and expert could have also provided it under

21  the rules for the disclosure of expert reports and also

22  in response to discovery.  And what's key here is not

23  only could they have, but should they have.  Indeed,

24  rule -- and we can get into a discovery dispute about

25  what --

1          **THE COURT:**  Well, we are not going to get

2     into a discovery dispute because discovery is closed,

3     and the Court in its initial order made it very

4     explicit that matters of discovery had to be raised

5     within 21 days of the production.  So unless there is

6     something very unusual, we should not be discussing

7     discovery disputes at trial.

8          **MS. MCKNIGHT:**  I understand, Your Honor, and

9     the point I was going to make is that Mr. Sells brought

10    up discovery request yesterday.  We could go into

11    discovery requests.  We don't need to.  You don't need

12    to.  It's all in the federal rules under Rule

13    26(a)(2)(B).  It commands disclosure and production of

14    any data that Dr. McBride relied on in his reports.

15    Now, I've gone back, I've looked as his report to see

16    he cited or identified the data that's supporting the

17    2004 sheriff's race.  How he cited it, it's simply not

18    enough.  And you heard him on the stand yesterday say

19    that this is data from the archive.  You look in his

20    report.  The citation for it is not enough, and we've

21    discussed it with our expert, was this enough for you

22    to go back and find the data that he used to confirm

23    this number.  Her answer was, no, it's not enough.

24    Now, 26(a)(2)(B) commands disclosure, and as you know

25    Rule 37(c) governs this.  There was no requirement to

1    file a motion to compel.  That's under 37(a).  Rule

2    37(c) commands this disclosure.  It was not made.  This

3    document was not included with Dr. McBride's expert

4    report when it was provided to defendant.

5         THE COURT:  We're talking about 31-C?

6         MS. MCKNIGHT:  That's right, Your Honor, and,

7    you know, you heard testimony yesterday about it, that

8    they provided this document last week as a trial

9    exhibit is so far beyond when it was required to be

10   disclosed and when defendant's expert had a chance to

11   review it and identify what -- determine, and

12   defendants had a chance to review and determine whether

13   they needed to ask questions of Dr. McBride and examine

14   him in discovery.

15        MR. SELLS:  May I be heard, Your Honor?

16        THE COURT:  Yes, indeed.

17        MR. SELLS:  Counsel for the Sumter County

18   Board of Elections and Registration is complaining

19   about not having access to a document prepared and

20   produced by the Sumter County Board of Elections and

21   Registration.  It is an election return, Your Honor.

22   His predecessor and office signed that return.  His

23   office presumably has either a copy of it or has access

24   to copies of it.  Now --

25        THE COURT:  I'm not concerned so much about

1    how she could have gotten it.  The objection is that it

2    was a required part of the expert's opinion that he

3    used and that it was not produced as allegedly is

4    required to be produced under the rules.

5         **MR. SELLS:**  Sure.  And I disagree with that

6    assertion, Your Honor, because Dr. McBride's testimony

7    just a moment ago was that he did not use that page in

8    his analysis, because it didn't contain the precinct

9    returns.  So that was not part of his analysis.  And so

10   it was not required to be disclosed under Rule 26(a),

11   but the section, what Ms. McKnight is arguing is that

12   we should be subject to Rule 27(c) sanctions for

13   failure to disclose a document.  Under Rule 37(c) even

14   if Dr. McBride had an obligation to disclose that he

15   looked at the document, it's harmless because it's

16   their document, and if it's harmless, it doesn't get

17   excluded under 37(c).

18        **THE COURT:**  What I want to know is, was it a

19   part of his -- a basis for his opinion?

20        **MR. SELLS:**  Dr. McBride's testimony just a

21   moment ago was that it did not contain the data that he

22   needed to do the analysis.

23        **THE COURT:**  Now, if that's the case, what is

24   the objection?

25        **MS. MCKNIGHT:**  Your Honor, there are two

1      points on this.  If I may, it will be illustrative if I

2      put up Plaintiff's Exhibit 6, page, Bates number 142.

3      Your Honor, if you recall yesterday my line of

4      questioning to Dr. McBride about this issue was, how do

5      you know that this number of votes, write-in votes were

6      for Nelson Brown and not some other candidate.  He said

7      he relied on this data from the archive -- and I'll get

8      to that point in a moment -- from the archive to

9      determine -- and if you look at the page on your

10     screen, in the very first box where it says write-in,

11     parens, Nelson Brown -- could you highlight that

12     portion?  Write-in Nelson Brown.  Dr. McBride testified

13     that he relied on the information, the data from the

14     archive, in order to determine that that parenthesis

15     should say Nelson Brown, and not Nelson Brown to the

16     exclusion of other write-in candidates.  Nelson Brown,

17     but not Ralph Nader, Nelson Brown alone.  He used that

18     data to say that Nelson Brown is the one who received

19     all of those write-in votes.  So, yes, when he said he

20     relied on that data for this portion of his report, he

21     was saying to the Court this data was relied upon.  So

22     Mr. Sells' assertions to the contrary do not fit with

23     the testimony from yesterday, and indeed don't fit with

24     what is your on screen right now in Dr. McBride's

25     report.  The second issue.  What you heard Mr. Sells

1    tell you is, if there is ever a government party, that

2    an expert witness on the other side should simply be

3    able to say they're archives and there are data in it

4    and somehow that government party should always be

5    expected to dig through the archives and find that

6    specific needle in a haystack, that that objection,

7    that burden should be on the government party.  We

8    don't believe that's true.  We don't believe that's

9    fair, and indeed the rules govern otherwise.  There's

10   no exception for, you know, government parties or

11   archives.  Their obligation is clear, and they failed

12   to meet it.

13        **THE COURT:**  All right.  When was this

14   document produced?  I'll let you all argue in the

15   future about whether it was relied on or not.  The

16   Court will remember the testimony of the witness.

17        **MR. SELLS:**  The document was produced in

18   conjunction with the plaintiff's exhibits because it is

19   our view that it was not --

20        **THE COURT:**  When?  When, Mr. Sells?

21        **MR. SELLS:**  That was December 6th, I think --

22   no, no, no, I'm sorry, it was December 4th.  Objections

23   were December 6th, exhibits were December 4th.

24        **THE COURT:**  All right.  Okay.  Provisionally

25   the Court is going to overrule the objection and allow

1    it.  I have a real doubt about any harm here, and I

2    further have a real question about whether or not these

3    are matters that could have and should have been

4    brought to the Court attention earlier as a matter of

5    whether or not discovery has been complied with.  I

6    think the parties are still free to argue whether or

7    not the witness's evidence -- or rather testimony is

8    supported by the evidence and whether it's supported by

9    matters that were unfairly -- untimely made available

10   to the defendant.  I don't think it so voluminous a

11   matter.  It was clearly gone into in great detail on

12   cross examination yesterday, and I don't suppose that

13   ultimately the defendant's witness will be hampered in

14   its ability to rebut the claims or the results or the

15   opinion held by this witness on the stand.  So the

16   witness -- the objection is overruled.  All right.

17   This is 31-C.  That's the issue -- that is the document

18   that's in dispute as I understand it.

19          MR. SELLS:  That is what we have been

20   discussing.

21          MS. MCKNIGHT:  That's correct, Your Honor.

22          THE COURT:  That's the Court ruling as to

23   31-C.  The other 31 associated, there is no objection

24   as I understand; is that right?

25          MS. MCKNIGHT:  That's right, Your Honor.

1          **THE COURT:**  Okay.  So 31 and its associated

2   exhibits are admitted, with the exception of 31-C which

3   the Court specifically allowed over objection and notes

4   the objection for the record.  The others are admitted

5   without objection, and 33, I guess there was no

6   objection to that also; is that right?  33 I understand

7   was described as a summary?

8          **MR. SELLS:**  Your Honor, I think I misspoke.

9   It should have been 34.  33 has already been admitted.

10          **THE COURT:**  All right.  34, there's no

11   objection, then?

12          **MS. MCKNIGHT:**  No objection, Your Honor.

13          **THE COURT:**  All right.  So 34 is admitted

14   without objection.  You may continue.

15          **MR. SELLS:**  Your Honor, that concludes my

16   redirect.

17          **THE COURT:**  All right.  Is there further

18   recross, Ms. McKnight?

19                  **RECROSS EXAMINATION**

20   **BY MS. MCKNIGHT:**

21   **Q.**   Good morning, Dr. McBride.

22   **A.**   Good morning.

23   **Q.**   I heard plaintiff's counsel ask you some questions

24   about the ACS data.  Do you remember that testimony?

25   **A.**   I do.

1    Q.    And do you remember plaintiff'S counsel asking you

2    about census blocks and census tracts?

3    A.    I do.

4    Q.    And I recall your testimony saying that down at

5    the census block level using ACS data may not be as

6    reliable as using census data.  Is that fair?

7    A.    It doesn't detail those estimates at the block

8    level.

9    Q.    Okay.  But does ACS data detail estimates at the

10   county level?

11   A.    You have to aggregate to the county using the

12   blocks -- using the census block groups.

13   Q.    But so you are able to use ACS data to aggregate

14   up to the county level; is that right?

15   A.    One could.  I don't draw districts with ACS data.

16   Q.    And briefly, could we put up table 12 --

17            MS. MCKNIGHT:  Pardon me, Your Honor.

18            THE COURT:  All right.

19   Q.    We are putting table 12 from Dr. McBride's expert

20   report.  We were just discussing -- you were discussing

21   this on redirect, correct, Dr. McBride?

22   A.    Correct.

23   Q.    And now, when I look at this table it appears to

24   me that this data is from 2014; is that right?

25   A.    Yes.

1    Q.    So do I understand correctly that table 12 is

2    related to one election in 2014?

3    A.    It's related to a series of those elections.

4    Q.    What do you mean by series?

5    A.    It was more than one election in 2014.  So based

6    on the methodology used to derive this table, there

7    were white participation, black participation, and

8    rates of cohesion and crossover from various elections,

9    not just -- not just one.

10   Q.    And by various elections, do you mean the election

11   for seat district one, that's one election; the

12   election for the seat in district two is another

13   election.  Is that what you mean?

14   A.    Right.  Because the participation and -- the

15   participation rates based on the table used before,

16   they match.  So previous elections were used in the

17   methodology to derive this table.  I'm sorry.

18   Q.    No, that's okay.  I believe we probably -- I think

19   I can let that be.  I think we've gotten enough

20   testimony on that point.  My only other question is

21   that when you were looking at districts D-1 --

22   A.    Yes.

23   Q.    -- and D-5, would you consider those districts to

24   be supermajority districts and not just majority

25   districts with black voting age population?

**A.**    Could you define supermajority?

**Q.**    Have you ever used the term supermajority in your work as a political scientist?

**A.**    I have not used it.  I've seen it in districts with extreme numbers.

**Q.**    And what would you define as extreme numbers?

**A.**    It's a case by case analysis.  I imagine if someone said the African American percentage in a particular district was -- I looked at a district in Washington D.C. once.  It was 92 percent African American.  I imagine that's a supermajority district, but there is no other way you could have drawn that district.  So supermajority, I imagine, yes.  I don't have a particular derivative, I don't have a particular number that, okay, 69 is supermajority.  I don't have that.

**Q.**    I understand.  Well, thank you very much for your time.

          **MS. MCKNIGHT:**  No further questions, Your Honor.

          **THE COURT:**  All right.  Is there any further re-redirect?

          **MR. SELLS:**  No, Your Honor, but Dr. McBride is going to remain in the courtroom and may be called for rebuttal.

1          **THE COURT:**  All right.  As I understand,

2     that's the rule and it's permitted.  You may step down.

3     You may call your next witness.

4          **MR. SELLS:**  Your Honor, may I have one minute

5     to see who has arrived since I came in the courtroom?

6          **THE COURT:**  Well, somebody better be here.

7          **MR. SELLS:**  Yes.  We have someone but --

8          **THE COURT:**  All right.

9          **MR. SELLS:**  Your Honor, plaintiffs calls

10    Michael Coley to the stand.

11         **THE COURT:**  Michael Coley.  All right.

12         **COURTROOM DEPUTY:**  Do you solemnly swear or

13    affirm that the testimony you are about to give in the

14    case now before the Court will be the truth, the whole

15    truth, and nothing but the truth?

16         **THE WITNESS:**  Yes, ma'am.

17         **COURTROOM DEPUTY:**  Please be seated.

18         **THE COURT:**  You may proceed.

19         **MR. SELLS:**  Thank you, Your Honor.

20                    **MICHAEL COLEY**

21     **Witness, having first been duly sworn, testified on**

22                 **DIRECT EXAMINATION**

23    BY MR. SELLS:

24    **Q.**   Good morning, Mr. Coley.

25    **A.**   Good morning.

1    Q.   And would you please state your full name for the

2    record?

3    A.   Michael Delano Coley.

4    Q.   And where do you live, Mr. Coley?

5    A.   105 North Point Circle, Americus, Georgia.

6         THE COURT:  We ask that you not give your

7    exact address.  If counsel would assist witnesses in

8    not putting sensitive matters -- personal matters on a

9    record that can become public.  That's not necessary.

10        MR. SELLS:  I'll keep that in mind.  Thank

11   you for the reminder.

12   BY MR. SELLS:

13   Q.   Mr. Coley, what do you do for a living?

14   A.   I'm retired at the time.

15   Q.   Mr. Coley, you have previously been a candidate

16   for the at-large seat on the Sumter County Board of

17   Education that is the subject of this litigation,

18   correct?

19   A.   Yes.

20   Q.   All right.  Before we get to your political

21   experience, I want to find out a little more about your

22   background.  When and were you born?

23   A.   I was born in Americus, Georgia.

24   Q.   In what year?

25   A.   1954, June.

1    Q.   Did you grow up in Americus?

2    A.   No.  My parents and I stayed in Americus a few

3    years and we -- my parents move to Hartford,

4    Connecticut, and I think it was late 50s, and we -- I

5    was raised in Hartford, Connecticut for a few years,

6    and then we moved here in 1965, moved back to Plains,

7    Georgia in '65 after my parents -- my mother passed

8    away.

9    Q.   And who do you live with in Plains, Georgia after

10   your mother passed away?

11   A.   I was raised by my grandparents.

12   Q.   What were their names?

13   A.   Mr. Henry Jackson and Rosa Bell Jackson.

14   Q.   Where did you go to high school?

15   A.   At Plains High School.

16   Q.   When did you graduate?

17   A.   1973.

18   Q.   Was your high school integrated when you attended?

19   A.   Yes.  It was integrated when I attended Plains

20   High School, in 19 -- I think it was 1971, they

21   integrated all the schools, and I graduated from Plains

22   High School a couple years later.

23   Q.   Well, if they integrated in 1971, when did you

24   start in Plains High School?

25   A.   I want to school in Plains High School -- they had

1    -- in 1966 they had a volunteer integration, and my

2    parents and I, we decided that I would be one of the

3    pioneers to go to school at Plains High School in 1966.

4    It was 19 of us that attended Plains High School.

5    Q.    Did you have a lot of African American kids in

6    your classes?

7    A.    No, I was -- at the seventh grade I was the only

8    African American in my class.

9    Q.    What was it like to be the only African American

10   in your class in seventh grade in the late 60s in

11   Plains, Georgia?

12   A.    It was tough.  It was tough.  Every day I went to

13   school -- the first day of school, as a matter of fact,

14   the first day of school my books -- when we went to

15   lunch, my books were torn up and my notebook was torn

16   up outside the classroom.  So that was constantly from

17   the day -- day one until my seventh grade ended, it was

18   constantly something going on every day.  It wasn't a

19   day that passed by I don't think that I was not called

20   the N word during that time frame.

21   Q.    Not a day went by when you weren't called the N

22   word?

23   A.    No.

24   Q.    So this wasn't just regular bullying, was it?

25   A.    No.

1   **Q.**   What did you do after graduating Plains High

2   School?

3   **A.**   I received a two-year scholarship to play

4   basketball at South Georgia Technical College.  I went

5   to South Georgia Technical Institute, at the time, and

6   majored in electrical construction maintenance and

7   machine shop.

8   **Q.**   Well, what did you do after that?

9   **A.**   I joined the United States Navy, and I served five

10   years in the United States Navy as a sonar technician.

11   **Q.**   And what's the status of your discharge from the

12   Navy?

13   **A.**   Honorable discharge.

14   **Q.**   Well, thank you for your service.

15   **A.**   Thank you, sir.

16   **Q.**   What did you do you after you got out of the Navy?

17   **A.**   After I got out of the Navy, we moved to Americus,

18   Georgia at that time.  It was in 1981, my wife and I

19   and our children, and then I got a job as a deputy

20   sheriff for the Sumter County Sheriff's Department, and

21   a few months later I received a job notification that I

22   -- at Robins Air Force Base.

23   **Q.**   Were you going to school at the time?

24   **A.**   Yes, sir.  I attended Georgia Southwestern State

25   -- well, it's Georgia Southwestern College at the time.

1    Q.   Did you earn a degree?

2    A.   No, I did not.  I was in continuing education in

3    computer information, but I later transferred to Macon

4    State College where I earned my associate's degree in

5    business administration, and I earned a bachelor's

6    degree in business information technology.

7    Q.   And did you earn those degrees while you were

8    working at Robins Air Force Base?

9    A.   Yes, sir.

10   Q.   How long did you work at Robins Air Force Base?

11   A.   34 years.

12   Q.   Are you married, Mr. Coley?

13   A.   Yes, sir.

14   Q.   How long?

15   A.   I've been married 41 years.

16   Q.   What is your wife's name?

17   A.   Linda.

18   Q.   Where did your wife grow up?

19   A.   She grew up in Americus, Georgia.

20   Q.   Did she attend Sumter County schools?

21   A.   Yes, sir.  She attended Americus -- Americus

22   school system and graduated from Americus High School

23   in 1971.

24   Q.   Does your wife work outside the home?

25   A.   She's retired as well.  She's a retired educator.

1    She was a bookkeeper and secretary for the Sumter

2    County School System for over 27 years.

3    Q.   Do you and your wife have any children?

4    A.   We have three children.

5    Q.   How old are they?

6    A.   My oldest son, Terrell, he's 45; our middle child,

7    Michael, he is 39; and our daughter, she is 33.

8    Q.   Did they go to Sumter County Schools?

9    A.   Yes, sir.  All graduated from Americus High

10   School.

11   Q.   Are they employed?

12   A.   Yes, sir.  My oldest son he is retired Air Force.

13   He did 22 years in the Air Force, and he is now

14   currently working on Seymour Johnson Air Force base.

15   My middle child, Michael, he is administrator over

16   Randolph Clay school system.  My daughter is a fifth

17   grade teacher at the Sumter Intermediate school in the

18   Sumter County School System.

19   Q.   You must be very proud.

20   A.   Yes, I am.

21   Q.   Do you have any siblings?

22   A.   Yes, I do.  I have a brother, Terrell, he was a

23   lieutenant in the police force in Americus, Georgia.  I

24   have three sisters, who are Betty, Connie, and Sandra,

25   and they all live in Americus -- well, Sandra lives in

1    Americus.  Betty and Connie live in Plains, and my

2    oldest sister, Noreen, she lives in Detroit.

3    Q.    Are you involved in any community organizations?

4    A.    No, sir.  I'm currently the chairman of the Sumter

5    County Tax Assessors Board in Americus, Georgia, but as

6    far as activities, just in my church.

7    Q.    Well, tell us about your church activities.

8    A.    I'm a senior pastor at our church in Montezuma,

9    Georgia.  I've been a part and affiliated with our

10   church in Americus, Georgia for over 30 years, there

11   again, Holiness Church, Incorporated, and I was

12   associate minister there, and they sent me to Montezuma

13   to pastor that church, and I've been pastor of that

14   church since 1997, so 20 years; we celebrated our 20

15   years there.

16   Q.    So you've been pastor of a church in Montezuma for

17   20 years, and before that you were pastor at a church

18   in Sumter County for how many years?

19   A.    Associate minister.  I've been an associate

20   minister in Americus for -- since 1983 or '86.

21   Q.    Approximately how many members in your current

22   congregation?

23   A.    Apparently 125 to 150, somewhere along there.

24   Q.    And your current congregation is Macon County,

25   Georgia; is that right?

1    **A.**   Yes, sir.

2    **Q.**   Approximately how many members of your current

3    congregation live in Sumter County?

4    **A.**   I would guess somewhere about 10 to 15, maybe

5    20 percent of the congregation attend our church there.

6    **Q.**   And do you retain connections to your former

7    church in Americus?

8    **A.**   Yes, sir.

9    **Q.**   And how many members of that congregation were

10   there?

11   **A.**   Just, I would imagine about 200 members there at

12   our Americus church with my bishop, who is my pastor,

13   Bishop Arthur Fulton.

14   **Q.**   Mr. Coley, what is the racial makeup of your

15   current congregation in Montezuma?

16   **A.**   It's majority African American.

17   **Q.**   What is the racial makeup of your former

18   congregation in Americus, Georgia?

19   **A.**   Majority African American.

20   **Q.**   How many white congregants do you have in either

21   church approximately?

22   **A.**   None.  We've had some to attend my church in

23   Montezuma, but no members.

24   **Q.**   How about your church in Americus?

25   **A.**   I don't -- well, I don't know exactly, you know,

1    because I'm not there as often as I was.  So they may

2    be attending, but I'm not sure.

3    Q.    But when you were there how many white congregants

4    did you have, just approximately?

5    A.    I would say probably, maybe two to three, maybe

6    five at some times.

7    Q.    You mentioned the tax assessors board, you're the

8    chair?

9    A.    Yes, sir.

10   Q.    How long have you served as the chair of the tax

11   assessors board?

12   A.    This will be ending my first year as the chairman,

13   and I've been on the tax assessors board for two years.

14   Q.    Have you served on any other governmental boards?

15   A.    Yes.  I was appointed on the board of Sumter

16   Regional Hospital, and, I think around the year 2000.

17   I served on that board for ten years until 2011.

18   Q.    Did you ever serve as chairman of the hospital

19   board?

20   A.    No.  No, I did not.

21   Q.    Now, that we know a little bit more about your

22   background, I want to turn back to your political

23   experience.

24   A.    Yes, sir.

25   Q.    When you first run for political office?

1    A.    It was into 1995, in 1995, the Americus City Board

2    of Education, I was elected the City Board of Education

3    and then it dissolved, and then I ran for the Sumter

4    County Board of Education, and I won my district in

5    1996, 05-'96 time frame.

6    Q.    And how long did you serve on the Sumter Board of

7    Education at that time?

8    A.    For -- until 2005.  I served until 2005.

9    Q.    Why did you decide to run for the Sumter County

10   Board of Education?

11   A.    Because I thought I had something to give back to

12   my community.  I wanted to serve my community.  I've

13   been in public eduction.  I thought public education

14   was crucial to a lot of our children's future.  And it

15   had been a blessing to me and my family, and I wanted

16   to give back and be a support to our young people.

17   Q.    Do you remember how many times you were reelected

18   to the school board when you were on between '95 and

19   2005?

20   A.    I was reelected, I think it was in year 2000, in

21   1999 I ran again, and I won my election in my district,

22   and in 2000 -- I think it was 2000, I think it was

23   because I was four years and then four years.  It was

24   two four-year terms.

25   Q.    Two four-year terms.

1     **A.**    Uh-huh.

2     **Q.**    So you ran two or three campaigns during in that

3     earlier stint in politics?

4     **A.**    Yes, sir.

5     **Q.**    Now, when you ran those campaigns, were -- was

6     your district majority black?

7     **A.**    Yes, sir, it was.

8     **Q.**    Why did you leave the board in 2005?

9     **A.**    Well, there was a young guy that came to me and

10    said that he thought that he could bring some new

11    ideas, and I didn't want to stand in his way, and, you

12    know, I was doing, him a favor, him saying that he

13    wanted to be a part of school system, and he had some

14    -- young bright ideas, and I didn't want to run against

15    him, and he didn't want to run against me, so I stepped

16    aside.

17    **Q.**    When was your next run for the board?

18    **A.**    It was in 2014, I believe.

19    **Q.**    And what did you run for?

20    **A.**    I ran for the at-large position on the Sumter

21    County Board of Education.

22    **Q.**    Why did you decide to run again?

23    **A.**    There, again, I wanted to see -- give back to my

24    community, my experiences that I had shared and went

25    through as in my military background, working on the

1  board -- direct -- board of directors at my church,

2  board of Sumter County Regional Hospital board, and

3  then being a former Board of Education member, I

4  thought I had something to give back to my community.

5  Q.  Well, let me ask you this.  What made you think

6  you were qualified to represent an entire county on the

7  school board?

8  A.  My experiences, you know, as -- on the Board of

9  Education I served as the chairman of the Board of

10  Education, two terms as a chairman.  I served as a vice

11  chair on the Sumter County Board of Education.  I was

12  on the technology committee, the personnel committee.

13  So I brought a lot of experience, not only from

14  personal experience, but from experience being on the

15  board, and I thought that that would be a great asset

16  to Sumter County.

17  Q.  Were you aware of the racial composition of the

18  electorate in the county when you decided to run?

19  A.  I was aware that there was a slight majority white

20  and -- in our community.

21  Q.  Were you aware of racial voting patterns in the

22  county when you decided to run?

23  A.  No, sir, I was not.

24  Q.  Let me ask you this.  Did you think you could win

25  the support of white voters in Sumter County?

**A.**   I did.

**Q.**   Why did you think that?

**A.**   Because, I -- you know, I had been very active in my community, and a lot people in our community knew me as a deputy sheriff, as working on the hospital authority, especially during the tornadoes.  During our tornadoes, we rebuilt Sumter County hospital, and I had just -- you know, my personality.  I just knew a lot of people in Sumter County, and I really felt I had what it took to be a part and represent the Board of Education at that time.

**Q.**   How did your qualifications compare to your opponent?

**A.**   Looking at my opponent, she was, to me, she had only been in Sumter County, Americus for a couple of years, a few years, and I'd pretty much had been there, you know, 30 some odd years and graduated from Plains High School, and, you know, I thought that, you know, I had more advantage than she did at the time.

**Q.**   So tell us about your campaign.  What did you do to campaign and earn votes in 2014?

**A.**   It was more of a grass root.  I went from door to door.  I had committees in various communities from Plains, Leslie, to Andersonville, and all over the City of Americus.  I had committees working, ground troops

1    who were knocking on doors, putting our signs out.  I

2    had radio ads going, as well as newspapers and so.

3    Q.   Did you attend campaign forums?

4    A.   Yes sir, I did.

5    Q.   Did your campaign use phone banking?

6    A.   Yes, we did.  We called -- we pulled the -- some

7    of the vote registration, voter banks and tried our

8    best to communicate with people through phone calls and

9    told them, you know, to get out and vote, aspect.

10   Q.   And what was the result of your 2014 campaign?

11   A.   At 2014, I think there was several candidates.  I

12   kind of remember that we ended up in a runoff.  I had

13   more votes than she did, than my opponent, as a matter

14   of fact, and there was a runoff so -- but after the

15   runoff, I lost the election in the runoff.

16   Q.   What did you do to campaign specifically in the

17   runoff?

18   A.   Pretty much the same things I did prior to the

19   election, continued door to door and phone calls,

20   signs, you know, radio ads.

21   Q.   Do you think you were the choice of African

22   American voters in the 2014 election?

23          MR. BRADEN:  I object, Your Honor, I don't

24   see a foundation for this question.

25          MR. SELLS:  Your Honor, the foundation is

1    that Mr. Coley is an experienced politician, has been

2    in Sumter County for 34 years, he knows his community

3    and his community knows him.

4         **THE COURT:**  Well, I'll allow you to lay a

5    foundation through the witness if you can for that

6    question.

7         **MR. SELLS:**  Sure.

8    **BY MR. SELLS:**

9    **Q.**   Well, I'm going to ask you, how do you know that

10   you were the African American candidate of choice in

11   that election?

12   **A.**   Well, I felt that I was.  I had a lot of people

13   that encouraged me at various venues, church, Walmart,

14   you know, to encourage me to run for the school board

15   because they had previously -- they liked the progress

16   the school system made when I was on the school board.

17   **Q.**   Do you think you were the choice of the white

18   community in the 2014 election?

19   **A.**   Evidently, I don't think so because -- I don't --

20   most of the people I talked to, the whites in our

21   community that knew me, said they would support me in

22   this election.

23   **Q.**   Well, how do you know then if white folks that you

24   knew told you they would support you, how do you know

25   that you weren't the white community's favorite

1    candidate in that election?

2    **A.**   I didn't -- I never had that concept in my mind.

3    I never thought that I was not anyone's candidate.  I

4    thought that I presented a -- my experiences and

5    everything, I thought that I was a candidate, I thought

6    I would win the election.

7    **Q.**   Now, now that you didn't win that election, to

8    what, if anything, do you attribute your defeat?

9    **A.**   I really can't answer that, you know.

10   **Q.**   Did you look at election returns from your 2014

11   election?

12   **A.**   I looked at the numbers.  That's all I looked at.

13   I did not go into detail or demographics and all that

14   stuff.  I just looked at, you know, I think I had over

15   25 -- 2700 votes, and she had a little over 3,000 so it

16   was fairly -- I thought fairly close, but she beat me

17   by a few hundred votes, you know.

18   **Q.**   Were there any racial incidents in your 2014

19   campaign?

20   **A.**   No, sir.  The only one I can think of, and I don't

21   think it would be racial, but some of my signs during

22   -- down the Lee Street area, every time I put a sign up

23   it would be -- it would mysteriously disappear the next

24   day.  So people that would put them in their yards,

25   they would take them away.

1   Q.    What is the Lee Street area for those of us who

2   don't know Americus?

3   A.    It is like the main street down -- on South Lee

4   Street area.  So it's down near the manor, going to

5   Magnolia Manor, in the area down through that way.

6   Q.    Is that a predominantly African American

7   neighborhood?

8   A.    No, it's a predominantly white neighborhood.

9   Q.    Did you run for an at-large seat again in 2016?

10  A.    Yes, sir, I did.

11  Q.    Why did you decide to run again?

12  A.    For punishment, no.  There again, I thought that I

13  had an opportunity and saw what it meant to be running

14  for election.  Can I back up for a second there?  A lot

15  of people during this election didn't understand what

16  it meant to be -- by the at-large position, especially

17  when I campaigned from door to door, they didn't know

18  exactly what it meant by running at-large in Sumter

19  County.  So I had to do a lot of explaining about the

20  at-large position.  And then the 2016, when I ran, it

21  was same thing, we had -- I think it ran into a

22  situation where the Republican and Democratic tickets,

23  they didn't know I was at-large.  So at-large, and I

24  was nonpartisan, that I would be on all the tickets,

25  and a lot of people that decided they wanted to vote

1    Republican, they didn't know that I was on the

2    Republican ticket and the ones that voted Democrat,

3    didn't know I was the Democratic ticket so there was a

4    lot that went on there, too.

5    Q.   Well, tell us about your 2016 campaign.  What did

6    you do to campaign in that election?

7    A.   Pretty much the same thing.  Door to door, radio

8    ads, newspaper ads, and consistently communicating with

9    people in the churches.  So, it was a lot of work

10   because Sumter County is large.

11   Q.   What was the result of your 2016 campaign?

12   A.   I lost that election as well.

13   Q.   Do you think you were the choice of the African

14   American community in the 2016 election?

15   A.   There again, yes.  There again, I received a lot

16   of encouragements to run, encouragements to be -- to

17   run for the board because of my past experiences.

18   Q.   Do you think you were the choice of the white

19   community in the 2016 election?

20   A.   There, again, I can't -- I can't answer.  I

21   thought I was because, there again, I thought that I

22   had proven that I was someone that was reputable.  I

23   had, you know, raised my family, and I was an advocate

24   of public schools, and so that's why I thought so as

25   well.

Q.   So what, if anything, do you attribute your defeat
in the 2016 election?

A.   There again, I think what contributed, I think,
one, as stated before, one was the fact that a lot of
people didn't know that they could vote.  I talked to
people afterwards, and they said, I didn't know your
name was on ballot.  It was on the last part of the
ballot once they voted for -- I think at the time the
sheriff's race was going as a Republican ticket, and
then there were several people that wanted to vote on
the Democratic ticket because there was a favorite
candidate that they wanted, and they said, I didn't
know.  I said, did you scroll down and see at the end
of the ballot that I was on that ballot, and a lot
people said, I don't know, so they just voted and
didn't even vote for the school board at the time.

Q.   Were there any racial incidents in your 2016
campaign?

A.   No, sir.

Q.   How about yard signs?

A.   Hmm --

Q.   Do you remember any yard signs being removed in
2016?

A.   There were several.  But, you know, there again,
it's pretty much about the same, same aspect of what

1    happened in 2014.

2    **Q.**   Well, let me ask you this.  Do you think you lost

3    because you didn't campaign hard enough?

4    **A.**   I think I gave it my all.  I think -- I had

5    limited resources.  I didn't get the donations that I

6    needed as far as I had in 2014, in 2016 because the

7    other races that were going on.  And, but I think I

8    campaigned as hard as I possibly could and -- but, you

9    know, I live with the results.

10   **Q.**   Do you think you didn't win because your

11   reputation isn't good in the community?

12   **A.**   No, sir.  I have -- I think I have a really good

13   reputation in Sumter County.

14   **Q.**   Mr. Coley, you have run multiple campaigns for a

15   districted seat and for an at-large seat on the Board

16   of Education, correct?

17   **A.**   Yes, sir.

18   **Q.**   And you have run multiple campaigns under the

19   current election plan, what we call the House Bill 836

20   plan, with elections held in May and the prior plan

21   with nine single member districts and elections held in

22   November, correct?

23   **A.**   Yes, sir.

24   **Q.**   So let me ask you, how is campaigning for a

25   district seat different from campaigning for an

1    at-large seat?

2    **A.**    Well, the districts are smaller.  They had -- and

3    but, the at-large seat was countywide.  It's a

4    tremendous amount of effort, time put into running a

5    countywide campaign, and but, the district one is much

6    smaller, less financial burden on the candidate.

7    **Q.**    Which one is more expensive?

8    **A.**    The at-large one.

9    **Q.**    What kinds of things do you need to spend money on

10   in an at-large race that you don't need to spend on in

11   a district race?

12   **A.**    Well, you need more, more of everything, and -- at

13   the countywide elections.  In the district, you pretty

14   much can stay and focus on that district, concentrate

15   on those people that's in your district.  But as far as

16   the countywide, it's a tremendous amount of work put

17   forth in running a countywide election.

18   **Q.**    How did your opponent campaign in the 2014 and

19   2016 elections?  Do you remember anything about her

20   campaign?

21   **A.**    Well, I do remember the electronic board.  She was

22   -- she put ads on the electronic board and her signs as

23   well, but I don't know anything else more about her

24   campaign.

25   **Q.**    Mr. Coley, can you explain what an electronic

1      board is?

2      **A.**    Well, there's an electronic advertisement board at

3      -- right, coming into -- I think it's on Forsyth

4      Street, coming into by the CVS, and most of the people

5      that come either into Americus from -- on 280 coming

6      from the Cordele area -- and most of the people coming

7      in from Walmart, Belk's will see that electronic sign.

8      **Q.**    How big is it?

9      **A.**    Just estimating, I'm thinking it's maybe six feet

10     by six, something like that, six foot by six foot.

11     **Q.**    It's a big sign?

12     **A.**    It's a big sign, yes.

13     **Q.**    It's meant to be seen by drivers?

14     **A.**    Yes.

15     **Q.**    And Ms. Roland took out an ad on that sign in her

16     elections?

17     **A.**    Yes.

18     **Q.**    Did you take out a sign on that bulletin board?

19     **A.**    No, I did not.

20     **Q.**    Why not?

21     **A.**    The financial cost.

22     **Q.**    Being it was too expensive?

23     **A.**    Yes, sir.

24     **Q.**    In your experience how does the timing of the

25     election in May versus November affect elections for

1    the Board of Education?  I think you spoke a little bit

2    to this earlier.

3    **A.**    From my past experience I think mostly you're

4    going to get more of participation in voter turnout in

5    November than you would in May, and that's historically

6    true.  A lot of people go out and vote because there

7    are a lot of things going on during the general

8    elections.

9    **Q.**    Do you know whether African Americans in Sumter

10   County have a depressed socioeconomic status compared

11   to whites in Sumter County in such areas as

12   unemployment, education, income, poverty, those sorts

13   of things?

14   **A.**    Are you asking me do I feel that?

15   **Q.**    Yes.

16   **A.**    Yes, sir, I think so.

17   **Q.**    What makes you think that?

18   **A.**    Well, looking at the -- at some of the, I guess

19   you would say, the jobs that are available, they're not

20   available in Sumter County.  We once had a thriving

21   community, but there are a lot of things, a lot of

22   industries like Textron that are closed, you know, and

23   people that live in Americus, the jobs are not there,

24   and they are mostly farm type of things so.

25   **Q.**    How does as that affect elections, specifically

1    African Americans participation in elections in Sumter

2    County in your experience?

3    A.    I really don't know how to answer that because,

4    you know, it's -- economically, I mean, people still

5    should have an opportunity to come and get out and

6    vote.  So it might affect them, but I'm not sure how it

7    would.

8    Q.    Mr. Coley, how long have you been a voter in

9    Sumter County?

10   A.    I've been a voter in Sumter County since 1981.

11   Q.    And since 1981, as best you can remember, how many

12   African Americans have been elected to a countywide

13   public office in Sumter County over that time?

14   A.    I can't -- I can't recall any.

15   Q.    Mr. Coley, before I ask you a few concluding

16   questions, is there anything else you think Judge Sands

17   should know as he considers whether the at-large school

18   board seats dilute black voting strength in Sumter

19   County?

20   A.    No, sir.

21   Q.    All right.  Based on your own experience, do you

22   think African Americans voters in Sumter County have a

23   meaningful opportunity to elect their preferred

24   candidates to the at-large seats on the school board?

25   A.    Personally, I don't think so.  I don't think so.

1    I don't think so because they're in a minority, and it

2    would perhaps -- I don't know -- be able to look at

3    voter history and voter patterns, in looking at it, I

4    don't think they would have an opportunity with that.

5    Now, that I have ran an election twice and saw that

6    this opportunity to do it, I don't see that's going to

7    be possible.

8    Q.    Mr. Coley, do Sumter County and the state of

9    Georgia have a history of discrimination against

10   African Americans?

11   A.    For my personal answer on that, I think so.

12   Q.    And that includes a history of discrimination in

13   voting, right?

14   A.    Yes, sir.

15   Q.    In fact, you have lived through some of that

16   discrimination in your own lifetime; isn't that right?

17   A.    Yes, sir.

18   Q.    You mentioned a few moments ago that hardly a day

19   went by when you weren't called the N word by your

20   classmates, I believe you were in the 7th grade?

21   A.    Yes, sir.

22   Q.    Do any of those classmates still live Sumter

23   County?

24   A.    You know, it's amazing you bring that up.  I was

25   campaigning in my district several years ago, and I

1    knocked on this door, and one of the guys that was in

2    my classroom, Mr. Hill, and I told him my name, I said,

3    Michael Coley, I'm running for school board in this

4    district in the Plains, Georgia area, and he said, Mike

5    Coley, he said -- he said I'm Terry Hill, he said,

6    you've got my vote because all of the hell I put you

7    through, we put you through, you know, and you still

8    standing and you're running for school board, you got

9    my vote, and so that just made me feel really good.

10   Other people that were in my classroom, I met one guy

11   at the Walmart the other day, and he said, man, I

12   really apologize for what we took you through, he said,

13   come on out to the house some time and let's sit down

14   and eat a burger or something, you know.  And so

15   several of them are still living, and they're still

16   living in Plains, and Plains and Americus area, so I

17   run them across them every now and again.

18            **MR. SELLS:**  Those are my questions.  I'll

19   turn over the witness.

20            **THE COURT:**  All right.  I think we are near

21   to the time that we would be breaking for the morning,

22   and we'll be in recess for about 20 minutes and we'll

23   resume cross examination.  All right.

24   *(RECONVENED; ALL PARTIES PRESENT, 10:27, a.m.)*

25            **THE COURT:**  All right.  Is it Mr. Raile?

1          **MR. RAILE:**  Raile, Your Honor, not phonetic.

2          **THE COURT:**  Okay, I wanted to make sure I had

3     it right.  Okay, you may proceed with cross

4     examination.

5          **MR. RAILE:**  Thank you, Your Honor.  Mr.

6     Coley, I'm Richard Raile, and I represent the county in

7     this case, and I don't actually have any questions for

8     you today, but on behalf of the county I would like to

9     say thank you for your military service, for your

10    service to the county, and for your time coming out

11    here today to testify.  We thank you.

12         **THE WITNESS:**  Thank you, sir.

13         **THE COURT:**  All right.  I assume there is no

14    redirect?

15         **MR. SELLS:**  Nothing to redirect.

16         **THE COURT:**  Is there any objection to the

17    witness being excused?

18         **MR. RAILE:**  No objection, Your Honor.

19         **MR. SELLS:**  None.

20         **THE COURT:**  You may leave or remain in you

21    wish.

22         **THE WITNESS:**  Thank you, sir.

23         **THE COURT:**  You may call your next witness.

24         **MR. MCDONALD:**  We call Kelvin Pless, Your

25    Honor.

1          **THE COURT:**  All right.  If you come forward

2     and be sworn in.

3          **COURTROOM DEPUTY:**  Do you solemnly swear or

4     affirm that the testimony you are about to give in the

5     case now before the Court will be the truth, the whole

6     truth, and nothing but the truth?

7          **THE WITNESS:**  Yes, I do.

8          **THE COURT:**  All right.  Mr. McDonald, you may

9     proceed.

10          **MR. MCDONALD:**  Thank you, Your Honor.

11                        **KELVIN PLESS**

12      **Witness, having first been duly sworn, testified on**

13                     **DIRECT EXAMINATION**

14     **BY MR. MCDONALD:**

15     **Q.**   Would you please state your name for the record?

16     **A.**   I'm Kelvin W. Pless.

17     **Q.**   And what's your age, Mr. Pless?

18     **A.**   I am 51, 52 tomorrow.

19     **Q.**   And what is your race, please?

20     **A.**   African American.

21     **Q.**   And where do you currently reside?

22     **A.**   Americus, Georgia.

23     **Q.**   How long have you lived in Americus?

24     **A.**   All my life.

25     **Q.**   And you were born there?

1    **A.**   I was born there, and the only time I wasn't there

2    was the time during my education, college education

3    time.

4    **Q.**   Well, did you attend public schools in Sumter

5    County?

6    **A.**   I did.  Americus High School.

7    **Q.**   And did you graduate from the public schools

8    there?

9    **A.**   I did.

10   **Q.**   And what year did you graduate?

11   **A.**   1984.

12   **Q.**   And were the schools racially segregated during

13   any of the time that you attended schools in Sumter

14   County?

15   **A.**   During the time, I was in the city school system

16   during that time, and we was integrated at that time.

17   **Q.**   So when you first entered the public schools, they

18   were integrated?

19   **A.**   Yes, it was.

20   **Q.**   Now, growing up in Sumter County do you have

21   significant contact with whites?

22   **A.**   Yes, through school mainly.  That's pretty much

23   it, you know, community.

24   **Q.**   Well, what neighborhood did you live in the Sumter

25   County?

1    A.    The neighborhood I lived in was predominantly

2    black.  I lived on the north side of Americus.

3    Q.    And predominantly black, you say?

4    A.    Yes, predominantly black.

5    Q.    Well, did you experience any racial incidents when

6    you were growing up in Sumter County?

7    A.    The most I experienced, was, you know, some light

8    incidents maybe in high school, and more so when I was

9    on the school board.

10   Q.    Well, tell me, what were the incidents when you

11   were in the public schools?

12   A.    Well, just a few friends and myself were hanging

13   out one day after a basketball game or before, rather,

14   and there were a few white guys hanging out also, and

15   one of my friends accidently brushed his pickup truck,

16   and he wanted to start a fight over it.  So it went on

17   from there.  Of course, we stood up for our side, and

18   they did theirs also.

19   Q.    Well, when you say our side, what do you mean by

20   that?

21   A.    Okay, be more specific.  Like I say, the white

22   guys got upset because my friend accidently brushed up

23   against his pickup truck, and, you know, he got sort of

24   hostile about it.  So that happened, and it started an

25   altercation, we begin to fight about it because we're

1   standing up for our black friend, and the other guys

2   stood up for their white friend.

3   Q.   Well, did you find that when you were in the

4   public schools that whites and blacks tended to be

5   separate or together or what?

6   A.   For the most part unless there's was a particular

7   event, we hung with our group.  The African Americans

8   hung with their group, and the whites hung with theirs,

9   unless, you know, we played in the band or football,

10   you know, some significant event.  Otherwise, everybody

11   pretty much hung within their own race.

12   Q.   Now, are you currently employed?

13   A.   I am, yes.

14   Q.   And what work do you do?

15   A.   I work for the Georgia Department of Juvenile

16   Justice in the education department.

17   Q.   And how long have you been there?

18   A.   Seven years.

19   Q.   And were you employed prior to that?

20   A.   I was.

21   Q.   And what did you do?

22   A.   Prior?  Prior to that?

23   Q.   Yes.

24   A.   I worked at Nobort *(phonetic)* International Paper,

25   and I was a technical coordinator.

1   **Q.**   How would you describe the neighborhood in which

2   you currently live in Sumter County?

3   **A.**   Well, the neighborhood I live in now, still the

4   same, it's predominantly black.  I do have some

5   Hispanic neighbors now.  It's not very many people on

6   my street, but it's predominantly black.

7   **Q.**   Well, do you have significant contact with whites

8   today in Sumter County?

9   **A.**   Not a whole lot.  Other than maybe if there's a

10  particular event going on.

11  **Q.**   Well, how can you explain that, or can you?

12  **A.**   Well, hmm, like I say, pretty much, you know, my

13  church is predominantly black.  Most of the places I

14  am, pretty much African American.  I work at the local

15  radio station, of course, there's whites there.  We do

16  fine.  Or if I'm invited to a certain event, I'm around

17  whites.  On my job it's pretty much predominantly

18  blacks in my department, so that's the most contact I

19  have with the opposite race.

20  **Q.**   Are you a member of any civic organizations in

21  Sumter County?

22  **A.**   Yes, I am.

23  **Q.**   What are those organizations?

24  **A.**   I'm not active now, but the Masonic Lodge.

25  **Q.**   Well, are there --

1    A.    It's --

2    Q.    Is it racially integrated?

3    A.    Yes -- it's predominantly -- it's black.  All

4    black.  African American.

5    Q.    Is that only organization that you belong to?

6    A.    For right now, other than my church.  It's

7    black -- African American.

8    Q.    Does it have any white members at all?

9    A.    Not that I've seen, no.

10   Q.    Well, how can account for the fact that churches

11   are segregated today?

12   A.    How can I account for it?

13   Q.    Yes.

14   A.    I've heard that Sunday is the most segregated day

15   of the week.  African Americans pretty much worship

16   together, and the white community worships together,

17   and the Hispanic community worships together

18   separately.

19   Q.    And do you know why that's the case?

20   A.    I guess that's just their preference in doing.

21   Q.    Now, have you run for public office in Sumter

22   County?

23   A.    Yes, I have.

24   Q.    And tell me when you ran.

25   A.    I ran for school board district in 2010.  I won

1   that election, and then I ran again, I believe it was

2   2014 in the at-large election.  I lost that election.

3   And just recently I ran for Americus City Council,

4   which is just a district election.  I won that one.

5   Q.   Well, let me ask you about the 2010 election for

6   the school board.  What was the district that you ran

7   in?

8   A.   District three.

9   Q.   How did you conduct your campaign?

10  A.   I did door to door campaigning mainly.  You know,

11  just face to face campaigning to the people.

12  Q.   Well, did you think you qualified to hold public

13  office?

14  A.   Yes, sir.

15  Q.   And tell me why.

16  A.   Well, for the most part I have a connection with

17  people, engagement with the people, and the people

18  pretty much were the ones that requested me to do such,

19  and the support of the people were there, whether it

20  was financially, assisting in campaigning.  And my

21  education level, I understanding -- well, at that time

22  the school system was my interest.  I have a degree in

23  education also, so that helped out.

24  Q.   Well, were there any racial incidents in your

25  campaign in 2010?

1    **A.**   I would believe so.  Are you referring to just the

2    campaign?

3    **Q.**   Yes.

4    **A.**   Yes.

5    **Q.**   What were they?

6    **A.**   You know, when you're out campaigning there are

7    people that will turn you off based on your race.  You

8    know, I didn't limit myself to just African American

9    votes.  I had some white constituents also, and you

10   could very well tell that they didn't want to be

11   bothered with me based on race, you know, and they made

12   that clear.

13   **Q.**   Well, what impact did that have on you personally

14   and on your campaign?

15   **A.**   As far as on me, it was disappointing in this day

16   and time that you would still have that type of thing

17   still going on, but it didn't stop my effort in terms

18   of campaigning because I wanted to represent the

19   school.

20   **Q.**   Now, you said you ran again in 2010; is that

21   correct?

22   **A.**   Well, I think that was the initial one.  I ran for

23   reelection in 2014 or '13, however.  I was getting

24   ready to do my second round for the school board.

25   **Q.**   I'm sorry, the question that I wanted to ask you,

```
 1    when you ran in 2010, was that under the nine single
 2    member district system?
 3    A.   No.  It was a single member district at that time.
 4    Q.   Nine?
 5    A.   Nine.  Yes, sir, I'm sorry, I misunderstood you.
 6    Q.   How much African Americans served on the board at
 7    that time?
 8    A.   It was five.
 9    Q.   Was the election contested?
10    A.   Yes, it was.
11    Q.   Who contested you?
12    A.   It was Donna Minich.
13    Q.   But you won the election?
14    A.   I did win the election.
15    Q.   And was it contested by her after the election was
16    over?
17    A.   Yes.  She did.  After the election she filed a
18    lawsuit against me contesting or saying that I did some
19    illegal things with the absentee ballots.
20    Q.   And what was her race?
21    A.   She's white.
22    Q.   What was the outcome of that contest?
23    A.   I did win the election.  I'm not sure on the
24    specific numbers, but I won by a pretty large margin.
25    Q.   Well, I mean, the contest that she filed
```

1    challenging the election, what was the outcome of that?

2    **A.**    My attorney, I hired attorney Maurice King at the

3    time, he was African American, and he responded to her

4    charge, and it was immediately -- she dropped the case

5    or discontinued her effort.

6    **Q.**    Is that Maurice L. King?

7    **A.**    Maurice, Maurice L. King, Jr., yes.

8    **Q.**    Did the school ever hire him as its attorney?

9    **A.**    Yes, the school did.

10   **Q.**    What were the circumstances under which he was

11   hired?

12   **A.**    Well, of course, I nominated him at the time, and

13   we had two previous law firms, Skipper, and then we had

14   the law firm out of Atlanta, Hartley Harden at the

15   time.  So just for economic reasons we came up with

16   Mr. King, Maurice King, that is, and we hired him, and

17   the circumstances of that was -- created some outrage

18   from the white community.

19   **Q.**    Well, explain what you mean by created outrage.

20   **A.**    Well, obviously -- well, if I have to stand onto

21   what happened with the lawsuit, I guess the lost by Ms.

22   Minich, she was still sort of bitter about it, so she

23   sort of kept a group of the white community upset about

24   it.  So that was just one portion of where she still

25   stimulated some hostility through the white community

1    to, they hired this African American attorney, and we

2    don't think he's qualified and a lot of other

3    derogatory statements that was made about him.

4    **Q.**   Well, did he stay on as the attorney for the

5    school board?

6    **A.**   Yes, he did.

7    **Q.**   Well, did you experience any racial incidents when

8    you served on the school board?

9    **A.**   Oh, yes.

10   **Q.**   Tell me what they were, please.

11   **A.**   Quite a bit, actually.  We -- it was like a lynch

12   mob from the white community where we would probably

13   have sometime maybe ten people at board member --

14   meeting, I should say, probably end up being almost a

15   hundred people there, mainly whites, and, you may have

16   a few African American that just attend on a regular

17   basis, and there was a lot tension and hostility drawn

18   toward us.  We were labeled by even the local media as

19   the Gang of Six.  A lot of negative things were said by

20   the local media.  Even here in Albany, they used the

21   Albany media, WALB, to use things to make it seem that

22   we were a bad board when actually we hadn't even had a

23   chance to execute any plans.  They had town hall

24   meetings, and it was, you know, they were pretty

25   aggressive.  You know, they said negative things, a lot

1    of nasty things about us, even to the point of writing

2    employers letters saying negative things that weren't

3    true actually.  At the time I was hired by South

4    Georgia Tech, my boss or supervisor was sent a letter

5    saying I had attacked some child even.  Of course,

6    nothing came out of it.  I was never questioned by the

7    institution or anything of nature, but that just how

8    in-depth they were to -- how mean they were towards us.

9    Q.   So who was the Gang of Six?

10   A.   The Gang of Six was the African American school

11   board members at the time.

12   Q.   And that included you?

13   A.   That included me, yes.

14   Q.   Well, how did you feel about being described as a

15   member of the gang of six?

16   A.   Well, I have never been a part of a gang.  I

17   just -- it was insulting that I would be referred to as

18   a gang member.  I worked with gang members every day in

19   my facility where I work, and I know what gangs are,

20   and there is no part of me that's a gang member, and,

21   like I said, you know, I can speak for the rest of the

22   board members at the time, they weren't either.

23   Q.   Well, what about the attitude of the board members

24   towards the children in the schools, how would you

25   describe that?

**A.**    Well, the board members' attitude toward the
children of the school, we were there mainly for
student achievement.  Unfortunately, we spent so much
time fighting against these nitpicking racial attitudes
that we weren't as successful as we wanted to be, but
we accomplished quite a bit.  We did see, before my
term was up, we saw scores rise up in the student
achievement, the EOC scores, and, of course, scores
rise up.  Our interest towards the children was just
that, our love for them and making sure they can get an
education.  Unfortunately, the motives of others was
different.  Even to the point I didn't mention of, they
even called SACS and tried to kill the accreditation of
the children.  That was hurtful also.

**Q.**    Who tried to?

**A.**    Particularly that charge was led by the previous
board chair at the time, Dr. Michael Busman, Meta
Krenson, and some more in the community that attacked
us -- they used SACS as a way of leveraging against us.

**Q.**    Well, what was the race of those individuals?

**A.**    African -- white.

**Q.**    Well, do you think they were motivated by some
racist attitude or what?

**A.**    Yes, they were.

**Q.**    Well, explain what you mean by that.

1    A.   Well, that's when they went after -- they didn't

2    go after the African Americans to come and say that the

3    school was bad, they pretty much went into the white

4    community and encouraged them.  Even the local radio

5    station announcing, hey, we want you to be at the

6    school board meeting tonight.  I mean, if I could use

7    the word, they had the whole white community energized

8    or hyped up, should I say, to go after us, and every

9    board meeting it felt like we was part of, you know,

10   was being lynched based on the way we was treated.  I

11   didn't even feel comfortable walking out after a board

12   meeting because you didn't know what was going to

13   happen.  But, like I say, those white members didn't

14   reach out to any African Americans to be there.  If

15   that was the case, you know, maybe you could say it

16   wasn't racial, but they sought the white community to

17   fight against the majority black school board at the

18   time.

19   Q.   Well, do you know whether or not any letters were

20   ever sent to the employers of African American board

21   members making complaints against them?

22   A.   Yes.  As I mentioned earlier, I had -- and I

23   received a copy of it myself, a letter that was sent to

24   my -- the president of the -- of South Georgia Tech

25   saying, you know, like I say, making allegations that I

1    attacked some child or just anything they could to get

2    us fired off of our jobs.

3    Q.   Well, were there any laws passed by the state

4    legislature that had an impact on the new school board?

5    A.   Yes.  At the time I think the previous board --

6    the former board chair at that time, Dr. Michael Busman

7    had a relationship with Mike Cheokas that worked in the

8    state office, state representative.  And they came up

9    with this thing about our travel expense.  And, of

10   course, you know, travel expense include, you know, a

11   number of the things, the hotel expense, the cost of

12   the workshops that you are required to attend, and they

13   even went so far to have Mr. Cheokas go up there and

14   legislate a budget specifically for Sumter County Board

15   of Education, really an unfair amount, I think like

16   $2400 a year, if I remember correctly, and, of course,

17   you know the cost of travel expense, that wouldn't

18   cover the entire year that was based on requirements of

19   us being there.

20   Q.   Well, you may have mentioned this, but I just

21   wanted to ask you, did the white board members ever

22   attempt to have the school's accreditation removed?

23   A.   They did.

24   Q.   Explain what they attempted to do.

25   A.   Again, they called up the SACS representatives,

1    and we went through this long process of them saying we

2    was an unfit school board.  Former chairman Michael

3    Busman even went on the -- got in the news media and

4    said he hoped that they remove all of us.  They also

5    sent letters to the Governor Nathan Deal at the time,

6    well, still Nathan Deal, but requesting him to have us

7    removed also.  We ended up going to court before the

8    State Board of Education also, hearings up in Atlanta

9    in a case to have us removed, and all of this was

10   motivated by the white school board members.

11   Q.   When you say have us removed, to whom are you

12   referring to?

13   A.   African American, the six African American board

14   members.  I guess, to make it look politically correct.

15   He wanted us all of us of removed, but it was mainly

16   aimed at the African American board members.

17   Q.   Now, the school board, are you aware of the fact

18   that it was redistricted in 2014 under House Bill 836?

19   A.   Yes, it was.

20   Q.   Well, do you have any views as that to why that

21   bill was enacted?

22   A.   Pretty much for the -- to the African Americans

23   not to have as much control over the school board.  It

24   was watered down to -- of course, we went from a nine

25   district to, I think, a seven district, two at-large

1    and five single districts, and that would give the

2    white board members the upper hand over the school

3    board, which they have now.

4         **MR. BRADEN:**  Your Honor, I've been sitting

5    patiently hearing a series of questions that I believe

6    are irrelevant to this Court's decision.  The issue

7    before this Court is the effect of the plan and the

8    ability of the African community to elect its

9    candidates of choice.  Obviously these questions have

10   nothing to do with the question of whether or not the

11   African American community has an equal opportunity to

12   elect candidates in the county.

13        **MR. MCDONALD:**  Well, Your Honor, it goes also

14   to the question of purpose behind the adoption of the

15   plan.  I mean, we know purpose or effect are two of the

16   things that one takes into account in determining

17   whether or not a challenged practice violates Section

18   2.  This is plainly irrelevant.

19        **THE COURT:**  Well, the Court does not find

20   that it's totally irrelevant.  So I think the objection

21   goes more to the weight, if any, that the evidence

22   might have, so the Court overrules and allows you to

23   continue.

24   BY MR. MCDONALD:

25   Q.  So, again, can you tell me what you base your view

1    that there was a discriminatory purpose underlying

2    House Bill 836?

3    A.    Yes.  As I mentioned earlier I think the whole

4    idea was to give control back to the white board

5    members.

6    Q.    Well, did that House Bill 836 have any impact on

7    the district from which you were elected?

8    A.    Yes, it did.

9    Q.    What was the impact?

10    A.    The impact was, was I was in district three which

11    turned into what I believe what is district two,

12    however it was, it ended up being a predominantly white

13    district all the sudden.  So with that, I had to make a

14    choice between whether I was going to run district or

15    at-large, which was both pretty risky, and well, didn't

16    leave too much of a choice.  It was a slim chance I

17    could possibly get reelected again.

18    Q.    So what decision did you make?

19    A.    I decided to take my chance at running at-large.

20    Q.    And was it more difficult for you to run at-large

21    than from a single member district?

22    A.    Yes, it was.

23    Q.    Explain why.

24    A.    Well, for one, the demographic is a lot more

25    territory to cover and more expensive, and you still,

1    like I said, dealing with a lot more territory to cover

2    as far as the, you know, the campaigning efforts and

3    the financial efforts in terms of buying political

4    signs and political materials as well.

5    Q.    Well, did you win or lose that at-large race in

6    2014?

7    A.    Yes, I lost that race.

8    Q.    Who did defeated you?

9    A.    Dr. Michael Busman.

10   Q.    And what's his race?

11   A.    He's white.

12   Q.    So when did your term on the school board expire?

13   A.    It expired at the end of my term in 2014.

14   Q.    How would you describe the campaign that you

15   conducted in your at-large election?

16   A.    It was painstaking.  I mean, it was, like I said,

17   it was a lot of grounds, a lot of strategies that had

18   to come in mind, because of the style campaign that I

19   did, I like to make direct contact with my

20   constituents, so that really, versus a district, you

21   know, that means I was going to more rural areas of

22   campaigning, and, of course, a countywide election is a

23   lot more grounds to cover than just a district.

24   Q.    Were there any racial incidents in that at-large

25   campaign?

1    A.    I can't recall any right off the bat, not during

2    the campaign.

3    Q.    Well, did you any problems with removal of signs,

4    for example?

5    A.    Signs were moved.  I just can't pin it on any

6    particular person of what happened with it, you know.

7    That's some of the things that occur when you put out

8    yard signs, but some were removed, yes.

9    Q.    Well, based on your experience running for

10   political office, do you think that voting is racially

11   polarized in Sumter County?

12   A.    Yes.  Whites tend to vote white, blacks tend to

13   vote black.

14   Q.    What do you base that view on?

15   A.    Well, the election results.  And, you know, you go

16   back and look at reports.  Of course, you don't know

17   who voted for you, but for the most part it's seemingly

18   just as the way the community, Sumter County community,

19   even socialize or deal each other is separated by race

20   anyway.

21   Q.    Well, do you think you were the preferred

22   candidate of African American voters?

23   A.    Yes, sir.

24   Q.    And do you base that on what you previously said?

25   A.    Right.

1   Q.   Okay.  And do you think African American voters

2   have a meaningful chance of electing their preferred

3   candidates to at-large seats on the school board?

4   A.   African Americans?

5   Q.   Yes.

6   A.   It's more an advantage when do you it by single

7   district.

8   Q.   Well, do you think that they do have an equal

9   opportunity to elect candidates of choice to the

10  at-large seats?

11  A.   No.

12  Q.   And why do you base your view on that?

13  A.   The records show African Americans don't win in

14  at-large elections in Sumter County.

15          MR. MCDONALD:  Well, your Honor, that's all

16  the question I have for Mr. Pless.

17          THE COURT:  Okay.  Mr. Braden, cross

18  examination?

19                  CROSS EXAMINATION

20  BY MR. BRADEN:

21  Q.   Good morning.

22  A.   Good morning.

23  Q.   Do you know whether an African American is the

24  clerk of the superior court in Sumter County?

25  A.   Yes.

1    Q.   And she was elected countywide?

2    A.   Yes.

3         MR. BRADEN:  Thank you, Your Honor.  No

4    further questions.

5         MR. MCDONALD:  Redirect, Your Honor?

6         THE COURT:  Yes.

7              REDIRECT EXAMINATION

8    BY MR. MCDONALD:

9    Q.   Well, the office -- and the question that you

10   previously got, will you tell me whether or not that

11   was a primary election or a countywide election?

12   A.   I think it was a primary election, Democratic,

13   Republican.  I'm not very sure on that.

14   Q.   Well, is the Democratic party majority black?

15   A.   Yes.

16   Q.   And you think that election was held in the

17   Democratic primary?

18   A.   It was.

19   Q.   And was there a general election after the

20   primary?

21   A.   She didn't have to run for a general election, I

22   don't think.

23   Q.   Okay.  Thank you very much.

24   A.   Okay.

25         MR. MCDONALD:  That's all the questions I

1    have.

2          THE COURT:  All right.  Any there further

3    recross, Mr. Braden?

4                **RECROSS EXAMINATION**

5    BY MR. BRADEN:

6    Q.   So it's your testimony that her name did not

7    appear on the ballot in the general election?

8    A.   I'm not sure, sir, about the -- you said her name

9    appeared?  Yes, it appeared on there uncontested.

10   Q.   Do you know whether Sanford -- that's enough.

11   Thank you.

12         THE COURT:  All right.  Anything further?

13         MR. MCDONALD:  Nothing further from me, Your

14   Honor.

15         THE COURT:  All right.  Any there reason this

16   witness cannot be excuse from either side?

17         MR. MCDONALD:  I'm sorry?

18         THE COURT:  Any reason the witness can not be

19   excused.

20         MR. MCDONALD:  None for us, Your Honor.

21         MR. BRADEN:  None for us.

22         THE COURT:  All right, sir.  You are excused.

23   You may leave if you wish, or remain if you wish, it's

24   up to you.

25         THE WITNESS:  Thank you.

1        **THE COURT:**  All right.  You may call your

2   next witness.

3        **MR. MCDONALD:**  We're calling Mr. Mahone, Your

4   Honor.

5        **THE COURT:**  If you will come right here and

6   be sworn and then take a seat in the witness box.

7        **COURTROOM DEPUTY:**  Do you solemnly swear or

8   affirm that the testimony you are about to give in the

9   case now before the Court will be the truth, the whole

10  truth, and nothing but the truth?

11       **THE WITNESS:**  I do.

12       **THE COURT:**  You may begin.  You might want to

13  pull that mic down a just little bit.  All right.  You

14  may proceed.

15                    **MICHAEL MAHONE**

16   **Witness, having first been duly sworn, testified on**

17                 **DIRECT EXAMINATION**

18  BY MR. MCDONALD:

19  **Q.**   Will you please state your name for the record?

20  **A.**   Sam Mahone.

21  **Q.**   And where do you currently reside, Mr. Mahone?

22  **A.**   I reside at 690 Timber Road, Atlanta, Georgia.

23  **Q.**   And tell us what your race is, please?

24  **A.**   African American.

25  **Q.**   And where were you born and where did you grow up?

1  A.   I was born and raised in Americus, Georgia.

2  Q.   And how long did you live there?

3  A.   Hmm, I went through the school system, graduated

4  high school.  I stayed in Americus until I was roughly

5  about 18 years of age.

6  Q.   And where did you attend school?

7  A.   I went to Eastview -- well, first of all, McCoy

8  Hill Elementary.  I went from there to Eastview

9  Elementary, and from there to Stately Junior High, and

10 I graduated from Sumter County High in 1964.

11 Q.   And were the schools at that time racially

12 segregated?

13 A.   Yes, they were.

14 Q.   And what was that like for you growing up?

15 A.   As a child we knew that there were -- schools were

16 not equal.  We -- the books that we received had been

17 passed down, and so it -- as we got older, we

18 recognized that we were not getting the latest

19 information in terms of the books that we were given to

20 study.  So, as you got older, as you progressed as an

21 individual, you noticed the inequities in the system

22 itself.  It wasn't as noticeable as a young child, but

23 as you got older, you recognized it was stark

24 differences in what you received as an education.

25 Q.   Well, what about the communities in which you grew

1    up, was it integrated or segregated or what?

2    **A.**    Neighborhoods were totally segregated.  Stark

3    differences in terms of the community itself.  We had

4    red dirt roads, the roads were not paved, no sidewalks.

5    I didn't experience an indoor toilet until I was -- had

6    graduated high school.  We had outdoor toilets during

7    my whole adolescent years.  We didn't get an outdoor

8    toilet until after I graduated high school.  Totally

9    segregated, the schools, businesses, hmm, just no

10   really communication at all in terms of black and white

11   communities.  And that was reenforced by your parents

12   who had gone through the same inequities, and so they

13   kind of had to sort of prepare you in terms of how you

14   were to respond if you were approached by someone --

15   well, a white person and what have you.

16   **Q.**   So how were you to respond?

17   **A.**   You had to defer, because they wanted to protect

18   you.  Your parents wanted to protect you, and they knew

19   what they had gone through and what they had

20   experienced, and so they prepared you to sort of bite

21   your tongue if someone said something negative to you,

22   or if someone treated you -- if someone physically

23   mishandled you, and you learned as you looked at your

24   parents, just subtle things that you noticed in your

25   parents that you saw -- for instance, my father, when I

1    would notice him conversing with a white person how he

2    would never look that person in the eye.  He always

3    looked down as if he looked them in the eye, that was

4    immediately seen as a confrontation, a confrontation

5    with them.  And so walking down the streets downtown,

6    deferring to white people as you walk down the

7    sidewalk, you moved aside, and you stepped off the curb

8    and what have you, things like that.

9    **Q.**   Well, did you have to do that when you were

10   growing up?

11   **A.**   Yes.  It was something that your parents, you had

12   seen them do, and so it was kind of ingrained and

13   instilled in you that you always had to defer to that.

14   There had been too many instances of people who had not

15   done that and who were either beaten or jailed or

16   something of that nature.  That's just how stark it was

17   at that time.

18   **Q.**   Well, any specific incidents that happened to you,

19   racial incidents that you would like to discuss?

20   **A.**   Yes.  I recall my brother, my older brother who

21   was in the Navy, he was on his second term.  During

22   that time -- my mother was a domestic worker, she

23   worked in white people's homes, she kept and fed their

24   children.  My father was a laborer who worked at what

25   was called then a basket factor, manufacturing baskets.

1    During that time there was what we called a policy man

2    insurance agent who would to your house and collect the

3    policy, the money for your policies, and on this one

4    occasion my brother was -- who had traveled all over

5    the world and he was home on leave, and I was about in

6    tenth grade, I believe, and we were sitting on the

7    front porch, and the policy man drives up, and he walks

8    up the steps, he never bothers to knock, but he walks

9    past us and he walks into our house without saying who

10   he was or speaking or anything.  So my brother -- to

11   me, it was kind of normal because that's what they

12   always did, but my brother who had traveled the world,

13   and had, you know, had sort of, you know, he'd been out

14   there and he'd experienced other things, you know.  My

15   brother got up and confronted him and said, you know,

16   why are you walking through our house, you didn't even

17   speak, you didn't knock, we don't know who you were.

18   So the policy man was offended simply by him asking the

19   questions.  And so there was a confrontation, and my

20   brother literally threw him off the porch, and we took

21   him, and we both grabbed and took him to his car

22   because when my brother did that, that kind of embolden

23   me, and so we put him in his car, and so he drove off.

24   My mother and father, they were just afraid.  So they

25   -- my mother packed a lunch for us, said we had to get

1   out of town.  I had an uncle who lived in Atlanta, so

2   she packed a lunch, and we drove and we went to

3   Atlanta.  The thing about is that we didn't hear

4   anything more about it.  We thought that -- I stayed in

5   Atlanta for about a week, and my brother went on back

6   to whatever he was stationed, but we never got any

7   reports from the police or -- that was it.  And so,

8   there were other incidents also when I became involved

9   in the Civil Rights Movement.

10  Q.   When did you become involved in the Civil Rights

11  Movement?

12  A.   When I was a junior in high school, there was what

13  was called the Americus Business League, which

14  consisted of several local black businessmen, civic

15  leaders who decided that they wanted to start a voter

16  registration, voter education -- voter registration

17  drive and voter education drive, so as a young kid, I

18  began to -- the organization was run by a man named Sam

19  Weston who was a local tailor on Cotton Avenue.  He

20  also ran a soda shop where teenagers would hang out

21  after school.  And he was also the first black to run

22  for public office in Americus.  So he would encourage

23  us kids to become involved.  We would go back by his

24  shop in the afternoon after school and we would

25  literally canvass the neighborhoods door to door, going

1    door to door, seeing if people, African Americans were

2    registered to vote.  If they wadn't, we'd take their

3    names down.  We would arrange for them to be picked up,

4    if they didn't have transportation to the courthouse to

5    register.  And that was my first involvement.  In 1961

6    Martin Luther King was brought to Americus from Albany

7    and was jailed in the Sumter County jail.  He had been

8    arrested in Albany, and they said they brought him to

9    Americus for safekeeping, and he was placed in the

10   Sumter County jail.  That was when the student

11   nonviolent coordinating committee, which had been

12   operating in Albany and Southwest Georgia came to

13   Americus under the leadership of Charles Sherrod,

14   Shirley Sherrod.  So, that first venture into that

15   political activism sort of pushed me toward that group.

16   They came into Sumter County to start a voter

17   registration drive, and, again, after school, I would

18   go to what we called the SNIK office.  SNIK was Student

19   Nonviolent Coordinating Committee.  And we would

20   literally canvass neighborhoods door to door, taking

21   people down to register.  There were occasions when I

22   would -- we had this old Volkswagon bus that we would

23   line people up and arrange to take to the courthouse to

24   register.  And when I took some people down, there

25   would normally be about 12 to 15 people, and we would

1    stand in the hallway to wait to see if they could

2    register.  A couple of occasions I was attacked from

3    behind by a gentleman, who was -- his name was J.W.

4    Southwell.  He was the justice of the peace, and he had

5    an office in the courthouse there, and he would be the

6    main antagonist who would attack people from behind,

7    hit them and beat them.  And one day he attacked me as

8    I was standing in line with people, and --

9    Q.   Well, what --

10   A.   -- we were taught to --

11   Q.   What year was that?

12   A.   This was 1963.

13   Q.   Okay.

14   A.   And we were taught when we were attacked to curl

15   up in a fetal position on the floor to protect our

16   heads and our bodies from being kicked and what have

17   you.  We always expected something like that to happen,

18   so we prepared for it.  We would actually have these

19   classes where we would teach people how to defend

20   themselves, nonviolently by not fighting back because

21   we knew if we did, then we wouldn't live for the next

22   day.

23   Q.   Well, were you able to hold meetings, voter

24   registration meetings, for example, in local black

25   churches?

1    A.    We did initially.  We couldn't inside the city of

2    Americus because the local black pastors were afraid.

3    And during that time there were a number of church

4    bombings throughout Southwest Georgia and so pastors

5    were afraid to let us use their churches.  So the first

6    churches we actually used were out in the country, out

7    in the county.  One was called New Pineville Baptist

8    Church, one was called New Corinth Baptist Church.  We

9    would load school buses, old school buses in the

10   evenings and ride those buses, a 15, 20-minute drive

11   out in the country and we would have meetings there.

12   It wasn't until about a year later that the churches,

13   one by one in Americus began to open up and let us,

14   allow meetings inside the City of Americus.

15   Q.    Well, when you joined SNIK, did you work in other

16   counties?

17   A.    I did.  I began in Americus, but we would always

18   call in other counties if there was, for instance, if

19   there was an election held where the first black

20   decided to run for office, and we would send people to

21   other counties to work on those drives and to get

22   people registered and to take them to down to vote as

23   well.  Places like Terrell County, Dawson, Lee County,

24   and Dougherty County as well.

25   Q.    Well do you know who was the first black to run

1      for political office in Sumter County?

2      **A.**    That would be Sam Weston who -- yeah.

3      **Q.**    And what year was that?

4      **A.**    That was 1962.

5      **Q.**    What office did he run for?

6      **A.**    I think it was justice of the peace, I believe.

7      I'm not sure.  I think that's what it was though.

8      **Q.**    Well, did he win or lose?

9      **A.**    He lost the election, yes.

10     **Q.**    Did you ever attempt when you were living in

11     Sumter County to desegregate any places of public

12     accommodation in Americus?

13     **A.**    Yes, I did.  I was part of the first group of 11

14     who decided to try -- once we began the voter

15     registration drives, we began to -- as students, you,

16     know, we couldn't go to any places.  The most visible

17     and places of segregation was, to us was a movie

18     theater.  It was called the Martin Theater.  You could

19     go to the theater, but you had to go down to a separate

20     ticket window in the back, go down this long dark alley

21     and then walk up three flights of stairs and sit in the

22     balcony.  And so that was chosen as a target by

23     students, not the leaders of the -- not the civil

24     rights leaders, but the students actually decided that

25     we wanted to see if we go into that theater.  So one

1    night 11 of us stood at the front window, the ticket

2    window, and we stood there, and they wouldn't wait on

3    us, and so they called the police.  The police came and

4    arrested us for disorderly conduct and failure to obey

5    an officer.  They put us in jail, took us to court the

6    next Monday -- the next morning, and they sentenced us

7    all to 90 days probation, and as kids we didn't realize

8    what probation really meant.  The next week, four of us

9    who had originally -- 11 were arrested again for the

10   same -- at the same theater, and they took us to court

11   the next morning and they said we'd have to serve those

12   90 days sentences in the city prison.  So, of course,

13   as kids we didn't -- just knew we were going to get out

14   of jail.  They're not going to put us in jail for 90

15   days, you know.  But they did.  They sent us to city

16   prison.  They put us in prison garb, and the next day

17   they took us out to work.  There were two, myself and

18   another guy, and two women, two girls.  That first day

19   we went out, we decided we're not going to work, and so

20   we just -- we just sat down.  They took us and put the

21   two guys in what was called the hold at county jail.

22   The hold was a six by six concrete bunker that had a

23   small opening at the bottom of the door where they

24   would put a cup of water and some bread each day for

25   you to -- well, we decided we were going to fast.  The

1    other gentleman's name was Bobby Lee Mathis -- Bobby

2    Lee Jones, who still lives in Americus.  There were two

3    women, Lena Turner and Loren -- Lorene Sanders, they

4    were going to put the women on the street also, but the

5    ministers, the black ministers got together and

6    demanded, which was quite bold at that time, that they

7    don't put those women on the street, working and

8    digging ditches and things like that.  So the women

9    were placed in jail.  So myself and the other guy we

10   decide we were going to go on a fast.  So we wouldn't

11   accept the bread and water.  We fasted for about a week

12   til we passed out.  And they took us out, took us down

13   to Sumter County hospital and pumped some fluids in us,

14   took us back to the jail.  After that, we went to work.

15   Each day they would take us out with an armed guard.

16   And they had special details for us because we were

17   civil rights demonstrators, we were those agitators.

18   The most egregious duty they had for us was to shovel

19   -- they took us to the sewage plant in Americus, those

20   long pools of sewage, and once a week we had to dig out

21   those.  They would send an armed guard with us, just

22   the two of us.  They put us on the back of a truck with

23   an armed guard.  They'd take us to these pools, and

24   they'd give us pitch forks, not shovels, pitch forks to

25   shovel up the sewage on the back of this dump truck.

1    And on weekends they put us on the back of a garage

2    truck to pick up the garage in communities.  We dug

3    ditches, we cut grass, anything the city thought, but

4    the worse duties they would give to us because they

5    were trying to punish us even more.

6    **Q.**   Well, after you were released did you do any

7    picketing of local stores in Americus?

8    **A.**   Yes.  Every move -- any time they attempted to

9    suppress us and oppress, even -- it just embolden us

10   that we knew that there was no turning back.  Once we

11   became involved and emersed in that struggle, we knew

12   that we were at a point that we had to do what we -- we

13   had to pursue and just go to the next level, which

14   meant places of -- testing other places of public

15   accomodation, the restaurants, and, of course, the

16   theater, the schools.  The grocery stores that refused

17   to hire blacks, we would have what we called shop-ins

18   where we would just go into the stores and we'd just

19   take an empty cart and just push it around the store,

20   demanding that they hire blacks in positions, store

21   clerks and what have you, things like that.

22   **Q.**   Well, was there any big civil rights demonstration

23   that took place in Sumter County in the 1960s?

24   **A.**   Yes, there were.  '63 was when the largest

25   demonstrations occurred, which, as I mentioned, started

1    out around the Martin Theater, but then there were

2    other places of accomodation that we were trying to

3    integrate as well.  And as people became arrested, more

4    and more people would meet, and they would follow those

5    demonstrations as well and become arrested.  So much so

6    that the jails became full in Americus, and they began

7    to take demonstrators out to different counties to be

8    jailed, places like Leesburg, Terrell County.  The most

9    infamous was the Leesburg, Georgia stockade, which was

10   an abandoned prison camp where they took up to 35 minor

11   girls, age from 11 to like 15.  They were first jailed

12   in Americus, but then in the middle of the night they

13   took a tractor-trailer truck, backed it up to the jail,

14   loaded all these girls into the back of this

15   tractor-trailer truck and drove them down to Leesburg,

16   not knowing were they were going, they couldn't see

17   where they were going.  Their parents hadn't been

18   notified and they dropped them off in abandoned prison

19   camp that hadn't been occupied in at least 15, 20

20   years.  It was rat and rodent infested.  On one

21   occasion a guard put a snake in there with them.  And

22   some of them stayed in there from two weeks up to 35,

23   40 days.  This story has been documented in a film

24   called The Stolen Girls of Americus.  You can Google

25   that, and you'll see that entire story.  But there were

1    other of us who were sent out to Dawson, Georgia

2    stockades as well.

3    **Q.**    Well, do you know approximately how many civil

4    rights demonstrators were arrested at that time?

5    **A.**    I think in the summer of '63, I would say close to

6    3 to 500 people over a period of time.

7    **Q.**    Well, does the phrase the Americus Four have any

8    relevance --

9    **A.**    Yes.

10   **Q.**    -- or resonation with you?

11   **A.**    On one occasion during a demonstration at night --

12   and sometimes a demonstration was spontaneous, they

13   weren't planned.  We would have these mass meetings,

14   and after the mass meetings people would go out into

15   the streets and decide to protest and march on the --

16   the theater, for instance.  On this particular night

17   the strategy for the city officials and the police was

18   that they want to cut off the head of the snake, and

19   they thought the head of the snake was the civil rights

20   leaders who were there.  There were snake people.

21   There was one person who was from CORE, Congress of

22   Racial Equality and from SCLC also.  On this particular

23   night, as we marched down Cotton Avenue -- well, I was

24   in jail at the time, but as they matched down Cotton

25   Avenue, the police singled out four civil rights

workers, three from SNIK and one from CORE, Congress of
Racial Equality, and they charged them with
insurrection, a century old law that at that time
demanded the death penalty in Georgia.  It was a death
penalty offense, a capital offense.  So they arrested
them, separated them, put them in jail.  They stayed in
jail three months and they were finally represented by
the gentleman who this building is named after C.B.
King, who represented all of us.  That's an irony that
I find myself today in a building, that C.B. King was
the attorney who represented all of us and they were
successful in that trial.  They were released three
months later after having served about 90 days in jail.
The case itself captured the nation and also the
international community because the thought that these
guy could be arrested and possibly sentenced to death
for exercising their constitutional rights.

Q.  Well, were there any subsequent civil rights
demonstrations in 1965?

A.  Yes.  '65 brought about another turn of
demonstration.  The first woman to run for justice of
the peace against a gentleman who I said attacked me,
J.W. Southwell, was Mary Kate Fish Bell.  She decided
that she would run for the office.  On the day of the
election, she, as a candidate, and three other women

1    decided they wanted to vote -- the voting lines were

2    segregated, of course.  So they decided they wanted to

3    get in the white voting line to see if they could vote.

4    Well, they did, and they got arrested.  That galvanized

5    the community, and so another set of demonstrations

6    began that lasted several weeks demanding their release

7    from jail.  They were finally released, but there were

8    a lot of demonstrations, and on one occasion there was

9    -- whites in the community had formed these night rider

10   groups who would ride through the black communities,

11   most notably the housing projects on the north side of

12   town, and they would throw fire bombs and bottles and

13   bricks into those homes and shoot into the air and

14   things like that.  One night we were having an all

15   night vigil on the grounds of the courthouse demanding

16   the release of those women.  We brought our blankets

17   and sleeping bags to literally sleep on the concrete

18   floor of the parking lot of the courthouse.  About an

19   hour after we'd been there, we heard shots ring out,

20   and a block away, we learned later on that a white

21   youth had been killed by two blacks who had been -- who

22   had rode by that -- what was happening was that whites

23   had gathered on the corner, and they were throwing

24   bricks and bottles into every car that came by that had

25   black people, black occupants in the car.  Well, it

1    turned out they threw bricks at this car and one of the

2    guys was armed, and so he shot into the crowd and

3    killed one of white youths on the corner.  And, of

4    course, when we heard that news, everybody -- we

5    thought it best that everybody leave so we packed up

6    our sleeping bags and we ended that demonstration that

7    night and dispersed.

8    Q.   Well, during the time that you lived in Sumter

9    County did you think that voting was racially

10   polarized?

11   A.   Very much so.  Every attempt was made to keep

12   African Americans from voting.  My mother, who had not

13   been registered, and her brother, who drove a cab, I

14   recall the first day that she registered to vote and

15   how happy she was, but before that, what really drove

16   her, was that -- as I said, she was a domestic worker,

17   and she had been at a rally at the courthouse grounds

18   before she had registered, and she had been seen by the

19   neighbor of the woman she worked for, and when the

20   woman reported that she had seen her at the courthouse,

21   she fired her.  Well, she got work after that, but, I

22   mean, this woman fired her because she was at the

23   courthouse attempting to register to vote.  See, there

24   was that kind intimidation.  Some that was more blatant

25   than others at times.

**Q.**   So you graduated in 1964; is that correct?

**A.**   That is correct, yes.

**Q.**   Well, what did you do after that?

**A.**   I continued to stay in Americus, working in the movement for about another year and a half doing the same kind of work.  At the time the organization of Student Nonviolent Coordinating Committee was offering scholarships for people to go to college if they would return to their home town and continue the kind of work we had been doing.  So I had a scholarship to go to Tougaloo College in Mississippi, Tougaloo, Mississippi, just outside of Jackson.  I went there to -- I was going to major in socialism -- sociology.  I stayed there a couple of years, but I -- when I got there my work really began to -- Mississippi was involved in its own civil rights movement, and so I wound up working a lot in the Mississippi Delta with tenant farmers who had been displaced and taken off their property for registering to vote and things like that.  On one evening I was going to a lecture, and as it turned out, the lecture was conducted by an attorney called Warren Fortson from Americus who was a brother of the secretary of state, then secretary of Ben Fortson.  Warren Fortson was a white lawyer from Americus who had defended -- defended two black students, two of them

1    had gone to Americus -- attended Americus High.  He had

2    been an ally of the Civil Rights Movement, and for that

3    alliance he had been forced to leave Americus, forced

4    out of Americus.  He now lives in Atlanta.  I left

5    Tougaloo after a couple of years, but at that lecture

6    in Mississippi I ran into Warren, and I told him I was

7    going to be leaving pretty soon, and he said, well,

8    what are you going to do.  I said, I don't know.  He

9    said, well -- I told him I was going back to Atlanta,

10   and he said, well, I'll tell you what, go by the

11   secretary of state's office, my brother Ben, and see

12   what -- so I went by his office, and they sent me to

13   the state department of archives and history, and I

14   found a job there, and I was taken in as an apprentice,

15   and I learned the craft of paper restoration, and

16   conservation and restoration, and I did that, restoring

17   state documents and papers for about 15 years, learning

18   the craft of how to restore paper documents.  During

19   that time I took up photography.  I enrolled in the Art

20   Institute of Atlanta.  Before I resigned my job at the

21   archives, I opened up an art gallery, and I got to the

22   point where I was comfortable enough, I resigned the

23   state job, and I continued the art gallery job for

24   about 15 years.  When I closed the gallery, I went to

25   work for the High Museum of Art, and there I worked at

1    in the gift shop and also as an installation,

2    installing art work, what have you.  I resigned from

3    that position in '90 -- I'm sorry, 2013.

4    Q.   Well, do you know when the schools were

5    desegregated in Sumter County?

6    A.   In '64, I believe it was when we -- you mean the

7    first attempt to integrate the schools or when it was

8    officially -- the first attempts was -- there were four

9    students who integrated Americus High.  Dobbs Wiggins,

10   Jewel Wise, Robertiena Freeman, was the daughter of one

11   of the ministers whose church we used, and David Bell.

12   Those four students were the first ones to integrate

13   Americus High, and they faced all kinds of harassment,

14   physical, beatings and what have you, things like that.

15   As well as students from Koinonia Farm, nearby Koinonia

16   Farm.  I don't know if people are familiar with

17   Koinonia Farm outside of Americus.  They were allies of

18   the Civil Rights Movement, and it was a place of refuge

19   for us.  When we would be released from jail, it was a

20   place we could go to revitalize and rejuvenate

21   ourselves for the next battle.  It was an integrated

22   community, and their kids suffered the same abuse as

23   black students as well because --

24           THE COURT:  Excuse me.  Excuse me, just one

25   moment.  I thought the question was when were the

1    schools integrated.  I know the witness has a lot of

2    information about a lot of things, but we've got to

3    manage the evidence a bit so that we can get finished,

4    and I thought your question was when was the school

5    integrated, and we are out into other communities,

6    outside of Americus.  What I'm saying is, if you would

7    assist the witness in narrowing his testimony where

8    it's needed so we would get to those things that are

9    most directly pertinent to the issues here.

10              MR. MCDONALD:  I will, Your Honor.  I have

11   just a few more questions, Your Honor, but I will ask

12   the witness to be more specific.

13   BY MR. MCDONALD:

14   Q.   When were the schools formally desegregated in

15   Sumter County?

16   A.   I believe it was '64.  I'm just not sure though.

17   I'm not sure of the year exactly.

18   Q.   Well, do you know what the response was in the

19   white community to the formal desegregation of public

20   schools in Sumter County?

21   A.   The response immediate was -- during that time, if

22   I can elaborate, there was effort to -- I think the

23   local officials saw the handwriting on the wall after

24   the *Brown versus Board*, and I recall the commission

25   called a Sibley Commission, I believe, where they were

1     ten counties, I believe.  They decided to hold these

2     meetings on how communities would respond to

3     integration of the school, and Sumter County, I

4     believe, was where the first meeting was held.  And

5     what was decided was that segregation at any cost.

6     That was when the first private school came about,

7     Southland Academy in Americus, I believe.  Their

8     response was to create private schools that would

9     remain segregated at that time.

10    **Q.**    What was the name of the school?

11    **A.**    Southland Academy.

12    **Q.**    Do you know what the racial composition of that

13    school is today?

14    **A.**    I believe it's probably still about 95 percent

15    white and about maybe 3 to 4 percent black I believe.

16    **Q.**    Well, do you still have contact with Americus and

17    Sumter County?

18    **A.**    I do, yes.  Several years ago myself and several

19    other veterans of the Americus Civil Rights Movement

20    came back to Americus, and we decided that we would

21    begin to collect and document all activities of the

22    Civil Rights Movement.  That meant collecting papers,

23    photographs, film, whatever we could find, artifacts

24    memorabilia, that -- from the movement, and our

25    long-range goal was to eventually house it in a civil

1    rights museum or a civil rights center so that we could

2    pass on the struggles of my generation to this

3    generation so they could empower themselves and know

4    that the struggle that we face is never over, that it's

5    a continuing struggle, and they have to be prepared for

6    it.  The organization is called the Americus-Sumter

7    County Civil Rights Movement Remembrance Committee.

8    That is a long title, but we've held several

9    remembrances where we've recognized people who have

10   contributed to the Civil Rights Movement in Americus

11   and Sumter County.  We started out giving scholarship

12   to kids, book scholarships.  We try to recognize those

13   leaders in the community who continue to uplift and

14   empower that community, politically, culturally, and

15   what have you.  We don't want the building that we

16   eventually have to just be a place where people can

17   come and look at things.  We want it to be a living

18   place where they can come and be engaged in things that

19   will empower them eventually.

20   Q.   Well, have you been involved in any recent

21   meetings or conferences in Sumter County?

22   A.   Yes.  I recently attended the fifth anniversary of

23   the Koinonia Farm.  We continue to hold -- I

24   participated in the NAACP annual conference banquet.

25   We participate in King Day activities in Americus, our

1    organization, Martin Luther King Day.  We try to

2    participate in all the community activities that occur

3    there.

4    Q.   Well, my last question for you is, how would you

5    describe race relations today in Sumter County?

6    A.   It's interesting because I go to Americus now --

7    you know, Americus is my hometown, I mean, and I always

8    tell people that I may not live in Americus, but

9    Americus lives in me, and that is to say that it will

10   always be my hometown, but I come back now and I see

11   things virtually unchanged.  It's a city that's still

12   polarized.  It's a school system that remains as

13   segregated today as it was 50 years ago in my opinion.

14   I still see inequities in the school system.  There's

15   very little interaction between whites and black.  And

16   it's a far cry from what you would think it would be

17   56 years later.  We've been trying to get the city to

18   recognize the history of the Civil Rights Movement and

19   not only to see that it not only impacted Americus, but

20   it impacted the nation, because what happened in

21   Americus literally impacted the 19 -- Civil Rights

22   Bill, you know, and also the Voting Rights Act as well.

23   The struggle that took place there.  Had it not for

24   those demonstrations on a daily basis, it would not

25   have forced that legislation out of Congress to get

1    bills finally passed.  So this is history that we

2    need -- we want to pass on, but we don't get the

3    support from the city.  The city doesn't want to

4    recognize that.  We have a building that's been -- a

5    little development toward the northern corridor of

6    Americus.  All the development has gone toward the

7    southern part of Americus where whites live.  They're

8    historic buildings in the northern corridor where the

9    blacks are, but they refused to be recognized in the

10   historic district, and because of that we can't seek

11   funding that -- to renovate or rehabilitate those

12   buildings that are historic in nature.  And there just

13   seems to be very little willingness to embrace that

14   history, you know, and help us with this project.  It's

15   still segregated.

16   Q.   Thank you very much, Mr. Mahone.

17        MR. MCDONALD:  Your Honor, that's all the

18   questions I have.

19        THE COURT:  All right.  Cross examination,

20   Mr. Braden?

21        MR. BRADEN:  No questions, Your Honor.

22        THE COURT:  All right.  Is there any reason

23   this witness cannot be excused?  Just a minute.

24        MR. BRADEN:  He may be excused, Your Honor.

25        MR. MCDONALD:  No reason, Your Honor.

1          **THE COURT:**  All right.  Nobody objects and

2     you can leave if you wish or remain if you wish.  All

3     right, you may call your next witness.

4          **MR. MCDONALD:**  Our the next witness is John

5     Marshal, Your Honor.

6          **THE COURT:**  All right.

7          **COURTROOM DEPUTY:**  Do you solemnly swear or

8     affirm that the testimony you are about to give in the

9     case now before the Court will be the truth, the whole

10    truth, and nothing but the truth?

11         **THE WITNESS:**  I do.

12         **THE COURT:**  All right, you may begin, Mr.

13    McDonald.

14                     **JOHN MARSHALL**

15      **Witness, having first been duly sworn, testified on**

16                  **DIRECT EXAMINATION**

17    BY MR. MCDONALD:

18    **Q.**   Would you please state your name for the record?

19    **A.**   John D. Marshall.

20    **Q.**   And what is your race, Mr. Marshall?

21    **A.**   Black.

22    **Q.**   And where do you currently live?

23    **A.**   I'm 155 Markenburg Drive in Americus, Georgia.

24    **Q.**   Well, let's redact your address --

25         **MR. MCDONALD:**  Your Honor, is that correct?

1    He gave his address.

2         THE COURT:  Well, you can, but it's already

3    -- it just saves y'all a lot of trouble for redaction

4    later on.

5         MR. MCDONALD:  Okay.  Thank you, Your Honor.

6         THE COURT:  If you ask a witness that

7    directly, they're going to give you the information.

8    So you have to warn them not to be that specific.

9         MR. MCDONALD:  I should have done that, Your

10   Honor.  I apologize for not having done that.

11        THE COURT:  All right.

12   BY MR. MCDONALD:

13   Q.   So when and where were you born?

14   A.   I was born in Savannah, Georgia, 1946.

15   Q.   And what did your parent do there?

16   A.   My father was a railroad man for 44 years on the

17   Central Georgia Railroad.  My mother was a beautician.

18   Q.   Well, I don't want to ask too many questions about

19   Savannah, Georgia since this lawsuit involves Sumter

20   County, but was Savannah racially segregated when you

21   were growing up there?

22   A.   Yes it was, very segregated.

23   Q.   And what was like growing up in Savannah for you?

24   A.   Well, just like any other typical black American,

25   we were segregated.  We were on the west side of town.

1    Whites were on the east side.  I went to all black

2    schools.  I graduated from a black high school.  And it

3    was just segregated situation.

4    **Q.**   All right.  Well, what did you do after high

5    school?

6    **A.**   After high school I went to Savannah State College

7    in Savannah, Georgia, and after that I went into the

8    Air Force for four years.  And after the Air Force I

9    worked for Pfizer Pharmaceutical for six years, and

10   then I want on to medical school.

11   **Q.**   And when did you come to Sumter County?

12   **A.**   I came to Sumter County in 1986.

13   **Q.**   Well, what did you do when you came to Sumter

14   County?

15   **A.**   When I came to Sumter County in 1986, I had

16   attended medical school, and I attended on a

17   scholarship through public health.  And when I finished

18   medical school, I had to come to an area of need, and

19   Sumter County was the area of need that I came to.

20   **Q.**   And where specifically in Sumter County?

21   **A.**   Now, once I got to Sumter County, I first worked

22   at Plains Clinic, Jimmy Carter's hometown, and the

23   clinic subsequently closed down temporarily in '88, and

24   then I moved over to Leslie, Georgia, which is still in

25   Sumter County, and I finished my public health

obligation there, and I stayed here after that.

**Q.**   So you've been in Sumter County then for -- from what year to?

**A.**   From '86 to now, 31 years.

**Q.**   Well, have you ever run for public office?

**A.**   No.

**Q.**   And tell me why not.

**A.**   Well, I had been president of the NAACP, and it's hard to run for office and fight in civil rights type organizations, so I would work and help out candidates, but I did not run.

**Q.**   Well, have you been involved in any public affairs in Sumter County?

**A.**   What you mean public affairs?

**Q.**   Well, you know, organizations.

**A.**   Yeah, well, like I said, I was president of NAACP, National Association for the Advancement of Colored People, for 14 years in Sumter County, and I was succeeded by Mr. -- Reverend Mat Wright, and probably some other organizations, but that was the main one that I participated in where I --

**Q.**   Well, what did you do when you were a participant in the work of the NAACP?

**A.**   Well, as president we had to deal with a lot of complaints, usually complaints dealing with unfair

1   practices, racist type actions against several blacks,

2   and we also defended some whites, but it was pretty

3   much fighting for the rights of those, whether it was

4   employment, law enforcement, any -- almost any area

5   where people were working, hospitals, anywhere there

6   were discrimination cases, unfair practices.

7   **Q.**   Well, did you read any articles in the local

8   newspaper that you thought were racially improper?

9   **A.**   Oh, you talking the local paper we have.

10   **Q.**   Yes.

11   **A.**   In Sumter County.  Yes.  In fact, it was -- I was

12   a victim of that paper because I had -- I was president

13   of NAACP, and there was an old lawsuit against me, and

14   it was dropped, but because the editor of that local

15   white-dominated white newspaper in Americus wanted to

16   make an example of me and she published on the front

17   page above a full article about that lawsuit which was

18   dropped.  And so not only in several other cases, but

19   we've seen them in that particular newspaper go after

20   pretty much progressive blacks, blacks who are in

21   important positions, blacks who ran for office, that

22   paper would give a lot of negative news on them.

23   **Q.**   Well, what was the name of that local newspaper

24   you're referring to?

25   **A.**   The Americus Times Recorder Newspaper.

1    Q.    And did you ever have an occasion to make a

2    comment on an article that was entitled the Cornbread

3    Murder?

4    A.    Yes.  That was the reason why the editor came

5    after me.  When I saw the article the Cornbread murder,

6    this was a woman whose husband shot her and allegedly

7    she had burned some cornbread.  The gentleman, the man

8    who shot her was mentally ill, and I went to the editor

9    of that paper and I told her this was wrong to

10   sensationalize this woman's death about a cornbread and

11   to call it the cornbread murder.  So after that she

12   decided to put me in the paper, and that's when, after

13   she did that, that's when I had to develop my own

14   paper.

15   Q.    So you developed your own paper in response to the

16   article?

17   A.    Yes.  And the other negative articles against

18   black people in that city.  That was why I did the

19   paper.

20   Q.    What was the name of the newspaper that you

21   founded?

22   A.    The newspaper is the Americus Sumter Observer

23   newspaper.

24   Q.    Is it still in existence?

25   A.    It's been in existence for 20 years this year.

1    Q.   What issues do you cover in the Americus Sumter

2    Observer?

3    A.   Pretty much what the NAACP was doing, and that was

4    exposing any racial discrimination, unfair practices,

5    and just news articles that they would put in, we would

6    counter it with the truth if we -- if we had

7    information and research that it was a lie, we would

8    show the truth.  So we did a lot of that in Sumter

9    County.

10   Q.   Do you continue to do that or?

11   A.   Still doing it to this day.

12   Q.   Well, do you have any examples of recent things

13   that you've done that you just described?

14   A.   Hmm, recent.  I can't think of anything right now.

15   If I think of it, I'll tell you in a minute.

16   Q.   Okay.  Well, how would you describe your

17   readership, to whom are you --

18   A.   We are actually reaching quite a few.  We don't

19   have a scientific or a certified number of readers

20   listed and you can certify them, but we do reach, we

21   estimate, about 25,000 because we actually give papers

22   away to churches and to beauty shops and what have you,

23   plus we have the actual newspaper racks, and we

24   distribute that way.  So we do reach quite a few.  And

25   our thing is that everybody does not read it, but we

1    notice that the nonreaders hear about what we've done

2    through readers.

3    **Q.**   Well, based on your experience living in Sumter

4    County how would you describe race relations today in

5    Sumter County?

6    **A.**   It's still pretty much as racist as it was when I

7    first got here in 1986.  I couldn't believe some of the

8    thing I saw.  The biggest thing I saw when I got here

9    was the people were so -- blacks were so afraid, they

10   were almost trembling in fear, and I watched this, and

11   that's one of the reasons why I became very active

12   because I did not like the way they were treated, and I

13   thought I needed to fight for that.

14   **Q.**   Well, do you think that your newspaper has had any

15   impact on race relations in Sumter County?

16   **A.**   Oh, I think it has because when we first came out,

17   we had to really fight that local white paper, the

18   Times Recorder.  As time went on, whenever we would

19   expose racist discriminatory behavior from whatever

20   entity, the public looked at that, and they were

21   waiting on that Times Recorder to counter us as if we

22   were not telling the truth, but as time went on, the

23   public realized that we were giving true information,

24   information that we could support and back up.  And

25   that other paper couldn't do it, and they couldn't come

1    after us because we had the truth on our side while

2    they were coming with other things.

3    Q.   Well, as someone who has lived in Sumter County

4    how do you think that the Sumter County School Board

5    functioned when blacks were a majority of its members?

6    A.   It was very apparent that when we had blacks in

7    the majority of that school board, the achievement went

8    up on, AYP.  Most of the schools, almost six schools

9    had great scores with average yearly progress.  We had,

10   when Dr. Perry, the first black superintendent we had

11   and the majority was black, we had six black male PhDs

12   in administration.  As soon as he left and the majority

13   changed to white, we ended up with hardly any.  So we

14   lost a lot.  The main thing that we lost was the

15   achievement and the progress of the students.

16   Q.   Well, do you know how many black candidates have

17   run for countywide office in Sumter County?

18   A.   Oh, yes.  Bill Houston, who ran for sheriff before

19   I got here, he became a friend of mine.  In fact, he

20   helped me get placed and what you have.  He ran for

21   sheriff countywide and lost.  He was a high ranking

22   policeman in Detroit, and this is his home in Americus,

23   he came back to run for sheriff, but he didn't win

24   countywide.  We also had just recently two school board

25   members that just ran, Michael Coley, Kelvin Pless,

1    they ran in these at-large districts, and they both

2    lost.

3    **Q.**    Well, do you think that blacks in Sumter County

4    today are politically cohesive and tend to vote as a

5    block or a group?

6    **A.**    Yes, we have done that, yes.

7    **Q.**    What do you base your view on?

8    **A.**    Well, just looking at the actual numbers, the --

9    when we look at those numbers at the end of these

10   elections we see that most blacks voted Democratic and

11   voted in a block.

12   **Q.**    Well, just one moment.  Can you tell me what year

13   the black candidate ran for sheriff that you just

14   testified about?

15   **A.**    Well, the candidate ran for sheriff -- oh, we also

16   had one, I forgot, one other candidate was Nelson

17   Brown.  But I can't tell you the year, but he ran

18   probably about, maybe ten years ago.  In fact, he ran

19   twice for sheriff, and he lost.  But I can't tell you

20   the year.  I just can't remember the year.  It was

21   probably more than ten years ago.

22   **Q.**    Well, as a medical doctor do you think there's has

23   been a history of discrimination against blacks by the

24   state in Sumter County in such areas as health, voting,

25   education, and employment?

**A.**   Yes.  As a medical doctor I have been really
disturbed by the fact that we did not get the Medicaid
expansion in Georgia from the governor, and we've lost
a lot of lives right in Sumter County in this area
because they don't have access to medical care.  They
can't get preventive care and a lot of people -- we
actually lost the hospital over in Montezuma, which a
lot of people used to have to go there.  And if you
lose a hospital, and they can't get care, if somebody
is about to have a heart attack, you are not going to
make it to Americus or Perry, wherever they had to go.
So I have been disturbed about the way healthcare is on
the state level.  And even locally we've had problems
with our local hospital administration, trying to get
them to take care of these indigents, and the quality
of care has gone down, Albany, as well as Sumter
County.

**Q.**   Well, do you think that has a disparate impact on
blacks?

**A.**   Yes, because most of those patients in those
hospitals are black.  I don't know about in Albany
because a lot blacks would leave -- a lot of patients
would leave Sumter County and come to Albany or go
somewhere else.  So it left a lot of blacks that were
victimized in these hospitals, especially in Sumter

County.

        **THE COURT:**  All right.  Let's stop here.  I think it's an appropriate place to stop for our lunch break.  And we'll resume with the completion of direct at 1:30.  We'll be in recess.

*(RECONVENED; ALL PARTIES PRESENT, 1:35 p.m.)*

        **THE COURT:**  All right.  Mr. McDonald, you may continue the direct examination.

        **MR. MCDONALD:**  May it please the Court.

        **THE COURT:**  Yes, sir.

**BY MR. MCDONALD:**

**Q.**  Dr. Marshall, do you think blacks in Sumter County have a depressed socioeconomic status compared to whites?

**A.**  Yes, we do.  The economy is such that we don't have the jobs, at least that we used to have, so it's even worse than it was when I got there.  At least they had much more industry there, but now it's much less, and it impacts blacks more than any other group.

**Q.**  Well, do you think that that depressed status has any impact on black participation in the political process and school board elections?

**A.**  Possibly, possibly, because when people are thinking about trying to make a living and traveling to find a job somewhere other than Sumter County, it makes

1    it hard on elections and to get people to vote like we

2    want.  So it's been kind of hard.  It does impact them.

3         **MR. MCDONALD:**  That's all the questions I

4    have, Your Honor.

5         **THE COURT:**  All right.  Cross examination,

6    Ms. McKnight?

7         **MS. MCKNIGHT:**  Yes, thank you, Your Honor.

8    We have no questions for this witness.

9         **THE COURT:**  All right.  Is there any

10   objection to this witness being excused?

11        **MR. SELLS:**  Can witness be excused, Your

12   Honor?

13        **MS. MCKNIGHT:**  No objection, Your Honor.

14        **THE COURT:**  No objection.  Then you are

15   excused, sir, and you may leave if you wish or stay,

16   whatever your pleasure.  All right.  You may call your

17   next witness.

18        **MR. SELLS:**  Your Honor, the plaintiffs call

19   Alice Green to the stand.

20        **COURTROOM DEPUTY:**  Do you solemnly swear or

21   affirm that the testimony you are about to give in the

22   case now before the Court will be the truth, the whole

23   truth, and nothing but the truth?

24        **THE WITNESS:**  Yes.

25        **THE COURT:**  All right.  You may proceed.

1          **MR. SELLS:**  Thank you, Your Honor.

2                          **ALICE GREEN**

3     **Witness, having first been duly sworn, testified on**

4                    **DIRECT EXAMINATION**

5     BY MR. SELLS:

6     **Q.**   Good afternoon, Ms. Green.

7     **A.**   Good afternoon.

8     **Q.**   Would you please state your full name for the

9     record?

10    **A.**   Alice Virginia Green.

11    **Q.**   And in what city do you live, Ms. Green?

12    **A.**   Americus, Georgia.

13    **Q.**   What do you do for a living?

14    **A.**   I'm a retired educator.

15    **Q.**   Ms. Green, you're a current member of the Sumter

16    County Board of Education from district one, correct?

17    **A.**   Yes.

18    **Q.**   Great.  Before we get into your service on the

19    board, I want to find out a little bit more about your

20    background.  When and where were you born?

21    **A.**   I was born in Seminole County, Georgia.  When?

22    **Q.**   In what year?

23    **A.**   In 1944.

24    **Q.**   Thank you.  Did you grow up in Seminole County?

25    **A.**   I did.

1    Q.    Where did you go to school?

2    A.    In Seminole County, high school, that is.

3    Q.    You went to Seminole County High School.  And for

4    those of us who may not be familiar with Georgia

5    geography, where is Seminole County relative to Sumter

6    County?

7    A.    It's Southwest Georgia, south of Albany.

8    Q.    Did you graduate from high school in Seminole

9    County?

10   A.    Yes.

11   Q.    In what year?

12   A.    '62, 1962.

13   Q.    Were the high schools integrated in Seminole

14   County when you attended?

15   A.    No.

16   Q.    What did you do after graduating high school?

17   A.    I attended college in Fort Valley State in Fort

18   Valley, Georgia.

19   Q.    And did you graduate from Fort Valley State?

20   A.    I did.

21   Q.    And in what year and with what degree?

22   A.    1973, a bachelor's degree in social science.

23   Q.    Let me ask you a few questions about your

24   employment history.  What was your first job out of

25   college?

1    **A.**    Teaching at the Macon County.

2    **Q.**    And what school in Macon County did you teach in?

3    **A.**    It was Oglethorpe Grammar School at that time.

4    **Q.**    Were the schools integrated when you taught there?

5    **A.**    They integrated while I was there.

6    **Q.**    What did you teach?

7    **A.**    Social Studies.

8    **Q.**    And did you teach in a black school or a white

9    school?

10   **A.**    I taught at a black school.

11   **Q.**    Where did you work after you left Macon County

12   public schools?

13   **A.**    Americus.

14   **Q.**    And for whom did you work in Americus after you

15   left Macon County public schools?

16   **A.**    The Sumter County Board of Education.

17   **Q.**    Were Sumter County schools integrated when you

18   began teaching there?

19   **A.**    They were.

20   **Q.**    And how long did you work for Sumter County

21   schools?

22   **A.**    26 years.

23   **Q.**    When did you retire?

24   **A.**    2000.

25   **Q.**    Did you work at all after that?

1    **A.**    Yes.  I worked four years at South Georgia

2    Technical College in adult education.

3    **Q.**    So how long have you lived and worked in Sumter

4    County, Georgia?

5    **A.**    I have lived in Sumter County, Georgia for

6    44 years.  I worked in Sumter County for 27 years and

7    the other five years in Macon County.

8    **Q.**    So you were living in Macon County while you were

9    -- excuse me.  You were living in Sumter County while

10   you were working in Macon County?

11   **A.**    Yeah.

12   **Q.**    Okay.  You have lived in Sumter County for the

13   last 44 years?

14   **A.**    I have.

15   **Q.**    Okay.  Do you belong to a church in Sumter County?

16   **A.**    Yes.

17   **Q.**    Which one?

18   **A.**    Friendship Missionary Baptist Church.

19   **Q.**    How long have you been a member of that church?

20   **A.**    I became a member of Friendship in 1976, so since

21   1976.

22   **Q.**    Approximately how many members does your church

23   have?

24   **A.**    I would say approximately, maybe a thousand

25   members.

1    Q.   A thousand members sounds to me like a pretty

2    large church.  How large is it in -- among the churches

3    in Sumter County?

4    A.   It is one of the largest churches, however, I said

5    a 1000 members, but that doesn't mean active membership

6    there every Sunday, you know.

7    Q.   I hear some chuckling from the reverends in the

8    back, I think.  What percentage of the congregation at

9    your church is African American?

10   A.   98 percent.

11   Q.   I should have asked -- do you regularly attend on

12   Sundays?

13   A.   Yes.

14   Q.   Okay.  It's foundation for knowing the makeup.

15   Are you involved in any community organizations other

16   than your church?

17   A.   I am.

18   Q.   Can you list those organizations for me?

19   A.   Yes.  Delta Sigma Beta Sorority, Incorporated,

20   City Federation of Colored Women's, Incorporated,

21   Silver Circle Civic and Social Club, the Phoebe Sumter

22   Auxiliaries, Order of the Eastern Star, and Heroines of

23   Jericho, Daughters of Isaac, and I think that might be

24   it.

25   Q.   Okay.  I want to ask you first about the last

1    three you mentioned, the Order of the Eastern Star,

2    Daughters of Isaac, and the Heroines of Jericho.  What

3    are those?

4    **A.**   Those are organizations that are affiliated with

5    the Maternal Order of the Masonic's.

6    **Q.**   How long have you been involved in those orders?

7    **A.**   Approximately, Eastern Star about 35 years and the

8    others maybe 30 years or less, difference.

9    **Q.**   Let me ask you for some general background on the

10   Masons so we can understand your testimony.  The Masons

11   are a fraternal organization, correct?

12   **A.**   Of men.

13   **Q.**   Of men.

14   **A.**   And I'm a member of the Eastern Star, which is

15   like sisters, I guess, to the Masons.

16   **Q.**   Okay.  Are there predominantly white Masonic

17   organizations, and are there predominantly black

18   organizations?

19   **A.**   There are.

20   **Q.**   And the orders to which you belong are related to

21   the predominantly black Masonic organizations, correct?

22   **A.**   Right.

23   **Q.**   Approximately what percentage of the local Sumter

24   County members in the orders that you belong to are

25   African American?

1    **A.**    To my knowledge, 100 percent.

2    **Q.**    Are there predominantly white Masonic

3    organizations in Sumter County?

4    **A.**    It is.

5    **Q.**    Are there any African American members of the

6    white Masonic organizations in Sumter County?

7    **A.**    Not to my knowledge.

8    **Q.**    Do the white Masonic organizations and the black

9    Masonic organizations in Sumter County ever hold events

10   together?

11   **A.**    No.  Not to my knowledge, no.

12   **Q.**    Let me ask you next about the Silver Circle Civic

13   and Social club.  That's a mouthful, but what is that?

14   **A.**    That's basically a social organization, but we do

15   some civic work also.  Its objective is to better the

16   community.

17   **Q.**    How long have you been a member of that

18   organization?

19   **A.**    Since 1977.  It was founded in 1977.

20   **Q.**    And were you one of the founders?

21   **A.**    Yes.

22   **Q.**    Have you held any leadership positions in the

23   organization?

24   **A.**    Yes.

25   **Q.**    Such as?

1    **A.**    President.  I'm currently president today, and

2    I've been president for about ten years.

3    **Q.**    Does the Silver Circle Civic and Social Club

4    engage in any political activity?

5    **A.**    Not -- we do somewhat, such as trying to do voter

6    education in the community.

7    **Q.**    Okay.  What does that mean?

8    **A.**    Just try to educate the people when elections are

9    coming up, the candidates, and just urge them to get

10   out and vote and make their voice heard.

11   **Q.**    What percentage of the Silver Circle Civic and

12   Social Club's members are African American?

13   **A.**    100 percent.

14   **Q.**    Let me ask you next, about the City --

15   **A.**    -- Federation of Colored Women's Clubs.

16   **Q.**    Thank you.  City Federation of Colored Women's

17   Club.  What is that?

18   **A.**    That's a national organization of African American

19   women that also -- they form the sisterhood to try to

20   better the community, to work to make the communities

21   better.

22   **Q.**    And how long have you been a member?

23   **A.**    I would say about 25 years.

24   **Q.**    Have you held any leadership positions in that

25   organization?

1    A.    Yes.

2    Q.    Such as?

3    A.    President and secretary.  Currently I'm -- and

4    I've also been treasurer, but currently I hold the

5    office of secretary.

6    Q.    Does that club engage in any political activity?

7    A.    Basically the same as the other, small scale, just

8    trying to educate the voters of the importance to vote

9    and to let them know when elections are coming up and

10   who's running and the platforms and to help them be

11   educated so they can make intelligent choices of who to

12   vote for.

13   Q.    What percentage of the City Federation of Colored

14   Women's Club is African American?

15   A.    In Americus it is 100 percent, but this is a

16   national organization, so I really can't speak above.

17   I'm just familiar with Americus on the state level, but

18   beyond that, I don't know.

19   Q.    What is the racial makeup of the membership at the

20   state level?

21   A.    I really -- I'm not going to say because I'm not

22   sure 100 percent.

23   Q.    Okay.  All right.  I want to ask you next about

24   Delta Sigma Theta, what is that?

25   A.    That's a sorority.

1    Q.   And how long have you been with Delta?

2    A.   Oh, I joined Delta Sigma -- 25 years.

3    Q.   So you pledged a graduate chapter?

4    A.   Graduate chapter in Americus.

5    Q.   How active is the graduate chapter in Sumter

6    County?

7    A.   We're active.

8    Q.   Have you held any leadership positions in that

9    organization?

10   A.   I have.

11   Q.   Such as?

12   A.   I was president for eight years.  I also served as

13   financial secretary, treasurer.  Currently I am social

14   action chair.

15   Q.   You are social action chair.  And what does the

16   social action chair do?

17   A.   We keep our members, as well as the community,

18   abreast also of politics, what's happening in politics.

19   Same thing, keeping them abreast of elections that are

20   coming up and just encouraging them to get out and vote

21   and passing out literature to try to educate them on

22   voting and the importance of voting.

23   Q.   How long have you been the chair of the Social

24   Action Committee?

25   A.   I did it for two years, and now I'm start -- the

1    second -- for three years, and I have one year left.

2    **Q.**    Okay.  Is the Social Action Committee an active

3    committee?

4    **A.**    Right.

5    **Q.**    Why do you want to be on the Social Action

6    Committee?

7    **A.**    Well, I believe that good government require good

8    citizens.  The government can only be as good as the

9    citizens so.

10   **Q.**    So tell us what kind of activities the Social

11   Action Committee undertakes.

12   **A.**    Well, like I say, we actually are affiliated with

13   also state and national so we get information down from

14   the national and state level on elections, whether it's

15   at the state level or whatever level.  And also we do

16   the same thing, just inform and educate the public.

17   **Q.**    Do you distribute information to the public?

18   **A.**    We do.

19   **Q.**    How do you do that?

20   **A.**    Well, in the last major election we assimilated

21   educational packets, and we distributed them to the

22   members of different churches -- well, our members in

23   the sorority took them to their various churches or

24   organizations or wherever.  So we help to distribute

25   that kind of information.  And passed out fliers at

1   like Walmart and different places and put the fliers on

2   cars and that kind of thing.

3   **Q.**   What percentage of the membership in the graduate

4   chapter of Delta Sigma Theta in Sumter County is

5   African American?

6   **A.**   It's 100 percent.  We're all black.

7   **Q.**   Now, Ms. Green, I am not from Sumter County, and I

8   want you to assume that I know absolutely nothing about

9   Sumter County.  Would you please explain to me what

10  race relations are like in Sumter County today?

11  **A.**   Well, race relations.  So you're asking does

12  race -- prejudice exist or racism exists?  Is that what

13  you're asking?

14  **Q.**   If that's how you want to interpret it.

15  **A.**   Okay.  I will say it's very much alive.

16  **Q.**   And what makes you say that?

17  **A.**   Well, when you look back at -- let's just talk

18  about my experience since I've been here, and we talk

19  about the different organizations and we talk about the

20  elections that I've always been involved in.  And we

21  look at the result of the elections, and to me that's

22  an indication that it's a grass root problem.

23  **Q.**   Okay.  Now, I'd like to turn back to your service

24  on the Board of Education.  How long have you been on

25  the board?

1    **A.**    Sixteen years and roughly five months.

2    **Q.**    Why did you decide to serve?

3    **A.**    Well, I -- back -- my background is education and

4    I believe in education.  And I just decided to serve

5    after I retired because I had been in the classroom,

6    and I thought this would be a chance for me to serve on

7    the Board of Education.  I could represent -- help

8    represent the students and teachers and their concerns

9    and their needs, because I heard it.  So I wanted to be

10   like a liaison between the teachers, students, and the

11   Board of Education.

12   **Q.**    Got it.  How many times have you been elected to

13   the board?

14   **A.**    Okay.  Okay.  So it's 2002, '06, '10, '14.  Four

15   times.  I think it's four.

16   **Q.**    Four times.  Tell us about your campaigns.  What

17   have you done to campaign in your elections?

18   **A.**    Campaign?  Well, largely I did signs.  I used -- I

19   did some mailings.  I'm old fashioned.  I knocked on

20   doors in my district, did some radio spots, and the

21   last election I did a little technology, like social

22   media.

23   **Q.**    Are you planning to run for reelection when your

24   current term is up?

25   **A.**    I cannot say yes, 100 percent because anything I

1    do I kind of spend time in consultation and prayer.  So

2    whatever the higher power lead me to do, that's what I

3    would do, however I would like to see the progress that

4    has begun in Sumter County's school system continue.

5    Q.   Have you always represented a district in which

6    African Americans make up a majority of the population?

7    A.   Yes.

8    Q.   Do you think you could win in a district in which

9    African Americans did not make up a majority of the

10   population?

11   A.   No.

12   Q.   Why not?

13   A.   Well, I'm basing it on past experience.  It hasn't

14   happened yet, and I don't think it's going to happen,

15   because I think in Sumter County people tend to vote

16   along racial lines.

17   Q.   Do you think you could win election to one of the

18   at-large seats?

19   A.   No.

20   Q.   Why not?

21   A.   Because the voters for the at-large seats, I

22   believe the majority of those are white voters.

23   Q.   How do you think it would affect your campaigning

24   if you had to run for one of the at-large seats?

25   A.   Well, of course, I would -- it would have to be

1    more extensive because at the at-large everybody votes.

2    So I have larger districts to cover.  I have -- it

3    would be a great expense for me.

4    **Q.**    It would be a greater expense.  Would you have to

5    raise money?

6    **A.**    I would.

7    **Q.**    How much?

8    **A.**    Now, I have never dealt with rasing money for

9    campaigning, so I'm not going to say, but I know it

10   would take a lot of money to cover Sumter County.

11   **Q.**    So let me back up.  You don't raise money for your

12   district campaign?

13   **A.**    I haven't.

14   **Q.**    But you think you would have to raise money if you

15   were to run at-large?

16   **A.**    Yeah, because I'm going to do -- have to do much

17   more.

18   **Q.**    Would money play into your decision about whether

19   to run?

20   **A.**    No.  The children and their education and my

21   concern for education is more important than money.

22   But I would say it would be something that -- a greater

23   expense.

24   **Q.**    Okay.  Do you think you could raise the money that

25   you would need to run at-large?

1    **A.**    That's a question where I have to say, oh,

2    probably not.

3    **Q.**    Why not?

4    **A.**    Because of resources in Sumter County.

5    **Q.**    What do you mean?

6    **A.**    I don't think I would have the resources that I

7    would need to help me get elected.

8    **Q.**    Well, if you were trying to raise money from other

9    people, why would your resources matter, or am I not

10   understanding your answer?

11   **A.**    Will you repeat that question so I see if I am

12   understanding your question?

13   **Q.**    Sure, I'll try to clarify.  I would like to know

14   why you think you couldn't raise enough money to run

15   for one of the at-large seats.

16   **A.**    Because I don't think I would get the support,

17   because I would need to get out of my community also to

18   get some support.

19   **Q.**    And you don't think they would want to give you

20   support?

21   **A.**    In my opinion I don't think I would get the

22   support I needed, no.

23   **Q.**    Is that because people in your community don't

24   like you or want to vote for you, or is it something

25   else?

1    **A.**    No, I just think there's an attempt to minimize

2    black representation.

3    **Q.**    Okay.  Let me ask you a few questions about Sumter

4    County schools.  What is the approximate racial makeup

5    of the students who attend Sumter County schools?

6    **A.**    Hmm, there is a majority, I would say -- I'm

7    thinking about 85 percent.  It might be a little

8    higher, but it's high.

9    **Q.**    Is the African American share of the school

10   population higher than the African American share of

11   the county at-large?

12   **A.**    Is the -- say that again.

13   **Q.**    Is the black percentage of the Sumter County

14   schools higher than the black percentage of Sumter

15   County?

16   **A.**    Yes, yes.

17   **Q.**    To what do you, a long-time member of the school

18   board, attribute that higher share in the Sumter County

19   public schools?

20   **A.**    Okay.  Say that -- ask that question again to make

21   sure I know what you want -- the question you're

22   asking.

23   **Q.**    Sure.  I'll try to rephrase so it's clearer.

24   **A.**    Okay.  Thank you.

25   **Q.**    Why is the black student population so high

1    compared to the county's population in Sumter County

2    schools?

3    **A.**    The student population?

4    **Q.**    Yes.

5    **A.**    Why there are more students, black students?

6    **Q.**    Yes.

7    **A.**    Than in the county.  Well, looking at the schools,

8    the black population, I think, in the schools is so

9    high, higher than the white, because parents -- many

10   parents choose to send their schools *(sic)* to other

11   counties, to the private school and to other

12   educational facilities, so that makes the white

13   population smaller in the schools.

14   **Q.**    Do you have any sense of why white families send

15   their kids to these other schools?

16   **A.**    It has to be pure speculation, but I think it is

17   because -- to avoid the large percentage of blacks, the

18   children attending school with the large population of

19   black students.

20   **Q.**    What makes you think that?

21   **A.**    Based on what has happened over the years.  They

22   continue to take them out is, in my opinion, it's not

23   the quality of education in the neighboring schools,

24   because we have a good curriculum, and we have good

25   schools.  So it's just leading me to think perhaps it

1    has to do with race, in my opinion.

2    **Q.**   Now, you have been in Sumter County and associated

3    with the Sumter County schools for a long time.  Is

4    this a recent phenomenon, this white flight from Sumter

5    County schools?

6    **A.**   It's not a recent white flight.  It has been going

7    on for some time.

8    **Q.**   When did it start?

9    **A.**   That, I can't answer when it started.

10   **Q.**   Was it present when you started working at Sumter

11   County schools?

12   **A.**   Yes, but on a smaller scale at that particular

13   time.  But it has been ongoing.

14          **MR. SELLS:**  Your Honor, at this point in the

15   record I like to offer an exhibit that is Plaintiff's

16   Exhibit 260, which is the -- an excerpt of the Georgia

17   Advisory Committee to the United States Commission on

18   civil rights entitled -- a report entitled,

19   Desegregation of Public School Districts in Georgia, a

20   Factfinding Report.

21          **THE COURT:**  All right, Ms. McKnight?

22          **MS. MCKNIGHT:**  Your Honor, the only

23   objections to that would be Ms. Green's -- any

24   foundation for her to testify about it.  I don't know

25   what kind of testimony he'll be able to get out of her.

1    He hasn't established that yet.

2         **MR. SELLS:**  I am not going to ask Ms. Green a

3    single question about it, but it's the appropriate

4    point in the record, I think, to insert that since she

5    has discussed school desegregation and the --

6         **THE COURT:**  I don't understand.  How is it

7    because she's discussed it, how does that make it

8    admissible over the objection?

9         **MR. SELLS:**  Well, there's no -- it's a self

10   authenticating document.

11        **THE COURT:**  That's what I'm asking you.  What

12   is the basis for you moving its admission?  That's all

13   I'm asking.

14        **MR. SELLS:**  I think this is just an

15   appropriate point in the record to offer that exhibit

16   because Ms. Green has been discussing this particular

17   phenomenon in --

18        **THE COURT:**  All right.  And your basis for

19   its admission is what?

20        **MR. SELLS:**  It's a legally admissible

21   document.  It is a self-authenticating public record.

22        **THE COURT:**  All right.

23        **MS. MCKNIGHT:**  The objection stands that it's

24   even more clear now that Mr. Sells intends to ask

25   Ms. Green no questions about this document.  He's just

1    asking to have it admitted.

2         THE COURT:  I mean, we can do this later in

3    the day, but, I mean, unless there is an objection, we

4    can admit it and move on.  I don't know.

5         MR. SELLS:  I don't understand what the

6    objection is to the timing.  I could have offered --

7         THE COURT:  Well, we are not going to spend a

8    long time discussing it.  Is there an objection beyond

9    whether or not it has to do with this witness?

10        MS. MCKNIGHT:  That's correct, Your Honor.

11   No, that's the objection, that there's no testimony

12   from this witness on that document.

13        THE COURT:  All right.  And then you say it

14   is self authenticating.  In what way is it self

15   authenticating?  Is it certified or what is it?

16        MR. SELLS:  No, it is what it appears to be.

17   It's a government record that is evident from the face

18   of the document, and there is no authenticity objection

19   from the defendant either.

20        THE COURT:  All right.  If that's the case,

21   then it's admitted.

22        MR. SELLS:  Thank you.

23        THE COURT:  And that's number 260?

24        MR. SELLS:  Yes, sir.

25        THE COURT:  You may proceed.

BY MR. SELLS:

Q.   Ms. Green, I want to shift our focus now to the change in the method of electing members of the Board of Education.  You were on the board when those changes were discussed between 2010 and 2014, correct?

A.   Correct.

Q.   Were there any discussions of changing the method of electing the school board prior to the November 2010 election?

A.   No.

Q.   I'm sorry.  I did not --

A.   No.

Q.   -- hear your answer.  And in the 2010 election, an African American candidate, Kelvin Pless, defeated a white incumbent for the district three seat on the board, right?

A.   Right.

Q.   What was the racial composition of the Board of Education following the 2010 election?

A.   5/4, five blacks, four whites.

Q.   What was the racial composition of the school board just before the 2010 election?

A.   It was four blacks, five whites.

Q.   Did the racial composition of the board change in 2011 while discussions of changing the method of

1  election were ongoing?

2  **A.**  It did.

3  **Q.**  Can you please explain how it changed?

4  **A.**  Michael Coley -- not Coley, Michael Lewis was

5  appointed to the board, so that gave a six black, three

6  white.

7  **Q.**  Michael Lewis was African American?

8  **A.**  Yes.

9  **Q.**  How soon after the 2010 elections did discussions

10  of changing the method of election begin?

11  **A.**  It was shortly afterward.

12  **Q.**  Who brought up those discussions in 2010?

13  **A.**  The discussion was initiated by Michael Busman.

14  **Q.**  At the time did you support changing from nine

15  single member districts to five single member districts

16  and two at-large seats?

17  **A.**  No.

18  **Q.**  Has anyone ever given you a justification for

19  electing two members of the board at-large?

20  **A.**  No.

21  **Q.**  As you sit here today, in this courtroom, do you

22  know the policy justification for electing two members

23  of the board at-large?

24  **A.**  No, I do not.

25  **Q.**  Do you think the two at-large seats have been good

1    for the people of Sumter County?

2    **A.**    No.

3    **Q.**    Why not?

4    **A.**    Because it kind of gave us a setback.   It

5    diminished black representation, which took us back.

6    **Q.**    In your opinion, what was the motivate -- scratch

7    that.   Let me start again.   In your opinion, what was

8    motivating your fellow board members who supported the

9    change from nine single-member districts to five

10   single-member districts and two at-large seats?

11   **A.**    Again, I would say to diminish black

12   representation on the board.

13   **Q.**    Ms. Green, are you familiar with Kelvin Pless and

14   Michael Coley, Sr.?

15   **A.**    I am.

16   **Q.**    In what capacity and how long have you known those

17   gentlemen?

18   **A.**    I've known them every since I've been in Americus

19   because they both were born in Americus, and they live

20   in Americus.   Mike is a permanent elder, a minister.

21   Kelvin is a prominent citizen.   I worked with Kelvin at

22   South Georgia Tech, so I know both of them.

23   **Q.**    What is their reputation in and around Sumter

24   County?

25   **A.**    Outstanding citizens in the community.

1    Q.   Are you aware that each of them ran for the

2    at-large seats on the Board of Education?

3    A.   I am.

4    Q.   Do you believe that those men are qualified to

5    hold those positions?

6    A.   Yes.

7    Q.   Are you familiar with the campaigns they ran for

8    those offices?

9    A.   Yes.

10   Q.   In your view as an experienced politician

11   yourself, how would you characterize the quality or

12   competency of their campaigns?

13   A.   I think they ran very high quality, reputable

14   campaigns.

15   Q.   Tell us, if you can remember, what they did.

16   Gives us some examples, please.

17   A.   Well, they just campaigned, to me, fairly.  I

18   didn't ever hear them criticizing or mudslinging or

19   doing any of that kind of thing, what I contribute to

20   dirty campaigning.

21   Q.   To what, if anything, do you attribute their

22   defeats in those elections?

23   A.   I must say it is because they were running in an

24   at-large district.

25   Q.   Is voting in elections for the at-large district

1    on the Board of Education racially polarized?

2    **A.**    Yes.

3    **Q.**    And what makes you think that?

4    **A.**    Because it's just -- it's just historically the

5    way it is.  Blacks vote for blacks and whites basically

6    vote for white.

7    **Q.**    Ms. Green, how long have you been a voter in

8    Sumter County?

9    **A.**    I moved to Sumter County in 1973, so it had to be

10   about 1975.  So somewhere along those about -- yeah.

11   **Q.**    So more than 40 years?

12   **A.**    Wait a minute.  I have been here since '70.  I

13   have been voting ever since I've been here.  I voted --

14   I registered, changed my registration two years after I

15   moved here.  That's what I'm trying to say.

16   **Q.**    Got you.  So you've been a voter in Sumter Counter

17   --

18   **A.**    40 plus years.

19   **Q.**    -- for a long time.  Now, as best you can

20   remember, how many African Americans have been elected

21   to countywide public office in Sumter County over that

22   time?

23   **A.**    None that I'm familiar with, that I know of.

24   **Q.**    Do you know whether African Americans in Sumter

25   County have a depressed socioeconomic status compared

1  to whites in such areas as unemployment, education,

2  income, and poverty?

3  **A.**  I would think so.

4  **Q.**  What makes you think that?

5  **A.**  Well, just looking back over unemployment over the

6  years of what -- just what it is.  You just don't see

7  it.

8  **Q.**  In your experience what impact, if any, do these

9  socioeconomic disparities have on black voters' ability

10 to participate in elections in Sumter County?

11 **A.**  That's a big impact.

12 **Q.**  Okay.  Explain what you mean.

13 **A.**  Because when you know better, you do better.

14 Education means a lot.  When you're educated, then

15 you're going to do better.

16 **Q.**  Ms. Green, do Sumter County and the State of

17 Georgia have a history of discrimination against

18 African Americans?

19 **A.**  Repeat it again.  I didn't hear the first part.

20 **Q.**  Do Sumter County and the State of Georgia have a

21 history of discrimination against African Americans?

22 **A.**  I would say so.

23 **Q.**  And that includes a history of discrimination in

24 voting, doesn't it?

25 **A.**  It does.

1   Q.   In fact, you have lived through some of that

2   discrimination in your own lifetime, yes?

3   A.   I'm sorry, excuse me.  I didn't mean to nod my

4   head.  Yes, I have.  I lived it all my life.

5   Q.   Well, based on your life experiences, do you think

6   African American voters in Sumter County have a

7   meaningful opportunity to elect candidates to the

8   at-large seats on the school board?

9   A.   No, I do not.

10          MR. SELLS:  Your Honor, those are my

11   questions.

12          THE COURT:  Is there cross examination?

13          MS. MCKNIGHT:  There is, Your Honor.

14          THE COURT:  All right.  Ms. McKnight.

15                CROSS EXAMINATION

16   BY MS. MCKNIGHT:

17   Q.   Good afternoon, Ms. Green.

18   A.   Good afternoon.

19   Q.   I just have a few questions for you today.  But at

20   the outset, just two questions.  Are you familiar with

21   the Americus Times Recorder?

22   A.   I am.

23   Q.   Okay.  And that paper reports on meetings of the

24   school board, doesn't it?

25   A.   It does.

1    Q.    Okay.  And I wanted to ask you about the vote of

2    the school board in December 2010 to reduce the size of

3    the school board from nine members to seven members.

4    Now, it's true, isn't it, that in December 2010 you

5    voted for the reduction in the size of the school board

6    from nine-member districts to seven districts?

7    A.    I did.  Now, do I need to explain that?

8    Q.    No.  If your counsel would like to go through that

9    on direct, he may.

10   A.    Okay.  I'll tell you why I voted, but the question

11   was, was I always in favor of it.

12   Q.    Okay.  Well, now, in June 2010 the board

13   considered downsizing from nine to seven, and you voted

14   against it, didn't you?

15   A.    I might be getting it mixed up.  There were times

16   I voted no and times just -- the first time I voted

17   yes.  So there were times I voted no.  So, maybe so.

18   However, the Time Recorder, in my opinion, is not

19   always factual.

20   Q.    I understand.  So is it -- let me ask you again on

21   this issue, just because I want to make sure the Court

22   is clear on the votes.

23   A.    Okay.

24   Q.    Isn't it true that in June 2010 the board

25   considered reducing the size of the board from nine to

1  seven, and you vote -- at that time you voted against

2  downsizing?

3  **A.**   As I said earlier, there was a time that I did

4  vote no, so perhaps it was that time.  When it comes to

5  dates, whether it was June, I'm not sure, because I did

6  vote no at one time.

7  **Q.**   Now, isn't it right -- I'm trying to understand

8  the reduction in size of the number from nine to seven.

9  And isn't it correct that SACS, the accrediting agency,

10  recommended reducing the size from nine down?

11  **A.**   To my understanding SACS ordered us to follow --

12  at that time we had gotten I think a court order asking

13  us to follow through with that.  So SACS, to my

14  knowledge now, I don't remember SACS being the ones to

15  initiate that.

16  **Q.**   But you understood, as a board member, that it was

17  being recommended or that you were somehow being

18  directed to reduce the size of the board from that nine

19  figure; is that right?

20  **A.**   At that time?  At that time when you are speaking

21  about when it came from SACS?

22  **Q.**   If your understanding differs in timing, let's go

23  through with the different timing.  Did you ever

24  understand that SACS, the accrediting agency, or a

25  court, however your understanding was, either

1    recommended or directed that the school board be

2    reduced from the nine number?

3    A.    Again, I don't know whether that was SACS.  I

4    think -- I think it came from court, and SACS had

5    written us a letter asking us to follow through, which

6    we were in the stage of trying to do, proceed with.

7    Q.    So to summarize, as a board you understood you

8    needed to reduce the size from nine downward; is that

9    fair?

10   A.    Uh, when you say that we understood that we needed

11   to reduce it, after we got the -- after we were

12   actually told to do this, when we got the communication

13   from SACS and the court?

14   Q.    Yes.

15   A.    Yes.

16   Q.    And do you know if the state has a policy

17   regarding the optimum number of school board members on

18   a board such as yours?

19   A.    I do.  I also know that when that -- when they had

20   that policy or that law passed, that we had a -- it was

21   up to us to decide whether we wanted to or not.  It was

22   not mandatory.

23   Q.    And that state policy, isn't it correct, that that

24   passed Georgia's legislature and was signed by the

25   governor in that 2010 timeframe?

1    **A.**   But we were grandfathered in.  We had nine

2    members, and we did not have to do that.

3    **Q.**   I understand and --

4    **A.**   I understand that, yeah.

5    **Q.**   -- and pardon me, yes, I don't mean to cabin you

6    too much, but I will -- Mr. Sells will have time to

7    talk with you after this.

8    **A.**   Okay.

9    **Q.**   I'm just trying to get a real yes or no.

10   **A.**   I knew that there was a law passed, yeah.

11   **Q.**   Okay.  And that the law was passed in the 2010

12   timeframe; is that right?

13   **A.**   Yes, uh-huh.

14   **Q.**   Okay.  And that law identified as its optimum

15   number for school board members, or members in a board

16   like your school board, no more than seven; isn't that

17   right?

18   **A.**   That's right.

19   **Q.**   Thank you, Ms. Green.  I have no further questions

20   now.  Thank you.

21   **A.**   You are welcome.

22           **THE COURT:**  Any redirect, Mr. Sells?

23           **MR. SELLS:**  Yes, Your Honor.

24                   **REDIRECT EXAMINATION**

25   **BY MR. SELLS:**

1    Q.    Ms. Green, Ms. McKnight asked you about having

2    voted to reduce the size of the board from nine to

3    seven at one point.

4    A.    Uh-huh.

5    Q.    Did you ever vote in favor of creating two

6    at-large districts?

7    A.    No.

8    Q.    Did the board ever vote in favor of adding two

9    at-large districts?

10   A.    No.

11   Q.    You mentioned the grandfather clause in the state

12   law passed in 2010.  Can you explain your understanding

13   of that grandfather clause?

14   A.    My understanding is that -- I know the state law

15   was passed, because we go to Georgia School Board

16   Associations every year, and we go to policy workshops.

17   And at the policy workshop, you know, our lawyers tell

18   us what is coming down the pipe and what has passed,

19   and they told us that that law, you know, was passed.

20   And they also explained that for boards that already

21   exceeded seven, it is up to the boards to decide

22   whether you want to reduce.  You may keep what you

23   have.  So it was not mandatory that we had to reduce

24   those seats.

25   Q.    Ms. McKnight asked you about a recommendation from

1  SACS.  Tell me what you recall, if anything, about that

2  recommendation.

3  A.   I do remember getting a letter from SACS, but all

4  of that was hindsight.  That was after we had been

5  directed to -- from the state, from the legislature, to

6  reduce the seats and go to seven, that 7/2.  That came

7  from the legislature.

8  Q.   So that was after the Georgia legislature, in

9  early 2011, reduced the size of the board?

10  A.   Uh-huh, yeah.  Yes, because that was when -- yeah,

11  the SACS came after that, yes.

12          MR. SELLS:  I have no further questions.

13          THE COURT:  I have a question that I need to

14  get a clarification.  Did the board itself vote to

15  adopt a change to seven members from nine?  Not

16  respective -- I understand what your position was.  But

17  did the board as a majority ever vote to favor changing

18  it from seven -- from nine to seven.

19          THE WITNESS:  The board voted to change from

20  nine to seven with details to be worked out.  To go to

21  seven, but how we get to seven was never voted upon.

22  We voted to move to seven.

23          THE COURT:  Did the board, at any time, while

24  you were still on the board ever take a different

25  position or challenge the ultimate change from nine to

1    five and two?

2           THE WITNESS:  When we had our submission

3    withdrawn from the Justice Department, I guess, if

4    that's what you're speaking of.

5           THE COURT:  Well, I don't know.

6           THE WITNESS:  All right.

7           THE COURT:  Was there a submission to the

8    justice department?

9           THE WITNESS:  Yeah.

10          THE COURT:  I'm sorry?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  And what happened to it?

13          THE WITNESS:  Oh, we voted to have our

14   preclearance withdrawn.

15          THE COURT:  The Board did?

16          THE WITNESS:  The Board did.

17          THE COURT:  All right.  Now, do either of you

18   have any questions based on the Court's questions?  I

19   will allow Mr. Sells to ask further questions if he

20   needs to, and likewise, Ms. McKnight, if you do.

21          MR. SELLS:  Your Honor, based on your

22   questions I would like to introduce additional

23   exhibits.  They would be Plaintiff's Exhibit 28, 29,

24   and 30, to start with.  There are a few others.

25          THE COURT:  What are they?

1        **MR. SELLS:**  Those are the preclearance

2   submissions, Your Honor.

3        **MS. MCKNIGHT:**  And no objection, Your Honor.

4        **THE COURT:**  Plaintiff's 28, 29 --

5        **MR. SELLS:**  28, 29, and 30.

6        **THE COURT:**  Okay.  I understand there's no

7   objection.  They are each admitted without objection.

8        **MR. SELLS:**  And the plaintiffs would also

9   like to offer Exhibits 266 through 272, which are the

10  local legislation adopted between 1968 and the 2011.

11       **THE COURT:**  Wait a minute.  Wait a minute.

12       **MR. SELLS:**  All right.

13       **THE COURT:**  Okay, now.  What does 1968

14  legislation have to do with the change of the board

15  from five to -- from nine, to five and seven?

16       **MR. SELLS:**  It is, Your Honor, six short

17  exhibits listing every change to the board's

18  composition over that time period.

19       **THE COURT:**  All right.  Any objection?

20       **MS. MCKNIGHT:**  Pardon me, Your Honor.  Pardon

21  me, Mr. Sells, could you repeat the Plaintiff's Exhibit

22  number?

23       **MR. SELLS:**  Sure.  It's 266 and 272.

24       **THE COURT:**  As I understand they are all the

25  legislative changes -- is that right, the legislative

1    changes to the composition of the board?

2          **MR. SELLS:**  That's correct, Your Honor.  And

3    the reason we've offered them as exhibits is primarily

4    for the Court's convenience, because local legislation

5    in Georgia can be difficult to retrieve and find, and

6    we have found it, but having it in the record, I think

7    will put it at the Court's fingertips.

8          **THE COURT:**  All right.  That's fine.

9          **MS. MCKNIGHT:**  Yes, Your Honor.  The only

10   objection, and it's not necessarily a hard objection,

11   but how the Court would like to handle legal

12   authorities.  It's common practice in lawyering that

13   you cite to legal authority.  You do not attach it as

14   an exhibit.  An issue here starts to develop in these

15   cases where there is just so much paperwork.  This

16   would not deny plaintiffs any right to use these legal

17   authorities or cite them, whether for factual basis or,

18   you know, historical or legal basis.  So it's simply an

19   objection that we noted, that if the Court would like

20   to allow these kinds of legal authorities in as

21   exhibits, it would increase the paper load of this

22   case.  And, frankly, the alternative, which is to allow

23   plaintiffs to continue to cite to these legal

24   authorities as they need to, that would be, frankly, it

25   seems to us, a more economical route to dealing with

1    this issue.

2            THE COURT:  Well, of course.  I guess if

3    there -- it's a public record if it's a legislative

4    act.  I assume that's what you are talking about,

5    legislative acts?

6            MR. SELLS:  Yes, Your Honor.  It's local

7    legislation passed by the general assembly.  Not every

8    state has local legislation, and it's not available on

9    West Law, so it may be available on Lexus, and I don't

10   know if the Court has access to Lexus.  But in my

11   experience it can be hard to find, and we have made the

12   effort of finding it, and so we think there's a basis.

13   We're talking a handful of pages.

14           THE COURT:  I think it's better, since we're

15   talking about a limited number, but when you said 1968,

16   I guess, that it was done every year, so I was thinking

17   there was going to be a string of them.  But I don't

18   know that that's unusual since we may apparently get

19   into discussions about what was at the behest of board

20   and what was at the behest of the legislature or both.

21   So if that's the only objection, the Court will allow

22   it over objection.

23           MS. MCKNIGHT:  Thank you, Your Honor.

24           THE COURT:  Okay.  That's 266 through 272,

25   inclusive.  All right.

1      **MR. SELLS:**  Yes, Your Honor.  Thank you.  And

2    I don't have any further questions.

3           **THE COURT:**  Ms. McKnight, do you have any

4    further questions either in recross or based on the

5    questions that the Court asked?

6           **MS. MCKNIGHT:**  I do.  Thank you, Your Honor I

7    do, briefly.

8           **THE COURT:**  In fairness to each side.

9                    **RECROSS EXAMINATION**

10   BY MS. MCKNIGHT:

11   **Q.**   Ms. Green, just a few questions for you to

12   crystalize, I think, what your testimony has been

13   today.  That, as a board, in December 2010, with -- as

14   a board of nine members in December 2010, you voted

15   unanimously, including your own vote, to reduce the

16   school board size from nine to seven, correct?

17   **A.**   Correct.

18   **Q.**   Okay.  Then one other fact that the Court raised

19   was where the Court asked a question and you raised in

20   your response was this issue of withdrawing the

21   preclearance submissions.  I'd like to ask you about

22   the vote to withdraw the preclearance submission.  Does

23   it sound right to you that that vote was made in around

24   January 2012?

25   **A.**   Sounds like it.  So, the vote taken -- I'm

```
1    thinking six to three to withdraw the preclearance.
2    Q.   Would it sound right to you if there were five
3    votes in favor, including Mr. Lewis, Mr. Pless, Ms.
4    Fitzpatrick, Ms. Edith Green and Ms. Alice Green, and
5    four were opposed, Ms. Krenson, Dr. Busman, Ms.
6    Whitehead and Mr. Mock?
7    A.   Maybe so.  I said maybe nine-three, but I was not
8    exact.  I told you I wasn't sure.
9    Q.   I understand.  So does it sound right to you that
10   the vote could have been five to four, along those
11   lines?
12   A.   Might have been, I know, but the majority to
13   withdraw the preclearance was -- we had the majority
14   vote to withdraw it, but the exact -- I thought I was
15   remembering six-three, but I could possibly be wrong.
16            MS. MCKNIGHT:  Thank you, Ms. Green.  No
17   further questions.
18            THE COURT:  Any further questions from the
19   plaintiff?
20            MR. SELLS:  No, Your Honor.
21            THE COURT:  All right.  Is there any reason
22   this witness cannot be excused, likewise?
23            MR. SELLS:  No.
24            MS. MCKNIGHT:  No, Your Honor.
25            THE COURT:  All right.  Ma'am, you may leave
```

1    if you wish, you are excused, or remain if you wish,

2    whatever your pleasure.

3              **THE WITNESS:**  Thank you.

4              **THE COURT:**  You may call your next witness.

5              **MR. SELLS:**  Your Honor, the plaintiffs call

6    Ms. Edith Green.

7              **COURTROOM DEPUTY:**  Do you solemnly swear or

8    affirm that the testimony you are about to give in the

9    case now before the Court will be the truth, the whole

10   truth, and nothing but the truth?

11             **THE WITNESS:**  I do.

12             **THE COURT:**  All right.  You may proceed.

13             **MR. SELLS:**  Thank you, Your Honor.

14                         **EDITH GREEN**

15    **Witness, having first been duly sworn, testified on**

16                   **DIRECT EXAMINATION**

17   **BY MR. SELLS:**

18   **Q.**   Good afternoon, Ms. Green.

19   **A.**   Good afternoon.

20   **Q.**   Would you please state your full name for the

21   record?

22   **A.**   Edith Ann Green.

23   **Q.**   And in what city do you live, Ms. Green?

24   **A.**   Americus.

25   **Q.**   What do you do for a living?

1    **A.**    I'm retired.

2    **Q.**    And, Ms. Green, you are a current member of the

3    Sumter County Board of Education from district five,

4    right?

5    **A.**    Yes, I am.

6    **Q.**    Before we get into your service on the board, I

7    want to find out a little bit about your background.

8    When and where were you born?

9    **A.**    Americus, 1947.

10   **Q.**    Did you grow up in Americus?

11   **A.**    I did.

12   **Q.**    Where did you go to school?

13   **A.**    I went to school in Americus, excuse me, and I

14   went to college in Americus at Georgia Southwestern.

15   **Q.**    When you attended schools in -- before college,

16   were the schools integrated when you attended?

17   **A.**    No.

18   **Q.**    Did you graduate from high school in Sumter

19   County?

20   **A.**    I did graduate, in Webster County.

21   **Q.**    Why Webster County?

22   **A.**    Because I became a mother and a wife, and I went

23   to Webster County to finish school.

24   **Q.**    Okay.  What year did you graduate?

25   **A.**    1965.

1    Q.    What did you do after graduating high school?

2    A.    I attended Southwestern.  The year might have been

3    1966 that I graduated.

4    Q.    Was Georgia Southwestern integrated when you

5    attended?

6    A.    No.

7    Q.    Well, how did you attend?

8    A.    Well, except for me and three other people, about

9    four of us blacks attended Southwestern.

10   Q.    So you integrated Georgia Southwestern?

11   A.    Yes.

12   Q.    What was it like to be a pioneer?

13   A.    Well, I was ignored a lot, but I learned.  I

14   learned, and that was what was important to me.  I

15   wanted to learn, and I wanted to graduate.  So I was

16   able to do that.

17   Q.    So you earned a college degree in what year?

18   A.    1970.

19   Q.    Do you have any other degrees?

20   A.    I also have a master's degree from Southwestern as

21   well that I earned in 1974.

22   Q.    In what field?

23   A.    Business education.

24   Q.    Let me ask you a few questions about your

25   employment history.  What was your first job out of

1    college?

2    **A.**    Stewart County High School in Lumpkin -- not

3    Stewart County, I'm sorry.  Lumpkin High School in

4    Lumpkin, Georgia.

5    **Q.**    And what did you teach there?

6    **A.**    Business education.

7    **Q.**    And when did you start at Lumpkin County High

8    School?

9    **A.**    I started in 1970, in January of 1970.  This was

10   before I actually graduated Southwestern, but I had

11   finished all of my requirements.  So in January of '70,

12   I went to work at Lumpkin High School, and I worked

13   there until June.

14   **Q.**    Was Lumpkin High School integrated when you taught

15   there?

16   **A.**    No.

17   **Q.**    And did you teach then at the white school or a

18   black school?

19   **A.**    A black school.

20   **Q.**    For those of us who aren't familiar with Georgia's

21   geography, where is Lumpkin High School relative to

22   Sumter County?

23   **A.**    It's west of Sumter.

24   **Q.**    In which county?

25   **A.**    Stewart County.

1    Q.    Where did you work next?

2    A.    Next, I worked in the Sumter County School System

3    at Central Junior High School.  That was my next job.

4    Q.    And when was that?

5    A.    In '70.  I started there in the fall of 1970.

6    Q.    And was Central Junior High School integrated when

7    you worked there?

8    A.    It was.

9    Q.    How long did you work there?

10   A.    For two years.

11   Q.    And after that?

12   A.    Americus High School, and I taught business

13   education there.  It too was integrated.

14   Q.    And how long did you teach at Americus High

15   School?

16   A.    Until 1987.

17   Q.    You said when you went -- when you started working

18   at Americus High School, it was integrated?

19   A.    It was.

20   Q.    Did you have very many white students in your

21   class?

22   A.    Not a lot.  A lot of the white students had left

23   the system for private schools or other schools, I

24   guess, in surrounding counties.

25   Q.    And this was in what year?

1    **A.**    '72.  There were quite a few there, but not a lot.

2    **Q.**    So when you started teaching at Americus High

3    School, it was already predominantly African American?

4    **A.**    Not predominately -- well, I guess, yes.  Yes.

5    **Q.**    You worked at Americus High School until 1987.

6    Where did you work after that?

7    **A.**    South Georgia Technical College.

8    **Q.**    From when to when?

9    **A.**    From '87 until I retired in 2004.  And then after

10   that, I went back in the evenings.

11   **Q.**    To teach it -- to teach in the evenings.

12   **A.**    To teach in the evening.  I taught business

13   education.

14   **Q.**    But you're retired now?

15   **A.**    I am.

16   **Q.**    So is it fair to say that with the exception of

17   your time working at Lumpkin High School in Stewart

18   County that you have lived and worked in Sumter County

19   for your entire life?

20   **A.**    I have.

21   **Q.**    Do you attend church in Sumter County?

22   **A.**    Yes.

23   **Q.**    Which church?

24   **A.**    Big Bethel Baptist Church.

25   **Q.**    How long have you attended Big Bethel?

1    **A.**   Uh, if I can remember, maybe 65 years.

2    **Q.**   Approximately how many members does your church

3    have?

4    **A.**   Approximately a hundred who come regularly.

5    **Q.**   And approximately what percentage of those members

6    are African American?

7    **A.**   A hundred percent.

8    **Q.**   Okay.  I want to turn now to your service on the

9    board.  How long have you been on the Board of

10   Education?

11   **A.**   Now, I've served on two Boards of Education.

12   Early '90s, I was appointed to the Americus City Board

13   of Education by the Americus City Council and Mayor at

14   that time, and I served there until we merged systems

15   in 19 -- I can't remember dates too well, but when the

16   systems merged, I was serving on Americus City Board.

17   **Q.**   Was it mid-nineties?

18   **A.**   Yes.

19   **Q.**   Okay.

20   **A.**   And then I was elected for one year for the

21   Americus City Board because the law changed.  You

22   couldn't be appointed anymore.  And then I was elected

23   to the Sumter County Board after the merger.

24   **Q.**   And have you served on the Sumter County Board of

25   Education since that time in the mid-nineties?

1    **A.**    I have.  I have.

2    **Q.**    So that's more than 20 years, right?

3    **A.**    Right.

4    **Q.**    Why did you decide to serve, first on the Americus

5    Board, and then on the Sumter County Board of

6    Education?

7    **A.**    I wanted to serve my community.  I've always

8    wanted to be a servant in my community.  My mother

9    helped influenced that.  My teachers influenced it, and

10   that was something I wanted to do.  I wanted to serve

11   the children.  When I was given an opportunity, I, of

12   course, jumped at it.

13   **Q.**    Have you always represented a district in which

14   African Americans make up a majority of the population?

15   **A.**    I have.

16   **Q.**    And if I've done my math right, you've run for

17   election at least five times over the course of your

18   career on the Board of Education, right?

19   **A.**    I'm sure -- yes, yes.

20   **Q.**    Well, tell us about your campaigns.  What do you

21   do to campaign for Board of Education?

22   **A.**    I guess the most important thing I can do is knock

23   on doors, and I try to educate people as to what's

24   going on, and ask them, of course, to vote for me.  And

25   I talk to people.  I attend any event that's for my --

1  you know, for candidates.

2  **Q.**  Okay.  Anything else you can think of?

3  **A.**  Well, I knock on plenty of doors.

4  **Q.**  Okay.

5  **A.**  I have to do that.  So I walk a lot in the streets

6  to inform people and to solicit their support.

7  **Q.**  Are you planning to run for reelection when your

8  current term is up?

9  **A.**  I really haven't decided yet.  I'm still thinking

10  about that.

11  **Q.**  Let me ask you a few questions about the Sumter

12  County schools.  What is the approximate racial makeup

13  of the students who attend Sumter County schools?

14  **A.**  More than 75 percent black.

15  **Q.**  Is that higher than the black share of the

16  county's population?

17  **A.**  Yes.

18  **Q.**  And why is that?

19  **A.**  Because of private schools and schools in

20  surrounding counties that white students attend.

21  **Q.**  And that's the same reason why you had few white

22  students in your class when you came to work for Sumter

23  County schools back in the '70s, right?

24  **A.**  Right.

25  **Q.**  That white flight never went away?

1    **A.**   It never went away.

2    **Q.**   Are you aware that Sumter County schools were part

3    of a large desegregation lawsuit brought by the United

4    States against the State of Georgia in the late 1960s?

5    **A.**   I am.

6    **Q.**   And do you know whether the federal court has

7    entered an order declaring that Sumter County schools

8    have achieved unitary or fully desegregated status?

9    **A.**   No, I'm not aware of any of that.

10   **Q.**   I want to shift our focus to the change in the

11   method of electing members of the board.  You were on

12   the board when those changes took place between 2010 an

13   2014, right?

14   **A.**   Correct.

15   **Q.**   Were there any discussions of changing the method

16   of electing the school board before the November, 2010

17   election?

18   **A.**   No, not that I can recall.

19   **Q.**   And in the 2010 election, an African American

20   candidate, Kelvin Pless, defeated a white incumbent for

21   the district three seat on the board, right?

22   **A.**   Correct.

23   **Q.**   Now, what was the racial makeup of the board

24   before Kelvin Pless was elected?

25   **A.**   Before Kelvin, there were four blacks and five

1    whites.  After Kelvin -- you asked for before.

2    **Q.**   Oh --

3    **A.**   But, you know, after Kelvin, then it changed.

4    **Q.**   So what was it before Kelvin?

5    **A.**   Before Kelvin, four blacks, five whites.

6    **Q.**   And after Kelvin, it was what?

7    **A.**   Five blacks and four whites.

8    **Q.**   And did the racial composition of the board change

9    in 2011 while discussions of changing the method of

10   election were taking place?

11   **A.**   I believe so.  I can't remember the years, but I

12   -- I think I know who you're talking about, yes.

13   **Q.**   Okay.  Who do you think I'm talking about?

14   **A.**   Lewis, when Lewis came on.

15   **Q.**   That would be Michael Lewis?

16   **A.**   Right.

17   **Q.**   Is Mr. Lewis African American or white?

18   **A.**   He's African American.

19   **Q.**   And how did he get on the board?

20   **A.**   He was appointed.

21   **Q.**   By whom?

22   **A.**   By the board.

23   **Q.**   And after he came on the board, what was the

24   racial makeup of the board?

25            **THE COURT:**  I'm sorry.  Who appointed him?

1          MR. SELLS:  The board.

2          THE COURT:  The board?

3          THE WITNESS:  The board, because someone who

4    was elected resigned.

5          THE COURT:  And the board itself named

6    someone?

7          THE WITNESS:  Uh-huh, right.

8          THE COURT:  All right.  I just wanted to be

9    sure I understood that.

10   BY MR. SELLS:

11   Q.   And to ask one further follow-up question,

12   Ms. Green, that was the board whose makeup was five

13   African American and four white members, right?

14   A.   Correct.

15   Q.   And it was one of the white members who had

16   resigned?

17   A.   Correct.

18   Q.   How soon after the 2010 election did discussions

19   of changing the method of election begin?

20   A.   I'm not sure how soon after.  I'm not sure how

21   soon after, but it couldn't have been very long.

22   Q.   Were any members of the board in particular

23   advocating for the change?

24   A.   Yes.

25   Q.   Which ones?

1    **A.**   The white board members were advocating.

2    **Q.**   At the time did you support changing from nine

3    single member districts to five single member districts

4    with two at-large seats?

5    **A.**   No, I didn't support that.  I was fine with

6    changing to seven, the seven didn't bother me, but the

7    at-large seats I thought should not have been.  That

8    distinction, the at-large, really set our community

9    back, I'd say 15 years.  That was something that should

10   not have been done.

11   **Q.**   Why do you say that?

12   **A.**   Well, first, because in all the history of Sumter

13   County, in all the years I've been there, there has

14   never been an at-large seat won by a black person.  And

15   we've had three -- well, two elections when there were

16   three seats up for election, and neither of those even

17   came close to winning an at-large.  And the history

18   continues.  Now, I've known several people run for

19   at-large seats in Sumter County who were black, and not

20   one, not one, has come close to winning an at-large

21   seat.

22   **Q.**   Who do you have in mind?

23   **A.**   Well, I know, years ago, I can't tell you what

24   year, Mary Kate Fish Bell ran, and I think at time for

25   the justice of the peace, Nelson Brown, Mr. Houston ran

1    for sheriff, and there have been ones that I may not

2    even think about now, but who have run, but never in

3    the history of Sumter County has a black won an

4    at-large seat in an election, in a general election.

5    Q.   Has anyone ever given you a justification for

6    electing two members of the board at-large?

7    A.   No.

8    Q.   As you sit here today, do you know the policy

9    justification for electing two members of the board

10   at-large?

11   A.   No, I don't.

12   Q.   Has anyone ever given you a justification for

13   moving the school board election from November to May?

14   A.   No.

15   Q.   As you sit here today, do you know the policy

16   justification for moving the school board election from

17   November to May?

18   A.   No.

19   Q.   And hadn't it always been in November?

20   A.   It had been.

21   Q.   Do you think that the two at-large seats and

22   moving the election from November to May have been good

23   for the people of Sumter County?

24   A.   Well, no, I don't.  But I think the at-large seats

25   are not good for the people of Sumter County anyway,

1    but to move it -- and people are not educated about

2    that May election, especially when they vote in

3    November during an election year.  They don't

4    understand what's going on then in May, and that makes

5    it very hard.

6    **Q.**   Ms. Green, are you familiar with Kelvin Pless and

7    Michael Coley, Sr.?

8    **A.**   I am.

9    **Q.**   In what capacity and how long have you known them?

10   **A.**   I've known them quite a number of years.  They are

11   good people, very good people.  Michael served on the

12   Board of Education for a while, and, of course, Kelvin

13   did too, but even before then I knew both of them.

14   **Q.**   What is their reputation in and around Sumter

15   County?

16   **A.**   They have a good reputation.

17   **Q.**   Are you aware that each of them ran for the

18   at-large seats on the Board of Education?

19   **A.**   Yes, I am.

20   **Q.**   And are you familiar with their campaigns for

21   those offices?

22   **A.**   Yes.

23   **Q.**   In your view as an experienced politician

24   yourself, how would you characterize the quality of

25   their campaigning?

1    **A.**    I think they ran a good campaign.

2    **Q.**    And then, what do you mean by that?

3    **A.**    I think they did things that they should have done

4    to send in some votes from the community.

5    **Q.**    Things that you, yourself have done?

6    **A.**    Things I have done.

7    **Q.**    Can you recall any other efforts that they engaged

8    in in their campaigns?

9    **A.**    I know that they made some -- made new signs and

10   things of that nature.

11   **Q.**    To what, if anything, do you attribute the fact

12   that they lost?

13   **A.**    I attribute the fact that they lost --

14   **Q.**    Why do you think they lost?

15   **A.**    I think they lost because people did not

16   understand the process and the voting for that, and

17   I -- I think that -- well, I know that a lot of black

18   people may have been confused about the voting and did

19   not get out to do what they could do, but so many times

20   people just don't understand because of when it's

21   taking place, as I said, and also because of the

22   confusion surrounding what was going on.

23   **Q.**    Ms. Green, do you think voting in elections for

24   the at-large seats on the board of education is

25   racially polarized?

**A.**   Yes, I do.

**Q.**   And how do you know that?

**A.**   Because when you look at the votes, you can see that the blacks vote for the blacks, the whites vote for the whites.  And I think we're not voting for the candidate as such, but just voting because of race.  So when that happens, if you have more whites voting than blacks, because for whatever reason, and it's always something, criminal record or something that's going on with the black -- with black voters.  But we're always coming short.

**Q.**   I want to follow up on that last point you mentioned that there are black voters in Sumter County who have criminal records.

**A.**   In every county.

**Q.**   Unfortunately, yes.  And in Georgia that means that means they can't vote, right?

**A.**   Well, now you can, some of them can, but the problem is a lot of them don't know it.

**Q.**   And have you seen that issue be a problem in Sumter County?

**A.**   I have.

**Q.**   Ms. Green, how long have you been a voter in Sumter County?

**A.**   Probably since I was old enough to vote, since I

1    was -- that's been a long time, a very long time.  But

2    I know that as soon as I was old enough to vote, I

3    registered to vote.  I remember.

4    **Q.**    Do you know whether African Americans in Sumter

5    County have a depressed socioeconomic status in

6    unemployment or education, per capita income or

7    poverty, those kinds of indicators?

8    **A.**    Yes.

9    **Q.**    And what makes you think that?

10   **A.**    I think so because there's hardly any place to

11   work, and a lot of the businesses are owned by --

12   they're kind of like mom and pop businesses.  There's

13   not a lot of industry in Sumter County.  We have good

14   educational opportunities, but it's still not a lot of

15   industry.  There is a lot of -- not much economical

16   growth.

17   **Q.**    How do those socioeconomic disparities affect

18   black voters' ability to participate in elections?

19   **A.**    Well, you know, they're uneducated, that's one

20   thing.  And another thing, in our previous elections

21   there was so much confusion around these districts and

22   so forth until a lot of blacks just didn't know what to

23   do.  So that's where the education comes in.  But we

24   have to knock on doors and, you know, try to get as

25   many as we can to vote.  And that's not an easy task,

1     not at all.  We can't just put out signs and say vote

2     for me, and people will vote.

3     Q.    You got to knock on doors to do it?

4     A.    You have to.  We have to.  We have to.  We have to

5     really get out there.

6            **THE COURT:**  All right.  I think we are at the

7     time for our afternoon break.  We will be in recess for

8     about 20 minutes, and then we'll resume with direct.

9     *(RECONVENED; ALL PARTIES PRESENT, 3:28 p.m.)*

10            **THE COURT:**  All right.  You may continue,

11    Mr. Sells.

12            **MR. SELLS:**  Thank you, Your Honor.

13    **BY MR. SELLS:**

14    Q.    Ms. Green, I want to ask you if you are aware that

15    in the 2010 timeframe, the Georgia General -- scratch

16    that.  In the timeframe of when the Sumter County Board

17    of Education was considering its change from nine to

18    seven, that the Georgia General Assembly passed a law

19    indicating a preference for school boards with seven

20    members on them.  Are you aware of that?

21    A.    I don't understand what you mean about a

22    preference.  I'm aware on the change in the law, yes.

23    Q.    If we could, I'd like to show you a Georgia

24    Session Law.  This is not an exhibit.  It's not into

25    evidence.  But this was codified in Section 20-2-52.1

1   of the Georgia Code, and this is from the 2011 Session

2   Laws.  And do you see in the middle, beginning with the

3   word such?

4   **A.**   Uh-huh.

5   **Q.**   Can you read that sentence for me that has been

6   highlighted in front of you?

7   **A.**   Such county boards of education shall consist of

8   seven members elected from single-member districts of

9   approximately equal population.

10  **Q.**   Are you aware of any law passed by the Georgia

11  General Assembly expressing a general preference for

12  at-large seats?

13  **A.**   No, I'm not.

14  **Q.**   Thank you.  Ms. Green, before I ask you just a few

15  concluding questions, is there anything else that you

16  think Judge Sands should know as he considers whether

17  the at-large school board seats dilute the black voting

18  strength of voters in -- I messed that question all up.

19  Let me start again.  Before I ask you a few concluding

20  questions, is there anything else that you think Judge

21  Sands should know as he considers whether the at-large

22  seats on the school board dilute black voting strength

23  in Sumter County?

24  **A.**   I think the Judge should know that the people of

25  Sumter County, the school board in particular, I'm

1    saying the school board in particular, was not for

2    at-large seats.  And I think he should know that the

3    people of Sumter County, especially the black

4    population, do not fully understand and do not

5    understand the impact of these at-large districts.  We

6    were not for at-large districts because we knew from

7    the history of Sumter County that black people cannot

8    win those seats.  And we also knew, and we're aware of

9    the law from 2013 that said that they should be single

10   member districts, and I read that on the screen there.

11   They should be single member districts according to the

12   law of Georgia.

13          **MR. SELLS:**  I have no further questions, Your

14   Honor.

15          **THE COURT:**  All right.  Cross examination,

16   Ms. McKnight?

17                   **CROSS EXAMINATION**

18   **BY MS. MCKNIGHT:**

19   **Q.**   Good afternoon, Ms. Green.

20   **A.**   Good afternoon.

21   **Q.**   It's not often I get to ask questions of two

22   sisters in a row in a courtroom.  So it's a pleasure to

23   meet you.

24   **A.**   Thank you, but you know we are sisters-in-law.

25   **Q.**   Oh, I understood --

1    **A.**    But we are sisters.  I'm from a family where we

2    are sisters-in-law, but we are sisters.

3    **Q.**    You are sisters, great.  Now, I'll just have a few

4    questions for you about the testimony you just provided

5    Mr. Sells.  Now, to ask you questions about the voting

6    performance of different districts in Sumter County,

7    would it be your testimony that when whites outnumber

8    blacks in a district in Sumter County, that blacks do

9    not have an opportunity to be elected?

10   **A.**    Would you repeat that question?

11   **Q.**    Sure.  Would it be your testimony that when whites

12   outnumber blacks, when there are more whites than

13   blacks in a district in Sumter County, that blacks do

14   not have an opportunity to be elected?

15   **A.**    Now, the term opportunity might mean something

16   different to each of us.  I would say that blacks are

17   not likely to be elected, and that has been proven, if

18   they're in a district.  Are you talking about in a

19   district or an at-large?

20   **Q.**    Well, in -- the question asked was in a district.

21   **A.**    Okay.  In a district.

22   **Q.**    And would it be fair to say that the inverse is

23   also true, meaning that if blacks outnumber whites in a

24   district, blacks would have that opportunity to be

25   elected?

1    A.    Yes, I would say that's fair.  But when you look

2    at it, you have to look at the proportions and the

3    percentages.  If it's just a few, maybe not, but you

4    have to look at more than just who's there.

5    Q.    Thank you.  Now, I heard your testimony earlier

6    with Mr. Sells that it was your recollection that the

7    Board of Education did not discuss reducing its size

8    from nine to seven at any time prior to November 2010.

9    Did I understand that correctly?

10   A.    I believe so.  I don't remember the dates, but I

11   believe that's correct.

12   Q.    Now, if there were board meeting minutes from the

13   Board of Education, Sumter County, showing that on

14   June 17, 2010, the board voted for a reduction in the

15   size of the board to five or seven to align with the

16   county commission districts, but those minutes also

17   show you were absent from that meeting, is it fair to

18   say you couldn't testify about what was discussed at

19   that meeting?

20   A.    You said prior to 2010, did you not?

21   Q.    November of 2010.

22   A.    But did you say before?  Your previous question

23   that you said was before 2010?

24   Q.    My previous question I asked whether there were

25   discussions prior to November --

1    **A.**    2010.

2    **Q.**    -- November 2010.  Because as I understood that

3    was Mr. Sells question to you or that was your response

4    to him.  So let's take a minute.  There may -- I had

5    understood your testimony to Mr. Sells that you do not

6    recall any discussion on the school board about

7    reducing the size of the board from nine to seven at

8    any time prior to November 2010.  Is that right?

9    **A.**    That's correct, then.

10   **Q.**    Okay.

11   **A.**    I did attend -- I was not at the meeting, the

12   initial meeting, when they talked about it first.  I

13   was not there.  There had been no discussion before

14   then that I can recall.

15   **Q.**    And, now, Ms. Green, I understand memory can be

16   fickle, so pardon this question.  I just want to

17   understand what your testimony is today.  If there's

18   also a newspaper article dated October 2nd, 2010,

19   reporting --

20            **MR. SELLS:**  Your Honor, I'm going to object.

21   I think this line -- this form of questioning is

22   improper, describing documents that are not in

23   evidence, are not going to be in evidence, and she's --

24   the attorney is testifying here.

25            **THE COURT:**  Well, I think she's on cross

1    examination, for one thing, so the leading is not

2    improper.  But it may be unfair to the witness just to

3    suggest a document that's not observable by the

4    witness.  The witness might want to see it, for all I

5    know.

6            **MS. MCKNIGHT:**  I understand, Your Honor.

7            **THE COURT:**  But as far as that being a

8    subject of cross examination, that's fine.  The

9    objection is overruled.

10           **MS. MCKNIGHT:**  Okay.  And if you don't mind,

11   I'll just break it up into a few questions.  I

12   understand that the objection is overruled; is that

13   right, Your Honor?

14           **THE COURT:**  Yes.

15           **MS. MCKNIGHT:**  Okay.  Then I'll break it up

16   in a few questions, and we can proceed.

17   **BY MS. MCKNIGHT:**

18   **Q.**   So, Ms. Green, if there was an article dated

19   October 2nd, 2010, and it reports --

20           **THE COURT:**  Well, I don't think that's a fair

21   question.  That's a hypothetical, if there was.  I

22   think you can suggest that there was, and if she's

23   familiar with it, and whether she --

24           **MS. MCKNIGHT:**  Okay.  I can take it a

25   different way.

1          THE COURT:  -- because that may --

2          MS. MCKNIGHT:  I was trying to be -- sure.

3          THE COURT:  -- maybe it will refresh her

4     memory in effect.

5          MS. MCKNIGHT:  Okay.

6          THE COURT:  I don't think it's fair just to

7     hypothesize --

8          MS. MCKNIGHT:  Okay, fair enough.

9          THE COURT:  -- about something that could be

10    a fact or not.

11    BY MS. MCKNIGHT:

12    Q.  Do you remember that in October, early October

13    2010, the Board of Education discussed downsizing, and

14    you attended that meeting?

15    A.  I don't remember.

16    Q.  Okay.  Would it refresh your recollection to see a

17    newspaper record of that meeting?

18    A.  It might.

19          MS. MCKNIGHT:  Your Honor, I would like to

20    put this up on Elmo.  I think it's the most useful way.

21          THE COURT:  That will be fine.

22    BY MS. MCKNIGHT:

23    Q.  I'll show you the full first page, and then I can

24    zoom in as you need.

25          THE COURT:  Ms. McKnight, if you would pull

1       that mic around towards you.

2                MS. MCKNIGHT:  Sure.

3       BY MS. MCKNIGHT:

4       Q.   Now, Ms. Green, I'll represent to you as it is

5       shown on this document that this is an article from the

6       Americus Times Recorder, Americus, Georgia, dated

7       October 2nd, 2010.  I'm going to move the document up

8       so you can see the web page source for it, that it's

9       pulled from the Internet.  As you can see this article

10      states:  BOE discusses its downsize.  Do you see that?

11      A.   Yeah, I see it.

12      Q.   Now, on page two of this article, I see your name

13      here as being in attendance and saying you're not ready

14      or needed more details.

15      A.   Uh-huh.

16      Q.   Is that a fair reading of the page?

17      A.   I guess so.

18      Q.   Okay.  Now, seeing this --

19                THE COURT:  Just a minute.

20                MR. SELLS:  Your Honor, I think the first

21      page said Edith Green was not in attendance.

22                THE WITNESS:  Let's see, in November.

23                THE COURT:  Well, the only purpose is, if the

24      -- the witness should be allowed to read this --

25                MS. MCKNIGHT:  I can take it more slowly,

1    because he misread the page, so I can take it more

2    slowly if he needs to.

3            THE COURT:  Well, that's what I'm saying.  I

4    don't want to get into whether you -- which of your

5    characterizations are correct.

6            MS. MCKNIGHT:  I understand.

7            THE COURT:  I think the witness can read this

8    document, and the question is does that refresh her

9    recollection.  It may or may not, and then you may ask

10   her a question.  I think that's -- let us know when you

11   have an opportunity to complete your reading.

12           THE WITNESS:  I need my glasses, Your Honor.

13           THE COURT:  Do you have them?

14           THE WITNESS:  They're in my purse.

15           MS. MCKNIGHT:  Would it be easier for you,

16   Ms. Green for me to bring you the document?  Would that

17   be easier?

18           THE WITNESS:  That would be worse.  If I can

19   get my purse, I can get them from my purse.

20           THE COURT:  She says she can get her purse.

21           MS. MCKNIGHT:  She can get -- okay,

22   whichever.

23           THE COURT:  I'll allow her to do so, yes.

24           MS. MCKNIGHT:  Okay.  Pardon me.

25           THE COURT:  There would have been a time I

1   would not have understood that request, but I do.  It

2   might also work better if she has a hard copy to look

3   at.  That may be easier for her to look at.

4           **MS. MCKNIGHT:**  I'm sorry, Your Honor, I

5   believe I only have this one copy.

6           **THE COURT:**  I mean, you can retrieve it once

7   she's looked at it.

8           **MS. MCKNIGHT:**  Okay.  Oh, sure.  Is it okay

9   for me to approach and give this to her?

10          **THE COURT:**  Yeah, sure, sure.  She's going to

11  let you use her copy to look at first, and then you can

12  give that back to her.

13  *(Pause)*

14          **MS. MCKNIGHT:**  Your Honor, would you like me

15  to display it for the Court, or may I just ask Ms.

16  Green a few more questions about it?

17          **THE COURT:**  You can ask her about it.  I

18  think it only becomes relevant if it assists her in her

19  recollection, as far as that, but I don't need to see

20  at this point.

21          **MS. MCKNIGHT:**  I understand.  Okay.

22  **BY MS. MCKNIGHT:**

23  Q.   Now, Ms. Green, does that -- does reading that

24  newspaper article refresh your recollection about a

25  discussion by the Board of Education in and around

1    early October 2010 regarding downsizing?

2    **A.**    Yes.

3    **Q.**    Does it refresh your recollection that indeed on

4    or around October 2nd, 2010, the Board of Education

5    discussed downsizing?

6    **A.**    Yes.

7    **Q.**    And you attended that meeting, right?

8    **A.**    In October?

9    **Q.**    2010.

10   **A.**    Uh-huh, but not prior to 2010.  And that's what I

11   understood your original question to be, prior to 2010,

12   there was no discussion that I can recall.

13   **Q.**    I understand.  Okay.  Thank you.

14   **A.**    And I don't remember the dates, but --

15   **Q.**    Okay.  And, now, ultimately there was a vote in

16   December 2010 regarding downsizing, and I understand

17   that vote was unanimous.  Do you remember casting a

18   vote?

19   **A.**    To downsize --

20   **Q.**    To downsize.

21   **A.**    -- to seven members, yes.

22   **Q.**    Okay.  Thank you, Ms. Green.  I have no further

23   questions.

24   **A.**    -- at-large.

25           **THE COURT:**  All right.  Did you get your copy

1    back?

2           **MS. MCKNIGHT:**  Yeah.  If you don't mind.

3           **THE COURT:**  We don't want to lose your

4    documents.  All right.  Is there any redirect, Mr.

5    Sells?

6           **MR. SELLS:**  May I have just a moment to

7    confer, Your Honor?

8           **THE COURT:**  Sure.

9           **MR. SELLS:**  No redirect, Your Honor.

10           **THE COURT:**  All right.  Is there any reason

11   this witness cannot be excused?

12           **MR. SELLS:**  This witness may be excused.

13           **THE COURT:**  All right.  For the defendants,

14   any objection?

15           **MS. MCKNIGHT:**  Wait.  Your Honor, pardon me.

16   I neglected to ask a question.  I'd ask leave of Court

17   to ask another question on cross and allow plaintiffs

18   an opportunity to redirect if they need to.

19           **THE COURT:**  If it's cross, I'll allow it.

20   You may do so.

21   **BY MS. MCKNIGHT:**

22   **Q.**   Ms. Green, pardon me, but one more question about

23   this article.  Did it also refresh your recollection

24   that there were discussions prior to November 2010 that

25   the school board would decrease in size and would have

1    the same five districts with two countywide at-large

2    seats?

3            **MR. SELLS:**  Objection.  In order to refresh,

4    you have to establish that she doesn't remember

5    something, and she hasn't done that yet.

6            **MS. MCKNIGHT:**  I can take it in two parts.

7            **THE COURT:**  All right.

8    BY MS. MCKNIGHT:

9    **Q.**   Do you remember that in the October 2nd, 2010,

10   meeting the board discussed reducing in size from nine

11   to seven with five single member districts and two

12   at-large districts?

13   **A.**   Yes.  But also in that same article I said that I

14   needed more details and more information.  I was not in

15   agreement with the two at-large districts.  I don't

16   know if any of the board members, except those

17   presenting it, were in favor of the two at-large

18   districts.  Those two at-large districts, we knew that

19   no black voter -- no black person, could win in Sumter

20   County.  That was already established.  We knew that

21   from the history of Sumter County.  In that same

22   article, and I must tell you, under oath, that I don't

23   rely very much on the Americus Times Recorder.  But in

24   that same article, and my name is mentioned there as

25   needing more details.  I had questions.  Most of us had

1    questions.  But the important thing here is that this

2    took place without the Board of Education agreeing to

3    it.  We never voted to have five districts and two

4    at-large.  It may have been discussed.  It was also

5    discussed seven single member districts.  There were a

6    lot of things discussed, but nothing was ever,

7    according to the Board of Education, really decided on.

8    And then, in retreat, and in retreat there was no vote

9    taken.  That was for discussion.  There was no vote

10   taken.

11   Q.    Thank you.  I do appreciate that.  And is it your

12   testimony that that vote in December 2010 that you

13   voted for, that you made, did not contemplate two

14   at-large districts?

15   A.    It did not.  And what we really were voting for,

16   we thought, was to look into it.  But as it turned out,

17   it was something different.  We voted, and the motion

18   was to look into it, but when we came back later and

19   saw what was written, it was not the same as what we

20   thought we were voting for.

21   Q.    Thank you very much.

22   A.    And we never looked into it.  Someone else did

23   that, and as a board, we did not plan this legislation.

24   Q.    Thanks for your time, Ms. Green.

25   A.    Thank you.

1          **THE COURT:**  All right.  Any further redirect

2     based on the allowed cross?

3          **MR. SELLS:**  No, Your Honor.

4          **THE COURT:**  All right.  Now, is it all right

5     that the witness be excused at this point?

6          **MS. MCKNIGHT:**  Yes, Your Honor.  Thank you.

7          **THE COURT:**  Thank you.  You are excused.  You

8     may leave if you wish or remain, whatever your choice.

9     You may call your next witness.

10          **MR. MCDONALD:**  Mathis Wright, Your Honor.

11          **COURTROOM DEPUTY:**  Do you solemnly swear or

12     affirm that the testimony you are about to give in the

13     case now before the Court will be the truth, the whole

14     truth, and nothing but the truth?

15          **THE WITNESS:**  Yes, ma'am.

16          **THE COURT:**  All right, Mr. McDonald.

17     BY MR. MCDONALD:

18     Q.   Would you please state your name for the record?

19     A.   Mathis Kearse Wright, Jr.

20     Q.   And are you the plaintiff in this action?

21     A.   Yes, sir.

22     Q.   And where and when were you born?

23     A.   I was born in Sumter County, Georgia, June 22nd,

24     1951.

25     Q.   And what is your race, Mr. Wright?

1   **A.**   Black, African American.

2   **Q.**   And how long have you lived in Sumter County?

3   **A.**   Basically all my life.  I did move away for a

4   while when I was a baby.  My parents moved to

5   Connecticut, but that was a short stay.  Her parents

6   came and got me when I was about six months old, so

7   basically I grew up in -- grew up in Sumter County.

8   **Q.**   Well, did you have a name change when you came

9   back to Sumter County?

10   **A.**   Yes.  Later on, my mother's parents -- parents

11   legally adopted me from -- from my parents so -- cause

12   that's -- my name was Mathis Kearce, Jr., and so that's

13   how it became Mathis Kearce Wright, Jr.

14   **Q.**   And where did you attend grammar and high school?

15   **A.**   Grammar school was Southeast Elementary School in

16   Leslie, Georgia, and high school was Sumter County High

17   School in Americus, Georgia.

18   **Q.**   And what year did you graduate?

19   **A.**   1969.

20   **Q.**   Were the schools in Sumter County racially

21   segregated when you attended them?

22   **A.**   Yes.

23   **Q.**   Now, were there any whites at all who attended the

24   schools that you attended and graduated from?

25   **A.**   Two that I remember.  It might have been a third

1      one, but I'm positive of two.  And they were there from

2      -- they were part of the Koinonia Farms group, who were

3      basically sort of a -- I'm going to say white group of

4      people who kind of was -- had sympathy for the way

5      black people were being treated, so they had their

6      children there.

7      **Q.**   Two or three students --

8      **A.**   Yes.

9      **Q.**   -- white students?

10     **A.**   Yes.

11     **Q.**   And were the rest of the students black?

12     **A.**   Yes.

13     **Q.**   And what about the teachers and principals, what

14     was their race in the schools that you attended?

15     **A.**   All black.

16     **Q.**   And when were the schools integrated in Sumter

17     County?

18     **A.**   1971.

19     **Q.**   Now, when you were growing up in Sumter County

20     what were race relations like, that is, relationships

21     between whites and blacks?

22     **A.**   Hmm, real bad.

23     **Q.**   Can you elaborate on that?  What do you mean real

24     bad?

25     **A.**   Well, for one, we had to ride a school bus that

1    had the black fender on it, and they basically would

2    know that that was the, as they put it at that time,

3    the colored folk's bus.  There were plenty of times

4    when there would be other white students or young white

5    males and older males, they would throw stuff at the

6    bus.  But my worst situation --

7    **THE COURT:**  I'm sorry.  I want to understand

8    something.  The school buses were painted differently?

9    **THE WITNESS:**  Yes, sir.  The --

10    **THE COURT:**  In all my years, I've never heard

11    of such.  I just had to stop him there, because I

12    wanted to be clear I understood what you were saying.

13    **THE WITNESS:**  Yes, sir.  The school buses for

14    black students had black fenders, and the school buses

15    for white students were all yellow.  So that's how they

16    knew which bus was which, that it was a load of black

17    students, versus a load of white students.

18    **THE COURT:**  All right.  I just wanted to be

19    sure I heard him straight, because I don't think I've

20    -- I've heard many things.  That's one I can say I have

21    never heard until today.

22    **MR. MCDONALD:**  That's the first time I've

23    heard that too, Your Honor.

24    **THE COURT:**  All right.

25    **THE WITNESS:**  Well, it was -- you can check

1    it in the archives.

2    **BY MR. MCDONALD:**

3    Q.   Well, other than buses, did the black students --

4    were they molested in any way by the white students?

5    A.   Well, you know, like I said briefly about it was,

6    it was plenty of occasions when they would be lined

7    along the roads, and we -- it was regular that we got

8    eggs or something threw at the bus.  So it was common.

9    It was sort of like business as usual.

10   Q.   Well, did anything happen to any of the white

11   girls -- I'm sorry, the black girls who --

12   A.   Well, yeah.  Well, just before the Judge, that was

13   about to -- there was a black female friend of mine,

14   she was probably between 14 and 16, and I guess I must

15   have been about 11 to 12.  And this afternoon after we

16   got home from school -- we lived probably two miles

17   apart, maybe three -- and, hmm, when she got off the

18   school bus that afternoon, she and her brothers, that

19   was the last time I saw her alive.  That afternoon, it

20   was a store about 200 yards from her house, her mother

21   sent her to the store that afternoon, and she never

22   came back.

23   Q.   Well, did you receive any violence from white

24   students at all yourself, or white people yourself?

25   A.   Hmm, only during -- after, when I was

1    participating in the voter registration drives that I

2    was a part of, I got a lot of repeatedly N words, you

3    know, you better watch that, and you don't know what

4    you're doing.  You better stay home.  We see you out

5    here again, you know, you're going to turn up missing.

6    It was all sorts of threats about when we were doing

7    voter, voter registrations, canvassing, and that was

8    primarily in the Cobb, Lake Blackshear, Leslie and De

9    Sota area, which would be in the eastern part of Sumter

10   County.

11   Q.    Well, how did you deal with that?

12   A.    Well, I just had a strong grandfather who was part

13   of the Civil Rights Movement, and he just basically

14   kept us motivated and said it was, you know, that it

15   was worth fighting for.  And that -- at that time there

16   was other reports of other black people homes being

17   shot in.  There was some of our black relative friends'

18   homes actually got burnt down.  Our home got burnt

19   down.  But he always just said, you know, it was worth

20   fighting for, and that to -- that to never give up.  He

21   was the -- he was the youngest of all of his siblings,

22   and he used to tell us that his dad named him Freeman

23   because he always wanted him to remember that he was a

24   free man.  And so everybody grew up calling him Free.

25   And so -- and he was a farmer, and the lord had blessed

1   him to be successful, and once a month he would invite

2   all of the voter registration people from Albany and

3   all surrounding counties, and he would have a big

4   barbecue on the grill out there.  And so, that was the

5   nature of how I grew up.  It was like, don't ever look

6   back, and if you die, you die for it, but when you're

7   right, you stand up for what's right.

8   Q.   Well, did you know how your house came to be

9   burned?

10  A.   Well, it happened while we were all away from

11  home.  I went to school that morning, and my uncle, his

12  -- as they said back in that day -- that he was the

13  knee baby's son, he was having some real serious kidney

14  problems, and the baby son, at that time they both were

15  in their twenties, and we -- they all were away in

16  Albany, here, matter of fact.  One son gave the other

17  son a kidney, and so everyone was away from home.  And

18  so it was never determined what started the fire, but

19  my granddad always felt like it was set.

20  Q.   Well, how many other black houses were burned?

21  A.   That I am aware of, two.  And the ones that got

22  shot in that I'm aware of, three.

23  Q.   Well, are you familiar with any white homes that

24  were burned or were shot into?

25  A.   Not that I'm aware.

1    Q.    Now, how did your grandfather get interested in

2    civil rights?

3    A.    Well, he was -- I guess it was just, like I said

4    earlier, that his dad had told him that that's why he

5    had named him Freeman, that he was going to be free.

6    And he had always been independent and the lord had

7    blessed him to acquire a large farm, and so he was, I

8    guess, in some sense he was somewhat self sufficient.

9    And it was just one of the things that he was doing

10   that he had all of us doing from his children to his

11   grandchildren.

12   Q.    Now, were you involved in any of the actual civil

13   rights marches in the 1960s?

14   A.    Naw, I didn't never actually do any of the

15   marching in Americus.

16   Q.    Now, you indicated that you did some voter

17   canvassing; is that correct?

18   A.    Yes, sir.

19   Q.    And how old were you when you were involved in

20   that?

21   A.    Hmm, It had to be between, let's see 10, 11.  I

22   had to be between 11, 13, 14, in that age range.

23   Q.    Well, what sort of things would you do as you

24   participated in that canvassing?

25   A.    Well, we would go house to house.  Another

1    gentleman that was involved in it, his name was

2    Mr. Sam, last name Case, and he would be the one that

3    would be taking us around.  It was three other young

4    blacks, two other males and one female.  And he would

5    basically be with us sort of our chaperone or guard,

6    and we would get out and go.  They would be on one side

7    of the road, and we would be on the other side of the

8    road.  It wasn't really streets.  And we would go home

9    to home encouraging people to go and register to vote,

10   because at that time some of the things were changing

11   about -- they didn't have to go through the strenuous

12   tests that had been put on black people in order to

13   register to vote.  So it was just -- we went from door

14   to door, and then Mr. Case would be the primary one

15   that would go back and take them to Americus to the

16   voter registration office.  We would basically set up

17   with them at a time that they could go.  And then he

18   would be the one or someone else would go back and pick

19   them up that day and take them to the voter

20   registration office so that they could register.

21   Q.   Well, did you experience any racial incidents

22   during your voter canvassing activities?

23   A.   Well, no more than the -- you know, it became so

24   usual, you know, you kind of expected the threats.  No

25   one never actually physically touched me or anything,

but the -- but, you know, the name calling was -- you
already knew you were going to get it when you went out
there because the way the roads are laid out, there
would be some black houses and then there would be some
white homes, you know, with white people.  So you --
when you -- so you would skip their house, but many
times they would come out, and so, as you're going by,
you know, you got -- you know, you got the N word and
the curse words and catch you on this street, you'd
better not be seen after dark.  I mean, it was just,
you just knew, you just kind of conditioned yourself to
get ready for it, but it was going to be every time you
went, you knew you were going to get it.

**Q.**   Well, after you graduated from high school, did
you attend college?

**A.**   Yes.

**Q.**   And where did you go?

**A.**   Georgia Southwestern.

**Q.**   And did you graduate from there?

**A.**   No, sir.

**Q.**   Well, what did you do after you left college?

**A.**   I got married.

**Q.**   And did you have any children?

**A.**   Yes.  I'm married to -- matter of fact, my wife,
Linda Releford Wright, we've been married 44 years, and

1   we have six children, five daughters and one son.

2   Q.   And did they attend school in Sumter County?

3   A.   Yes.  All of our kids went to the public school

4   system in Sumter County.  Three of the daughters are

5   college graduates.  The son is a graduate from West

6   Point Army school in New York.  And so, you know, the

7   school systems is a good school system, you know, it's

8   just that, you know, I don't really get it why they

9   keep putting down the public school system so, because

10  if I just look at my own son, he came right out of that

11  school.  It was 1,079 students in his class from

12  everywhere.  At West Point he, academically, he was

13  number 477.  Militarily, he was number eight, meaning

14  that he was the eighth highest ranking officer on the

15  campus, and he came right out of that system in Sumter

16  County and competed with people from all over the

17  world.  So, you know, what else can I say about it?

18  Q.   Well, the schools were desegregated by the time

19  your children enrolled?

20  A.   They were supposed to be desegregated, but at the

21  time my kids were going through there, it was almost

22  like it was when I was going.  There were some white

23  students there, and he did have -- and they did have

24  some white friends, but from my recollection in his

25  class -- and someone said, well, how did you notice

that, because I was always civil rights oriented and I
just looked at things differently from other people.
But in their graduation class, their class was easily
82 percent black and maybe 12 percent white, and then
the other part was other.

Q.   Well, when you were growing up and before you went
off to college, did you have any meaningful
relationships with any people in the white community in
Sumter County?

A.   Outside of two that went to the school where I
graduated from, Sumter County, no.  And that was --
that was the difference between what I would say how
white people got treated when they came into a
predominantly black school and opposed to a black
student going to a predominantly white school.  And I'm
only making this reference because my first cousin went
to Leslie Georgia at Union High, and Union High was a
predominantly white school, and some of the things he
used to tell me that he used to have to endure, from
getting, you know, urine dashed on him to his books
been torn up and all sorts of things like that.
Wherein we, when I say we, the black students at Sumter
County, we basically welcomed them in, embraced them,
treated them just like you treat anyone else.

Q.   And you are referring to the students from

1    Koinonia?

2    **A.**    Right, the two students.  So outside of those two,

3    they were about the only two, let's say white people,

4    that I really had any real dealings with.

5    **Q.**    Now, what employment have you had?

6    **A.**    I worked for Textron, which was an automobile

7    industry, and I was on the management level there.  And

8    during that time while I was there, I ended up actually

9    filing an EEOC complaint about job discrimination.  And

10   the late C. B. King, after it went through the EEOC

11   process and they found cause, the late C. B. King was

12   the one that was representing me in that particular

13   lawsuit.

14   **Q.**    Well, did your EEOC complaint have any positive

15   impact?

16   **A.**    It did at that particular company, but it didn't

17   have a positive impact on the community.

18   **Q.**    And explain your answer in a little more detail if

19   you will?

20   **A.**    Well, at the company, the company then started

21   looking more, I want to say broadly, at promoting other

22   blacks who were qualified after the -- after the EEOC

23   had found cause, and that they put the injunction in

24   for them to stop that type of behavior in their

25   promoting -- promoting and hiring process.  But then in

1    the community itself, you would still -- you would

2    still -- you get those, hmm, the same treatment from

3    other segments of the community.  You know, you always

4    got treated different when you went in the stores.  You

5    got treat -- you know, even though the law was passed

6    that you could go in the front, you might have -- you

7    might have went in the front, but you still was black,

8    you know, and you got treated a little bit different

9    from your white counterparts.  And then that became

10   sort of expected, and so you sort of, you know, so you

11   know you are going to get it, so then we got kind of

12   complacent with it, and you got kind of, you know, you

13   never really get comfortable with it, but you just do

14   it because it's what -- it's what you expect to happen.

15   Q.   Well, did you have subsequent employment?

16   A.   Oh, yeah, after I left Textron we opened up, we

17   went into -- we opened up a business called Dixie

18   Bakery, Catering and Diner, and then we did that for 20

19   plus years all the way up until I retired.

20   Q.   Well, have you been doing any work for any public

21   interest organizations?

22   A.   Well, yeah.  Well, now I am president of the local

23   NAACP in Americus.  I am president of the Local 2194

24   IBEW Union.  I'm president of the Pastors and Layman's

25   Organization.  I am a member of the Middle Flint Work

1   Force Development.

2   **Q.**   Well, what have you done as a result of your work

3   with the NAACP in Sumter County?

4   **A.**   Hmm, well, one of the issues we fought was against

5   the white school board in 2008, when it was the

6   majority white school board.  A family came and said

7   that they believed that the white teachers were

8   changing their daughter's grades, and that -- that it

9   was a effort to prevent their daughter from being

10  valedictorian.  And so, they were very, very adamant

11  about it, so we decided to look into it and started

12  doing the investigation.  So for sake of time, long

13  story short, we did find evidence that that had

14  occurred.  At that time, the majority white school

15  board, we presented them with the findings that we had,

16  and we were basically brushed off, ignored.  So we

17  filed a complaint with OCR, and then OCR accepted the

18  complaint, then they came in and did a investigation.

19  And then they found out that not only had they -- that

20  the information was true, that they had been changing

21  the black student's grades, but they found that, as far

22  as the law would let them go back, which was eight

23  years, they found that they had been doing it for eight

24  consecutive years that they had been changing black

25  students' grades to assure that they would always have

1   a white valedictorian.  And then, they were also

2   withholding the -- let's see, what is his first name.

3   His last name was Byrd.  It was some type of a

4   scholarship.  They found out that they were only

5   offering that to the white students, because that was

6   something we didn't even know about, but when they

7   started and did the investigation, they found out that

8   there was that particular scholarship was only being

9   offered to the white graduating students who were

10  there, which was that small little majority of

11  students, but you got this big black -- this big number

12  of black students, and they wasn't even being made

13  aware and offered to get this particular scholarship.

14  Q.   Well, what year was that investigation made and it

15  found --

16  A.   2008, and it concluded, if I remember, around

17  December 2009.

18  Q.   Are you still active with the NAACP?

19  A.   Yes, sir.

20  Q.   And how long have you been a minister?

21  A.   Let's see, 2012.  Five years.

22  Q.   Okay.  And what church are you the minister -- are

23  you the pastor of?

24  A.   New Union Grove Baptist Church in Americus.

25  Q.   And does your wife have any position in the

1    church?

2    **A.**    Say that again.

3    **Q.**    Does your wife have any position in the church?

4    **A.**    Oh, yes, sir, she's the co-pastor.

5    **Q.**    And is your church integrated?

6    **A.**    No, sir.

7    **Q.**    How many members are there?

8    **A.**    35.

9    **Q.**    And are they -- none of them are white?

10   **A.**    No.

11   **Q.**    And why do you think that is the case?

12   **A.**    Well, it's not just -- because basically, pretty

13   much, white people go to white churches, and black

14   people go to black churches, and we just don't.  You

15   know, it's not a whole lot of integrating going on

16   period, you know, at all.

17   **Q.**    Well, are there private clubs in Sumter County

18   that you are familiar with?

19   **A.**    Yes.

20   **Q.**    And are they integrated or segregated or what?

21   **A.**    Well, they -- they have a -- they have, like most

22   places, they have this, hmm, let's say this policy that

23   they say that they are for affirmative action, or we

24   don't discriminate for race, color, creed, and all

25   that, you know, that's in place, but as far as I know

1    about the Lounge Club or the Kiwanis Club, there's

2    probably maybe just a few black members.  And then, if

3    I take the branch where I'm at in the NAACP, there's

4    just a few white members.

5    Q.   Okay.  Now, have you run for a political office in

6    Sumter County?

7    A.   Yes, I have.

8    Q.   And what did you run for and when?

9    A.   It was in 2006, and I ran for district four,

10   county commissioner seat.

11   Q.   And why did you run?

12   A.   Well, at that particular time I felt like I could

13   help make a difference in the -- in the community, that

14   there was some things going on in the community that I

15   had identified with the then county commissioner who

16   was in my district.  And basically he had pretty much

17   blew me off, so then I decided, well, then I'll run for

18   the seat and see if I couldn't make a difference.

19   Q.   Well, how did you do in the election?

20   A.   Well, it was a three-man race.  There were two

21   white males, the incumbent, Tift Pace and the other

22   challenger was Randy Howard, and so it ended up in a

23   runoff between Randy Howard and myself.  And on the day

24   of the election, all the way to -- they got to the part

25   where they brought the votes out of the back from what

1    they call the absentee ballots, which is -- has been

2    where Randy Howard has always won, even when he was

3    sheriff when we use to challenge some of his -- some of

4    his people that he would have on absentee ballots.  It

5    was even discovered that there was some that was even

6    deceased, and it was reported to the secretary state

7    office, and those challenges were put in place.  But,

8    anyway, long story, I ended up losing to him after they

9    had counted the absentee ballots.  During that

10   campaign, he had made a complaint about one of my signs

11   on someone's truck that was at the, uh, at the voting

12   poll, and he went down within the -- in the, uh, within

13   the 40-foot district, feet district, of the polling

14   place, and he stayed within that, standing on the

15   outside of the polling place, which was -- he stayed

16   there about 43 minutes.  And so my complaint was, you

17   know, it didn't take that long for him to go down just

18   to complain about a sign, and that he had violated, you

19   know, the rule.  He had taken advantage of it just

20   because someone that was parked had my sign on the side

21   of their truck.  Long story short, anyway, I challenged

22   it, and I ended up going to jail about it.

23   Q.   So how did you go about challenging it?

24   A.   Well, I challenged it that I stood there too, and

25   so they came and got me for standing there and saying,

1    basically, I said if he could do it for 43 minutes, I

2    should be able to do it for 43 minutes, that if you are

3    not going to do anything to him, then you shouldn't do

4    anything to me, but he never went to jail, but I did.

5    Q.   Well, do you think that was racially motivated

6    against you?

7    A.   I know it was racially motivated.

8    Q.   Well, let me ask you a question.  In 2006, when

9    you ran for county commission from district four, what

10   was the racial composition of that district at that

11   time?

12   A.   It was, if I remember correctly, 2006, that

13   particular district was pretty close.  That was one of

14   the reasons why, after we had looked at it, that we

15   thought that we had an opportunity to win it.  We

16   actually looked at it and thought that there may have

17   been a few more black voters in that district than what

18   we had originally -- had been thinking, that it was

19   more heavily white concentrated, but evidently they

20   must have moved out or something.  But, long story

21   short, that was the determining factor was that we

22   thought it was enough black voters there to where we

23   might win it.

24   Q.   Now, let me just make sure I understand what

25   you've previously said in one of your answers, that the

1    candidate who actually won that election had claimed

2    some absentee ballots by people who were dead?

3    **A.**   Yes.

4    **Q.**   And how many of those ballots do you think there

5    were?

6    **A.**   Well, the only ones that we actually got our hands

7    on was two.

8    **Q.**   Okay.  And what was the vote count in the runoff?

9    **A.**   The final count was -- it was less than a hundred

10   votes that separated us.  But going into that part, I

11   was leading before -- before the absentee ballots, I

12   was leading.

13   **Q.**   Now, were there any racial incidents involved in

14   your campaign?

15   **A.**   Oh, yes, cause we really campaigned hard.  My

16   relatives came from out of town, people that --

17   friends, all my children who were within -- within 200

18   miles would come every weekend.  And we went to every

19   single person, home in the district, and -- but on this

20   one occasion this -- this white family sicced their

21   German shepherd on the -- on one of my daughters during

22   one of the times.  And then there were other times

23   when, you know, they just basically said, you know,

24   sorry, but, you know, we don't vote for -- and they

25   said the N word.  And then there was a couple of

1    incidents where they said don't come on my property.

2    **Q.**    Well, did you challenge the outcome of your

3    election?

4    **A.**    Yes, we did.

5    **Q.**    And why did you do so, and what was the outcome?

6    **A.**    Well, we did so because we felt like that the

7    election had been stolen, based on the information and

8    the facts that we had.  We got a copy of who all had

9    voted.  We know just about everyone -- when I say know

10   everyone, not all the white citizens in that district,

11   but we basically can say pretty closely that we know

12   every black person in the district.  So we got the list

13   and we went through it person by person, and we

14   separated out all the black voters from what was left.

15   So we said then, if every white person voted for me,

16   this is how many votes I would have had, and if no

17   white person voted for me, this is how many he would

18   have had.  So that's how we kind of said, well, then,

19   something -- something just ain't right because the

20   numbers just was not adding -- adding up to come out to

21   what the results were.  So once we filed the complaint

22   with the Secretary of State office, it's done pretty

23   much like other instances.  We have filed plenty of

24   complaints with the Secretary of State offices about

25   voting right issues.  And they -- you know, for black

1    people, justice is just hard to get.  You know, many

2    times we end up -- we don't actually end up fighting

3    the people who we are actually challenging, we ending

4    up fighting justice, just to get justice to do right.

5    So that's really what happened.  We had the evidence,

6    but they still did nothing.

7    Q.   The Secretary of State took no action on your

8    complaint --

9    A.   Took no action --

10   Q.   -- is that what you said?

11   A.   -- didn't sanction nobody, just basically swept it

12   under the rug, and so -- so, what do you do?

13   Q.   Now, you talked about charges that were filed

14   against you for putting up a sign in a polling place.

15   How were they ultimately resolved, those charges?

16   A.   They said for -- well, I was looking forward to

17   that trial, because I knew that the Secretary office

18   was going to have to come, but the district attorney

19   dropped all charges, and said he did it for the -- for

20   the best interest of justice.  And I may not pronounce

21   it correct, he did what is called a nolle prose or pros

22   or something like that and just dismissed it and said

23   for the best interest of justice.

24   Q.   Well, do you plan to run for office again?

25   A.   Well, no, I kind of like what I'm doing now.  I

1    can do -- I can help more people from the position I'm

2    in now than if I get tied into a voted-in position.  I

3    wouldn't have as much freedom.

4    Q.   Well, as someone who has lived all of his life in

5    Sumter County, you've been involved in NAACP and

6    politics, how would you describe race relations in

7    Sumter County today?

8    A.   Well, they are worse than they were to me in 1969,

9    because in 1969 I knew exactly what to expect.  I knew

10   how they were going to deal with it.  Today, the racism

11   is so subtle.  They -- they will, as my granddad used

12   to put it, and excuse this expression, he used to

13   always say, stop peeing down my back and telling me

14   it's raining.  And that's what we get all the time.

15   They basically make it seems like everything is fine

16   and dandy, but everything ain't fine and dandy at all.

17   The complaints that comes into the office about job

18   discrimination, since 2008 they have almost doubled.

19   At the Equal Opportunity Commission, in 2010, they

20   reported that since their conception in 1975, they had

21   more complaints about job discrimination in 2010 than

22   they had ever had.  And then, 2011 exceeded '10.  '12

23   exceeded '11.  '13 exceeded '12.  '14.  So all the

24   numbers says that it is getting worse.

25   Q.   Well, have you received any complaints about the

1     lawsuit that you have filed that we are having a trial

2     on today?

3     A.   Well, yes.  What happened, there was, hmm, the,

4     uh, radio station was the primarily one.  They had

5     broadcast that because of the lawsuit that I had filed,

6     citizen taxes was going to go up; if you don't get a

7     raise, Mat Wright is going to be to blame.  If you, uh,

8     if the roads and inter structure are not being paved

9     and resurfaced, Mat Wright is going to be to blame.

10    He's the one that you are going to be able to thank for

11    all of the negativities that may not happen.  And then,

12    after that -- I always get a few, you know, a little

13    bit of hate mail, but after that it spiked pretty good

14    there in the office.  It was coming -- most of it came

15    through on the Sumter Observer's email and, you know,

16    so then I had to call the radio station and talk to the

17    owner and tell him, you know, that they had to pipe

18    that down, you know, that people, you know, I could --

19    seriously I could get hurt, somebody take it the wrong

20    way and that type thing.

21    Q.   Well, are you aware of any problems that black

22    students have had in the public schools, violence or

23    anything like that?

24    A.   Yes.  Well, one involved a white female teacher

25    that had hit two young black students, one was a male

1    and one was a female.  And again, when you try to get

2    justice for people -- we were able to get the sheriff

3    office to get a warrant for her for simple battery, but

4    we filed a complaint with the Professional Standards

5    Commission to try to get her sanctioned about what she

6    had done.  And ironically, just to show you how things

7    work, the same day that she pleaded guilty to simple

8    battery, the Professional Standard Commission issued

9    their decision that they couldn't find nothing wrong.

10   Q.    So what ultimately happened to that teacher?

11   A.    Well, by it was a simple battery misdemeanor, and

12   then they didn't take any actions to suspend her

13   teaching certificate, the last time I heard about her

14   she was -- she was still teaching, but she just wasn't

15   teaching in Sumter County.  She was teaching in another

16   system.

17   Q.    Yeah.  Well, do you think that blacks in Sumter

18   County have a depressed socioeconomic status compared

19   to whites?

20   A.    Yes.

21   Q.    And what do you base your opinion on?

22   A.    Well, when you look at the average black kid, most

23   of them are walking, most of them are unemployed, most

24   of them don't really have a whole lot to look to in

25   Sumter County.  Even that happened with my own kids,

they had to move away to find decent work somewhere.

And so then when you look in the white community I

think, you know, it's like -- it's like day and night,

most of them either have access to automobiles, most of

them have access to, you know, funding to do different

things, to go different -- things.  So when you put

those things together, you create a situation where the

poor blacks don't have anywhere to turn to.  I mean,

even in Americus, I mean, Americus don't even no longer

-- don't even have a movie theater anymore.  They can't

even outlet to just to go watch a movie.  So you really

hustle and you work real hard trying to motivate them

and get them to come to different events.  We sponsor

different events in the parks where they live, in their

communities to try and motivate them that there is a

better life, but it just may not be in Sumter County.

Q.    Well, does that have an impact in any way upon the

ability of blacks to participate in the political

process in Americus and Sumter County, in your

judgment?

A.    No.

Q.    It has no impact?

A.    That don't.  Not what I just described don't,

because, you know, they -- they have it so the

oppression is so, so subtle, but yet so devastating

1    that it -- it have them almost numb, you know, they

2    just don't do it.  And you -- and you -- and the

3    motivating factors, I mean -- I mean the whole purpose

4    of the 5/2 plan was to readdress to take things back,

5    because things were moving one way in the school system

6    and that whole 5/2 plan was just to undo what was --

7    some of the progress that had been made.

8    Q.    Well, be a little more specific.  What do you

9    think the underlying purpose of the 5/2 plan was, why

10   it was adopted and what its impact would be?

11   A.    Well, the impact was to the white community wanted

12   to have control of the school board, and everything has

13   come down, as we're talking about, economics.  Well,

14   the school system has probably the largest or one of

15   the largest budgets in the entire county.  So

16   therefore, when you control the money, you control

17   basically what goes on, what curriculum you teach,

18   those different -- because like we were pushing, before

19   this, before they -- before they dismantled the black

20   school board, we were really seeking to get what is

21   called STEM where -- because you have a lot of black

22   students, in particular, they may not be great in the

23   book, but they are great hands on.  If you can teach

24   them a skill, and that's what STEM is all about.  So

25   things were moving in that direction, but as soon as

1    they flipped it, that stopped.  You can't hardly get

2    them to talk to you about STEM anymore.  So, you know,

3    it's just, you know, I mean, it's just sad.

4    Q.   Well, do you think that the House Bill 836, which

5    adopted the 5/2 plan, that it was racially motivated in

6    any way?

7    A.   Oh yeah, I mean, certainly the --

8         MR. BRADEN:  Your Honor, I would object to

9    that question.  It's total speculation on his part and

10   motive isn't an issue here.

11        THE COURT:  If you're asking motive, if you

12   can lay a foundation, otherwise the objection is

13   sustained.

14        MR. MCDONALD:  Yeah, I -- I'll ask him what

15   the foundation is for his view, what he bases his view

16   on.

17        THE COURT:  Well, ask him what he knows about

18   how this was determined and then you can ask his

19   opinion following that, not the other way around.

20        MR. MCDONALD:  Okay.

21   BY MR. MCDONALD:

22   Q.   Well, do you have any knowledge of the reason why

23   the House Bill 836 plan was adopted?

24   A.   Yes.

25   Q.   What is your knowledge?

1    **A.**   I had a long talk with the author of the bill,

2    which is Mike Cheokas.  So what I'm about to say is not

3    something I heard; it's something he and I talked

4    about.  And also, the signer of the bill, which was to

5    help get it through, which was Ms. Freddie Powell Sims,

6    and I talked to her personally.  So what I'm about to

7    say is not hearsay.  It's where we actively had

8    conversations about it.  With Mike Cheokas, I said,

9    well, why are you going to do it, and he said, well,

10   basically my constituents want --

11           **MR. BRADEN:**  Your Honor, I've got to object.

12   If we want to hear why he did it, we'll have to call

13   him.

14           **THE WITNESS:**  Okay.  Well, then --

15           **THE COURT:**  Well, just a minute, Mr. Wright.

16   What was -- did you complete your statement?

17           **MR. MCDONALD:**  Well, I'm not sure.  What was

18   the objection?

19           **MR. BRADEN:**  My objection to this is it's

20   hearsay.  If we want to understand why the member voted

21   for it, assuming, of course, he can get past the

22   legislative privilege issue, we actually need to call

23   him.

24           **THE COURT:**  Just so we can move along, I will

25   allow it for the purpose of what he says was told him

1   but not to prove the truth that it was the motive

2   because that is not evidence of the motive.

3           **MR. MCDONALD:**  Well, it's evidence of his

4   knowledge, Your Honor.

5           **THE COURT:**  No.  No, it's not evidence of his

6   knowledge, because his -- a statement, a hearsay

7   statement can't be presented for the truth that it

8   asserts.  He can say this is what he heard, if that's

9   what you want to tell me, if that's what somebody said

10  to him, but to prove that that was the motive for doing

11  what was done, that is not probative of that question.

12  You'd have to present the direct evidence of that.

13          **MR. MCDONALD:**  Well, Your Honor, if he can

14  just finish his answer, the Court can give whatever,

15  you know, relevance to it deems appropriate.

16          **THE COURT:**  I will allow it for the purpose

17  of him saying what was said to him, but I will not

18  accept it as proof that that was the truth of what was

19  the motive of the change.

20          **MR. MCDONALD:**  I understand, Your Honor.

21          **THE COURT:**  -- understand what I'm saying?

22  All right.  So we may get completed.  You may go ahead.

23  **BY MR. MCDONALD:**

24  **Q.**   Can you finish your answer?

25  **A.**   He said that it was his constituents --

1    Q.    That what?

2    A.    His constituents, you know, the people.  And I

3    said, how many constituents did you talk to, because

4    everyone that I'm talking to that's in the black

5    community is against it.  And so, we had conversation

6    along those lines, and so he says, well, it's just the

7    best thing to do for the community.  And I said, well,

8    you know, a 5/2 plan is not the best thing for the

9    community.  I can see if you go with a seven-member --

10   single member district, but not at -- but no at-large

11   seats.  So it went from there, and then with Ms. Powell

12   Sims, when we had our conversation, she basically said

13   she would not sign it, but in the end she did.  And

14   that is whole reason I filed the -- when I say the

15   reason I filed the complaint in the whole beginning pro

16   se was that I felt that it was a -- that it was

17   racially motivated, that it was -- that it had came

18   about to create a situation where black people could no

19   longer select the candidate of their choice.

20   Q.    Well, do you think that voting in Sumter County is

21   racially polarized?

22   A.    Yes.

23   Q.    And what do you base that opinion on?

24   A.    Well, when we basically looked at the numbers

25   after an election, and, like I said, in a small

1    community like ours you basically know everyone, so

2    when you look at the votes and you look at how many

3    votes they actually received, you can -- you can then

4    make that -- make that decision pretty much without

5    having a flaw, because you can count the votes, and you

6    can see that basically everybody you know who was

7    black, and everyone else, if you make them be white,

8    and you look at how many votes that person got, you

9    basically see that they got most of the black votes.

10   **Q.**   Okay.  Well, do -- are you familiar with the

11   phrase, Gang of Six?

12   **A.**   Yes.

13   **Q.**   And what does it refer to?

14   **A.**   It referred to the Sumter County School Board

15   members that were all black, African Americans.

16   **Q.**   And did you approve of that phrase or designation

17   or characterization?

18   **A.**   No, I didn't approve of it at all.  I mean, I

19   thought it was, you know, was one they say that -- I

20   guess for lack of a better word, that was like a blow

21   below the belt.

22   **Q.**   Well, blacks are the most of the voting age

23   population, but can any person vote simply because they

24   are a voting age population in Sumter County?

25   **A.**   Well, naw.  They can't because you have to take

1     into account that a lot of those particular people,

2     hmm, have criminal records, felony records, I mean, and

3     I know a bunch of them, because that's another thing

4     that we try to educate them on is that just because you

5     have a felony, in many cases, if you go back and

6     reregister, there is a possibility that you may be able

7     to get reinstated.  But just because you are in that

8     particular age group, that doesn't mean that you are

9     necessarily eligible to vote just because of your

10    criminal history.

11            **MR. MCDONALD:**  Okay.  Thank you very much.

12            **THE COURT:**  All right.  Cross examination,

13    Mr. Braden.

**CROSS EXAMINATION**

**BY MR. BRADEN:**

16    **Q.**   Good afternoon, Reverend Wright, Mark Braden.  Do

17    you know whether the black registration rate in Sumter

18    County is higher than the white registration rate?

19    **A.**   Do I know -- again?

20    **Q.**   Do you know whether more blacks are registered to

21    vote in Sumter County than white folks?

22    **A.**   No.

23    **Q.**   Did I understand that you were -- you testified to

24    having a meeting with Ms. Powell Sims about the

25    legislation changing the school board?

1    **A.**    Yes.

2    **Q.**    And what's her position?

3    **A.**    She's a state senator.

4    **Q.**    And does she -- what area does she represent?

5    **A.**    She represent the northern portion of Sumter

6    County.

7    **Q.**    Uh-huh.

8    **A.**    And then Terrell County and something else.

9    **Q.**    And is she an African American?

10   **A.**    Yes.

11   **Q.**    And you had a lengthy conversation with her about

12   the bill?

13   **A.**    It wasn't that lengthy.  It was a phone call, and

14   we -- and I basically told her what I thought about it,

15   and she said that she would not sign it because it was

16   not presented on the floor correctly, and then that was

17   the basis of it, and that was it.

18   **Q.**    Do you know whether she voted for the bill or not?

19   **A.**    I know she signed it.

20   **Q.**    She agreed to it then?

21   **A.**    Yes.

22   **Q.**    So she supported the change?

23   **A.**    Yes.

24   **Q.**    Do I understand correctly that -- and I'll do this

25   characterization, and if it's not fair, please let me

1    know -- that you felt you were robbed in one foray into

2    politics?

3    **A.**   I almost knew I was robbed, more than felt.

4    **Q.**   Did you file for a recount in your election?

5    **A.**   Yeah, I mean, like I said, when you're black you

6    can do all of that.

7    **Q.**   I'm sorry.  I was just --

8    **A.**   I mean, I'm just telling you, and you asked the

9    question.

10   **Q.**   I understand.  I'm just asking a very

11   straightforward, simple question.  There's a procedure

12   when you lose a close election to file for a recount.

13   Did you file for a recount?

14   **A.**   Well, no, we filed a complaint with the Secretary

15   of State office, because we could not get all the

16   access to those absentee ballots, and we knew they

17   could, and so that's the way it went.  If it had have

18   been on the --

19   **Q.**   Excuse me.  It was a simple --

20   **A.**   -- on the computers --

21          **THE COURT:**  Just one minute.

22   **Q.**   It was a very simple question that could have been

23   responded to by yes or no:  Did you file for a recount?

24   **A.**   And I'm giving you my simple answer.

25   **Q.**   Yes or no?

1   **A.**   Recount.  I filed a complaint with the Secretary

2   of State office.

3   **Q.**   Do you know whether there's a distinction between

4   filing a complaint or asking for a recount?

5   **A.**   Say that again.

6   **Q.**   Do you know whether there's a distinction in the

7   election law between filing a complaint or filing for a

8   recount in your election?

9   **A.**   Yes, I know the difference.

10  **Q.**   Okay.  Did you file for a recount in your

11  election?

12  **A.**   No, I didn't file for a recount.

13  **Q.**   Thank you.  Do you believe that the black

14  community in Sumter County should have the opportunity

15  to elect a majority on the school board?

16  **A.**   I think you need to rephrase that.

17  **Q.**   Do you believe that the black community in Sumter

18  County should have an opportunity to elect a majority

19  on the school board?

20  **A.**   Do I believe that the black community -- for some

21  reason, I'm having a problem hearing you.

22  **Q.**   Sure.  Let me try it one more time.  Do you

23  believe that the black community of Sumter County

24  should have an equal -- let's say the word -- an equal

25  opportunity to elect a majority on the school board, a

1    majority of members of the Sumter County School Board?

2    **A.**   Yes, with the word equal, yes, I agree to that.

3    **Q.**   So it's important for them to have a majority,

4    correct?

5    **A.**   It's important for them to have an equal right to

6    elect the majority.

7          **MR. BRADEN:**  No further questions, Your

8    Honor.

9          **THE COURT:**  All right.  Is there any

10   redirect?

11         **MR. SELLS:**  I just have one or two, Your

12   Honor.

13                    **REDIRECT EXAMINATION**

14   **BY MR. MCDONALD:**

15   **Q.**   Reverend Wright, are you familiar with the turnout

16   levels of black and white voters in elections in Sumter

17   County?

18         **MR. BRADEN:**  Objection, Your Honor.  That's

19   outside the scope of --

20         **THE COURT:**  What does the turnout level have

21   to do with the cross examination?  Just help me

22   understand how it's related.

23         **MR. MCDONALD:**  Well, because he asked him a

24   question about whether blacks were registered at higher

25   rates than whites, and I just want to see if he knows

1    what the actual turnouts are, because I think that's

2    relevant to that.

3            **THE COURT:**  I'll give you a chance and let's

4    us see.  I mean, they are not totally unrelated, but

5    it's pretty close to the line.  Go ahead.

6            **MR. MCDONALD:**  Okay.

7    **BY THE WITNESS:**

8    **A.**   Right now today, I'm not.

9    **BY MR. MCDONALD:**

10   **Q.**   You're not?

11   **A.**   Nuh-uh.

12           **MR. MCDONALD:**  Well, there's plenty of

13   evidence that's been introduced in the record, Your

14   Honor.

15   **Q.**   Has it been your experience, during all of the

16   years that you have been around, that black politicians

17   sometimes will vote for rights that are bad for black

18   people?

19   **A.**   Say that -- since my experience is it sometimes

20   that -- that white --

21   **Q.**   No, that a black elected official will vote for

22   something that is bad for the black community or black

23   voters?

24   **A.**   Yes.

25   **Q.**   And do you believe that blacks should have an

1    equal opportunity to participate in the political

2    process and elect representatives of their choice?

3    **A.**   Yes.

4    **Q.**   And do you know whether or not that is precisely

5    -- that's precise language contained in Section 2 of

6    the Voting Rights Act?

7    **A.**   Yes.

8    **Q.**   And do you believe that Section 2 protects that

9    right?

10   **A.**   Yes.

11              **MR. MCDONALD:**   Thank you very much.

12              **THE COURT:**   Is there any further recross?

13              **MR. RAILE:**   No, Your Honor.

14              **THE COURT:**   All right.  You may step down

15   Reverend Wright.  I just will note that, as Reverend

16   Wright made reference, that he started this case out

17   pro se with a hearing in Macon, Georgia years ago, and

18   it's been all the way to the court of appeals and back

19   and in a full trial, so I must that say that's not the

20   track of most pro se cases.  Without any suggestion one

21   way or the other about the case, I thought that was

22   significant to note.  All right.  You may call -- we're

23   really at the end of the day, so is there any

24   additional witness?  Where does the plaintiff stand

25   with this case?

1          **MR. SELLS:**   Reverend Wright is our final

2     witness in our case in chief.   We have some exhibit

3     issues, and we can either try to start dealing with

4     them now.   I'm not sure we would finish before 5:00 or

5     we can deal with them first thing in the morning.

6          **THE COURT:**   All right.   I'll tell you what.

7     Let's go ahead and give you all a chance to get

8     together, and it may be that -- I think you all can

9     take the opportunity to share what those submissions

10    are going to be.   So that may solve some of the things

11    that I might otherwise have to decide tomorrow morning.

12    So we'll just suspend now and start back tomorrow

13    morning.   If you all allow them to remain in the

14    courtroom so they may review these documents for a bit

15    of time, and we'll start back at 8:30 tomorrow morning.

16    As soon as those things are taken care of, if there are

17    no other matters to be taken up by way of motion, then

18    we will be ready to start the defendant's case.   All

19    right.   Thank you, very much.   We are adjourned until

20    8:30 tomorrow morning.

21    _____

22                   *CERTIFICATE OF OFFICIAL REPORTER*

23         *I, Sally L. Gray, Federal Official Court Reporter,*
      *in and for the United States District Court for the Middle*
24    *District of Georgia, do hereby certify that pursuant to*
      *Section 753, Title 28, United States Code that the*
25    *foregoing is a true and correct transcript of the*
      *stenographically reported proceedings held in the*

1   above-entitled matter and that the transcript page format
    is in conformance with the regulations of the Judicial
2   Conference of the United States, dated this 20th day of
    December, 2017.

3
                            /s/ SALLY L. GRAY
4                           SALLY L. GRAY, CCR, RPR
                            FEDERAL OFFICIAL COURT REPORTER
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25