1           IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
2                     ALBANY DIVISION

3                  _____

    MATHIS KEARSE WRIGHT, JR., :  Case No. 1:14-CV-42-WLS
4                              :
               PLAINTIFF    :
5   vs.                        :      December 13, 2017
                               :       Albany, Georgia
6   SUMTER COUNTY BOARD OF     :
    ELECTIONS AND REGISTRATION,:
7                              :       Volume 3 of 4
               DEFENDANT. :
8   _____

9                     BENCH TRIAL
         BEFORE THE HONORABLE W. LOUIS SANDS
10      UNITED STATES DISTRICT JUDGE, PRESIDING

11  APPEARANCES:
    FOR THE PLAINTIFF:        BRYAN L. SELLS
12                            P.O. BOX 5493
                              ATLANTA, GA 31107
13
                              LAUGHLIN MCDONALD
14                            2700 INTERNATIONAL TOWER
                              229 PEACHTREE ST NE
15                            ATLANTA, GA 30303

16                            AKLIMA KHONDOKER
                              P.O. BOX 77208
17                            ATLANTA, GA 30309

18  FOR THE DEFENDANT:        KATHERINE L. MCKNIGHT
                              E. MARK BRADEN
19                            RICHARD RAILE
                              1050 CONNECTICUT AVE NW
20                            STE 1100
                              WASHINGTON, DC 20036-5403
21
                              KIMBERLY A. REID
22                            P.O. BOX 5005
                              CORDELE, GA 31010
23  _____
                    SALLY L. GRAY, USCR
24            201 W. BROAD ST, SECOND FLOOR
                    ALBANY, GA 31701
25
                    (478)787-3905

*INDEX TO PROCEEDINGS*

*DECEMBER 13, 2017*

*VOLUME 3 of 4*


*MICHAEL SHANE BUSMAN*
    *DIRECT EXAMINATION BY MR. BRADEN*     *8*
    *CROSS EXAMINATION BY MR. MCDONALD*    *27*
    *REDIRECT EXAMINATION BY MR. BRADEN*   *39*
    *RECROSS EXAMINATION BY MR. MCDONALD*  *41*
    *REDIRECT EXAMINATION BY MR. BRADEN*   *41*

*SYLVIA ROLAND*
    *DIRECT EXAMINATION BY MR. RAILE*      *42*
    *CROSS EXAMINATION BY MS. KHONDOKER*   *53*
    *REDIRECT EXAMINATION BY MR. RAILE*    *57*
    *RECROSS EXAMINATION BY MS. KHONDOKER*  *58*

*ROBERT EDWARD BRADY*
    *DIRECT EXAMINATION BY MR. RAILE*      *59*
    *VOIR DIRE EXAMINATION BY MR. SELLS*   *72*
    *CONTD DIRECT EXAMINATION BY MR. RAILE* *75*
    *CROSS EXAMINATION BY MR. SELLS*     *105*
    *REDIRECT EXAMINATION BY MR. RAILE*   *117*
    *RECROSS EXAMINATION BY MR. SELLS*   *119*

*KAREN LESLIE OWEN*
    *DIRECT EXAMINATION BY MS. MCKNIGHT*   *121*
    *VOIR DIRE EXAMINATION BY MR. SELLS*   *125*
    *CONTD DIRECT EXAMINATION BY MS. MCKNIGHT* *130*
    *CROSS EXAMINATION BY MR. SELLS*     *208*


*CERTIFICATE OF COURT REPORTER*       *228*

```
 1                    P R O C E E D I N G S
 2      December 13, 2017                       8:36 a.m.
 3               THE COURT:  All right.  Good morning.
 4               COUNSEL:  Good morning, Your Honor.
 5               THE COURT:  Before I take up the submissions
 6      that the plaintiff proposes, there is a question I had
 7      in mind yesterday based on some of the testimony.  When
 8      it comes to nonpartisan elections I would like for the
 9      parties to suggest, are those election dates set by
10      statute or not?  In other words, as I vaguely remember,
11      there's a schedule for certain elections.  The city
12      elections take place at a certain time, national
13      elections, or the national office elections take place
14      on a certain schedule, and I did not remember
15      specifically whether or not when a class has
16      nonpartisan elections, which is what I understand the
17      Board of Election is in Sumter County, whether that's
18      one that's set statutorily as opposed to chosen by the
19      local entity.
20               MR. SELLS:  I can answer that question, Your
21      Honor.  I don't know how long the nonpartisan general
22      election has been in May, but it has been a number of
23      years, but that is on the election calendar, a
24      nonpartisan general election.  However, the general
25      assembly has the power, through local legislation, to
```

1    require that a locality hold elections whenever it so

2    chooses.  And so what you'll see, if you look back

3    through the history of Sumter -- the election plans for

4    the Sumter County Board of Education, is that as

5    recently as 2011, when the General Assembly first went

6    to the 5/2 plan, it specified that elections would be

7    held in November.  It was only in the 2014 change,

8    House Bill 836, that it was moved to May to coincide

9    with the other nonpartisan general elections.

10            **THE COURT:**  I guess what my question is, is

11    that a strict thing, or is that a variable, adaptable

12    thing?

13            **MR. SELLS:**  Right.  I think the answer is

14    that it is variable.  The General Assembly can vary it

15    however it likes.  The default, if you will, is that if

16    the local legislation does not provide otherwise,

17    nonpartisan elections happen in May.  But in Sumter

18    County for elections for the Board of Education, they

19    have always been in November as provided by local

20    legislation.

21            **THE COURT:**  All right.  Mr. Braden?

22            **MR. BRADEN:**  Your Honor, the registrar is

23    going to be testifying later today, I assume, and he

24    can provided the most informed testimony on this.

25            **THE COURT:**  Right.  I was just going to

1    invite both sides to suggest to the Court what the

2    answer to that question is.  That just came to mind as

3    I was listening yesterday, and I thought -- but I would

4    not want to trust my memory on it -- but I thought that

5    there was some schedule set out there.

6              **MR. BRADEN:**  Yeah, the registrar will be

7    sitting in the chair, and that's what he does for a

8    living.

9              **THE COURT:**  All right.  Thank you.  I believe

10   the plaintiff was about to rest, but there were some

11   final submissions that hopefully you all have had a

12   chance to discuss?

13             **MR. SELLS:**  Yes, Your Honor.

14             **THE COURT:**  Mr. Sells?

15             **MR. SELLS:**  We have, and we've reached a

16   stipulation.  The parties have agreed to the following

17   stipulation, and I'll hand it up, but I'll read it for

18   the record.

19             **THE COURT:**  All right.

20             **MR. SELLS:**  Wherefore the parties stipulate

21   that Georgia and Sumter County have a long and

22   extensive history of voting discrimination against

23   African Americans.  That is the eighth proposed

24   undisputed fact from the summary judgment stage of this

25   case verbatim.  That is where that language comes from,

1    and the parties are now willing to stipulate to that

2    fact.

3              THE COURT:  All right.  Is that correct Mr.

4    Braden and Ms. McKnight?

5              MS. MCKNIGHT:  That's correct, Your Honor.

6              THE COURT:  All right.  That's noted for the

7    record and accepted by the Court based on the parties'

8    stipulation, and you may submit --

9              MR. SELLS:  May I --

10             THE COURT:  -- to the clerk for filing.  I

11   guess we'll just call that the parties' joint exhibit?

12             MS. MCKNIGHT:  Pardon me, Your Honor?

13             THE COURT:  I guess we can just call it the

14   parties' joint exhibit?

15             MS. MCKNIGHT:  Sure.

16             MR. SELLS:  However the Court would like to

17   deal with it, is fine.

18             THE COURT:  Let's call it the Parties Joint

19   Exhibit 1 just for clarity.  You may proceed.

20             MR. SELLS:  And, Your Honor, in exchange for

21   that stipulation, the plaintiff has agreed not to

22   formally offer into evidence Exhibits 35 through 242

23   that are not already in evidence, and I don't think any

24   of them are.

25             THE COURT:  Is that correct, Ms. McKnight?

1      **MS. MCKNIGHT:**  That's correct, Your Honor --

2  and oh -- that is correct, Your Honor.

3      **THE COURT:**  All right.

4      **MR. SELLS:**  However, there are a few that we

5  would like to move into evidence at this time.  And as

6  part of the agreed-upon stipulation my understanding is

7  that the defendant will have no objection to these.

8  Those would be 26, 243 through 252, 254 through 259 and

9  that's it.

10      **THE COURT:**  All right.

11      **MS. MCKNIGHT:**  That's correct, Your Honor.

12  And defendant withdraws its objections to any of those

13  exhibits that they are moving into evidence.

14      **THE COURT:**  All right.  Then without

15  objection Plaintiff's 26, Plaintiff's 243 through 252,

16  inclusive, Plaintiff's 254 through 259, inclusive, are

17  admitted without objection.  All right.  Any further

18  evidence from the plaintiff at this time?

19      **MR. SELLS:**  No, Your Honor, with those

20  exhibits in the record, the plaintiffs rest their case

21  in chief.

22      **THE COURT:**  All right.  Is the defendant

23  ready to proceed?

24      **MR. BRADEN:**  Yes, Your Honor.  We'd like to

25  call Dr. Busman at this time.

```
1              THE COURT:  All right.

2              COURTROOM DEPUTY:  Do you solemnly swear or

3     affirm that the testimony you are about to give in the

4     case now before the Court will be the truth, the whole

5     truth, and nothing but the truth?

6              THE WITNESS:  Yes.

7              THE COURT:  Mr. Braden, you may proceed.

8              MR. BRADEN:  Thank you, Your Honor.

9                     MICHAEL SHANE BUSMAN

10       Witness, having first been duly sworn, testified on

11                      DIRECT EXAMINATION

12    BY MR. BRADEN:

13    Q.   Could you please provide the Court with your full

14    name?

15    A.   Michael Shane Busman.

16    Q.   And could you tell the Court where you live, but

17    don't provide your actual street address.

18    A.   Americus, Georgia.

19    Q.   And how long have you lived in Americus, Georgia?

20    A.   19 years and 5 months.

21    Q.   And before living in Americus, where did you live?

22    A.   Columbia, South Carolina.

23    Q.   And where did you go to school, Dr. Busman?

24    A.   Undergraduate at Emory University in Atlanta, and

25    then medical school at the Medical University of South
```

1    Carolina in Charleston, South Carolina.

2    **Q.**    And what do you do for a living in Americus?

3    **A.**    I am a family medicine and sports medicine

4    physician.

5    **Q.**    And does your practice include both black and

6    white patients?

7    **A.**    Yes.

8    **Q.**    And do you know what the percentage is?

9    **A.**    Not exactly, but I would venture to say about

10   50 percent of each.  Of course, I do have, you know,

11   all racial groups, Hispanic, Asian, and so on.

12   **Q.**    And when did you first seek election to the Sumter

13   County School Board?

14   **A.**    2002.

15   **Q.**    And besides serving on the school board, is there

16   anything else you do for the schools?

17   **A.**    Well, I was a volunteer wrestling coach for

18   probably about six years.  I am the volunteer team

19   physician for the high school.  I give free physicals

20   for the sports, athletes, and also do Special Olympic

21   physicals for free for those students at all grade

22   levels.

23   **Q.**    And are most of the athletes in the Sumter County

24   school African American?

25   **A.**    They are.

1    Q.   So when you first sought election to the school

2    board, why did you decide to run?

3    A.   Well, I saw that our school system wasn't doing

4    well compared to a lot of schools in the state, and

5    actually we're kind of toward the bottom.  And I felt

6    like I could really add something to it through my, you

7    know, experiences with life and education.  I just

8    wanted to make a difference and try to make things

9    better.

10   Q.   So have you continuously served on the school

11   board from 2002 until today?

12   A.   I have.

13   Q.   And what's your position on the school board now?

14   A.   Currently I'm the board chair.

15   Q.   And you were elected at-large?

16   A.   This term I was.

17   Q.   And prior ones you were elected by district?

18   A.   Correct.

19   Q.   So let me ask about your first campaign for

20   office.  How did you actually seek the office of school

21   board?

22   A.   Well, you have to qualify, so you have to go to

23   the courthouse and sign up and make sure you're

24   eligible.  And then after I qualified, I got -- excuse

25   me -- campaign signs and probably initially had a

1    newspaper ad or two and had a few radio spots, and then

2    made a lot of phone calls to people asking them to

3    support me.

4    **Q.**    This being Georgia, am I safe to guess that on

5    Friday nights in the fall it was probably a lot of

6    people you could have campaigned to?

7    **A.**    Sure.  As I stated, I was the team physician, so

8    they say -- a lot of people saw me on the sidelines and

9    appreciated the work I was doing.

10   **Q.**    And did you campaign in both white and black areas

11   of Sumter County?

12   **A.**    Yes.

13   **Q.**    And you sought votes from both black and white

14   voters?

15   **A.**    Correct.

16   **Q.**    Okay.  So the first time you were elected in 2002,

17   was that a district -- your last election was at-large?

18   **A.**    Correct.

19   **Q.**    So was your second election, this last election

20   at-large district, different in any way from running in

21   the district?

22   **A.**    Well, it's a bigger area I had to cover and

23   represent.

24   **Q.**    But did you end up actually spending more money

25   than in your first election?

1    A.    Actually less money.

2    Q.    And why was that?

3    A.    Well, I mean, I had an established record of, you

4    know, volunteering my time and service and being on the

5    school board for 12 years.  And I think a lot of people

6    appreciated that work, and then I had some old campaign

7    signs that I just recycled.  And being -- you know,

8    being known at the football games and other sporting

9    events, when needed, because I also volunteer for the

10   local colleges, and then, thirdly, being in my office

11   with all the patients that come in, I just had an

12   opportunity to talk to people.

13   Q.    So you recycled your campaign signs from prior

14   campaigns?

15   A.    Yes.

16   Q.    Were you able to get all of the campaign signs, or

17   did some of them disappear during the campaign?

18   A.    Yeah, some disappeared, yeah.

19   Q.    Do you have any reason or any knowledge of whether

20   any of that, your signs disappearing, was based in any

21   way on race?

22   A.    Oh, I don't know.

23   Q.    So you ran some radio ads?

24   A.    A few, yeah.

25   Q.    How much does a radio ad cost?

1    A.    Well, they go up around campaign season, but I

2    don't -- they weren't that much money.  It may have

3    been ten bucks a spot or something like that, so, you

4    know, a couple hundred dollars at the most.

5    Q.    Let me take a step back here, and we'll use some

6    documents.

7              MR. BRADEN:   And if we could bring up

8    Plaintiff's Exhibit, Trial Exhibit 248.

9    Q.    Dr. Busman, do you recognize this document?

10   A.    I do.

11   Q.    Okay.  Can you just tell us what it is?

12   A.    It is a response from our attorney at the time

13   Jimmy Skipper to the Justice Department responding to

14   their request for additional information regarding the

15   two proposed at-large districts.

16   Q.    And when you say our attorney, the attorney for

17   who?

18   A.    The school board, at the time, their local

19   attorney.

20   Q.    I'm going to ask you a couple questions before we

21   get to this document, but I'm going to use this

22   document with you to assist you in remembering some of

23   the dates and assisting the Court.  I believe there was

24   some confusion over an early testimony, so this will

25   hopefully clarify that.  So you were first elected in

1    2002, correct?

2    **A.**    Correct.

3    **Q.**    And do you remember about whether or not there

4    were any discussions between 2002 and 2010 about

5    changing the size of the school board?

6    **A.**    There were.

7    **Q.**    And what were those discussions as best you can

8    remember?

9    **A.**    Well, it was just -- it was just about, we have a

10   big board.  A nine-member school board is big.  I

11   believe it's the largest size in the state.  There were

12   two other systems that had ten-member boards that have

13   since been decreased.  So nine was the largest number

14   of board members in the state, and we have a relatively

15   small county, so it just really didn't make any sense.

16   And then, you know, it was more money on the taxpayers

17   to pay for nine board members in a county that already

18   was struggling with funds.  It was confusion with the

19   voting, with the electorate, because we have five

20   county commission seats, and you can be in district one

21   school board and be in district five county commission,

22   and they were really, really confused.

23   **Q.**    Did you have any input from your accrediting

24   agency -- first, who's the accrediting agency for the

25   school?

1    **A.**   SACS, and that stands for the Southern Association

2    of Colleges and Schools.  And they go under the name

3    sometimes of AdvancEd.

4    **Q.**   Okay.  And that's the one that approves the

5    accreditation for the school.  Is that of importance to

6    the school system?

7    **A.**   Oh, very, very much so, yes.

8    **Q.**   And if you didn't accredited, what type of impact

9    would it have on your students?

10   **A.**   Well, the graduating students may not be eligible

11   to go to college.

12   **Q.**   And did you understand they had a position on the

13   size or recommendation in the size of the school board?

14   **A.**   Yes, they made -- they made reference on several

15   occasions about, wow, you guys have a big school board.

16   **Q.**   Okay.

17         **MR. BRADEN:**  So I'd like to go to page 3 of

18   the letter, and if we could turn to that.  And if we

19   could highlight the little box, please.

20   **Q.**   Do you see the little highlighted section?

21   **A.**   I do.

22   **Q.**   And what do you believe that little box shows?

23   **A.**   It shows the timeline or progression of how the

24   board went from a nine-member board to a seven-member

25   board.

1    Q.    Okay.  Let me -- let's do the first box, the

2    6/17/10.  What occurred at that board meeting,

3    according to this description?

4    A.    Yeah, there had been discussion in the recent

5    months about shrinking the board, so at that time there

6    was a -- you know, a motion to decrease the board to at

7    least get the ball rolling on either to five or seven

8    members.  And since the county commission had five

9    members, it made sense to align with them, and it had

10   been approved by the Justice Department.  So it made

11   sense to align with them, and then it was just a

12   discussion of the board whether to go with the five or

13   have five plus two at-large because it -- you know,

14   theoretically, it would have been easier to go from

15   nine to seven than nine to five.

16   Q.    And to the best of your recollection is that first

17   entry and description correct?

18   A.    Yes.

19   Q.    And then the next box is November 11th, 2010.

20   What does that say?

21   A.    Well, a motion was made by Mr. Goodwin, seconded

22   by Ms. Fitzpatrick, to pursue a resolution to reduce

23   the board to seven members, and the motion was carried

24   unanimously.  So the board did agree to go with seven

25   instead of five.

1    Q.   And that was in November of 2010?

2    A.   Correct.

3    Q.   And let's move down to the next box, which is

4    December 9th.  Can you tell what that box illustrates

5    for us?

6    A.   Yeah, it just, once again, it's the -- once -- we

7    had the resolution, so the attorney prepared the

8    resolution, the board got a chance to review it, and

9    there was motion made by Mr. Goodwin and seconded by

10   Mr. Krenson to approve the resolution and then sent it

11   to the local legislation to reduce the number of the

12   board from nine to seven, and the motion carried

13   unanimously.

14   Q.   Were you aware at the meeting of any opposition to

15   it?

16   A.   No.

17   Q.   Were you aware of any discussion that this would

18   have some disparate racial impact?

19   A.   No.

20           MR. BRADEN:  Your Honor, I'd like to approach

21   the witness.  I have a -- the resolution that was

22   passed at that time, I don't believe it's presently an

23   exhibit, so I'd like to bring it up and use it as a

24   demonstrative and hopefully get it in as an exhibit.

25   I'll provide copies to everybody.  If I can approach

1    the --

2             **THE COURT:**  You may.

3    **BY MR. BRADEN:**

4    **Q.**    Dr. Busman, can you identify this document?

5    **A.**    Yeah.  This is actually the approved minutes of

6    the meeting from December 9, 2010, signed at the back

7    by the chair at the time, which was me, and the

8    superintendent, who is the secretary of the school

9    board, which was Dr. Roy Brooks at the time.

10    **Q.**    And so I'm looking at the first page.  There seems

11    to be a discussion of, am I correct, approving a

12    wedding reception at the gym and various field trips?

13    **A.**    Correct.

14    **Q.**    Would you describe this as maybe somewhat more

15    mundane matters of the board?

16    **A.**    Nah, we -- if somebody wants to use our

17    facilities, we look at each individual circumstance and

18    we decide whether or not to approve it.  So we have to

19    approve if they're going to use our facilities.

20    There's a -- you know, we have to approve the minutes

21    from the meetings before.  We approve field trips and

22    facility use and stuff like that, so we do that every

23    meeting.  But we go through that process.

24    **Q.**    And if you'll turn to the second page of the

25    document I provided to you?

1    A.    Uh-huh.

2    Q.    If you'll take a second to look at it.

3    A.    Uh-huh.

4    Q.    Does it appear to be an accurate copy of the

5    resolution that was passed by the board?

6    A.    Oh, that would be the third page, but, yes.

7    Q.    And if I could do first, where -- the second and

8    last -- the -- well, let me count them here and get it

9    correct.  So on page, what's marked as page 1 of the

10   resolution, there's a paragraph that talks about

11   reducing the size of the board from nine members to

12   seven, correct?

13   A.    Hmm, yes.

14   Q.    And then the second one, does it talk about

15   whether they'll be at-large or by districts?

16   A.    Hmm, yes.

17   Q.    Is there -- was there any confuse -- in your mind

18   was there any confusion in this resolution about

19   whether it was going to be two at-large and five

20   districts?

21   A.    No.

22   Q.    And was there any opposition that you heard

23   expressed at that meeting in regards to that?

24   A.    No.

25   Q.    So following the passage of the resolution, what

1  did you ask the -- what did the board ask the attorney

2  for the board to do?

3  **A.**  Yeah, so the purpose of the resolution was to get

4  documentation and explanation to the state legislature,

5  so the attorney would submit that to the state

6  legislature through our local state legislators.

7  **Q.**  And to change the election system for the board it

8  needed local legislation under Georgia law, to your

9  understanding?

10  **A.**  Correct.

11  **Q.**  And your -- who was your attorney?

12  **A.**  Well, our attorney at the time, James -- Jimmy

13  Skipper.

14  **Q.**  Yeah.  So he -- do you know who he transmitted

15  these materials to?

16  **A.**  I believe Senator George Hooks.

17  **Q.**  Okay.  And so this was transmitted in December of

18  2010?

19  **A.**  I believe so.  December or January, probably --

20  the legislators didn't get in session until January.

21  **Q.**  And did any of the local legislator members from

22  Sumter County oppose it?

23  **A.**  Nah.

24  **Q.**  To the best of your knowledge did they all support

25  it?

1    **A.**    Yes.

2    **Q.**    And was it passed by the Georgia Legislature?

3    **A.**    It was.

4    **Q.**    And do you know whether the vote for it was

5    overwhelming?

6    **A.**    Oh, it was overwhelming.

7    **Q.**    Do you know whether there was any discussion in

8    the legislature about it being discriminatory in any

9    way?

10   **A.**    Not to my knowledge.

11   **Q.**    Okay.  Do you know whether -- approximately -- do

12   you know whether the governor signed the bill in the

13   9/21/11?

14   **A.**    Yes.

15   **Q.**    So do you remember whether Georgia was covered by

16   Section 5 of the Voting Rights Act and required

17   preclearance of changes in the election law?

18   **A.**    Well, it would be Section 4, right?  Was it

19   Section 4?

20   **Q.**    Yeah, it could be Section 4.  It could be Section

21   5.

22   **A.**    Okay.  Yeah, we were under that.  We were under

23   that.

24   **Q.**    Okay.  And so did I -- did your lawyer submit a

25   request to the Department of Justice for a

1  preclearance?

2  **A.**   Yes, the governor -- there was a -- I believe

3  there was a senate bill that requested that this

4  information be sent to the Justice Department for

5  preclearance, and our attorney was responsible for

6  doing that.

7  **Q.**   And was that approximately October, sometime in

8  October of 2011 to your recollection?

9  **A.**   Yes.

10  **Q.**   Are you aware of the Department of Justice ever

11  refusing to preclear your change?

12  **A.**   No, huh-uh.  It got withdrawn, but they never

13  turned it down, nor did they approve it.  It never went

14  to completion.

15  **Q.**   Okay.  And in January -- and did your attorney,

16  Skipper, ever indicate to you that he did not believe

17  the Department of Justice was going to approve this

18  provision?

19  **A.**   No.

20  **Q.**   Okay.  So, in January of 2012, did the board --

21  did the board have a board meeting in January of 2012?

22  **A.**   Yes.

23  **Q.**   And is the meeting at which the board voted to

24  withdraw the proposed plan for preclearance from the

25  Department of Justice?

1    A.    Nah, I believe there was a meeting, I think

2    January 12th, and that was a regularly scheduled board

3    meeting.  And I believe there was a motion at that time

4    to reduce -- well, actually the approval was for seven

5    members, but instead of a five plus two model, there

6    was a motion made for seven separate districts at that

7    time, and that did pass.

8    Q.    And did the board direct Skipper to withdraw the

9    submission to the Department of Justice?

10    A.    I don't believe it was at that meeting.  I believe

11    it was at a called meeting the next week.

12    Q.    And your counsel, Skipper, Mr. James Skipper --

13    he's got a last name that sounds like I'm being

14    flippant to some degree, and I'm certainly not.  But

15    your counsel, Mr. Skipper, did he fulfill that -- did

16    he withdraw it?

17    A.    Well, he told the board that it was really not a

18    board issue, that it was legal issue, and he was

19    required by state law to submit this information to the

20    Justice Department, and he had to submit it because

21    they were asking for additional information.  So he did

22    not want to withdraw it, because he was complying with

23    his legal responsibility to submit this information to

24    Justice.

25    Q.    So did he indicate to you that he felt he was

1    conflicted?

2    **A.**    He did, and he ended up resigning over the matter

3    because he was in a conflict; does he abide by the

4    wishes of his client and violate the law and his

5    ethics with the Georgia Bar, or does he respect the law

6    and not comply with his client's wishes.  So he

7    therefore sent us a letter resigning.

8    **Q.**    And you hired new counsel for this purpose?

9    **A.**    Well, actually at the -- we usually have a -- what

10   we call a local attorney, and then we also have a

11   school law specialist.  And that January 12th meeting

12   we continued our local attorney to be -- I'm sorry,

13   Jimmy Skipper, James Skipper, and then for the school

14   law specialist the majority of the board hired Maurice

15   King.  So when Mr. Skipper resigned, Maurice King was

16   left, and we didn't hire another local one.  They just

17   assumed that he would do everything.

18   **Q.**    And did Mr. King indicate to you that you could

19   continue to use your nine-member district as a plan?

20   **A.**    He did.

21   **Q.**    Do you know whether or not that resulted in a

22   lawsuit being filed against the board?

23   **A.**    It did.

24   **Q.**    Would that be the one that was filed May 22nd,

25   2012, in this courtroom?

**A.**   Well, I'm not sure which courtroom it is, but

somewhere in federal court, yeah, here in Albany, yes.

**Q.**   And do you remember what the claim was?

**A.**   Oh yeah.  It was the Bird lawsuit filed by William

Bird, and it was over the nine districts being

malapportioned due to the recent census that came out

in 2010, and it was also the one-man, one-vote federal

law.

**Q.**   And do you remember whether or not an injunction

was issued in that case?

**A.**   It was.

**Q.**   Does June 2012 sound approximately correct to you?

**A.**   Yes.

**Q.**   And did the Court, in March of 2013, begin a

remedial process to draw its own plan?

**A.**   I believe so.

**Q.**   And do you remember whether or not the Court

decided in October of 2013 that the matter was moot

because of the *Shelby* decision effectively taking

Georgia out from under preclearance coverage?

**A.**   Yes, that's correct.

**Q.**   Okay.  So HB 836 is the bill, am I correct, is

that the bill, the local legislation bill that's

effectively adopted the 5/2 plan?

**A.**   Yes.  What happened was in the original plan there

1    was some dates that had passed, so there had to be a

2    new legislation to correct those dates, and the House

3    Bill which you stated was that, yes.

4    **Q.**   So other than just simply changing the dates,

5    because it's past the other dates, there's no other

6    change in the legislation?

7    **A.**   I don't believe so.

8    **Q.**   And are you aware of any opposition, any -- do you

9    know whether or not HB 836 passed with the same

10   overwhelming majorities as the other bill?

11   **A.**   I believe it did, yes.

12   **Q.**   Are you aware of any opposition to this bill from

13   any of the local representatives in the legislature?

14   **A.**   Oh, no, uh-uh.

15   **Q.**   Okay.  I represent to you that we heard

16   significant testimony yesterday that in the campaign

17   process many of the candidates received substantial

18   support from the members of their various church

19   congregations.  So did you rely on significant support

20   from the congregations of your church in Americus?

21   **A.**   Hmm, I'm Jewish, so I don't go to church --I don't

22   have a church in Americus.

23   **Q.**   So do you, off the top of your head, have an

24   estimate as to the number of Jews that live in Sumter

25   County?

1    **A.**   Not many.  Practicing, probably five or less, not

2    many.

3    **Q.**   So you are a insular minority in Sumter County?

4    **A.**   I'd probably guess I'm probably the number one

5    minority would be my guess.

6          **MR. BRADEN:**  No further questions.

7          **THE COURT:**  All right.  Cross examination,

8    Mr. McDonald?

9          **MR. MCDONALD:**  I have some cross examination,

10   Your Honor.

11         **THE COURT:**  All right.

12               **CROSS EXAMINATION**

13   BY MR. MCDONALD:

14   **Q.**   Dr. Busman, the district from which you were first

15   elected was majority white, correct?

16   **A.**   Yes.

17   **Q.**   That was in 2002?

18   **A.**   Correct.

19   **Q.**   And the district -- it was district five, and it

20   was about 75 percent white; isn't that correct?

21   **A.**   I don't know the exact -- I didn't think it was

22   quite that high.  I thought it was in the 60s, but it

23   was a majority white.

24   **Q.**   Well, do you deny that it was about 75 percent

25   white, or you just don't know?

1    A.   Well, I just don't know.  My recollection was it

2    was in the 60s, but I don't know, but I don't believe

3    -- but it was definitely majority white.  I don't know

4    -- I don't recall 75 percent being the number.

5    Q.   Okay.  You last ran countywide and were elected;

6    is that correct?

7    A.   That's right.

8    Q.   But you did not move to Sumter County until 1998;

9    isn't that correct?

10    A.   Correct.

11    Q.   Now, you have four children; isn't that right?

12    A.   That's right.

13    Q.   One graduated from Americus Sumter High School,

14    and the other three are now home schooled; isn't that

15    correct?

16    A.   That is correct.

17    Q.   And your wife made the decision to take those

18    students out of the public school and home school them;

19    isn't that correct?

20    A.   That's right.

21    Q.   And she did so because there was certain racial

22    concerns she had; isn't that right?

23    A.   Hmm, I'm not aware of that specifically.  She

24    didn't feel like the school, at the time, was providing

25    what she wanted.

1          **MR. BRADEN:**  Your Honor, I would object.  I

2     believe this is outside of the scope of the direct

3     testimony.

4          **MR MCDONALD:**  Well, Your Honor, I think I'm

5     entitled to ask him questions about, you know, his

6     involvement in the -- as a school board member, his

7     involvement in the public schools.  He testified about

8     all of that.

9          **THE COURT:**  I think he did.  I think it's

10    fair.  The objection is overruled.

11         **MR. MCDONALD:**  Thank you, Your Honor.

12         **MR. BRADEN:**  Your Honor, I know that you've

13    already ruled, but it did seem the last question

14    actually went to the intent of his wife, which

15    certainly seems to be a little far afield.

16         **THE COURT:**  Well, I think in terms of his

17    performance, he testified about his performance and

18    things and his reasons of why he was involved in the

19    school system, so I think it's -- it being cross

20    examination, I think it's a fair question.  The

21    objection is overruled.  You may continue.

22         **MR. MCDONALD:**  Thank you very much, Your

23    Honor.

24    BY MR. MCDONALD:

25    Q.   Now, you're not familiar with a lot of the history

1    of discrimination against blacks in Georgia and Sumter

2    County; isn't that correct?

3    **A.**    Oh, it happened.  It's happened all over the

4    south.

5    **Q.**    I said, but you are not familiar with a lot of the

6    history of discrimination, are you?  Isn't that

7    correct?

8    **A.**    No, I can't name all the specifics, but I am aware

9    that there was a lot of discrimination over the years.

10   **Q.**    Well, for example, you did not know that it was a

11   crime to teach blacks to read and write; isn't that

12   correct?

13   **A.**    I've heard of that before.

14   **Q.**    Well, but when I took your deposition -- well, let

15   me call up your deposition.

16   **A.**    I may not have been aware at the time, but I am

17   aware of it now.

18   **Q.**    But you were not aware of it at the time you were

19   deposed?

20   **A.**    I don't recall.

21   **Q.**    Well, let's look at your deposition, page 8 -- I'm

22   sorry, page 11.

23            **THE COURT:**  Just one minute, Mr. McDonald.

24   Go ahead.  All right.  You may proceed.

25   **BY MR. MCDONALD:**

1    Q.    This will be page 11, lines 21 through 23.

     Question:  Are you aware of the fact that as late as

2    the 1860s it was a crime to teach blacks to read and

3    write in Georgia?  Answer:  I was not aware of that

4    specifically.

5    A.    That's right.  I wasn't familiar the date.

6    Q.    Well, you were not familiar with the fact that it

7    was a crime to teach blacks to read and write; isn't

8    that correct?

9    A.    My recollection is I don't know when I was aware

10   of that fact, but I was not aware on that specific

11   date.

12   Q.    Okay.  And you did not know that there was a law

13   in Georgia prohibiting interracial marriages; isn't

14   that correct?

15   A.    I do not recall when I was aware of that law, but

16   I am aware of it now.

17   Q.    But you weren't aware of it when I took your

18   deposition; isn't that right?

19   A.    I can't remember the timeline on that.

20   Q.    Well, let's look at page 11, line 25.  I ask you:

21   And do you know whether or not there was a -- ever a

22   law prohibiting interracial marriages in Georgia?  And

23   your answer was:  No, I am not familiar with that law.

24   A.    I understand.

1   Q.   Well, do you dispute the validity of your answer

2   at that --

3   A.   No.

4   Q.   -- in your deposition?

5   A.   No, I don't dispute it.

6   Q.   All right.  And you did not know that you had to

7   be a property owner in order to vote in Georgia at one

8   time; isn't that correct?

9   A.   Again, I don't remember the timeline, but that

10  would probably be correct.

11  Q.   Well, let's look at page 12, line 22.  Question:

12  And are you aware of the fact that you had to be a

13  property owner in order to vote in Georgia at one time?

14  Answer:  Not specifically.

15  A.   I'm not disputing that.

16  Q.   Okay.  And you did not know that elected school

17  boards were abolished in favor of appointment by racial

18  exclusive grand juries in Georgia; isn't that correct?

19  A.   Sure.

20  Q.   What?

21  A.   At the time.

22  Q.   When your deposition was taken?

23  A.   Correct.

24  Q.   Okay.  That's fine.  And you did not know that

25  prisons and jails were required at one time to be

1    racially segregated in Georgia; isn't that correct?

2    **A.**    At the time.

3    **Q.**    Of your deposition?

4    **A.**    Correct.

5    **Q.**    You were not aware of that.  And you did not know

6    at the time of your deposition that the state

7    legislature adopted a resolution that the 14th and 15th

8    amendments were void and of no effect, correct?

9    **A.**    I'm sorry.  I couldn't hear that.

10   **Q.**    You did not know that the state legislature

11   adopted a resolution that the 14th and 15th amendments

12   were void and of no effect?

13   **A.**    Correct.

14   **Q.**    You did not know that?

15   **A.**    Not at the time.

16   **Q.**    And you did not know when you were deposed that

17   there were redistricting laws enacted by the state

18   legislator for the Sumter County Board of Education

19   that were objected to by the Department of Justice

20   under Section 5 of the Voting Rights Act; isn't that

21   correct?

22   **A.**    At that time.

23   **Q.**    When your deposition was taken?

24   **A.**    Yeah.

25   **Q.**    And you did not know when your deposition was

1      taken that there was successful challenges to elections

2      for the Sumter County Commission and the Americus City

3      Council as diluting black voting strength?

4      **A.**   Correct.

5      **Q.**   And at the time of your deposition you were not

6      aware of any blacks who had ever been elected to a

7      countywide office in Sumter County; isn't that correct?

8      **A.**   From Sumter County.

9      **Q.**   Yes.

10     **A.**   Right.  No Sumter County residents, but blacks

11     have won Sumter County in -- you know, the majority of

12     the votes in Sumter County, but not a resident of

13     Sumter County.

14     **Q.**   Wait a minute.  I'm not sure I understand what

15     your answer is.

16     **A.**   So no resident -- no black resident of Sumter

17     County I was aware of having won a countywide election,

18     but there have been black elected officials that have

19     won the majority vote in Sumter County.

20     **Q.**   Well, my question was, were you aware of any black

21     who had been elected to a countywide office in Sumter

22     County?

23     **A.**   Right, no.

24     **Q.**   Okay.  But you agree that blacks should have the

25     equal opportunity to participate in the political

1    process and elect candidates of their choice, correct?

2    **A.**   Without a doubt.

3    **Q.**   Without a doubt.  And would you agree that the

4    Southland Academy, which is a private school in Sumter

5    County, opened after the decision in *Brown versus Board*

6    *of Education*, was opened in opposition to the

7    desegregation of the public schools?

8    **A.**   Most likely.

9    **Q.**   What?

10   **A.**   Most likely.

11   **Q.**   Well, that's what you testified in your

12   deposition, right?

13   **A.**   That's right.  Sure.

14   **Q.**   So you do agree?

15   **A.**   Sure.

16   **Q.**   Okay.  And would you agree today that the vast

17   majority of students who attend the public schools in

18   Sumter County are black?

19   **A.**   Yes.

20   **Q.**   And would you agree that the remaining white

21   students are either home schooled, as your children are

22   now as we speak, that they go to Southland Academy, or

23   they go outside Sumter County and attend schools in

24   Schley County?

25   **A.**   Hmm, can you state that one more time, please.

1   Q.   Wouldn't you agree that the remaining white

2   students --

3   A.   Oh, the remaining.

4   Q.   -- the remaining white students are either home

5   schooled, as your children are as we speak, that they

6   go to Southland Academy, which was established in

7   opposition to desegregation of the public schools, or

8   they go outside Sumter County and attend schools in

9   Schley County?

10  A.   Yeah, most of them.  There are some that probably,

11  you know, may go to neighboring counties because their

12  parents may teach there or something like that, but

13  that would be correct.

14  Q.   And wouldn't you agree some parents don't send

15  their children to the public schools in Sumter County

16  because of the racial demographics of the public

17  schools?

18  A.   I can't speak for a lot of them.  It's certainly

19  possible that there are a small minority that may

20  believe that.

21  Q.   Well, look at page 38 of your deposition, on line

22  8:  Well, do you think it has anything to do with the

23  racial, the demographics of the public school system?

24  Answer:  I think a very small percentage does, probably

25  less than five percent, but I believe that is a factor,

1    and I think it's a very small percentage.

2    A.    Yeah, I basically said that.  Okay.

3    Q.    Okay.  Now, are you familiar with Act Number 9,

4    Senate Bill 79, April 20, 2011?

5    A.    By that description I can't recall.

6    Q.    Well, do you recall whether or not it says that

7    boards of education shall be composed of seven single

8    member districts?

9    A.    No.

10   Q.    You're not familiar with that at all?

11   A.    I believe Senate Bill 84 came out stating that no

12   school board shall be more than seven or less than

13   five.

14   Q.    But you don't remember that bill that I just

15   cited?

16   A.    No.

17   Q.    That provides that they shall be compiled of seven

18   single-member districts?

19   A.    No, I'm not aware of that.  I just know about

20   Senate Bill 84, which I believe is still existence,

21   says no school board shall be more than seven or less

22   than five.

23   Q.    Now, you testified about the SACS recommendation

24   to the school board?

25   A.    Yes.

1   Q.   Do you know that there is no SACS document

2   available involving a recommendation which they may

3   have made?

4   A.   Right, it was just a -- when they came to visit --

5   they have to visit every five years -- they just made

6   that statement.

7   Q.   So there is no document?

8   A.   No, I don't believe there's a document available.

9   It was just -- it was a statement that was made by the

10  -- I guess they call them investigators or surveyors.

11  Q.   Okay.  And also you testified about the minutes of

12  the regular meeting of the Board of Education held on

13  December 9, 2010.  Do you remember that?

14  A.   I believe so.

15  Q.   And on page 2 there is a statement under the

16  title, new business.  A motion was made by Mr. Goodwin,

17  seconded by Ms. Krenson, to approve a resolution to

18  introduce local legislation providing for a reduction

19  in the number of board members, motion carried

20  unanimously?

21  A.   That's correct.

22  Q.   But that does not indicate that the resolution

23  involved any at-large elections; isn't that correct?

24  A.   What -- hmm, yeah, it actually does state that --

25  according to the resolution right here it does state

1    that there are two at-large districts.

2    **Q.**   But there's nothing in the minutes that indicate

3    that; isn't that correct?

4    **A.**   No, but it referred to the resolution.  That was

5    the document that everybody had in front of themselves.

6    **Q.**   Yeah, but as I say, there's nothing in the minutes

7    that would indicate that?

8    **A.**   The minutes refer to the resolution.  That is

9    attached to the minutes of the meeting.

10   **Q.**   Now, there was a vote on 6/17/2010 on reducing the

11   size of the school board.  You testified about that,

12   correct?

13   **A.**   That's right.

14   **Q.**   And isn't it true that that vote was along racial

15   lines?

16   **A.**   Hmm, I believe so.

17   **Q.**   You believe so?

18   **A.**   Yeah, well, yes.

19            **MR. MCDONALD:**  That's all that I have.  Thank

20   you very much.

21            **THE COURT:**  Is there any redirect?

22                  **REDIRECT EXAMINATION**

23   **BY MR. BRADEN:**

24   **Q.**   Dr. Busman, are resolutions regularly attached to

25   the Sumter County Board of Education minutes?

1    **A.**    Oh, yes.  They are a part of the minutes.

2    **Q.**    And were there any special minutes or documents

3    that were provided to any of the members that didn't

4    include this resolution?

5    **A.**    No, everybody got the information.

6    **Q.**    And this is a matter that had been in discussion

7    for a number of months?

8    **A.**    Oh, yes.

9    **Q.**    Reported extensively in the newspapers?

10   **A.**    Oh, yes, and on the radio also.

11   **Q.**    Do you believe that the African American community

12   has an equal opportunity to elect its candidates in the

13   two at-large districts?

14   **A.**    Oh, definitely so.

15   **Q.**    And you actively -- did you believe you needed to

16   get black votes to be elected to the school board?

17   **A.**    Oh, yes.

18   **Q.**    And did you actively seek them?

19   **A.**    Certainly.

20        **MR. BRADEN:**  No further questions.

21        **THE COURT:**  Is there any recross?

22        **MR. BRADEN:**  Oh, I do have one, yes.  I

23   believe it would be appropriate at this time to move

24   for the admission of the resolution and the minutes as

25   Defendant Exhibit 11.

1          THE COURT:  Any objection?

2          MR. MCDONALD:  No objection, Your Honor.

3          THE COURT:  All right.  It's admitted without

4     objection as Defendant's Number 11.

5                    RECROSS EXAMINATION

6     BY MR. MCDONALD:

7     Q.   Dr. Busman, are you aware of the fact that blacks

8     have run for at-large elections for the school board,

9     but no black has ever been elected to an at-large seat

10    under the existing plan?

11    A.   Yes.

12         MR. MCDONALD:  Thank you very much.

13         THE COURT:  All right.  Is there further

14    question?

15                    REDIRECT EXAMINATION

16    BY MR. BRADEN:

17    Q.   And does that simply consist of two candidates who

18    now serve?

19    A.   That's right.

20         MR. BRADEN:  No further questions.

21         THE COURT:  All right.  I'll ask again, any

22    further questions?

23         MR. MCDONALD:  No further questions from me,

24    Your Honor.  Thank you.

25         THE COURT:  All right.  Is there any reason

1    this witness cannot be excused?

2            **MR. BRADEN:**  No, Your Honor.

3            **THE COURT:**  All right.  You may be excused.

4    You may leave if you wish or remain, whatever your

5    choice.  You may call your next witness.

6            **MR. RAILE:**  Your Honor, the defendant calls

7    Ms. Sylvia Roland.

8            **COURTROOM DEPUTY:**  Do you solemnly swear or

9    affirm that the testimony you are about to give in the

10   case now before the Court will be the truth, the whole

11   truth, and nothing but the truth?

12           **THE WITNESS:**  I do.

13           **THE COURT:**  Mr. Raile?

14                        **SYLVIA ROLAND**

15       **Witness, having first been duly sworn, testified on**

16                      **DIRECT EXAMINATION**

17   BY MR. RAILE:

18   **Q.**   Good morning, Ms. Roland.  Could you please state

19   your full name for the record?

20   **A.**   Sylvia Colleen Roland.

21   **Q.**   Ms. Roland, without telling us your street

22   address, could you tell us where you live?

23   **A.**   I live in Sumter County.

24   **Q.**   And do you currently hold a public office in

25   Sumter County?

1  **A.**  Yes.

2  **Q.**  And what is that public office?

3  **A.**  I am a member of the Sumter County Board of

4  Education, at-large position.

5  **Q.**  And how long have you been in that position?

6  **A.**  Three years.  I am in -- just finished the first

7  year of my second term.

8  **Q.**  And so when did you first decide to run for that

9  position?

10  **A.**  2014.

11  **Q.**  Did you have any qualifications that made you

12  believe that you could contribute effectively in the

13  role of school board member?

14  **A.**  Yes, I was a career public school educator.

15  **Q.**  And can you describe that career for the Court,

16  please?

17  **A.**  Yes.  I served 12 years as an English teacher at

18  the middle school and high school level in Arkansas,

19  and then I moved to Florida.  I served as a literacy

20  coach for six years at a middle school.  And then I

21  moved to Georgia, and I served one year as a school

22  improvement specialist at Americus High School.

23  **Q.**  And could you describe for the Court what job

24  function you had in that last position at Sumter High

25  School?

**A.** Yes. I oversaw some of the professional development for the teachers in the high school, and I served as a liaison between the high school and the state department of education to ensure that teachers were using best practices in the classroom.

**Q.** Now, from your testimony it sounds like you are not from Sumter County originally; is that correct?

**A.** Yes.

**Q.** Can you tell the Court where you are from originally?

**A.** I was born in Tampa, Florida. I lived there two years. I moved to Mississippi for five years, and then I moved to Arkansas, where I lived for 40 or so years before moving back to Florida and then to Georgia.

**Q.** And when did you move to Sumter County?

**A.** 2012.

**Q.** And you're a public official in Sumter County today, we heard, correct?

**A.** Yes.

**Q.** And in your capacity as a public official, would you want Sumter County to be the kind of place where someone who wasn't from here originally could not come and move and feel like they could contribute?

**A.** Yes.

**Q.** I'm sorry. What's your position? Could you state

1   your position, because I think my question was a little

2   confusing.

3   **A.**   Yes.  I would like Sumter County to be the kind of

4   place where people who could move into the county and

5   contribute towards the betterment of the county, like I

6   feel I am doing.

7   **Q.**   Yeah, and, in fact, you're not from Sumter County,

8   and do you feel like you've made a contribution?

9   **A.**   Yes.

10  **Q.**   Do you feel like you've been treated as a second

11  class citizen because you're not from Sumter County?

12  **A.**   No.

13  **Q.**   Do you feel like the county has been welcoming to

14  you?

15  **A.**   Yes.

16         **MS. KHONDOKER:**  Objection, Your Honor,

17  leading the witness.  He hasn't allowed --

18         **THE COURT:**  Well, I think that has been done

19  quite a bit without much objection, but the objection

20  is valid.  Sustained.  You may ask the witness a

21  non-leading question.

22  **BY MR. RAILE:**

23  **Q.**   Why did you decide to run for the Sumter County

24  School Board?

25  **A.**   I wanted the students and citizens of Sumter

1    County to have access to the best possible public

2    education.

3    Q.    And what does that have to do with your decision

4    that you should run?

5    A.    I felt I had something to offer.

6    Q.    And what was the basis of that belief?

7    A.    I am a career public school educator.

8    Q.    How many times have you run for that position?

9    A.    Two times.

10   Q.    And when was the first time again?

11   A.    2014.

12   Q.    And can you describe to the Court what you did in

13   that campaign?

14   A.    Yes.  After I filed for office I sent out what I

15   would call an introductory letter to everybody that I

16   had met by that time whose addresses I had, and to let

17   them know about my career in public education.  And I

18   also sent the same letter by email to everyone whose

19   email addresses I had at that time.  I also ordered

20   yard signs and put them in yards of people who

21   volunteered to have them in their yards.  I had door

22   knockers, is what they're called, it's just a little

23   card that you can hang on a doorknob telling a little

24   bit about my career in public education.  And I

25   attended three public forums, and I campaigned door to

1   door in many neighborhoods in Sumter County.

2   Q.   And how did you decide what -- well, let me first

3   ask this.  What neighborhoods were those?

4   A.   Hmm, well, every neighborhood I had the energy to

5   go to.  I started with my home neighborhood and worked

6   my way down Lee Street, which is the main corridor in

7   town.  I tried to focus on many neighborhoods that had

8   schools nearby, because I felt those citizens would be

9   concerned about the school system.  I also went to the

10  smaller communities in Sumter County and campaigned as

11  well, because I was running for an at-large position

12  and that covered the whole county.

13  Q.   Did you go to predominantly African American

14  neighborhoods?

15  A.   Yes, I'm sure some of the neighborhoods that I

16  went to were predominantly African American, but I did

17  not choose those neighborhoods based on ethnicity.

18  Q.   What did you tell voters when you went to their

19  door to try to convince them to vote for you?

20  A.   I told them about my career in education, and that

21  I was concerned that the kids in Sumter County have

22  access to the best possible education, and that I

23  wanted to contribute towards that.

24  Q.   Did you have a different message that you told to

25  white voters than you told to African American voters?

**A.**   No.

**Q.**   Now, you mentioned yard signs.  Did you have any other displays up showing that you were running for office?

**A.**   I used the electronic billboard in town, which was new in 2014 when I ran for office.  I used some radio spots, and I used the newspaper.

**Q.**   Altogether, approximately how much did you spend?

**A.**   I don't recall exactly.  I believe it was between 2,000 and $2500.

**Q.**   Okay.  Did you get all your signs back after that campaign?

**A.**   Hmm, no.  I tried, but I didn't get them all back.

**Q.**   Did any disappear from where you put them up?

**A.**   Yes, one did.  I was told that the City of Americus collected signs that were put in improper places.  I understand there is a right of way that you aren't supposed to put signs in.  I didn't know this, and I was told where to go retrieve it, so I went downtown to where the city told me to go, and I retrieved my sign.

**Q.**   Did you see the signs of any other candidates when you went to that place?

**A.**   Yes.

**Q.**   And did you see the sign or any signs there by an

1    individual named Michael Coley?

2    **A.**    Yes.

3    **Q.**    How did you know it was his?

4    **A.**    It had his name on it.

5    **Q.**    Did you speak with white voters in campaigning?

6    **A.**    Yes.

7    **Q.**    Did you speak with any black voters in

8    campaigning?

9    **A.**    Yes.

10   **Q.**    Did any white voters say they would vote for you?

11   **A.**    Yes.

12   **Q.**    Did any black voters say they would vote for you?

13   **A.**    Yes.

14   **Q.**    Do you have any way to quantify how many?

15   **A.**    No.

16   **Q.**    Do you recall?

17   **A.**    I was happy when anybody said he or she would vote

18   for me.

19   **Q.**    Sure.  Did you think you could ignore the black

20   community?

21   **A.**    No.

22   **Q.**    Do you recall the other candidates in that race?

23   **A.**    Do you mean the 2014 race?

24   **Q.**    Yes, ma'am.

25   **A.**    They first one.  Yes, I had three opponents.

1    Michael Coley, David Kitchens and Penny Taft.

2    **Q.**   Did you consider them to be your opponents?

3    **A.**   Well, I can't say I felt like I was running

4    against them.  I was running for the seat on the Board

5    of Education.

6    **Q.**   Do you believe you have any qualifications that

7    Mr. Coley didn't bring to the table?

8    **A.**   Well, I feel that my career in public education is

9    a very important quality that I have, and that is why I

10   ran because I had that background.  I understand that

11   he is a law enforcement career person, so I don't

12   believe that he has an educational career.

13   **Q.**   Did anyone recommend to you that you should run

14   because there should be a majority white membership on

15   the school board?

16   **A.**   No.

17   **Q.**   Did anyone suggest to you that you should run

18   because majority whites should have --

19           **MS. KHONDOKER:**  Leading, Your Honor.

20   Objection.

21           **MR. RAILE:**  I don't think that's leading,

22   Your Honor.  I'm asking it as an open-ended.  She can

23   agree or disagree.  I mean, it's a lot less leading

24   than a lot of what we've heard in the last two days.

25           **MS. KHONDOKER:**  He's putting words in her

1    mouth, Your Honor.

2            THE COURT:  Well, we have.  The Court has

3    been very lenient and the Court has not imposed its own

4    objections to what has been tremendous leading on both

5    sides, but the objection is being raised today.  And

6    although I'll give you some room to question whether

7    certain things were involved or not, but I think to

8    suggest an answer is violative of the rule against

9    leading.  So you might want to restate your question.

10   BY MR. RAILE:

11   Q.   Did you have a racial motivation at all for your

12   campaign?

13   A.   No.

14           THE COURT:  Technically that's leading.

15           MR. RAILE:  All right.  Well, I think we've

16   exhausted the issue, Your Honor.  I'll move on.  If it

17   please the Court.

18           THE COURT:  I wasn't picking on you about

19   that.  I am just being a little bit facetious.

20   BY MR. RAILE:

21   Q.   So what was the result of the first election?

22   A.   Mr. Coley had the most votes of the four of us,

23   but he did not have an over 50 percent majority, so he

24   and I went into a runoff, and then I won the runoff.

25   Q.   Okay.  And so are you on -- was that when you

1    began your term on the school on the school board?

2    **A.**    Several months after that, the following January.

3    **Q.**    All right.  Let's move -- you said you ran in --

4    more recently than 2014; is that correct?

5    **A.**    Yes.  I ran for reelection in 2016.

6    **Q.**    Okay.  Can you describe what you did in that

7    campaign?

8    **A.**    Yes.  I did far less campaigning than I did the

9    first time.  I was a lot busier with my part-time job

10   at my church, my volunteer activities, as well as my

11   school board activity, and I didn't have the amount of

12   time to campaign that I had the first time.  And I

13   spent a lot less money.  I did use the electronic

14   billboard for a shorter amount of time.  I recycled my

15   yard signs and used the same ones again.  I used my

16   same door knockers again, and I did a little bit of

17   door to door campaigning, but not to the extent that I

18   did in 2014.

19           **THE COURT:**  Counsel, just for my information,

20   is this a two-year term or a four-year term?  She said

21   she ran in '14 and '16.

22           **THE WITNESS:**  My first term was a two-year

23   term.  The two at-large positions, one that I ran for

24   was a two-year, the other one was a four-year term.

25   Now, I have a four-year term, and every seat has a

1    four-year term now.

2           THE COURT:  So they were initially staggered

3    then.

4           THE WITNESS:  Yes, so that we wouldn't all

5    run for reelection at the same time.

6           THE COURT:  I understand.  Thank you.  You

7    may proceed.

8    BY MR. RAILE:

9    Q.   What did you tell voters in the second campaign?

10   A.   I told them that I felt that the Board of

11   Education was making progress toward improving Sumter

12   County schools, and that I wanted to continue to be

13   part of that improvement.

14   Q.   Do you recall the other candidate or candidates in

15   that campaign?

16   A.   Yes, Michael Coley was my opponent.

17   Q.   And what was the result of that race?

18   A.   I won that race.

19          MS. RAILE:  No further questions at this

20   time, Your Honor.  Thank you.

21          THE COURT:  All right.  Cross examination.

22   That's Ms. Khondoker; am I correct?

23          MS. KHONDOKER:  Yes, Khondoker.

24          THE COURT:  Khondoker, okay.

25                    CROSS EXAMINATION

BY MS. KHONDOKER:

**Q.**   You said that you were employed as -- in Sumter County schools as a school improvement specialist?

**A.**   I was for the 2012/2013 school year.

**Q.**   So you only held that position for one year?

**A.**   That's correct.

**Q.**   And you only moved to Sumter County in 2012; isn't that correct?

**A.**   That is correct.

**Q.**   And you never had any school -- any students -- any children in Sumter County schools; is that correct?

**A.**   That is correct.

**Q.**   You haven't voted in city elections; is that correct?

**A.**   That is correct.

**Q.**   You've only voted in county elections?

**A.**   That is correct.

**Q.**   You mentioned in your campaign that you raised between 2,000 and $2500; is that right?

**A.**   To best of my memory, that is correct.

**Q.**   And you received unsolicited money for your campaign?

**A.**   That is correct.

**Q.**   And as you were door knocking and going door to door, you said that you went to predominantly black

1    neighborhoods?

2    **A.**    Yes.

3    **Q.**    What neighborhoods did you go?

4    **A.**    I went to many of the neighborhoods that are close

5    to some of the schools, and I went to neighborhoods off

6    of Lee Street.  I tried covering the whole city of

7    Americus the best I could.

8    **Q.**    And you went to your own neighborhood; is that

9    right?

10   **A.**    Yes.

11   **Q.**    And your own neighborhood is predominantly white;

12   is that right?

13   **A.**    Yes.

14   **Q.**    You mentioned that you are a part of church?

15   **A.**    Yes.

16   **Q.**    And your church is predominantly white?

17   **A.**    Yes.

18   **Q.**    And you're also part of several other

19   organizations, like Kiwanis, for example?

20   **A.**    I am a member of Kiwanis.

21   **Q.**    And Kiwanis is predominantly white?

22   **A.**    Yes.

23   **Q.**    You said that the schools were in need of

24   improvement, and during your second campaign you saw

25   that they were improving; is that right?

1    **A.**    Yes.

2    **Q.**    And Sumter County High School, would you say that

3    that's predominantly African American?

4    **A.**    Yes, upwards of 87 or so percent.

5    **Q.**    Okay.  And you said that a reason why you wanted

6    to be involved in the schools is because the schools

7    were operating subpar?

8    **A.**    Yes.

9    **Q.**    You said that Coley won the majority of the votes?

10   **A.**    Yes, in the 2014, yes.

11   **Q.**    And you've never held a political office in Sumter

12   County; is that right?

13   **A.**    The school board is my only office, yes.

14          **MS. KHONDOKER:**  May I confer with counsel,

15   Your Honor?

16          **THE COURT:**  You may.

17   **BY MS. KHONDOKER:**

18   **Q.**    You mentioned some African American neighborhoods

19   that you visited, for example, you mentioned the Lee

20   Street neighborhood?

21   **A.**    That's not the correct name, I just -- a lot of

22   the neighborhoods in Americus don't have neighborhood

23   names.

24   **Q.**    Uh-huh.

25   **A.**    I could name the streets I went on, but --

1    Q.   So you don't know the name of the neighborhoods

2    that you visited?

3    A.   A few of them I do, but a lot of them I don't

4    believe have actual neighborhood names.

5    Q.   Okay.  So in the African American community when

6    you went to Lee Street, you don't know the name of

7    those neighborhoods.  You're not familiar with those

8    neighborhoods?

9    A.   No.

10           MS. KHONDOKER:  No further questions, Your

11   Honor.

12           THE COURT:  All right.  Is there any redirect

13   Mr. Raile?

14           MR. RAILE:  Shortly.

15                   REDIRECT EXAMINATION

16   BY MR. RAILE:

17   Q.   I believe you were asked if you vote in city

18   elections.  Do you remember that question?

19   A.   Yes.

20   Q.   And your answer was that you don't vote in city

21   elections; is that correct?

22   A.   That is correct.

23   Q.   Why not?

24   A.   I live outside the city limits.

25   Q.   Would you be allowed to vote in that election, in

1    the city election?

2    **A.**   No.

3           **MR. RAILE:**   Thank you, Your Honor.

4           **THE COURT:**   Any recross?

5           **MS. KHONDOKER:**   Briefly, Your Honor.

6                   **RECROSS EXAMINATION**

7    BY MS. KHONDOKER:

8    **Q.**   And on the city elections, when you first ran, you

9    weren't sure where you were able to vote; is that

10   right, whether it was city or the commissioner, like

11   you were unclear about where and how you could vote?

12   **A.**   Yes.

13   **Q.**   Okay.  Thank you.

14           **THE COURT:**   Any further?

15           **MR. RAILE:**   Nothing further, Your Honor.

16           **THE COURT:**   Is there any objection to this

17   witness being excused from either side?

18           **MS. KHONDOKER:**   No.

19           **MR. RAILE:**   No, Your Honor, she's free to go

20   and on behalf of the county I'd like to thank her for

21   coming out and for her time.

22           **THE COURT:**   All right.  You are excused.  You

23   may leave if you wish or remain, whatever your choice.

24           **THE WITNESS:**   Thank you.

25           **THE COURT:**   You may call your next witness.

1          **MR. RAILE:**  Your Honor, the defendant would

2     call Robert Brady.

3          **COURTROOM DEPUTY:**  Do you solemnly swear or

4     affirm that the testimony you are about to give in the

5     case now before the Court will be the truth, the whole

6     truth, and nothing but the truth?

7          **THE WITNESS:**  Yes, ma'am.

8          **THE COURT:**  You may proceed.

9                    **ROBERT EDWARD BRADY**

10    **Witness, having first been duly sworn, testified on**

11                   **DIRECT EXAMINATION**

12    BY MR. RAILE:

13    **Q.**   Mr. Brady, would you state your full name for the

14    record?

15    **A.**   My name is Robert Edward Brady.

16    **Q.**   Without stating your street address, could you

17    tell us where you live?

18    **A.**   I live in Americus, Georgia.

19    **Q.**   What is your current occupation, Mr. Brady?

20    **A.**   I am the supervisor of elections and the chief

21    registrar of Sumter County.

22    **Q.**   How long have you had those jobs?

23    **A.**   A little over five years.

24    **Q.**   And I'll ask you about those in a minute, but I

25    just want to ask a little bit about your background.

Where are you from originally?

**A.**   I was born in Tifton, Georgia.

**Q.**   And where did you grow up?

**A.**   My father was a career Air Force officer or actually enlisted man, and as a result of that I grew up all over the United States.  Do you want me to list where?

**Q.**   Just give us a few examples.

**A.**   I was born in Georgia.  I lived in Texas.  I lived in California.  I lived in Alaska.  I lived in North Carolina.

**Q.**   How long have you lived in Sumter County?

**A.**   Eight years.

**Q.**   Can you provide us with your work history briefly?

**A.**   Yes, sir.  After I graduated from college, I moved to Georgia again and took up a career with Bell South Telephone.  I stayed with Bell South through its acquisition by -- excuse me, Southern Bell by its acquisition, Bell South, and again through ATT.  I worked for them for right at 32 years.  After that, I had a short term working for the Georgia State Police, and then after that I took this job as -- in the election board.

**Q.**   And you said that one of your job titles is registrar; is that right?

1    **A.**    Yes, sir.

2    **Q.**    What is the job function of the registrar?

3    **A.**    The registrar is tasked with maintaining and

4    collecting the voter registration information for the

5    county and assuring its authenticity and accuracy.

6    **Q.**    And in that capacity -- well, let me just ask you.

7    Do you have access to the registration rates in Sumter

8    County?

9    **A.**    I'm sorry.  Ask me again.

10   **Q.**    Do you have access to information about

11   registration?

12   **A.**    Oh, yes, sir.

13   **Q.**    And are you aware of the percent of African

14   American registration in Sumter County?

15   **A.**    Yes, sir.

16   **Q.**    And what's your understanding?

17   **A.**    It's my understanding that it's approximately

18   52 percent African American and approximately

19   48 percent Caucasian.  Now, having said that, those

20   numbers vary on a day to day basis, so those may not be

21   exact.

22   **Q.**    Why do they vary on a day to day basis?

23   **A.**    Because they change as the population of the

24   county changes.

25   **Q.**    Would you describe those variations -- well, how

1    would you describe those variations?

2    **A.**    Those variations are generally subtle over time,

3    but there's the difference in the particular specific

4    number at any given moment as opposed to the general

5    number over time.

6    **Q.**    Do -- does the registration percentages include

7    individuals who, for whatever reason, are not entitled

8    to vote?

9    **A.**    No, sir.

10   **Q.**    Would that include individuals who are not

11   entitled to vote because of some conviction or former

12   conviction?

13   **A.**    Those individuals are not included in that number.

14   **Q.**    Okay.  Now, can you describe to the Court the job

15   function of the supervisor of elections?

16   **A.**    The supervisor of elections is the chief election

17   official of the county.  That individual's task is to

18   confirm that the equipment works, in advance, that the

19   votes are going to be collected on, maintaining

20   security of that equipment, also to maintain and run

21   the elections in compliance with Georgia state law, and

22   to maintain a controlled -- evidential control of the

23   results of those elections and to record them and

24   transmit them to the appropriate authorities at the

25   state level.

1   Q.   Are you familiar with the districting plan

2   governing the Sumter County School Board?

3   A.   Yes, sir, I am.

4   Q.   Can you describe that plan for the Court?

5   A.   That plan -- excuse me.  That plan has five

6   specific unique districts that elect one representative

7   a piece.  There are two at-large seats, if you will,

8   that are selected by the entire population of the

9   county.

10  Q.   Has that districting plan changed during your

11  tenure?

12  A.   Yes, sir.  When I -- yes, sir, it has.

13  Q.   And can you describe that change for the Court?

14  A.   When I came into this world, that's the election

15  world, there was currently some discussion about making

16  changes that I was not privy.  I can't address anything

17  before 2012, but I can tell you that when I came into

18  the election business we had nine unique school board

19  districts.

20  Q.   And did those nine single-member school board

21  districts align with any other districts that were used

22  to administer any other elections?

23  A.   No, sir.  They didn't appear to be aligned with

24  anything.

25  Q.   Is the current plan different in that respect?

1    A.    Yes, sir, it is.

2    Q.    And can you explain that difference?

3    A.    Yes, sir.  What happened is all of the nine

4    districts were consolidated into larger groups that

5    were then aligned and superimposed over the county

6    commission districts.  Again, with the exception of the

7    at-large, and they cover the entire county.

8    Q.    Did you administer an election or elections under

9    the old plan that you just described during your

10   tenure?

11   A.    Yes, sir, I have.

12   Q.    And have you administered elections under the new

13   plan?

14   A.    Yes, sir, I have.

15   Q.    What's the difference from the perspective of your

16   job function?

17   A.    It's infinitely easier, it's infinitely cheaper to

18   hold the elections under the current five plus two than

19   it was over the original nine.  This is a function of

20   all of the -- well, the patchwork of districts that

21   existed prior to the consolidation.  It's a much more

22   efficient process, and it's way easier to secure.

23   Q.    Why is it easier to secure?

24   A.    It's easier to secure because I have information

25   coming from fewer places, and there is less -- it's a

1    much less deluge of information that has to be

2    confirmed.

3    Q.   Now, are you aware of the candidate qualifications

4    for the school board?

5    A.   In general, yes, sir.

6    Q.   And can you describe to the Court, generally, what

7    those are?

8    A.   Now, with the caveat that there are additional

9    requirements that the state board of elections, or

10   excuse me, education has that I'm not really versed in.

11   Q.   And I just want you to testify about what you know

12   and not speculate.

13   A.   You have to be a resident of the county, or if

14   you're running in a district race, you have to be a

15   resident of the districts you wish to represent.  You

16   have to be of voting age.  You have to be a registered

17   voter.

18   Q.   Is there a fee?

19   A.   There is a qualification fee that you have to pay

20   that is a predetermined amount.  Those are basically

21   the requirements.

22   Q.   What's the fee?

23   A.   I'm not certain.

24   Q.   Approximately.  What's it approximately?

25   A.   Approximately?  Approximately $75, $72, something

1    like that.  The fee as established by legislation is

2    three percent of the possible salary of the year.

3    Q.    Is there a form that perspective candidates have

4    to fill out?

5    A.    Yes, sir.  The forms are subtlety different.  One

6    of them is known as a notice of intent to run, the

7    other one is a declaration of intent to run, one of

8    them is for incumbents, and one of them is for new

9    candidates, but they are essentially the same

10   information.

11   Q.    And how long is that document?

12   A.    How long is the document?

13   Q.    Yes, sir.

14   A.    As I recall, two pages.

15   Q.    Can you explain to the Court in a nutshell what

16   you or your agents do to prepare for election day?

17   A.    The election day process starts about two months

18   before the election.  At that time all of the equipment

19   -- it's determined how much equipment is going to be

20   used, where it's going to be deployed, and once these

21   decisions are made, then we -- I have a team of

22   individuals, with myself, that go and actively check

23   the equipment for calibration, for accuracy, for

24   consistency, and for liability.  After this process is

25   completed, then the equipment is sealed up and is

1    stored in a secured holding facility, not to be

2    tampered with again until the election or the day

3    before elections.  Then I contact all of the people

4    that are involved in the ballot creation process, and

5    while we do have the ability to duplicate ballots on

6    cite, we do not have the ability to create them.  Once

7    this information is confirmed, about that time, a call

8    for the election is issued as required by law.  Then

9    any additional -- well, the qualifying takes place

10   shortly after the call is issued.  Then, at that point,

11   all of the information that we have is brought together

12   and confirmed as accurate and representative of the

13   election.  Early voting process, which is the

14   colloquial name for advanced in-person voting, takes

15   place for 15 days before the election unless it's

16   involving a federal candidate, then it's a Saturday

17   which makes it be 16 days.  Then we hold the election.

18   When we hold the election, the polls open at 7:00 a.m.

19   and are open until 7:00 p.m., and because we generally

20   have a small enough number of absentee or paper ballots

21   to canvass, we don't generally tabulate early.

22   Q.   Can you explain to the Court in a nutshell what

23   you and your agents do to count the election results?

24   A.   Yes, sir.  The information acquired by the

25   electronic voting devices are transmitted to me in

1    sealed containers, and at that point I have the

2    equipment at our office that will translate the

3    information on those memory cards to a format that is

4    useable by our -- well, it's referred to as the GEMS

5    computer.  That's an acronym.  I don't recall what it

6    stands for, but the information is all accumulated

7    there.  Then I have a team, a ballot duplication

8    committee that actually counts through an electronic

9    optical reader the paper ballots involved with the

10   election.  This leaves only the ballots that would be

11   marked as provisional or UOCAVA, overseas voting

12   ballots, that have to be voted at a later time.  All of

13   this information is collated and it's presented in a

14   table or a report that's available to candidates and

15   their appropriate parties.  And at that point I collect

16   it all up, and I send it electronically, if it is a

17   state level or -- a county level or above, excuse me,

18   election, and it's all maintained by the Secretary of

19   State's office.  And at that point I don't know what

20   they do with it.

21   Q.   Once the Secretary of State receives the results

22   from Sumter County, are they published anywhere?

23   A.   You are asking me if once I send them to the

24   state, are they available for view?  Yes, sir, the

25   results are available to the public in general.

1    Q.    In what format?

2    A.    Once they are transmitted to the Secretary of

3    State's office, they are presented in a graphical,

4    usually, format, on the Internet, it's an Internet --

5    electronic format.

6    Q.    Is that on a website within the purview of the

7    Secretary of State?

8    A.    Yes, sir, controlled and maintained.

9    Q.    Is that available to the general public?

10   A.    Yes, sir, it is.

11   Q.    Is that a website that you are familiar with?

12   A.    Yes, sir.  The Secretary of State is the

13   controlling entity, but they have used various other

14   organizations under their control to display this, so

15   it changes as to who it is exactly.

16   Q.    Well, do you know how to use the website?

17   A.    Yes, sir, I do.

18   Q.    Have you instructed individuals on how to use that

19   website as part of your role as a agent of the Sumter

20   County Board of Elections?

21   A.    Yes, sir, I have several times.

22   Q.    Are the displays of election results on the

23   Secretary of State's website accurate to the best of

24   your knowledge?

25   A.    Yes, sir.

1    Q.   Have you ever identified an error in the display

2    of elections results information on the Secretary of

3    States website?

4    A.   The question was, have I ever identified an error

5    in their display of information?

6    Q.   Yes, sir.

7    A.   No, sir, I have not.

8    Q.   Let's look at Defendant's Exhibit Number 1.

9         THE COURT:   Before we do that, I think this

10   is probably a good time to stop.  We are just a little

11   past the time we would normally take our break.  We

12   will be in recess for our morning break for about

13   20 minutes.

14   (RECONVENED; ALL PARTIES PRESENT, 10:35 a.m.)

15        THE COURT:   All right.  Mr. Raile, you may

16   continue.

17        MR. RAILE:   Thank you, Your Honor.

18   BY MR. RAILE:

19   Q.   Mr. Brady, we were just talking about elections

20   results on the Secretary of State's website.  Do you

21   recall that discussion?

22   A.   Yes, sir.

23   Q.   Let's take a look at Defendant's Exhibit Number 1.

24   Now, Mr. Brady, what's up on the screen here, do you

25   know what this document shows?

1    A.    Yes, sir.  This document shows election results by

2    county for what appears to be the 1992 general

3    election.

4    Q.    Now, have you -- I'll represent to you that this

5    document runs for a long ways.  Have you reviewed a

6    document that is about the length of the document that

7    I'm holding up here?

8    A.    Yes, sir.  I'm familiar with it.  Yes, I have

9    reviewed it.

10   Q.    And do the elections results run for a -- much

11   closer in the future than 1992?

12   A.    Yes, sir.

13   Q.    And what do these documents here and these pages

14   that you've reviewed and what's on your screen, where

15   are they from?  Can you tell?

16   A.    Where are they from?  They are a tabulation, and

17   to be truthful, I am uncertain exactly where they

18   originate, but they do ultimately come from the

19   Secretary of State's archives and records, and then

20   they are displayed in here for public consumption.

21   Q.    Are those records kept on the website we've been

22   discussing within the purview of Secretary of State's

23   authority in the ordinary course of business?

24   A.    Yes, sir, they are.

25   Q.    Now, in reviewing these pages, are there different

1   formats of election results shown?

2   A.   Yes, sir, there are.

3   Q.   Let's look, just for example, at page 155.  Is

4   that a different format from what we saw on the first

5   page?

6   A.   Yes, sir, it is.

7   Q.   And is that familiar to you as a different format

8   that is used on the Secretary of State's website to

9   show election results in the ordinary course of

10  business?

11  A.   Yes, sir.  It's the same basic information, just

12  presented in a little bit different format.

13          MR. RAILE:  Your Honor, at this time I would

14  respectfully request to move into evidence Defendant's

15  Trial Exhibit Number 1.

16          THE COURT:  Any objection to Number 1?

17          MR. SELLS:  Your Honor, may I ask the witness

18  some questions, some further foundational questions

19  before I decide whether to object?

20          THE COURT:  You may do so.

21                  VOIR DIRE EXAMINATION

22  BY MR. SELLS:

23  Q.   Mr. Brady, in Exhibit 1, are those the complete

24  election returns for the years identified?

25  A.   They are the complete election returns for the

1    elections that the state has captured and is interested

2    in presenting, yes, sir.

3    Q.   Well, let me ask you this, because I'm not sure

4    that you understood my question or --

5    A.   That could be.

6    Q.   -- or you understood -- or I understand your

7    answer.

8              MR. SELLS:  So if we can -- can we put

9    Exhibit 1 on the screen, the first page of Exhibit 1?

10             THE COURT:  Is it a question as to whether

11   this is authentic, because otherwise it's just cross

12   examination?

13             MR. SELLS:  No, I don't think it's --

14             MR. RAILE:  Your Honor, I would observe, we

15   presented this exhibit to them, and they have no

16   objection that they informed us about on this.  So I'm

17   not sure what this is all about.  I have no idea.

18             THE COURT:  I understood it goes to

19   authentication of the document presented.

20             MR. SELLS:  In a way I think it --

21             THE COURT:  As to what it might not include

22   is a matter for cross examination.  That was the

23   limited reason I allowed you to interpret the

24   examination.

25             MR. SELLS:  I think it does go to

1    authentication, Your Honor.

2         **THE COURT:**  So are you all raising an

3    objection as to authenticity of Number 1?

4         **MR. SELLS:**  Well, there may be an issue as to

5    the authenticity of the editing of Number 1, Your

6    Honor.

7         **MR. RAILE:**  But that was not notified in

8    their objections to the exhibit.  There's no

9    authenticity objection that we're aware of.

10        **THE COURT:**  Unless there's an objection to

11   the authenticity, the Court's going to leave the

12   examination to cross examination.  Whatever short

13   comments or otherwise, I think that's a matter to be

14   addressed on cross.

15        **MR. SELLS:**  Okay.  Thank you.

16        **THE COURT:**  All right.  You may continue.

17        **MR. RAILE:**  Well, Your Honor, I would move to

18   admit Exhibit 1.  We're not aware of an objection

19   listed.  So I renew my motion to admit Exhibit 1 into

20   evidence.

21        **THE COURT:**  Okay.  Does the plaintiff wish to

22   interpose an objection?

23        **MR. SELLS:**  Not as to the authenticity, Your

24   Honor.

25        **THE COURT:**  All right.  On that basis then,

1    the Court will admit it without objection with the

2    understanding, of course, that plaintiff has a full

3    right to examine the witness with regard to it.

4              **MR. RAILE:**  Of course, Your Honor.

5              **THE COURT:**  All right.

6    **BY MR. RAILE:**

7    **Q.**   Is this a pretty long document, Mr. Brady?  Are

8    there election results for counties that are not Sumter

9    County in this document here?

10   **A.**   Yes, sir.  That document contains a summary of the

11   entire state.

12   **Q.**   And so if I were interested just in Sumter County

13   elections, how long do you suppose would it take for me

14   to go through here and just pull out the Sumter County

15   election results?

16   **A.**   Not to appear flippant, but how long would it take

17   you or how long would it take me?

18             **THE COURT:**  That might be a better question.

19   **BY MR. RAILE:**

20   **Q.**   How long would it take you?

21   **A.**   It would not be a substantially difficult thing

22   for me to do.  It would be a little bit time consuming.

23   It would be.  But other than that it would not be --

24   **Q.**   But if you were just looking at the paper document

25   --

1   **A.**   Yes, sir.

2   **Q.**   -- as opposed to using a computer, would it take a

3   while?

4   **A.**   Yes, sir, it would.

5   **Q.**   Okay.  Let's look at -- well, let me ask you this.

6   Have you seen a document that just pulls out Sumter

7   County election results?

8   **A.**   Yes, sir.

9   **Q.**   Let's look at Defendant's Exhibit Number 10.  And,

10  Mr. Brady, what is this document?

11  **A.**   This document is election results for the general

12  election from November of 1992.

13  **Q.**   And let's look at page 27.  And what is on this

14  page?

15  **A.**   This is -- let's see, general primary and

16  nonpartisan election.  This would be May of 2016.  It

17  also contains information from the November of 2016

18  election also.

19  **Q.**   Now, Mr. Brady, this document that I'm holding up

20  here, does this look like a paper version of the

21  document that you have on your screen?

22  **A.**   Yes, sir, it does.

23  **Q.**   Is that about the right length?

24  **A.**   Yes, sir, it is.

25  **Q.**   And have you reviewed a copy of this document in

1    its entirety?

2    **A.**    Yes, sir, I have.

3    **Q.**    Have you done anything to confirm the accuracy of

4    the election results on this document in Defendant's

5    Exhibit Number 10?

6    **A.**    I'm not sure I understand the question.

7    **Q.**    Did you do anything to make sure that the

8    information in Defendant's Exhibit Number 10 is

9    accurate?

10   **A.**    Yes, sir.  I took this document and compared it

11   against the information presented from the Secretary of

12   State's office for the same period of time, same

13   elections.

14   **Q.**    And did you do it election by election?

15   **A.**    Yes, sir, I did.

16   **Q.**    Did you do every single one?

17   **A.**    Yes, sir, I did.

18   **Q.**    Did you find some typographical errors when you

19   did it?

20   **A.**    Yes, sir.  There were, as I recall, two

21   circumstances where I believe an eight was presented as

22   a three, that sort of thing.  Nothing that was --

23   **Q.**    And were those corrected?

24   **A.**    Yes, sir, they were.

25   **Q.**    All right.  Do you know how to read this document?

1    **A.**   Yes, sir, I do.

2    **Q.**   So let's look at the first, this area here.

3          **MR. RAILE:**   If that can be blown up.

4    **BY MR. RAILE:**

5    **Q.**   What information do you see on the left side of

6    the screen in this first election?

7    **A.**   The left side of the screen represents the party

8    of the -- excuse me -- the political party affiliation

9    of the candidates, the number of votes that were

10   accumulated at the state level.  It designates the

11   successful candidate and the percentage of the vote

12   that was accumulated at the state level and the name,

13   of course, of the candidate.

14   **Q.**   So this is at the state level?

15   **A.**   Yes sir, this information is.

16   **Q.**   All of Georgia?

17   **A.**   Yes, sir.

18   **Q.**   And what's this designation here that I'm trying

19   to circle?

20   **A.**   Are you -- you are trying to circle the Alpha

21   letter D?

22   **Q.**   Yes, sir.

23   **A.**   Yes, sir.  That indicates the political party and

24   the winner of the race.

25   **Q.**   Okay.  So who won this election, and we'll talk

1   about what election it is in a minute, but who won this

2   election statewide?

3   A.   This would be the Honorable Mr. Jim Barksdale.

4   Q.   And what political party is he from?

5   A.   Mr. Barksdale is affiliated with the Democratic

6   party.

7   Q.   And how do you know that he is a Democrat?

8   A.   Again, the column designated at the top is E,

9   echo.  It designates the -- well, it's the win flag,

10  the WF is the win flag.

11  Q.   What information is over here on the right side of

12  the screen?

13  A.   The right side of the screen contains the same

14  information at the county level.

15  Q.   And which county is that?

16  A.   This would be Sumter County.

17  Q.   So who, in this race, won the highest percentage

18  of the vote in Sumter County?

19  A.   That would again, be Mr. Barksdale.

20  Q.   And how do you know that?

21  A.   The format of the information presented on the

22  right-hand side of the screen is the total number of

23  votes accumulated.  Then the next column over which is

24  designated J is the win flag there, and then the next

25  one designated is the percentage of votes acquired of

the total.

**Q.**   So you are just looking at 49?

**A.**   Yes, sir, 49.1 percent.

**Q.**   So what year is this first election?

**A.**   This is May of 2016.

**Q.**   What election is it?

**A.**   I'm sorry?

**Q.**   What's the election for?

**A.**   Oh, this is the general primary and the nonpartisan election.

**Q.**   And what office is at issue?

**A.**   This is for the U.S. Senate seat.

**Q.**   Now, we just discussed who the -- the prevailing party was, and this is the democratic primary; is that correct?

**A.**   Yes, sir, it is.

**Q.**   And is this the date that I'm circling here?

**A.**   Yes, sir.  This is May 24, 2016.

**Q.**   Okay.  Do you know the race of any other candidates in that election by any chance?

**A.**   Truthfully, sir, no.  I have no idea.

**Q.**   Okay.  Let's scroll down here to the next race or the next election.

**A.**   Yes, sir.

**Q.**   And what election is that?

1    **A.**    This is, again, the general primary and

2    nonpartisan election.

3    **Q.**    And who's the contest between?

4    **A.**    In this particular case it would be Mr. Sanford

5    Bishop, and he is apparently unopposed.

6          **MR. SELLS:**  Your Honor, I want to object.

7    We've gone, I think, a little bit far beyond

8    foundation, and he's now reading the document that

9    hasn't been admitted into evidence.  It's not in

10   evidence.

11          **THE COURT:**  Mr. Raile?

12          **MR. RAILE:**  Well, Your Honor, I could move it

13   into evidence at this time with the foundation.  So

14   I'll respectfully move it into evidence or move to make

15   --

16          **THE COURT:**  This is Number 10?

17          **MR. RAILE:**  Yes, Your Honor.

18          **THE COURT:**  All right.  Mr. Sells?

19          **MR. SELLS:**  Yes, the plaintiff objects.  This

20   document was not produced to the plaintiff in a timely

21   manner under Rule 26(a)(3)-- it's (a)(3)(A)(iii).

22   Summaries of evidence are required to be disclosed at

23   the same time that pretrial disclosures are required to

24   be disclosed, and in this case those disclosures were

25   required December 4th.  The plaintiff did not get this

1     document until December 7th, and this document is 28

2     pages long.  It -- each page contains maybe a dozen --

3     summaries of a dozen elections.  Each election has

4     several figures in it that would require the plaintiff

5     to verify, and we haven't had the opportunity to do

6     that.  But, more importantly --

7          THE COURT:  How would the plaintiff verify

8     this document if it's authenticated as coming from the

9     Secretary of State's office?

10         MR. SELLS:  Your Honor, that's not my

11     understanding of Mr. Brady's testimony.

12         THE COURT:  I don't mean the summary itself,

13     but the document presumably that it's taken from.

14         MR. SELLS:  Right.  So Exhibit 1, my

15     understanding of Mr. Brady's testimony is that this is

16     a summary of Exhibit 1, and so the plaintiffs -- the

17     plaintiffs -- had this been disclosed in a timely

18     manner, the plaintiff would have gone through

19     Exhibit 1, added up the numbers to see whether, for

20     example, Jim Barksdale got 166,627 votes in the state

21     and 827 votes in the democratic primary in Sumter

22     County.  You have to add the 11 numbers for the

23     precincts, the vote totals for the 11 precincts of

24     Sumter County to get that number.  The statewide number

25     may be easier, I'm not sure.  But that's a lot of

1    addition that the plaintiff's would have to do, and in

2    order to verify the numbers on here -- we -- we're

3    simply not in a position to say and agree that Jim

4    Barksdale got 827 votes in Sumter County because we

5    didn't have the opportunity as the rules require to do

6    that kind of addition.  We got this three days before

7    the beginning of trial.  I think it's hundreds of

8    person hours worth of work.  But, again, more

9    importantly, this document, as well as the Exhibit 1,

10   are -- purport to identify African American candidates

11   for statewide public office, and he just testified that

12   he doesn't know the race of these candidates.  Somebody

13   edited these election returns to pull out the black

14   candidates.  There has been no testimony to that

15   effect, and it --

16          **THE COURT:**  Well, we don't know what -- there

17   may be at some point.  I don't know.

18          **MR. SELLS:**  Well --

19          **THE COURT:**  I mean, if that's the question,

20   obviously if that's the purpose someone has got to be

21   able to do it.  I don't -- not necessarily with this

22   witness.  But the point of the production of time that

23   the plaintiff is objecting to, Mr. Raile.

24          **MR. RAILE:**  Your Honor, the rule that Mr.

25   Sells identified requires an identification of each

1    document, and we identified this document in a timely

2    fashion, and the actual document was produced to them

3    last week, and they didn't inform us at the time of an

4    objection that could be dealt with at the pretrial

5    conference, and it had several days to look at the

6    information.  Additionally the document does not

7    actually say the race of any candidate.  It is true Mr.

8    Brady testified as to one election that he didn't know

9    the race, but we'll have to see if that testimony is

10   different.  I think it might be different on some other

11   races.  So our position is that the identification was

12   timely.  It's a summary exhibit of this.  You have a

13   witness who testified that he --

14           THE COURT:  When was it identified?

15           MR. RAILE:  It was identified on -- is it

16   December 4th?  Ms. McKnight knows the details.

17           MS. MCKNIGHT:  Pardon me, Your Honor.  May we

18   ask leave for me to answer your question?  Okay.  This

19   document was identified timely along with all the

20   pretrial disclosures that were due, I believe the week

21   of the pretrial conference when we identified the

22   exhibit list.  We identified this summary exhibit in

23   that list of exhibits that we submitted to the Court on

24   Friday, November 17th.

25           THE COURT:  Did I not give the parties an

```
 1     instruction as to a date certain that you would share
 2     exhibits?  I may be thinking of another case.  There
 3     were several cases that I had pretrial conferences in.
 4     I don't remember.
 5              MS. MCKNIGHT:  That's right, Your Honor.  We
 6     exchanged exhibits last Monday, December 4th.
 7              THE COURT:  All right.  And was this document
 8     produced on that date?
 9              MR. SELLS:  Your Honor, I think Ms. McKnight
10     misspoke, because I'm looking at Exhibit C-2, the
11     pretrial order submission, and there's no Defendant's
12     Exhibit 10 on that.  Would you like to see my computer?
13     (Attorneys aside)
14              THE COURT:  My ultimate question is whether
15     the -- by the deadline the Court set, these documents
16     were made available on both sides.
17              MS. MCKNIGHT:  Your Honor, by December 4th,
18     this document was not exchanged.  What was exchanged
19     was all of the data, about 1500 pages of data that
20     formed this summary exhibit.  So the data from this
21     exhibit was exchanged timely.  It was exchanged on
22     December 4th.
23              THE COURT:  All right.  Okay.  Anything
24     further?
25              MR. SELLS:  Well, there's no dispute about
```

1    that, Your Honor, but it was supposed to be, under the

2    rule, identified on November 17th when we submitted the

3    list.  And I think Ms. McKnight would agree now that it

4    was not identified on the defendant's exhibit list, and

5    it was not produced on December 4th, which was this

6    Court's order following the pretrial conference.  It

7    was produced on December 7th.  That put the plaintiff

8    in the position of having to summarize well over a

9    thousand pages, well over *(indicating)* a thousand pages

10   of election data in the three days before trial.

11   That's unfair.  It's prejudicial under Rule 37(c) it

12   should not come in.

13          **THE COURT:**  All right.  But the full

14   documents were exchanged?

15          **MS. MCKNIGHT:**  Yes, Your Honor.

16          **THE COURT:**  This is a summary?

17          **MS. MCKNIGHT:**  Yes, Your Honor.

18          **THE COURT:**  All right.  The Court is going to

19   overrule the objection.  The representation from the

20   witness that it is a summary, I guess, reviewed by him

21   or produced by him.  Summaries are clearly allowed to

22   be used in cases, and I just want to say this.  This

23   case has gotten squeezed down as far as the time

24   between trial and the completion of the case, because

25   there was tremendous amounts of time that we used, on

1    both sides, that the Court tried to accommodate.  So

2    there's going to be some inconvenience, and there's

3    going to be some midnight oil burning, but I don't see

4    that you had a few days to look at it.  And I'm going

5    to give you all an opportunity also just to brief this

6    matter to the Court as your summaries.  So unless

7    there's some real question about whether this is --

8    there's a misrepresentation to the Court about what

9    this document is, I don't think it's appropriate, and

10   the Court will overrule the objection.  I think there

11   is a sufficient general compliance with what the Court

12   was trying to do to keep this situation from arising

13   where we don't know what everything is, but there's no

14   perfect way to get it done, but part of it is because

15   of the schedule that we find ourselves in, where

16   everyone suggests the case needs to be concluded so

17   that if it impacts the elections in 2018, that that

18   could be done.  So this Court is going to have a

19   thousand pages to look at, too, and it's not going to

20   have a long time to look at it.  So I think all of us

21   will suffer some things here, but I don't think there's

22   an actual prejudice.  I think there's clearly some

23   inconvenience and maybe burden on the plaintiff, but

24   not to the degree that I think it should be kept out.

25   So on that basis the Court will overrule the objection.

1    You may continue.

2              **MR. RAILE:**  Thank you, Your Honor.

3    BY MR. RAILE:

4    **Q.**   Mr. Brady, we were discussing this race here that

5    I'm circling.  It's the second one on the 2016 list,

6    and what office is that for?

7    **A.**   That would be for the U.S. House seat.

8    **Q.**   And is that a general or primary?

9    **A.**   This is a primary.

10   **Q.**   And who is the candidate?

11   **A.**   That would be the Honorable Sanford Bishop.

12   **Q.**   Do you know Mr. Bishop's race?

13   **A.**   Yes, I do.  He is African American.

14   **Q.**   How do you know that?

15   **A.**   I know him personally.

16   **Q.**   Is he running against anyone?

17   **A.**   Not in the primary, no, sir.

18   **Q.**   So did he win?

19   **A.**   If he wins, he will be forced to face a republican

20   candidate in the general election.

21   **Q.**   The next election, what office is that for?

22   **A.**   This is the clerk of superior court of Sumter

23   County.

24   **Q.**   And who was the prevailing candidate?

25   **A.**   That would be Ms. Cortisa Barthell.

1    Q.    Do you know her race?

2    A.    Yes, sir.  She's African American.

3    Q.    Do you know the race of her opponents?

4    A.    Yes, sir.  Ms. Crommer and Ms. Harry are both

5    Caucasian.

6    Q.    And what was the percentage of the vote that the

7    victorious candidate received?

8    A.    79.1 percent.

9    Q.    And is that a primary or a general election?

10    A.    This is a primary.

11    Q.    So what happens next?

12    A.    Well, what happens is if there were a Republican

13    contestant, then in the general election she would face

14    the Republican.

15    Q.    Okay.  Let's go down to the next election.

16    district two, County Board of Education, do you see

17    that there?

18    A.    Yes, sir.

19    Q.    And how many candidates are in that race?

20    A.    One.

21    Q.    And who is that?

22    A.    That would be Ms. Meda Krenson.

23    Q.    Do you know --

24    A.    This is also a nonpartisan election.

25    Q.    What date was it on?

1    A.   May 24th, 2016.

2    Q.   Do you know why it's on that date?

3    A.   Because that's when the latest set of legislation

4    and the latest set of regulations mandated that it be.

5    Q.   Do you have any knowledge about that legislation?

6    A.   I am familiar with the piece of legislation that

7    allowed this election to take place, but as far as --

8    the state legislature makes routine housekeeping

9    changes in the rules.  They do things all the time, and

10   as exactly why it's on May the 24th, no, sir, I'm not

11   privy to what that decision.  It doesn't really matter

12   to me.  I just hold them when they tell me to.

13   Q.   Understood, sir.  Next election, district four,

14   just one candidate again?

15   A.   Yes, sir.

16   Q.   And who is that?

17   A.   That would be Mr. Rick Barnes.

18   Q.   Do you know his race?

19   A.   He is Caucasian.

20   Q.   Let's scroll down.

21   A.   All right.

22   Q.   Next race, what district is -- well, first all

23   what election is this?

24   A.   This is, again, the May 24th nonpartisan election,

25   school board.

1    Q.    And what district is it for?

2    A.    This is for one of the at-large positions.

3    Q.    Okay.  And do you know the race of either

4    candidate?

5    A.    Yes, sir, I do.  Mr. Coley is African American.

6    Ms. Roland is Caucasian.

7    Q.    And who was the victorious candidate?

8    A.    Ms. Roland.

9    Q.    Next race.  What election is this?

10   A.    We've changed elections.  This is the general

11   election.  That would be November of 2016.  This is

12   also, what you just highlighted, is the presidential

13   election.

14   Q.    Okay.  We already talked -- we talked about the

15   two sides, the left side and right side.  Let's focus

16   on the right side, and what county is -- are these --

17   is this information for that I just boxed?

18   A.    This is for Sumter County.

19   Q.    And who, which candidate won the county?

20   A.    That would be Ms. Hillary Clinton.

21   Q.    Do you know her race?

22   A.    She is Caucasian.

23   Q.    Do you know her political party?

24   A.    She is a Democrat.

25   Q.    And who was her main opponent?

**A.**   Her main opponent was Mr. Donald Trump.

**Q.**   Do you know his race?

**A.**   He is Caucasian.

**Q.**   Okay.  And Ms. Clinton won Sumter County as a Democrat; is that right?

**A.**   Yes, sir, she did.

**Q.**   Next race, U.S. Senate, who are the candidates.

**A.**   The candidates would be Mr. Barksdale, Mr. Buckley and Mr. Isakson.

**Q.**   Do you know the race of any of those candidates.

**A.**   Mr. Isakson is Caucasian, but I am uncertain of the other two.

**Q.**   Okay.  And what's Mr. Isaacson's political party?

**A.**   He is a Republican.

**Q.**   And what percentage of the vote did he obtain in Sumter County?

**A.**   He accrued 51.6 percent of the vote.

**Q.**   What percentage did his lead opponent get?

**A.**   His main opponent was Mr. Barksdale, and he was able to accrue 46.5 percent of the vote.

**Q.**   So we have a democratic winner in the presidential contest, and on the same day a republican winner in the senate contest in Sumter County; is that correct?

**A.**   Yes, sir.

**Q.**   Okay.  Let's flip to the next page, page 28, and

1    let's zoom in on the top of the page.  And what is this

2    first race that you see there?

3    A.    The first race is the U.S. House of

4    Representatives seat.

5    Q.    And who are the candidates?

6    A.    That would be the Honorable Mr. Sanford Bishop and

7    Mr. Greg Duke.

8    Q.    And what race is Mr. Bishop?  I think we already

9    said.

10   A.    He is African American.

11   Q.    And what was the result of that race?  Well, what

12   race was Greg Duke?

13   A.    I'm sorry, say again.

14   Q.    Do you know the race of his opponent?

15   A.    Yes, Mr. Duke is a Caucasian.

16   Q.    Okay.  What was the result in Sumter County?

17   A.    In Sumter County Mr. Bishop was able to obtain

18   58 percent of the vote.

19   Q.    And that's countywide?

20   A.    Yes, sir.

21   Q.    And was he victorious?

22   A.    Yes, sir, he was.

23   Q.    All right.  Next race.  All right.  What's the

24   next race on the list, Mr. Brady?

25   A.    The next race on the list is the public service

commissioner, referred to as A and B, this is A.

**Q.**   What geographic territory does this office cover?

**A.**   Hmm --

**Q.**   Is that statewide?

**A.**   Oh, there are two of the commissioners.  It's my understanding that the state is split in half.

**Q.**   And who were candidates in this race?

**A.**   That would be Mr. Eric Hoskins and Mr. Tim Echols.

**Q.**   Do you know the race of either of those candidates?

**A.**   I'm uncertain.

**Q.**   And who was victorious?

**A.**   That would be Mr. Echols.

**Q.**   And was he victorious in Sumter County as well as the state?

**A.**   Yes, sir.

**Q.**   And what political party is he from?

**A.**   He is affiliated with the republican party.

**Q.**   Okay.

        **MR. SELLS:**  Your Honor, I want to object as repetitive and superfluous, a waste of time.  This exhibit is in the record.  He's just testifying to the numbers that are on the screen now.  Is there some purpose?

        **MR. RAILE:**  Your Honor, he's testifying to

1    the results and where he knows, to the race of the

2    candidate.

3            THE COURT:  All right.  I'll give both sides

4    the opportunity to present what they believe is

5    pertinent.  All right.  Objection is overruled.  You

6    may continue.

7    BY MR. RAILE:

8    Q.   What's the next race, Mr. Brady?

9    A.   The next one is the state senate race.

10   Q.   And is that an opposed race, an opposed contest?

11   A.   No, sir, it is not.

12   Q.   And do you know the race of Mr. Sims?

13   A.   Actually it's Ms. Sims, and, yes, she is African

14   American.

15   Q.   Okay.  Next race?

16           THE COURT:  Of course, the Court was not

17   suggesting that we were going to go through the whole

18   list.

19           MR. RAILE:  Yes, Your Honor.

20           THE COURT:  Did I understand you correctly?

21   I supposed there were particular races that you wanted

22   to point out to the Court through this witness.

23           MR. RAILE:  Yes, Your Honor, I will --

24           THE COURT:  So when I overruled Mr. Sells'

25   objection, that was with an idea I would give both

1    sides to point out what they think is pertinent, but

2    certainly I don't have need to have the whole list read

3    to the Court.

4        **MR. RAILE:**  Understood, Your Honor, and I

5    will keep that in mind and try to keep this as short as

6    possible.

7    **BY MR. RAILE:**

8    **Q.**   Mr. Brady, let's look down -- scroll down on the

9    page to this election right here.  What election did I

10   just highlight or circle?

11   **A.**   Scroll back up the page just a little bit, please.

12   I missed the date of this election.  This is hmm --

13   **Q.**   I'll represent to you that it's November 8th.

14   It's on the previous page.

15   **A.**   Oh, okay.  All right.  November 8th and then that

16   was the clerk of superior court, Sumter County.

17   **Q.**   And we saw the primary.  What's the result of the

18   general?

19   **A.**   The result of the general is Ms. Cortisa Barthell

20   was elected to the clerk of superior court.

21   **Q.**   Mr. Brady, could you look at the elections from

22   there to the bottom of the page and tell me if you can

23   identify the race of any of the candidates who are

24   listed there?

25   **A.**   Yes sir, I can.

1    **Q.**    And which ones?

2    **A.**    Okay.  With regard to what's on the screen now,

3    Adam Smith is Caucasian, Plez Harden is Caucasian,

4    Cortisa Barthell is African American, Pete Smith is

5    Caucasian, and Greg Hancock is Caucasian, Mr. Aldridge

6    is Caucasian, Ms. Johnson is Caucasian, and then down

7    below at the county commission, Mr. Clay Jones is

8    African American, Mr. Harvey Clayborne is African

9    American, and the last one listed would be Mr. Torbert,

10   he is Caucasian.

11           **MR. RAILE:**  And could you -- Mr. Conner,

12   could you scroll all the way to the bottom of the page?

13   **A.**    And Mr. Jordan down at the bottom.  The last one

14   would be Mr. Thomas Jordan.  He is African American.

15   **Q.**    All right.  Let's look at page 23.  And let's

16   start with the -- and what year is this, Mr. Brady?

17   **A.**    This is March the 18th, 2014.  This is a special

18   election.

19   **Q.**    Okay.  Do you know why it's a special election?

20   **A.**    Yes, sir.  The -- first of all, the State of

21   Georgia mandates that elections to fill vacancies take

22   place in March, and there are different dates,

23   depending on if it's an even or an odd number year.

24   But what you're seeing here -- well, what's been pulled

25   up on the screen is also in Georgia, it's not possible

1    to remove an incumbent from their job, okay, unless

2    they've either been lawfully recalled or unless there

3    is an election held, and they are duly relieved of

4    their position.  This election took place in an effort

5    to make the conversion from a nine member school board

6    to a seven member school board, and it was to allow

7    candidates to exit their seat so that the reelection

8    process could begin.

9    Q.   And those -- just the school board elections

10   here --

11   A.   Yes, sir.

12   Q.   -- can you identify the race of any of the

13   candidates?

14   A.   Yes, sir.  Mr. Williams is Caucasian, Ms. Krenson

15   is Caucasian, Ms. Fitzpatrick is African American, Ms.

16   Taft is African American, Mr. Mock is Caucasian, Ms.

17   Pride is African American.

18   Q.   So in this race here in district four, that is two

19   black or African American candidates running against

20   each other; is that right?

21   A.   Yes, sir.  That is correct.

22   Q.   And who is victorious in that race?

23   A.   In that particular race that would be Ms. Taft.

24   She was able to obtain 58.4 percent of the vote that

25   was cast.

1    Q.   Great.  Now, could you look down at or scroll down

2    to the second half of the page which has other

3    elections.  Do you note the race of any of the

4    candidates in those elections?

5    A.   I am familiar with Mr. Bishop.  He's African

6    American.  I am uncertain of any of the rest of them.

7    Q.   Very good.  All right.  Let's turn to the next

8    page, page 24.  And the top half of the page, can you

9    tell us what elections these are?

10   A.   These are school board elections, but I miss the

11   heading at the top.  I'm uncertain of the date.

12          MR. RAILE:  Mr. Conner, could you scroll to

13   the top?

14   Q.   And actually this carries over from the last page.

15   Let's look at the very bottom of page 23.  Do you see

16   the very bottom it just carries over what that says

17   there?

18   A.   Yes, that says County Board of Education.

19   Q.   Now, does that refresh your recollection of what

20   the --

21   A.   Yes, sir.  This is May the 20th, 2014.

22   Q.   Okay.  And why is an election being held on this

23   date?

24   A.   May the 20th of 2014 would have been the day that

25   was assigned as the primary election for the partisan

1    elections to take place in November.  It would also

2    have been the day designated to elect the nonpartisan

3    candidates of the school board.

4    **Q.**   Why was there an election on that date?  Didn't we

5    just see an election a couple of months earlier?

6    **A.**   Yes, sir, we did.  This is the first election that

7    was held entirely under the seven-member plan.

8    **Q.**   And did you administer the election in March?

9    **A.**   Yes, sir.

10   **Q.**   And did you administer the election in May?

11   **A.**   Yes, sir.

12   **Q.**   Okay.  All right.  Let's turn to page 24 then.

13   All right.  Can you tell us the race of any candidates

14   you recognize in that first set of school board

15   elections?

16   **A.**   Yes, sir, I can.  Ms. Alice Green is African

17   American, Ms. Lockhart and Mr. Smith are Caucasian.  In

18   the next race Mr. Bird and Ms. Krenson are Caucasian

19   and Ms. Pride is African American.  In the next

20   election, which would be district seat three, that

21   would be Ms. Fitzpatrick is African American, Mr. Reid

22   is Caucasian.  In district four, Mr. Barnes and Mr.

23   Houston were both Caucasian.  In district five

24   Ms. Green is African American, Mr. Griggs is Caucasian.

25   Then moving down to the at-large, Mr. Coley is African

1    American, Mr. Kitchen is Caucasian, Ms. Roland is

2    Caucasian, and Ms. Taft is African American.  And going

3    down to the last race, Mr. Busman is Caucasian and Mr.

4    Pless is African American.

5    Q.   All right.  Let's scroll down to the bottom half

6    of the page.  And do you know what elections these are,

7    Mr. Brady?

8    A.   Yes, sir.  This is July 22nd, 2014.  These are

9    general primary runoff, excuse me.

10   Q.   Do you recognize the race of any of the candidates

11   in those elections?

12   A.   I am uncertain of the state school superintendent,

13   but at the county level, the Board of Education,

14   district two that would be Mr. Byrd is Caucasian and

15   Ms. Krenson is Caucasian, Mr. Coley is African

16   American, and Ms. Roland is Caucasian.

17   Q.   Okay.  And the next election is on November 4th,

18   and the first one is for U.S. Senate.  Do you see that

19   down there, Mr. Brady?

20   A.   Yes, sir, I do.

21   Q.   Do you recognize the race of any of those

22   candidates?

23   A.   I -- Ms. Nunn is Caucasian.  I'm uncertain of Ms.

24   Swafford, and Mr. Perdue is Caucasian.

25   Q.   All right.  Let's turn to the next page.  Do you

1    see the U.S. House race there?

2    **A.**    Yes, sir.

3    **Q.**    And what race is Mr. Bishop?  We've already said.

4    **A.**    Mr. Bishop is African American, and Mr. Duke is

5    Caucasian.

6    **Q.**    And was Mr. Bishop successful in Sumter County?

7    **A.**    Yes, he was.

8    **Q.**    Do you recognize the race of any of the other

9    candidates that you see on the screen there, Mr. Brady?

10   **A.**    Yes, sir.  I'm familiar with a few of them.

11   **Q.**    Well, which ones do you know?

12   **A.**    Mr. Carter is Caucasian, for the governor's race,

13   Mr. Deal is Caucasian.  I am uncertain of Mr. Hunt.  I

14   am certain that Mr. Cagle is Caucasian.  I'm uncertain

15   of Ms. Stokes.  I am certain that Brian Kemp is

16   Caucasian.  I'm uncertain of Ms. Carter.  Those are the

17   only ones that I have any -- that I'm sure of.

18   **Q.**    Okay.  Let's scroll down to the bottom of the

19   page.  Do you recognize the race of any of the

20   candidates here in this screen?

21   **A.**    Not until we get down to the state senate level,

22   at that level, yes, sir, I'm familiar with the

23   candidates.

24   **Q.**    Okay.  Tell us what you know.

25   **A.**    Ms. Freddie Powell Sims is African American.

1     Mr. Greg Kirk is Caucasian.  Mr. Mike Cheokas is

2     Caucasian, and I believe Mr. Brown is African American.

3     Q.    All right.  Turn to the next page 26.  Do you

4     recognize the race of any of any of the candidates on

5     this page, Mr. Brady?

6     A.    Yes, sir.  All three of those are Caucasians.

7     Q.    Okay.  Let's go to page 21.  We see at the top

8     Mr. Bishop in a primary.  Let's look at the election,

9     these two elections right here?

10    A.    The middle to the general election from 2012?

11    Q.    Yes, sir.

12    A.    Yes, sir.

13    Q.    And what race is the first one here?

14    A.    That would be the President of the United States,

15    the candidates would be Mr. Barack Obama, Mr. Gary

16    Johnson, and Mr. Mitt Romney.

17    Q.    All right.  Do you recognize the race of any of

18    those candidates?

19    A.    Yes, sir.  Mr. Obama is African American.

20    Q.    How did they perform in Sumter County?

21    A.    In Sumter County Mr. Obama was successful,

22    achieving 53.9 percent of the vote.

23    Q.    And we see U.S. House down here.  We have already

24    discussed Mr. Bishop.  Was he successful?

25    A.    Mr. Bishop and Mr. House.  Mr. House is Caucasian.

1    In that particular election, Mr. Bishop was successful

2    garnering 59.7 percent of the vote.

3    Q.    Do you recognize the race of any candidates in the

4    public service commissioner race, Mr. Brady?

5    A.    No, sir, I don't know any of them.

6    Q.    Okay.  Scroll down to the bottom of the page.

7    These races here for state house and senate, do you

8    recognize the race of any of those candidates?

9    A.    Yes, sir.  Ms. Freddie Powell Sims is African

10   American.  Mr. John Crosby is Caucasian.  I believe Mr.

11   Kevin Brown is African American.  Mr. Mike -- excuse

12   me, Michael Arthur Cheokas is Caucasian, and Mr. Ed

13   Rynders is Caucasian.

14   Q.    Okay.  Let's turn to the next page.  Do you

15   recognize the race of any of the candidates on this

16   page?

17   A.    Yes, sir, I do.

18   Q.    And can you tell who those people are?

19   A.    Adam Smith, the tax commissioner is Caucasian.

20   Mr. Plez Harden, the district attorney, is Caucasian.

21   Ms. Nancy Smith, the clerk of superior court is

22   Caucasian.  Mr. Pete Smith is the sheriff is Caucasian.

23   The coroner, Mr. Greg Hancock is Caucasian.  Both of

24   the candidates for chief magistrate are Caucasian.

25   Down at the county commission race there, Mr. Clay

1    Jones and Mr. Harvey Claiborne are both African

2    American.  County commission, Ms. Tangalia Robinson, I

3    believe is African American and Mr. Tobert is

4    Caucasian.  Ms. Andrea Brooks is African American and

5    Mr. Harbuck is Caucasian.

6    **Q.**   Now, Mr. Brady, I understand that you became the

7    registrar and supervisor of elections in 2012; is that

8    correct?

9    **A.**   Yes, sir.

10   **Q.**   All right.  So we've gone through 2012, and we

11   will leave it at that.  Thank you sir.

12           **MR. RAILE:**  No further questions at this

13   time, Your Honor.

14           **THE COURT:**  You're saying no further

15   questions of the witness?

16           **MR. RAILE:**  On direct, Your Honor.  And I

17   assume --

18           **THE COURT:**  All right.  Cross examination,

19   Mr. Sells?

20           **MR. SELLS:**  Yes, Your Honor.

21                     **CROSS EXAMINATION**

22   BY MR. SELLS:

23   **Q.**   Good morning, Mr. Brady.

24   **A.**   Good morning, sir.

25   **Q.**   You have been registrar in Sumter County since

1    June of 2012, correct?

2    **A.**   No, sir, actually it's July of 2012.

3    **Q.**   July.  Thank you for the correction.  And there

4    was not an election held under the prior -- scratch

5    that.  There was not a general election held under the

6    prior plan during your tenure on the -- as registrar in

7    Sumter County, correct?

8    **A.**   I'm sorry.  Ask me again.  I want to make sure I

9    understand your question.

10   **Q.**   Yes.  You never administered a general election

11   under the nine-member plan, did you?

12   **A.**   Yes, sir, actually I did.

13   **Q.**   Can you tell us when that election took place?

14   **A.**   Again, I want to be certain that I understand your

15   question.  It was -- I suppose that I misspoke in that

16   it was a special election, not a general election, but

17   it took place in March of 2014.

18   **Q.**   Okay.  So, again, I'm going to ask you.  You never

19   administered a general election under the nine-member

20   plan that existed prior to House Bill 836?

21   **A.**   No, sir.

22   **Q.**   Special elections are costly for registrars in

23   counties like yourself, right?

24   **A.**   Yes, sir, they are.

25   **Q.**   I've spoken with a lot of registrars in my day,

1    and the two things registrars seem to hate are special

2    elections and close elections; isn't that right?

3    A.   Yes, sir.  Those are not my preferred way of doing

4    it.

5    Q.   And so when you testified earlier about, in your

6    experience the elections under the at-large plan are

7    cheaper and easier, you were referring back to your

8    experience with the special election under the

9    nine-member plan, right?

10   A.   Yes, sir.  I was referring to any of the elections

11   that I've held that had at-large seats, and those in

12   this instance would be, yes, the special election.

13   Q.   And that's because you have no experience

14   administering the nine-member plan other than the

15   special election, right?

16   A.   The specific answer to that is yes.

17   Q.   I want to ask you about Defendant's Exhibit 1, the

18   lengthy returns?

19   A.   Uh-huh.

20   Q.   You did not compile these, did you?

21   A.   No, sir, I did not compile it.

22   Q.   Someone provided them to you, correct?

23   A.   Yes, sir.

24   Q.   And these do not contain the complete returns for

25   each election year of every race that was on the ballot

1    in the election that's reflected on them, correct?

2    **A.**    That would require some clarification.  The

3    records that are kept by the state are records of

4    elections held from the county level and above.  They

5    do not maintain -- they don't contain the municipal

6    elections.

7    **Q.**    Okay.  Well, that's not what I'm getting at.

8    **A.**    So that's -- so in answer to your question, no,

9    sir, they don't contain 100 percent, because there are

10   elections that are not maintained by the state.  Of the

11   elections that the state maintains the records of, all

12   of the information available is presented and it's

13   available.  Everything is out there.

14   **Q.**    Okay.  But --

15              **THE COURT:**  Can you speak a little louder?

16   Your voice dropped.

17              **THE WITNESS:**  Oh, I'm sorry.  Excuse me.

18   **BY MR. SELLS:**

19   **Q.**    In the 1992 general election, for example,

20   president was on the ballot, right?

21   **A.**    Should have been, yes, sir.

22   **Q.**    Maybe senate on the ballot depending on the cycle,

23   right?

24   **A.**    Possibly, yes, sir.

25   **Q.**    And there may have been other statewide races,

1    lieutenant government, whatnot, on the ballot --

2    **A.**    Yes, sir.

3    **Q.**    -- in Sumter County?

4    **A.**    There would have been complete ballots, yes, sir.

5    **Q.**    Yeah.  And do you know whether Defendants's

6    Exhibit 1 contains the results in Sumter County for

7    president or any of those other races?

8    **A.**    Are you asking me does this document contain all

9    of those?

10   **Q.**    Right.

11   **A.**    I don't know if it does, no, sir.

12           **THE COURT:**  Which document are we referring

13   to?  Are we referring to Exhibit 1 or Exhibit 10?  You

14   use the term this document, so I don't know what you

15   are referring to.

16           **MR. SELLS:**  Your Honor, thank you for

17   allowing me to clarify.  Right now I'm referring to

18   Exhibit 1.

19           **THE COURT:**  All right.

20           **MR. SELLS:**  It's the big exhibit.

21           **THE COURT:**  All right.  I just wanted to be

22   sure I knew what you all were talking about between the

23   two of you.

24           **MR. SELLS:**  Yes.

25   BY MR. SELLS:

1    Q.    And, in fact, Exhibit 1 only contains the results

2    for the second congressional district from the 1992

3    elections; isn't that right?

4    A.    Yes, sir, that is correct.

5    Q.    Do you know who edited these election returns?

6    A.    By edit, you mean accrued it to put in this

7    document?

8    Q.    Well, do you know who decided to include the

9    congressional race, but not the presidential race?

10   A.    Oh, I don't know.  No, sir.

11   Q.    You don't know who did that, right?

12   A.    No, sir.

13   Q.    And you don't know what criteria that person or

14   people used in selecting the election returns that are

15   included in Defendant's Exhibit 1, do you?

16   A.    No, sir.  I can't attest to the criteria used.

17   Q.    And as to Defendant's Exhibit 10, did you prepare

18   Defendants's Exhibit 10?  That's the summary that you

19   were just going over with Mr. Raile?

20   A.    Did I prepare it?

21   Q.    Yes, did you prepare it?

22   A.    No, sir, I didn't.

23   Q.    Do you know who prepared it?

24   A.    No, sir.

25   Q.    Do you know what criteria the preparer of that

1    document used to select which elections would be

2    summarized in that document?

3    **A.**    No, sir.  I can't attest to that either.

4    **Q.**    Are you familiar with the term cherry picking?

5    **A.**    In a lot of different -- yes, sir, in a lot of

6    different environments.

7    **Q.**    Explain to me your understanding of the term

8    cherry picking?

9    **A.**    Cherry picking, with regard to the accumulation of

10   information is picking the information that suits

11   whatever image you are trying to present.  Cherry

12   picking with regard to buying a new car, you know, is

13   essentially the same thing as determining what -- what

14   most meets your needs.  We --

15   **Q.**    Now, Mr. Brady, you're not qualified to offer any

16   expert opinions on racial voting patterns in Sumter

17   County, are you?

18   **A.**    No, sir.

19   **Q.**    And you haven't conducted any statistical analysis

20   of the voting patterns of African Americans in Sumter

21   County, have you?

22   **A.**    No, sir.  Both of those items fall outside the

23   scale of what I do.

24   **Q.**    And so you don't know which candidates on the

25   election returns in Exhibit 1, from the defendants, or

1    Exhibit 10, from the defendants, are the candidates

2    preferred by African American voters in Sumter County?

3    **A.**   No, sir.

4    **Q.**   Those election returns don't indicate the

5    preference of minority voters, right?

6    **A.**   From the aspect that they are the winners and the

7    minority voters are required for them to have won, yes,

8    they do.  But in answer to your question the way that

9    you are phrasing it, no, sir, there's not any way to

10   tell.

11   **Q.**   Does your office qualify candidates for the

12   superior court clerk?

13   **A.**   Yes, sir, we do.

14   **Q.**   You may know the answer to this.  If you don't,

15   just give me an approximate one.  When is the

16   qualifying date for candidates seeking to qualify for

17   the office of superior court clerk?

18   **A.**   The qualification period is mandated by law.  It

19   lasts three and a half days and it completes on the

20   fourth day after the call of the election.  So

21   approximately the 25th day before the election itself.

22   Is that what you were asking, or were you asking the

23   date itself?  The date, I don't recall.

24   **Q.**   So about 25 -- that was a pretty fantastic answer,

25   but 25 days, roughly, before the primary election?

1    A.    Yes, sir.

2    Q.    Are independent candidates allowed to run in that

3    race for superior court clerk?

4    A.    Yes, sir.  It would be possible for an independent

5    candidate to run in that primary, yes.

6    Q.    And what is the qualification date for independent

7    candidates?

8    A.    I believe it to be the same period of time.

9    Q.    It would be the same period of time.  And

10   candidates who wish to qualify for the office of

11   superior court clerk have to indicate whether they want

12   to run as a Republican or as a Democrat or as an

13   Independent, correct?

14   A.    Yes, sir.

15   Q.    Okay.  And all of those applications are due at

16   the same time, right?

17   A.    Yes, sir.

18   Q.    So it's not possible, under Georgia law, for a

19   candidate to emerge once one knows the winner of the

20   democratic primary, right?  You are kind of stuck with

21   what you got if nobody files in the republican primary,

22   it's too bad, there's no opposition?

23   A.    This is assuming that there were no contestants on

24   the Republican primary; that would be correct, yes.

25   Q.    And in the 2016 superior court clerk race there

1    were no contestants in the Republican primary, were

2    there?

3    **A.**   That is correct.

4    **Q.**   And so Ms. Barthell or Bartel, I'm not sure how

5    it's pronounced.

6    **A.**   Barthell, yes, sir.

7    **Q.**   She was unopposed in the general election,

8    correct?

9    **A.**   Yes, sir, she was.

10   **Q.**   And it would not have been possible for a

11   candidate to sign up to run against her on the ballot

12   after her election as the Democratic nominee, right?

13               **THE COURT:**  What was answer?

14               **THE WITNESS:**  Sir?

15               **THE COURT:**  I did not hear your answer.

16               **THE WITNESS:**  I haven't yet --

17               **THE COURT:**  That's what I am saying.

18               **THE WITNESS:**  Yes, sir, sorry.

19               **THE COURT:**  I thought I may have missed it.

20               **THE WITNESS:**  I was confirming what I was

21   going to say.

22               **THE COURT:**  All right.

23               **THE WITNESS:**  My apologies, sir.

24               **THE COURT:**  If you need to restate your

25   question or if he needs to state his answer, that's

1    fine.  I just wanted to make sure I did not miss it as

2    opposed to him not answering it.

3            **MR. SELLS:**  Yes.

4    **BY THE WITNESS:**

5    **A.**   The outcome of the primary dictates the candidate

6    representing the political party.  Should there be no

7    opposition from the other political party, there always

8    exists the opportunity for a write-in candidate to file

9    appropriate procedures and become an authorized

10   write-in candidate.  That would be the only addition

11   that you would have to the ballot.

12   **BY MR. SELLS:**

13   **Q.**   Well, let me ask you for clarification of that,

14   because do write-in candidates appear on the ballot?

15   **A.**   Yes.

16   **Q.**   Their names appear on the ballot?

17   **A.**   No, their names don't appear.  There is a list of

18   authorized write-in candidates or certified write-in

19   candidates that is available.

20   **Q.**   But it does not appear on the ballot?

21   **A.**   No, sir, it doesn't.

22   **Q.**   So a voter could go into your office and ask for

23   the list, maybe look it up on the Internet, but it does

24   not appear on the ballot, correct?

25   **A.**   That's correct.

1  Q.   Do you have to file to be a write-in candidate?

2  A.   There is a procedure that has to be followed, yes,

3  sir.

4  Q.   And there were no qualified write-in candidates

5  opposing Ms. Barthell?

6  A.   No, sir, there weren't.

7  Q.   Mr. Brady, the Board of Elections and

8  Registration, your office, does not keep records

9  denoting the race of candidates; isn't that right?

10  A.   Specifically, yes.  Candidates, no, sir, we don't.

11  To be a candidate it is required that you be a

12  registered voter, and the only time race appears

13  anywhere is for identification purposes on a voter

14  registration form.

15  Q.   So your testimony this morning as to the race of

16  candidates is based on your personal knowledge?

17  A.   Yes, sir.  These are folks that I know, or I'm

18  familiar with.

19       MR. SELLS:  Your Honor, may I have a moment

20  to confer?

21       THE COURT:  Yes.

22       MR. SELLS:  Thank you, Your Honor.  Those are

23  my questions on cross.

24       THE COURT:  All right.  Is there any

25  redirect, Mr. Raile?

1          **MR. RAILE:**  Briefly, Your Honor.

2                    **REDIRECT EXAMINATION**

3      BY MR. RAILE:

4      **Q.**    Mr. Brady, do you remember Mr. Sells' question,

5      series of questions that led up to something about

6      cherry picking?

7      **A.**    Yes, sir.

8      **Q.**    Now, you reviewed each race, if I understood your

9      testimony correctly, in Defendant Exhibit 10, right?

10     **A.**    Which one is that?

11     **Q.**    The short one.

12     **A.**    Yes, sir, I did.

13     **Q.**    And did you find any race listed in Exhibit 10

14     that appeared in this exhibit that was not on the

15     Secretary of State's website?

16     **A.**    No, sir, I did not.

17     **Q.**    So, for example, the race between Hillary Clinton

18     and Donald Trump was on the Secretary of State's

19     website; is that correct?

20     **A.**    Yes, sir.

21     **Q.**    And someone interested in learning about Sumter

22     County voting patterns would have access to that; is

23     that right?

24     **A.**    Yes, sir, they would.

25     **Q.**    And were you in the courtroom yesterday, or I

1    guess two days ago, to listen to the expert of the

2    plaintiffs, the plaintiff testify?

3    A.    No, sir, I was not in the courtroom for that.

4    Q.    Okay.

5    A.    I was not allowed back in until the afternoon.

6    Q.    Now, Mr. Sells asked you about the big exhibit

7    too.  Do you remember that?

8    A.    Yes, sir.

9    Q.    And he mentioned, for example, that congressional

10   district two is included?

11   A.    Yes, sir.

12   Q.    Do remember that?  What congressional district is

13   Sumter County in?

14   A.    Congressional district two.

15   Q.    Would congressional district returns from

16   congressional district five tell us anything about

17   voting patterns in Sumter County?

18   A.    No, sir.  District five would -- any information

19   you garnered from district five would not be germane to

20   Sumter County.

21   Q.    Now, Mr. Sells asked you, can you tell from

22   election results whether members of one racial group

23   tended to support this or that candidate.  Do you

24   remember that question?

25   A.    Yes, sir.

1    Q.   And I believe your response was that no, you

2    can't.

3    A.   No, sir, specifically I can't.

4    Q.   So if a witness came in and testified that they

5    understood someone to be the preferred candidate of the

6    black community based on just the election results,

7    there wouldn't be any basis for that, would there?

8    A.   No, sir.  I would have difficulty accepting that.

9         MR. RAILE:   Thank you, Your Honor.  No

10   further questions.  Oh, and Your Honor, I just wanted

11   to clarify for the record.  I know I had moved to admit

12   Exhibit 10 in, and there had been an objection that was

13   overruled.  And I just want to clarify, am I correct,

14   for the record, that Exhibit 10 was, in fact, admitted

15   over objection?

16        THE COURT:   Admitted over objection.  That's

17   correct.

18        MR. RAILE:   Thank you, Your Honor.

19        MR. SELLS:   Very brief recross, Your Honor.

20        THE COURT:   All right.

21             RECROSS EXAMINATION

22   BY MR. SELLS:

23   Q.   Mr. Brady, to follow up on that last question, let

24   me ask you this.  You're not from Sumter County, right?

25   A.   I have been a resident of Sumter County since

1   2010, but my initial upbringing is not in the county.

2   Q.   And, in fact, you listed off a very long list of

3   places you've lived over the course of your life,

4   right?

5   A.   Yes, sir.

6   Q.   So you've only had an opportunity to observe

7   voting patterns in Sumter County for seven years,

8   correct?

9   A.   Yes, sir.

10   Q.   Thank you.

11            THE COURT:  Anything further?

12            MR. RAILE:  Nothing further, Your Honor.

13            THE COURT:  All right.  I think -- is he here

14   in his representative capacity also?  I think that's

15   what we agreed?

16            MR. SELLS:  Yes, Your Honor, that's the

17   agreement.

18            MR. RAILE:  Yes.

19            THE COURT:  All right.  So you may remain in

20   court, of course, but you are excused as far as your

21   testimony.

22            THE WITNESS:  Thank you, sir.

23            THE COURT:  You may call your next witness.

24            MS. MCKNIGHT:  Your Honor, defendant calls

25   expert witness Karen Owen to the stand.

1          **THE COURT:**  All right.

2          **COURTROOM DEPUTY:**  Do you solemnly swear or

3    affirm that the testimony you are about to give in the

4    case before the case will be the truth, the whole

5    truth, and nothing but the truth?

6          **THE WITNESS:**  Yes.

7          **THE COURT:**  All right.  Ms. McKnight, I

8    thought you disappeared.  You may proceed.

9          **MS. MCKNIGHT:**  Thank you, Your Honor.

10                   **KAREN LESLIE OWEN**

11    **Witness, having first been duly sworn, testified on**

12                 **DIRECT EXAMINATION**

13    **BY MS. MCKNIGHT:**

14    **Q.**   Good morning, Dr. Owen.

15    **A.**   Good morning.

16    **Q.**   First, for the record, could you state your full

17    name?

18    **A.**   Karen Leslie Owen.

19    **Q.**   And what is your profession?

20    **A.**   I am an assistant professor at the University of

21    West Georgia.

22    **Q.**   And has your job changed since you submitted your

23    reports in this matter?

24    **A.**   Yes.  I was an assistant professor at Reinhardt

25    University until July 31st of this year and August 1st

1    I started a tenure track position at the University of

2    West Georgia.

3    Q.    Congratulations on the tenure track.

4    A.    Thank you.

5    Q.    And happy birthday today, too and what better way

6    to celebrate.  Let me ask, did you receive your PhD,

7    Dr. Owen?

8    A.    Yes.

9    Q.    Okay.  And in what area?

10   A.    I have a PhD in political science, the

11   concentration, the major concentration is in American

12   politics, and then I have a minor concentration in

13   methodology from the University of Georgia.

14   Q.    And, ma'am, do you have any expertise in

15   statistics?

16   A.    Yes, the minor that I have in my PhD work is

17   focused on methodology and statistics.

18   Q.    And is your statistical expertise grounded in any

19   expertise in political science?

20   A.    So the methodology I've learned has focused on

21   using statistics and social science behavior and in

22   social science analysis.

23   Q.    And you've taught political science courses in

24   Southern Politics, Legislative Politics and American

25   Government; isn't that right?

**A.**   Yes.

**Q.**   And you've done extensive research in electoral

and legislative politics, specifically women in

politics and state politics and redistricting; isn't

that right?

**A.**   Yes.

**Q.**   Okay.

        **MS. MCKNIGHT:**  And could we put up on the

screen Defendant's Exhibit DX-5 at page 23, please?

**Q.**   Dr. Owen, is this a copy of your most current

resume?

**A.**   Yes, it is.

        **MS. MCKNIGHT:**  Your Honor, at this time

defendants move for the admission of testimony and the

reports of Dr. Karen Owen as she is an expert in

statistics and political science.

        **THE COURT:**  All right.  Does the plaintiff

wish to voir dire the witness as to her qualifications

for the proposed testimony?  I understand it was --

what -- statistics and --

        **MS. MCKNIGHT:**  Political science.

        **THE COURT:**  All right.

        **MR. SELLS:**  Well, I'm not sure procedurally

how to proceed, Your Honor.  We have indicated that we

rest on our Daubert papers.  We understand the Court's

1    ruling, finding that her testimony does not

2    criticize --

3         **THE COURT:**  I haven't heard her testimony

4    here in trial.  I mean, she is being presented as an

5    expert in matters of statistics and political science.

6    The offer is, if you want to question her further as

7    for qualifications to testify in that regard, and then

8    I will hear any objection that you might have.  But,

9    you know, you have made your record objection, but the

10   Court doesn't know that what's coming out at trial

11   necessarily is going to be exactly what was submitted

12   before.  The Court hypothesized that if it was of a

13   certain weight, it probably would be admissible, but,

14   of course, it was not locked into that, because I don't

15   know exactly how things will appear.  But for the

16   proposal that she will testify giving her opinions

17   based on her expertise in statistics and the political

18   science, if you wish to voir dire her further as far as

19   those qualifications to so testify, you may do so.  If

20   you are satisfied that you've pointed out what you

21   wanted to point out to the Court, that's fine with me.

22   But I wanted to give you that opportunity if you wished

23   to otherwise.

24        **MR. SELLS:**  In that case I think it would be

25   appropriate for me to ask a question or two of voir

1    dire, Your Honor.

2            **THE COURT:**  All right.  You may do so at this

3    time.

4                    **VOIR DIRE EXAMINATION**

5    **BY MS. MCKNIGHT:**

6    **Q.**    Good morning, Dr. Owen.

7    **A.**    Good morning.

8    **Q.**    Do you recall being deposed by me on March 20th of

9    this year?

10   **A.**    Yes.

11   **Q.**    And you testified in your March 20th deposition in

12   this case that you would not say you're an expert in

13   ecological inference, correct?

14   **A.**    I did say that I was not a methodologist expert in

15   the technique of ecological inference, because a

16   methodologist, as an expert in that, would be focused

17   on trying to change the technique or advance the

18   technique.  But I am knowledgeable in how the technique

19   is used and what the technique involves and the

20   structure of the technique.

21   **Q.**    I appreciate that explanation, but that wasn't my

22   question, Dr. Owen, and I'd appreciate it if you would

23   listen to the question and then answer the question.

24   The question was, you testified in your March 20th

25   deposition in this case that you would not say you are

1   an expert in ecological inference, correct?

2   **A.**   If that's what you have exactly before you in my

3   deposition, then that's what was said.

4   **Q.**   And you don't remember what you said?

5   **A.**   I don't remember the exact quotation from the

6   deposition.

7   **Q.**   Would it refresh your recollection if I showed you

8   where in your deposition you admitted that you are not

9   an expert in ecological inference?

10  **A.**   Sure.

11       **MR. SELLS:**   Can we look at Dr. Owen's

12  deposition at page 118 of the deposition.

13  **Q.**   And, Dr. Owen, I want to call your attention to

14  lines 118 of the deposition, please, at lines 19 to 21.

15  And do you see where I asked you the question:  Do you

16  hold yourself out to be an expert in ecological

17  inference?  And your answer is:  I would not say I'm an

18  expert in that.

19       **MS. MCKNIGHT:**   Your Honor, just to enable the

20  witness to testify completely to her response to the

21  question, we need to see the complete answer to the

22  question.  So I'd ask that the entire answer be put up

23  so that Dr. Owen can testify to it.  Thank you.

24       **THE WITNESS:**   Could you ask your question

25  again, I'm sorry?

1    BY MR. SELLS:

2    **Q.**    Isn't it true that you testified in your

3    March 20th deposition in this case, quote:  I would not

4    say I'm an expert in that, end quote.  With that

5    referring to ecological inference?

6    **A.**    That is what line 21 says, and then it goes on to

7    say:  I'm trained in a tool and I know the methods

8    behind it but I don't spend my time researching EI or

9    manipulating the mathematics to create a new process.

10   No, which is what an expert would do -- want to do.

11   **Q.**   Right, you don't do those things.  That's what an

12   expert does.  You're not expert; isn't that right?

13   **A.**   I would not say it like that.

14   **Q.**   Isn't that what you said on March 20th in your

15   deposition?

16        **MS. MCKNIGHT:**  Your Honor, I would object.

17   This has gotten to the point where it's badgering the

18   witness.  The answer is clear.  Not only that, this is

19   an improper use of deposition.  The words on this page

20   that she said earlier this year are nearly identical to

21   what she just testified to a few moments ago.

22        **THE COURT:**  I'll let you all argue that.  But

23   put your questions to the witness, and we'll get

24   completed with this process.  You may continue.

25   BY MR. SELLS:

1    Q.    With regard to ecological inference, you only

2    studied ecological inference as a discrete topic within

3    two of your methods classes as you were in your studies

4    to get your PhD, correct?

5    A.    Yes, I studied ecological inference.

6    Q.    And you did not use ecological inference in your

7    dissertation?

8    A.    No, I did not.

9    Q.    And you have never taught ecological inference,

10   correct?

11   A.    Correct, because I -- I don't -- I teach research

12   methods, but I teach it to public administrators, not

13   PhD students.

14   Q.    None of your published or unpublished academic

15   writing uses ecological inference as a statistical

16   technique, right?

17   A.    What is listed currently on my CV would not

18   contain anything that has EI.  I am working on a

19   project, we've just begun about two months ago that

20   does look at -- does use EI, looking at elections in

21   the Sixth Congressional District race.

22   Q.    Well, at the time you formed your opinions in this

23   case, none of your written work had ever used EI in an

24   academic setting?

25   A.    No, it did not.

1    Q.   And, in fact, you also testified in your

2    March 20th deposition that you have never run a full

3    racially polarized voting analysis, didn't you?

4    A.   I think that's correct.

5         MR. SELLS:   Then, Your Honor, we would object

6    to the witness's testimony about the ecological

7    inference technique.  She admitted in her deposition

8    that she's not an expert in it.  She may talk about

9    kinds of statistics.  We understand that that's your

10   ruling, and we understood your ruling to be that she

11   doesn't intend to criticize Dr. McBride's application

12   of the ecological inference technique.

13        THE COURT:   All right.  If that's your

14   objection, I'll let you reserve that when we get to a

15   question about ecological inferences as to whether it

16   goes beyond the tools and the technique to give an

17   opinion.  But that's what I understand it is, and the

18   Court gave a restricted ruling, and it's hard to make a

19   -- I guess a projected sort of ruling without knowing

20   the full context.  So that's what I'll do at that

21   point, at the point that you believe that the opinion

22   being offered violates what the witness represents her

23   expertise to be, then I'll hear it at that time.  But I

24   think for the purposes of testifying with regards to

25   statistics and political sciences, as projected -- as

1    presented, the Court believes that she is sufficiently

2    qualified to do so and will allow her so to testify.

3    We are in our midday lunch break.  See you all back at

4    1:30.

5    *(RECONVENED; ALL PARTIES PRESENT, 1:35 p.m.)*

6            **THE COURT:**  All right.  You may continue, Ms.

7    McKnight.

8            **MS. MCKNIGHT:**  Thank you, Your Honor.

9            **CONTINUED DIRECT EXAMINATION**

10   BY MS. MCKNIGHT:

11   **Q.**   Dr. Owen, could you begin by addressing a topic

12   that came up yesterday, and possibly the day before

13   too, the issue of ACS data, could you begin by

14   explaining to the Court what ACS data is?

15   **A.**   ACS data is the American Community Survey.  So it

16   is survey population estimates that are released yearly

17   and then it's a running average of those estimates

18   which is different from the census data that is taken,

19   like in, 2000 or 2010 where it's an official count of

20   the population.  The ACS looks at population estimates

21   between those ten-year periods to understand and give a

22   snapshot kind of in that current year or over that

23   five-year aggregate of what the population is at a

24   particular time, and it, you know, looks at the nation,

25   states, counties, cities, and towns.

**Q.**   So does it -- would it help someone like you

identify population trends in a certain area?

**A.**   Yes, you could use it for that.

**Q.**   And in your experience is it a fairly reliable

source to help determine what a population trend is?

          MR. SELLS:  Objection, Your Honor.  Her

report contains nothing about ACS data.  This goes way

beyond anything she's been designated as an expert in.

          THE COURT:  What was the question again?

          MS. MCKNIGHT:  Your Honor, this was asking

about ACS data.  She has already been admitted as

expert in both statistics and political science.  If

you'd like me to ask her a question about her use of

ACS data in those fields, I'm happy to do so.

          MR. SELLS:  This is not a question of her

expertise, Your Honor.  I don't know what her expertise

is, because she didn't included any analysis of ACS

data in her reports, and so I have not had an

opportunity to examine her on that subject.  This is a

matter of disclosure.

          THE COURT:  Is she about to be asked about an

examination she did or an exercise that she performed

in her role as an expert?

          MS. MCKNIGHT:  Well, in her role as an expert

she has -- and I can get her to list -- to provide you

1    with this testimony that she's familiar with ACS data.

2    ACS data was released just last week, so it could not

3    have been subject to some examination by Mr. Sells --

4         **THE COURT:**  I think Mr. Sells is saying,

5    though, that she is -- there's been no indication that

6    she was going to be testifying about ACS data.

7         **MS. MCKNIGHT:**  She is going to be testifying

8    about the reliability of data and the statistics used

9    in data.  That issue, and not only about that, but

10   about how Dr. McBride used data in his own report.

11   There was plenty of testimony yesterday and the day

12   before by Dr. McBride that he limited his use of data

13   to census data in a number of circumstances.  There

14   were questions about how ACS data was used or whether

15   it was appropriate.  Here you have a statistician who

16   is an expert to rebut Dr. McBride's reports and his use

17   of statistics and data in those reports.  She's

18   certainly qualified to talk about it and it's certainly

19   within the scope of her expertise in this case.

20        **MR. SELLS:**  Perhaps I could voir dire again

21   on this issue?

22        **THE COURT:**  No, if I understand, the question

23   is about statistical data and method that the Court has

24   passed on that.  If that's what the question is about

25   and you are getting a background about it, you know, so

1      she can ultimately give her opinion as to whether a

2      certain procedure was followed and what the meaning was

3      or was not about that, then I think is allowable under

4      what the Court understood the testimony was going to

5      be.  But I think what his objection is, she's not going

6      to give an ultimate opinion about an issue in the case

7      based on ACS data.

8              **MR. MCKNIGHT:**  I don't think she's going to

9      give an opinion.  She'll -- I think ultimately we'd

10     just like her to talk about what the recent ACS three

11     points or a couple of points that the ACS data that was

12     recently released revealed or showed about these

13     population trends in this county.

14             **THE COURT:**  Well, that's close enough to what

15     I understand, if that's the case, you may proceed.

16             **MR. MCKNIGHT:**  Thank you, Your Honor.

17     BY MS. MCKNIGHT:

18     **Q.**   And do you understand that the ACS recently

19     released updated data on Sumter County?

20     **A.**   Yes.

21     **Q.**   And do you use -- have you used ACS data before in

22     your work, in your studies?

23     **A.**   I have looked at census data, and I have reviewed

24     ACS data, but I don't typically use a lot of the

25     variables that are provided in that into my current

1    research.

2    **Q.**    And, pardon me, you have reviewed the ACS data

3    about Sumter County?

4    **A.**    I reviewed, like, the factfinder sheet that

5    showed the county population over that -- within the

6    ACS release of last week.

7    **Q.**    And what does the ACS data show about Sumter

8    County's racial makeup?

9    **A.**    So if you look at the county, it says that the

10   population estimate right now is about 31,070 people

11   and --

12           **MR. SELLS:**  Objection, again, Your Honor.

13   She's testifying about data that's not in the record.

14   This came out last week.  It has not been offered as an

15   exhibit.  She's reading, presumably from memory, census

16   data into the record.  It's improper.

17           **THE COURT:**  All right.  Ms. McKnight?

18           **MS. MCKNIGHT:**  Your Honor, this objection is

19   no different from the one that you just overruled where

20   I identified for you which questions I would be asking,

21   and I'm only asking those questions of her now.  He's

22   simply renewing an objection that you've already

23   overruled.

24           **MR. SELLS:**  I respectfully disagree.

25           **THE COURT:**  Is this rebuttal?

1        **MS. MCKNIGHT:**  This is showing a population

2    trend in the county, so in a way, yes, it is rebuttal.

3        **MR. SELLS:**  But that data is not in the

4    record.

5        **MS. MCKNIGHT:**  That data was released after

6    exhibits were exchanged, and as we know plaintiffs are

7    very firm about exchanging data in time.  We gave --

8        **THE COURT:**  But --

9        **MR. SELLS:**  -- which is why it should not

10   come into the record.

11       **THE COURT:**  But it's not been submitted into

12   the record.  I mean, we are having testimony about

13   something that's not in the record, as I understand the

14   objection to be.

15       **MS. MCKNIGHT:**  Well, Your Honor, we can -- if

16   you'd like, we can prepare a printout of the ACS data

17   from the website.

18       **THE COURT:**  I'm not trying to tell either

19   side what to do in their case, but the objection is

20   that the witness is testifying about a matter that's

21   not in the record.  You know, what time is it in San

22   Francisco:  I mean, you know.

23       **MS. MCKNIGHT:**  I understand, Your Honor.

24       **THE COURT:**  I'm not being facetious, I mean,

25   but -- you all may disagree about what the use of the

1    material is and what can be derived from it or what can

2    be testified about it, but she is merely stating,

3    without support, what is shown in certain documents

4    that are not in the record or not before the Court.

5         MS. MCKNIGHT:  Okay.  I understand, Your

6    Honor.  We brought this issue up in the case.  We asked

7    Dr. McBride about it on Monday.  The plaintiffs

8    certainly have a right to rebut in their case with Dr.

9    McBride in examination of the ACS data if they'd like.

10   They have that opportunity.

11        THE COURT:  But I understood that data was

12   within Dr. McBride's materials is what I understood.

13        MS. MCKNIGHT:  Some ACS data was.  I was --

14   pardon me, I was referring to questions we had for him

15   about this recent data release.

16        THE COURT:  All right.  That was gone into.

17   And did he give any opinion or any information about

18   that at all?  Did he acknowledge knowing anything about

19   it?

20        MS. MCKNIGHT:  And, Your Honor, if I can --

21   if I may cut to the chase, part of the issue is there

22   has been --there have been positions taken by

23   plaintiffs that the African American community is

24   somehow smaller than it actually is and that these data

25   estimates are showing that it is.  So this is data and

1   this testimony to rebut that point.  They will have a

2   time to rebut.

3           THE COURT:  But the testimony has to be

4   supported by something.  I don't think she can just

5   come in and say, this is the population of --

6           MR. SELLS:  It's not personal knowledge, Your

7   Honor.

8           THE COURT:  -- of Sumter County.  That's what

9   I'm getting at.  I --

10          MS. MCKNIGHT:  I understand, Your Honor.

11          THE COURT:  -- whatever the ultimate point

12  is, I think that's a valid objection, that I think it

13  has to be produced in some form that the witness may be

14  able to acknowledge and identify, and then she may be

15  asked about it.

16          MS. MCKNIGHT:  I understand, Your Honor, I

17  do.  If you could give me just one moment.

18          THE COURT:  All right, yeah.  Just for the

19  record, the objection as stated is sustained.

20          MR. SELLS:  Thank you, Your Honor.

21          MS. MCKNIGHT:  Pardon me, Your Honor.  We can

22  move on from this issue for now.

23          THE COURT:  All right.  That will be fine.

24          MS. MCKNIGHT:  And I appreciate your ruling,

25  and we understand what the Court would like to see.

1          **THE COURT:**  All right.

2     **BY MS. MCKNIGHT:**

3     **Q.**    Dr. Owen, I'd like to ask you a few questions

4     about your experience with EI.  First of all, could can

5     you explain to the Court what EI is?

6     **A.**    EI is ecological inference, and it's a technique

7     that was created by Gary King to examine how particular

8     groups of voters vote for their candidates, which

9     candidate they would select.  And ecological inference

10    was created because double regression analysis in

11    statistics perhaps -- or would give you sometimes

12    unrealistic estimates.  They could be sometimes

13    negative or sometimes above a hundred or one.  So

14    therefore he built this technique in order to create a

15    bound between zero and one.

16    **Q.**    So is it fair to say that EI is a statistical

17    method used to examine or estimate how particular

18    groups of voters vote?

19    **A.**    Yes.

20    **Q.**    And as a statistical method is its reliability

21    governed by the field of statistics?

22    **A.**    Yes.  It's a reliable method.

23    **Q.**    And as a statistical method of estimating

24    political behavior, is its reliability also informed by

25    the field of political science?

1  **A.**    So, I think, if I understand your question

2  correctly, that it has helped aid in studying political

3  science, because of voter behavior, secret ballots, we

4  do not know the candidates that voters are choosing

5  because we cannot see their ballots, and so this is a

6  way to estimate how they are voting.  And so it allows

7  us as political scientists to understand more political

8  behavior.

9  **Q.**   And so have you used EI to estimate voting

10  behavior?

11  **A.**    I testified in an opinion, in a report, in a

12  Fayette County case where EI was used.  That was used

13  to examine kind of a partisanship of how voters were

14  voting for particular parties, the Democrat,

15  Republican, I used EI in that case.  And then, as I

16  mentioned earlier, I'm working on a new project where

17  we will be using EI to understand the electorate at a

18  particular congressional district.

19  **Q.**   So is it fair to say that you know how to assess

20  its soundness as a statistical method?

21  **A.**    So I am familiar with the data analysis and the

22  output that comes from using the statistical method.

23  And those are estimates, and so within the realm of

24  statistics and what they mean and the reliability, yes.

25            **MS. MCKNIGHT:**  Your Honor, this addresses an

1    issue brought up by plaintiff's objection earlier on,

2    the remaining Daubert motion.  We believe that Dr. Owen

3    is qualified to testify about EI analysis as it is a

4    statistical method that she has used.  She is capable

5    of assessing its soundness using her background and

6    expertise in statistical methods and in political

7    science.

8              **THE COURT:**  Mr. Sells?

9              **MR. SELLS:**  Well, I understand the Court has

10   already ruled on that portion of our Daubert motion,

11   finding she was not an expert in ecological inference,

12   and, in fact, that her testimony did not criticize Dr.

13   McBride's application of that.  Now, we think that's

14   exactly where she's headed.  She has admitted on the

15   record that she is not an expert in the EI analysis, or

16   at least was not at the time of her deposition.  Now,

17   that was a long time at this point, but we stand by our

18   view that she is not qualified to criticize Dr.

19   McBride's application, just what you said in your

20   order, application of this statistical method in this

21   case.

22             **MS. MCKNIGHT:**  Your Honor, I believe that's a

23   mischaracterization of this Court's order.  What you

24   have just heard from Dr. Owen and what you have found

25   before is that she is an expert in statistical

1    methodology.  This is a statistical method.  Whether or

2    not in a deposition or today she says that she is an

3    expert in EI, does not prevent her from testifying to

4    its soundness as a statistical method and being able to

5    analyze its reliability.  She's an expert not only in

6    statistics, but also in political science.  This is a

7    type of analysis that she's familiar with.  She knows

8    what it is.  She's used it before.  She's using it now.

9    She's used in the past.  She's testified in court

10   before about this analysis.  She's certainly capable to

11   testify about how this analysis was applied in this

12   case, how the numbers came up, what numbers were used,

13   what numbers came out of the method and whether they

14   are reliable.

15           **THE COURT:**  Well, I'm not going to reapply

16   the same hand again.  I think within the meaning of

17   what the Court was intending, that if she is testifying

18   about statistical analysis and how it's applied and

19   used in this method, she may testify about those

20   things.  I don't see where she would not be qualified

21   as a statistician, and for me, with her particular --

22   how stats are used, and to say whether not she thinks

23   it meets certain standards or not, in that regard, but

24   not as an EI expert, a person who was practicing that

25   thing.  I think that's part of what I was hearing her

1    say anyway.  But that's the Court -- the Court thinks

2    statistics and political science as they may apply to

3    that matter, I think the Court's ruling was that she

4    could, and I stand by that, and I think the objection

5    is overruled to that degree.

6            **MS. MCKNIGHT:**  Thank you, Your Honor.

7            **THE COURT:**  You may proceed.

8    **BY MS. MCKNIGHT:**

9    **Q.**   Now, Dr. Owen, a question about the preferred

10   candidate of choice for the African American community.

11   In your expertise, as between a Democrat and a

12   Republican, which would be the candidate, the preferred

13   candidate of choice for the African American community?

14           **MR. SELLS:**  Objection.  That's nowhere in her

15   report.  That was --

16           **THE COURT:**  I don't know if it's in the

17   report.  What is the basis for the question is what I'm

18   asking?

19           **MS. MCKNIGHT:**  The basis for the question?

20   Her expertise in statistics and political science and

21   her experience working in this field.  She's able to

22   testify about what the statistical results are of these

23   races.

24           **THE COURT:**  Well, I think she's going to have

25   to give a basis for that first, and then you can ask

1     her that question.  I think you are starting out with

2     the end rather than beginning.

3          **MR. SELLS:**  But it's an opinion that has

4     never been disclosed to the plaintiffs.  Now, I

5     understand there's --

6          **THE COURT:**  Well, I don't think -- now, we've

7     gone over this a long time.  I don't think every

8     incremental statement made by a person is necessarily

9     bound to be given an absolute detail in a report.  I

10    think we can -- I mean, we can argue all day about does

11    this precise statement or this precise question ever

12    come up.  But I think the Court understands her

13    expertise is about statistics as applied in political

14    science.  And to get to whatever it is she's going to

15    be talking about, there may be some things that have to

16    be talked about or described to the Court.  And if we

17    stop on every one of those, we'll never get to the end

18    of this.  The Court has some ability to tease through

19    this and throw out that that it thinks is inconsistent

20    with its understanding of what it has allowed, and will

21    certainly hear from the opposition about it, but I

22    think we can't stop every sentence before we even know

23    what it is connected to, to say that that's an opinion

24    that's not in the report.  I don't know yet know where

25    this is going.  That's why I just stated to lay some

```
1    foundation so I'll know what this -- the conclusion is
2    that she's stating and have some way of knowing whether
3    it fits within what the Court has set its parameters
4    for her opinion.  But there's got to be something here
5    to decide about first.
6              MR. SELLS:  Your Honor, may I be heard
7    briefly on that?
8              THE COURT:  Yes, yes.
9              MR. SELLS:  And I understand the Court's
10   frustration.  I'm frustrated at having to pop up every
11   second.  But what we have here is a case of defendant
12   changing lawyers three weeks before trial, four weeks
13   before trial, and they've come up with a different
14   strategy.  And she is offering opinions that were never
15   disclosed to the plaintiffs.  They have changed their
16   strategy, and it's coming right down the pipe.
17             THE COURT:  Let me put it this way.  I'm
18   going to let the defendants proceed.  If I determined
19   that it is inconsistent with what the Court has ruled
20   and allowed, the Court will strike it --
21             MR. SELLS:  Understood, Your Honor.
22             THE COURT:  -- in whole or in part.  But I
23   can't get there -- it's like -- I almost quoted
24   something about the meaning of words, but I won't use
25   that one.  But that's what I'm saying, I mean, I'm
```

1    going to allow the counsel to lay a foundation for the

2    purposes that she suggested to the Court she's

3    attempting to do.  And that the Court will lay against

4    the parameters that the Court has set.  And I think if

5    the Court believes that if it fits it, it will allow

6    it, if it doesn't, the Court is going to strike it, but

7    I can't -- I can't predetermine what the answer is

8    based on what I've heard at this point to either

9    appreciate the proponent or the opponent's objection.

10   So with that, proceed.

11           **MS. MCKNIGHT:**  Thank you, Your Honor.

12   **BY MS. MCKNIGHT:**

13   **Q.**   Dr. Owen, I'd like to ask you some questions about

14   the elections selected by plaintiff's expert witness in

15   his reports.

16   **A.**   Okay.

17   **Q.**   By my count it's roughly 15 races that he

18   analyzed.  Does that sound about right to you?

19   **A.**   Yes.  I remember in the report specifically he

20   mentions 12, but if you look at, I guess, the totality

21   of both reports it may be right at 15.

22   **Q.**   Okay.  And so are some of those elections, those

23   15 elections, included in the initial report but

24   excluded from the second report?

25   **A.**   Yes.

1    Q.    And are you familiar with the term cherry picking?

2    A.    Yes.

3    Q.    And what do you call that in statistics?

4    A.    Selection bias.

5    Q.    Okay.  And what does that mean?

6    A.    That means that you select only certain parts of

7    your sample to reveal or discuss in your analysis.

8    Q.    I'd like to start going through those elections

9    and ask you your opinion on the reliability of the

10   statistics on those elections.  Let's start with

11   Defendant's Exhibit 6.  This is Dr. McBride's first

12   report.  And we're turning to page 41, which is

13   Appendix C.  Dr. McBride, *(sic)*, did you analyze Dr.

14   McBride's analysis on this page in preparing your

15   report?

16   A.    This was Dr. McBride's original report, and yes, I

17   used this to -- I analyzed it and used it when I wrote

18   my first report.

19   Q.    And can you tell the Court any problems you see in

20   the numbers on this page?

21   A.    So this is Dr. McBride's racially polarized voting

22   analysis.  And if we look at the first column, it gives

23   the election that he's analyzing with the candidates.

24   And he has noted in bold that those are the -- that's

25   the African American candidate, and this would have

1    been a Board of Election -- a Board of Education

2    election for the sixth district and on March 18th,

3    2014.  And then in the second column he provides the

4    statistical estimates where he ran two different types

5    of statistical methods, and to produce estimates of how

6    the black voters would be voting for a candidate.  And

7    then he did that in the third column to show the

8    estimate of the percent of the non-black voters and how

9    they would vote for a particular candidate.  So what we

10   see is the -- for each candidate, under a column where

11   there is a percent, that's the estimate, and he labels

12   where it says BERA, that's the Bivariate Ecological

13   Regression or the Double Regression Analysis, and then

14   King is -- I believe, how he wrote about it in previous

15   pages, that's the ecological inference.  That's King's

16   EI method.  So those are the estimates he's provided,

17   and you'll see, like if we look at King, there's

18   58 percent and for Mock, candidate Mock, and then for

19   candidate Pride, there's 41.7 percent.

20   Q.   And what does show you?

21   A.   So that shows you his estimate for the percent of

22   the black voters, how that 58 percent of the black

23   voters voted for candidate Mock.  And because that

24   estimate is over 50 percent, he puts that candidate

25   Mock as the black preferred candidate.  So if we go

1    over to the column that says black preferred candidate,

2    he has an X.  So he identified Mock as the black

3    preferred candidate, and then that -- that, to left in

4    the column -- before that where it says total votes,

5    you see that Michael Mock won this contest, and so he

6    labeled black preferred candidate defeated as no.

7    Q.   So he identified, in this race, March 18, 2014,

8    that the Caucasian candidate, not the black candidate

9    was the black preferred candidate; is that right?

10   A.   Yes.

11   Q.   And did he identify this as a contest that was

12   polarized?

13   A.   No.  In the last column there's no identification,

14   and here, with these two estimates for King, the EI

15   estimates reported at 58 percent and 41.7 percent.

16   Arguably, it's not a clear split, so they're relatively

17   close.  So the black voters, I mean, are over a

18   majority supporting Mock in this, but the cohesion is,

19   they're split amongst their vote.

20   Q.   So what does it show you about cohesion?

21   A.   It's not conclusive that the black voters here are

22   overwhelmingly supporting one candidate over the other.

23   Q.   Now, this was for an election for the Board of

24   Education district six, right?

25   A.   Yes.

1    Q.    Okay.  What if I came to you and said, look,

2    district six no longer exists so therefore you can

3    ignore this analysis.  What would you say?

4    A.    I would say that we shouldn't ignore this analysis

5    because it is a Board of Education election, and those

6    are important in this type of analysis because this is

7    the districts and the elections that are pertinent and

8    probative.  This also is still representative of the

9    same voters and the same electorate in Sumter County.

10   Q.    So even though this district may no longer be

11   there, the voters are still there and their behavior is

12   still there; is that right?

13   A.    Yes.

14           MS. MCKNIGHT:   Now, could we bring up on the

15   screen, next to this, Plaintiff's Exhibit 6, at 20.

16       For the Court's reference, what I'm doing here is

17   showing a comparison of Dr. McBride's initial report at

18   DX-6 to his supplemental corrected report at PX-6.  And

19   then the other exhibit we need is Plaintiff's Exhibit

20   6, not Defendant's Exhibit 6.  Thank you, Mr. Conner --

21   20.

22   Q.    So, Dr. Owen, is this the same election, but as

23   analyzed by Dr. McBride in his two different reports?

24   A.    Yes, this is his analysis in the supplemental

25   corrected report.  It is the same election.

1    Q.   And so we just discussed his analysis from his

2    first report.  What changed when he analyzed this

3    election in his second report?

4    A.   So, again, he has listed in the first column the

5    election and the two candidates.  And you see that

6    Sarah Pride is still listed as the black candidate, but

7    in these, the EI estimates for the white voters and the

8    black voters has changed, and now Sarah Pride is

9    getting a point -- or an estimate of 68 percent for the

10   black voters.  So if we look under the column for black

11   voters and EI, her percentage here as estimated of

12   receiving black voter support is different than what

13   was in the first original report where it was at

14   41.7 percent.  So now it's higher, and here he has

15   determined that she is the black preferred candidate of

16   choice.  Wherein the first one he had identified Mock,

17   in the second supplemental now he has changed that

18   identification to Sarah Pride.  And then we also see

19   that the black voters are roughly 52.1 percent

20   supporting candidate Michael Mock.  And if you add

21   those two estimates together, they're over a

22   100 percent.  They're not bound at zero to one as a

23   point estimate or zero to a 100 percent, so this calls

24   into question just the reliability because there is

25   inconsistencies between these numbers, and then that is

1    over -- 100 percent over the bound that King created

2    with his EI technique.

3    Q.   And now, a couple of questions about that.  The EI

4    results in Dr. McBride's second report, it appears they

5    add up to a little over 120 percent.  Does that look

6    right to you?

7    A.   Yes.

8    Q.   And could that just be a rounding error?

9    A.   No.

10   Q.   And were you in the courtroom when you heard Dr.

11   McBride's testimony about the EI bounds?

12   A.   Yes.

13   Q.   And do you recall him saying that those bounds are

14   as applied to a candidate, not across candidates and

15   election?

16   A.   Yes.

17   Q.   Is that your understanding of the bounds used by

18   EI?

19   A.   No.

20   Q.   What is your understanding?

21   A.   My understanding is that the technique is bound so

22   that when you run one candidate, you do receive an

23   estimate, and then when you run the second candidate,

24   you reverse kind of that order, so you get a new

25   estimate, but those estimates added together are the

1    bound that is zero to one hundred -- or zero to one is

2    what the output would be because you are given a point

3    estimate.  But when we translate that to percentages,

4    it would be the zero to 100 percent.

5    **Q.**   And now, we focused on EI, but briefly, are the

6    BERA different between the two reports?

7    **A.**   Well, if you look at the first report, he doesn't

8    provide a BERA estimate for the nonblack voters, but

9    now he has one for the white voters in the

10   supplemental.

11   **Q.**   And it looks to me like there was an adjustment in

12   the BERA figures from the first report for percent

13   black voter voting for candidate to the second report;

14   is that right?

15   **A.**   Yes, those numbers have slightly changed.

16   **Q.**   Now, based on your expertise, can the Court rely

17   on Dr. McBride's analysis of the March 18, 2014, BOE

18   Number 6 election?

19   **A.**   I would say that these estimates are unreliable.

20   They're not conclusive that black support is

21   politically cohesive behind one candidate.  One, the

22   estimates are over 100 percent, over their bound, so

23   that calls into the question the reliability of them.

24   Is there perhaps a data problem, perhaps the sample was

25   very small in this district, so there's few precincts

1    to actually generate a reliable estimate.  So it just

2    calls into question the reliability.  Are these

3    consistent?  Are we really getting a picture of what

4    the voters are actually voting for?  Because the

5    numbers, they don't add up exactly, and yet they are

6    relatively close so that voter -- the black voters are

7    split, not clearly showing cohesion to one candidate.

8         **MS. MCKNIGHT:**  Could we turn to Defendant's

9    Exhibit 6, page 42?

10   **Q.**   Dr. Owen, did you analyze this selection, the

11   May 20, 2014, BOE Number 1 in Dr. McBride's first

12   report?

13   **A.**   Yes.

14   **Q.**   And what did you find?

15   **A.**   So in this analysis, again, in the left-hand

16   column he's identified the candidates, and Alice Green

17   has been identified as the black preferred candidate,

18   also identified as a black candidate.  And then we have

19   EI estimates, as well as the BERA estimates for this

20   election.  And if we look at the nonblack voters,

21   you'll see in the King estimates, if we add those up,

22   that we see -- when we look at them, there's 60 percent

23   of the nonblack voters are supporting Smith, 14.6

24   percent are supporting Lockhart, and 26.2 percent are

25   supporting Alice Green.  So the white vote is divided

1    amongst the three candidates.

2    Q.    And on those the EI figures, you were discussing

3    earlier, that they should add up to -- there's a bound,

4    a zero to 100 bound.  How do his numbers score on that

5    fare?

6    A.    I would have to quickly add.  It's over a hundred

7    looks like.  So it's not within those bounds.

8              MS. MCKNIGHT:  And now, I'd like to pull up

9    side by side, Plaintiff's Exhibit 6, pages 15 to 16,

10   and that's Plaintiff's 6 is the other exhibit.

11   Q.    Now, because the second report splits over two

12   pages, if you don't mind, I'd just like to ask you

13   about any differences in the candidate whose identified

14   on page 15, and then we will go to 16 in a moment.  But

15   on page 15 how have the figures changed on Page 15 of

16   PX-6 from page 42 of DX-6?

17   A.    So if we look at Alice Green, which is the only

18   candidate shown right here in the supplemental, you'll

19   see that for the white voters, the percent is for EI

20   estimate, that's a 15, whereas in the previous report,

21   the original report it was at 26.2.  And for black

22   voters that percent has increased to 94.2 from what was

23   originally reported as 87.9 percent.  And we can see a

24   difference in the BERA results as well for the black

25   voters, where it's 112 in the supplemental, and it had

1    been previously reported at 99.3 percent.

2    **Q.**    And can we turn to page 16 of PX-6 to show the

3    remaining candidates in the election as reported by Dr.

4    McBride in his second report.  Now, this is a big chart

5    on the second page.  If we can just focus on those

6    first two rows, Lockhart, and Smith, Allen, and how did

7    these numbers change?

8    **A.**    So for Lockhart, in the first row, we see this

9    first number is 11.6 which is the percent of the vote,

10   and the second one is the estimate for EI for the white

11   voters, and it is now 21.2.  In the original report it

12   was 14.6.  And then Allen Smith percentage of the white

13   support is at 66.8, which in comparison to the original

14   one has increased above that 60.6, still in the

15   60s percent for Smith, but the other two candidates,

16   their EI estimates have almost reversed.  They have

17   flipped in percentage.  And then we see that for the

18   black voter support of the other two candidates they

19   have dropped to around the one percent.

20        **MS. MCKNIGHT:**   And then, if we could show

21   just Plaintiff's Exhibit 6, the bottom of page 15, in

22   the top, you can leave that Lockhart and Smith down at

23   the bottom.  But I'd like for you to be able to see all

24   three candidates from the PX-6 Exhibit.  So it would be

25   page 15, the last row.  This is PX-6, pages 15 and 16.

1     Thank you, Mr. Conner.

2     **Q.**     Dr. Owen, what do the EI results for white --

3     anticipated white voter support show you on that issue

4     of being bound between zero and a hundred?

5     **A.**     Those estimates add up to more than a 100 percent.

6     **Q.**     Now, some of these shifts seem -- maybe someone

7     could say, oh, they're just minor shifts in numbers.

8     But what are you concerned about when you see these

9     shifts in numbers and these numbers falling outside the

10    bounds?

11    **A.**     It calls into question the consistency of the

12    data.  It makes me ask what data was used.  And I know

13    that, based on my reading of his supplemental report,

14    he did use different data.  He used the turnout data

15    provided by the state, where it does classify the

16    turnout by race, so you can calculate these figures

17    differently, whereas if we looked at the first original

18    report, it does have turnout where he had to estimate

19    turnout first from census data and then using that

20    estimate, created a new estimate -- or to create the

21    estimate for which group of voters were voting for

22    particular candidates.  So I understand that these

23    numbers in this supplemental report may change, because

24    he has used the precise turnout data, but they're still

25    adding up to over a 100 percent, which is not what that

1     technique would provide you, it would bound you to a

2     100.  So it just calls into question the consistency

3     and reliability that we're seeing here in these.  And

4     it may be a small sample for that district one, few

5     precincts, so you are not getting a lot of leverage to

6     create the variations you need to come up with reliable

7     statistical estimates.

8     Q.    So even if Dr. McBride used more -- or data that

9     was better in the second report, does that resolve all

10    your concerns about these changes in the out of bounds

11    number on this election analysis?

12    A.    No.

13    Q.    And based on your expertise, can the Court rely on

14    Dr. McBride's analysis of the May 20, 2014 BOE Number 1

15    election?

16    A.    I think you see from his estimates that black

17    voters are supporting a candidate, white voters are

18    split amongst candidates, but those estimates that have

19    been generated for the white voters, there's just

20    questions, perhaps about the reliability of those

21    estimates and whether they're giving an accurate

22    picture of how those voters are voting in that

23    particular election.

24    Q.    Let me stop you.  I'd like to ask you questions

25    about other elections, but, you know, because this

1    analysis is focused on an estimate of voter behavior

2    based on race, black or white, that's what our

3    discussion has focused on.  But are there factors other

4    than race that drive a candidate's success in an

5    election?

6    **A.**   Yes.  So there are a variety of reasons why voters

7    vote the way they do or candidates win an election or

8    lose an election.  And it can be simply candidate

9    effects, so whether the candidate is an incumbent,

10   whether the candidate is a good candidate, qualified,

11   actually has had prior electoral experience.  And then

12   there can be campaign effects, meaning were the

13   resources pumped into the campaign for the candidate to

14   raise or garner.  And then turnout can be a factor, so

15   was there perhaps issues; do the candidates, do they

16   encourage people to turn out to vote.  Did one

17   particular part of the electorate receive a lot more

18   attention to get out the vote?  I mean, there's a host

19   of other reasons that can affect electoral outcomes.

20   **Q.**   Could a timing of an election affect electoral

21   outcomes?

22   **A.**   Yes.

23   **Q.**   And could ballot placement of an election affect

24   election results?

25   **A.**   Could you clarify a little bit about ballot

1    placement?

2    **Q.**   Sure.  If an election is placed further down on a

3    ballot, than top of the bill, does that have an effect

4    on the number of votes or the type of votes that would

5    go toward that candidate?

6    **A.**   Yes.  So in a presidential contest, presidential

7    year, the president would be at the top, and so that

8    increases voter turnout usually and then more people

9    are likely to vote for the president because it's at

10   the top of the ticket.  And then countywide races or

11   municipal races are at the bottom part of the ballot,

12   and so we have roll-off.  So voters may vote for those

13   top of the ticket seats and then not vote for the races

14   at the bottom.

15   **Q.**   Is that called roll-off?

16   **A.**   Yes.

17   **Q.**   I'm going back to our elections, Dr. Owen.

18          **MS. MCKNIGHT:**   Could we turn to page 43 in

19   Defendant's Exhibit 6?

20   **Q.**   Now, Dr. Owen, this appears to be Dr. McBride's

21   analysis for the May 20, 2014, BOE Number 2 election.

22   Is that your read?

23   **A.**   Yes.

24   **Q.**   And did you review Dr. McBride's analysis on this

25   election?

1    **A.**    Yes.

2    **Q.**    And what did you find?

3    **A.**    So in this contest he's identified Sarah Pride as

4    the black preferred candidate, and he has shown that,

5    with an EI estimate, that 50.5 percent of the black

6    voters would be voting for Ms. Pride.  And then roughly

7    8 percent of the black voters would be supporting

8    Krenson, and about 25.1 percent supporting Everett

9    Byrd.  And in looking at this, the 50.5 percent is

10   above 50 percent, but it's not significantly above

11   50 percent.  And so my first, you know, look at this

12   said, one, he hasn't reported a standard error with

13   this analysis, and therefore we don't know the

14   deviation around that estimate.  And if we knew that,

15   we can then build a confidence interval and know a

16   range.  And so this is a point estimate, but that range

17   could be, depending on the standard error, you know, 40

18   percent to 60 percent.  So it can vary, and so I am not

19   confident that you would say that the black voters are

20   cohesively supporting this one candidate because the

21   support could be less than 50 percent, but it perhaps

22   could be, you know, somewhat more.  And then we look at

23   the nonblack voters, we see that, starting at the top,

24   that 30 percent go to Byrd, 60 percent -- 60.2 percent

25   is for Krenson and then 13 percent for Pride.

1    Q.    Now, you talked about the fact that there was no

2    standard error reported.  When you look at the figures

3    of -- under percent black voter voting for candidate,

4    and you see 25.1 percent for Everett Byrd and

5    50.5 percent for Sarah Pride, considering that you

6    don't understand what the standard of error is

7    applicable to these numbers, does it call into doubt

8    voter cohesion among black voters?

9    A.    Yes.

10   Q.    And why?

11   A.    Because you're not sure if they have supported one

12   particular more -- one particular candidate more than

13   another.  That vote seems to be split.  And when

14   there's no standard error so that you know how precise

15   that estimate is, it's hard to say with certainty that

16   the black voters are lined up behind one candidate over

17   the other.

18   Q.    So do these numbers also call into doubt

19   polarization?

20   A.    Yes.

21        MS. MCKNIGHT:  Now, could we pull up beside

22   this Plaintiff's Exhibit 6, page 16?  And we are

23   looking May 20, 2014, BOE Number 2.

24   Q.    Now, Dr. Owen, looking at Dr. McBride's first

25   report as compared to the second report, can you

1    describe what changed?

2    **A.**    His EI estimates have changed between the

3    different voters for -- his EI estimates for the

4    candidates have changed.  So if we look at the sixth

5    column where it has the estimate support amongst black

6    voters for the candidates, you'll see that Sarah Pride

7    is now receiving 99.3, and in the first report she

8    received 50.5 percent.  Krenson is not receiving any

9    support amongst the black voters, so he's estimated at

10   zero percent.  And then you have an estimate for Byrd

11   at 23.3 percent.  And just looking at those numbers we

12   can see they add up to over a 100 percent.

13   **Q.**    They add up to roughly 122 percent by your quick

14   glance?

15   **A.**    Yes.

16   **Q.**    And, again, could this just be a rounding error?

17   **A.**    No.

18   **Q.**    And, again, this is in Dr. McBride's second

19   report, correct?

20   **A.**    Correct.

21   **Q.**    And have any of the changes that Dr. McBride made

22   to his analysis between his first and second report

23   resolve all of your concerns about his analysis for

24   this election?

25   **A.**    Well, there's inconsistencies in these reports,

1    and in the supplemental report, which utilized the

2    turnout data, you're still getting an estimate outside

3    that bound.  And, again, it just -- it calls into

4    question the reliability of this.  And perhaps it's

5    data that was input to create the estimate, or it could

6    be as simple that this is a district with very few

7    precincts, and so you're not allowed to get a lot of

8    variation which could give you accurate, reliable

9    estimates to understand how the voters are voting.

10   **Q.**   And based on your expertise, would you rely on Dr.

11   McBride's analysis of the May 20, 2014, BOE Number 2

12   election?

13   **A.**   I would not rely on this.  I would rerun the

14   numbers.

15   **Q.**   Now, we've already talked about the March 18, 2014

16   BOE 6 election.  Based on your expertise would have

17   relied on Dr. McBride's analysis of that election?

18   **A.**   I'm sorry, which election?

19   **Q.**   This is the first election we discussed.

20   **A.**   The March --

21   **Q.**   March 18, 2014, BOE Number 6.

22   **A.**   I would not -- I would not rely on those as

23   accurate estimates.

24   **Q.**   And just to make sure I cover my bases, the

25   election we just looked at, which is the election

between Alice Green, Elaina Lockhart, and Allen Smith

on May 20, 2014, based on your expertise would you rely

on Dr. McBride's analysis of this election?

A.    No.

Q.    Moving on to Defendant's Exhibit 6, page 44.

Dr. Owen, I believe you may be able to clear the

marking on your screen.  There you go.  Okay.  Dr.

Owen, this page depicts Dr. McBride's analysis for the

May 20, 2014, BOE Number 3 election; is that what you

see?

A.    Yes.

Q.    And did you review Dr. McBride's analysis of this

election?

A.    Yes.

Q.    And what did you find about his analysis on page

44 of DX-6?

A.    And in this contest he's provided estimates,

again, for the voters' preferences of candidates.  And

if we look in the second column for black voter

support, we see that the black preferred candidate,

Willa Fitzpatrick, received 56.3 percent and then J.C.

Reid received 52.1 percent.  So those estimates are

both above 50 percent.  It doesn't show real -- clear

cohesion, clear coalescing behind one particular

candidate.  They are almost evenly split, and, again,

1      those estimates are over a 100 percent.

2      **Q.**   And does he indicate that this contest was

3      polarized?

4      **A.**   Yes.

5      **Q.**   And by your read of these numbers, these

6      estimates, is it polarized?

7      **A.**   I believe based on these estimates you cannot

8      reliably say that, because the black voter support is

9      almost evenly split between those two candidates.

10     **Q.**   And it appears that the EI estimate for percent

11     black voter voting for candidate for Willa Fitzpatrick

12     and J.C. Reid adds up to over 100; is that right?

13     **A.**   Yes.

14            **MS. MCKNIGHT:**   Could we pull up, side by

15     side, Plaintiff's Exhibit 6, page 16?

16     **Q.**   Now, Dr. Owen, it appears to me that Dr. McBride

17     changed his EI estimate between his first report and

18     his second report for the percent black voter voting

19     for candidate; is that right?

20     **A.**   Yes.

21     **Q.**   And --

22     **A.**   So he's reporting now 92.3 percent for Willa

23     Fitzpatrick as the EI estimate for black voter support.

24     **Q.**   And then is he now reporting 95 -- going to the

25     percent nonblack voters voting for candidate, is he now

1    reporting 95 percent for J.C. Reid?

2    A.    Yes.

3    Q.    So on Willa Fitzpatrick, his adjustment was from

4    56.3 percent estimate to 92.3 percent; is that right?

5    A.    Correct.  Yes.

6    Q.    And based on your expertise would you rely on Dr.

7    McBride's analysis of the May 20, 2014, BOE Number 3

8    election?

9    A.    There are inconsistencies in these estimates, but

10   if done correctly, in the second one, then, you know,

11   these are falling within the bound, and they seem

12   reasonable.  But I don't know if I would rely on what

13   is produced having seen the first ones and seeing the

14   inconsistencies and not knowing for sure if they have

15   captured what the voters are really doing.

16   Q.    Now, turning to page 45 on DX-6.  Dr. Owen, am I

17   reading this correctly -- this is the analysis that Dr.

18   McBride performed for the May 20, 2014, BOE Number 5

19   district?

20   A.    Yes.

21   Q.    And did you review this in your report?

22   A.    Yes.

23   Q.    And am I reading this correctly that Dr. McBride

24   has estimated black voter support for Mark Griggs at

25   33.2 percent?

**A.**   Correct.

**Q.**   And am I also reading this correctly, that the total votes cast in this election were about 750?

**A.**   Yes.

**Q.**   Now, when I look in the total vote column it looks like Ms. Green earned 416 votes and Mr. Griggs earned 334 votes.  Is that your read?

**A.**   Yes.

**Q.**   And it seems that that's about a difference of 80, 82 votes?

**A.**   Yes.

**Q.**   Now, on this page does it indicate what the black voter age population in the district is?  This is page 45.

**A.**   I'm sorry.  Could you ask your question again?

**Q.**   Absolutely.  On this page does it tell you what the black voting age population of this district was?

**A.**   Yes, under the date of the election it says that it's 70.6 percent B-VAP.

**Q.**   Now, what do you think explains why the black preferred candidate, Ms. Green, and a district with over 70 percent black voting age population only won by about 80 votes?

**A.**   There could be many explanations for why she only won with a, you know, 80 vote margin.  And it could be

1    the candidate, how well she campaigned, did people know

2    her, was she an incumbent to this district.  It could

3    be turnout.  It could just be very low turnout in the

4    district.  And then, here, he's showing that even

5    blacks are supporting the white candidate, Mark Griggs,

6    at a third almost.  So again, going back to candidate,

7    which one was communicating their messaging to the

8    community, to the district, and then also just the

9    campaign that can be involved, the effects there.

10            MS. MCKNIGHT:  And could we show side by side

11   Plaintiff's Exhibit 6 at page 16, please.  Page 16,

12   please?

13   Q.   Dr. Owen, we're looking at this election at the

14   bottom of page 16, the May 20th, 2014 D-5 election.

15   And it looks like Dr. McBride has changed his estimate

16   of support under -- using EI or the King analysis for

17   Mark Griggs.  Do you see that?

18   A.   Yes.

19   Q.   Does it look to you like Dr. McBride changed his

20   estimate from 33.2 percent in the first report down to

21   14.3 percent in the second report?

22   A.   Yes.

23   Q.   And then similarly it appears that Dr. McBride

24   adjusted downward his estimate for percent nonblack

25   voters voting for candidate from a 19.9 level for

1  Ms. Green, in his first report, down to a 13.9 level in

2  his second report.  Is that your read too?

3  **A.**   Yes.

4  **Q.**   Now, based on your expertise would you rely on Dr.

5  McBride's analysis of the May 20, 2014, BOE Number 5

6  election?

7  **A.**   It calls into question, again, the reliability.

8  There's differences in the numbers that are reported

9  here.  So I would question those inconsistencies and

10  want to know more.

11            **MS. MCKNIGHT:**  If we could turn to DX, page

12  46, please?

13  **Q.**   Dr. Owen, this looks like the May 20, 2014 BOE

14  at-large election.  Is that your read?

15  **A.**   Yes.

16  **Q.**   And did you review Dr. McBride's analysis of this

17  election?

18  **A.**   Yes.

19  **Q.**   And could you tell the Court, what do the EI

20  estimates add up to for percent black voter voting for

21  candidate?

22  **A.**   To the black voter voting for each candidate, so

23  you have 68.2 percent for Coley, 7.8 percent for David

24  Kitchens, 30.9 percent for Sylvia Roland, and

25  5.7 percent for Patricia Taft.

1    **Q.**   And in your estimate does that add up to over a

2    hundred?

3    **A.**   Yes.

4    **Q.**   And does it appear that the black vote was split

5    between different candidates in this election?

6    **A.**   Yes.  He is showing Michael Coley getting

7    68 percent where the other candidates are receiving

8    42 percent of the vote, and Sylvia Roland's receiving

9    almost a third of the vote.

10   **Q.**   Now, it looks to me like the leaders of votes were

11   between Michael Coley and Sylvia Roland; is that right?

12   **A.**   Yes.

13   **Q.**   And it looks like the difference is about nine

14   votes; is that fair?

15   **A.**   Yes.

16   **Q.**   With 1584 for Coley and 1575 for Roland; is that

17   right?

18   **A.**   Yes, those are the total votes reported.

19          **MS. MCKNIGHT:**   Now, could we put up

20   Plaintiff's Exhibit 6, pages 13 and 14?  Let's go to

21   page 14, because I think it's just the header on this

22   page.

23   **Q.**   So Dr. Owen, do you see Dr. McBride's analysis of

24   the same election on page 14 of his supplemental report

25   including candidates, Coley, Kitchens, Roland, and

1    Taft?

2    **A.**    Yes.

3    **Q.**    And is it -- is my read correct that the EI

4    estimates for black voter voting for candidate add up

5    to over a 100 percent here?

6    **A.**    Yes.

7    **Q.**    Now, based on your expertise would you rely on Dr.

8    McBride's analysis of the May 20, 2014, BOE at-large,

9    two-year election in your own work?

10   **A.**    No.  I would -- looking at this on its face, just

11   seeing the numbers add up to over a 100 percent, I

12   would wonder about the reliability of what I have done,

13   what I had produced, and so I would go back and try to

14   analyze more of the data.

15             **MS. MCKNIGHT:**  I'd like to skip to DX-6, page

16   48.

17   **Q.**    This appears to be Dr. McBride's analysis of the

18   July 22, 2014, BOE two-year at-large runoff is; that

19   right?

20   **A.**    Yes.

21   **Q.**    And so is it a fair read that the election we just

22   looked at where Mr. Coley and Ms. Roland were the top

23   vote getters, that this is the runoff for that

24   election?

25   **A.**    Correct.

1   Q.   And in this election it looks like Dr. McBride

2   estimates Mr. Coley's black voter voting for candidate

3   support at 65.6 percent?  Is that what you see?

4   A.   Yes.

5   Q.   And he estimated that the black voter voting for

6   candidate support for Ms. Roland was at 35.4 percent;

7   is that right?

8   A.   Yes.

9        MS. MCKNIGHT:   And could we pull up

10  Plaintiff's Exhibit 6, page 14, please?

11  Q.   So Plaintiff's Exhibit 6 at page 14.  And we are

12  looking at the July 22nd, 2014 two-year runoff.  And

13  now it appears that Dr. McBride's estimate for black

14  voter voting for candidate has changed from his first

15  report estimating 65.6 percent support for Mr. Coley to

16  99.5 percent for Mr. Coley.  Is that your read?

17  A.   Yes.

18  Q.   And then it also appears that Dr. McBride's

19  estimate for black voter voting for candidate for

20  Ms. Roland has changed from 35.4 percent down to 0; is

21  that fair?

22  A.   Yes.

23  Q.   Now, base on your expertise would you rely on Dr.

24  McBride's analysis of the July 22, 2014 two-year

25  at-large runoff in your own work?

1  **A.**   So, again, this election shows inconsistencies

2  between the EI estimates.  And, you know, looking at

3  these numbers on the supplemental report, that are on

4  the screen right now, in parenthesis he has small

5  standard errors.  So this perhaps is showing a better

6  caption, but, again, having not run this data and

7  seeing the inconsistencies, I would just want to know

8  more about what was put into the data and why there are

9  inconsistencies.

10            **MS. MCKNIGHT:**   Now, if we can turn to DX6,

11  page 47.

12  **Q.**   And is it your read that this is Dr. McBride's

13  analysis of the May 20, 2014, BOE at-large four-year

14  election?

15  **A.**   Yes.

16  **Q.**   And did you review this in your work in this case?

17  **A.**   Yes.

18  **Q.**   Now, it appears here that Dr. McBride estimated

19  Mr. Busman's percent support of black voter voting for

20  candidate as 27.6.  Is what your read?

21  **A.**   Yes.  That's the King estimate, uh-huh.

22  **Q.**   And then he also estimated using the King or EI

23  estimate 72.9 percent black voter voting for candidate

24  for Kelvin Pless; is that right?

25  **A.**   Yes.

1          **MS. MCKNIGHT:**  And now, could we pull up

2     Plaintiff's Exhibit 6, page 14?

3     **Q.**   By your read of this Dr. Owen, of Dr. McBride's

4     second report, it appears that he's revised his

5     estimate of support for Dr. Busman from 27.6 percent

6     black voter voting for candidate in his first report,

7     he's revised that down on to 3 percent black voter

8     voting for candidate in his new report.  Is that your

9     read?

10    **A.**   Yes.

11    **Q.**   And it also looks like he revised upward the black

12    voter voting for candidate from the first report where

13    it was reported at 72.9 percent for Mr. Pless, and now,

14    in his second report he's reporting it at 96.7 percent.

15    Is that your read?

16    **A.**   Yes.

17    **Q.**   Now, again, if you were confronted with someone

18    saying, hey, look, he used better data in his second

19    report, that's why the estimates are different.  Would

20    that cause you to be able to rely on Dr. McBride's

21    analysis of this election?

22    **A.**   I think better data helps you know -- if you're

23    using better data, what does better data mean.  So if

24    that better data is the actual turnout data provided,

25    and you can use that and you can account this isn't,

1    you know, one of the four-year at-large so that

2    incorporates all the precincts.  So, yes, that better

3    data should provide better estimates, and it would be

4    more likely to be reliable in that instance.

5    Q.   Based on your expertise would you feel comfortable

6    relying on Dr. McBride's analysis of the May 20, 2014,

7    BOE at-large four-year election, seeing his analysis

8    from both his initial report and his supplemental

9    report?

10   A.   Seeing the inconsistencies, I'm not sure that I

11   would rely on it.

12           MS. MCKNIGHT:   Could we go to Defendant's

13   Exhibit 6 at page 49?

14   Q.   This looks like the 2010 Board of Election,

15   District 3 election.  Is that your read?

16   A.   Yes.

17   Q.   And did you review Dr. McBride's analysis of this

18   election in your work?

19   A.   Yes.

20   Q.   Now, the way I read this information as provided

21   by Dr. McBride, it appears that the black preferred

22   candidate won; is that right?

23   A.   Yes.  He's says that the black preferred candidate

24   defeated, no.  So, yes.

25   Q.   And what was the black voting age population in

1    this district at the time of this election?

2    **A.**   48.4 percent.

3    **Q.**   And what is your understanding of the black voting

4    age population, countywide, in Sumter County at the

5    time of the 2010 census?

6    **A.**   I believe in the reports it stated that the black

7    voting age population was around 48 percent.

8    **Q.**   Now, plaintiff's counsel may draw your attention

9    to this race and say, but this district no longer

10   exists, because it was before the current plan.  How

11   would you respond to that?

12   **A.**   This is still a Board of Education election, and

13   since there are very few elections over, you know, the

14   most current history, this is one we can look at.  But

15   also this election took place in the county, the voters

16   are still living in this county, and so you have the

17   same electorate.  That has not changed significantly.

18          **MS. MCKNIGHT:**  Could we bring up side by side

19   Plaintiff's Exhibit 6 at page 19, please?

20   **Q.**   Now, it appears to me, Dr. Owen, that Dr.

21   McBride's estimate of black voter voting for candidate

22   Donna Minich changed from .4 percent in his initial

23   report, using the King number, to 6.3 percent in his

24   supplemental report.  Is that your read?

25   **A.**   Yes.

1    Q.   And it looks like Dr. McBride's estimate for

2    percent black voter voting for candidate, using the

3    King number, for Kelvin Pless changed from 99.5 percent

4    down to 94 percent; is that right?

5    A.   Yes.

6    Q.   And I'm looking at the percent nonblack voters

7    voting for candidate.  It looks like Dr. McBride's King

8    number for Donna Minich changed from 60.8 up to 76.7;

9    is that right?

10   A.   Yes.

11   Q.   And his King number for Kelvin Pless changed from

12   38.9 down to 22.9; is that right?

13   A.   Yes.

14   Q.   Now, again, if you are confronted with -- well,

15   look, there just -- it's not that -- some of these

16   differences aren't that large, it doesn't make a

17   difference, does that have an impact on your estimate

18   of the reliability of these numbers?

19   A.   I wouldn't say that just because it's not that

20   large of a difference that it shouldn't be analyzed and

21   looked at.  So, again, it's about the reliability.  Do

22   we believe that these estimates are accurately showing

23   us how the voters are voting, how they are -- how we

24   can generate an estimate to try and understand how they

25   are voting.  And the inconsistencies, again, it's back

1  to the actual data used, how it was input, maybe it

2  was, you know, not correctly entered into the

3  specification of the model, or perhaps there's other

4  reasons.  But, again, just because they are

5  inconsistent makes me question the reliability.  There

6  is that not consistent measure, so whether it can

7  really tell us what's happening in the electorate.

8  Q.   Based on your expertise, would you rely on Dr.

9  McBride's analysis of the 2010 BOE Number 3 election?

10  A.   No.

11  Q.   Now, Dr. Owen, I'm going to shift a little bit

12  into elections that were included in Dr. McBride's

13  first report, but were excluded from his second report.

14       MS. MCKNIGHT:  Can we turn to page --

15  Defendant's Exhibit 6, page 50?

16  Q.   Now, does this appear to you to be the 2008 Board

17  of Education district one election?

18  A.   Yes.

19  Q.   And using Dr. McBride's analysis, it appears from

20  his analysis that the black preferred candidate was not

21  defeated.  In other words, the black preferred

22  candidate won.  Is that your read of this election?

23  A.   Yes.

24  Q.   And what is the B-VAP level in this district as

25  reported?

1    **A.**    49.5 percent.

2    **Q.**    And now, do you know why -- first, strike that.

3    Do you know if this election was included in Dr.

4    McBride's second report?

5    **A.**    It was not included in the supplemental.

6    **Q.**    And do you -- oh, sorry.  Pardon me.

7    **A.**    It was not included in the supplemental report.

8    **Q.**    And do you know why it was not included?

9    **A.**    No.

10   **Q.**    Just a quick read of the King numbers, it appears

11   they calculate, they sum to a total over 100; is that

12   right?

13   **A.**    For the black voter preferences, yes.

14   **Q.**    Correct, yes.  Okay.  Now, based on your

15   expertise, would you rely on Dr. McBride's analysis of

16   the 2008 BOE Number 1 election?

17   **A.**    Again, the estimates are over 100 percent, which

18   calls into question the reliability.  On this, too, he

19   shows, for the nonblack voters, that there's not a

20   majority of the nonblack voters supporting the white

21   candidate.  They're also giving 43.1 percent estimated

22   support to the black candidate.

23   **Q.**    Now, there's some data on this page that is not

24   part of an analysis calculated by Dr. McBride.  And by

25   that I mean, is it fair to say that when he identifies

1    Carolyn Whitehead as winning the election, that's not

2    part of his analysis; that's a data input into his

3    analysis, correct?

4    **A.**   I'm sorry.  Could you ask that again?

5    **Q.**   Sure.  As I understand from your testimony, you

6    would not be comfortable relying on Dr. McBride's

7    analysis of this election; is that right?

8    **A.**   Yes, because of the King estimates being outside

9    the bounds.

10   **Q.**   Now, when it shows that Carolyn Whitehead won the

11   election, that's not part of Dr. McBride's analysis,

12   right?  That's a fact.  That's a data point that was

13   put into his analysis?

14   **A.**   Yes.

15   **Q.**   And similarly, the B-VAP figure, 49.5 percent,

16   that was not calculated by Dr. McBride.  That was a

17   data input into his analysis, right?

18   **A.**   Yes.

19   **Q.**   So when we talk about being able to rely on this

20   analysis of Dr. McBride, that doesn't mean you can't

21   rely on the fact that the black preferred candidate won

22   at 49.5 percent B-VAP, right?

23         **THE COURT:**  All right.  Let's stop for our

24   afternoon break.  We will be in recess for about

25   20 minutes.

1    *(RECONVENED; ALL PARTIES PRESENT, 3:38 p.m.)*

2              **THE COURT:**  All right.  Are you ready to

3    continue?

4              **MS. MCKNIGHT:**  Thank you, Your Honor.

5              **THE COURT:**  All right.

6    **BY MS. MCKNIGHT:**

7    **Q.**   Dr. Owen, where we left off was on DX-6, page 50.

8    And as I understood your testimony, you had said that

9    base on your expertise, you would not be able to rely

10   on Dr. McBride's analysis of this election, the

11   election 2008 BOE Number 1; is that fair?

12   **A.**   I remember that -- yes, that I said that these

13   estimates raised some concerns for me.

14   **Q.**   But some information on this page, that is

15   Defendant Exhibit 6, page 50, is a reliable fact; isn't

16   it?  And as an example I'll give you the candidate

17   Carolyn Whitehead won.  You can rely on that, can't

18   you?

19   **A.**   Yes.

20   **Q.**   And you can rely on the fact that Carolyn

21   Whitehead is black?

22   **A.**   Yes.

23   **Q.**   And you can also rely on the fact that this

24   district was comprised of 49.5 percent black voting age

25   population?

1    **A.**    Yes.

2    **Q.**    And was this election included in Dr. McBride's

3    supplemental report?

4    **A.**    No.

5    **Q.**    Moving on to Defendant TX-6, page 51.  Now, right

6    off the bat, Dr. Owen, it appears to me that the EI

7    estimates under percent black voter voting for

8    candidate is close to 140 percent; is that your read

9    too?

10   **A.**    Yes.

11   **Q.**    Would you be able to rely on this analysis?

12   **A.**    Those estimates do not seem reliable.

13   **Q.**    And then, based on these estimates, can you

14   reliably say that black voters voted as a cohesive

15   block?

16   **A.**    I would say these estimates, they are not

17   reliable, so you cannot be confident that they are

18   showing you that the black voters are supporting one

19   candidate more than the other candidates.  Their vote

20   is split between Darius Harris and Carolyn Seay.

21   **Q.**    And based on your expertise, would you rely on Dr.

22   McBride's analysis of the 2016 Board of Education

23   Number 3 election?

24   **A.**    This election could be used.  The estimates are

25   what I call into question about the reliability and the

1    consistency of what they're actually telling us about

2    the voters' preferences.

3    **Q.**    And turning to -- now, was this election included

4    in plaintiff's supplement -- expert supplemental

5    report?

6    **A.**    No.

7    **Q.**    Do you know why it was excluded?

8    **A.**    No.

9    **Q.**    Turning the page to Defendant Exhibit 6, page 52.

10   By your read, is this Dr. McBride's analysis of the

11   election, 2002 BOE Number 3?

12   **A.**    Yes.

13   **Q.**    And it appears to me that there are two black

14   candidates in this election; is that your read too?

15   **A.**    Correct, yes.

16   **Q.**    Of the three candidates, Dr. McBride made

17   estimates of the black voter support for those

18   candidates.  Which of these three candidates did Dr.

19   McBride estimate earned the most support from the black

20   community?

21   **A.**    Based on the EI King estimates, black voter

22   support for candidate Donna Minich was at 41 percent,

23   which is the highest of the estimates of the three he

24   has.

25   **Q.**    And is Donna Minich indicated in this chart as

1    being an African American candidate?

2    **A.**    No.  Dr. McBride reports Carolyn Seay as the black

3    preferred candidate.

4    **Q.**    But under his King analysis, Carolyn Seay was

5    estimated to only receive 24.3 percent support from

6    black voters; isn't that right?

7    **A.**    Yes.

8    **Q.**    So just so I understand this correctly this -- Dr.

9    McBride's analysis on this page indicates that of the

10   three candidates, the nonblack candidate is the

11   candidate that earned the most support from black

12   voters?

13   **A.**    Correct.  Based on these EI estimates.

14   **Q.**    And yet he made the determination in this column,

15   black preferred candidate defeated, that Carolyn Seay

16   was the preferred candidate of black voters?

17   **A.**    Yes.

18   **Q.**    It appears that the other black candidate, Darius

19   Harris, under Dr. McBride's analysis, received more

20   black voter support than Carolyn Seay; is that your

21   read too?

22   **A.**    Yes.

23   **Q.**    Do you understand why Carolyn Seay was marked as

24   the black preferred candidate?

25   **A.**    I am not sure why.

1    Q.    Now, it also appears to me that the candidates in

2    this election, 2002 BOE Number 3, are the same

3    candidates as in the 2006 GE BOE Number 3 election

4    which is on page 51.

5           MS. MCKNIGHT:  Can we put up Defendant's

6    Exhibit 6, page 51 and 52 next to one another, please?

7    Q.    So is it your read of these two elections that the

8    same three candidates were running for office in both

9    elections?

10   A.    Yes.

11   Q.    But the candidate identified as the black

12   preferred candidate changed between these elections,

13   didn't it?

14   A.    Yes.

15   Q.    And by that, I mean Dr. McBride's indication, his

16   decision about which candidate was the black preferred

17   candidate changed?

18   A.    Yes.

19   Q.    Do you see any explanation for either -- for this

20   -- for the change?

21   A.    No.

22   Q.    Now, looking at these two elections together.

23   This is 2016 BOE 3, compared to 2002 BOE Number 3.

24   Based on your expertise would you rely on Dr. McBride's

25   analysis in either of these charts for these elections?

1    **A.**    These -- looking at each of these elections,

2    because of the inconsistencies in the summing of the EI

3    estimates, being that they are larger than the bound, I

4    would call into question the reliability of those and

5    whether we could take them as an accurate view of what

6    the electorate has decided and who they are actually

7    selecting as their preferred candidate.

8            **MS. MCKNIGHT:**  Could we turn to Plaintiff's

9    Exhibit 6 at page 13, please?

10   **Q.**    Now, this is an election that was not included in

11   Dr. McBride's initial report, and why is that?

12   **A.**    This election happened after the initial reports

13   were written.

14   **Q.**    And in this election between Michael Coley and

15   Sylvia Roland, who won that election?

16   **A.**    Sylvia Roland.

17   **Q.**    And do you know if Sylvia Roland was the

18   incumbent?

19   **A.**    Yes.

20   **Q.**    And is there an incumbency advantage in elections?

21   **A.**    Yes.

22   **Q.**    Can you explain that a little bit?

23   **A.**    In political science there's a great deal of

24   scholarship that talks about how incumbents have an

25   advantage.  There are many things that help them do

1    better in the next election, because they are already

2    holding the office that they are running for again.  So

3    they have higher name identification, because they are

4    holding the seat in the office.  They, because they

5    hold the seat, are usually capable of raising more

6    campaign resources.  They can utilize campaign

7    resources they already have, as well as they have a

8    record that they have, from service.  So they can run

9    on that record, and that can be helpful in many ways,

10   or it can harm them if that record has not been what

11   the electorate wanted.  But most of the time if they

12   have been serving their community or their state or the

13   nation, whichever jurisdiction level you're at, then

14   they would be likely to run on that record, and it

15   would help them, give them an advantage.

16           **MS. MCKNIGHT:**  And could we turn to

17   Plaintiff's Exhibit 6, pages 17 to 18?  If we could

18   also bring up this 18.  I think it bleeds over into the

19   next page, Mr. Conner.  Thank you.

20   **Q.**   Now, this election, the May 20, 2014, District 4

21   election was not included in Dr. McBride's initial

22   report, was it?

23   **A.**   No.

24   **Q.**   And do you know why it was not included?

25   **A.**   I don't know the exact reason.  I assume it

1    probably was not included because the elections that he

2    looked at were elections that involved a black

3    candidate and a white candidate, and this election

4    involved two white candidates.

5    Q.    And does Dr. McBride's analysis, assuming that it

6    is accurate and reliable, show that there is

7    polarization between white voters and black voters?

8    A.    No.  The analysis here, if we look, the white and

9    black voters are almost equally supporting Rick Barnes.

10   Q.    Now, could we go to Plaintiff's Exhibit 6, pages

11   18 to 19.  Dr. McBride, *(sic)* were you in the courtroom

12   when you heard Dr. McBride testify about the

13   November 2nd, 2004, sheriff's race?

14   A.    Yes, I was here.

15   Q.    There was some discussion that a write-in

16   candidate, the likelihood of a write-in candidate

17   winning an election.  What is your opinion on that?

18   The likelihood that a write-in candidate could win an

19   election?

20   A.    I would say that the likelihood is very slim, that

21   there's a great obstacle and hurtle to win an election

22   when you are a write-in candidate, because your name is

23   not on the ballot.  You're not part of the partisan

24   positioning on the ballot or the partisan election.

25   And so you're asking voters to take an extra step and

1   write-in your name, and you also have to make sure that

2   the electorate who is supporting you is spelling your

3   name absolutely correctly so it can be counted.  And

4   it's a very difficult opportunity to try to win an

5   election as a write-in.

6           **MS. MCKNIGHT:**  And could we go to Plaintiff's

7   Exhibit 21, page 1, please?

8   Q.   Dr. Owen, do you remember us discussing this

9   exhibit, these election results with Dr. McBride this

10   week?

11   A.   Yes.

12   Q.   And we discussed the issue of absentee ballots.

13   Could you explain the significance of over 4,000

14   absentee ballots where the total votes were about

15   11,000?

16   A.   So if I remember correctly, in the discussion,

17   4,000 absentee ballots are pretty much put into this

18   own category, and they are not included in the

19   tabulation of estimating how the voters voted in those

20   absentee ballots, and that's a significant portion of

21   the 11,000 votes cast.

22   Q.   And do you recall Dr. McBride testifying that he

23   did not include those absentee ballots in his analysis

24   of this election?

25   A.   Yes.

1   Q.   And how would that impact his analysis of this

2   election?

3   A.   Well, if you scroll -- if you look over that line

4   where it says 4,000 total votes were absentee, and then

5   1100 of those were write-in, he's not accounting for

6   those write-in votes and who they voted for in his

7   estimation.  He's just using -- my understanding, is

8   he's just using what's been tabulated in the precincts

9   above that number.  As so those would be roughly 1700

10  votes that you're counting.  So you have -- you limited

11  your sample.

12  Q.   So it looks like the total write-in votes were

13  around 3,020.  Is that your read of this chart?

14  A.   Yes.

15  Q.   And so would you say that about a third of those

16  are excluded -- or over a third of those are excluded

17  from Dr. McBride's analysis?

18  A.   Correct.

19  Q.   Now, going back to PX-18 to 19.  Here we see Dr.

20  McBride's analysis of the November 2, 2004, sheriff's

21  race.  So for the reasons we've been discussing, based

22  on your expertise, would you rely on Dr. McBride's

23  analysis of the November 2nd, 2004, sheriff's race?

24  A.   I believe that this contest is a unique contest

25  because of what I've already discussed about how it is

1    a write-in.  And I also think that excluding the

2    absentee ballots means that you have fewer data points

3    to use in your estimation.  So it can potentially bias

4    those estimates, and you're not getting conclusive,

5    reliable estimates to see that particular voters are

6    voting for a certain candidate.

7    Q.   Dr. Owen, I know you've published a number of

8    articles and a book.  Would you include this analysis

9    in your -- in an article that you were going to publish

10   with your name on it?

11   A.   It would depend on what I'm trying to discuss.  So

12   if I'm looking at a totality of elections, then this

13   could be included.  But, for instance, in my book, I

14   looked at elections for Congress from 1976 to 2010,

15   over 36 years of elections.  And I had almost 40,000

16   observations that I could actually run the statistical

17   methods on and make sure that my conclusions, my

18   coefficient estimates were reliable because of the

19   increase in the data.  If I needed to use this

20   election, I would want to have other elections of

21   similar types.  So if I could look at another write-in

22   election, and if I could account for all of the

23   different votes that were needed, I would not

24   necessarily just throw it out, but I would want to make

25   sure there was many more data points, many more

1    elections to also include to make sure I'm getting

2    variations, to know that what I'm seeing in a measure

3    of one election is consistent and reliable throughout.

4    **Q.**   Thank you.  So I understand you may use this

5    election if there were many other data points.  Do you

6    see those other data points in Dr. McBride's analysis?

7    **A.**   No.

8    **Q.**   And so I understand you may include this election

9    with many other data points, but would you publish this

10    analysis of that election?

11    **A.**   No.

12    **Q.**   Why not?

13    **A.**   Because I don't think you're seeing enough to have

14    a reliable discussion of how voters are selecting a

15    certain candidate and showing a particular choice -- a

16    preference and choice of candidate.

17         **THE COURT:**  What does the witness mean about

18    publish?  What's your definition for publish that you

19    are using?

20         **MS. MCKNIGHT:**  Oh, well, the definition that

21    I had been using were articles or a book.  I could use

22    a different definition, but I was --

23         **THE COURT:**  No, I was saying the issue was

24    the reliability of this report prepared for a specific

25    purpose at someone's request, as opposed to a general

1    publication of data.

2         **MS. MCKNIGHT:**  Fair enough, Your Honor.  I

3    understand.

4         **THE COURT:**  Whether that was a distinction is

5    what I want to be sure.

6         **MS. MCKNIGHT:**  I understand.  Let me ask a

7    question to cover your concern.

8    BY MS. MCKNIGHT:

9    Q.   Dr. Owen, based on your expertise and your

10   qualification as an expert as a statistician and a

11   political scientist, would you include this analysis in

12   any expert report you would submit in a court case like

13   this one here?

14   A.   If I were asked to look at certain elections for

15   the analysis of an expert report, then I would go and

16   try to find as many elections that would cover the

17   question or the challenge being presented.  So if I

18   need countywide elections, I would try to find as many

19   countywide probative elections as I could.  If this is

20   one of them, I would include it, but I would want to

21   have many more data points.  And the point being,

22   whether it's for a peer-review published article or for

23   an expert opinion, the more data you have that can tell

24   an accurate picture of the estimates -- because in

25   statistics, if your sample size increases, you have

1    less bias, and you have more confidence in what you're

2    actually generating and what you're telling.  So in an

3    expert report, if I had other similar countywide

4    elections, I would utilize that, but I would want to

5    have sufficient data points.

6    Q.   Okay.  Thank you.  And I think your answer focused

7    on this election.  I'd like to ask you about the

8    analysis done by Dr. McBride of that election.  If you

9    were preparing an expert report in a case like this,

10   based on your expertise, would you use and include this

11   analysis as prepared by Dr. McBride in that report?

12   A.   I would rely on an ecological inference analysis,

13   a statistical analysis.  Would I particularly look for

14   a write-in contest?  I'm not sure that that would be my

15   first reaction to use that as an analytical point.

16   Q.   Okay.  And should the Court, in your opinion, rely

17   on this, on Dr. McBride's analysis of this election?

18   A.   I have concerns about the reliability of this, so

19   I would not rely on this election in analyzing.

20   Q.   Thank you.  Now, Dr. Owen, I understand that you

21   teach or have taught political science courses in

22   Southern Politics?

23   A.   Yes.

24   Q.   In your area of expertise in political science, do

25   you have an understanding of racial voting patterns in

1    the South?

2    **A.**    In that Southern Politics class we do discuss

3    racial voting, and we look at trends.

4    **Q.**    So in order to teach that topic, have you looked

5    at, say, published literature on the topic?

6    **A.**    Yes.

7    **Q.**    Including things like social science studies on

8    the topic?

9    **A.**    Yes.

10   **Q.**    Political science studies on the topic?

11   **A.**    Yes.

12   **Q.**    Statistical studies on the topic?

13   **A.**    Usually included, yes, with the political science,

14   uh-huh.

15   **Q.**    And based on that expertise, statistically

16   speaking, as between a Republican and a Democrat --

17           **MR. SELLS:**   Objection, Your Honor.

18           **MS. MCKNIGHT:**   I haven't even finished the

19   question, Your Honor.

20           **MR. SELLS:**   I know where we're going.

21           **MS. MCKNIGHT:**   Okay.

22           **THE COURT:**   Well, for the record ask the

23   question, and I'll hear the objection.

24   BY MS. MCKNIGHT:

25   **Q.**    Statistically speaking, based on all that

1    expertise you just described, as between a Republican

2    and a Democrat, do African Americans tend to vote for

3    Democrat or Republicans?

4        **MR. SELLS:** The objection, Your Honor, is

5    that defendant's new counsel is trying to turn this

6    into a case about partisanship. The defendant's old

7    counsel did not. It was not disclosed in Dr. Owen's

8    initial report in 2014. That opinion about

9    partisanship was not disclosed in her supplemental

10   report in 2016. I have not had the opportunity to

11   depose her about it. This is new as of today.

12       **THE COURT:** Your response, counsel?

13       **MS. MCKNIGHT:** Your Honor, this is not about

14   partisanship, as I'm sure plaintiff's counsel is well

15   aware. This is about candidates of choice.

16   Plaintiff's own expert testified earlier this week that

17   something in the 90th percentile range, upper 90th

18   percentile range black voters tend to vote for

19   Democrats over Republicans. As plaintiff's expert is

20   well aware, as our expert is well aware, the data we

21   can use to try to determine which candidates of choice

22   are winning countywide is limited. We must have an

23   understanding of who the candidates of choice of the

24   African American community are. And this is part of

25   that. Plaintiffs have been well aware of that. It's

1    not a partisanship issue.  It's a trend issue.  It's a

2    political science issue.

3        **THE COURT:**  Well, it may be a political

4    science issue, but I think counsel has made the point

5    that it was not noticed as a matter that this witness

6    would testifying to.  And I think, in light of the

7    restrictions the Court made, that that's a fair

8    statement, and therefore the Court sustains the

9    objection.

10        **MS. MCKNIGHT:**  Okay.  Thank you, Your Honor.

11    Pardon me, Your Honor, just clean up.

12        **THE COURT:**  All right.

13    **BY MS. MCKNIGHT:**

14    **Q.**    Now, Dr. Owen, earlier today we were talking about

15    ACS data.  Do you remember that?

16    **A.**    Yes.

17    **Q.**    And I understood from you that you had reviewed

18    the factfinder results for the ACS release from last,

19    December 7th, released on December 7th, last week from

20    the American Community Survey for Sumter County; is

21    that right?

22    **A.**    Yes.

23        **MS. MCKNIGHT:**  Can we put -- Your Honor, what

24    we're putting on the screen now, and let me ask her a

25    few questions to establish it for you.

1    BY MS. MCKNIGHT:

2    Q.   When you discussed reviewing the factfinder

3    information --

4         MR. SELLS:  Your Honor, I'm -- excuse me, I'm

5    sorry, counsel -- but I think you've already sustained

6    our objection to her testifying about this, what is not

7    even an exhibit yet.

8         MS. MCKNIGHT:  Your Honor --

9         THE COURT:  Well, I will allow counsel to

10   state her question so the Court will fairly know what

11   is being stated and give you the opportunity to object.

12        MS. MCKNIGHT:  Sure.  Your Honor, just to

13   clarify, I think that mischaracterizes your ruling.

14   You had said we would like to have a document in front

15   of us, that would be useful.  So that's what we're

16   doing right now.

17        THE COURT:  Okay.  That was when you first

18   asked this question about Democrat or what --

19   predisposition.  I forgot what it was, but --

20        MS. MCKNIGHT:  That's okay, Your Honor.  This

21   is the ACS data issue from earlier today.  Some of my

22   first questions of Dr. Owen we received objections, and

23   you had suggested it would be useful to have paper in

24   front of us, have a document in front of us of this

25   recent release from last week so that we would know

1    what Dr. Owen was testifying about.

2         **THE COURT:**  All right.  You may ask her a

3    question to identify what the document is.

4         **MS. MCKNIGHT:**  Okay.

5    **BY MS. MCKNIGHT:**

6    **Q.**   Dr. Owen, do you recognize this document?

7    **A.**   Yes, this is what I reviewed.

8    **Q.**   And what is it?

9    **A.**   This is a from the -- well -- from the website,

10   it's the American Factfinder Results for Racial

11   Composition in Georgia and Sumter County through the

12   American Community Survey Five-Year Estimates.

13   **Q.**   And looking at the data under Sumter County

14   Georgia, what is the total estimate?

15   **A.**   31,070.

16        **MR. SELLS:**  Wait -- objection, Your Honor.

17   Now, she's putting evidence in the record.

18        **THE COURT:**  As you understand it, you expect

19   this witness to testify about the most recent ACS?

20        **MS. MCKNIGHT:**  Yes, Your Honor.

21        **THE COURT:**  I recall there was a discussion

22   about that in the plaintiff's case in chief?

23        **MS. MCKNIGHT:**  That's correct, Your Honor.

24        **THE COURT:**  Was this report discussed?

25        **MS. MCKNIGHT:**  Yes, that's right.

1          **MR. SELLS:**  Your Honor, that -- the data that

2     was discussed in the plaintiff's case in chief was from

3     last year's release, and it was part of the plaintiff's

4     judicial notice request that has already been briefed

5     and ruled on without objection by the defendants.  This

6     data was released last week and has not been produced

7     or discussed, but, more importantly, Dr. Owen in her

8     report has offered no opinions whatsoever about ACS

9     data.  This is not testimony from her personal

10    knowledge.  So this is expert testimony that was never

11    disclosed.

12         **THE COURT:**  Well, the Court will allow a

13    little more room, as far as I understood it the

14    testimony previously, about this type of information

15    that's used in making calculations so far as it relates

16    to statistical political science stuff, but if this is

17    after that time release, after last year, the Court

18    will not allow an entirely new additional document to

19    be added.

20         **MS. MCKNIGHT:**  Your Honor, this is --

21         **THE COURT:**  If you want to direct it to what

22    was discussed by the other expert in the case, as to

23    that most recent document, but to bring an entirely new

24    additional document in without notice, I think that

25    would be outside of the purview of the Court's rather

1    liberal ruling.

2           MS. MCKNIGHT:  I would agree that that would

3    be outside the purview of the Court, but the fact is

4    plaintiffs are on notice that ACS data is at issue in

5    this case, they've been on notice.  You have already

6    ruled that Dr. Owen may testify about ACS data in her

7    work as a statistician and a political scientist.

8    We've already heard testimony that she uses it, she

9    relies on it, she can review it.  Earlier today she

10   started talking from her own -- her own recollection of

11   reviewing this data that was recently released.

12   Plaintiffs are trying to take the fact that this was

13   recently released data and somehow claim that it's lack

14   of notice.  They have been on notice that ACS data is

15   relevant since the beginning of this case.  And if this

16   Court is going to rule, how can it not rule using the

17   most recent data.  That's number one.  Number two, this

18   data is showing population trends that is certainly at

19   issue in this case, and the most recent data is the

20   most reliable data.  Plaintiffs have had this data as

21   long as defendants have, and plaintiffs -- not only

22   that, plaintiffs will have -- because it was released

23   last week, their expert is aware it was released last

24   week and could have reviewed it.  Pardon me, Your

25   Honor.  The issue here is, this is data, they've been

1   aware of it; it's the most accurate data for this

2   Court.  And as she's already testified, it shows

3   population trends.  It's the most reliable data you can

4   have.  Not only that, it rebuts testimony from

5   plaintiffs and claims from plaintiffs that somehow

6   Sumter County is not majority African American.  The

7   population trends show otherwise, and the most reliable

8   data for this Court is in this document, is in the most

9   recent release.

10        **THE COURT:**  All right.

11        **MR. SELLS:**  Your Honor, there are two issues

12   here that I think the Court has to deal with.  Does it

13   want the data?  The parties can address the data

14   perhaps through a motion for judicial notice after the

15   trial once we both have an opportunity to look at it,

16   and we can determine whether there is anything unfair

17   about it.  The second issue, which frankly is more

18   important, is Dr. Owen's undisclosed opinions.  She is

19   just about to testify about what the future trend is of

20   the population in Sumter County.  That is an opinion

21   based on the data, it is an expert opinion based on the

22   data, and it should have been disclosed.

23        **MS. MCKNIGHT:**  Your Honor, she's not

24   testifying about a future trend.  She's reading numbers

25   from a page released from last week and will provide

1     the Court an estimate of the percentage, a calculation

2     of the percentage.  This is something you ruled on

3     earlier, and said that it would be admissible.

4          **THE COURT:**  Well -- all right.  If she's just

5     noting information, I'm going to be frank about it, if

6     the Court in making its ruling were to rule in favor of

7     the plaintiff, the Court would need the most recent

8     information, of information that's provided to the

9     Court, for the Court to make the most appropriate

10    decision for anybody's purpose.  So I don't see, if, if

11    in fact, this is available and it was known to the

12    other side, then I don't see any unfairness.  I see a

13    relevance to it if information of that kind is being

14    relied on, that obviously the Court doesn't want stale

15    information, if it is, in fact, relevant and something

16    the Court would need to rely on.  Now, so, with that

17    stated, I will allow it in.  And I will allow anyone to

18    comment on it if they want to by some supplement to the

19    record.  But for now, I'll let it in.  But the witness

20    may not give an opinion about the meaning of this

21    information, because that would violate the Court's

22    purpose.  But if it's the data itself that is in this

23    case, but of a early time, and the Court will expect to

24    rule sometimes early next year, and we'll be either

25    asking for a supplement, depending on how the Court

1    rules.  So if we can get there now with everybody in

2    the courtroom, with an ability to protect or give their

3    viewpoint, I think that would be the better way.  So to

4    that extent the objection is overruled.  But I do stand

5    by the objection.  I think the witness cannot expand

6    her area of testimony beyond that that the Court has

7    allowed based on her -- the representation as the Court

8    understood it from the notice that was given in the

9    prior testimony.

10            **MS. MCKNIGHT:**  Thank you, Your Honor.  I

11   appreciate it, and I understand.  And my questions will

12   be few in number.

13   **BY MS. MCKNIGHT:**

14   **Q.**   Dr. Owen, what does this document show as the

15   total estimated population for Sumter County, Georgia?

16   **A.**   31,070 residents or population.

17   **Q.**   And what does this document show as the quote,

18   unquote, white alone estimated population for Sumter

19   County Georgia?

20   **A.**   13,095.

21   **Q.**   And what does this document show as the black or

22   African American alone population estimate for Sumter

23   County, Georgia?

24   **A.**   16,159.

25   **Q.**   And have you calculated the percentage of black or

1    African American alone population in Sumter County,

2    based on this document?

3    **A.**    Yes.

4    **Q.**    And what is that percentage?

5    **A.**    You asked black or African American?

6    **Q.**    That's right.

7    **A.**    It is 52 percent.

8    **Q.**    And have you calculated the percentage of quote,

9    unquote, white alone population in Sumter County based

10   on this document?

11   **A.**    Yes.

12   **Q.**    And what is it?

13   **A.**    42 percent.

14        **MS. MCKNIGHT:**  Your Honor, because we're

15   dealing with this issue now, I'm going to move for the

16   admission of this as Exhibit DX-12.

17        **THE COURT:**  As Exhibit 12?

18        **MS. MCKNIGHT:**  Yes.

19        **THE COURT:**  All right.  Any further

20   objection, understanding what the Court's ruling was?

21        **MR. SELLS:**  Nothing beyond that, Your Honor.

22        **THE COURT:**  With that understanding, the

23   Court will allow it without objection.  I remember

24   better now that when Mr. McBride was testifying, I

25   think he said these were snapshot type matters, as

1    oppose to calculating things over a period at a

2    specific time like with the census, as I remember.  I

3    guess my memory maybe failed me, but I think he was

4    explaining the difference between what the value of the

5    figures and accuracy of figures by a census at the end

6    of ten years as opposed to these periodic ACSU -- what

7    is it?

8              **MS. MCKNIGHT:**  ACS data.

9              **THE COURT:**  ACS, right.  ACSU.  It's not

10   Albany State.  But this is a type of an ongoing data --

11   well, I guess snapshots I think was the term he used.

12   So the Court does think it will be relevant and useful

13   based on what's in the record and because of its

14   recentness, and obviously plaintiff may comment on it

15   by rebuttal after the completion of the defendant's

16   case.  So the Court admits it for those reasons.

17   **BY MS. MCKNIGHT:**

18   **Q.**   Dr. Owen, did you review any of Dr. McBride's

19   rebuttal reports?

20   **A.**   Yes, I believe I remember reading his rebuttal to

21   my supplemental report.

22   **Q.**   And how would you characterized his rebuttal?

23   **A.**   He critiqued the idea that I had not compensated

24   or incorporated the idea that he had used new data to

25   generate his ecological inference estimates, that I may

1    have discounted that in some way, and how he had used

2    now better data in the supplemental report.  And then I

3    believe another portion of that was that maybe I wasn't

4    clear about what the Eleventh Circuit opinions had

5    stated towards this case.

6    Q.   And what's your response to his rebuttal reports?

7    A.   I was aware that he had used turnout data that was

8    provided and that he had also accounted for where he

9    could, the split precincts.  I did account for that,

10   but I still saw inconsistencies and the EI estimates

11   that concerned me, that perhaps they are still not

12   reliable and there are other issues, methodologically

13   going on with the data.  And as far as the Eleventh

14   Circuit, I had read it, and I understood why he was

15   responding with certain elections -- using certain

16   elections in this new supplemental report.

17   Q.   Now, is it your opinion that it's simply not

18   possible to prepare reliable data or analyses using the

19   statistical methods Dr. McBride used?

20   A.   I'm sorry.  Could you ask that again?

21   Q.   Absolutely.  Using the statistical methods that

22   Dr. McBride used, is it simply impossible to prepare

23   reliable results?

24   A.   You can generate reliable results using ecological

25   inference, and bivariant ecological regression.  I

1    think we've all had a discussion how ecological

2    inference, the King method is a better method.  But

3    yes, you can get reliable results.

4    **Q.**   So it possible; it just wasn't accomplished here?

5    **A.**   Yes.

6    **Q.**   Thank you very much, Dr. Owen.

7            **MS. MCKNIGHT:**  No further question on direct.

8            **THE COURT:**  All right.  Mr. Sells cross

9    examination?

10           **MR. SELLS:**  Your Honor, I can't guarantee we

11   will finish, but I can certainly start.

12           **THE COURT:**  The Court anticipated we would

13   finish today or probably early tomorrow.  Is that a

14   fair -- I was going to ask y'all at the end of the day,

15   but is that a fair guesstimation that we will finish

16   tomorrow?

17           **MR. SELLS:**  I think that's right, Your Honor.

18           **MR. BRADEN:**  I believe so too, Your Honor.

19           **THE COURT:**  All right.  That's fine.  I think

20   I gave y'all -- I took the higher estimate, did I not?

21   So I think I'll be close to right on this one, but

22   you're fine.

23                        **CROSS EXAMINATION**

24   BY MR. SELLS:

25   **Q.**   Good afternoon, Dr. Owen, and happy birthday.

1    **A.**    Thank you.

2    **Q.**    There has been a lot of disagreement this

3    afternoon, but I want to start by asking you about a

4    few areas where I think you and Dr. McBride agree.  So,

5    you agree that racial turnout data is the best data

6    available in Georgia for a racial block voting

7    analysis, correct?

8    **A.**    Yes.

9          **THE COURT:**  What data -- I just missed.

10          **MR. SELLS:**  Racial turnout data.

11          **THE COURT:**  Okay.  Thank you.

12          **MR. SELLS:**  My apologies, Your Honor.

13    **BY MR. SELLS:**

14    **Q.**    And you agree that turnout data is better than

15    voting age population data in running a racial block

16    voting analysis?

17    **A.**    Yes.

18    **Q.**    And you agree that if you were reanalyzing an

19    election with turnout data that you had previously

20    analyzed with voting age population, you would rely on

21    the analysis using the turnout data, right?

22    **A.**    I'm sorry.  Could you ask that again?

23    **Q.**    Yes, I certainly can.  And you agree that if you

24    were reanalyzing an election with turnout data that you

25    had previously analyzed with voting age population

1    data, you would rely on the analysis using turnout

2    data, right?

3    **A.**    Yes, I would be more comfortable using the

4    analysis that had the turnout data.

5    **Q.**    And you agree, as we just heard, that Gary King's

6    ecological inference technique is a reliable

7    statistical technique for analyzing voting patterns in

8    a racial block voting analysis, right?

9    **A.**    Yes.

10   **Q.**    And you agree, generally speaking, that more

11   recent and endogenous elections are more probative than

12   older and exogenous elections, right?

13   **A.**    Yes.

14   **Q.**    And you agree that, generally speaking, cohesion

15   estimates in the 90s indicate high levels of cohesion,

16   right?

17   **A.**    What do you mean by cohesion estimates?

18   **Q.**    Estimates of black support for a candidate that is

19   in the 90s.

20   **A.**    So you are saying the EI estimate is in the 90s.

21   **Q.**    Well, I'm not limiting the question to EI, but it

22   --

23   **A.**    I'm sorry.  I did interpret you.  I was just

24   confused about what your --

25   **Q.**    -- my question isn't about a particular

1    methodology.  It's about whatever methodology is used

2    to generate an estimate of minority cohesion, you agree

3    that an estimate that is in the 90s is a high level of

4    cohesion?

5    A.    The estimate is high if it's in the 90.9 or the

6    90th percentile, and it would show that that preference

7    is high; those voter preferences are high.

8    Q.    And you would characterize that as high cohesion

9    or a lot of cohesion, right?

10   A.    Yes.

11   Q.    And the same is true of white preferences.  If

12   white voters prefer a candidate at levels approaching

13   90 or above, that would also be high cohesion in your

14   view, right?

15   A.    Yes.

16   Q.    And your -- excuse me.  You agree that Dr.

17   McBride's racial block voting analyses in this case

18   don't contain any standard errors that are

19   substantively large, correct?

20   A.    Are you talking about in his supplemental report,

21   because that's the one that contains standard errors.

22   Q.    Okay.  Let me rephrase then.  You agree that Dr.

23   McBride's racial block voting analysis, using the

24   ecological inference method does not contain any

25   standard errors that are substantively large, correct?

212 of 228

**A.**   I mean, I would have to look at each standard

error, but right now my recollection, I don't remember

some astronomically high standard error.

**Q.**   Well, do you recall me asking you that question in

your deposition?

**A.**   I don't remember the exact question.

**Q.**   Okay.

**A.**   But I --

**Q.**   I'd like to refresh your recollection on that, if

we could, and pull up Dr. Owen's deposition at page

221.  And I'd like to focus your attention on line 17

to 20.  Does that refresh your recollection of your

assessment of the standard errors in -- reported in Dr.

McBride's supplemental report?

          **MS. MCKNIGHT:**  Objection, Your Honor.  I'd

ask to allow the witness to review the entire page,

possibly the page before and the page after.  It's

possible this is a narrow answer to a narrow question,

but we couldn't possibly tell by the four lines

identified by the plaintiff's counsel.

          **THE COURT:**  I'll leave it to the witness.  If

the witness needs to see more to respond, she may ask

him to do it.

          **THE WITNESS:**  Yes, I would like to see the

entire page, perhaps the page before in this to see the

1    context of when the questions were asked?  Okay.  Can I

2    see the next?  Thank you.

3    **BY MR. SELLS:**

4    **Q.**    Dr. Owen, does that refresh your recollection of

5    your assessment of the size of the standard errors

6    reported in Dr. McBride's supplemental report?

7    **A.**    Yes.

8    **Q.**    And, in fact, you agree that Dr. McBride's

9    standard errors are not substantively large, correct?

10          **MS. MCKNIGHT:**  Objection, Your Honor, that's

11   a mischaracterization of her answer to the deposition

12   question.  Not only that, this is an improper method of

13   impeachment.  Her answer here is not different from the

14   answer she gave on the stand, so if we going --

15          **THE COURT:**  Well, I will let you all argue

16   that now.  The witness is on cross examination.  I

17   think it is a fair question.  The witness can respond.

18          **MR. SELLS:**  Well, to be clear, Your Honor,

19   I'm not impeaching the witness.  I'm refreshing the

20   witness's recollection.

21   **BY MR. SELLS:**

22   **Q.**    So, Dr. Owen, does this refresh what you --

23   actually I think we have already established that it

24   refreshed your recollection.  And so I'd like to ask my

25   original question that perhaps I can ask it in a

1    different way.  Based on your review of Dr. McBride's

2    supplemental report, you haven't identified any

3    standard errors that are substantively large, right?

4    A.    Not that I'm aware of, that I remember.

5    Q.    And as you sit here today, you don't remember any

6    standard errors in his supplemental report that are

7    substantively large?

8    A.    Not that I can recall.

9    Q.    Dr. Owen, the focus of your scholarship has been

10   primarily women in politics, hasn't it?

11   A.    Yes.

12   Q.    And are you familiar with the 2014 Senate race

13   here in Georgia between now Senator David Purdue and

14   Michelle Nunn?

15   A.    I'm aware of that race.

16   Q.    Have you studied that race?

17   A.    No, I have not.

18   Q.    Do you recall whether Senator Purdue won by a

19   small margin or large margin?

20   A.    No, I do not know the exact.

21   Q.    You testified earlier that Edith Green's margin

22   over her opponent in the 2014 race in one of the

23   majority black district was a small margin, I think the

24   number was 82 votes.  Do you recall that testimony?

25   A.    Yes.

1    Q.    Now, you also testified that there are, I think,

2    700 or so votes cast in that election, right?

3    A.    Yes.

4    Q.    And if I've done the math, I'm not a statistician,

5    but that's about an 11 percentage point margin, right?

6    A.    Yes.

7    Q.    Do you know whether that margin is larger than

8    President Obama's margin over John McCain in the 2008

9    presidential race in the popular vote?

10   A.    No, I do not know the exact count of that

11   election.

12   Q.    Do you know whether that 11 percent margin is

13   greater than President Obama's margin in the popular

14   vote over Mitt Romney in the 2012 presidential

15   election?

16   A.    I don't have those numbers in my memory.

17   Q.    Do you know whether that 11 percent point margin

18   is greater than Secretary Clinton's margin over

19   President Trump's in the popular vote in the 2016

20   presidential election?

21   A.    No.

22   Q.    Would it surprise you to learn that it was larger

23   than all three?

24   A.    I would want to see the numbers, so I don't know.

25   Q.    I heard you testify earlier and use the phrase

1    same electorate with regard to a district election for

2    the Board of Education.  Do you recall that testimony?

3    A.    Yes.

4    Q.    Now, the voters in a district are not the same as

5    the voter who would be able to vote in an at-large

6    election, correct?

7    A.    The voters who live in a district would be able to

8    vote in a countywide election.

9    Q.    But they're not the only voters who would be able

10   to vote in an at-large election, would they?

11   A.    No.

12   Q.    All right.  There are voters in other districts,

13   correct?

14   A.    Yes.

15   Q.    And so when you said, same electorate, you didn't

16   mean that the district election results include all of

17   the voters who would vote in an at-large election?

18   A.    No.

19   Q.    Or who would be eligible to vote in an at-large

20   election?

21   A.    No.

22   Q.    So how do you define electorate?

23   A.    So in this, the electorate of Sumter County would

24   be those citizens over 18 who are eligible to vote and

25   voting.  And so the electorate is of Sumter County and

1    then you could have an electorate within the district

2    which would be those citizens over 18.

3    Q.    Well, isn't it true that the electorate, let's

4    say, in district one is a citizen over the age of 18

5    who is registered to vote who also lives in district

6    one?

7    A.    I'm sorry, could you ask that --

8    Q.    Yes.  I'm trying to define the electorate for a

9    district race for the Board of Education.  So, for

10   example, in a district one race in order to be a part

11   of the electorate you'd have to be a citizen over the

12   age of 18, registered to vote, not otherwise ineligible

13   and a residence of district one?

14   A.    Correct.

15   Q.    Okay.  Now, the criteria to vote in an at-large

16   would be different, right?  So you would have to be a

17   citizen, over the age of 18, registered to vote, not

18   otherwise ineligible but there's no requirement that

19   you live in district one, is there?

20   A.    No.  You'd have to be living in the county.

21   Q.    And that geographic boundary is different than the

22   geographic boundary of district one, right?

23   A.    Yes, there's a boundary for the district --

24   Q.    And those are --

25   A.    -- but it's within the county.

1    Q.    And they're different.

2    A.    The district is within the county, so I may live

3    in district one, but I also live in the county as well.

4    Q.    So --

5    A.    I'm not just a district one only voter.

6    Q.    So when you testified earlier that, for example,

7    district one is the same electorate as an at-large

8    election, what you really meant to say was that

9    district one is part of the electorate of an at-large

10   election?

11   A.    It's same voters who live in district one.  They

12   can vote too in the countywide race.  They are a part

13   of the entire county electorate.

14   Q.    Thank you.  I think I understand your testimony a

15   little better.

16         **MR. SELLS:**  I'd like to put up Defendant's

17   Exhibit 6 at page 49, please.

18   Q.    I want to draw your attention to the black voting

19   age population number.

20   A.    I'm sorry, can I interrupt you for just a moment

21   to clarify.  Where is this from?

22   Q.    This is Defendant's Exhibit 6.

23   A.    Okay.  Thank you.

24   Q.    And I want to draw your attention to the black

25   voting age population number, which you said was

greater than the county at-large I believe.

**A.**   I don't remember saying greater than.

**Q.**   Okay.  My question to you is:  Do you know what the white voting age population of district three was in 2010?

**A.**   Not based off this, and I don't recall.

**Q.**   And you know -- don't know what the Hispanic voting age population was in district three in this 2010 election, do you?

**A.**   No.

**Q.**   I heard you testify earlier that you don't know why the three elections were not included in Dr. McBride's supplemental report, those three being the 2002, '04, and '08 district elections for Board of Education.  Do you recall that testimony?

**A.**   Yes.  Yes.

**Q.**   You sat in on Dr. McBride's deposition in the case, did you not?

**A.**   Yes.

**Q.**   And you read his rebuttal report, correct?

**A.**   Yes.  It's been a while, but yes.

**Q.**   And you sat in on his testimony here in this court when he explained why he did not repeat those analyses in his supplemental report; isn't that right?

**A.**   I was in the courtroom on Monday.

1   Q.   And you heard that testimony, correct?

2   A.   Yes.  I don't think I could say exactly what he

3   said, but I was here.

4   Q.   And you heard it.

5   A.   But, again, I don't recall exactly what he said,

6   but I was in the room.

7   Q.   Okay.  I didn't ask you anything other than

8   whether you heard the testimony.  I heard you mention

9   contextual effects or candidate effects?  I'm not sure

10  which term you used.  Do you recall that testimony?

11  A.   Yes.

12  Q.   And I heard you mention timing effects, meaning

13  that the timing of an election might affect how an

14  election performs?

15  A.   Yes.

16  Q.   And I think you mentioned down ballot effects?

17  A.   Yes.

18  Q.   Incumbency effects?

19  A.   Yes.

20  Q.   And maybe effects of the absentee ballot, such a

21  large number of absentee ballots or write-ins cast in a

22  particular election.  Do you recall that?

23  A.   Yes.

24  Q.   You didn't analyze what impact any of those

25  effects had on any election in this case in any of your

1    reports, did you?

2    **A.**   No, I was not asked to do analysis.

3    **Q.**   Now, one could analyze factors like that using a

4    multivariate analysis; isn't that right?

5    **A.**   Correct.

6    **Q.**   And you're aware that the Supreme Court in

7    *Thornburg versus Gingles* ruled that a multivariate

8    analysis that takes into account other effects is not

9    required to prove a claim of Section 2, right?

10   **A.**   Correct.

11   **Q.**   Your report doesn't contain any analysis -- excuse

12   me, let me start again.  Your reports in this case

13   don't offer any opinions about Dr. McBride's analysis

14   of census data in his report, right?

15   **A.**   Correct.  I was not asked to analyze that.

16   **Q.**   And your supplemental report doesn't contain any

17   opinions with respect to Section 6 of Dr. McBride's

18   supplemental report which is entitled Application of

19   Racial Block Voting Analysis to Illustrative Plan.

20   Correct?

21   **A.**   I was not asked to review that.

22   **Q.**   So your report doesn't contain any opinions on

23   that section of Dr. McBride's report?

24   **A.**   It does not.

25   **Q.**   And, in fact, you testified in your deposition

1      that you've never performed any analysis to determine

2      the viability of any districts, right?

3      **A.**    No.

4      **Q.**    No, you didn't testify to that in your deposition?

5      **A.**    I may have testified, no, I have not done the

6      analysis.

7      **Q.**    Okay.  I just want to be clear what your answer

8      was.  Now, in that section of Dr. McBride's report he

9      uses a conceptual framework for drawing effective

10     minority districts developed by Bernard Grofman, Lisa

11     Handley, and David Lublin.  Do you remember that?

12     **A.**    Yes.

13     **Q.**    And you're familiar with Bernard Grofman, right?

14     **A.**    Yes.

15     **Q.**    And you testified in your deposition that you

16     consider him to be an authority, correct?

17     **A.**    Yes.

18     **Q.**    In fact, you have cited his works in your own

19     scholarship, right?

20     **A.**    Correct.

21     **Q.**    There was some discussion of the 2004 election for

22     sheriff in Sumter County when -- on your direct

23     examination.  Do you recall that?

24     **A.**    Yes.

25     **Q.**    And you never --

1    **A.**   I'm sorry, excuse me.

2    **Q.**   Could I offer you a cough drop?

3    **A.**   Sure.  I'm sorry, Your Honor.

4          **THE COURT:**  Would you like some water?

5    You've got some?

6          **MR. SELLS:**  Your Honor, may I?

7          **THE COURT:**  You may do so.

8          **THE WITNESS:**  I'm sorry.  Thank you.

9    **BY MR. SELLS:**

10   **Q.**   Getting back to the 2004 sheriff's race that Ms.

11   McKnight asked you about.  I heard your testimony to

12   say that the number of write-ins gives you concerns

13   about the reliability of that analysis, right?

14   **A.**   Those were votes that were not accounted for in

15   the analysis.

16   **Q.**   And you did not express that opinion in your

17   supplemental report, did you?

18   **A.**   Not that I recall talking about that in detail,

19   no.

20   **Q.**   And you didn't express that opinion in your

21   March 20th deposition with me, did you?

22   **A.**   I don't recall talking about that.

23   **Q.**   Did you develop that opinion before or after new

24   attorneys were brought onto this case?

25   **A.**   I looked at those numbers sitting in the courtroom

1   on Monday.

2        **MR. SELLS:**  Your Honor, I'd move to strike

3   her testimony.  She's offered an opinion that was not

4   disclosed.  We did not have an opportunity to explore

5   this in deposition.

6        **THE COURT:**  Was the question -- was the

7   answer in response to your question, though?

8        **MR. SELLS:**  I'm sorry, I wasn't clear in what

9   I want stricken from the record.  What I -- I'm asking

10  to strike her testimony with regard to the 2004 sheriff

11  on direct from Ms. McKnight because it was an

12  undisclosed opinion.

13       **MS. MCKNIGHT:**  Your Honor, this issue came up

14  on Monday when we learned from plaintiff's expert

15  witness that he excluded over 4,000 votes from his

16  consideration of that tally based on an exhibit

17  submitted by plaintiffs.  So to the extent it was

18  undisclosed, it was undisclosed because plaintiff's

19  expert first disclosed the fact that he had excluded

20  numbers on Monday.

21       **MR. SELLS:**  And the defendant's attorney

22  deposed Dr. McBride on March 16th, 2017 and all the

23  data was available at the time.

24       **MS. MCKNIGHT:**  Your Honor, if I may, because

25  we may keep running into this.  We've already run into

1    it a number of times, and you've already ruled.  You've

2    already ruled that she's an expert in statistical and

3    political science and that she's allowed to look as his

4    election data and what elections he used and what it

5    means and what the data means and the value of it and

6    statistically in his report.  You also ruled that she

7    can't possibly identify every single possible opinion

8    she has about the flaws in his report in one report.

9    There has to be some leeway for issues identified by

10   plaintiff's expert on the stand on Monday for her to be

11   able to respond to that as rebuttal.

12            **THE COURT:**  The Court think it's within its

13   ruling.  The objection is overruled.

14            **MR. SELLS:**  Your Honor, I am about to launch

15   into a very lengthy section of my cross examination,

16   and we have about eight minutes to go.

17            **THE COURT:**  I was going to say, if we stay on

18   track and you all promise not to expand tomorrow beyond

19   what we rationally expect, and also the witness seems

20   to have some discomfort and maybe she can rest her

21   throat a bit, it would be easier for everybody.  So I

22   think we can stop a few minutes earlier.

23        Let me suggest to y'all this, that you consider it

24   overnight because when we complete the evidence, of

25   course, the Court does not want to deprive anyone of

1    allocution before the Court, but often, particularly

2    when I sit to hear a case as judge only, I offer the

3    parties to do a closing -- present their closing by

4    written argument.  And I think it allows you to

5    organize better, and it helps the Court more.  But I

6    won't -- if you want to do it, I'll let you argue to me

7    and tell me in great words and expressions that I'm

8    sure you are all capable of.  But -- you don't have

9    tell me anything, but if you all consider that and I

10   think everybody has to do it, either everybody argue or

11   everybody present a brief, so you all can talk about

12   that.  But that often helps the Court quite a bit, and

13   I offer that to you, but I'm willing to either way

14   you'd like to do that, and I wanted to let you know

15   that this afternoon so you can think about it, rather

16   than having to given an answer right away.

17            **MR. SELLS:**  May I ask a follow-up question on

18   that, Your Honor?

19            **THE COURT:**  Yes.

20            **MR. SELLS:**  Do you have an anticipated

21   deadline or due date in mind?

22            **THE COURT:**  We are going to talk about that.

23   Yeah, there would be a time set, a deadline for that.

24   Obviously I would need those at or near -- prior to or

25   at the time that you all make submissions of proposed

1     findings of law and conclusions of law.

2          **MR. SELLS:**  Thank you, Your Honor.  That

3     helps.

4          **THE COURT:**  All right.  Anything else?  If

5     not, am I right in estimation that the defendant should

6     finish tomorrow morning?

7          **MS. MCKNIGHT:**  You're correct, Your Honor, as

8     long as cross does not expand past the morning time, we

9     expect to finish by the morning.

10         **THE COURT:**  Well, he's going to have the

11    night to refine it, so I'm sure he won't go a long

12    time.

13         **MS. MCKNIGHT:**  I hope so.

14         **THE COURT:**  And does the plaintiff expect any

15    extensive in terms of time rebuttal?

16         **MR. SELLS:**  No, Your Honor.

17         **THE COURT:**  Okay, then.

18         **MR. SELLS:**  Short.

19         **THE COURT:**  We can expect to finish tomorrow

20    then.  All right, with that we're going to stop just a

21    few minutes early and we'll start back tomorrow morning

22    at 8:30.

23         **MR. SELLS:**  Thank you.

24         **THE COURT:**  We are adjourned.

25    _____

1          *CERTIFICATE OF OFFICIAL REPORTER*

2          *I, Sally L. Gray, Federal Official Court Reporter,*
   *in and for the United States District Court for the Middle*
3  *District of Georgia, do hereby certify that pursuant to*
   *Section 753, Title 28, United States Code that the*
4  *foregoing is a true and correct transcript of the*
   *stenographically reported proceedings held in the*
5  *above-entitled matter and that the transcript page format*
   *is in conformance with the regulations of the Judicial*
6  *Conference of the United States, dated this 20th day of*
   *December, 2017.*

7
                    */s/ SALLY L. GRAY*
8                   *SALLY L. GRAY, CCR, RPR*
                    *FEDERAL OFFICIAL COURT REPORTER*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25