1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF GEORGIA
2                            ALBANY DIVISION

3                       _____

        MATHIS KEARSE WRIGHT, JR., :   Case No.1:14-CV-42-WLS
4                                  :
                    PLAINTIFF    :
5       vs.                        :     December 14, 2017
                                   :      Albany, Georgia
6       Sumter County Board of     :
        Elections and Registration,:
7                                  :      Volume 4 of 4
                    DEFENDANT. :
8       _____

9                            BENCH TRIAL
                    BEFORE THE HONORABLE W. LOUIS SANDS
10              UNITED STATES DISTRICT JUDGE, PRESIDING

11      APPEARANCES:
        FOR THE PLAINTIFF:          BRYAN L. SELLS
12                                  P.O. BOX 5493
                                    ATLANTA, GA 31107
13
                                    LAUGHLIN MCDONALD
14                                  2700 INTERNATIONAL TOWER
                                    229 PEACHTREE ST NE
15                                  ATLANTA, GA 30303

16                                  AKLIMA KHONDOKER
                                    P.O. BOX 77208
17                                  ATLANTA, GA 30309

18      FOR THE DEFENDANT:          KATHERINE L. MCKNIGHT
                                    E. MARK BRADEN
19                                  RICHARD RAILE
                                    1050 CONNECTICUT AVE NW
20                                  STE 1100
                                    WASHINGTON, DC 20036-5403
21
                                    KIMBERLY A. REID
22                                  P.O. BOX 5005
                                    CORDELE, GA 31010
23      _____

                        SALLY L. GRAY, USCR
24                201 W. BROAD ST, SECOND FLOOR
                        ALBANY, GA 31701
25
                        (478)787-3905

1              *INDEX TO PROCEEDINGS*

2               *DECEMBER 14, 2017*

3                *VOLUME 4 of 4*

4        *DR. KAREN OWEN*

             *CONTD CROSS EXAMINATION BY MR. SELLS      5*

5            *REDIRECT EXAMINATION BY MS. MCKNIGHT       89*
             *RE-REDIRECT EXAMINATION BY MR. SELLS       110*

6

       *DR. FREDERICK MCBRIDE*

7        *(REBUTTAL) DIRECT EXAMINATION BY MR. SELLS   127*
             *CROSS EXAMINATION BY MS. MCKNIGHT          138*

8

*CERTIFICATE OF COURT REPORTER                      153*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G**

December 14, 2017                                    8:30 am

        **THE COURT:**  All right, you may proceed.

        **MR. SELLS:**  Your Honor, before I resume my
cross examination of Dr. Owen, I think we have three
items of housekeeping, I'd like to raise with the
Court.  First, is the offer that the Court extended at
the close of business yesterday to deliver our closing
arguments in written form, and I have conferred with
opposing counsel, and we accept that offer and would
like to extend an offer back to the Court that we'd be
willing to, presuming we finish at a reasonable hour
today, remain and answer any questions that the Court
may have, not make arguments per se, but if the Court
has any questions, we would like to answer them sooner
rather than later.

        **THE COURT:**  That's fine.  That's appropriate.
Thank you.

        **MR. SELLS:**  The second and third items are
related.  During the back and forth yesterday, I heard
you to say that you would like to see the most updated
ACS numbers, and we would like to set a deadline on
that, and I have conferred with opposing counsel, and
we suggest that the record be supplemented with regard
to the ACS data by the January 12th deadline for our

1    post-trial findings.  It may not take us that long but

2    what I envision is probably something similar to the

3    motion for judicial notice that we submitted using last

4    year's data.  I understood the Court to want something

5    similar but with the current data.

6         **THE COURT:**  That's fine.  The Court agrees

7    and accepts that stipulation.

8         **MR. SELLS:**  Okay.  And the last item is

9    similar to that one, we raised an objection to

10   Defendant's Exhibit 10 on the grounds that we hadn't

11   yet had enough time to check calculations that went

12   into that summary.  I understood that the Court

13   overruled our objection on that, but indicated that it

14   would give us time to supplement if it turns out that

15   when we check it we identify any errors, and we would

16   like that deadline to also be January 12th, and

17   opposing counsel has represented that they don't

18   disagree.

19        **THE COURT:**  That's appropriate.  The Court

20   agrees.  So ordered.

21        **MR. SELLS:**  Okay.  Well, that takes care of

22   my housekeeping, Your Honor.

23

24

25

1          **THE COURT:**  Okay.

2                **KAREN OWEN**

3     **Witness, having previously been sworn, testified on**

4          **CONTINUED CROSS EXAMINATION**

5     BY MR. SELLS:

6     **Q.**   Good afternoon, Dr. Owen.  I hope you're feeling

7     better today.

8     **A.**   Good morning.

9     **Q.**   Did you have the opportunity to confer with your

10    attorneys about your testimony last night?

11    **A.**   No.  I did not speak to them.

12    **Q.**   Okay.  I want to start this morning by taking

13    another look at the racial block voting analysis in Dr.

14    McBride's supplemental report which is Plaintiff's

15    Exhibit 6.

16          **MR. SELLS:**  And for these question, Ms. King,

17    I'm going to use the Elmo.

18    **Q.**   Dr. Owen, can you see what's on the Elmo?

19    **A.**   Yes.

20    **Q.**   Would you please identify that for the Court?

21    **A.**   This is a table that shows the May 24, 2016

22    four-year election contest, and it provides the

23    estimates of the percent of white and black support for

24    the candidate.

25    **Q.**   And this is table four from the supplemental

1    report on page 13; is that right?

2    **A.**    Yes.

3    **Q.**    Let me ask you first, you remember when we went

4    over these tables in your deposition, right?

5    **A.**    Yes.

6    **Q.**    Okay.  I want to start with the analysis that's

7    reported on this page.  You testified in that

8    deposition that you haven't identified any errors in

9    Dr. McBride's estimates in the part of the table that

10   is on page 13, correct?

11   **A.**    I would have to see the exact language I used.  I

12   don't remember what I said exactly on this particular

13   table in my deposition.  I remember our discussion of

14   the table.

15   **Q.**    Okay.  Well, then since you don't recall your

16   testimony at your deposition on that, let's put that on

17   the screen, and for that we need to switch over to

18   Mr. Bean.  Let's look at page 206, lines 4 to 12.  Does

19   that refresh your recollection of your testimony

20   regarding whether there are any errors in the part of

21   table 14 that are on page 13?

22        **MS. MCKNIGHT:**  Your Honor, if he would allow

23   the witness just to review the whole page in context.

24        **THE COURT:**  Well, I think -- let's just have

25   this understanding.  If the witness believes that she

1   needs more in response in being prepared to answer the

2   question, then the witness can ask for that, and the

3   Court will accommodate that rather than counsel having

4   to guess or participate.

5        **MR. SELLS:**  Your Honor, this seems like

6   coaching this witness to me.

7        **THE COURT:**  Well, that prevents that from

8   being -- I'm not suggesting that was the case, but that

9   prevents that from being a problem.  So the witness

10  understands if you believe you need more than what's

11  presented to you in order to be able to answer the

12  question, you may ask to do so and the Court will allow

13  that for you.

14       **MS. MCKNIGHT:**  Your Honor, I think it may be

15  more useful for him to elicit her testimony as it is

16  today.  If he needs impeach her, he's welcome to if

17  we're going to go a whole series 0f --

18       **THE COURT:**  Well, I'm going to allow him to

19  do his cross.

20       **MR. SELLS:**  Thank you, Your Honor.

21  **BY THE WITNESS:**

22  **A.**   I was going to ask that may I see this page, and

23  perhaps if I remember correctly in the discussion of

24  our deposition, you had asked me to assume that these

25  are reliable estimates and that would have been in

1   pages before, I believe.

2   **BY MR. SELLS:**

3   Q.   Okay.  Which page would you -- I want you -- we

4   have all day, so --

5         **THE COURT:**  No.  Go ahead, Mr. Sells.

6         **MR. SELLS:**  I think this is an important

7   point, Your Honor, because the witness has changed her

8   testimony.

9   **BY MR. SELLS:**

10  Q.   So I want you to look at your deposition for as

11  long as you need in order to identify whether, in fact,

12  that is your testimony.  And, well, let me rephrase

13  that.  My question to you was whether you had

14  identified any errors in this table, okay?

15  A.   As I read this page of my deposition, I stated

16  that:  No, not in error.

17  Q.   And you also testified that these estimates on

18  page 13 of Dr. McBride's report doesn't raise any cause

19  for alarm, right?

20  A.   I stated that, they seem fine, on the line 12

21  there.

22  Q.   Okay.  And we're on page 206 of the deposition,

23  right?

24  A.   Correct.

25  Q.   Now, let's turn to page 205.  Read that page.  Do

1    I ask you to assume anything about Dr. McBride's

2    estimates?

3    **A.**   I do not see that on this page.

4    **Q.**   But do you see on this page that at the bottom is

5    where we begin our discussion of Dr. McBride's tables?

6    **A.**   It says -- it starts with table four.

7    **Q.**   The tables that reflect his racial block voting

8    analysis, right?  That's the first table that reflects

9    his EI analysis?

10   **A.**   My recollection, yes, from -- that this is where

11   we started on the table.  I do remember a conversation

12   we had at the deposition that you asked me to assume

13   that they were realistic.

14   **Q.**   And that a part of a different conversation,

15   wasn't it?

16   **A.**   I would have to see the entire deposition and read

17   each part.

18   **Q.**   Your counsel can redirect you on that.  Let's go

19   back to tables on the screen -- on the Elmo, Ms. King.

20   Dr. Owen, you're aware of your duty to supplement the

21   record if you have identified any errors or omissions

22   from your report, right?

23   **A.**   Yes.

24   **Q.**   And you're aware that that duty to supplement

25   extends to the answers that you gave in your

1    deposition, right?

2    A.    Yes.

3    Q.    And in this case there was no supplement of your

4    report or of your deposition, was there?

5    A.    Not -- no, not that I recall.

6    Q.    And you're aware that your report itself must

7    contain a complete statement of the opinions that you

8    will express in this case?

9    A.    Yes.

10   Q.    And we went over that in your deposition, you

11   remember?

12   A.    Yes.

13   Q.    Now, you offered an opinion in your direct

14   testimony that you find Dr. McBride's analysis of this

15   race that is reflected on page 13 to be unreliable, do

16   you remember that?

17   A.    I'm sorry, could you ask that again?  Yesterday?

18   Q.    Yes.  In your direct testimony under questioning

19   from Ms. McKnight yesterday you offered an opinion that

20   you find Dr. McBride's analysis of this contest that is

21   reflected in table four, on page 13 to be unreliable.

22   Do you remember that?

23   A.    Yes.

24   Q.    Now, that opinion does not appear anywhere in your

25   report, does it?

1    **A.**   I would have to look at every contest that I

2    discussed in my report.

3    **Q.**   You have your report sitting at your left foot.

4    There's a binder of the defendant's exhibits.  Your

5    report is Exhibit 5.  Could you please pull that out?

6    Do you have that report in front of you?

7    **A.**   Yes.

8    **Q.**   Okay.  Now, did you review that report in

9    preparation for your testimony at trial here this week?

10   **A.**   I did review it Monday night.

11   **Q.**   And you've read what was in that report numerous

12   times over the course of this litigation, haven't you?

13   **A.**   Yes.

14   **Q.**   Okay.  Now, I'd like you to spend a few moments

15   reviewing your report and tell me on which page of that

16   report you offer an opinion that this race is

17   unreliable?

18   **A.**   *(Witness complying).*

19        **MR. SELLS:**  I'd like the record to reflect

20   the clock indicates that it's 8:50 a.m.

21   **Q.**   Take as much time as you need.

22   **A.**   On page 14 of my supplemental report I mention

23   that it is understandable to include the most recent

24   2016 election as it is probative.  And then I write:

25   These changes and inconsistent estimates make Professor

1    McBride statistical analysis and therefore his findings

2    and overall conclusions unreliable, which goes to page

3    15.  And I discussed:  Between the --

4    **Q.**   Which line, excuse me, this is page 14 of your

5    report?

6    **A.**   It's page 14.  I don't have a line, sir.

7    **Q.**   All right.  Can we put on the computer page 14?

8    Would you please draw and indicate the part where you

9    think the plaintiffs were put on notice that you find

10   this race unreliable?

11   **A.**   I mention right here where I started to read:  It

12   is understandable to include the most recent 2016

13   election.  And then I go down and state:  These changes

14   -- that goes into the page 15 which I read --

15   inconsistent estimates make Professor McBride

16   statistical analysis and therefore his findings and

17   overall conclusions unreliable.  I did not specifically

18   address that particular race in my other part of my

19   report, but it goes into my overall opinion that the

20   races he included there are unreliable and

21   inconsistencies in his analysis.

22   **Q.**   Now, wait.  Back up, as I read page 14, you're

23   saying it's understandable to include this race, right?

24   **A.**   Yes, because it's probative.

25   **Q.**   But you're not identifying this one as unreliable?

1   A.   I did not directly address this race in the

2   previous pages where I had discussed other races, but I

3   discus that overall there are inconsistencies in the

4   analysis that I felt like made the record have

5   unreliable estimates --

6   Q.   Now --

7   A.   -- and could not be conclusive on some of the --

8   conclusive on some of the assertions or inferences he

9   was making.

10  Q.   And this report didn't appear in Dr. McBride's

11  original report, did it?  Excuse me, this election did

12  not appear in Dr. McBride's original report, did it?

13  A.   No.

14  Q.   And there's nothing inconsistent in his analysis

15  of this race between the 2014 report and the 2016

16  report because there is the 2016 election.

17  A.   There's nothing to compare it to to the first

18  report because --

19  Q.   Which means that it's not an inconsistency, right?

20  A.   There are inconsistencies in other elections,

21  therefore just seeing this I don't have a comparison,

22  but I don't know that I could honestly say, I just

23  trust what's put in front of me.

24  Q.   Did you develop that opinion before or after the

25  defendant hired new counsel?

1    **A.**    I've had that opinion, which I think I've stated

2    in the supplemental report that I believe there are

3    inconsistencies which led me to believe that there are

4    unreliable -- this is unreliable analysis.

5         **MR. SELLS:**  Your Honor, we move to exclude

6    Dr. Owen's opinion with respect to this election.  It

7    was not identified in her report.

8         **MS. MCKNIGHT:**  Your Honor, as Dr. Owen just

9    explained, this was part of her report, it was part of

10   her analysis.  She has included it in her supplemental

11   report.  Her opinion yesterday was look, the

12   inconsistencies, the number and variety of

13   inconsistencies between the first report and the second

14   report concern me.  Even though this is a new election

15   it still concerns me, the quality of this analysis

16   causes me concern, but I don't know that I can rely on

17   it to make the conclusions that Dr. McBride is making.

18   Now, there are suggestions that this is a new opinion

19   since new counsel has been hired, but it's clear that

20   that opinion that's in Dr. Owen's report, it's been

21   there, the plaintiffs have been on clear notice for a

22   long time since Dr. Owen has submitted the report that

23   her opinion is it's not reliable, the data is not

24   reliable, and I can -- I can certainly ask her a few

25   questions on redirect to address this.

1          **MR. SELLS:**  Your Honor, her deposition

2    testimony says:  There's no cause for alarm.  They did

3    not supplement.  This is clearly a manufactured opinion

4    with new counsel.

5          **THE COURT:**  All right.  Well, the Court is

6    going to deny the motion.  I think it goes to the

7    weight of the argument, and I think the Court trying to

8    make such a fine line tuning determination of what is

9    exactly and precisely and certain of what is implicit

10   and what is generally stated isn't beneficial to the

11   Court.  The Court can't really do it, but the points

12   being made I think are things the Court would take

13   into, the Court will take into account.

14          **MR. SELLS:**  Thank you, Your Honor.

15          **THE COURT:**  That's the Court's ruling.  All

16   right.

17          **MR. SELLS:**  Ms. King, if we can go back to

18   the Elmo.  And, Dr. Owen, I want to stay with this

19   analysis.

20          **THE COURT:**  And as I will reiterate, and I've

21   said it before, of course, the Court is looking the --

22   has accepted this witness's testimony based on the

23   presentation of her as an expert in statistical matters

24   and political science.  So that's the way the Court is

25   looking at it to evaluate it.  All right.

1    BY MR. SELLS:

2    Q.   Now, Dr. Owen, I want to ask you about some of the

3    estimates on here, and I'm going to circle first the

4    estimate of black cohesion for Michael Coley that --

5    you see 93.6?

6    A.   Yes.

7    Q.   You would agree with me that that is an estimate

8    of high cohesion amongst black voters, right?

9    A.   If these are realistic estimates, yes.

10   Q.   Well, and your deposition testimony you found no

11   cause for alarm in looking at these estimates, right?

12   A.   Correct.

13   Q.   And the estimates reflected in this table on page

14   13 also show that the election is racially polarized,

15   right?

16   A.   It shows cohesion between the black voters to one

17   candidate and cohesion for white voters for another

18   candidate.

19   Q.   And you're aware that white voters were a majority

20   of the voters who turned out in this election, right?

21   A.   I would have to see the turnout numbers.  I don't

22   have that memorized for each contest.

23   Q.   You don't have any reason to dispute that as you

24   sit here today, right?

25   A.   Again, I'd want to see for sure the number.  I

1    mean, I don't have a reason to sit here and argue over

2    what you're saying, but, you know, as a researcher I'd

3    like to see numbers presented.

4    **Q.**   Okay.  Well, those numbers are already in the

5    record and so I won't get us bogged down in looking at

6    them.  But based on these numbers, you would agree that

7    Michael Coley is the minority preferred candidate in

8    this race, right?

9    **A.**   He's been identified as that, yes.

10   **Q.**   And you would agree that Mr. Coley was defeated by

11   the choice of white voters, Sylvia Roland?

12   **A.**   Ms. Roland won the election.

13   **Q.**   I'm going to mark this with an L.  Do you see

14   that?

15   **A.**   Yes.

16   **Q.**   Okay.  I'm going to move to the next election in

17   Dr. McBride's analysis, and the table unfortunately

18   spans the page break, so I'm going to have to slide

19   both pages onto the Elmo.  See if you can see it.  Can

20   you see that?

21   **A.**   Yes.

22   **Q.**   And so I want to look at the next election which I

23   believe was the May 20th, 2014, two-year at-large

24   position.  And this was between Coley, Kitchens,

25   Roland, and Taft.  Do you see that?

1    **A.**   Yes.

2    **Q.**   Now --

3    **A.**   I'm sorry, *(coughs).*

4    **Q.**   This is a race as to which you testified yesterday

5    that you have concerns because the estimates of black

6    cohesion that I've just circled add up to about

7    105 percent; is that right?

8    **A.**   Yes.  They add up to over a hundred.

9    **Q.**   And that's the basis for your concern?

10   **A.**   It raises concerns about the reliability of those

11   estimates, yes.

12   **Q.**   And you haven't identified any other concerns with

13   this particular table, have you?

14   **A.**   Not that I can recall right now.

15   **Q.**   Okay.  For example, none of the standard errors

16   reported on this table are substantively large enough

17   to raise any concerns, right?

18   **A.**   I mean, it depends on how you define substantively

19   large, but I don't find them to be large.

20   **Q.**   Well, I'm asking you.  You don't find --

21   **A.**   I think the standard errors reported, they are --

22   I mean, they make sense, yes.

23   **Q.**   Okay.  But this is a race for which you had some

24   concerns about the black cohesion estimate adding up to

25   over 100.  So I'm going to draw a bracket around that.

1   And I want to focus next on the following race in the

2   table -- this is on page 14.  Can you see that?

3   A.   I'm sorry, the next race down?  Can you clear --

4   where I can --

5   Q.   There we go.  I'm referring to the May 20, 2014,

6   four-year election between Michael Busman and Kelvin

7   Pless.

8   A.   Okay.

9   Q.   Do you see that?

10  A.   Yes.

11  Q.   Now, the estimates of black and white cohesion

12  using the EI method do not exceed 100, correct?

13  A.   If my math is correct on the white, it's 100.2,

14  but it's close enough to a hundred, so, yes.

15  Q.   So that .2 difference isn't enough to raise

16  concerns from you, right?

17  A.   I mean, I'd wonder why it's not precise.

18  Q.   It could be a rounding error?

19  A.   Possibly, I'm not a hundred percent sure.

20  Q.   And the estimates of black cohesion don't exceed

21  100, right?

22  A.   No.

23  Q.   Okay.

24  A.   They don't add to a hundred exactly.

25  Q.   Are there any standard errors on this table that

1    are large enough that they raise concerns about the

2    substance of this table?

3    **A.**    No.

4    **Q.**    And the estimates on this table reflect high

5    cohesion for Kelvin Pless among the black voters,

6    correct?

7    **A.**    As reported, yes.

8    **Q.**    And they reflect high polarization, indeed, white

9    voters voted at 94.4 percent for Michael Busman, right?

10   **A.**    Yes.  That's what's reported.

11   **Q.**    You didn't offer any opinion about the reliability

12   of this particular election in your report or

13   deposition, did you?

14   **A.**    Again, I'd have to look exactly through the report

15   to pull which ones I discussed in detail.

16   **Q.**    Okay.  Your report is 15 pages long.  Go ahead and

17   take a moment to review the report and point out to me

18   where you raise concern about the reliability of this

19   particular election.

20   **A.**    I do not see anything that directly relates to

21   this one, where I call it out specifically.

22   **Q.**    And you didn't call it out specifically in your

23   deposition, right?

24   **A.**    Again, I'd have to look directly through the

25   questions and answers on the deposition.  I do not have

1   it memorized.

2           **MR. SELLS:**  Your Honor, I understand the

3   Court's previous ruling, and I won't move to exclude at

4   this point but --

5           **THE COURT:**  I understand your point, but for

6   the same reason as you suggested, the Court thinks it's

7   a weight matter rather than exclusion matter.

8           **MR. SELLS:**  I want to try to move us along.

9           **THE COURT:**  All right.  Thank you.

10  BY MR. SELLS:

11  **Q.**   Now, Kelvin Pless was defeated by the candidate

12  preferred by white voters in this race, wasn't he?

13  **A.**   Michael Busman was the winner in this contest.

14  **Q.**   And Michael Busman was the choice of white voters,

15  right?

16  **A.**   As these estimates are reported, yes.  He received

17  support from the white community.

18  **Q.**   And white voters were a majority of the turnout in

19  this election, right?

20  **A.**   Again, I don't know specific turnout numbers.

21  **Q.**   Now, this was an election that you -- that was --

22  scratch that.  Kelvin Pless was the minor preferred

23  candidate, right?

24  **A.**   Yes, that's reported.

25  **Q.**   And Kelvin Pless lost, right?

1    **A.**    Yes.

2    **Q.**    Okay.  I'm going to write an L next to this race.

3    And I want to focus on the last one on this table.

4    Now, Dr. McBride's EI estimates, if I've done my math

5    correctly, don't exceed 100, right?

6    **A.**    Correct.

7    **Q.**    And we're talking about the runoff, the July 22,

8    2014 runoff, right?

9    **A.**    Correct.

10   **Q.**    And the standard errors that are reported in this

11   table don't raise any substantive concerns, right?

12   **A.**    No.

13   **Q.**    And you haven't identified any errors in these EI

14   estimates, have you?

15   **A.**    I don't believe so.

16   **Q.**    Now, these estimates show extremely high cohesion

17   belong blacks voters for Coley, right?

18   **A.**    Yes.

19   **Q.**    And it shows high cohesion for Sylvia Roland among

20   white voters, correct?

21   **A.**    It shows her receiving over 90 percent, so, yes.

22   **Q.**    Would you characterize that as high?

23   **A.**    Yes.

24   **Q.**    This race is polarized, correct?

25   **A.**    As it's reported here, yes.

1    Q.    And do you know whether white voters were a

2    majority of the turnout in this election?

3    A.    I do not, no.

4    Q.    Would that be relevant to your analysis if you had

5    analyzed this race?

6    A.    I would -- yes, I would have utilized turnout data

7    to run the estimate, and I would have looked at the

8    turnout.

9    Q.    And in analyzing this for purposes of the *Gingles*

10   factors whether white were the majority of the voters

11   or the minority of the voters would have been relevant

12   to your *Gingles* analysis, wouldn't it?

13   A.    I think it's important to know the turnout of the

14   voters, yes.

15   Q.    Okay.  And according to these estimate Michael

16   Coley is the minority preferred candidate, correct?

17   A.    Yes.

18   Q.    And Michael Coley lost, right?

19   A.    Yes, Sylvia Roland won.

20   Q.    I'm going to write an L next to this race.  Now,

21   your report and your deposition contained no opinion

22   about the reliability of this particular race, do they?

23   A.    I don't remember that I wrote directly on this

24   particular race in the report, but, again, it goes back

25   to the discussion of the complete reliability and

1    consistency in reporting data.

2    **Q.**    And you didn't supplement your report to identify

3    reliability concerns with this particular race

4    reflected in Dr. McBride's supplemental report?

5    **A.**    No.

6    **Q.**    You agree that the at-large school board elections

7    are the elections that are most at issue in this case,

8    right?

9    **A.**    Yes.

10    **Q.**    Okay.  If we look at how minority preferred

11    candidates performed in the elections for which you --

12    that we've just discussed this morning -- I'm not sure

13    I can put both of these on the screen, but it's 0 for

14    3, isn't it?

15    **A.**    I'm sorry.  Could you ask that again?

16    **Q.**    Yeah.  Minority preferred candidates are 0 for

17    three in these elections in table four that we have

18    just discussed?

19    **A.**    Yes.

20    **Q.**    And table four contains the at-large elections

21    which are the elections at issue primarily in this

22    case?

23    **A.**    Yes.

24    **Q.**    I'd like to look now at table five.  This is

25    another table that's splits the page break, and I

1      apologize for that.  Let's see -- oops.  Can you see

2      the first election that's reported in table five, Dr.

3      Owen?

4      A.    Yes.

5      Q.    Now, this is another election about which you

6      testified yesterday, and I believe you indicated that

7      your concern was that the cohesion estimates for white

8      vote exceeds 100 percent if you add them all up?

9      A.    Yes.

10     Q.    And those estimates for white voters would be in

11     this column I'm marking on the Elmo, correct?

12     A.    Yes.

13     Q.    And about what do they add up to?

14     A.    103, 104 percent.

15     Q.    103 -- between 103 and 104 percent.  Now, since

16     you identified concerns about this race, I'm going to

17     draw some brackets around the sides.

18     A.    I believe I also identified here that the

19     estimates changed in the white voters for EI.  So

20     Lockhart and -- I'm sorry.  I believe it was Green and

21     Lockhart's numbers, there were inconsistencies in those

22     numbers.  They were reverse -- or they were changed in

23     that way.

24     Q.    Now, when you say inconsistencies, you mean

25     relative to Dr. McBride's initial report produced in

1    2014 using voting age population data, correct?

2    **A.**   Yes.

3    **Q.**   Okay.  But as to the estimates reported here on

4    this page, the only concern that you identified in your

5    report, for the deposition, for your testimony

6    yesterday was that the white cohesion estimates exceed

7    100 by between 3 and 4 percentage points?

8    **A.**   Correct.

9    **Q.**   I'd' like to move to the next election in table

10   five.  This is May 20th 2014, district two election.

11   Do you see that?

12   **A.**   Yes.

13   **Q.**   And this is another race where you expressed some

14   concern because the cohesion estimate this time for

15   black voters exceeds 100 percent, correct?

16   **A.**   Yes.

17   **Q.**   And I'm going to mark that column with an arrow.

18   Did I mark that correctly?

19   **A.**   Yes.

20   **Q.**   And those estimates add up to about 121, 122,

21   something in that matrix?

22   **A.**   Yes.

23   **Q.**   Did you identify any other concerns with the

24   estimates reported on this table?

25   **A.**   White voter estimates don't add up to a hundred

1    percent, but --

2    **Q.**    To what do they add up?

3    **A.**    94.

4    **Q.**    94.  Okay.

5    **A.**    94.9.

6    **Q.**    Okay.  And I'm going to put an arrow over the

7    cohesion estimates for white voters.  The standard

8    errors on this page aren't substantively large so as to

9    give you a concern, are they?

10   **A.**    No.

11   **Q.**    Okay.  Since you've identified -- well, let me ask

12   you.  Are there any other bases for your concerns about

13   the estimates on this table?

14   **A.**    With the inconsistent -- well, with the estimate

15   for black voters supporting the candidates adding up

16   over a hundred percent calls in the reliability of

17   these and knowing with confidence that the African

18   American community coalesced behind one particular

19   candidate.

20   **Q.**    Would that -- but that concern is related to the

21   fact that the estimates exceed 100 percent, right?

22   **A.**    Yes.

23   **Q.**    Okay.  My question to you was whether there are

24   other bases for concerns about the estimates reported

25   on this table?

**A.**    No.

**Q.**    Let me ask you, Dr. Owen, this is a multi-candidate race, isn't it?

**A.**    Yes.

**Q.**    And this can't be analyzed using two by two tables, right?

**A.**    Correct.

**Q.**    Can you explain to the Court what a two by two table is?

**A.**    A two by two table is a contingency table, so you would have the candidate in a particular row and then you'd have the black and white supporters in a particular column or vice versa, right now, and then they would have their -- so for candidate A, how black supporters vote that candidate in one cell, and then in another cell right besides that how the nonblack support that candidate A, and then the same for B.  So it's, like, filling in those cells, the tables within the -- those cells within that table.

**Q.**    And a two by two table is kind of like the lowest common denominator or basic unit of a statistical analysis, right?

**A.**    Yes.

**Q.**    The first election in table five where we identified that you had concerns, that's also a multi-

1    candidate race, correct?

2    **A.**   Correct.

3    **Q.**   And you remember in table four the four-person

4    race about which you expressed concern because the

5    estimates exceeded 100, that was also multi-candidate

6    race too, wasn't it?

7    **A.**   Which race?  Sorry.  Are you talking about the

8    at-large four-candidate --

9    **Q.**   Yes.  Let me show you on the screen so we can be

10   clear.  I'm talking about the race for the two-year

11   at-large seat between Coley, Kitchens, Roland, and Taft

12   that went to a runoff, and I put a bracket in the

13   margin because you had identified concerns about that

14   race.

15   **A.**   Yes.

16   **Q.**   And that is a multi-candidate as well?

17   **A.**   Yes.

18   **Q.**   Going back to table five -- do you want to get

19   some water?  I'll wait for a moment.  Okay.  I want to

20   direction your attention to the third race in table

21   five, this being the district three race from 2014

22   between J.C. Reid and Willa Fitzpatrick.  Do you see

23   that?

24   **A.**   Yes.

25   **Q.**   Now, the estimates of white and black cohesion do

1    not substantially exceed 100, do they?

2    **A.**   So the black voters is over a hundred, but you

3    asked substantially?

4    **Q.**   I asked substantially.

5    **A.**   No.

6    **Q.**   And there are no standard errors on this table for

7    this election that are substantively large that raised

8    concerns for you, correct?

9    **A.**   No.

10   **Q.**   And this table reports high cohesion among black

11   voters for Willa Fitzpatrick, correct?

12   **A.**   As -- yes, as reported.

13   **Q.**   And this table reports high white cohesion for

14   candidate J.C. Reid, correct?

15   **A.**   The estimate is 95, yes.

16   **Q.**   And you would characterize that as high?

17   **A.**   Yes.

18   **Q.**   And this race is polarized, racially polarized --

19   I'm sorry, I'll --

20   **A.**   I'm sorry.  Would you ask that again?

21   **Q.**   Yes.  I will start again.  This table reflects

22   high polarization, correct?

23   **A.**   It shows polarization, yes.

24   **Q.**   Would you characterized that level of polarization

25   as high?

1   **A.**   I mean, the estimates are over 90 percent, so,

2   yes, high.

3   **Q.**   And white voters were a majority of the turnout in

4   this election, right?

5   **A.**   In this district race, I don't know.

6   **Q.**   Okay.  Willa Fitzpatrick was the minority

7   preferred candidate in this race, correct?

8   **A.**   Yes.

9   **Q.**   And Willa Fitzpatrick was defeated by J.C. Reid,

10  the preferred candidate of white voters, correct?

11  **A.**   J.C. Reid won the contest.

12  **Q.**   All right.  I'm going to mark this one with an L

13  in the margin.  Do you see that?

14  **A.**   Yes.

15  **Q.**   Now, in your report you didn't raise any concerns

16  about this race with regard to the estimate that -- of

17  black cohesion that exceeds 100 by about a percentage

18  point or a little bit less than a percentage point, did

19  you?

20  **A.**   I mean, I'd have to, again, look exactly, but I

21  don't recall.  I know I talked about those that

22  exceeded a hundred percent raising concerns.

23  **Q.**   But you didn't identify this one in particular,

24  did you?  Do you need to look at your report?

25  **A.**   I am looking at the report.

1    Q.   Okay.  Take a moment and look at your report and

2    see if you identified this race as being unreliable

3    because the estimates of minority cohesion are 100.8.

4    A.   I did point out on page ten of my report, I did

5    discuss this election about how -- it reads:

6    Nonetheless, Professor McBride reports in his

7    supplement expert report significant racial cohesion

8    among the candidate preferences.  McBride shows the

9    percentage of black voters for minority preferred

10   candidate Fitzpatrick as to be 92.3 and the percentage

11   of the white voters support candidate Reid to be 95

12   percent.  These estimates are very different than the

13   previous estimates reported by Professor McBride.

14   Q.   Well, I understand that, Dr. Owen, but my question

15   to you was, can you identify where in your report you

16   raise any concern with respect to the fact that these

17   estimates exceed 100 by less than one percentage point?

18   A.   It does not say that.

19   Q.   Okay.  I just want to be clear on the basis for

20   your reliability concerns about this election.  Now, I

21   want to move to the last election reported on this

22   table, which is the May 20th, 2014, election in

23   district five between Edith Green and Mark Griggs.  Do

24   you see that one?

25   A.   Yes.

1    **Q.**   Now, the cohesion estimates for white and black

2    voters don't exceed 100, do they?

3    **A.**   No.

4    **Q.**   And there are no standard errors on this table

5    that are large enough to raise substantive concerns for

6    you, correct?

7    **A.**   No.

8    **Q.**   This table reflects high cohesion among voters for

9    Edith Green, right?

10   **A.**   It shows different voter patterns.  It's not above

11   90 percent.

12   **Q.**   Would you characterize 85.5 percent as anything

13   other than high?

14   **A.**   It's a -- it's a significant indicator.

15   **Q.**   The white cohesion for Mark Griggs reported in

16   this table is even higher than that, 86.4; isn't that

17   right?

18   **A.**   It is higher.

19   **Q.**   And this race is polarized, right?

20   **A.**   Yes, as reported here.

21   **Q.**   Right.  And you were in the courtroom when

22   Ms. Green testified on Tuesday, were you?

23   **A.**   No, I was not.

24   **Q.**   You were not.  Okay.  Do you know whether district

25   five was majority black?

1    **A.**   I don't recall, but I believe it is.  I don't

2    recall with certainty, but I believe district five is

3    one of the majority minority districts.

4    **Q.**   And you testified in your deposition that you had

5    no issues with the estimates reported in this table,

6    right?

7    **A.**   I don't recall.  I don't remember saying anything

8    about this particular election.

9    **Q.**   Well, you know we went over every election in Dr.

10   McBride's analysis, right?

11   **A.**   Yes.  But I don't remember exactly what I said on

12   every election.  I know we discussed each election.

13   **Q.**   Well, can we switch over to the computer and pull

14   up Dr. Owen's deposition at page 213, lines 14 to 19.

15   And, Dr. Owen, please review that silently and see if

16   that refreshes your recollection that you, in fact,

17   that you didn't see any issues with the other estimates

18   presented in table five.

19   **A.**   Could you ask your question again now that I've

20   read it?

21   **Q.**   The question is, you testified in your deposition

22   that you have no issues -- or you didn't see any issues

23   with the estimates for any of the other races in table

24   five; those other races, referring to the Edith Green

25   and Mark Griggs race?

**A.**   That's what I stated.

**Q.**   Okay.  Thank you.  Can we switch back over to the Elmo?  Now, you expressed no opinion in your report or deposition about the reliability of this particular set of estimates, did you?

**A.**   Not that I recall.

**Q.**   Okay.  Since this contest took place in a majority black district, I'm going to make a notation -- well, let me back up.  Edith Green won this race, correct?

**A.**   Yes.

**Q.**   Since this district took place in a majority black district, I'm going to mark on the side an MB.  You don't know whether black voters were a majority of the turnout as well, right?

**A.**   No.  What is MB?

**Q.**   Majority black.

**A.**   Okay.  I just want to clarify.

        **MR. SELLS:**  You want to move to table six?  Actually go back.  Stay with table five.

**Q.**   You identified concerns with two races in table five with regard to the cohesion estimates exceeding 100, and we've noted those with a bracket, right?

**A.**   I can't see the entire table.  I can only see the first.  Thank you.

**Q.**   I'm going to scroll it for you.  So we noted on

1    this -- in the margins that you had concerns about the

2    estimates exceeding 100 with regard to two of the races

3    on this table.  One of the races on this table took

4    place in a majority black district that we denoted with

5    MB, and the other race reflected in this table resulted

6    in the lost for the minority preferred candidate,

7    right?

8    **A.**   Yes.

9    **Q.**   So among the races reflected on table five where

10   you found otherwise reliable estimates in this table,

11   there was one lost and no victory for the minority

12   preferred candidate?

13   **A.**   You noted a loss.  We noted in the majority black

14   district there was a victory for the minority preferred

15   candidate and then the other two were questionable.

16   **Q.**   Okay.  Thank you.  Now, let's move to table six.

17   There's only one election in this table.  This is page

18   17 and over to 18, and it's Dr. McBride's supplemental

19   report.  Do you see that?

20   **A.**   Yes.

21   **Q.**   There is no African American candidate in this

22   race, correct?

23   **A.**   Correct.

24   **Q.**   And so this race does not present a racial choice

25   to the voters, right?

1    **A.**    Right.

2    **Q.**    Okay.  You testified in your deposition that you

3    had not identified any errors in the estimates

4    presented in this table, correct?

5    **A.**    Again, I'd have to see the exact statement that I

6    made in the deposition.

7    **Q.**    You don't remember that?

8    **A.**    I don't remember this exact contest and what I

9    specifically said in this contest.

10   **Q.**    Can we show Dr. Owen her deposition at page 213,

11   lines 20 to 25?

12   **A.**    May I see the whole page, please?

13   **Q.**    Take a moment to read that to yourself and see if

14   that refreshes your recollection.

15   **A.**    And going to next page, is there any more on my

16   answer, or is that only statement I made?

17   **Q.**    We'll let you look at page 214.  Do you see that?

18   **A.**    Yes.

19   **Q.**    So you testified in your deposition that you could

20   find no errors in the estimates reported in table six,

21   correct?

22   **A.**    I state:  None I'm recognizing right now.  Yes.

23   **Q.**    And you also testified on page 214 of your

24   deposition that none of the estimates reflected in

25   table six raise any cautionary flags for you, right?

1    **A.**    I stated:  Not that I can see, no.

2    **Q.**    Okay.  And what that means is, for example, this

3    -- none of the standard errors on the table are

4    substantively large, right?  That would be one of the

5    cautionary flags that you might have looked at, right?

6    **A.**    Correct.

7    **Q.**    Can we switch back over to the Elmo?  Another

8    cautionary flag might have been where the estimate

9    exceeded 100 by more than an insignificant amount,

10   right?

11   **A.**    Yeah, more than -- yeah, a significant amount,

12   they were 100 percent.

13   **Q.**    And you didn't raise that as a concern with

14   respect to table six in your deposition?

15   **A.**    No.

16   **Q.**    And you didn't raise that concern with respect to

17   the race reflected in table six in your report, did

18   you?

19   **A.**    Not that I recall.

20   **Q.**    And as you sit here today and look at the

21   estimates of white and black cohesion for these races

22   they don't substantially exceed 100 if you sum them

23   together, right?

24   **A.**    I'm sorry.  I having a hard time adding in my head

25   for a moment, so I apologize.

1    Q.   Expert statisticians should always bring a

2    calculator in my experience, but take all the time you

3    need to add them.  I can give you a piece of paper if

4    you like, or you can use my phone to add them up.

5    A.   Can I just have a pen?

6    Q.   Sure.

7           MR. SELLS:  Your Honor, may I give the

8    witness a pen?

9           THE COURT:  You may.

10   A.   I'm sorry.

11   Q.   *(Handing to witness)*.

12   A.   Thanks.  So it's over by -- I'm sorry.  The black

13   voter support is over 100 percent by .5.

14   Q.   As you sit here today does that cause you -- raise

15   substantive concern for you?

16   A.   It's over 100 percent, so is it substantial large

17   over 100 percent?  No.  But is it over a hundred

18   percent, yes.

19   Q.   And that could be the result of rounding error,

20   correct?

21   A.   It's possible.  I'd have to know by looking

22   directly at the data.

23   Q.   But you haven't looked directed at the data, have

24   you?

25   A.   I wasn't asked to.

1    Q.   And you might also be able to tell that by looking

2    at Dr. McBride's statistical output right?

3    A.   For a rounding error?  I'm not sure by looking at

4    output.  It's possible.  I'd have to really look at it

5    in detail form.

6    Q.   All right.  So this race is not racially

7    polarized, was it?

8    A.   Mr. Barnes received almost equal support amongst

9    the white and black voters.

10   Q.   I'm going to make a notation in the margin that

11   this is a race that offered no racial choice for the

12   voters.  But it does appear that a very slight majority

13   of black voters supported the winner, Rick Barnes, as

14   did a very slight majority of white voters, correct?

15   A.   Based on the these estimates, yes.

16   Q.   Our next table, unfortunately also splits the page

17   break, but it's table seven.  Can you see table seven

18   there?

19   A.   Yes.

20   Q.   And this is the 20 -- excuse me, the November 2nd,

21   2004, sheriff's race, correct?

22   A.   Yes.

23   Q.   Now, you testified in your deposition that you had

24   identified no errors in the estimates reflected in this

25   table, right?

1    A.   Again, we went through each contest.  I'd have to

2    see exactly what I stated.

3    Q.   And you testified that there were no cautionary

4    flags reflected in this -- reported in this table,

5    right?

6    A.   I would have to see the exact statement that I

7    made regarding this race.

8    Q.   You don't remember your testimony on that point?

9    A.   As I said, we went through multiple elections, and

10   I do not recall every statement I made on every

11   election.

12   Q.   Well, then let's switch back over to the computer

13   so that we can show Dr. Owen her deposition at page

14   214, lines 4 to 10.

15   A.   Can I see the whole page, please?  Thank you.

16   Q.   Dr. Owen, review page 214 and let me know if that

17   refreshes your recollection about whether you testified

18   that you had not identified any errors in table seven

19   and that the estimate didn't raise any cautionary flags

20   for you.

21   A.   I stated:  No, and not as I see them right now.

22   Q.   And you didn't supplement that opinion, did you?

23   A.   No.

24   Q.   So as you sit here today you have identified no

25   errors in the estimates reported here and these

1    estimates reported here don't raise any cautionary red

2    flags to you, do they?

3    A.    I stated in the deposition that, no, they did not.

4    Q.    Well, have you reached a different substantive

5    opinion with regard to the estimates in here?

6    A.    I'd have to back and look at the table again.

7         MR. SELLS:  Can we switch back over to the

8    Elmo?

9    A.    As I sit here, I see estimates that are over a

10   hundred in the EI.

11   Q.    And you didn't raise that as a cautionary flag in

12   your deposition, did you?

13   A.    No.

14   Q.    According to the table seven that you see on the

15   Elmo, who was the minority preferred candidate?

16   A.    The write-in candidate, Nelson Brown.

17   Q.    And the level of black cohesion for Mr. Brown was

18   extremely high, wasn't it?

19   A.    As reported here.

20   Q.    Was this race racially polarized?

21   A.    If you look at the estimates of white voters, the

22   white voters have split their support amongst the two

23   candidates.

24   Q.    Which candidate would have been elected if the

25   election had been held only among white voters?

1    **A.**   That estimate is above 50 percent and knowing the

2    standard error we can build up a confidence interval

3    and know if it would be a majority to have elected Pete

4    Smith, but you'd have to know that interval to make

5    sure because that's just a estimate.  It could be

6    smaller, it could be larger, but it's estimate, and so

7    presumably based just on looking at 54.6 and saying

8    that is accurate estimate, then the white voters

9    supported Pete Smith and he won that contest.

10   **Q.**   Okay.  And you construct a confidence interval

11   using the standard error that's reported here, right?

12   **A.**   Right.

13   **Q.**   And this is a pretty small standard error for Pete

14   Smith it's, in fact, zero?

15   **A.**   Correct.  So it would be a tight confidence

16   interval most likely.

17   **Q.**   And it's not likely that that confidence interval

18   would extend across the 50 percent line for the

19   majority of white voter supporting Mr. Smith, would it?

20   **A.**   I'd have to calculate the number exactly, but my

21   -- with that small standard of error, I would say, no,

22   it probably wouldn't be.

23   **Q.**   And that standard error would have been reported

24   on Dr. McBride statistical output from his EI analysis,

25   right?

**A.**   Correct.

**Q.**   And so take with that analysis, you could have calculated a confidence interval to assure yourself that this number is above 50 percent with confidence?

**A.**   Right.

**Q.**   But you didn't do that analysis?

**A.**   No.

**Q.**   So based on your testimony that in all likelihood Pete Smith was the choice of the majority white voters, would you say that this race is rationally polarized?

**A.**   As I sit here today and look as these, there are concerns about the estimates as I'm seeing them, but if we look at it, Pete Smith won and he had support from the white voters.  This is a unique contest anyway because it's a write-in contest.  So Nelson Brown's name is not on the ballot, so voters have to take a next step and actually write in that name which is an obstacle.

**Q.**   It's pretty impressive that Mr. Brown got so many votes in a write-in contest, isn't it?

**A.**   Correct.

**Q.**   Okay.  And you haven't reanalyzed this race to determine whether there was any effect from these write-in votes, that these concerns about write-ins that you mentioned had any effect.

1    **A.**    I did not do an analysis.

2    **Q.**    And the concerns that you just mentioned about

3    write-in candidates having a hard time winning, that

4    doesn't affect the reliability of Dr. McBride's EI

5    estimates, does it?

6    **A.**    I mean, mathematically you don't factor in that.

7    You're just looking at a -- what vote -- try to

8    determine which voters are voting for which candidate.

9    **Q.**    And in your deposition you identified no

10   cautionary flags with regard to the estimates reported

11   in table seven?

12   **A.**    Correct.

13   **Q.**    Was Mr. Brown defeated by the candidate preferred

14   by white voters, Mr. Smith?

15   **A.**    Pete Smith won the contest.  Nelson Brown did not.

16   **Q.**    This is a contest that's offered voters a racial

17   choice, correct?

18   **A.**    Mr. Brown is a write-in candidate, so the whole

19   community would have to have been, the whole community

20   of Sumter County would have had to have been aware of

21   his candidacy.  So he's an African American, you would

22   have to know he spoke to the African American community

23   to write in his name as well as the white community.

24   They would have had to have been aware that they could

25   have had that choice as well to write his name in.

1    Q.   Do you know Mr. Brown was a qualified write-in

2    candidate?

3    A.   I don't know if he was certified.

4    Q.   Were you courtroom when Mr. Brady testified about

5    what it means to be a qualified write-in candidate?

6    A.   Yes, I was here.

7    Q.   It means that your name is up on a list somewhere,

8    right?

9    A.   Correct.

10   Q.   So it's available to the public?

11   A.   Correct.  The voters still have to be aware.  Just

12   because it's on a document doesn't mean they're aware

13   that they have the choice to make a write-in candidate.

14   Q.   Okay.  I understand.  But the analysis that we've

15   got before us shows that Nelson Brown was, in fact,

16   defeated by Pete Smith who was the preferred candidate

17   of white voters, doesn't it?

18   A.   It shows that Pete Smith won and Nelson Brown did

19   not win.

20   Q.   I'm going to mark this one with an L.  Now, I want

21   to move to table eight.  Do you see table eight there

22   on page 19 of Dr. McBride's supplemental report?

23   A.   Yes.

24   Q.   You testified in your deposition that you had

25   identified no errors and no cautionary flags with

1    respect to this election, didn't you?

2    **A.**    Again, I'd have to see the exact phrases I used

3    for table eight.

4    **Q.**    You don't remember what you testified to with

5    regards to table eight in your deposition?

6    **A.**    We went through many elections.  I do not recall

7    the exact phrase I used on this particular election.

8              **MR. SELLS:**  Can we switch over to the

9    computer and show Dr. Owen her deposition at page 214,

10   lines 11 to 17?

11   **Q.**    Dr. Owen, take a look at this page, review it to

12   yourself, and see if that refreshes your member about

13   what you said in your deposition about table eight.

14   **A.**    I answered:  No, not that I see right now, and

15   then, no.

16   **Q.**    So you testified in your deposition that you have

17   identified no errors in the estimates presented in

18   table eight and that those estimates don't raise any

19   cautionary flags for you, right?

20   **A.**    Yes.

21   **Q.**    Do the EI estimate in this table -- let's go back

22   over to the Elmo.  Do these EI estimates as you look at

23   them today exceed 100 in any significant degree?

24   **A.**    The black voter is 100.3.

25   **Q.**    Is that a significant degree to you?

1    **A.**   We talked about that's over a hundred percent, but

2    it's, you know, different than being 120.

3    **Q.**   I'm not sure that answered my question.  Do you

4    consider 100.3 to be a significant amount over 100?

5    **A.**   Perhaps not significant, but it is over

6    100 percent, which EI would bound at a hundred percent.

7    **Q.**   It's your testimony that EI as a statistical

8    technique bounds some of all estimates in an analysis

9    at 100?

10   **A.**   It sums between a bound of zero and one.

11   **Q.**   That wasn't my question.

12   **A.**   And then --

13   **Q.**   My question is, it's your testimony here today

14   that EI, ecological inference, has -- as a statistical

15   technique has the feature that all of the estimates in

16   analysis must sum to 100?

17   **A.**   That is not exactly what I said.

18   **Q.**   That is not your testimony?

19   **A.**   EI is bound between 0 and 1 because we get point

20   estimates below one and then we turn them into

21   percentages which would bound them between zero and 100

22   percent.  And the method was created by Gary King

23   because he was dissatisfied with other estimates that

24   exceeded 100 percent because they seemed unrealistic,

25   not right, so he wanted them to be between 0 and

1    100 percent.

2    **Q.**    Now, I want to be clear on this for the Court.  It

3    is no longer your testimony that EI as a statistical

4    technique forces estimates to sum to 100.  Did I

5    understand your testimony correctly?

6    **A.**    I don't believe that's what I said.

7    **Q.**    I'm asking you what your testimony is right now.

8    I want to make sure that I understand it.  Is it your

9    testimony right now that EI, ecological inference, the

10   technique, does or does not require that the sum of all

11   cohesion estimates equals 100?

12   **A.**    Ecological inference is bound between 0 and 1,

13   zero and 100 percent, and so all the estimates added

14   up, summed, would equal 100 percent or up to one

15   because it's given in a point.  And then we put them in

16   tables and percentages because that's what we can

17   understand and interpret, like you would understand the

18   vote percentage.

19   **Q.**    So, again, I'm afraid that you're giving

20   contradictory answers one after the other.  I want to

21   be clear.

22        **MS. MCKNIGHT:**  Your Honor, this has been

23   asked and answered.  Every answer she's given has

24   sounded clear and it's rising to the level of badgering

25   her.  If Your Honor has any questions for her or has

1    any confusion we suggest he able to ask, but to suggest

2    the confusion by Mr. Sells is not helpful to the Court

3    or the witness.

4         **THE COURT:**  All right.  The objection is

5    overruled.  The witness is on cross.  I will allow

6    counsel a reasonable opportunity to do so.  You may

7    continue.

8    **BY MR. SELLS:**

9    **Q.**   Dr. Owen, I'm going to try to phrase this as a yes

10   or no question, and I'd like a yes or no answer please.

11   Is it your testimony today, yes or no, that ecological

12   inference as a statistical technique forces estimates

13   of minority political cohesion to sum to 100?

14   **A.**   No, not the word forced.  They should add in sum

15   to 100.

16   **Q.**   We're going to come back to this, but since we are

17   close to the break I want to see if I can get to table

18   nine, and that would be our last table.  But before we

19   leave table eight, Dr. Owen, this was a contest in

20   which Kelvin Pless was the African American -- excuse

21   me, let me start over.  As reflected on table eight,

22   Kelvin Pless was the minority preferred candidate,

23   correct?

24   **A.**   Yes, he was denoted as that.

25   **Q.**   And Kelvin Pless won this contest, correct?

**A.**   Correct.

**Q.**   Do you know whether white voters were the majority in this election?

**A.**   I do not know if they were the majority of the turnout.

**Q.**   Okay.  I'm going to mark this one as a W in the margin.  Do you see that?

**A.**   Yes.

**Q.**   Okay.  Now, I'd like to finish up with table nine. As recorded on page 20 of Dr. McBride's supplemental. Do you see that?

**A.**   Yes.

**Q.**   And --

**A.**   Excuse me.

**Q.**   And this is a contest where the estimates do total over 100 and you discussed this in your testimony yesterday.  Do you remember that?

**A.**   Yes.

**Q.**   Okay.  So I'm going to mark the estimate for black voters.  Do you have same concerns with regards to the estimates for white voters?

**A.**   Yes.

**Q.**   And I'm going to put a bracket around this one because you have reliability concerns about this one based on the EI estimates.  Did you identify any other

1    concerns with regard to the estimates reported on this

2    table?

3    A.    Not with the estimate.  We talked about how they

4    were over the 100 percent.

5    Q.    The standard errors are not substantively large on

6    this table, are they?

7    A.    No.

8    Q.    If we look back over the table in the elections

9    about which you did not have or express reliability

10   concerns, do you know how many times the African

11   American preferred candidate won?

12   A.    We would have to go through and total them.

13   Q.    It's only once, isn't it?

14   A.    Again, I'd want to see the total that we

15   discussed.

16   Q.    Well, that total will be reflected in the record.

17            MR. SELLS:  Your Honor, it's 10 o'clock.

18   Should we take a break?

19            THE COURT:  Thank you for your suggestion.

20   All right.  We'll do so, and we'll be in recess

21   20 minutes.  If you need a break at some point with the

22   issue that you have, get my attention or the officer's

23   attention, and we'll accommodate you.

24            THE WITNESS:  Thank you.

25   *(RECONVENED; ALL PARTIES PRESENT, 10:30 a.m.)*

1          **THE COURT:**  You may continue.

2     **BY MR. SELLS:**

3     **Q.**    Now, Dr. Owen, you testified in your deposition

4     that you weren't asked to replicate Dr. McBride's

5     analysis, correct?

6     **A.**    Yes.

7     **Q.**    Could you have done so?

8     **A.**    Yes.

9     **Q.**    And so even though you could have attempted to

10    replicate Dr. McBride's racial black voting analysis,

11    your reports in this case contain no statistical

12    analysis of your own, right?

13    **A.**    No, they do not have any of my own analysis.

14    **Q.**    And you testified in your deposition that you have

15    never used the EzI software program to run an EI

16    analysis, correct?

17    **A.**    I do not use EzI.

18    **Q.**    And in the EzI software you run each individual

19    candidate against the others, right?

20    **A.**    My understanding is that you run each candidate

21    and then you reverse kind of the order and then run the

22    other candidate.  So there's a step process.

23    **Q.**    It's what we call iterative; you do it over, over,

24    and over again for each candidate in the race, right?

25    **A.**    Correct.

1   **Q.**   That's how EzI works, right?

2   **A.**   Yes, that's my understanding.  Again, I don't use

3   EzI.

4   **Q.**   Gary King wrote the EzI software program, didn't

5   he?

6   **A.**   Yes.

7   **Q.**   And Gary King invented the ecological inference

8   technique that we have been talking about for the last

9   four days, right?

10  **A.**   Yes.

11  **Q.**   Gary King is an authority on the EI technique,

12  isn't he?

13  **A.**   Yes.

14  **Q.**   And you don't take issue at all with the validity

15  of the EzI software program Gary King wrote to perform

16  EI analysis, right?

17  **A.**   I'm sorry.  Can you ask that again?  The validity?

18  **Q.**   Yes.  You don't take issue with the validity of

19  the EzI program that Gary King wrote?

20  **A.**   No.

21  **Q.**   Is there any reason why you're not capable of

22  learning to use EzI?

23  **A.**   I'm capable of learning, but with a current

24  computer with the Windows that I have right now, you

25  cannot download EzI to it because it's an older

1    program.

2    **Q.**    Is there any reason why you would not have been

3    cable of finding a suitable machine to replicate Dr.

4    McBride's analysis using EzI software program if you

5    had been asked to do that?

6    **A.**    If I had been asked I could have perhaps spoken

7    with some people and maybe figured out how to get it,

8    but it would've had to have been an older computer is

9    my understanding of what it has to run on.

10    **Q.**    Now, you're aware that the EzI program written by

11    Gary King will produce ecological inference estimates

12    that sum over 100 for all candidates because, as you

13    just described, it runs one candidate at a time, right?

14    **A.**    So if you run the iterative process and the

15    candidates are summing over a hundred, it would call to

16    question what this underlying data has been inputted.

17    It would raise a concern that they perhaps -- that you

18    need to rerun the model because Gary King wanted to

19    ensure that we were getting estimates between a bound

20    of zero and 100 percent.

21    **Q.**    Well, Gary King's own software doesn't do that,

22    does it?

23    **A.**    I don't use EzI.

24    **Q.**    But you are aware that the EzI program will

25    produce ecological inference estimates that sum over

1    100 for all candidates because it runs those candidates

2    one at a time, aren't you?

3    A.    The output that I have seen, they do not sum over

4    100.  The output that -- I mean, the analyses that Dr.

5    McBride put up, they do add up over 100 percent, but my

6    understanding from what I've seen and read is that they

7    are bound between zero and 100 percent.  So if you go

8    over that bound, then it would be a face validity check

9    to perhaps rerun the numbers and see what is going on

10   with the data analysis.

11   Q.    Do you remember me asking you about this summing

12   over 100 using EzI in your deposition?

13   A.    Again, I'd have to see exactly our conversation

14   from that.

15   Q.    Well, isn't it true in our conversation that you

16   said that, yes, they will go over to 100 if you're

17   using EzI software because it runs candidates one at a

18   time.  Isn't that what you said?

19   A.    Can I see what I said in my deposition to --

20   because I do not remember the exact phrase I used on

21   that question.

22   Q.    Let's show Dr. Owen her deposition at page 203.

23   We're going to focus on line four through 21.  And do

24   you see, Dr. Owen, where I asked you the question:  So

25   the EzI method was not developed in response to the

1   problem that you're identifying which is that all three

2   or four, or five, depending on how many candidates

3   there are in a race, estimates could total over a

4   hundred.  And where you had answered:  I will say

5   first, EzI is not the technique, EzI is the physical

6   program.  EI is the technique we use so ecological

7   inference is the program we use and your estimates will

8   be bounded.  Will they go above 100 percent when you

9   sum all those categories?  Yes, if you're using the EzI

10  program because you have to do one candidate at a time.

11  Did I read that correctly, Dr. Owen?

12  **A.**   Yes.

13  **Q.**   Dr. Owen, can you identify that I'm holding in my

14  hand?

15  **A.**   That is Gary King's book on ecological inference.

16  **Q.**   This book is the authority on the ecological

17  inference technique, right?

18  **A.**   It's the first book he wrote on ecological

19  inference in 1997.

20  **Q.**   You have this book in your collection, right?

21  **A.**   Yes.

22  **Q.**   You've read it, correct?

23  **A.**   Yes.  It's been a while since I've read it detail

24  by detail, but, yes, I've read it.

25  **Q.**   Can you show me in this book where Gary King says

1    that ecological inference estimates can't exceed 100?

2    A.   As I sit here --

3    Q.   Excuse me -- if you sum them all up?

4    A.   As I sit here right now, I cannot point to a page.

5    I have not read that book in quite a while.

6    Q.   Can you tell me what chapter that would be in?

7    A.   No.  I don't have the book memorized.

8    Q.   Isn't it, in fact, the case that Gary King says in

9    this book that EI estimates will sometimes exceed 100,

10   particularly whether you're running races with more

11   than two candidate?

12   A.   I would have to see exactly where he says that.

13   Q.   You're not aware of that?

14   A.   I am -- based on my reading of that and others,

15   ecological inference was bound to zero to a hundred.

16   Q.   And before you offered your expert opinion on

17   ecological inference, you didn't go back to see whether

18   that's backed up by Gary King in his book?

19   A.   I did not go and cite his book in my report.

20   Q.   In fact, you didn't cite anything for the

21   proposition that EI estimates should not exceed 100 if

22   you add them all up, did you?

23   A.   No.

24   Q.   Can you tell us today what peer reviewed

25   publication actually said that?

1    A.    I can't identify something specific from a peer

2    reviewed journal of the top of my head here.

3    Q.    So, the basis for your opinion on that matter is

4    your extensive experience and training with the

5    ecological inference technique; is that right?

6    A.    It is based off of what I was taught in my

7    methodology classes and reading.

8    Q.    Well, there's extensive material in the record

9    about your methodological classes.  I won't rehash

10   that.  But it's fair to say that you never used

11   ecological inference in a professional setting until

12   2015 in the Fayette County case, which was after you

13   had already offered the opinion that estimates should

14   not sum over 100 percent; isn't that right?

15   A.    I did not use it in my dissertation or my

16   research.

17   Q.    And did you use it in any professional work before

18   your 2015 declaration in the Fayette County case?

19   A.    So as a political scientist, as a researcher, we

20   use tools.  It doesn't mean that I always publish on

21   them, provide them in a paper, or write on them, but I

22   can utilize them, have utilized ecological inference

23   and looked at it, but I have not published before the

24   2015 analysis in Fayette County.

25   Q.    I think the record is full of your lack of

1    experience on EI, so I'm going to move on, Your Honor.

2    But I want to stay with Gary King.  Isn't it true that

3    Gary King in his book identifies potential problems

4    with his method?

5    **A.**    I would have to, again, read through the book and

6    know exactly what he says, but with any mathematical

7    computation technique most researchers put in that

8    there could be issues and that for the next scholar to

9    come along, it makes sense to advance the technique or

10   find errors or mistakes or work to improve things.

11   **Q.**    Well, isn't it true that Gary King identifies what

12   those problems are and discusses them at length in his

13   book?

14   **A.**    Perhaps, yes.  Again, we'd have to go chapter by

15   chapter and see.

16   **Q.**    And can you tell me what one of the three major

17   issues that he has identified in this book with his

18   technique might be, any one of the three?

19   **A.**    If I remember correctly, probably something

20   associated with how the errors are distributed, if

21   they're correlated.

22   **Q.**    How confident are you about that answer?

23   **A.**    As I mentioned earlier I have not read that book

24   in detail in quite a while.

25   **Q.**    So you don't remember what the major pitfalls with

1    EI are that Gary King identified in his book?

2    **A.**    As I stated, I feel like that was probably one of

3    them.

4    **Q.**    Do you remember or do you not remember the

5    pitfalls with EI that Gary King mentions in his book?

6    **A.**    In detail, no, not right at this moment.

7    **Q.**    Would it refresh your recollection if I let you

8    look through the book to identify what those are?

9    **A.**    If I remember correctly from that book in the

10    preface it asks that you read each chapter and they

11    build on each chapter because it's a methodological

12    technique in total, so you go from the first and go

13    through.  So if you'd like me to sit here and read

14    through the entire book, I will, because that would

15    give me confidence to answer your question.

16    **Q.**    So would it refresh your recollection for me to

17    show you the book?

18    **A.**    I mean, you can, but I would ask that I could

19    please have time to read the entirety of the Gary King

20    to give a solid answer of what he says.

21    **Q.**    Let's try this --

22            **MS. MCKNIGHT:**  Your Honor, just a moment, I'd

23    object to -- I've been patient.  We're dealing with a

24    textbook that was published in 1997.  If we are to

25    created a memory test or a speed reading test for our

1   expert of a text from 1997 that she's read before,

2   she's also read a lot of published material --

3          **THE COURT:**  I tell you what, I don't mean to

4   cut you off, but I'm waiting for the question and then

5   I'll --

6          **MS. MCKNIGHT:**  Okay.  Thank you.

7          **MR. SELLS:**  I'm sorry.  I asked the witness

8   to review the table of contents and tell me which

9   chapter that might be.

10         **THE COURT:**  Well, what is this about?  She

11  says she doesn't remember, so are you going test her

12  ability to read the book in court?

13         **MR. SELLS:**  No, Your Honor.

14         **THE COURT:**  I mean, she's admitted she

15  doesn't recall and she has not been able to identify

16  specifically.  If you want to prompt her to something

17  as part of your examination, fine, but just to have her

18  thumb through a book, I don't know that adds anything

19  to this hearing or this trial.

20         **MR. SELLS:**  Your Honor, I'll move on and if

21  we need to back to it, perhaps we can do that, but I'll

22  see if we can get around it.

23         **THE COURT:**  I mean, you know, we don't have a

24  jury here to impress with the examination.  The Court

25  understands that there is something that the witness

1    has failed to recall and you want her to acknowledge by

2    your pointing it out, that's fine, but just to go

3    through what she's indicated, she needs to review the

4    whole thing in order to answer your question as asked.

5              **MR. SELLS:**  I'll cut to the chase and perhaps

6    Dr. Owen can answer it, if not, we may need to dig

7    further.

8              **THE COURT:**  All right.

9    **BY MR. SELLS:**

10   **Q.**   So the bottom line here, Dr. Owen, is that you did

11   not examine Dr. McBride's statistical output or any of

12   his data to determine whether it suffers from the

13   pitfalls that Gary King identified in his book, did

14   you?

15   **A.**   No, I did not review his output or his data.  I

16   reviewed his analysis, the interpretations, the

17   estimates that he provided in his report.

18   **Q.**   Okay.  Well, same set of questions, not with

19   regard to pitfalls, but with regard to the diagnostics

20   for those pitfalls.  Isn't it true that Gary King in

21   this book identifies a number of diagnostics that a

22   researcher can run to determine whether the pitfalls

23   may have been encountered?

24   **A.**   Again, I'd have to go through the book, yes, but

25   I'm -- as a methodologists, as training, we would

1    discuss the tools that you use, just like in regression

2    analysis, that you use to diagnose, to provide the

3    reliability and validity of what you're providing in

4    your analyses.

5    **Q.**   So there are diagnostics, correct?

6    **A.**   Yes.

7    **Q.**   And they are listed in this book, correct?

8    **A.**   Again, I'd have to look exactly in the book, but I

9    would assume they are there.

10   **Q.**   Do you remember what they are?

11   **A.**   I know that you can use tomography plots to

12   evaluate --

13   **Q.**   I'm sorry, I didn't mean to cut you off.  Complete

14   your answer.

15   **A.**   To evaluate your estimates and the analysis that

16   you receive.

17   **Q.**   Do you remember the others?

18   **A.**   Again, I'd have to go through the book detail by

19   detail.  You can look at standard errors.  We do that

20   with regression analysis, and we look at standard

21   errors when we use maximum likelihood estimation, which

22   is based off the Bayesian maximum likelihood

23   estimation.

24   **Q.**   I'd like to show you Bates number 000182 which

25   comes from Plaintiff's Exhibit 17, which is Dr.

1    McBride's rebuttal report, and we may -- no, if we can

2    zoom in on the bottom paragraph.  Review those --

3    A.    Could I see the whole page again?  I'm sorry.

4    Q.    Sure.  So review this page of Dr. McBride's

5    rebuttal report, and I'm going to ask you if that

6    refreshes your recollection about the diagnostic tools

7    that Gary King identified in his book.

8    A.    I've read what's in front of me.

9    Q.    Does that refresh your recollection about what

10   some of the diagnostic tools are that Gary King

11   suggests for determining the reliability of EI results?

12   A.    Again, can I see the whole entire page so I can

13   see the footnote?  In the footnote where those

14   diagnostic tools are used is not the book that you're

15   holding.

16   Q.    Fair enough, but it is by Gary King?

17   A.    Correct.

18   Q.    Well, does that page then refresh your

19   recollection about the diagnostic tools that Gary King

20   has identified?

21   A.    Well, these are not a direct quotation from Gary

22   King, but it is footnote and cited by Dr. McBride as

23   those.  So it shows them and I've read them, so my

24   memory has seen them, my mind has seen them.

25   Q.    And you don't remember whether those diagnostics

1    also appeared in the book?

2    **A.**    Again, I can read through the book if you'd like

3    me to, detail by detail in the chapters and see what's

4    in there.

5    **Q.**    Dr. Owen, that wasn't my question.  My question

6    was you don't remember whether those diagnostics are

7    listed in the book, do you?

8    **A.**    I've talked about how it's been a while since I've

9    read that, so I do not recall exactly every page in the

10   book and what's listed.

11   **Q.**    Let me ask you this.  What would you need in order

12   to run the diagnostics that Gary King mentioned in his

13   article?

14   **A.**    In which article?

15   **Q.**    The article cited in Dr. McBride rebuttal report.

16   **A.**    Can I see the citations again?

17   **Q.**    Certainly.

18   **A.**    So you would have needed to have run the analyses

19   and have the outputs and then there would be a way to

20   then plot -- to gather your tomography plot, there

21   would be a way to capture that with other programming

22   of the code to do it, depending on the program you're

23   in, or I guess pointing and clicking to find those

24   tools, and then you would create based off of your data

25   and what you have run in your models these plots and

1    you would look at your data and sample measures.

2    **Q.**    Are there any diagnostics other than the ones that

3    Dr. McBride has listed here in his rebuttal report that

4    you would also want to run to determine the reliability

5    of EI analysis?

6    **A.**    I don't see where he specifically is talking about

7    the standard errors, but I talk about how I would want

8    to know those standard errors, and I'm not sure

9    exactly, where he says ensuring the maximization

10   procedure worked properly, I assume that's the model is

11   specified correctly, but, again, I can't know that

12   exactly as he's written it, and he is not directly

13   quoting Dr. King, Professor King.

14   **Q.**    Well, let me ask you this.  For any of the

15   diagnostic -- let me back up.  You don't have any

16   reason to dispute that what Dr. McBride says on the

17   bottom of this page that he actually ran these

18   diagnostics, do you?

19   **A.**    I did not write any kind of response to this

20   rebuttal from Professor McBride, so I don't have a

21   formal written statement on this, and as I read it

22   right now he has paraphrased from Gary King what these

23   diagnostic tools are.  I assume, he's a researcher and

24   expert, he has written exactly in his own words what

25   those are.

1    Q.    And as you sit here today you don't have any basis

2    for believing that Dr. McBride didn't run those

3    diagnostics on his results?

4    A.    I do not know.  I was not sitting with him when

5    did his data analysis.

6    Q.    And as you sit here today, can you identify any

7    additional diagnostics that you think Dr. McBride

8    should have run in evaluating the reliability of his EI

9    estimates?

10   A.    I mean, I talked about the standard errors part,

11   and he reported those in his supplemental report, but

12   not in his original report which brought up some of the

13   inconsistencies that I addressed in my report.

14   Q.    Where are standard errors reported?

15   A.    With the estimate.

16   Q.    Do they show up on the EI output?

17   A.    As I run it, with an R statistical package

18   program, yes.

19   Q.    To run these diagnostics and to look at the

20   standard errors that, as you just mentioned, what would

21   you need?  Would you need that output?  Is there

22   anything else?

23   A.    You would have to have an underlying data.  You

24   have to run -- have data, run the model, and not just

25   have the output, but you have to have the whole series

1    of work you have done in order to then move to next

2    step to run those diagnostic tools.

3    Q.   Now, you sat in on Dr. McBride's deposition on

4    March 16th of this year, right?

5    A.   Yes.

6    Q.   At least by telephone I think it was, right?

7    A.   No, I believe I was in the room.

8    Q.   Okay.  Did you also participate in Dr. McBride's

9    2014 deposition?

10   A.   Yes, I was there.

11   Q.   And you're aware that Dr. McBride gave the

12   defendant's attorney his full statistical output from

13   EI analyses at both depositions, aren't you?

14   A.   I do recall the output on paper at his first

15   deposition.  I don't recall from the second deposition.

16   Q.   You don't remember telling me at your second

17   deposition that, in fact, you had reviewed the output?

18   A.   Again, if I said it in this deposition, we can

19   look at and I'll be happy to jog my memory of what I

20   said.  But right now as you ask me, it's December and

21   that was March, and I don't recall what was handed

22   between us at the deposition.

23   Q.   Before we look at the deposition, you were handed

24   the output at the deposition, right?

25   A.   At which deposition?

1    Q.   Excuse me.  Let me ask that question again.  At

2    some point after Dr. McBride gave the output to

3    defendant's counsel it was provided to you, right?

4    A.   At this first deposition, the output was provided

5    to us and to me, and I looked at it to run a confidence

6    interval.

7    Q.   Okay.

8    A.   Based off of his original report so that I could

9    write a confidence interval to understand the range

10   around some of the point estimates.  I did not keep

11   that data output.  The attorneys did.  And I was not

12   asked to further analyze anything, and I also did not

13   have his underlying data and the model specified right

14   in front of me.  All I had was the paper out.

15   Q.   That paper output was quite voluminous, right?

16   A.   I don't recall how large it was, but I -- most

17   output is not just one or two pages.

18   Q.   And just to be clear for the Court, when we're

19   talking about output, we're talking about the results

20   in raw form that would be produced by Dr. McBride's EzI

21   program that would then be collected into the tables

22   that we've been discussing during this trial, right?

23   A.   Yes.

24   Q.   And you reviewed that output as you've indicated

25   in your depositions earlier this year, right?

1    **A.**   Again, I'd have to see the exact phrase I said in

2    my deposition of what I reviewed.

3    **Q.**   All right.  Let's show Dr. Owen her deposition at

4    page 219, lines 11 to 15.  Review that to yourself.

5    **A.**   May I see the whole page again, and not just

6    the -- thank you.  Okay.  Can you ask the question?

7    **Q.**   Yes.  So you have reviewed Dr. McBride's EI

8    output, right?

9    **A.**   I stated that I know we asked to see the output

10   and I've seen the output.

11   **Q.**   Okay.  Well, I want to be clear for the Court

12   today.  Have you not just seen it, but reviewed it?

13   **A.**   I have seen the output from the first deposition

14   where we asked and I ran the confidence interval

15   calculation.  That was all the review I did.

16   **Q.**   Okay.  So you didn't review any of the output that

17   was provided to the defendant's counsel at Dr.

18   McBride's deposition on March 16th of this year?

19   **A.**   I don't recall looking or reviewing or being asked

20   to review that output.

21   **Q.**   And you never asked for any of Dr. McBride's data,

22   right?

23   **A.**   I was not asked to run a data analysis, so I would

24   not have asked for his data.

25   **Q.**   And you weren't asked to run any further

1    diagnostics on the reliability of Dr. McBride's EI

2    analysis based on the EI output that Dr. McBride had

3    disclosed to the defendant's attorney?

4    A.    I wouldn't run diagnostics just on paper output.

5    Again, you would have to have the model where those

6    estimates are on the program so then you could utilize

7    what's being generated to create those diagnostic

8    measures.

9    Q.    So now your testimony is that you needed not just

10   the data, not just the output, but you also needed

11   something else.  Is that your testimony?

12   A.    You can review output to see what data is to look

13   at the standard errors, which in the original report

14   did not contain standard errors, and so I asked to see

15   the output from those original estimates so that I

16   could derive a confidence interval which you can with a

17   point estimate and the standard error.  In the second

18   report he submitted, the supplemental report, there

19   were standard errors there, and I raised concerns

20   regarding the inconsistencies in estimates reported.

21   Q.    So just to be clear for the Court, you actually

22   did review the standard errors associated with Dr.

23   McBride's 2014 EI analyses, even they weren't reported

24   in his original report because you had access to his

25   statistical output, I want to be clear, that's correct,

```
1    right?
2    A.    Yes.  I reviewed the standard errors on that first
3    output.
4    Q.    Okay.  But it's your testimony today that you
5    would have needed also access to his model in order to
6    run diagnostics on his EI analyses?
7    A.    So if I'd have gone further to run more
8    diagnostics beyond the standard errors.  So, the plot
9    comes, not from taking numbers off of a piece of paper
10   and then building a new, you have to have the data
11   which will generate how those plots will be made.
12   Q.    Well, doesn't the output often contain the
13   tomography plots that you just mentioned?
14   A.    Yes, they do.
15   Q.    And you could have reviewed the tomography plots
16   that are on the statistical output?
17   A.    If they were provided.  Yes, if they had been
18   generated along with -- when you said output, I'm
19   thinking point estimate and confidence interval -- I
20   mean, sorry, excuse me, standard error.
21   Q.    Well, the output actually contains a lot of
22   additional information, doesn't it?
23   A.    Yes.
24   Q.    And that additional information is designed to
25   help the researcher assess the reliability of his or
```

1    her analyses, isn't it?

2    **A.**    It is, but I was not asked to review all of the

3    output provided.

4    **Q.**    So you were not asked to review the output for

5    purposes of running a diagnostic to assess the

6    reliability of Dr. McBride's EI analysis?

7    **A.**    The output was provided later after my reports

8    were written.

9    **Q.**    So you were not asked to analyze the output; yes

10   or no?

11   **A.**    Not in my original scope of being asked on this

12   case what to work on.

13   **Q.**    And, in fact, you never did analyze the output to

14   assess the reliability of Dr. McBride's EI analysis,

15   other than looking at the standard errors?

16   **A.**    From the original report.

17   **Q.**    Well, from either report.

18   **A.**    That's what I was asked to do, was to analyze his

19   report and to look at his methodology, his estimates,

20   and his conclusions.

21   **Q.**    Okay.  I want try to break this down so that we're

22   clear for the Court.  I want to go backwards in time,

23   starting with Dr. McBride's output for the analyses

24   that are contained in his supplemental report.  You

25   have seen that output, as you testified in your

1    March 20th deposition, right?

2    **A.**   I have seen output.

3    **Q.**   But you were not asked to perform any analysis of

4    that output?

5    **A.**   On the supplemental report, no.

6    **Q.**   And you have not voluntarily performed any

7    analysis of that output, right?

8    **A.**   I have -- I have done what I was asked to do.

9    **Q.**   Okay.  So now, let's go back in time just to be

10   clear for the 2014 report, you also had access to Dr.

11   McBride's output from his 2014 analyses, right?

12   **A.**   Yes.  It was given to us at his first deposition.

13   **Q.**   And you were asked to analyze the standard errors

14   that appeared on that output, correct?

15   **A.**   Yes.  That date at the deposition I was asked to

16   review them.

17   **Q.**   And you did not identify any issues with

18   substantively large standard errors?

19   **A.**   I don't recall reading -- I mean, I don't recall

20   everything written on that output.  I remember being

21   asked by the defense attorney at that time to take this

22   output, take the standard error, and go and derive the

23   confidence interval, and then let us know what that is.

24   **Q.**   And so as you sit here today you can't remember

25   identifying any errors that were substantively large

1    that would have caused concern back in 2014?

2    A.    I didn't write anything related to that.

3    Q.    Okay.  Can you remember substantively large errors

4    from the 2014 that you didn't write about?

5    A.    I'm sorry, I don't understand.

6    Q.    I'll withdraw the question.  I'll move on.  We

7    have been talking a lot this morning about ecological

8    inference, but there are other statistical methods

9    reported in both Dr. McBride's initial report and his

10   supplemental report, correct?

11   A.    Yes.

12   Q.    And those are homogenous precinct analysis,

13   bivariate ecological regression analysis, and, of

14   course, EI, or ecological inference analysis, right?

15   A.    Yes.

16   Q.    Your supplemental report does not conduct any

17   homogeneous precinct analysis, does it?

18   A.    No.

19   Q.    It does not conduct any bivariate ecological

20   regression analysis, does it?

21   A.    No, I was not asked to conduct analysis.

22   Q.    And your report does not criticize Dr. McBride's

23   application of any of those three statistical

24   technique, does it?

25   A.    I'm sorry.  Did you ask the application?

1    Q.   Let me break it down.  I will withdraw the

2    question and rephrase so it's clearer.  Your report

3    does not criticize Dr. McBride's application of

4    homogenous precinct analysis, does it?

5    A.   No.

6    Q.   Your report does not criticize Dr. McBride's

7    application of the statistical technique known as

8    bivariate ecological regression analysis, does it?

9    A.   No, not that I recall, no.

10   Q.   Your report does not criticize Dr. McBride's

11   application of the ecological inference statistical

12   technique, does it?

13   A.   I don't criticize him using it.  So if that's -- I

14   don't criticize the use of EI.

15   Q.   That wasn't my question, Dr. Owen.  The question

16   is, your report, does it criticize Dr. McBride's

17   application of those analyses?

18   A.   No, not with application, if I correctly

19   understand it.

20   Q.   Your report does not suggest a better statistical

21   tool to apply than the ones that Dr. McBride has

22   already applied in this case, does it?

23   A.   No.

24   Q.   And your report does not identify any elections in

25   particular that you think Dr. McBride should have

1    analyzed, but did not?

2    **A.**    I wasn't asked to provide any other outside

3    information about other elections or my thoughts on

4    that.

5    **Q.**    So to make sure that the record is clear and that

6    you've answered my questions, your report doesn't

7    contain or identify -- let me start again.  Your report

8    doesn't contain any opinions or identify any elections

9    that you think Dr. McBride should have analyzed, but

10   didn't?

11   **A.**    No.

12          **THE WITNESS:**    Judge --

13   **Q.**    I'd like to show you -- oh, I'm sorry, the witness

14   is getting your attention.

15          **THE COURT:**    Yes.  We'll suspend for just a

16   few moments.

17          *(Pause)*

18          **THE COURT:**    All right.  Are we ready to

19   continue, Mr. Sells?

20          **MR. SELLS:**    Yes, Your Honor.

21   **BY MR. SELLS:**

22   **Q.**    Dr. Owen, I would like to explore a hypothetical

23   with you to better understand how you would apply the

24   second and third *Gingles* factor in this case.  Can we

25   show that on the screen?  Take a moment to review that

1    hypothetical, Dr. Owen.

2    **A.**   May I ask a clarification of MPC?

3    **Q.**   Yes.  It's minority preferred candidate.

4    **A.**   Thank you.

5    **Q.**   Okay.  Have you had enough time to review that?

6    **A.**   I've looked at it.  I have questions.

7    **Q.**   Sure.  I want to point out how I constructed this

8    hypothetical.

9    **A.**   Okay.

10   **Q.**   I mentioned that MPC is the minority preferred

11   candidate, Able, Baker and Cain are their names.  Do

12   you see that?

13   **A.**   Yes.

14   **Q.**   And this is three separate elections, and we can

15   call them at-large elections or multimember district

16   elections, but these are three separate elections.  So

17   there was one election in 2016 and two elections in

18   2014 in this multimember or at-large district.  Do you

19   follow me so far?

20   **A.**   Yes.

21   **Q.**   Okay.  And the candidates, who were the minority

22   preferred candidates, were Able, Baker, and Cain, and

23   we have collapsed this down.  We're not looking at the

24   white preferred candidate, but we're going to assume

25   that there are only two candidates in the each race.

1    So Able was in a head to head.  The column under white

2    indicates the level of white support for the candidate,

3    and the column under black indicates the black support

4    for the minority preferred candidate.  Do you see that?

5    A.   Yes.  Can I ask a clarifying question?

6    Q.   Yes.

7    A.   So you're saying that 28 represents an estimate of

8    the white support for candidate Able?

9    Q.   Correct.  That's the crossover.  Do you understand

10   the term crossover?

11   A.   Yes.  Okay, and then just to clarify again, the 92

12   would be the estimate for the support of the black

13   voters to candidate Able?

14   Q.   That's correct.

15   A.   Okay.

16   Q.   So, in this table -- let's go and look at the

17   first election, Able receives 92 percent of the black

18   vote, an estimated 92 percent of the black vote.  Now,

19   that's highly cohesive, right?

20   A.   Yes.

21   Q.   And going to the next election down, Baker also

22   gets an estimated 92 percent of the black vote in that

23   election, right?

24   A.   Yes.

25   Q.   And that's also highly cohesive?

1    **A.**    Right.

2    **Q.**    And Cain, in the other 2014 race, gets 88 percent

3    of the black vote, and how would you characterize that

4    88 percent, is that cohesive?

5    **A.**    It's co -- yes, cohesive.

6    **Q.**    Is it highly cohesive?

7    **A.**    Again, it's high, it's relatively high, yes.

8    **Q.**    And would you say that if these were the elections

9    in a voting rights lawsuit that the plaintiff had

10   satisfied the second *Gingles* factor, as you understand

11   it?

12   **A.**    As I understand it, it would show black supporters

13   of their -- the minority preferred candidate

14   politically cohesive and --

15   **Q.**    Well, let me -- complete your answer.

16   **A.**    No, no, no, I'm sorry.

17   **Q.**    I want to be a little bit clearer for the record

18   because your report offers opinions about whether the

19   plaintiffs have satisfied the second and third *Gingles*

20   factor, right?

21   **A.**    Yes.

22   **Q.**    So I want to get at your understanding of what

23   satisfies the second and third *Gingles* factor that

24   purpose of this hypothetical.

25   **A.**    Okay.

1    Q.   Okay.  So if these were the elections that you had

2    before you, would you say that a minority plaintiff

3    would have satisfied the second *Gingles* factor?

4    A.   So in analyzing these estimates, again, just for

5    the purpose of knowing reliability of them, I would

6    want to see those confidence intervals, and I would

7    analyze them to ensure that the estimates are reliable,

8    and then if we did see the support of one group

9    coalescing behind one candidate, their preferred

10   candidate, then there would be political cohesion.

11   Q.   So based on these three elections would you or

12   would you not reach the conclusion that a plaintiff had

13   satisfied the second *Gingles* factor?

14   A.   Yes.

15   Q.   Okay.  Now, I want you to assume that candidates

16   Able, Baker, and Cain were defeated in each of these

17   three elections.  Do you follow me?

18   A.   Yes.

19   Q.   Would you conclude that the plaintiffs had

20   satisfied the third *Gingles* factor, as you understand

21   it?

22   A.   As I understand, that minority preferred candidate

23   would have to be usually typically defeated by the

24   block of the white vote, and as I see this, with 42 and

25   not having a confidence interval associated with this

1    and a standard error, I don't know if that is the exact

2    estimate and an accurate representation of that white

3    voting group and how they split.  And, so, this does

4    show that there is less support from the white

5    community to these minority preferred candidates, and

6    if your situation is correct and they we were defeated,

7    then there would not be a success of the minority

8    preferred candidate, but if this is the only three

9    elections that we're looking at in the whole universe,

10   then they would be 0 for three or they would not have

11   won.

12   Q.   Okay.  So in this hypothetical example, the

13   minority preferred candidates would be 0 for three,

14   correct?

15   A.   Yes.

16   Q.   And there would be 0 for three with one election

17   in 2016 and two elections in 2014, correct?

18   A.   Correct.

19   Q.   Now, would you conclude from that 0 for three that

20   the plaintiffs had satisfied the third *Gingles* factor;

21   yes or no?

22   A.   Yes, if this is the only universe of the

23   elections, meaning there is no other elections to look

24   at and that these are reliable consistent estimates.

25   Q.   Do you think that these elections are not enough

1    from which a court could conclude that the plaintiffs

2    have satisfied the third *Gingles* factor?

3    A.    I think you would use probative recent elections.

4    In social science the hope and the intent is that you

5    would have a sample to understand the trend.

6    Q.    Well, that's not my question.  My question is

7    whether these three elections are enough to satisfy the

8    third *Gingles* factor as you understand that term?

9    A.    I'm not sure if these three are enough.  If this

10   is all we had, then we'd have to allow the courts to

11   decide that these are the only three elections and make

12   the determination.

13   Q.    Do you know whether any courts have made that

14   determination that three elections are enough?

15   A.    I don't know.

16   Q.    Dr. Owen, you've read *Thornburg versus Gingles,*

17   right?

18   A.    Yes.

19   Q.    That's the central case by the Supreme Court in

20   vote dilutions cases, isn't it?

21   A.    Yes.

22   Q.    Do you know whether *Thornburg versus Gingles*

23   indicates whether three elections are enough?

24   A.    I don't know the specifics, I can't recall.

25   Q.    I'd like to show you *Thornburg versus Gingles*

1    since you can't recall.  Do you see that?

2    **A.**    Yes.

3    **Q.**    This is the *Thornburg versus Gingles* case.  And do

4    you remember that in *Thornburg versus Gingles* there's

5    an appendix opinion at the end?

6    **A.**    There's a -- I'm sorry, there's a?

7    **Q.**    There's an appendix to the opinion at the end.

8    **A.**    Uh-huh.  Yes.

9    **Q.**    And in that appendix the Court lists the election

10   analysis that it's relying on in the case.  Do you

11   remember that?

12   **A.**    Yes.

13   **Q.**    Well, let's look at some of that analysis.  Take a

14   look at the analysis at the bottom of the page.

15            **MR. SELLS:**  Can we get the heading which is

16   just above this in the zoom, please?

17   **Q.**    Do you see the Supreme Court'S analysis or the --

18   not analysis, but the Supreme Court's data from the

19   House District 36 race?

20   **A.**    Yes.

21   **Q.**    And you see that there was a 1980 and two 1982

22   elections.

23   **A.**    Yes.

24   **Q.**    Three elections in total.

25            **MS. MCKNIGHT:**  Your Honor, I would object to

1    the mischaracterization of the chart itself and the

2    elections themselves.  I appreciate he's trying to get

3    the expert witness to testify about a legal opinion,

4    but it's clear that he has mischaracterized a number of

5    elections on that page.

6            **MR. SELLS:**  Your Honor, I can clarify.

7            **THE COURT:**  All right.

8    BY MR. SELLS:

9    **Q.**   -- if I misspoke.  What I'm referring to is that

10   these are the number of elections in House District 36

11   which was an issue in *Thornburg versus Gingles*.  It was

12   a multimember district that was part of the case.  So

13   we're focusing on House District 36.  Now, do the

14   numbers on the right-hand side of this part of the

15   court's appendix look familiar to you, Dr. Owen?

16   **A.**   Yes.

17   **Q.**   In fact, those are the same numbers from the

18   hypothetical that we just went over; isn't that right?

19   **A.**   I believe that's correct, yes.

20   **Q.**   Do you know whether the Supreme Court found that

21   these three elections with these results were enough to

22   satisfy the third *Gingles* factor?

23           **MS. MCKNIGHT:**  Your Honor, again, I object to

24   asking the expert to testify to a legal conclusion.

25           **MR. SELLS:**  Your Honor, she's offering

1    opinions on the third *Gingles* factor all over her

2    report and testimony in this case.

3         THE COURT:  Yeah, I mean, her position and

4    what her expertise is, but asking her for a legal

5    analysis --

6         MR. SELLS:  That is for this Court.

7         THE COURT:  Yeah.

8         MR. SELLS:  I'm getting at her understanding

9    and her testimony.

10        THE COURT:  If you are asking for her

11   understanding of it and how she uses it in reaching her

12   decision, that's fine, but to ask her for what it means

13   in a legal fashion, I think would be a problem.  Recast

14   it the other way and I think it would be okay to ask

15   it.

16   BY MR. SELLS:

17   Q.   Let me ask it this way then.  When you have

18   referred to whether the plaintiff in this case have

19   satisfied the third *Gingles* factor or had not satisfied

20   the third *Gingles* factor, you didn't have this case in

21   mind, did you?

22   A.   I don't understand the question.

23   Q.   When you opine with respect to the third *Gingles*

24   factor in your report and in your testimony just

25   yesterday that you need more data points to draw

1    conclusions, you weren't remembering what the Supreme

2    Court has said about how many data points one needs to

3    satisfy the third *Gingles* factor, were you?

4    **A.**    I set out in my expert report, and I talked about

5    *Gingles*, and I talked about the conditions that need to

6    be met.  Did I think specifically on this appendix and

7    race results?  I don't bring that into my opinion.

8    **Q.**    Now, isn't it true, Dr. Owen, that in the three

9    at-large school board elections that we talked earlier

10   this morning, the levels of minority political cohesion

11   are as high or higher then the three races from House

12   District 36 that are attached to the end of *the Gingles*

13   opinion?

14   **A.**    As I can recall, yes, they were estimated high,

15   higher than these.

16   **Q.**    And the level of white crossover support for the

17   minority preferred candidates in the three at-large

18   elections that we discussed this morning from table

19   three are significantly lower than the white crossover

20   reported in these three elections in House District 36

21   that are attached to the *Thornburg versus Gingles*

22   opinion, correct?

23   **A.**    Again, I can look at the table, but if I remember,

24   they are lower.

25   **Q.**    Can we switch over to the Elmo briefly?  Here is

1    table four.  White crossover is 15.3 percent in that

2    race, isn't it?

3    A.    Yes.

4    Q.    That race being the May 24th, 2016 four-year race

5    between Coley and Roland?

6    A.    Yes.

7    Q.    And the May 20, 2014 four-year race between Busman

8    and Pless, the white crossover vote for Pless was 5.8,

9    correct?

10   A.    Yes.

11   Q.    And in the July 22 runoff between Coley and Roland

12   white crossover voting was 7.5 percent.  Do you see

13   that?

14   A.    Yes.

15   Q.    And all three of those estimates are much lower

16   than the white crossover voting in that *Gingles* race

17   that we just looked at?

18   A.    Yes, they're less.

19   Q.    And you testified earlier that the minority

20   supported candidate in those three race is 0 for three,

21   right?

22   A.    Yes.

23   Q.    No further questions.

24            **THE COURT:**  All right.  Redirect?

25                 **REDIRECT EXAMINATION**

1    BY MS. MCKNIGHT:

2    **Q.**   Good morning, Dr. Owen.

3    **A.**   Good morning.

4    **Q.**   I've got some questions for you about what

5    plaintiff's counsel just discussed with you, but let me

6    start with something he recently discussed with you.

7    Tell me, has EI developed since 1997?

8    **A.**   Yes.

9    **Q.**   And is EzI the most current method to generate EI

10   estimates?

11   **A.**   No.

12   **Q.**   Okay.  What is the most current method?

13   **A.**   So you can run ecological inference, the

14   technique, on other statistical programs such as the R

15   program, which is free, a free online program, and then

16   you just write the code to run the ecological inference

17   method.

18   **Q.**   Does that method have the benefits of bounding

19   results from 0 to 100?

20   **A.**   Yes.  And you can run multiple candidates.  It's

21   just a two-by-two table.

22   **Q.**   Did I hear you correctly that in order for you to

23   use EzI you have to use an older computer, you'd have

24   to bring an older computer online to even use the EzI

25   method?

1    **A.**   Yes.  So, when I was working in 2015 on the

2    Fayette case, I tried to download King EzI onto my

3    computer, and I could not because my computer Windows

4    was too recent a version.

5    **Q.**   And regarding the bounds of zero to 100, what's

6    the problem with using EzI?

7    **A.**   So, you are assuming the two-by-two contingency

8    table, so you are running each candidate in that

9    iterative process, and with a package like R, you would

10   have the bounds, you would see how the estimated totals

11   are there and generated from zero to 100.

12          **MS. MCKNIGHT:**  Can we bring up Defendant's

13   Exhibit 9, page nine?  That's defendant nine, page

14   nine.  Can we zoom in on footnote 14, please?

15   **Q.**   Dr. Owen, your understanding of the bounds on EI

16   estimates as being from zero to hundred was challenged

17   by plaintiff's counsel, and he brought you to this page

18   in plaintiff's witness -- expert witness's report and

19   ask you to testify about sources that are cited in this

20   report.  And he focused you in on a book from 1997, but

21   I'd like to ask you about this footnote 14.  Would it

22   surprise you to know that this footnote, including

23   cases like *Bone*, *Euclid*, and *Alamosa* all talk about the

24   zero to 100 bound and that EI is bound by that figure?

25   **A.**   Did you ask if it would surprise me?

1    Q.   Yes.

2    A.   No, I would not be surprised because it's a more

3    current piece of the literature.

4    Q.   Now, there were a lot of questions and

5    insinuations that your report didn't address certain

6    things, so I'd like to start by just going over what

7    you did do in your report and what you did address.

8         MS. MCKNIGHT:   Could we turn to Defendant's

9    Exhibit 5 at page two, please?

10   Q.   Now, focusing in on scope and plan, you were asked

11   to evaluate the supplemental expert report and data

12   analysis offered by plaintiff's expert; isn't that

13   right?

14   A.   Correct, yes.

15   Q.   And that regarded a Voting Rights Act section to

16   the vote dilution claim?

17   A.   Yes.

18   Q.   And were you asked to render your opinion on Dr.

19   McBride's analysis concerning his data methodology and

20   findings?

21   A.   Yes.

22        MS. MCKNIGHT:   Could we turn to page three of

23   her report?

24   Q.   I'm focusing in on that first paragraph which

25   carries over from the scope section of your report.

1    Had you reviewed Dr. McBride's data and findings as you

2    had in the original report in this supplemental report?

3    **A.**   I'm sorry, could you ask the question again?

4    **Q.**   Sure.  Did you review Dr. McBride's data and

5    findings as you had in your original report in this

6    supplemental report?

7    **A.**   Yes.

8    **Q.**   And did you conclude again that you disagree with

9    his statistical estimates and results and dispute his

10   conclusions that elections for Sumter County Board of

11   Education are racially polarized and that the

12   districting scheme dilutes minority vote due to Dr.

13   McBride's lack of reliable evidence to substantiate

14   this claim?

15   **A.**   Yes.

16        **MR. SELLS:**  Your Honor, objection.  Counsel

17   is testified, just reading off the scheme.  This is in

18   the record, but it does not test her recall about what

19   her conclusions.  Were she's just reading off the

20   screen.

21        **MS. MCKNIGHT:**  Your Honor, plaintiff's

22   counsel focused heavily on what was not in Dr. Owen's

23   report, often mischaracterizing what was not in there.

24   I can move on from these general statements.  I was

25   about to -- I understood he interposed his objection

1    before I could ask my next question, but I'm happy to

2    go on to more specific questions about what she did in

3    her first report.

4         **MR. SELLS:**  Well, to be clear, it's not

5    testimony.  She doesn't remember what her conclusions

6    were, and, of course, she's not going to misremember

7    them if they're sitting in front of face, and she's

8    just reading.

9         **MS. MCKNIGHT:**  Your Honor, this isn't to

10   refresh her recollection; it's to rebut plaintiff's

11   counsel's insinuations that it was not in her report.

12        **MR. SELLS:**  But that's her testifying.

13   That's --

14        **THE COURT:**  I understand your argument.  You

15   all will be given plenty of opportunity to argue what

16   the evidence establishes or not or what the credibility

17   of a witness is or is not, but the objection is

18   overruled other than to note that for the record.

19   BY MS. MCKNIGHT:

20   Q.   And is it your understanding, Dr. Owen, that in

21   order to show minority vote dilution and satisfy the

22   requirements of the second and third *Gingles* prongs

23   that experts must analyze the degree to which racial

24   polarization has characterized voting in a

25   jurisdiction's elections?

1    **A.**   Yes.

2            **THE COURT:**  I think I also -- I wasn't sure,

3    I may have misremembered that you referenced leading in

4    your objection.

5            **MR. SELLS:**  Yes, Your Honor.

6            **THE COURT:**  And that is sustained.

7            **MS. MCKNIGHT:**  Thank you, Your Honor.

8            **THE COURT:**  The witness is on redirect

9    examination.

10           **MS. MCKNIGHT:**  Thank you.  Could we turn to

11   page four of Defendant's Exhibit 5?

12   **BY MS. MCKNIGHT:**

13   **Q.**   In your report did you analyze whether Dr. McBride

14   used sufficient evidence in his reports?

15   **A.**   I'm sorry, could you ask that again?

16   **Q.**   Sure.  In your supplemental report did you analyze

17   whether Dr. McBride used sufficient evidence to come to

18   the conclusions that he came to in his reports?

19           **MR. SELLS:**  Your Honor, I want to object

20   again.  She is leading the witness by putting up the

21   page where the answer is before she asks the question.

22   That's improper.

23           **THE COURT:**  Well, the witness should not be

24   prompted unless the witness asks to be prompted so --

25           **MR. SELLS:**  Exactly.  There's no testimony.

1    She doesn't remember the contents.

2         **MS. MCKNIGHT:**  That's fine.  I'll handle the

3    procedure a different way to satisfy the objection.

4         **THE COURT:**  I think, the question that was

5    asked I think was not a leading question, but it would

6    not be proper to prompt the witness before.  That is

7    noted for the --

8         **MS. MCKNIGHT:**  Could you -- *(aside).*

9         **THE COURT:**  You may continue.

10   BY MS. MCKNIGHT:

11   **Q.**   In your supplemental report, did you analyze

12   whether Dr. McBride used sufficient evidence to come to

13   the conclusions he came to in his report?

14   **A.**   Yes, I analyzed his materials.

15   **Q.**   And did you have concerns about selection bias in

16   the races Dr. McBride chose to analyze?

17        **MR. SELLS:**  Objection, leading.

18        **THE COURT:**  All right.  Let's try to get it

19   done without leading.  All right.  Sustained.

20   BY MS. MCKNIGHT:

21   **Q.**   What are some of the general ways that Dr.

22   McBride's reports shifted between the first report and

23   the second report?

24   **A.**   Between his original report and his supplemental

25   report there were inconsistencies in the minority

1    preferred candidate identified.  There were

2    inconsistencies in the EI estimates reported, and there

3    were changes as to whether the minority preferred

4    candidate was a winner or lost the election based off

5    how he had identified the minority preferred candidate.

6    **Q.**   And did you have any concerns about the fact that

7    numbers changed between his first report and second

8    report?

9          **MR. SELLS:**  Objection, leading.

10          **THE COURT:**  Restate your question.  I don't

11   think you finished it.

12          **MS. MCKNIGHT:**  Sure.  The better way to ask

13   it, Your Honor.  Let me get to that.

14          **THE COURT:**  All right.

15   **BY MS. MCKNIGHT:**

16   **Q.**   Regarding your concerns about Dr. McBride's

17   reports, we spent a lot of time yesterday talking about

18   those concerns and this morning Mr. Sells asked you

19   questions about the concerns about specific elections.

20   I'd like to ask you a question about the concerns that

21   you had about the at-large elections in 2014 and 2016.

22   And I saw Mr. Sells put up for you the table from Dr.

23   McBride's supplemental report showing the 2016 at-large

24   race.  Do you recall that?

25   **A.**   Yes.

1    **Q.**   In your opinion can you rely on that one race to

2    make the conclusions that Dr. McBride has made?

3    **A.**   No.

4    **Q.**   And why not?

5    **A.**   Having read his report and seen the

6    inconsistencies and changes in the numbers, I don't

7    have confidence that what's reported is showing exactly

8    an accurate picture of what the voters -- and how they

9    are voting and whether we are for sure confident in the

10    candidate of choice and that that minority preferred

11    candidate is defeated.  Because of the inconsistencies,

12    it calls into question whether there's authenticity and

13    accuracy in each of the new ones.

14    **Q.**   So even if this 2016 election was not included in

15    Dr. McBride's initial report, your confidence in his

16    numbers is colored, is affected by your confidence in

17    other numbers.  Is that fair to say?

18    **A.**   Yes.

19          **MR. SELLS:**  Objection, leading.

20          **THE COURT:**  It's leading.

21          **MS. MCKNIGHT:**  Your Honor, I'm actually

22    trying to help the Court and try to move things along,

23    but I understand.

24          **THE COURT:**  Well, there's been a lot of

25    leading all over the place since Monday morning, but

1    when it's raised, the Court addresses it.  So ask the

2    question in a non-leading manner.

3              **MS. MCKNIGHT:**  I understand.

4    **BY MS. MCKNIGHT:**

5    **Q.**   Did Dr. McBride make conclusions about racial

6    polarized voting in his report?

7    **A.**   Yes.

8    **Q.**   Okay.  And did he make conclusions about voter

9    cohesion in his report?

10   **A.**   Yes.

11   **Q.**   And can you have confidence in those conclusions?

12   **A.**   No.

13   **Q.**   Why not?

14   **A.**   Because between the reports there are

15   inconsistencies about the data that has been reported,

16   the estimates that have been reported, along with their

17   -- like in the original report, they were not standard

18   errors.  So to identify that these estimates are --

19             **MR. SELLS:**  Objection.  Asked and answered.

20             **THE COURT:**  The objection is overruled.

21   Please continue.  Finish your answer.

22   **BY MS. MCKNIGHT:**

23   **Q.**   Yes, please continue.  Take your time.

24   **A.**   So, in some of the analysis, I was not confident

25   that that estimate was accurate enough in showing that

1    voters were voting in that particular way, that they

2    were coalesced by one particular candidate, and, again,

3    just to be frank, reading one report where I had

4    concerns and then reading a new report with identified

5    better data and new numbers, it just raises concern

6    about what is really the accurate picture.  And I -- I

7    -- I'm not sure whether it's reliable to make a

8    determination.

9    **Q.**   Now, focusing in on those three at-large

10   elections, as we've already discussed the 2016 was not

11   in Dr. McBride's first report, but the two 2014

12   elections, were they included in his first report?

13   **A.**   Yes.

14   **Q.**   And could we turn to Defendant's Exhibit 6 at page

15   46?  Now, Dr. Owen, without limiting the detailed

16   testimony you gave yesterday about your concerns about

17   this election, are you able to identify off the top of

18   your head concerns you had with this election as

19   reported and analyzed by Dr. McBride?

20   **A.**   In this election he has estimates -- ecological

21   inference, yeah, estimates that are over 100 percent.

22   **Q.**   And did you have concerns about changes between

23   this analysis and the analysis in the supplemental

24   report?

25   **A.**   Yes.

1          **MR. SELLS:**  Objection, leading.

2          **THE COURT:**  I'll let this one go.  Go ahead.

3          **MS. MCKNIGHT:**  Thank you, Your Honor.

4    **BY THE WITNESS:**

5    **A.**  Yes.

6    **BY MS. MCKNIGHT:**

7    **Q.**  And let's turn to page 47, please.  Do you recall

8    having similar concerns about this analysis that Dr.

9    McBride performed?

10   **A.**  Yes, I had concerns about the estimate, and then,

11   how they were reported in the supplemental report as

12   well.

13         **MS. MCKNIGHT:**  I'd like to go to the Elmo

14   briefly.  So pardon me to the Court.  I did a quick

15   sketch of what I saw as the demonstrative used by

16   plaintiff's counsel.

17         **THE COURT:**  All right.

18   **BY MS. MCKNIGHT:**

19   **Q.**  And, Dr. Owen, you were given these numbers and

20   asked to make as a -- and given hypothetical questions

21   about this model.  Let me add a few factors to the

22   hypothetical.  First, if you had been given this data

23   to analyze, but you also knew that this data in this

24   analysis had been prepared by someone who had also

25   analyzed this election at rates such as 68.2 and 72,

1    would you have confidence in these numbers to draw a

2    conclusion that there is racially polarized voting in

3    the county at issue?

4    **A.**    I would ask more questions, and I'd want to know

5    more about the data underlying those results and where

6    those estimates were derived, and if they're showing a

7    picture.  I mean, off of those numbers, I'm not sure

8    I'd be confident to say yes.

9    **Q.**    And are any of those concerns related to the fact

10   that the numbers have changed?

11   **A.**    Yes.

12   **Q.**    Why?

13   **A.**    It -- when numbers change, there must be some

14   underlying reason of what's going on, whether it's

15   data, the use of certain data, how it's been coded, how

16   it has been applied and used, and so having the change

17   and not knowing the consistency, it just makes it to

18   where I'm not sure what is accurate, what is really for

19   sure and with certainty the voting preferences.

20   **Q.**    And would it affect your confidence in being able

21   to rely on these figures?

22   **A.**    Yes.

23   **Q.**    Now, I'm going to add another factor to this

24   hypothetical.  Now, in the *Gingles* shown to you by

25   Mr. Sells he identified what he described as only three

1    elections, but on that page did you also see a primary

2    election?

3    **A.**    Yes.

4    **Q.**    So if you total up all the elections that were

5    analyzed on that page how many are there?

6    **A.**    Six.

7    **Q.**    Is that greater than three?

8    **A.**    Yes.

9    **Q.**    Regarding the issue of standard errors, were they

10   included in Dr. McBride's first report?

11   **A.**    No.

12   **Q.**    And I heard a mischaracterization of your

13   testimony, so for the clarity of the record, what would

14   you have done if you had identified large standards of

15   error in Dr. McBride's data?

16   **A.**    It would have called in -- I would have been less

17   confidence in the results.

18   **Q.**    And would you have put that in your report?

19   **A.**    Yes.

20   **Q.**    And, unfortunately, we have to go back to the EI

21   issue.

22            **THE COURT:**  Well, let's stop here for our

23   break.

24            **MS. MCKNIGHT:**  Okay.

25            **THE COURT:**  All right.  Keep in mind we

1    should be finished by not later than five o'clock of

2    all the evidence.  All right.  We'll be in recess until

3    1:30.

4    *(RECONVENED; ALL PARTIES PRESENT 1:36 p.m.)*

5              **THE COURT:**  All right.  You may continue.

6              **MS. MCKNIGHT:**  Thank you, Your Honor.

7    **BY MS. MCKNIGHT:**

8    **Q.**   Dr. Owen, the issue of EI estimates and whether

9    they should or should not add up to over 100 was at

10   issue in your cross examination.  Do you recall that

11   topic?

12   **A.**   Yes.

13   **Q.**   You remember plaintiff's counsel, he suggested

14   that you did not call out this error in every single

15   instance it occurred.  Do you remember that?

16   **A.**   Yes.

17   **Q.**   Did this error occur throughout Dr. McBride's

18   reports?

19             **MR. SELLS:**  Objection, leading.

20             **MS. MCKNIGHT:**  I don't see what's leading

21   about that, Your Honor.

22             **THE COURT:**  The objection is overruled.

23             **MS. MCKNIGHT:**  Thank you.

24             **THE WITNESS:**  Can you ask the question again,

25   I'm sorry?

1    BY MS. MCKNIGHT:

2    Q.   Did this error occur throughout Dr. McBride's

3    reports?

4    A.   Yes.  There were estimates over 100 percent.

5    Q.   And do you report on this issue in your

6    supplemental report?

7    A.   Yes.

8    Q.   Because plaintiff's counsel has challenged whether

9    you reported on this issue, I'd like to turn to page --

10   to DX-5, page 14 and ask you to identify where in this

11   document, which is your supplemental report, you

12   address this issue of estimates exceeding 100?

13        MR. SELLS:  Your Honor, I want to renew my

14   objection to the attorney giving her the page to

15   provide the answer.  It's prompting the answer with --

16   it's already in evidence, and I think we've gone over

17   it, but I'd like to renew by objection.

18        THE COURT:  I understand you objection, but I

19   think the question was, though, specifically to point

20   out where it was.  So I think that's fair in light of

21   what the question was.

22        MS. MCKNIGHT:  Thank you, Your Honor.

23        THE COURT:  You may proceed.

24   BY THE WITNESS:

25   A.   I discussed this at the bottom of page 14,

1   starting with the sentence:  Furthermore, Dr. McBride

2   has vote estimates that exceed 100 percent.

3   BY MS. MCKNIGHT:

4   Q.    Thank you, Dr. Owen.  Now, I'd like to bring up

5   Plaintiff's Exhibit 16, page 18.  Now, I'll tell you

6   that this is table seven --

7           MS. MCKNIGHT:  Pardon me, I misspoke.  It's

8   Plaintiff's Exhibit 6, pardon me, Mr. Conner, page 18.

9   And, Mr. Conner, could you show the top of the next

10  page because this table bleeds over into the next page.

11  Now, so we need pages 18 and 19.

12  Q.    Now, Dr. Owen, I heard plaintiff's counsel ask you

13  questions about this table seven in your cross

14  examination.  Do you remember him asking you about this

15  table?

16  A.    Yes.

17  Q.    And I believe he suggested that you didn't raise

18  this -- you didn't raise in your deposition the point

19  that these figures, these EI figures, exceed 100.  Do

20  you remember him asking you that?

21  A.    Yes.

22  Q.    But you did identify this in your report, right?

23          THE COURT:  Well, since there has been an

24  objection to leading --

25  BY MS. MCKNIGHT:

1    **Q.**    Did you identify this in your report?

2    **A.**    I did discuss in this report this selection and

3    estimates of 100 percent.

4    **Q.**    Now, Dr. Owen, as an expert in statistics, when

5    you are running an analysis of numbers, is more data

6    better than less data?

7    **A.**    Yes, more data is better.

8    **Q.**    And does amount of data used in running an

9    analysis affect your confidence in that analysis?

10   **A.**    Yes.

11   **Q.**    How so?

12   **A.**    They more data you have, they more reliable you

13   can base your estimates on.  The estimates are more

14   reliable.  There -- with less data, we would have less

15   confidence, less reliability because you could

16   potentially have bias in those estimates because of the

17   fewer amounts of data utilized.

18        **MS. MCKNIGHT:**  Can you put up PX-21?  And for

19   the Court's reference, this is that 2004 sheriff race.

20   **Q.**    This is the same race, Dr. Owen, isn't it, that

21   was at issue in that table seven we just looked at?

22   **A.**    Yes.

23   **Q.**    I'd to ask you about absentee vote issue.  I

24   believe -- I know that Mr. Sells asked you about it.

25   What is your understanding of how Dr. McBride handled

1    the absentee ballots from this race in his analysis?

2    **A.**    I understand that he discarded those absentee

3    ballots because they could not be put back into a

4    precinct.

5    **Q.**    And by your reading of this chart, how many

6    absentee ballots are we talking about?

7    **A.**    4,065 total absentee ballots.

8    **Q.**    In your reading of this chart, how many votes were

9    cast in this election?

10   **A.**    Total votes 11,068.

11   **Q.**    So in a race involving 11,000 votes, what kind of

12   impact would removing over 4,000 votes have on the

13   reliability of an analysis?

14   **A.**    So, you are ignoring a larger percentage of the

15   vote that was cast in this election, so you have few

16   data points to be examining and so your estimates would

17   potentially be biased, and they would be less reliable.

18   **Q.**    Would you have less confidence in an analysis

19   based on the removal of 4,000 absentee ballots out of

20   11,000?

21   **A.**    Yes.  I would not be as confident and sure that

22   you are accurately assessing voter preferences.

23   **Q.**    Now, I heard Mr. Sells ask you about section six

24   of Dr. McBride's initial report.  The header for that

25   section is Plaintiff's Illustrative Plan.  Do you

1    remember him asking you questions about this section?

2    **A.**    Yes.

3    **Q.**    And I believe you responded to a question that he

4    had that you did not opine about this section in your

5    report; is that right?

6    **A.**    Yes.

7    **Q.**    Okay.  But in your report did you opine on

8    racially polarized voting?

9    **A.**    Yes.

10   **Q.**    And did you opine on political cohesion among the

11   black community in Sumter County?

12   **A.**    Yes.

13   **Q.**    Pardon me?

14   **A.**    Yes.

15   **Q.**    Dr. Owen, did the number of races analyzed change

16   between the first report of Dr. McBride and his

17   supplemental reports?

18   **A.**    Yes.

19   **Q.**    Were some races removed?

20   **A.**    Yes.

21   **Q.**    Could this be a reason for concern about the

22   confidence you could have in the results of an

23   analysis?

24   **A.**    Yes.

25   **Q.**    And could this be called cherry picking?

1          MR. SELLS:  Objection, leading.

2          THE COURT:  Sustained.

3          MR. SELLS:  Repetitive.

4   BY MS. MCKNIGHT:

5   Q.   What kind of concern would you have about the

6   removal of races from one report to another?

7   A.   In removing or not discussing the entire list of

8   races that was initially reported on, then you winnow

9   down your data and your analysis.  So you have

10  eliminated -- you have erased.  And if it was

11  originally reported on, you would want to include it in

12  the total analysis, I mean, not just exclude it so that

13  you have a clear picture of the voting behavior and

14  what is happening with candidates in the county.

15  Q.   Thank you, very much, Dr. Owen.

16          THE COURT:  All right, is there any

17  re-recross?

18          MR. SELLS:  I have a few questions about what

19  came up on redirect.

20                  RE-REDIRECT EXAMINATION

21  BY MR. SELLS:

22  Q.   I'd like to start with Plaintiff's Exhibit 21,

23  that's the 2004 sheriff race.

24          MR. SELLS:  Ms. King, can we put our computer

25  on the screen?

1   Q.   Dr. Owen, Ms. McKnight just asked you about this

2   sheriff race.  Do you remember that?

3   A.   Yes.

4   Q.   My question to you is, how many times have you run

5   an EI analysis of a race where the absentee ballots are

6   not allocated back to the precinct?

7   A.   I would have to look at the specific analysis that

8   I ran in Fayette County to again look at the precincts

9   and determine whether we looked at elections that did

10  not have the absentee ballots.  I know that in that

11  analysis there were split precincts, and so we had to

12  account for that.

13  Q.   Were there any analyses in your Fayette County

14  report that went back before 2010?

15  A.   I don't remember exactly.  I'd have to look at

16  that report.

17  Q.   So as you sit here today you can't remember ever

18  having analyzed an election with EI where the absentee

19  ballots are not allocated back to the precinct; isn't

20  that right?

21  A.   Again, I'd have to look at the report I wrote.

22  Q.   Okay, that's not my question.  My question to you

23  as, as you sit here today you can't remember a single

24  instance in which you performed a similar analysis

25  using EI?

1   **A.**   I don't recall.

2   **Q.**   So can you suggest a way that you could analyze

3   this race with EI given that the absentee ballots are

4   not allocated back to the precinct that Dr. McBride

5   could have or should have tried?

6   **A.**   No.  I'm not saying that there's a technique he

7   could have used to allocate these back.  You can look

8   to see in the voter turnout files how many absentee

9   ballots were cast and -- but it's concerning when you

10  have this large number of absentee ballots that have

11  been discounted.

12  **Q.**   So as you sit here today you don't know of

13  anything that Dr. McBride could have done differently

14  than he did in this case with this race?

15  **A.**   As I sit here, I don't -- I'm not exactly sure how

16  to answer that.

17  **Q.**   Do you know if you can look at the actual absentee

18  ballots themselves to find out in what precinct they

19  were cast?

20  **A.**   Yes.

21  **Q.**   And do you know whether Dr. McBride asked Mr.

22  Brady for copies of those absentee ballots?

23  **A.**   I do not know.

24  **Q.**   Ms. McKnight asked you about the cases that were

25  cited in a footnote in Dr. McBride's rebuttal report.

1    Do you remember that testimony?

2    **A.**    Cases?  I'm not sure they were cases.

3    **Q.**    Okay.  If it would refresh your recollection, I

4    can put that exhibit on the screen and blow up the area

5    that Ms. McKnight blew up.

6    **A.**    Sure.

7    **Q.**    Okay.  Let's look at Defendant's Exhibit 9 at page

8    nine and let's blow up footnote 14.  Does that refresh

9    your recollection of the question that Ms. McKnight

10   asked you with regard to the *Mallory versus Ohio* case

11   and the *Bone Shirt Fishers Hazeltine* case?

12   **A.**    Yes.

13   **Q.**    And, in fact, you testified, I believe, that all

14   of those cases indicate that EI can't produce estimates

15   over 100.  Was that your testimony?  Did I understand

16   that right?

17   **A.**    I don't think that was exactly, no, how I answered

18   her question.

19   **Q.**    Okay.  Well, what I want to ask you is, you

20   haven't actually read these cases, have you?

21   **A.**    Not in my recent memory, no.  I can't sit here

22   today and testify on any of those legal cases.

23   **Q.**    Okay.  And you don't know as you sit here today

24   whether those cases are referring to the bound of 100

25   for individual estimate under EI or the bounds for the

1    sum of all estimates of minority cohesion under EI?

2    **A.**   No, I do not know exactly what's in each of those

3    cases.

4    **Q.**   Ms. McKnight asked you a few questions about EzI,

5    and I believe your testimony was that you need an older

6    computer to run it.  Do you remember that?

7    **A.**   An older program, Window-based, yes.

8    **Q.**   How old is older to you?

9    **A.**   I don't have a definition on that.  I just know

10   that the Window software I have now, I could not

11   download the version of EzI on it.

12   **Q.**   Okay.  What version do you have?

13   **A.**   Windows -- the latest Windows version.

14   **Q.**   Would that be Windows 10?

15   **A.**   That sounds right.  I am not tech savvy individual

16   on computer programming names like Windows.

17   **Q.**   But EzI is still available for download on Gary

18   King's website, right?

19   **A.**   Last time I checked.

20   **Q.**   And you haven't seen Mr. King publish anything to

21   the effect that EzI should no longer be used by

22   researchers, has he?

23   **A.**   No.

24   **Q.**   Okay.  I want to turn next to the hypothetical

25   that you discussed with Ms. McKnight.  And we need to

1    turn over to the Elmo for that.  I have the second part

2    covered up for now, just as Ms. McKnight did, and I

3    want to focus first on the top part.  Do you see that?

4    A.    Yes.

5    Q.    And as I recall your testimony after Ms. McKnight

6    wrote in the numbers 68.2 and 72 on the right-hand

7    side, you testified that would undermine your

8    confidence in the reliability of the estimates and

9    would therefore draw into doubt your conclusions with

10   respect to the second and third *Gingles* factors.  Did I

11   get that right?

12   A.    Yes, because there would be inconsistencies in the

13   numbers.

14   Q.    Okay.  I want to make sure I understand that.  So

15   I'm going to obscure the numbers in the original

16   hypothetical, and I want you now to assume that the

17   numbers that Ms. McKnight wrote in were the original

18   analyses, would you conclude from the numbers there

19   that the plaintiffs had satisfied the second *Gingles*

20   factor?

21   A.    Are these the only numbers to be reported?

22   Q.    Yes.

23   A.    I would want to know the standard errors and be

24   very confident in this estimate, since it's an

25   estimate, that they are precise and reliable.

1   Q.   That wasn't my question.  My question was whether

2   you would conclude that the plaintiff was able to

3   satisfy the second *Gingles* factor which requires

4   minority political cohesion?

5   A.   And, again, to assess that cohesion I would want

6   to make sure I have the full amount of information.

7   Q.   Would you consider an estimate of 68.2 to be

8   cohesive?

9   A.   It's greater than a majority.  But, again, with a

10  standard error and a range, I need to make sure that

11  that range is not very large.  This doesn't say how

12  many precincts are reporting and how much data that --

13  to make a solid conclusion that that point estimate is

14  accurate.

15  Q.   Let me -- let's do this.  Let's assume that

16  there's a standard error next to this that is as large

17  as the largest standard error reported in Dr. McBride's

18  rebuttal report.  Now, would you conclude that an

19  estimate of 68.2 is politically cohesive?

20  A.   I believe you asked in his rebuttal report, and I

21  don't remember in his rebuttal report having tables and

22  the standard errors.

23  Q.   If I said rebuttal report, I misspoke.  Because I

24  intended to say was his supplemental report.

25  A.   Okay.  Can you ask your question again?  I'm

1    sorry.

2    **Q.**    So assume that the standard errors for these two

3    estimates are as large as the largest standard error

4    that you saw in his report, would you conclude that an

5    estimate of 68.2 shows minority political cohesion?

6    **A.**    Not seeing every one of his standard errors right

7    now in front of me, I don't remember any very large,

8    and so I would say that there may be a tight range

9    around that and that estimate could be accurate.

10   **Q.**    And from that estimate you would conclude that

11   minority voters are cohesive or are not cohesive?

12   **A.**    They -- a majority of them are coalesced behind

13   that particular candidate.

14   **Q.**    So yes, they would be cohesive?

15   **A.**    Yes.

16   **Q.**    And also they would also be cohesive for the 72

17   percent estimate, correct?

18   **A.**    Yes.  Based on what I just said about the previous

19   one.

20   **Q.**    So having found that minority voters were cohesive

21   in all four of these elections, you would conclude that

22   a minority plaintiff could satisfy the second *Gingles*

23   factor, right?

24   **A.**    Again, if this was the only numbers presented and

25   they had their standard errors and we could be certain

1    that those are reliable estimates, yes.

2    **Q.**   Okay.  And now I'm covering the numbers that

3    Ms. McKnight just wrote on there, and we have the

4    original hypothetical, you already testified that you

5    would consider these estimates to be -- evidence of

6    political cohesion that would satisfy the second

7    *Gingles* factor, right?

8    **A.**   Yes.

9    **Q.**   So it's only with the presence of two sets of

10   estimates, both of which in total show political

11   cohesion that you would say you have to throw them out;

12   is that right?

13   **A.**   It draws into question the reliability of the

14   estimates because they have changed.

15   **Q.**   Does it matter whether the number is -- whether

16   the true number is 92 or 68 in first instance or 88 and

17   72 in the second instance?

18   **A.**   I'm not sure I follow what you're asking, I'm

19   sorry.

20   **Q.**   Isn't it true that no matter which number you

21   pick, they're both evidence of political cohesion?

22   **A.**   Again, showing these two together there's a

23   change, there's inconsistencies.  So it just calls into

24   question the reliability.  If one was presented on its

25   on with standard errors and had a tight range and

1    confidence, then, yes, you would say there is political

2    cohesion.  And if the other one had been shown and

3    there's no comparison between because it's original

4    tight standard errors, then, yes, you could see

5    cohesion.

6    Q.   I think I understand your testimony on that.

7    Let's talk about the primaries a little bit.  Dr. Owen,

8    you're a political scientist, you know what a primary

9    is, right?

10   A.   Yes.

11   Q.   And you testified there there's this six

12   elections; is that right?

13   A.   If you add the primary elections to the general

14   elections.

15   Q.   Okay.  Do you see the years are designated as the

16   same.  Would you count that as six elections?

17   A.   I'm sorry, the years?  Can you --

18   Q.   Yeah.  So, in other words, this is the same

19   election cycle because one is from 2016 with the

20   candidate Able, and you also see in 2016 Able ran in a

21   primary.  I don't know whether it's a Democratic

22   primary or a Republican primary, but Able ran in the

23   primary.  Do you see that?

24   A.   Yes.

25   Q.   And the same is true with the 2014 races.  Do you

1    see that?

2    **A.**    Yes.

3    **Q.**    So this hypothetical in total reflects three

4    elections times two with a primary and a general; is

5    that fair to say?

6    **A.**    So there would be the primary contest in 2014 and

7    the primary contest in 2016.  So there are three

8    contests, one election of a primary in 2014 and one

9    election of a primary in 2016, but there's three

10   contests, and then the election above would be the same

11   way.

12   **Q.**    Okay.

13   **A.**    So you have six electoral contests.

14   **Q.**    Okay.  And I want to try to understand how you

15   would analyze these for purposes of the *Gingles*

16   factors.  Now, we know that Able, Baker, and Cain are

17   the minority preferred candidates.  I assume that

18   that's intent of this hypothetical.  But we see that

19   they get black support in the 70 to 80 percent range.

20   Do you see that?

21   **A.**    Yes.

22   **Q.**    Okay.  Now, a candidate doesn't make it to the

23   general election unless they win the primary, right?

24   **A.**    Correct.

25   **Q.**    Okay.  So, we have three victories here.  Do you

1  understand what I'm talking about in the primary

2  election?

3  **A.**   You are saying that these three candidates won

4  their primary.

5  **Q.**   Well, obviously they did because they're the

6  same --

7  **A.**   They went --

8  **Q.**   -- candidates who went on to appear in the general

9  election.

10  **A.**   I'm trying to follow you, yes.

11  **Q.**   You would count that as three victories?

12  **A.**   If they had won in this primary contest, yes.

13  **Q.**   On this hypothetical --

14  **A.**   Yes, yes.

15  **Q.**   And we know from the hypothetical as well that in

16  the general election all three minority preferred

17  candidates lost, right?

18  **A.**   Yes.

19  **Q.**   So that's three losses?

20  **A.**   Correct.

21  **Q.**   Now, for purposes of the third *Gingles* factor, how

22  do you analyze that?

23  **A.**   So the third condition, the third prong you would

24  look at, usual defeat.  So here you have a 3-3, three

25  victories to three defeats.

1    Q.   And so you would conclude that minority voters do

2    not satisfy the third *Gingles* factor according to this

3    hypothetical because it's 3 to 3?

4    A.   Well, it's equal loss, equal victory, and I

5    believe I define usually to be more often than not.

6    Q.   So you would count victory in the primary the same

7    as a defeat in the general?

8    A.   These are electoral contests so I would look at

9    them.

10          MS. MCKNIGHT:   Your Honor, plaintiff's

11   counsel has gone well beyond the scope of the redirect.

12          MR. SELLS:   This was the very subject

13   of redirect.

14          MS. MCKNIGHT:   I was not inquiring about

15   *Gingles* and satisfying *Gingles* factors, what *Gingles*

16   factors were, or asking a legal opinion of the witness

17   about the *Gingles* factors about this chart.  I was

18   asking about number of elections and her confidence in

19   numbers when they changed between reports.

20          THE COURT:   I think that's correct, but I'll

21   let you ask one more question.  This should be getting

22   narrower and narrower each phase.

23          MR. SELLS:   Yes, Your Honor.  I think I only

24   have about one more question.

25          THE COURT:   All right.

1      **MR. SELLS:**  Maybe one and a half.

2  **BY MR. SELLS:**

3  **Q.**  How many minority preferred candidates actually

4  took office in these elections cycle?

5  **A.**  Zero.

6  **Q.**  Do you know whether your view of the third *Gingles*

7  factor is consistent with the Supreme Court's analysis

8  of this very race itself?

9      **MS. MCKNIGHT:**  Your Honor, again, that calls

10  for a legal conclusion by the witness, to testify about

11  the Supreme Court opinion is improper.

12      **THE COURT:**  The objection sustained.

13      **MR. SELLS:**  I'll withdraw the question.  No

14  further questions.

15      **THE COURT:**  Any there re-redirect.  You've

16  got to be pretty narrow.

17      **MS. MCKNIGHT:**  No, Your Honor, there is no

18  redirect, and at this point I believe I need to handle

19  an administrative issue related to exhibits.

20      **THE COURT:**  All right.  You may step down.

21  You're excused.  All right, Ms. McKnight?

22      **MS. MCKNIGHT:**  So, Your Honor, defendants are

23  prepare to rest their case, but, first, we need to move

24  for the admission of exhibits DX-2 through DX-9.  Now,

25  most of these do not have an objection from plaintiffs,

1    but I understand that plaintiffs intend to re-revive

2    their Daubert motion on Dr. Owen's two reports, so I

3    can't certify for you that those are without objection,

4    but I'll give plaintiffs a chance to talk.

5           THE COURT:  Are there those known that they

6    are not objections to?  Are they identified?

7           MS. MCKNIGHT:  Yes, there are.  So the DX-2,

8    DX-3, DX-6, DX-7, DX-8, and DX-9, Your Honor, none of

9    those have objection to them.  So what we're talking

10   about right now are DX-4 and DX-5.

11          THE COURT:  Okay.  Just to be efficient, do

12   you agree as to 2-3-6-7-8, and 9, Mr. Sells?

13          MR. SELLS:  Yes, Your Honor.  And I don't

14   intend to argue anything further with regard to Dr.

15   Owen's report.  We have made our Daubert objections

16   clear.

17          THE COURT:  All right.  So DX-2, 3-6-7-8, and

18   9 are admitted without objection.  And DX-4 and DX-5,

19   what is the -- the objection is the Daubert objection,

20   right?

21          MR. SELLS:  Yes, Your Honor.

22          THE COURT:  Any further response?

23          MS. MCKNIGHT:  They're presenting nothing

24   new.  Your Honor has already ruled on this.  We believe

25   the objection have been ruled.

1          **THE COURT:**  Okay.  So DX-4 and 5 were

2    admitted over objection for the reason the Court has

3    earlier stated in its prior ruling for the reasons as

4    raised both in the objection by the plaintiff and the

5    response by the defendant.  All right.  So defendant

6    has rested.  Does the plaintiff wish to present any

7    rebuttal evidence?

8          **MR. SELLS:**  Well, yes, we do before, Your

9    Honor.  But before we move on.  I think it's probably

10   prudent to mark the hypothetical that was just

11   discussed and the chart that I prepared on the Elmo,

12   not for the truth of anything, but so that the record

13   complete and clear, and I don't know if --

14         **MS. MCKNIGHT:**  Your Honor, we would object on

15   both counts.  Both of those are demonstrative exhibits.

16   They were prepared today by counsel.  And with regard

17   to the chart where plaintiff's counsel drew some

18   scribbles and some undecipherable coding, first of all,

19   he did not confirm with plaintiff that that accurately

20   represented her concerns.  Oftentimes he would say, and

21   your concern are indicated by a squiggly line.  That's

22   not clear to the Court.  That doesn't illustrate

23   anything for the Court.  It's certainly not admissible

24   evidence.  It's not evidence really of anything other

25   that plaintiff's counsel running through and ticking

1    off certain issues he wanted to address with defendant,

2    defendant's expert witness.

3         MR. SELLS:  Well, Your Honor, it's certainly

4    possible that the Court could reconstruct what I did by

5    reading and reviewing probably what will be about 200

6    pages of transcript, I think it probably serves the

7    purposes of judicial economy to put it in the record

8    just as one would a deposition exhibit that had been

9    marked by a deponent.

10        THE COURT:  Well, I don't want to take a lot

11   of time on this, and I observed that you did not

12   mention at the time that the markings were done by

13   counsel and not by witness at the direction of counsel,

14   but I do understand what was being demonstrated --

15   presented as demonstrative by the plaintiff.  I don't

16   believe they are valid exhibits that should be a part

17   of the record, but the Court recalls.  If there's

18   testimony --

19        MR. SELLS:  If the Court doesn't need them,

20   then we won't put them in.

21        THE COURT:  Right.  That's right.

22        MS. MCKNIGHT:  Thank you, Your Honor.

23        MR. SELL:  Then the plaintiff calls, recall

24   Dr. Fred McBride in rebuttal.

25        THE COURT:  All right.  Mr. McBride, will you

1    take the stand again?  Dr. McBride do, you realize you

2    are still under oath?

3              **THE WITNESS:**  Yes, sir.

4              **THE COURT:**  All right.  You may proceed.

5                    **DR. FREDERICK MCBRIDE**

6          **Having been previously sworn, testified on**

7                **(REBUTTAL) DIRECT EXAMINATION**

8    BY MR. SELLS:

9    Q.   Good afternoon, Dr. McBride.

10   A.   Good afternoon.

11   Q.   You were in the courtroom just now and heard

12   testimony regarding the need to have an older computer

13   to run EzI, correct?

14   A.   Correct.

15   Q.   How old is your computer?

16   A.   One is 2012 and the other is 2013.

17   Q.   And what operating system do you run on that

18   computer?

19   A.   Windows 10.

20   Q.   Is that the latest Windows operating system?

21   A.   I think so.

22   Q.   Does EzI run on your computers?

23   A.   Yes.

24   Q.   Do you have any idea why someone would think that

25   you need an old commuter to run EzI?

1    A.    EzI runs with the 32 bit and some of them have --

2    some computers have 64, so it's a matter of

3    reconfiguring or taking it someplace to be reconfigured

4    unless you know how to do it yourself.

5    Q.    Your computer is running the latest operating

6    system that has configured to run 32-bit programs,

7    right?

8    A.    Yes.

9    Q.    Okay.  Why do you use EzI, Dr. McBride?

10   A.    I have always -- I've always used EzI, and I find

11   it reliable.

12   Q.    Dr. McBride, Dr. Owen testified about whether EI

13   constrains the sum of all EI estimates to 100.  Do you

14   remember that testimony?

15   A.    I do.

16   Q.    Does Gary King address that issue?

17   A.    He addresses what he refers to as internal

18   inconsistencies and such, but, yes.

19   Q.    And does he address that in his 1997 book on

20   ecological inference?

21   A.    He does.

22   Q.    Where in the book does he discuss that issue?

23   A.    It's several places, but I know it's chapter 8 and

24   chapter 15.

25   Q.    And what do those two chapters discuss?

1    **A.**   He provides a method to deal with, in this

2    instance, a method to deal with R by C tables, where by

3    column, those are going to be tables with more than two

4    candidates.  So he has a method or methods to deal with

5    that.

6    **Q.**   What are his methods for dealing with that?

7    **A.**   One of them, it involves -- it involves using an

8    algebraic expression or using several of them to trim

9    or what he refers to as truncate some of the estimates.

10   So ultimately you would use these algebraic expressions

11   with all of these different parameters and your output

12   would be, for lack of a better word, trimmed, so I

13   imagine that would bring the estimates within those

14   bounds.

15   **Q.**   Let me see I understand that correctly.  When you

16   say estimates would be trimmed, you're talking about

17   altering the estimates in some way?

18   **A.**   That's a way of putting it, yes.

19   **Q.**   Does Dr. King, Gary King, suggest anything else

20   that one can do if one gets estimates that are -- that

21   exceed 100?

22   **A.**   He also suggests just leaving your estimates as

23   they are.

24   **Q.**   Gary King doesn't say that you should reject those

25   results if you don't truncate them?

130

1    **A.**   It's up to the researcher, but based on your

2    testing models and looking at specification errors or

3    any errors you may have come you up with and fixed it,

4    but other than that, one could decide to do that -- he

5    doesn't direct what you do.  One could decide to do

6    that or simply leave the estimates as they are, which

7    is what I did.

8    **Q.**   And what does Gary King recommend in that second

9    case?

10   **A.**   In leaving them as they are?

11   **Q.**   Yes.

12   **A.**   You would report them as such.

13   **Q.**   Now, you didn't truncate or trim the estimates

14   produced by your EzI program, did you?

15   **A.**   I did not.

16   **Q.**   Why not?

17   **A.**   Because I wanted to present the result as they

18   were derived from EzI without altering them in any

19   manner.

20   **Q.**   Dr. McBride, I want to ask you now about

21   incorporating statewide or federal elections into

22   racial block voting analysis.

23   **A.**   Okay.

24   **Q.**   First of all, is it possible to analyze those

25   elections using the precinct returns from a single

1    county?

2    **A.**    With appropriate data, yes.

3    **Q.**    Did you analyze any state or federal elections as

4    part of your racial block voting analysis in this case?

5    **A.**    I did not.

6    **Q.**    Why not?

7    **A.**    They are less probative.

8    **Q.**    Why are they less probative?

9    **A.**    I think it's best if I could provide an example.

10   I remember a discussion, I think it was yesterday,

11   regarding Sanford Bishop in the Second Congressional

12   District.  That is a very large district with a voting

13   age population, I'm sure, of over 500,000 voters.

14   That's not Sumter County.  And to engage in a campaign

15   of that magnitude is going to require a lot of

16   resources, a lot of money, and from what I heard from

17   white and black candidates yesterday, that's going to

18   be a lot of doors to knock on.  It's going to take an

19   expansive amount of resources, added to -- because of

20   the size -- added to resources for media and publicity

21   and the date of the election.  The date of the election

22   is in November.  Novembers are going to always have a

23   higher turnout than, say, for, example a May election.

24   Simply put, or to put it another way, a congressional

25   or statewide election in comparison to a Sumter County

1    election would not shed much light on the voting

2    behavior or the dynamics of voting in a Sumter County

3    school board race.

4    Q.   Are there any other reasons why you didn't analyze

5    state or federal elections as part of your racial block

6    voting analysis in this case?

7    A.   There are several.  One, I had a sufficient number

8    of elections to run, endogenous elections to run.

9    Secondly, those elections that I did run have a clear

10   pattern, and with those endogenous elections, all of

11   those school board races, there are three at-large

12   since HB 836.  I don't want to count off the top of my

13   head, and I should know this, but about ten or 11

14   single member district races, as we discussed on

15   Monday, the Eleventh Circuit ruling that involved an

16   exogenous race, the sheriff's race, and the November

17   2nd, 2004 sheriff's race, and aside, since I just

18   mentioned the Eleventh Circuit ruling, there is nothing

19   in that ruling that thought it best to look into other

20   -- well, not other, but to even look into exogenous

21   races, so I did not do that.

22   Q.   Dr. McBride, if you wanted to include state or

23   federal elections in your racial block voting analysis,

24   could you identify the minority preferred candidate

25   using election returns alone?

1     **A.**    No, that would be speculative.

2     **Q.**    Could you measure minority political cohesion

3     using election runs alone?

4     **A.**    No.  No, I could not.

5     **Q.**    Could you measure racial polarization using

6     election returns alone?

7     **A.**    I could not.

8     **Q.**    Dr. McBride, you were present in the courtroom

9     when Dr. Owen criticized so-called inconsistencies in

10    the estimates reported in your original report and in

11    your supplemental report?

12    **A.**    I was.

13    **Q.**    How do you explain those inconsistencies?

14    **A.**    In the supplemental report, I had better data.

15    The originally report was based on voting age

16    population data.  The supplemental report was based on

17    turnout data.

18    **Q.**    Why would turnout data produce different results

19    than voting age population data in Sumter County?

20    **A.**    This black share of the population in the turnout

21    in the voting age population data is different than the

22    black share in the turnout data.

23    **Q.**    Now, I'd like to look at one of the so-called

24    inconsistencies, and I'd like to show you Defendant's

25    Exhibit 6 at page 47.

1   **A.**   Okay.

2   **Q.**   Do you recognize this as a table from your

3   original report?

4   **A.**   I do.

5   **Q.**   What election is this?

6   **A.**   This is the May 20th, 2014, Board of Education

7   at-large four-year seat.

8   **Q.**   And you analyzed this election using voting age

9   population data, correct?

10   **A.**   Correct.

11   **Q.**   Now, did you hear Dr. Owen testify yesterday that

12   when you run EI with voting age population data, EI

13   first uses the voting age population data to estimate

14   racial turnout, and then it uses the racial turnout

15   estimate to generate estimates of black and white

16   support for the candidates?

17   **A.**   I recall.

18   **Q.**   And is that how it works?

19   **A.**   Basically, yes.

20   **Q.**   And what racial turnout estimates did your EI

21   analysis produce for this particular election?  Can you

22   identify them on the screen?

23   **A.**   Yes.  For the four-year race here the black

24   turnout estimate is, and I'm circling, 16 percent and

25   the white turnout estimate is 19.6 percent.

1    Q.   Now, I'd like to do a side by side comparison if

2    we could of the actual turnout for this election as

3    reported in your supplemental report, and that appears

4    on Plaintiff's Exhibit 16.

5    A.   Okay.

6    Q.   Now, what is the actual turnout estimate in this

7    May 20th, 2014, at-large election for a four-year term?

8    A.   The white turnout is 11.2, and the black turnout

9    is 6.7.

10   Q.   Now, how do the actual turnout numbers for this

11   election compare with the estimated turnout numbers

12   generated as part of your VAP analysis?

13   A.   The actual turnout has a broader range.  It's not

14   quite 50 percent.  I imagine it's about 40 percent

15   difference.  Although the numbers are small, it's still

16   a wider range.

17   Q.   I want to be clear, what do you mean by a wider

18   range, Dr. McBride?

19   A.   There's a greater dispersion.  I mean, it's almost

20   two to one in the turnout race, and it's just -- it is

21   smaller with reference to the voting age population.

22   Q.   So the disparity between white turnout and black

23   turnout based on your actual turnout numbers is almost

24   two to one?

25   A.   It's basically -- yes.

1    **Q.**    And the turnouts figures that you estimated using

2    voting age population, are those 2 to 1?

3    **A.**    No, they're not.

4    **Q.**    How would you characterize the disparity between

5    black and white turnout in your estimated number?

6    **A.**    It's a -- I'm sorry, ask your question again.

7    **Q.**    Yeah.  Is it -- is the disparity between black and

8    white turnout on the estimated numbers, is that more

9    than 2 to 1, or is it closer to parity?

10    **A.**    In the -- okay, we were talking about the turnout

11    rates.  So these two are -- it's marked difference

12    between the voting age population and the turnout data

13    with reference to the turnout.  It's a -- again, it's a

14    broader range.  It's almost 2 to 1 in the participation

15    rates based on the turnout.

16    **Q.**    So the disparity between black and white turnout

17    is greater in the actual turnout --

18    **A.**    It's --

19    **Q.**    -- than the estimated turnout?

20    **A.**    That is correct.

21    **Q.**    Now, I want to look at how the different turnout

22    figures show up in your cohesion estimates.  So let's

23    put your cohesion estimates using the turnout data on

24    the right-hand side and leave the VAP analysis on the

25    left-hand side.  Can we do that?  Now, can you compare

1    the cohesion estimates for white and black voters in

2    your supplemental analysis versus your original

3    analysis?

4    **A.**    In the supplemental analysis there is black

5    cohesion and there is white cohesion.  In the voting

6    age population analysis, there is minority cohesion,

7    there is white cohesion.  It's higher in the turnout.

8    **Q.**    To what do you attribute the higher black and

9    white cohesion estimates when using actual turnout data

10   instead of turnout estimates?

11   **A.**    The voting age population model overestimates

12   black turnout -- well, let me do that.  It

13   overestimates black turnout.  And when you look at the

14   turnout table, you see some -- in the turnout model,

15   the voting age population has -- and based on that

16   estimate -- overestimation of the black population, the

17   voting age population -- I want to say estimates but

18   it's probably easier to say, thought that the black

19   voters were actually the white voters because if you

20   look at the turnout model, you'll see these increases

21   in the support for Michael Busman, you'll see the

22   increase there, and if the model incorrectly assumes --

23   because we've got turnout data.  If the model

24   incorrectly assumed that some black voters were white

25   voters -- well, some black voters were actually white

1     voters, then that support for the white candidate has

2     increased based on turnout.  So you can compare the

3     voting age population based on actual turnout.

4     Q.   Let me make sure I understand your testimony.

5     Because we're getting into some fairly heavy

6     statistics.  But if the black -- excuse me, if the

7     voting age population model is overestimating black

8     turnout, where do the voting preferences of the voters

9     who actually turned out who were estimated to be black,

10    but actually aren't, where are their voting preferences

11    showing up in the black cohesion estimates in your VAP

12    table?

13    A.   They are showing up in black support for Michael

14    Busman.

15    Q.   Thank you.  No further questions.

16              THE COURT:  All right, any there any cross?

17                     CROSS EXAMINATION

18    BY MS. MCKNIGHT:

19    Q.   Good afternoon, Dr. McBride.

20    A.   Good afternoon.

21    Q.   Nice to see you again.

22    A.   Okay.

23    Q.   Now, Dr. McBride, your PhD is in political

24    science, isn't it?

25    A.   It is.

1  Q.   And you're here in this case to provide expert

2  testimony about racial voting patterns in Sumter

3  County; is that right?

4  A.   That's correct.

5  Q.   Is it your testimony that Hilary Clinton was not

6  the candidate of choice of the African American

7  community in Sumter County?

8          MR. SELLS:  Objection, beyond the scope of

9  direct.

10          THE COURT:  Well, that's --

11          MS. MCKNIGHT:  This is precisely within the

12  scope.  He was asking why federal elections and

13  statewide elections are not probative.  I'm getting at

14  a point.

15          THE COURT:  If it's related to that matter,

16  then, yes.

17          THE WITNESS:  Okay, you're going to have to

18  ask that again.

19  BY MS. MCKNIGHT:

20  Q.   No problem.  Is it your testimony that Hilary

21  Clinton was not the candidate of choice of the African

22  American community in Sumter County?

23  A.   I don't know.  I did not look at the presidential

24  race in Sumter County.

25  Q.   Is it your testimony that Donald Trump was the

1    candidate of choice for the African American community

2    in Sumter County?

3    A.    I doubt it, but I don't know for sure.  I did not

4    look at the presidential elections in Sumter County.

5    Q.    Thank you.  Now, why do you doubt it?

6    A.    Because it doesn't take social science background

7    and a PhD to realize that he is not a highly preferred

8    candidate based on qualitative data, this is

9    statistics.  He is not a highly preferred candidate by

10   African American voters, but I did say I doubt it.  I

11   don't know.

12   Q.    And how would you know that he's not a highly

13   preferred candidate of the African American community

14   in Sumter County?

15   A.    Based on qualitative data, and, again, I can't

16   give you statistical data because I didn't run --

17   that's an election I didn't run.  I ran all the others.

18   But -- and personal observation, and this is totally

19   qualitative.  Based on -- and if I want to bring

20   statistics into it, I would have to use the only things

21   I know, but, again, I've just stated I'm not going to

22   compare an exogenous race like a congressional race or

23   a statewide race to an issue involving a county

24   election.  Just a personal opinion, I don't think that

25   -- I forgot the question.  Is it minority support for

Donald Trump?  What was the question again?

**Q.**   Is it your testimony that Donald Trump was the candidate of choice for the African American community in Sumter County?

**A.**   I don't know.  And, again, I added to that, I doubt it, but I don't know.  So I cannot say with certainty.

**Q.**   In part of your answer you said if I had to resort to statistics, are there any statistics that you would use?

**A.**   Not any that I ran.

**Q.**   Not that you've run, but you suggested that you're aware of statistics?

**A.**   I would go to the data set.  I could run it myself.  I could actually do that.  So I wouldn't have to rely on some article.  I'm sure I can find a -- it's -- the election was 2016, it's December.  I'm sure I could find something written on it that would keep me from having to go out and run the analysis myself. It's a variety of information out there, but I cannot say with certainty.  All I can do is speculate, and that's exactly what I'm doing.

**Q.**   And when you talked about there's certain qualitative factors that help you know that you doubt that he would be the candidate of choice, what are some

of those qualitative factors?

**A.**    A lot of African American people that I know
across many states are not Donald Trump supporters.
That is not something I can put into a statistical
model.  It is just qualitative.

**Q.**    When you were answering that question on whether
you believe this is a qualitative factor or a
statistical factor, is it relevant that Donald Trump is
a Republican?

**A.**    I imagine partisanship can -- well, does play a
role.  I can't answer with certainly.  Again, I didn't
run any analysis.  Partisan, racial, I have not done
that for Sumter County and that type of race.  I have
not done that.

**Q.**    And do you know that Sanford Bishop is the
candidate of choice of the African American community
in Sumter County?

**A.**    I don't know.  Statistically, I don't know that.
That was another race I have not ran.

**Q.**    So is it your testimony that Sanford Bishop is --
pardon me, strike that.  Is it your testimony that it's
possible that Sanford Bishop is not the candidate of
choice for the African American community in Sumter
County?

**A.**    There is always a possibility, so I guess I just

1    answered your question.  Again, if you want me to

2    speculate, I will speculate that he is.

3    **Q.**   That he is the candidate of choice?

4    **A.**   I will speculate.  I'm guessing.

5    **Q.**   Well, weren't you hired to make estimates and

6    guesses in this case?

7    **A.**   Not about Sanford Bishop.

8    **Q.**   But you do opine about candidates of choice in

9    Sumter County?

10   **A.**   I opine because I ran the analysis.  Y'all -- you

11   all -- excuse me, I'm sorry.  Yes.  Yes.

12   **Q.**   Thank you, Your Honor.  Thank you, Dr. McBride.

13   **A.**   Thank you.

14           **THE COURT:**  All right, is there any redirect?

15           **MR. SELLS:**  No, Your Honor.

16           **THE COURT:**  All right.  You may step down.

17   You are now excused.  Let's see.  Is there any

18   surrebuttal I should ask just to be sure.

19           **MS. MCKNIGHT:**  Pardon me, Your Honor?

20           **THE COURT:**  Is there any surrebuttal, I guess

21   I should ask?

22           **MS. MCKNIGHT:**  No, Your Honor, thank you.

23           **THE COURT:**  All right.  So we agree that the

24   evidence is closed?  All right.

25           **MR. SELLS:**  Yes, Your Honor.

1        **MS. MCKNIGHT:**  Yes, Your Honor.

2        **THE COURT:**  All right.  Let's take our break

3   a little bit early.  I'll give you all a chance to

4   review your notes and things, and I'll come back and

5   discuss with you a schedule of the written arguments

6   and other matters and probably set a future date for

7   conferring.  I think there was a suggestion by the

8   plaintiff as to what an overall schedule should be.  I

9   don't know that we are at a stage yet to conclude that,

10  but we probably should discuss that around the time

11  that you all will be submitting your proposed

12  conclusions and findings of fact, and I want to think

13  about it a little bit myself, and we'll come back and

14  talk about those things.  All right.  We'll take about

15  15 minutes.

16  *(RECONVENED; ALL PARTIES PRESENT, 3:00 p.m.)*

17       **THE COURT:**  First of all, let me just for the

18  record thank you for your professionalism and

19  cooperation in getting this case prepared and tried on

20  what we all agree is a pretty tough schedule, and none

21  on the rest of the schedule could take place without

22  this part having been taken care of.  The other thing

23  is, if you all will double check with each other that

24  the -- all the exhibits have been properly identified

25  that were admitted, and that they are in the possession

1    -- placed in possession of the clerk.  If there's some

2    disagreement about any of that, let me know and I'll

3    come in and address it, but otherwise I will assume an

4    agreement between you all will verify that the record

5    is assembled as required under the rule.

6        Now, with regard to the schedule, I would like for

7    to give your summations -- I think we would be here for

8    a while longer this afternoon if you were making your

9    arguments.  Of course, the plaintiff would the right to

10   make an opening and summation or closing argument, and

11   then responded to by the defendant, of course, and then

12   have a right to do a rebuttal argument.  So I'd like

13   your written briefings to be along that same line.  And

14   in order to do it while it's fresh and so the Court can

15   get it and try to stay in tune with this to be ready to

16   try to get this resolved once all of the filings are

17   completed, I would like for the plaintiff to file their

18   written opening closing or summation by Thursday

19   December 21st, and that the defendant's filed their

20   response, their closing, by Thursday December 28th,

21   2017.  I think that schedule gives you some time and

22   hopefully it gets you around the holiday enough that

23   none of us get into big trouble with families and

24   friends.  I know lawyers are used to work holidays, but

25   I say that that doesn't mean our families and friends

1    necessarily agree with us or understand it.  So I try

2    not to directly impact your holidays.  We are already

3    into one holiday, we'll be in an another in a few days

4    and then another after that, but I think that get's you

5    around it.  And then, of course, the plaintiff has the

6    right to do a rebuttal, of course, or a re-reply,

7    however you want to call it, but that should be ready

8    -- filed by Thursday, January 4th, 2018.  So each of

9    your dates are a few days before or after the holiday

10   that's nearest.  I think we all agree that the proposed

11   findings of fact and conclusions of law should be

12   submitted by Friday January 12th, 2018.  I think you

13   all have conferred with the reporter and that seems to

14   be doable.

15        I'm going to ask one additional thing of you in

16   that regard.  When you file your proposed findings of

17   fact and conclusions of law, I'll ask that you also

18   submit a legal brief with it basically supporting the

19   significance of the proposed findings of fact and the

20   legal implications as determined in the conclusions of

21   law that you suggest to the Court.  I think a brief

22   from each you will be helpful.  So I understand what

23   we're doing with the written arguments, closing, and

24   then with a brief with your submissions on the 12th is

25   a little more that you might you ordinarily, but I

1    think it would be most helpful to the Court in trying

2    to get through this as quickly as possible.  So I

3    appreciate you doing that, and I know I'm asking more

4    of you than you might otherwise be required to do.

5        The plaintiff has made a suggested -- provided a

6    suggested schedule.  I'm not prepared at this time to

7    agree to that or to get anything further from you all.

8    I think I'll be better able to respond to that once

9    there is -- the submissions are made on the 12th, but I

10   think the plaintiff's suggestion though that they

11   provide their remedial proposal, I think you all

12   suggested that you all could do that by the 22nd, or

13   when would be earliest you could do that?  And that's

14   not presuming anything about the Court's findings, but

15   I think here, since the defendants are essentially

16   denying that there is a violation, that there's not

17   really a real reason for them to make a proposal, but I

18   think it makes sense for the plaintiff to make a

19   proposal that they think would be appropriate or proper

20   under the law if they were to prevail, and that would

21   make it then possible for the defendants to either

22   object or to say what they think will be the more

23   appropriate one.  To do them in that order I think

24   makes sense, so that part of it I think would be okay.

25       And what I will do, by that time I should have a

1     pretty good idea where I am with it, and I'll probably

2     want to confer with counsel.  We might be able to do it

3     by phone or if it may be more efficient, we'll get

4     everybody reassembled, but then to discuss whether or

5     not we should take up the plaintiff's suggested

6     schedule, that or some variation of it, whether that

7     would be meaningful.

8          I do not -- I'll be frank with you.  I don't like

9     to make hypothetical decisions and possible decisions.

10    That doesn't really work well for me, but I understand

11    that was the procedure that was used by another court.

12    That might be appropriate under the circumstances, but

13    I'm not far enough along to know whether I would be

14    comfortable with that or think it would be meaningful,

15    but I'm certainly willing to discuss it, but I think it

16    would be better discussed at that -- around that time

17    rather than to do it now.

18         Does either side believe there is any other date

19    or matter we need to resolve today before you leave?  I

20    know you all have some flights to catch.

21              MS. MCKNIGHT:  Yes, Your Honor, just a few

22    questions for you.

23              THE COURT:  Yeah.

24              MS. MCKNIGHT:  As far as dates we conferred

25    with plaintiff, that issue of ACS data came up, and I

1    believe we can work with plaintiff to come with up with

2    a judicial notice of that ACS data, and we were

3    thinking it might make sense to just submit that at the

4    same time on Friday, January 12th.

5         THE COURT:   That's fine.  You will both have

6    access to it so you'll be able to refer to it in your

7    own submission, and that will fine if the Court gets it

8    by that time.

9         MS. MCKNIGHT:   Okay.  Two more questions.

10   One had to do with due dates related to these proposed

11   remedy and objection response, do you have proposed due

12   dates related to those, or was that what you were

13   saying you want to wait on?

14        THE COURT:   The plaintiff suggested a mutual

15   date of January 22nd, I belive, and I was just saying,

16   I think it makes more sense that the plaintiff will

17   first put forth what it believes is an appropriate

18   solution, a remedy based on their prevailing, and then

19   the defendant would in a position to either in light of

20   its position to respond to that or to suggest that if

21   the plaintiff did prevail whether that particular

22   proposal is appropriate or whether you believe some

23   other proposal would the most appropriate of the proper

24   remedy.

25        MS. MCKNIGHT:   I understand.

```
1          THE COURT:  Mr. Sells, so do you all need
2    until the 22nd of January to do that, if I don't do it
3    with you both having do it at the same time?
4          MR. SELLS:  I think we could certainly meet
5    January 22nd, Your Honor.
6          THE COURT:  That's fine with me.  But you
7    understand what I'm saying, more of a serial way.
8          MR. SELLS:  I do.
9          THE COURT:  What amount of time would the
10   plaintiff need to -- rather the defendant need to
11   respond to the remedial if it's filed by the plaintiffs
12   not later than January 22nd?
13         MS. MCKNIGHT:  Your Honor, pardon, we're just
14   checking the calendar.
15         THE COURT:  Yeah.
16         MS. MCKNIGHT:  We would ask for two weeks
17   time due to some other matters we have, and
18   January 22nd, if that's their date, that's Monday,
19   January 22nd, we'd ask our due date to be on Monday,
20   February 5th.
21         THE COURT:  All right.  That keeps it tight,
22   but I think that's reasonable under the circumstances.
23   So we'll set those dates for that, and I will probably
24   want to confer with you all and state whether I think
25   it's helpful or not.  You can expect to hear from me
```

1    somewhere around the 5th.  I might before then set a

2    time in advance so that everyone -- yeah, I'll do that.

3    Later this week, I'll look at this again and I'll

4    suggest a proposed conference date at least by

5    telephone after February 5th, and it would be near to

6    that.  Because if we let it get much further than that,

7    it really would not serve the purpose that's being

8    suggested to the Court.

9            **MS. MCKNIGHT:**  I understand.  And, Your

10   Honor, I just have one more question.  You had

11   described plaintiff's closing statement, defendant's

12   closing statement, and plaintiff's rebuttal reply, do

13   have you in mind page limits for those statements,

14   understanding the parties are already going to brief

15   you on the issues?

16           **THE COURT:**  Well, that is a good question.  I

17   had not thought about it.  What I normally do with the

18   arguments, and particularly with jury cases, is to see

19   if you all will agree to what you think is the

20   appropriate length of time to argue.  And if it's

21   reasonable and you agree to it, I will go with that.

22   Otherwise, I'll set it.  Do you all have a suggestion

23   to the Court what you believe will be the adequate

24   number of pages for the general argument?

25           **MS. MCKNIGHT:**  I think it's our position that

1    five double-spaced pages are enough.

2         THE COURT:  What does the plaintiff think

3    about that?  I probably should have asked the plaintiff

4    first since you've got the burden, get your view.

5         MR. SELLS:  Your Honor, I had a number closer

6    to 15 in my head, but still brief.

7         THE COURT:  The Court has heard a lot here,

8    so I think five would be really attractive, but I don't

9    know, I think that may be a little bit more optimistic

10   than suggested.  So what I'll do then, here's what I'll

11   so.  I'll give each side a maximum of 15 pages on their

12   main arguments, on the plaintiff's opening and on the

13   defendant's, its argument in response, and the

14   plaintiff I think five pages for a rebuttal would be

15   appropriate for the plaintiff.  All right.  I'm glad

16   you asked that question because that can -- it can get

17   out of balance very easily there is not some

18   instructions or agreement between the parties.  So we

19   have a page limit control here rather a time limit.

20   All right.  Was there any other question from the

21   defense?

22        MS. MCKNIGHT:  No more questions from the

23   defendant, thank you.

24        THE COURT:  Mr. Sells, anything else from the

25   plaintiff?

1          **MR. SELLS:**  No, Your Honor.  But we want to

2     thank you for accommodating us.

3          **THE COURT:**  All right.  Thank you all so

4     much, and be careful to get your flights, and a very

5     happy holiday, all of them between now and we get

6     together back in the next year.  All right.  We're

7     adjourned.

8     _____

9                *CERTIFICATE OF OFFICIAL REPORTER*

10    *I, Sally L. Gray, Federal Official Court Reporter, in and*
      *for the United States District Court for the Middle*
11    *District of Georgia, do hereby certify that pursuant to*
      *Section 753, Title 28, United States Code that the*
12    *foregoing is a true and correct transcript of the*
      *stenographically reported proceedings held in the*
13    *above-entitled matter and that the transcript page format*
      *is in conformance with the regulations of the Judicial*
14    *Conference of the United States dated this 20th day of*
      *December, 2017.*

15
                    */s/ SALLY L. GRAY*
16                  *SALLY L. GRAY, CCR, RPR*
                    *FEDERAL OFFICIAL COURT REPORTER*
17

18

19

20

21

22

23

24

25