## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

|  |  |
|---|---|
| MATHIS KEARSE WRIGHT, JR.,<br><br>      Plaintiff,<br><br>v.<br><br>SUMTER COUNTY BOARD OF<br>ELECTIONS AND REGISTRATION,<br><br>      Defendant. | CIVIL ACTION NO. 1:14-CV-42 (WLS) |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Table of Contents**

I.      PROPOSED FINDINGS OF FACT ...................................................................4

     A.    Background ...........................................................................................4

     B.    Demographics in Sumter County ..........................................................5

     C.    Elections in Sumter County ..................................................................6

           1.     Electoral Races in Sumter County in 2012 ................................6

           2.     Electoral Races in Sumter County in 2014 ................................8

           3.     Electoral Races in Sumter County in 2016 ..............................10

     D.    Changing the Size and Makeup of the Sumter County Board of Education .........11

     E.    Testimony by Candidates for Election to the School Board ...................15

           1.     Dr. Michael Busman ...............................................................15

           2.     Sylvia Roland .........................................................................17

           3.     Alice Green ............................................................................20

           4.     Edith Green ............................................................................23

           5.     Michael Coley ........................................................................25

           6.     Kelvin Pless ...........................................................................28

     F.    Other Fact Witness Testimony .............................................................29

           1.     Mathis Wright .........................................................................29

           2.     John Marshall .........................................................................29

           3.     Robert Brady ..........................................................................29

     G.    Expert Reports and Testimony of Dr. Frederick McBride ...................30

           1.     Summary .................................................................................30

           2.     Dr. McBride's Reports ............................................................31

           3.     Data Used ...............................................................................34

           4.     Findings About Demographics of Sumter County ....................34

5.      Software used to perform ecological inference analysis............................35

6.      Plaintiff's Alternative Plan ........................................................36

7.      Percentage BVAP Needed for Black Candidates to Win Under HB836...39

H.      Expert Reports and Testimony of Karen L. Owen ................................39

II.     PROPOSED CONCLUSIONS OF LAW ..............................................41

A.      Overview..................................................................................41

B.      The Plaintiff Failed Even To Articulate How the Black Community, Which Is
        Larger Than the White Community, Lacks Equal "Opportunity"........................43

C.      The Plaintiff Failed To Prove Racially Polarized Voting......................................47

D.      The Fact-Witness Testimony Does Not Show Polarized Voting..........................53

E.      The Plaintiff Failed To Show That an Improved Plan, Accounting for His
        Expert's Analysis, Exists ...........................................................53

F.      The Plaintiff Has Failed To Show Discrimination Under the Senate Factors .......55

G.      The Plaintiff Did Not Prove a "Packing" Claim ....................................58

H.      Summary of Conclusions.............................................................59

Defendant Sumter County Board of Elections and Registration respectfully submits these proposed findings of fact and conclusions of law.

## I.    PROPOSED FINDINGS OF FACT

### A.    Background

1.    On December 9, 2010, the Sumter County Board of Education ("SBOE") voted unanimously to reduce the number of its Board members from nine (9) to seven (7) with five (5) of the members selected from districts which are geographically identical to the five (5) election districts for the Sumter County Board of Commissioners, and two (2) of the members elected from at-large districts.  DTX11.

2.    Since the change was implemented, only three elections for the at-large seats have been held: the election for the two-year at-large seat on May 24, 2016, the election for the two-year at-large seat in May 20, 2014, and the election for the four-year at-large seat on May 20, 2014.

3.    According to the 2012-2016 ACS, Sumter County has a total population of 31,070 persons, of whom 13,095 (42.1%) are white and 16,159 (52.0%) are black. Dkt. 164-1 at 1 (Table B02001).

4.    According to the 2012-2016 ACS, Sumter County has a total population of 31,070 persons, of whom 12,399 (39.9%) are non-Hispanic white and 16,122 (51.9%) are non-Hispanic black.  Dkt. 164-1 at 3 (Table B03002).

5.    According to the 2012-2016 ACS, Sumter County has a voting-age population of 23,541 persons, of whom 10,991 (46.7%) are white and 11,652 (49.5%) are black. Dkt. 164-1 at 5-10 (Tables B01001, B1001A, and B1001B).

6.    When given the choice, Sumter County regularly votes Democratic.

7.    Black voters overwhelmingly support Democratic candidates versus Republican candidates. Tr. 1:180:25-181:4; Tr. 1:185:1-8.

8.      A review of 32 electoral races conducted since 2012 in general elections for partisan offices which included the entire county, reveals that Black candidates regularly win the majority of the vote in Sumter County.  DX1 and DX10; and *see infra* section C.  In fact, Black candidates won 24 out of the 32 (75%) of the races analyzed.  *Id.*

### B.      Demographics in Sumter County

9.      According to the 2012-2016 ACS, Sumter County has a total population of 31,070 persons, of whom 12,399 (39.9%) are non-Hispanic white and 16,122 (51.9%) are non-Hispanic black.  Dkt. 164-1 at 3 (Table B03002).

10.     According to the 2012-2016 ACS, Sumter County has a total population of 31,070 persons, of whom 13,095 are white (42.1%) and 16,159 (52.0%) are Black or African American alone.  DX12 at 1 (Table B02001).

11.     According to the 2012-2016 ACS, Sumter County has a voting-age population of 23,541 persons, of whom 10,991 (46.7%) are white and 11,652 (49.5%) are black.  Dkt. 164-1 at 5-10 (Tables B01001, B1001A, and B1001B).

12.     The Georgia Secretary of State tally of Active Voters by Race/Gender/District for the November 8, 2016 election, identifies the number of Black female, Black male, and Black unknown registered voters for Sumter County precincts.  DX3 at 1.

13.     The Georgia Secretary of State tally of Active Voters by Race/Gender/District for the November 8, 2016 election, identifies the number of White female, White male, and White unknown registered voters for Sumter County precincts.  DX3 at 1.

14.     The Georgia Secretary of State tally of Active Voters by Race/Gender/District for the November 8, 2016 election, identifies the total number of voters in all Sumter County precincts by the total number of registered voters and the number of those individuals who actually voted in the November election.  DX3 at 1.

15.     According to the Georgia Secretary of State Voter Registration System tally of Active Voters by Race and Gender (August 2014), Sumter County has a total active registered population of 2,822 males who are Black, not of Hispanic origin, and 4,457 females who are Black, not of Hispanic origin.  DX2 at 3.

16.     According to the Georgia Secretary of State Voter Registration System tally of Active Voters by Race and Gender (August 2014), Sumter County has a total active registered population of 3,337 males who are White, not of Hispanic origin, and 3,929 females who are White, not of Hispanic origin.  DX2 at 3.

17.     According to the Georgia Secretary of State Voter Registration System tally of Active Voters by Race and Gender (August 2014), Sumter County has 15,073 total active registered voters.  DX2 at 3.

### C.     Elections in Sumter County

#### 1.     Electoral Races in Sumter County in 2012

18.     A review of 18 primary and general races that occurred in 2012 shows that Sumter County voted for a black candidate in every one of the six races where a black candidate ran including the following candidates: Barack Obama for President, Sanford Bishop for Senate (primary and general), Freddie Powell Sims for State Senate, Clay Jones for County Commission, and Andrea Brook for County Commission.  DX 010, pp. 21-22; DX 001 pp. 1045-46 (Bishop primary), 1176-79 (Obama), 1186-87 (Bishop general), 1188-89 (Sims), 1208-09 (Jones), 1212-13 (Brook).

19.     Out of those races, 17 were general races, nine of which were contested.  In the contested races, Sumter County voters selected Democrats seven out of nine times and a Democrat lost only one of the two remaining contested races (no Democrat ran in the other race).  DX 010, pp. 21-22; DX 001, pp. 1129-1221.

6

20.     The nine contested general races were 1) Presidential – (DX 001 pp. 1129, 1176-77, won by a Democrat in Sumter County, but won by a Republican statewide), 2) Public Service Commissioner (pp. 1129, 1180-83, won by a Democrat in Sumter County, but by a Republican statewide), 3) Public Service Commissioner in a race with no Democratic candidate (pp. 1129, 1184-85, won by a Republican in Sumter County and statewide against a Libertarian candidate), 4) U.S. House of Representatives (pp. 1130, 1186-87, won by a Democrat in Sumter County and in the full district), 5) State House of Representatives, District 138 (pp. 1160, 1192-93, won by a Democrat in Sumter County, but by a Republican in the full district), 6) Chief Magistrate (pp. 1206-07, won by a Democrat), 7) County Commission (pp. 1208-09, won by a Democrat), 8) County Commission (pp. 1210-11, won by a Republican), and 9) County Commission (pp. 1212-13, won by a Democrat).

21.     Democrats won seats in four of the eight uncontested races.  DX 010, pp. 21-22; DX 001, pp. 1129-1221.

22.     The eight uncontested general races were 1) State Senate (DX 001 pp. 1134, 1188-89, won by a Democrat), 2) State Senate (pp. 1134, 1190-91, won by a Republican), 3) State House of Representatives, District 152 (pp. 1194-95, won by a Republican), 4) District Attorney (pp. 1172, 1196-97, won by a Republican), 5) Clerk, Superior Court (pp. 1198-99, won by a Democrat), 6) Sheriff (pp. 1200-01, won by a Republican), 7) Tax Commissioner (pp. 1202-03, won by a Democrat), and 8) Coroner (pp. 1204-05, won by a Democrat).

23.     In three of the contested races, Sumter County voters selected Democrats for positions that ultimately were won by Republicans.  DX 010, pp. 21-22; DX 001, pp. 1129, 1160, 1176-77, 1180-83; 1192-93.

24.     The three positions are 1) President of the United States (DX 001 pp. 1129, 1176-77, won

by a Democrat in Sumter County, but won by a Republican statewide), 2) Public Service

Commissioner (DX 001, pp. 1129, 1180-83, won by a Democrat in Sumter County, but by a

Republican statewide), and State House of Representatives (DX 001, pp. 1160, 1192-93, won by

a Democrat in Sumter County, but by a Republican in the full district).

### 2.     Electoral Races in Sumter County in 2014

25.     A review of 36 races that occurred in 2014, including 18 general elections, seven

nonpartisan general elections, four special elections, four Democratic primaries, and three runoff

elections, shows that Sumter County voted for a black candidate in 17 of the 22 races that had at

least one black candidate.  DX 010, pp. 23-26, DX 001, pp. 1223-1282, 1339-1424.

26.     The 22 races which had at least one black candidate included three of four positions on

the SBOE in the March 2014 Special Election (DX 010, p.23).

27.     In the May 2014 General Democratic Primary, all four races included a black candidate

who won Sumter County and the election overall (DX 010, p.23).  Those four races were: 1) U.S.

House of Representatives (DX 001, pp. 1364, Sanford Bishop in an uncontested Democratic

primary); 2) Secretary of State (DX 001, p. 1349, a black candidate beat a white candidate in a

Democratic primary); 3) Insurance Commissioner (DX 001, p. 1355, the black candidate

prevailed in a Democratic primary); 4) State School Superintendent (DX-001, p. 1357, a black

candidate won 49.9% of the Sumter County vote in the Democratic primary and 32.6% of the

statewide vote in a six-way contest).

28.     In the May 2014 Nonpartisan General Election, six of seven nonpartisan races for the

County Board of Education had at least one black candidate.  (DX 010, p. 24, DX 001 pp. 1386-

92).  Black candidates won three of the six races. *Id.*

29.     In the July 2014 Runoffs, there were black candidates in the Democratic Primary race for

State School Superintendent (DX 010, p.24, DX 001, p. 1398, the black candidate prevailed) and

in the General Nonpartisan Election Runoff for the County Board of Education (DX 010, p. 24,

DX 001, p. 1399, black candidate Michael Coley lost to white candidate Sylvia Roland and both

testified at trial regarding their view of their election history).

30.     In the November 2014 General Election, seven contests included black candidates: 1)

U.S. House of Representatives, District 2 (DX 010, p.25, DX 001, pp. 1242, 1414, the black

Democratic candidate won Sumter County and the full district); 2) Lieutenant Governor (DX

010, p.25, DX 001, pp. 1240, 1405, won by a black Democratic candidate in Sumter County, but

by a Republican statewide); 3) Secretary of State (DX 010, p. 25, DX 001 pp. 1241, 1406, won

by a black Democratic candidate in Sumter County, but by a Republican statewide); 4) Insurance

Commissioner (DX 010 p.25, DX 001, pp. 1241, 1409, won by a black Democratic candidate in

Sumter County, but by a Republican statewide); 5) State School Superintendent (DX 010 p. 25,

DX 001 pp.1241, 1410, won by a black Democratic candidate in Sumter County, but by a

Republican statewide); 6) Labor Commissioner (DX 010 p. 25, DX 001, pp. 1241, 1411, won by

a black Democratic candidate in Sumter County, but by a Republican statewide); and 7) State

Senate District 12 (DX 010 p.25, DX 001, pp. 1246, 1415, won by an uncontested black

candidate).

31.     In five of the 18 general election races, Sumter County voters selected a black

Democratic candidate for positions that ultimately were won by Republican candidates.  DX 010,

p.25, DX 001, pp. 1240-41, 1405-06, 1409-11.  Those races in which Sumter County voted for

the black Democratic candidate for positions ultimately won by Republicans were 1) Lieutenant

Governor; 2) Secretary of State; 3) Insurance Commissioner; 4) State School Superintendent;

and 5) Labor Commissioner.  DX 010, p.25, DX 001, pp. 1240-41, 1405-06, 1409-11.

32.     In addition to those five races, Sumter County voted for the Democratic candidate in

races for the U.S. Senate, U.S. House (District 2), Governor, Attorney General, Commissioner of

Agriculture, Public Service Commissioner (District 4 – Northern), and State House of

Representatives (District 138).  DX 010, pp. 24-25, DX 001, pp. 1240-42, 1273, 1403-04, 1407-

08, 1413, 1417.

33.     In fact, on November 4, 2014, Sumter County chose the Democrat candidate in all but

one of the 15 races in which a Democrat ran.  DX 010, pp. 24-26.

34.     Of the 36 races reviewed, eight (8) were uncontested and 28 were contested.  DX 010, pp.

23-26.

35.     Black candidates ran and won in three of the uncontested races: Special Election for

County Board of Education, Democratic primary for U.S. House of Representatives, and the

general election for State Senate.  DX 010, pp. 23-26.

### 3.     Electoral Races in Sumter County in 2016

36.     A review of 23 races (three general primary, three nonpartisan general, and seventeen

general election) in Sumter County in 2016 shows that black candidates ran in eight races and

won seven of those races.  DX 010, pp. 27-28, DX 001, pp. 1283-1338, 1425-63.

37.     Those eight races in which there was at least one black candidate were 1) U.S. House

primary (DX 001, p. 1432, uncontested), 2) Clerk, Superior Court, Democratic Primary (*id.*, p.

1440), 3) County Board of Education Primary (id, p. 1461), 4) U.S. House general (*id.*, p. 1295,

1469, 5) State Senate (*id.*, pp. 1298, 1470, uncontested), 6) Clerk, Superior Court, general (*id.*, p.

1475, uncontested), 7) County Commission (*id.*, p. 1480, both candidates were black), and 8)

County Commission (*id.*, p. 1482, uncontested).  (DX 010, p.27-28)

38.     The only race in which a black candidate ran and did not win was the 2016 School Board primary between Michael Coley, Sr. and Sylvia Roland.  (DX 010, p. 27, DX 001, p. 1461)

39.     Democrats won half of the twelve uncontested races.  DX 010, pp. 27-28.

40.     Four of the unconstested races were won by black candidates: Sanford D. Bishop, Jr. in the Democratic primary for the U.S. House of Representatives; Freddie Powell Sims for State Senate; Cortisa Barthell for Clerk, Superior Court after a contested primary; and Thomas Jordan for County Commission.  *Id.*, DX 001, pp. 1432, 1470, 1475, 1482.

41.     In contested partisan races with a Democrat running, Sumter County voters chose a Democrat in five of seven partisan general elections.  DX 010, pp. 27-28.

42.     In the Presidential race, Sumter County voted for the Democratic candidate.  *Id.*

**D.     Changing the Size and Makeup of the Sumter County Board of Education**

43.     The decision in December 2010 to reduce the number of School Board members from nine to seven with five single-member districts and two at large districts was the culmination of at least six months of discussion among the School Board beginning no later than June 2010. PX248 at 045934; Tr. 3:15:17-17:13; Tr. 3:40:6-10.  The reduction and addition of two at-large seats was reported extensively in both newspapers and on the radio.  Tr. 3:40:6-10.  All four Black members of the School Board voted for the reduction and introduction of two at-large districts.  DX11 p. 2.

44.     The Chair of the School Board, Dr. Michael Busman, testified about the reason for the change noting that during his tenure on the Board, between 2002 and 2010, there were discussions about the fact that the Board was too big.  Tr. 3:14:3-6  When asked about the content of those discussions, he testified:

> Well, it was just -- it was just about, we have a big board. A nine-member school board is big. I believe it's the largest size in the state. There were two other systems that had ten-member boards that have since been decreased. So nine was

the largest number of board members in the state, and we have a relatively small county, so it just really didn't make any sense. And then, you know, it was more money on the taxpayers to pay for nine board members in a county that already was struggling with funds. It was confusion with the voting, with the electorate, because we have five county commission seats, and you can be in district one school board and be in district five county commission, and they were really, really confused.

Tr. 3:14:7-22.

45.     Dr. Busman also testified that the accrediting agency for the Sumter County school system, the Southern Association of Colleges and Schools ("SACS"), had commented repeatedly that the Board was large.  Tr. 3:15:12-15.  This was meaningful to the SBOE because the school system's accreditation was at risk, and if it lost accreditation, graduating students may not be eligible to attend college.  Tr. 3:15:8-11.

46.     The unanimous vote to reduce the size of the Board and introduce two at-large seats was noted in minutes from the SBOE meeting on December 9, 2010 as "[a] motion was made by Mr. Goodin; second by Mrs. Krenson to approve a resolution to introduce local legislation providing for a reduction in the number of board members; motion carried unanimously."  DX11 p. 2.  The resolution considered at the meeting and indicated in the minute entry ("Resolution") was reviewed by the Board prior to the vote.  Tr. 3:17:6-13; 3:38:15-39:9.  Resolutions are regularly attached to SBOE meeting minutes and are considered to be part of the minutes.  Tr. 3:39:24-40:5.  There was no special set of meeting minutes from the December 2010 meeting that did not include the Resolution.  Tr. 3:40:2-5.

47.     At the December 9 SBOE meeting, no one expressed opposition to the Resolution, and there was no concern that the Resolution would have a disparate racial impact.  Tr. 3:17:14-19.  Further, there was no confusion about what the Resolution was meant to do: create five districts and two at-large seats.  Tr. 3:19:17-21.

48.     The Resolution stated:

WHEREAS, a majority of the members of the Board of Education deem it appropriate to reduce the size of the Board from nine (9) elected members to seven (7) elected members; and

WHEREAS, the Board deems it appropriate, in order to avoid voter confusion, to provide that five (5) of the members of the Board of Education shall be selected from districts which are geographically identical to the five (5) election districts for the Sumter County Board of Commissioners, and that two (2) of the members of the Board of Education be elected from at-large districts;

DX11 p. 3.

49.    The Resolution detailed the new arrangement of the SBOE as follows:

2.  That School Board Election District 1, School Board Election District 2, School Board Election District 3, School Board Election District 4, and School Board  Election District 5 shall be established so that such School Board Districts are  geographically identical to Sumter County Board of Commissioner Election District 1, Sumter County Board of Commissioner Election District 2, Sumter County Board of Commissioner Election District 3, Sumter County Board of Commissioner Election District 4, and Sumter County Board of Commissioner Election District 5, said Sumter County Board of Commissioner Election Districts having been previously approved by the Georgia General Assembly and pre-cleared by the United States Department of Justice under Section 5 of the Voting Rights Act of 1965, as amended.

3. That School Board Election District 6 shall be an at-large District encompassing the entire geographic area of Sumter County, Georgia.

4. That School Board Election District 7 shall be an at-large District encompassing the entire geographic area of Sumter County, Georgia.

DX11 p. 4-5.

50.    The Resolution further provided that the SBOE "hereby requests that the legislative

delegation to the General Assembly representing Sumter County have drafted and introduced,

during the upcoming 2011 Session of the Georgia General Assembly…legislation as more

particularly set out in this Resolution for adoption by the General Assembly and signing by the Governor in the manner required for local legislation in the Georgia General Assembly."  DX11 p. 5.

51.    Sumter County's legislative delegation to the General Assembly unanimously supported the Resolution, and the Resolution passed in the General Assembly by an "overwhelming" vote. Tr. 3:20:21-21:1.  The General Assembly did not raise a concern about the Resolution being discriminatory.  Tr. 3:21:7-10.  The Governor of Georgia signed the bill into law in October 2011.

52.    After passage, the Resolution had to be submitted to the United States Department of Justice for preclearance.  *See* DX11 pp. 4, 6.

53.    The Resolution was submitted for preclearance and the Department of Justice sought additional information related to the submission.  PX248.  The Department of Justice asked for additional information and, at a meeting in January 2012, a majority of the SBOE asked James M. Skipper, Jr., counsel to the SBOE, to withdraw the preclearance submission instead of responding to the letter.  Tr. 3:23:12-24.  Mr. Skipper was under a legal obligation to submit this information to the Department of Justice.  *Id.*  On January 19, 2012, Mr. Skipper sent a letter to the United States Department of Justice responding to their request for additional information regarding the change ("DOJ Letter").  Tr. 3:13:7-19; PX248.  The DOJ Letter details the process, related timeline and rationale for the proposed change to reduce the size of the SBOE.  PX248.

54.    Before the Department of Justice could preclear the Resolution, a majority of members of the SBOE voted to withdraw the resolution from consideration and Mr. Skipper resigned over a conflict of interest between abiding by his legal obligations to the state and the requests of his client the SBOE.  Tr. 3:22:10-14; 3:23:25-24:7.  The SBOE withdrew the plan from

consideration, and remaining counsel, Maurice King advised the SBOE to continue to use its nine-member plan.  Tr. 3:24:8-20.  As a consequence of following that advice, a lawsuit was filed in this Court against the SBOE for being malapportioned and violating the constitutional provision of one-person one-vote.  Tr. 3:24:21-25:8.  This Court issued an injunction.  *Bird v. Sumter County Board of Education, et al.*, 1:12-cv-00076-WLS (M.D. Ga.) (Dkt. 50) (June 21, 2012).

55.     After the decision by the Supreme Court in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), this Court found the matter moot and that the Court no longer had subject matter jurisdiction over the case.  *Bird*, 1:12-cv-00076-WLS (M.D. Ga.) (Dkt. 82) (October 28, 2013).

56.     HB 836 is the House Bill that adopted the Resolution.  Tr. 3:25:22-25; PX26.  HB836 was passed into law on January 17, 2014, and the first election held under HB 836 was the 2014 election.  Tr. 3:21:13; PX26.

57.     Elections to the Sumter County Board of Education are non-partisan. Tr. 3:90:24-25.

58.     Non-Partisan elections in Sumter County are held in May with primaries, pursuant to Georgia Law.  Ga. Code. Ann. § 21-2-139 (a) (Jan. 1, 2013).

### E.     Testimony by Candidates for Election to the School Board

#### 1.     Dr. Michael Busman

59.     Dr. Busman has lived in Americus, Georgia for over 19 years and is a family medicine and sports medicine physician.  Tr. 3:8:19-20; 3:9:2-4.  His practice includes both black and white patients at roughly a fifty-fifty ratio.  Tr. 3:9:5-11.

60.     Dr. Busman is the volunteer team physician for the high school and he performs free physicals for the school athletes and Special Olympics athletes.  Tr. 3:9:15-22.

61.     Most of the school athletes in Sumter County are black and families of athletes and other residents of Sumter County often see Mr. Busman on the sidelines of athletic events and expressed appreciation for the work he was doing.  Tr. 3:9:23-25;  3:11:4-9.

62.     Dr. Busman was first elected to the SBOE in 2002 and has served continuously since then.  Tr. 3:9:12-14; 3:10:10-12.

63.     Dr. Busman first sought election to the SBOE because he saw that the school system was not performing well compared to a lot of other schools in the state, and that the Sumter County school system was toward the bottom in rankings.  He felt that he could add something to the SBOE through his life experience and education.  He wanted to make a difference and try to make things better.  Tr. 3:10:1-9.

64.     Currently, Dr. Busman is the Chair of the SBOE in one of the two at-large seats.  Tr. 3:10:13-16.  Prior to his election to one of the at-large seats on the Board, Dr. Busman was elected to the Board to represent a single district.  Tr. 3:10:17-18.

65.     In Dr. Busman's first campaign for election to the SBOE, in 2002, he ran for a single-member district.  He went to the Courthouse to sign up for the election and ensure he was eligible.  After he qualified for the election, he printed campaign signs, he paid for one or two newspaper advertisements and a few radio advertisements, and he called a lot of voters and asked for their support.  Tr. 3:10:22-11:3.  He testified that the cost for radio advertisements was approximately $10 per spot so he likely spent a few hundred dollars at most on radio advertisements.  Tr. 3:13:1-4.

66.     Dr. Busman campaigned in black and white neighborhoods in Sumter County and sought votes from both black and white voters. Tr. 3:11:10-15.

67.     In Dr. Busman's campaign for the at-large seat in 2014, though it was a larger area to represent and campaign in, he spent less money than he did to campaign for his seat to represent a single member district.  Tr. 3:11:24-12:15.  When asked why he said:

> I had an established record of, you know, volunteering my time and service and being on the school board for 12 years. And I think a lot of people appreciated that work, and then I had some old campaign signs that I just recycled. And being -- you know, being known at the football games and other sporting events, when needed, because I also volunteer for the local colleges, and then, thirdly, being in my office with all the patients that come in, I just had an opportunity to talk to people.

Tr. 3:12:2-15.

68.     Dr. Busman testified that some of his campaign signs disappeared during the campaign. Tr. 3:12:16-18.  He testified that he did not know if they disappeared for racial reasons.  Tr. 3:12:19-22.

69.     When asked whether he could rely on his Church community for support, Dr. Busman answered that he is Jewish and he does not have a church in Sumter County on which to rely for support.  Tr. 3:26:15-27:5.

70.     Dr. Busman believes that the African American community in Sumter County has an equal opportunity to elect its candidates of choice in the two at-large districts.  Tr. 3:40:11-14. He knew that he could not win his seat on the Board without the support of black voters and he actively sought support from them.  Tr. 3:40:15-19.

### 2.     Sylvia Roland

71.     Sylvia Roland currently serves as a member of the SBOE in the second at-large seat.  Tr. 3:43:2-4.

72.     Mrs. Roland serves in the at-large seat with a 2-year tenure and she just finished the first year of her second term.  She was first elected to the position in 2014.  Tr. 3:43:5-10.

73.     Mrs. Roland is a career public school educator having served as an English teacher in middle and high school in Arkansas for 12 years, a literacy coach in middle school in Florida for six years, and as a school improvement specialist in Americus High School in Sumter County for one year.  Tr. 3:43:15-22.

74.     In her role as the school improvement specialist in Americus High School, Mrs. Roland oversaw the professional development for teachers in the high school, and served as a liaison between the high school and the state department of education to ensure that teachers were using best practices in the classroom.  Tr. 3:43:1-5.

75.     Mrs. Roland moved to Sumter County in 2012 and would like the County to be the kind of place where people can move and contribute toward the betterment of it, like she feels she is doing.  Tr. 3:45:3-6.

76.     Mrs. Roland decided to run for the SBOE because she wanted the students and citizens of Sumter County to have access to the best possible public education and as a career public school educator she felt she had something to offer.  Tr. 3:45:23-46:7.

77.     In order to run for her position in the at-large seat on the Board, Mrs. Roland filed to qualify for the election and then she mailed an introductory letter to everybody that she had met by that time to let them know about her career in public education.  She also sent the same letter by e-mail to every voter for whom she had an e-mail address.  She ordered yard signs and put them in the yards of people who volunteered to have them posted in their yards.  She printed "door knockers," cards to hang on doorknobs describing her candidacy and her career in public education.  She attend three public forums and campaigned door to door in many neighborhoods

in Sumter County.  Tr. 3:46:12-47:1.  Mrs. Roland also paid for advertising time on an electronic

billboard in downtown Americus, new to the town in 2014, and she purchased some radio and

newspaper advertisement spots.  Tr. 3:48:2-7.

78.     Mrs. Roland campaigned in every neighborhood she could.  She started with her home

neighborhood and worked her way down Lee Street, which is the main corridor in town.  She

focused on many neighborhoods that had schools nearby, thinking that those citizens would be

concerned about the school system.  She also campaigned in smaller communities in Sumter

County understanding that she was running for an at-large position that covered the whole

county.  Tr. 3:47:3-12.

79.     Mrs. Roland campaigned in predominantly African American neighborhoods but did not

target them based on race.  Tr. 3:47:13-17.

80.     Mrs. Roland's campaign message was to tell voters about her career in education, and

that she was concerned that the kids in Sumter County have access to the best possible education,

and that she wanted to contribute toward that.  Tr. 3:47:18-23.

81.     Mrs. Roland did not deliver a different campaign message to predominantly African

American neighborhoods.  Tr. 3:47:24-48:1.

82.     Mrs. Roland spoke with black and white voters during her campaign and black and white

voters told her they would vote for her.  Tr. 3:49:5-13.  She did not think she could ignore the

black community in her campaign.  Tr. 3:49:19-21.

83.     Mrs. Roland testified that some of her campaign signs disappeared during the campaign.

Tr. 3:48:11-13.

84.     Mrs. Roland defeated Michael Coley twice in her races to win the SBOE at-large seat; the

first time in 2014 and the second time, as the incumbent, in 2016.  When asked about the

difference between her and Mr. Coley as candidates for a seat on the SBOE, Mrs. Roland said

that her career in public education was a very important quality she has and she ran for office

because of that background.  Tr. 3:50:6-10.  Mr. Coley on the other hand has a career in law

enforcement and she did not believe he had an educational career of any kind.  Tr. 3:50:10-12.

85.     No one asked Mrs. Roland to run in order for the SBOE to have majority white

membership, 50:13-16, and she did not have a racial motivation for her campaign.  Tr. 3:51:11-

13.

### 3.     Alice Green

86.     Alice Green is a current member of the SBOE.  Tr. 2:122:15-17.

87.     Alice Green worked for the Sumter County schools for 26 years.  Tr. 2:124:20-22.

88.     Alice Green attends a predominantly African American church and it is one of the largest

churches in Sumter County.  Tr. 2:125:22-126:6.  Alice Green is active in her community, a

member of at least seven community organizations other than her church.  Tr. 2:126:15-24.

89.     Alice Green is the President, and one of the founding members, of the Silver Circle Civic

and Social Club, an organization founded in 1977 that provides voter education in the

community including educating people when elections will be held, the candidates in those

elections, and urging people to turn out to vote and make their voices heard.  Tr. 2:128:12-

129:10.  Silver Circle Civic and Social Club has 100% African American membership.  Tr.

2:129:11-13.

90.     Alice Green is also the Secretary of the City Federation of Colored Women's Club, a club

in which she has been a member for 25 years and has previously held the office of President.  Tr.

2:129:16-130:5.  This club performs similar voter education activities as the Silver Circle Civic

and Social club; educating voters of the importance of voting, informing voters of upcoming

election dates and candidate platforms, educating voters "so they can make intelligent choices of

who to vote for." Tr. 2:130:6-12.  The Club is a national organization and in Americus it has 100% African American membership.  Tr. 2:130:13-18.

91.     Alice Green has been a member of the Delta Sigma Theta sorority for 25 years and was the President of the local graduate chapter for eight years.  Tr. 2:130:23-131:14.  Currently, Alice Green is Social Action Chair of the local graduate chapter and in that position she leads efforts to keep members of the chapter, as well as members of the community, "abreast of politics," informed about upcoming election dates and encouraging voters to turn out and vote.  Tr. 2:131:15-22.  These activities include circulating literature to educate voters on the importance of voting.  Tr. 2:131:21-22.

92.     The Delta Sigma Theta sorority's local graduate chapter is affiliated with the state and national chapters of the sorority and receives election information from those chapters.  During elections, the graduate chapter of Americus assimilates voter education packets and members of the graduate chapter distribute those packets to their own churches.  Tr. 2:132:10-133:2.  They also pass out fliers at places like Walmart and put fliers on parked cars and engage in other voter education efforts with the general public.  *Id.*  The local graduate chapter has 100% black membership.  Tr. 2:133:3-6.

93.     When asked about race relations in Sumter County today, Alice Green stated "we look at the result of the elections, and to me that's an indication that it's a grass root problem."  Tr. 2:133:7-22.

94.     Alice Green decided to run for the SBOE because of her background in education and her desire to help the students.  Tr. 2:134:2-11.

95.     When asked to describe her campaign activities she said that her campaign consisted largely of signs, some mailings, some radio spots and a little technology, referring to social media.  Tr. 2:134:16-22.

96.     Alice Green testified that she did not think she could be elected to an at-large seat because she believed voters in Sumter County voted along racial lines and the voters for at-large seats are majority white.  Tr. 2:135:8-22.

97.     Alice Green testified that she thought running for an at-large seat "would be a great expense to me," because it would cover a larger territory, but she has never run for an at-large seat.  Tr. 2:135:23-136:3.  She testified that she would have to raise money to campaign for the at-large seat but she herself has no experience raising money for campaigns because she has never raised money for campaigning for her seat on the SBOE.  Tr. 2:136:4-17.  She provided no details about the amount of additional money she would need to run for an at-large seat.  Tr. 2:122:2-162:3.  She also concluded, without further detail, that she could not raise the money needed to run a campaign for the at-large seat because "there's an attempt to minimize black representation."  Tr. 2:136:24-138:2.

98.     Alice Green testified that this perceived increased expense would not prevent her from running for an at-large seat.  Tr. 2:136:18-23.

99.     When asked about why she thought white families would send their kids to schools other than Sumter County public schools, Alice Green conceded that her answer would be "pure speculation."  Tr. 2:139:14-16.

100.    Alice Green testified that there were no discussions of changing the method of electing the school board prior to the November 2010 election.  Tr. 2:143:7-10.

101.    Alice Green testified that no one ever gave her a justification, policy or otherwise, for electing two members of the board at-large.  Tr. 2:144:18-24.  She also testified that she participated in the December 9, 2010 meeting of the SBOE wherein the Resolution was discussed.  Tr. 2:150:1-7; DX11.

102.    Alice Green testified that in 2010 she did not support changing the SBOE from nine single member districts to five single member district and two at-large seats.  Tr. 2:144:14-17.  She testified that she never voted in favor of creating two at-large seats, or of adding two at-large districts.  Tr. 2:154:5-10.  She testified that the Board never voted on how it would reduce in size from nine to seven.  Tr. 2:155:13-22.  She also testified that she voted for this change in December 2010.  Tr. 2:150:1-7; DX11.

103.    When asked what impact, if any, socioeconomic disparities have on black voters' ability to participate in elections in Sumter County, Alice Green testified that it was a big impact because "when you know better, you do better.  Education means a lot.  When you're educated, then you're going to do better."  Tr. 2:148:8-15.  She cited no other reasons why socioeconomic disparities would have an impact on voting in Sumter County.  Tr. 2:122:2-162:3.

### 4.    Edith Green

104.    Edith Green is a current member of the SBOE representing a single-member district.

105.    Edith Green earned her masters degree in business education in 1974 and pursued a career in public education retiring in 2004.  Tr. 2:164:19-167:9.  She continued to teach in the evenings for some period thereafter.  Tr. 2:167:8-15.

106.    Edith Green has served on two boards of education, Tr. 2:168:8-11, and has served on the SBOE for over 20 years.  Tr. 2:168:24-169:3.  She decided to run for election for the SBOE because of a desire to serve her community and its children.  Tr. 2:169:4-12.

107.    When asked about her campaigns for election, Edith Green stated that she knocked on doors and asked for votes and she attended candidate events.  Tr. 2:169:20-170:6

108.    Edith Green testified that no one ever gave her a justification, policy or otherwise, for electing two members of the board at-large.  Tr. 2:175:5-11.  Edith Green testified that "We were not for at-large districts because we knew form the history of Sumter County that black people cannot win those seats."  Tr. 2:182:5-8.  She also testified that she participated in the December 9, 2010 meeting of the SBOE wherein the Resolution was discussed and approved.  Tr. 2:191:15-21; DX11.

109.    Edith Green testified that the SBOE discussed reducing the size of the Board, and introducing two at-large seats, in October 2010.  Tr. 2:191:3-12; 193:9-13.  She testified that she had questions about the at-large seats because of concerns about whether a black person could be elected to such a seat.  Tr. 2:193:9-194:10.  She also testified that she did not attend a Board meeting on June 17, 2010, and would not know if downsizing was discussed then.  Tr. 2:184:12-185:14.

110.    Edith Green testified that moving the election of the SBOE from November to May was not good for the people of Sumter County because "people are not educated about that May election, especially when they vote in November during an election year.  They don't understand what's going on then in May, and that makes it very hard."  Tr. 2:175:21-176:5.

111.    When asked why she thought Mr. Coley and Mr. Pless lost their races for the at-large seats, Edith Green cited voter confusion:

> Q. Why do you think they lost?
>
> A. I think they lost because people did not understand the process and the voting for that, and I -- I think that -- well, I know that a lot of black people may have been confused about the voting and did not get out to do what they could do, but so many times people just

> don't understand because of when it's taking place, as I said, and
> also because of the confusion surrounding what was going on.

Tr. 2:177:14-22.  She identified no other reason why she thought they lost.  *Id.*

112.    When asked whether she thought voting was polarized in elections in Sumter County, she

answer yes and described an issue of turnout; "we're always coming short."  Tr. 2:178:2-11.

113.    When asked whether socioeconomic disparities in Sumter County affect black voters'

ability to participate in elections, Edith Green's answer was telling.  She identified education as

issue affecting turnout, one that could be resolved through voter education and turnout efforts:

> Q. How do those socioeconomic disparities affect black voters'
> ability to participate in elections?
>
> A. Well, you know, they're uneducated, that's one thing. And
> another thing, in our previous elections there was so much
> confusion around these districts and so forth until a lot of blacks
> just didn't know what to do. So that's where the education comes
> in. But we have to knock on doors and, you know, try to get as
> many as we can to vote. And that's not an easy task, not at all. We
> can't just put out signs and say vote for me, and people will vote.
>
> Q. You got to knock on doors to do it?
>
> A. You have to. We have to. We have to. We have to really get out
> there.

Tr. 2:179:17-180:5.

114.    Edith Green testified that if blacks outnumber whites in a voting district, blacks would

have an opportunity to be elected.  Tr. 2:183:22-184:4.

### 5.    Michael Coley

115.    Michael Coley graduated from Plains High School in 1973.  Tr. 2:34:15-17.

116.    After high school, Mr. Coley attached South Georgia Technical College on a two-year

basketball scholarship.  Tr. 2:36:1-4.

117.    Mr. Coley testified that after two years he joined the United States Navy and served for

five years as a sonar technician.  Tr. 2:36:9-10.

118.     Mr. Coley testified that after leaving the Navy with an honorable discharge, he moved with his family to Americas, Georgia and took a job as a deputy sheriff for the Sumter County Sheriff's Department.  Tr. 2:36:13-20.

119.     He then took a job at Robins Air Force Base where he was employed for 34 years. Tr. 2:37:7-11.

120.     During his time at Robins Air Force Based, Mr. Coley obtained a degree from Macon State College.  Tr. 2:37:2-6.

121.     Mr. Coley testified that he was elected to the City Board of Education in 1995.  Tr. 2:42:1-5.

122.     Mr. Coley testified that he was elected to the County Board of Education in 1996 until 2005. Tr. 2:42:4-8.

123.     Mr. Coley testified that he chose not to run for reelection and allowed his term to expire in 2005 in deference to a younger candidate.  Tr. 2:43:9-16.

124.     Mr. Coley testified that he decided to run again in 2014.  Tr. 2:43:18.

125.     Mr. Coley testified that he obtained more votes in his first race against Ms. Roland in May, but that race necessitated a head-to-head runoff.  Tr. 2:46:11-15.

126.     Mr. Coley testified that he had volunteers working on his behalf, used phone banking, placed radio ads, and knocked on doors to campaign for his election to the SBOE.  Tr. 2:45:22-46:20

127.     Mr. Coley testified that "the white in our community that knew me, said they would support me in this election."  Tr. 2:47:19-22.

128.     Mr. Coley testified that there we no "racial incidents" during his 2014 campaign or his 206 campaign.  Tr. 2:48:18-20; Tr. 2:51:17-19.

129.    Mr. Coley testified that he ran in a second head-to-head election for the SBOE in 2016.

Tr. 2:49:9-10.

130.    Mr. Coley testified he thought it was more expensive to run for an at-large seat than a

single district seat.  Tr. 2:53:2-17

131.    During Mr. Coley's testimony, the following exchange occurred:

> Q.      You mentioned a few moments ago that hardly a day went
> by when you weren't called the N word by your classmates, I
> believe you were in the 7th grade?
>
> A.      Yes, sir.
>
> Q.      Do any of those classmates still live in Sumter County?
>
> A.      You know, it's amazing you bring that up.  I was
> campaigning in my district several years ago, and I knocked on this
> door, and one of the guys that was in my classroom, Mr. Hill, and I
> told him my name, I said, Michael Coley, I'm running for school
> board in this district in the Plains, Georgia area, and he said, Mike
> Coley, he said
> -- he said I'm Terry Hill, he said, you've got my vote because all
> of the hell I put you through, we put you through, you know, and
> you still standing and you're running for school board, you got my
> vote, and so that just made me feel really good.  Other people that
> were in my classroom, I met one guy at the Walmart the other day,
> and he said, man, I really apologize for what we took you through,
> he said, come on out to the house some time and let's sit down and
> eat a burger or something, you know.  And so several of them are
> still living, and they're still living in Plains, and Plains and
> Americus area, so I run across them every now and again.

Tr. 2:57:18-58:17

6.    **Kelvin Pless**

132.    Kelvin Pless is a former member of the SCBOE. Tr. 2:65:25-66:2.  He is an African

American and has lived in Americus Georgia his whole life.  Tr. 2:60:18-61:3.

133.    Mr. Pless grew up in a predominantly black neighborhood on the north side of Americus.

Tr. 2:61:24-62:4.  Mr. Pless still lives in a predominantly black neighborhood, with some

Hispanic neighbors.  Tr. 2:64:1-6

134.    Mr. Pless testified that he does not have a lot of significant contact with whites in Sumter

County unless there is a particular event.  Tr. 2:64:7-10, 16-17.  Mr. Pless testified to a fine

relationship with white coworkers at the local radio station.  Tr. 2:64:14-15.  At his job, Mr.

Pless works primarily with blacks coworkers.  Tr. 2:64:17-19.

135.    The church Mr. Pless attends is predominantly black and he has not seen any white

members.  Tr. 2:64:12-13; Tr. 2:65:5-9.  Mr. Pless did not know why that was the case, beyond

that it was the preference of each racial group.  Tr. 2:65:19-20.

136.    Mr. Pless testified that he believes Sumter County is separated by race.  Tr. 2:79:14-20.

137.    Mr. Pless has worked for the Georgia Department of Juvenile Justice for seven years.

2:63:12-18.  Before that, Mr. Pless worked at Nobort International Paper.  Tr. 2:63:19-25.  Mr.

Pless did not testify that he had any experience working for the Sumter County schools or any

public school system.  Tr. 2:60:15-2:82:25.

138.    In 2010, Mr. Pless ran for School Board in District 3.  He won that election and ran again

in 2014 in an at-large election, which he lost to Michael Busman.  2:65:21-2:66:2, 5-8; Tr.

2:78:5-9.

139.    When asked to describe his 2014 campaign for the at-large seat on the SBOE, Mr. Pless

testified that it meant covering more ground for the at-large seat.  Tr. 2:78:14-23.  He did not

testify that his 2014 race for the at-large seat was more expensive than his 2010 race for the single-member District 3.  Tr. 2:60:15-2:82:25.

140.    Mr. Pless testified that some of his campaign signs were moved but that he couldn't identify why it happened.  Tr. 2:79:3-8.

141.    Mr. Pless testified that he was qualified to hold public office because he has a connection with people, engagement with the people, and that the people asked him to run and supported his campaign financially and with assistance.  Tr. 2:66:12-20.  He further testified that his interest in the school system and his degree in education also qualified him.  Tr. 2:66:20-23.

### F.    Other Fact Witness Testimony

#### 1.    Mathis Wright

142.    Mathis Wright testified that he believes that the black community of Sumter County should have an equal opportunity to elect a majority of members on the SBOE.  Tr. 2:231:22-232:2.  He said that it was important for the black community to have "an equal right to elect the majority" of the SBOE.  Tr. 2:232:3-6.

#### 2.    John Marshall

143.    John Marshall testified that he moved to Sumter County in 1986.  Tr. 2:111:12.  He further testified that he started a newspaper called the Americus Sumter Observer to counter negative articles about him and members of the black community.  Tr. 2:113:11-114:23.  He testified that his newspaper reaches an estimated 25,000 people.  Tr. 2:115:18-24.

#### 3.    Robert Brady

144.    Robert Brady is the Supervisor of Elections and the Chief Registrar of Sumter County. Tr. 3:59:20–21.

145.    As Registrar, Mr. Brady is responsible for maintaining and collecting the voter registration information for Sumter County and assuring its accuracy and authenticity. Tr. 3:61:3–5.

146.    As Supervisor of Elections, Mr. Brady must confirm, in advance of an election, that the voting equipment functions properly. He must also maintain the security of the voting equipment, maintain and run elections in compliance with Georgia state law, and maintain evidential control of the election results. Mr. Brady is also responsible, as Supervisor, for recording election results and transmitting them to the appropriate state authorities. Tr. 3:62:16–25.

147.    Mr. Brady reviewed a copy of the election results Defendant's Exhibit 10, and confirmed that each race identified in DX10 was also included on the Secretary of State's website. 3:117:8–16.  Mr. Brady compared DX10 against the information presented from the Secretary of State's office for the same period of time and same elections, and identified and corrected some typographical errors. Tr. 3:76:9–77:24. Overall, the data in DX10 looked right to Mr. Brady. 3:77:3-24.

148.    Through his role as Registrar, Mr. Brady has access to voter registration information in Sumter County. Based upon a review of that information, African American registration outweighs Caucasian registration by a difference of 52% to 48%, respectively. Registration percentages do not include individuals who, for a number of reasons including prior felony conviction, are not entitled to vote. Tr. 3:61:10–62:13.

>    **G.    Expert Reports and Testimony of Dr. Frederick McBride**

>>    **1.    Summary**

149.    Dr. McBride submitted five expert reports in this matter.  DX6, DX7, DX8, DX9 and PX6.

150.    During the initial phase of this litigation in 2014 to 2015, Dr. McBride submitted two expert reports: Report of Frederick G. McBride (dated August 12, 2014), DX6; and Response to Defendant's Expert Report of Karen L. Owen (dated September 23, 2014), DX7 (together the "2014 Reports").

151.    During the remand phase of this litigation in 2016 and 2017, Dr. McBride submitted three expert reports: Supplemental Expert Report (dated September 28, 2016), DX8; Rebuttal Report to Supplemental Expert Report of Dr. Karen Owen (dated December 16, 2016), DX9; and Supplemental Expert Report (Corrected) (dated March 8, 2017), PX6.  He submitted the "corrected" version of the supplemental report to correct errors in the first version.  Tr. 1:30:5-1:30:20.  He admitted at trial that errors remained in even the final "corrected" version.  Tr. 1:189:7-192:7.

### 2.    Dr. McBride's Reports

152.    Dr. McBride's 2014 Reports provided estimates of black and white voting behavior for 12 elections involving seats for the Sumter County School Board.  DX6 at. P. 24-26, 41-52.

153.    In his 2014 Reports, Dr. McBride analyzed voting patterns in Sumter County and identified victories of black-preferred candidates in districts between 44% and 49% black voting-age population (BVAP).  *See*, *infra* at 155; *see also, e.g.*, DX6 p. 52 (showing black-preferred candidate Donna Minich (King method) winning in a district with 44.5% BVAP).

154.    In his 2016-2017 Reports, Dr. McBride analyzed voting patterns in Sumter County and identified victories of black-preferred candidates in districts as low as 43.9% voting-age population (BVAP).  PX6 at p. 140-141 (indicating that in a district with 43.9% BVAP the black-preferred candidate, Rick Barnes, won).

155.    The following table includes information about all the electoral races analyzed by Dr. McBride and uses Table 3 of his Supplemental Report as a foundation.   Election numbers 13, 14

and 15 in this table were included in the 2014 Reports but excluded from Dr. McBride's later

reports; election numbers 1, and 12 were added to the 2016-2017 reports.  DX6; PX6.  This table

illustrates a 50/50 success rate of black-preferred candidates at BVAP levels above 43%:

|  | **ELECTION** | **BVAP** | **BLACK-PREFERRED CANDIDATE WON** |
|---|---|---|---|
| **1** | May 24, 2016 - 4YR (At-Large) | 48.1 |  |
| **2** | May 20, 2014 - 2 YR (At-Large) | 48.1 | Michael Coley earned most votes; run off. |
| **3** | May 20, 2014 - 4 YR (At-Large) | 48.1 |  |
| **4** | July 22, 2014 - 2 YR (At-Large)  *Run off election.* | 48.1 |  |
| **5** | March18, 2014 06 | 28.0 |  |
| **6** | May 20, 2014 01 | 62.7 | Alice Green won. |
| **7** | May 20, 2014 02 | 30.3 |  |
| **8** | May 20, 2014 03 | 36.2 |  |
| **9** | May 20, 2014 04 | 43.9 | Rick Barnes won. |
| **10** | May 20, 2014 05 | 70.6 | Edith Green won. |
| **11** | November 2, 2010 03 | 48.4 | Kelvin Pless won. |
| **12** | November 2, 2004 (Sheriff)  *Shaded to indicate that black-preferred candidate was a write-in.* | 44.7 |  |
| **13** | 2002 General Election BOE #3 | 44.5 | Donna Minich won. |
| **14** | 2006 General Election BOE #3 | 33 |  |
| **15** | 2008 General Election BOE #1 | 49.5 | Carolyn Whitehead won. |

PX6 at p. 134, 136-137, 138-139, 140-142; DX6 at p. 50-52.  The black-preferred candidate in

the November 2, 2004 Sheriff's race was a write-in candidate and the usefulness of this election

in analyzing voting behavior was questioned at length by Defendant's expert, Dr. Karen Owen,

and so this election is excluded from the calculation of success rate.  Tr. 3:188:10-189:5; Tr. 3:190:19-192:16.

156.    Dr. McBride conceded that the four at-large elections endogenous elections in his analysis were "a limited number or a small number of elections to analyze."  Tr. 1:187:17-188:14; PX6 at Table 4, p. 136-137.

157.    Dr. McBride conceded at trial that he excluded from his polarization and cohesion analyses information from the absentee ballots cast in the November 2, 2004 Sheriff's race.  Tr. 1:168:1-16; PX13.  He also conceded that these absentee ballots—4,065 out of 11,068 total cast (37%)—constituted a substantial portion of the votes.  *Id.*  He agreed that of the 4,065 absentee ballots, 1,164 were write-in votes.  Tr. 1:174:9-18.  And he conceded that it was impossible for him to know the race of any of the absentee voters.  *Id.*; Tr. 1:169:8-10.

158.    Dr. McBride testified at trial that he did not analyze the 2016 Superior Court Clerk race, a race in which a black candidate, Cynthia Barthell won, in his Reports. Tr. 1:183:14-19.  Dr. McBride conceded that this race included the same at-large electorate as the at-large seats in the SBOE elections, Tr. 1:182:23-183:4, he conceded that it was more recent than the 2004 Sheriff's race, Tr. 1:183:5-7, he conceded that it did not include the special circumstances existing in the 2004 Sheriff's race which included a write-in candidate, Tr. 1:183:8-13.  Dr. McBride testified that black voters turned out in the 2016 primary in sufficient numbers to control the Democratic primary by an overwhelming majority.

159.    The single-district races he analyzed where white-preferred candidates won had 28%, 30%, 36.2%, and 33% BVAP.

160.    Dr. McBride conceded that his analyses did not pick up on any qualitative factors of why candidates might have won or lost such as experience, platform, or campaign efforts.  Tr.

1:177:13-23; Tr. 1:178:18-179:11.  He could not know if a particular candidate lost because of their race or because of some flaw in any of their qualitative factors.  1:179:12-19.

### 3.  Data Used

161.    Dr. McBride only used Census data, not ACS data, in preforming his polarized voting and cohesion analyses of elections in Sumter County.  1:152:4-6; 1:153:9-15.  He only used ACS data for his review of socioeconomic factors.  *Id.*

162.    Dr. McBride only used data for Black voters for those who identified as "Black alone" and not Black in combination with some other race.  Tr. 1:149:4-10.

163.    Dr. McBride did not analyze the voting patterns of the Hispanic community in Sumter County which, at the time of the 2010 Census, was reported to be 5.2%.  Tr. 1:155:9-22.

164.    Plaintiff's expert argues that Hispanics vote at single-digit levels in school-board elections.

165.    Dr. McBride excluded from his analysis of election results in Sumter County the fifteen self-identified racial groups indicated in columns 4 through the end of page 45 in Plaintiff's Exhibit 4.  Tr. 1:156:5-12; PX4 at p. 45.  As of the time of the 2008-2012 ACS, this excluded population amounted to 7.7% of the total population.  *Id.*

### 4.  Findings About Demographics of Sumter County

166.    Dr. McBride's reports show that African Americans made up 51.8% of the population in Sumter County according to the 2010 Census data, and 52.5% of the population according to the 2013 ACS data release.  Tr. 1:157:22-158:7.

167.    Dr. McBride's reports show that African Americans made up 48.1% of the voting age population according to the 2010 Census data.  Tr. 1:158:8-12.

168.    Dr. McBride conceded that white people never outnumbered black people in Sumter County during the period of time, roughly 12 years, he used to analyze elections.  Tr. 1:159:24-2.

### 5.      Software used to perform ecological inference analysis

169.    Dr. McBride testified that he used the EzI software to perform his ecological inference analysis ("EI"), a type of analysis created by Gary King.  Tr. 1:161:3-8.  Dr. McBride concedes that a limitation of the EzI software program was that it compared Candidate A to all other candidates and did not compare Candidate A as against, say, Candidate B.  Tr. 1:161:3-8.

170.    At trial, Dr. McBride testified that EI is bound for individual candidates, but not for the sum of all candidates.  Tr. 1:163:3-8.

171.    At deposition, Dr. McBride testified in response to the question "Is there ever a situation where your King number on a race would be above 140 percent, for example, for all the candidates?": "Not with King. King has a – they call it a Duncan Davis method that he uses that bounds you to 0 to 100."  Tr. 1:164:1-9.

172.    Dr. McBride agreed that other methods for running an EI analysis, such as using program R, would prevent a result where an estimate indicated that over 100 percent of the electorate voted in the election.  Tr. 1:165:6-22.  He agreed that, if run properly, using the program R, adding up voter support for the different candidates would not have exceeded 100 percent of the electorate.  Tr. 1:165:15-19.  He did not use program R.  Tr. 1:165:20-22.

173.    The Plaintiff's expert testified that black voters turned out in the 2016 primary in sufficient numbers to control the Democratic primary by an overwhelming majority, so news of the primary date obviously spreads among black voters.  Tr. 1:218:9–16.

174.    When asked whether Hilary Clinton carried Sumter County in vote totals, Dr. McBride responded "Honestly, I doubt it."  1:181:9-11.

175.    Dr. McBride testified that it is "well established in the political science literature, more than possibly 92 percent of African Americans support the Democratic party."  Tr. 1:185:3-6.

### 6.     Plaintiff's Alternative Plan

176.     Dr. McBride provided the Court an illustrative plan as an alternative to the existing

SBOE districts and at-large seats.  PX6 at p. 128-130.

177.     That plan proposes seven single members districts in place of the current 5/2 plan. Thus,

instead of a plan with two 60%+ BVAP districts and two black/white even districts (the current

plan), the proposed plan includes two 60%+ black districts (BOE 1 (64.4% BVAP) and BOE 5

(75.4% BVAP)), one 50%+ district (BOE 6 (54.5%)), and two districts near 40% (BOE 3 (41.3%

and BOE 7 (41.3%). Effectively, the proposed trade is two 49% BVAP districts for one 54%

BVAP district and one 41% BVAP district. See PEX6 at 4, 6.

178.     In this alternative plan, Dr. McBride proposed a third majority-black SBOE district

drawn at 54.5% BVAP.  Tr. 1:167:2-7; PX6 at p. 129.

179.     Dr. McBride's alternative plan was based on 2010 Census data and did not include any

updated data from recent ACS releases.  Tr. 1:193:12-25.

180.     Dr. McBride proposes a third single member majority black district drawn at 54.5 BVAP.

Tr. 1:194:10-17.  But Dr. McBride said that he could not be certain that this new district could

elect the African American community's candidate of choice.  Tr. 1:194:18-195:3.  When asked

if drawing this district at 54.5% meant that he thought this level of BVAP could provide an

opportunity for blacks to elect their candidates of choice in future elections, Dr. McBride balked:

"I wasn't predicting when I drew this plan."  Tr. 1:195:4-10.  When he drew this new district at

54.5%, Dr. McBride had not performed any kind of functional analysis to confirm that the

district would perform at this BVAP level.  Tr. 1:195:4-25.   Rather, the BVAP level was a result

of Dr. McBride tinkering with the map to come up with a district that complied with redistricting

principles with African American voting age population above 50%.  Tr. 1:195:4-25.   Even on

remand, Dr. McBride stated in his reports that "none of these estimates can predict with

precision how the illustrative plan district six is likely to perform in future elections with its 54.5% black voting age population." Tr. 1:198:2-6.

181.    Dr. McBride testified that black voters in this new district would have an equal opportunity to elect a candidate of choice where the white voting age population was set at 38.8%; white voting age population at this level would not act to deny that opportunity.  Tr. 1:198:23-199:8.

182.    Dr. McBride confirmed that the four remaining districts in his seven-district plan would not provide the black community an equal opportunity to elect its candidate of choice.  Tr. 1:199:16-200:5.

183.    Dr. McBride offered a single analysis in support of his alternative plan. PEX6 at 23. His analysis shows four data points indicating BVAP percentages needed for black-community success: 47.1%, 77.8%, 69.5%, and 44.1%. *Id.* These numbers fail to distinguish between the relevant numbers in this case, 49% (the at-large seats) and 54% (the remedial seat). *Id.* Two of the numbers, 77.8% and 69.5%, are far higher than both, providing no basis to believe *either* is sufficient for minority success. *Id.* The other two, 47.1% and 44.1%, are lower than *both*, providing no basis to believe either is *in*sufficient for minority success. *Id.* Although the analysis is ambiguous on whether 49% and 54% are sufficient or insufficient, it indicates that they are functionally the same.  *Id.*

184.    Dr. McBride argued that the 49% at-large seats are similar to the districts producing the 77.8% and 69.5% results (and hence are insufficient), and the 54% seat is similar to the districts producing the 47.1% and 44.1% results (and hence is sufficient). Tr. 2 13:10–19:8. But the seats producing the first set of results were *30.3%* (BOE 2) and *36.3%* (BOE 3) BVAP. PEX6 at 4. And the seats producing the second set of results were 62.7% (BOE 1) and 70.6% (BOE 5). The

at-large BVAP percentage, 49%, is well above 30.3% and 36.3%, and the proposed BVAP

percentage in the proposed plan, 54%, is well below 62.7% and 70.6%.

185.    Dr. McBride attempted to draw these comparisons by distinguishing between "majority-

minority" and "non-majority-minority." Tr. 2 13:10–19:8. But this places form above substance.

The choice of words assumed the conclusion that everything above 50% BVAP is sufficient and

everything below is insufficient. It masks the relatively minor difference between 49% BVAP

and 54% BVAP.

186.    A separate problem with Dr. McBride's analysis is that it makes no inquiry whatsoever

into turnout rates. Because the black registration exceeds white registration in Sumter County,

turnout rates comprise the difference between black-preferred and white-preferred candidates

success. But there is no reason 54% BVAP is sufficient to resolve that problem. To the contrary,

Dr. McBride's analysis shows that white turnout exceeded black turnout in the current plan's

*62% BVAP* district (BOE 1) in 2014. PEX6 at 21. Proposing a 54% BVAP district—8 percentage

points below that—to "remedy" this problem is unfounded.

187.    Moreover, Dr. McBride made no effort to ascertain what turnout rates would exist in his

proposed district. As his table shows, both black and white turnout numbers vary across districts,

so, for all the Court knows, Dr. McBride took the *lowest black turnout* areas of Sumter County

and included them in his proposed remedial district.

188.    Indeed, the alternative plan is more problematic because Dr. McBride is not proposing to

replace *one* 49% district with a 54% district; he is proposing that *two* 49% districts be replaced

by *one* 54% district and one *41%* district. PEX6 at 4, 6. So for every one opportunity for black

success in the 54% district, the current plan presents *two* in at-large districts with relatively

similar BVAP.

189.    Under the current plan, the black community has an equal opportunity to win a majority of seats on the school board.

190.    Under the proposed plan, the black community would not have an equal opportunity to win a majority of seats on the school board.

191.    The Plaintiff testified that he believes the black community should have an equal opportunity to win a majority on the school board. Tr. 2:231:22–232:6.

### 7.    Percentage BVAP Needed for Black Candidates to Win Under HB836

192.    Table 12 of Dr. McBride's supplemental (corrected) report illustrates the results of an analysis Dr. McBride conducted on remand to determine the percentage BVAP needed for a black candidate to win under HB836.  PX6 at p. 23.  Dr. McBride noted in his report and testified at trial that Table 12 shows that the black voting age population needed in a district for a black candidate to win in past elections under the HB 836 has ranged from 44.1 percent in district five to 77.8 percent in district two.  *Id.*, Tr. 1:203:5-9.

193.    Dr. McBride testified that the way he confirmed that 54.5% BVAP would allow the African American community to elect its candidate of choice was by reviewing the results of Table 12 and confirming that 54.5% fell within the range.  Tr. 1:197:7-22; 1:203:17-204:1.

### H.    Expert Reports and Testimony of Karen L. Owen

194.    Dr. Karen Owen, Defendant's expert witness, submitted two reports in this case: DX4 and DX5.  The Court admitted Dr. Owen as an expert in statistics and political science.

195.    Dr. Owen concluded that Dr. McBride's interpretations and conclusions do not sufficiently support a Section 2 vote dilution claim. DX4 at p. 7; DX5 at 14.

196.    She opined that the analysis of the election results from Dr. McBride's 2014 Reports shows that: in four of the twelve elections the claim that the Black minority group is political cohesive is unsubstantiated because the estimated black and non-black voters' support is the

same or the Black vote is split and not cohesive, thus not meeting the second prong of Gingles. DX4 at p. 7.

197.    She also opined that the preferred candidates of Black minority voters won 58.3% (seven of twelve) of the BOE contests from 2002 to 2014; therefore, the third prong of Gingles is not met because Anglo/white voters do not usually vote as a bloc to defeat the Black voters' preferred candidate.  DX4 at p. 7.

198.    Regarding Dr. McBride's 2016-2017 Reports, Dr. Owen opined that Professor McBride's new data and analyses contain many of the same flaws as seen in his original expert report regarding the validity and specification of the statistical models and the reliability of the estimates of the voters' choices.  DX5 at 14.

199.    Dr. Owen opined that, in his supplemental expert report, Dr. McBride has chosen to report findings on eleven elections over twelve years (2004 to 2016); whereas in his first expert report, he analyzed twelve elections from 2002 to 2014. DX5 at 14.

200.    She found that Dr. McBride chose to exclude from his supplemental analysis three Sumter County Board of Education elections from 2002 to 2008. She believed it was understandable to include the most recent 2016 election as it is probative, but found Dr. McBride had biased his electoral sample by selecting only those elections which are favorable to his asserted vote dilution claim. DX5 at 14.

201.    She also noted that Dr. McBride continued to have vote estimates that exceed 100% meaning that voter's preferences are summing to totals greater than 100 which are unreliable and unrealistic given the bounded limit of estimates from 0 to 100. Two candidates in an electoral contest cannot receive greater than 100% of votes and thus voter support. DX5 at 14.

202.    Dr. Owen opined that Dr. McBride also has changed estimates for certain candidates and has changed his designation of the minority-preferred candidate for specific contests in an election year.  DX5 at 14.

203.    Dr. Owen stated that, in her expert opinion, these changes and inconsistent estimates make Dr. McBride's statistical analysis and therefore his findings and overall conclusions unreliable.  DX5 at 14.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Overview

1.    Voting Rights Act § 2 forbids any voting "procedure" that "results in a denial or abridgment of the right…to vote on account of race or color." 52 U.S.C. § 10301(a). That standard is met if, "based on the totality of circumstances, it is shown that the political processes…are not equally open to participation by members of a class of citizens…in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

2.    The Supreme Court has held that lines of electoral districts that "dilut[e] minority voting power" result in a Section 2 violation. *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993). But a vote-dilution plaintiff must make every one of three required showings: (1) that the "minority group" is "'sufficiently large and geographically compact to constitute a majority in a single-member district'"; (2) that it is "'politically cohesive'"; and (3) that "'the white majority vot[es] sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.'" *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)). These *Gingles* factors "cannot be applied mechanically and without regard to the

nature of the claim," *id.* (quotation marks omitted), and courts also consider a series of factors in their local appraisal of the "totality of the circumstances," *id.* at 1010–1011.

3.       A Section 2 claim is "inherently fact-intensive." *Nipper v. Smith*, 39 F.3d 1494, 1498 (11th Cir. 1994). The Court "must conduct a 'searching practical evaluation of the past and present reality' of the electoral system's operation," which involves "a functional, rather than a formalistic, view of the political process" and an "'intensely local appraisal'" of the facts. *Id.* (quoting *Gingles*, 478 U.S. at 45).

4.       The Plaintiff's Section 2 claim fails under this standard for several reasons.

5.       First, the black community holds a numerical advantage over all other racial groups in both voting-age population and registration, thereby placing an enhanced burden on the Plaintiff to show that "opportunity" is unequal.  *Salas v. SW Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). The Plaintiff does not make any showing pertinent to this question and fails to prove that any failure of a black-preferred candidate to win is the result of white bloc voting.

6.       Second, the Plaintiff has the burden to prove block voting. Section 2 "does not assume" it. *Growe v. Emison*, 507 U.S. 25, 42 (1993). The evidence here is unreliable and was skewed to a predetermined result, as described above. Moreover, the election information that exists indicates either that voting is not polarized or that, if it is, the white bloc does not usually outvote the black bloc.

7.       Third, the Plaintiff has the burden to show "a hypothetical alternative" plan to show "what the right to vote *ought* to be," or else there is no "baseline with which to compare" the current plan and prove injury. *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000). The Plaintiff's alternative plan does not show this. At best, it shows that the lines could different, at

worst, it presents a step backward for the minority community. And, because the plan is not tailored to Section 2 requirements, enforcing the plan would violate the Constitution.

8.      Fourth, the "totality of the circumstances" analysis under the "Senate Report Factors" also does not support the Plaintiff. To be sure, there is no question that blacks have been the victims of racial discrimination in the County historically. But the evidence on ongoing effects that constitute an impediment to equal participation is perfunctory. The various Senate factors do not weigh in favor of relief.

### B.      The Plaintiff Failed Even To Articulate How the Black Community, Which Is Larger Than the White Community, Lacks Equal "Opportunity"

9.      As described above, the "minority" community here is not the "minority." This changes the complexion of the Section 2 analysis because a Section 2 plaintiff must prove that "'the white *majority* vot[es] sufficiently as a bloc to enable it ... usually to defeat the *minority's* preferred candidate.'" *Johnson*, 512 U.S. at 1007 (quoting *Gingles*, 478 U.S. at 50–51) (emphasis added). But, in Sumter County, if the white and black communities both vote as blocs for opposing candidates, the *black* community has the numbers—in both voting-age population and registered voters—to outvote the white community. This fact would suggest that the black community is unlikely to have "less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(a).

10.      This factual scenario is not a bar to Section 2 liability in every case, but it is on the record here, based on the facts described above. A protected group that outnumbers other groups in registration and voting-age population "faces an obvious, difficult burden in proving that their inability to elect," if it exists, "results from white bloc voting" and not from some other cause. *Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992).

11.     The Plaintiff has identified no reason why the alleged inability to elect black-preferred candidates is the result of white bloc voting, and the record reveals no such explanation.

12.     Effects of prior discrimination can impede equal opportunity to participate in the political process, but the most typical way this occurs is that economic disparity depresses registration rates, given that, e.g., individuals who do not own homes move more often than homeowners and face a higher burden to register at each new location and that high disenfranchisement rates due to racial disparities in felony convictions depresses registration in minority communities. *See, e.g.*, *Missouri State Conference of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1071 (E.D. Mo. 2016); *Jordan v. City of Greenwood*, 599 F. Supp. 397, 401 (N.D. Miss. 1984). That is not the case here, however, because black registration rates are higher than white registration rates.

13.     Similarly, there is no evidence that those registration rates are inaccurate, and, in fact, the Plaintiff conceded their accuracy. *Salas*, 964 F.2d at 1545, 1555 (discussing "soft" voter roles).

14.     Nor are there unique voting patterns, such as those present in *Meek v. Metropolitan Dade County*, 908 F.2d 1540, 1545–55 (11th Cir. 1990), where blacks and Hispanics together constituted a majority, but lacked cohesion, and thus the Hispanic and white voters could coalesce and outvote the black community. Here, however, the Plaintiff's expert provided no analysis of Hispanic voting behavior, and he argues that Hispanics vote at single-digit levels in school-board elections. No minority group, then, is joining forces with the minority-white community to outvote black-preferred candidates.

15.     Nor, for that matter, is this a case where an election scheme cracks the vote of a majority-minority community. For example, "[v]oters of the protected class, if they constitute a minority, could be spread throughout the several election districts of a county so that they constitute a

voting majority in none." *Smith v. Brunswick*, 984 F.2d 1393, 1400 (4th Cir. 1993). But here, the at-large seats protect *against* that form of dilution by allowing the black community to coalesce at the county level where it enjoys a numerical majority over other groups.

16.     Furthermore, "practical impediments to voting" may disproportionately affect members of a racial minority who comprise the majority of a jurisdiction. *Salas*, 964 F.2d at 1555–56. Conceivably, "migrant work" schedules might interfere with participation opportunity on election day. *Id.* Or, potentially, rural residents immobilized by poverty might not be able to reach polling places due to long distances. But, here, the black community is concentrated in the City of Americus, which can be traversed on foot, and there is no evidence suggesting any practical barrier to voting.

17.     No practical impediments exist here. Although there was suggestion that black voters do not understand when and where to vote in School Board elections, Tr. 2 177:14–22, this perfunctory testimony lacked credibility. The Plaintiff's expert testified that black voters turned out in the 2016 primary in sufficient numbers to control the Democratic primary by an overwhelming majority, so news of the primary date obviously spreads among black voters. 1 Tr. 218:9–16. Furthermore, the Court heard extensive testimony from Dr. John Marshall who owns a newspaper with widespread circulation in Sumter County, especially in the black community. The paper reports on school board issues and surely reports election dates to its readership. Tr. 2 115:18–16:2. Additionally, Alice Green discussed multiple organizations devoted to educating black citizens about the timing of elections, indicating that this information is actively disseminated in the Sumter County black community. Tr. 2 128:12–131:22.

18.     Likewise, the Plaintiff's claim that at-large campaigns are too expensive is not supported in the testimony. The only three candidates to run for both a single-member and an at-large seat

were Dr. Michael Busman, Michael Coley, and Kelvin Pless. Dr. Busman testified that his at-large election cost him less than his single-member district election, Mr. Coley said it cost him somewhat more (without specifying how much), and Mr. Pless was silent on the issue.

19.    Finally, "plaintiffs could conceivably prove that, despite a registered voter majority, low turnout at elections was the result of prior official discrimination." *Salas*, 964 F.2d at 155. But here, as in *Salas*, there was no evidence of past discrimination "*directly linking*…low turnout with past official discrimination." *Id.* (emphasis added). The Plaintiff's witnesses failed to make that link. Edith Green, for instance, testified that black voters were hindered—not by past discrimination—but by those mundane everyday threats to a democracy particularly at the local level: voter mobilization and education about the candidates and issues at play. Trial Tr. 179:17–180:5. Dr. Marshall testified that "possibly" the "depressed status" of the black community has an "impact on black participation," without giving any specifics. Tr. 2 120:23–21:2. The testimony from other witnesses was equally generic. *E.g.,* Trial Tr. 148:8–15 (Alice Green). "Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." *Salas,* 964 F.2d at 1556.  Yet that is the sum total of the claim here. Granting relief under these circumstances would amount to applying the *Gingles* factors "mechanically and without regard to the nature of the claim." *Johnson*, 512 U.S. at 1007 (1994).

20.    The Plaintiff's arguments are unpersuasive.

21.    First, he contends the black community is not the majority in Sumter County in voting-age population or registration: it is approximately 48% in each. Dkt. 163 at 3. But this contention ignores that (1) the black community is larger than the white community; and (2) the Plaintiff has provided no analysis of how the other racial or ethnic groups vote. In other words, the Plaintiff neither claims nor shows that the white community *together with other groups* outvotes the black

community; he claims that the *white* community alone outvotes the black community. The relevant comparison, then, is black and white. *See Nipper v. Smith*, 39 F.3d 1494, 1527 (11th Cir. 1994) (cautioning courts that vote dilution is "evaluated with a functional, not a formalistic, view of the political process"). The black community is a majority in VAP, registration, total population, and every other relevant metric.

22.     Second, the Plaintiff contends that the black community simply *must* be deprived of equal opportunity because Georgia and Sumter County have a history of discrimination. But generic claims of discrimination do not suffice in this context. *Salas*, 964 F.2d at 1556. There must be hard evidence tying the past discrimination to present lack of opportunity as to explain how a racial group with numerical superiority has less opportunity than other groups. There is none here.

23.     The Plaintiff complains that this "blames" the black community for not electing candidates the Plaintiff supported. But this quarrel is not with Sumter County or the Court; it is with Section 2's guarantee of *opportunity* rather than *results*. To the extent the black community shares the Plaintiff's views—and there is no reason to believe it does—there is a responsibility to exercise the opportunity that the system affords. The Court's role here is to assess whether the opportunity is afforded, not to wade in on who is to "blame" if the opportunity is not being exercised as a litigant wishes it were being exercised.

### C.     The Plaintiff Failed To Prove Racially Polarized Voting

24.     Under *Gingles* prongs 2 and 3 the Plaintiff must prove polarized voting; Section 2 "does not assume" it. *Growe v. Emison*, 507 U.S. 25, 42 (1993). The question under *Gingles* prong 2 is whether a racial group is "politically cohesive," and the question under *Gingles* prong 3 is whether the "white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Id.* at 40. "[N]o single statistic provides courts with a short-cut

to determine whether a set of [electoral structures] unlawfully dilutes minority voting strength."

*Johnson v. De Grandy*, 114 S.Ct. 2647, 2661–62 (1994).

25.     The standard is not met.

26.     As described in the findings of fact, the Plaintiff's expert does not present reliable information. Because the Plaintiff bears the burden, a vacuum of evidence defeats his case.

27.     Moreover, a review of all the evidence reveals that the Plaintiff fails to meet the *Gingles* factors even assuming the results provided.

28.     Plaintiff bases his position on the at-large School Board Elections in 2014 and 2016. The Plaintiff argues that, because black candidates are "zero for three" the *Gingles* factors are satisfied.

29.     *Gingles* does not support this conclusion. The analysis presented in *Gingles* involved "*53 General Assembly primary and general elections involving black candidates*" to test polarized voting in "six…multimember districts." 478 U.S. at 52–53 (emphasis added). The *Gingles* plurality determined that the lower court's careful factual analysis of all this data holistically "satisfactorily address[ed]" the "proper legal standard." *Id.* at 60. Quite the opposite of a *per se* "zero for three" rule, *Gingles* expressly held that "the number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances." *Gingles*, 478 U.S. at 57 n.25.

30.     Although, conceivably, polarized voting could be shown on only two or three votes, the "circumstances" here do not support that finding. Weighing the evidence together, the evidence does not show polarized voting, as described above.

31.     One relevant consideration is that Dr. McBride's 2014 analysis showed black, minority-preferred candidate successes in districts between 44% and 49% BVAP, indicating that BVAP

levels at or below the level present in Sumter County have been sufficient in the past for minority opportunity. Under that rubric, minority-preferred candidates are three for six, not zero for three.

32.     Another relevant consideration is that county-wide election results show repeated victories for minority candidates and Democratic candidates who are almost certainly minority-preferred. For example, in 2016, black candidates were on the ballot in Sumter County in eight races and won the county-wide vote in seven. DX 010, pp. 27-28, DX 001, pp. 1283-1338, 1425-63. Similarly, in 2012, Sumter County voted for a black candidate in every one of the six races where a black candidate ran including the following candidates. DX 010, pp. 21-22; DX 001 pp. 1045-46 (Bishop primary), 1176-79 (Obama), 1186-87 (Bishop general), 1188-89 (Sims), 1208-09 (Jones), 1212-13 (Brook). This is the type of evidence that courts typically consider in weighing the probative weight of election data. *See S. Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1293 (11th Cir. 1995).

33.     While the Plaintiff is correct that no party conducted a polarized voting analysis of these elections, his expert testified that black voters overwhelmingly prefer Democratic candidates to Republican candidates, and that is all the more likely the case when the Democratic candidate is black. 1 Tr. 180:25–181:4; *id.* 185:1–8. These elections therefore (1) have probative value; and (2) further cut against the credibility of the Plaintiff's expert, who ignored them in his polarized voting analysis.

34.     The Plaintiff also contends that this information should be ignored because it concerns "exogenous" elections (those not for Sumter County at-large Board of Education seats). But "evidence of exogenous elections are part of the totality of the circumstances that must be examined when applying the *Gingles* factors," *Cofield v. City of LaGrange, Ga.*, 969 F. Supp.

749, 773 (N.D. Ga. 1997), particularly where endogenous elections are scarce, *Citizens For a Better Gretna v. City of Gretna*, 834 F.2d 496, 502 (5th Cir. 1987); *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1330 (5th Cir. 1989), opinion corrected on reh'g, 897 F.2d 763 (5th Cir. 1990).

35.     The Plaintiff mistakes a general principle that a district court "may consider endogenous elections more important than exogenous elections," *Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000), for yet another hard rule that endogenous elections should be considered alone, in the absence of context that exogenous elections may provide. That is not the law. *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1209 (5th Cir. 1989); *Johnson v. Hamrick*, 155 F. Supp. 2d 1355, 1375 (N.D. Ga. 2001).

36.     In fact, *most* of the Plaintiff's elections are exogenous because they involve single-member BOE seats, which cover only a *subset* of the County. *See City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547 (11th Cir. 1987). The Plaintiff then is asking the Court to cherry-pick endogenous elections that help his claim, and that request is not well founded.

37.     Far from being irrelevant, the numerous elections in Sumter County resulting in victories for black-preferred candidates provide important context by which to understand the likely impact of the at-large scheme going forward. *See Johnson v. Hamrick*, 296 F.3d 1065, 1081 (11th Cir. 2002).

38.     Weighed in the balance, these results cast significant doubt on the claim that Sumter County's black community lacks an equal opportunity to elect its preferred candidates.

39.     Additionally, the circumstances of the three elections in which black-preferred candidates purportedly went "zero for three" indicate that these elections are not probative. Two of those elections involved the *same two candidates*, Michael Coley and Silvia Roland. The run-off

presented a special circumstance, and then, in the second race, Ms. Roland was the incumbent.
*Johnson v. Hamrick*, 296 F.3d 1065, 1078 (11th Cir. 2002) ("[I]t is important to bear in mind that
such factors as incumbency, the absence of an opponent, or the use of bullet voting might explain
divergences in individual elections."). This, of course, does not render the race irrelevant; but the
circumstances must be weighed in the balance, and they counsel against placing dispositive
weight on these two election.

40.     Similarly, the race between Michael Bussman and Kelvin Pless involved a veteran Board
of Elections member who is a popular physician and volunteer on the high school football team.
Tellingly, this Court heard from six candidates for election to the School Board, and only two of
those candidates never worked in the Sumter County schools: Michael Coley and Kelvin Pless,
the losing candidates in at-large races.

41.     Another consideration is the very low turnout numbers from *both* racial groups. Although
the Plaintiff emphasizes that black turnout is low, white turnout is rarely over 20% and is usually
much lower. PEX6 at 23. This means that the "opportunity" available to the black community
virtually always exists to the extent it mobilizes even 1 of 5 of black registered voters. That this
did not occur in the 2014 or 2016 at-large races does not itself indicate a *barrier* to its occurring
in the future. It could as easily indicate that the black community is not concerned about the
composition of the School Board or its performance.

42.     Altogether, the Plaintiff's "zero for three" argument is not holistic, and the relative value
of the at-large races does not defeat the other evidence that the Court must consider.

43.      Plaintiff's other election data do little to support his position. He emphasizes the defeat
of the purportedly preferred minority candidate in several single-member races, but ignores that

BVAP in these districts ranged from 28% to 33%, which is much lower than the 48% BVAP reported at the 2010 census and the 49% current estimate.

44.     Ironically, the Plaintiff uses differences in BVAP ranges when it is to his advantage by arguing that minority candidates' successes in 62% and 74% BVAP districts do not suggest the likelihood of black success in the 49% BVAP County. 1 Tr. 12:11–22. But, by the same token, minority-preferred candidate losses in districts ranging from 28% to 36% BVAP do not indicate that the same result will occur where blacks outnumber whites.

45.     To be sure, all of these elections are relevant, but the probative value of races involving districts with BVAP ranges in the vicinity of the at-large seats is greater than the value of races in districts with much lower or higher BVAP.

46.     Taken as a whole—including the evidence Dr. McBride originally presented and then withdrew—the evidence shows that black candidates win routinely in districts at 62% BVAP and higher, that white candidates routinely win in districts at 38% BVAP and lower, and that districts between 40% and 50% BVAP can be won by candidates of (and supported by) either race. The countywide evidence lends further credence to that conclusion.

47.     The only other election the Plaintiff's expert analyzed involved a *write-in* candidate for Sherriff in 2002. Although relevant, this race has very minor probative value.

48.     Because a write-in candidate can only receive votes from voters who have heard of the candidate, know to write in his or her name, and know how to *spell* it correctly, there is every reason to believe that the reason more white voters did not support the black write-in candidate was not "racial bias" but their ignorance of his campaign. *Nipper*, 39 F.3d at 1524 (holding that the polarized voting analysis turns on "racial bias in the community," not other considerations in the voting booth).

49.    Moreover, as described above, the analysis ignored over 4,000 of the 11,000 total votes which were cast as absentee ballots. By contrast, Dr. McBride failed to analyze a 2016 election for Clerk of the Sumter County Superior Court in which the black candidate overwhelmingly won in the Democratic Primary, on the same day school board elections were conducted.

50.    This race, even combined with the other races the Plaintiff proffers to show polarized voting, does not establish the *Gingles* bloc voting prongs under the totality of these circumstances.

### D.    The Fact-Witness Testimony Does Not Show Polarized Voting

51.    Although it is conceivable that fact-witness testimony could support a showing of polarized voting, the testimony here was ambiguous at best as described above. There being no basis as a matter of fact to find polarized voting from their testimony, it has no legal implications.

### E.    The Plaintiff Failed To Show That an Improved Plan, Accounting for His Expert's Analysis, Exists

52.    The Plaintiff bears the burden to present an alternative plan demonstrating that a meaningful improvement is possible as compared to the challenged plan. *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000). If a meaningful improvement is not shown, no injury exists. *Id.*

53.    The law is clear that, "along with determining whether the *Gingles* preconditions are met," the Court "must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice." *Holder v. Hall*, 512 U.S. 874, 880 (1994). It is not enough to show that the "lines could have been drawn elsewhere, nothing more." *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994). Rather, the proposed plan "must achieve a more proportional

representation of minorities than did the" plan being challenged. *Meek v. Metro. Dade Cty.*, 908

F.2d 1540, 1547–48 (11th Cir. 1990) (quotation marks omitted).[1]

54.     The Plaintiff fails this test. As described above, the Plaintiff failed to show that a seven

single-member district plan would enhance black opportunity as compared to the current plan.

There is no basis to conclude that a 54% district and a 41% district are improvements on two

49% at-large districts. The alternative plan also does not address the turnout problems that the

Plaintiff alleges exist under the current plan.

55.     In fact, as described above, there is every reason to believe the Plaintiff's plan would be a

step backwards. Obviously, that is not a viable alternative and cannot prove a Section 2 claim.

56.     Additionally, the Plaintiff's plan does not comply with law—namely the Constitution. A

Section 2 remedial district must itself be legal. *Dillard v. Crenshaw County*, 831 F.2d 246, 250

(11th Cir. 1987). The Plaintiff's version is not.

57.     The Fourteenth Amendment "prevents a State, in the absence of sufficient justification,

from separating its citizens into different voting districts on the basis of race." *Cooper v. Harris*,

137 S. Ct. 1455, 1463 (2017) (quotation marks omitted). Where a map-drawer "purposefully

established a racial target" and that target "had a direct and significant impact" on the district's

"configuration," courts apply strict scrutiny to determine the justification for the race-based

districting. *Id.* at 1468–69.

58.     Here, Dr. McBride clearly set out to draw a third majority-minority district, and made

"considerable changes to the existing boundaries" to achieve this race-based goal, PEX6 at 5. As

described above, race was the predominant motive in the plan under the standard of *Cooper*.

---

[1] Although the Court held on summary judgment that a black majority of 50% +1 could be drawn in three districts, the Court did not find or assess (and could not have found or assessed at that stage) whether the alternative is a feasible alternative. Dkt. 125 at 16. That is a separate question.

59.     Therefore, strict scrutiny applies. *Cooper*, 137 S. Ct. at 1469–70.

60.     Although the Supreme Court has presumed that Section 2 compliance is a compelling interest, *see id.*, Dr. McBride's plan is not narrowly tailored. As he conceded at trial, he made no analysis of whether 54% was either necessary or sufficient to create an opportunity district, but merely *assumed* anything above 50% satisfied Section 2. Only later did he attempt to support his choice with evidence, so his analysis consisted only of "post hoc justifications" for decisions he already made. *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). And, as described above, even these efforts were entirely insufficient to explain why the specific race-based choice he made—a 54% district—was tailored to the demands of Section 2. It is therefore not a Section 2 remedy, and, failing that, violates the Constitution. *See Cooper*, 137 S. Ct. at 1470.

### F.     The Plaintiff Has Failed To Show Discrimination Under the Senate Factors

61.     Under the totality-of-the-circumstances analysis, courts, in addition to those considerations described above, consider the so-called "Senate Factors." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006). Again, the Court must apply a fact-sensitive approach taking account of the "totality of the circumstances."

62.     The Plaintiff has not demonstrated under this test an unequal opportunity for electoral participation in the Sumter County School Board races.

63.     One factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Johnson v. Hamrick*, 196 F.3d 1216, 1220 (11th Cir. 1999). Although Sumter County concedes a "history of official discrimination in" Georgia and Sumter County, "the proper concern here is what effect discrimination in education has had on the level of black participation in the political process." *City of Carrollton Branch of*

*the N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1561 (11th Cir. 1987). Similarly, courts consider

whether members of the minority group "bear the effects of discrimination in such areas as

education, employment and health," but the relevant question is the extent to which these

disadvantages "hinder their ability to participate effectively in the political process." *Gingles*,

478 U.S. at 37.

64.     As described above, there is no evidence of ongoing "effect" on the "level" of black

participation in the political process. Although several fact witnesses offered opinion testimony

that effects of past discrimination continue to have a causal connection to participation, their

testimony was vague, lacked foundation, often identified no more than the standard everyday

barriers anyone faces in participating in an election, and reflected a lack of relevant information,

such as the rates of black registration.

65.     Another factor is the "extent" of polarized voting. *Gingles*, 478 U.S. at 37. As described

above, the Plaintiff has not proven polarized voting. But even if he had, the evidence suggests

the "extent" of polarized voting is minimal. Black candidates have won in districts at

approximately 45% to 49% BVAP, indicating white cross-over voting, which Dr. McBride's first

report showed. The results of numerous elections showing Sumter County supporting black-

preferred candidates, such as Sanford Bishop and Barack Obama, also strongly suggests the

willingness of white voters to vote for black-preferred candidates.

66.     Another factor is the success *vel non* of minority candidates. *See Gingles*, 478 U.S. at 37.

Black candidates have been successful in Sumter County, both in local races and in countywide

votes for other offices. Multiple black candidates have succeeded in school board races,

including in districts with below 50% BVAP, and black candidates routinely win countywide

races.

67.     Courts also consider whether there is a candidate slating process that has been used to

deny participation by minority candidates; no such evidence exists here. *Gingles*, 478 U.S. at 37.

68.     Yet another relevant factor is the existence *vel non* of "racial appeals" in campaigns.

*Gingles*, 478 U.S. at 37. The evidence indicates that this does not occur in the SBOE elections.

Four candidates described their campaigns for school board. All indicated that they campaigned

in both white and black neighborhoods, and none referenced any racial appeals. To the contrary,

all testified that they had the same message to all voters, and they testified that voters of both

races told them they would vote for that candidate.

69.     As part of the analysis, courts also may assess "the policy underlying the" County's

voting practice to discern whether it is "tenuous." *Gingles*, 478 U.S. at 37. The policy here is

clear and weighty: ease of administering elections under the same boundaries governing County

Board of Supervisors Elections. Although Alice and Edith Green testified impugning bad motive

on the move from a nine-member plan to a seven-member 5/2 plan, their memories were not

accurate on this point. Their testimony was that a change to the school board plan was not

contemplated until after a black candidate defeated a white candidate in (what they perceived to

be) a contentious race. They walked back their statements when challenged on the stand and

School Board Chairman Busman provided a different timeline. The School Board records and

local newspaper accounts confirm his testimony.

70.     The change was under consideration and discussion for at least 6 months. Defendant

guides this Court to Defendant's Exhibit 11 for answers to questions about the change. The

language of the resolution for the change is clear. Five single-member districts and two at-large

seats. All Board members approved this language. DEX11 at 3. This change passed unanimously

with all board members, white and black, including Alice and Edith Green, supporting it. DX 11

p. 2. The five districts are the same as the County commissioner districts. DEX11 at 4. This change was supported by all local legislators, both white and black members of the Georgia General Assembly. Every Sumter County Board member voted for the change.[2]

71.     An additional consideration that may have probative value "in some cases" is "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. The school board members testified that they do not believe they can afford to ignore the needs of the black community (as the large number of registered members of the black community would suggest), and there is no specific evidence that any needs have been ignored. Again, the Plaintiff called several witnesses who aired generalized and vague grievances, but they provided no specific instances where specific needs were presented to the school board and ignored for anything resembling racial reasons.

72.     In short, the various ways of analyzing the totality of the circumstances counsels against a finding of Section 2 liability. To the contrary the totality of the circumstances overwhelmingly indicates the black opportunity is on par with white opportunity in at-large races in Sumter County.

### G.     The Plaintiff Did Not Prove a "Packing" Claim

73.     A packing claim requires a showing that, without being over-concentrated in a certain number of districts, a minority group would be able to comprise a majority in *additional* districts. *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993).

74.     That showing was not made, and the information available refutes it. Dr. McBride's alternative plan does not show how drawing down black majorities in Districts 1 and 5 could

---

[2] Sumter County has not consented to trying a Section 2 "purpose" claim by consent, and the Court lacks authority to try this issue. Even if it did, these facts would refute such a claim.

result in a new majority-minority district; to the contrary, his plan *raises* BVAP in both districts. Furthermore, Dr. McBride offers Districts 1 and 5 as evidence of what BVAP levels are needed for a district to perform, so they can hardly considered "packed."

75.    The "packing" claim has not been proven.

### H.    Summary of Conclusions

76.    The Plaintiff did not prove that any alleged failure of black-preferred candidates to win was a result of white bloc voting.

77.    The Plaintiff failed to prove racially polarized voting.

78.    The Plaintiff failed to prove that an alternative Sumter County School Board plan is feasible.

79.    The Plaintiff did not show that, under the totality of the circumstances, the black community has less opportunity to participate in the political process than the white community.

80.    The Plaintiff did not prove a "packing" claim.

Submitted by:

s/ Katherine L. McKnight
E. Mark Braden (*pro hac vice*)
Katherine L. McKnight (*pro hac vice*)
Richard B. Raile (*pro hac vice*)
BAKER HOSTETLER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 861-1500

s/ Kimberly A. Reid
Kimberly A. Reid
Georgia Bar No. 596699
kimberly.reid@lawsonreidlaw.com
LAWSON & REID, LLC
901 East 17th Avenue
P.O. Box 5005
Cordele, Georgia  31010
(229) 271-9323 (telephone)
(229) 271-9324 (fax)

**ATTORNEYS FOR DEFENDANT SUMTER
COUNTY BOARD OF ELECTIONS AND
REGISTRATION**

## CERTIFICATE OF SERVICEU

I hereby certify that on this 12th day of January, 2018 the foregoing was filed and served pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

s/ Katherine L. McKnight_____
E. Mark Braden (*pro hac vice*)
Katherine L. McKnight (*pro hac vice*)
Richard B. Raile (*pro hac vice*)
BAKER HOSTETLER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 861-1500

**ATTORNEYS FOR DEFENDANT SUMTER COUNTY BOARD OF ELECTIONS AND REGISTRATION**