## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

MATHIS KEARSE WRIGHT, JR.,                    :
                                               :
      Plaintiff,                          :
                                               :        CASE NO.: 1:14-CV-42 (WLS)
v.                                             :
                                               :
SUMTER COUNTY BOARD OF                         :
ELECTIONS AND REGISTRATION,                    :
                                               :
      Defendant.                          :
_____                :

## ORDER

On May 16, 2019, the Eleventh Circuit Court of Appeals granted Plaintiff's motion for a limited remand authorizing this Court to conduct remedial proceedings and devise a remedy in time for the regularly-scheduled school-board election in May 2020. (Doc. 250.) The Court issues such a remedy herein.

## BACKGROUND

Plaintiff Mathis Kearse Wright, Jr. brought this action to challenge the method of electing members of the Board of Education in Sumter County, Georgia. (Doc. 1.) Plaintiff contends that the current election plan's two at-large seats and high concentration of African-American voters in Districts 1 and 5 dilute African-American voting strength in violation of Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301. (*Id.*) In 2015, the Court granted summary judgment to the Sumter County Board of Elections, and Plaintiff appealed. (Docs. 63 & 64.) Finding that the Court made impermissible credibility determinations, the Eleventh Circuit reversed and remanded. (Doc. 71.)

Thereafter, the Court entered a supplemental discovery order and held a bench trial. (*See* Docs. 78 & 144.) Following the trial, the Court issued an order not only recounting the history of racial discrimination and segregation in Sumter County, but specifically finding that the current voting map for Sumter County Board of Education (the "School Board") gives African-American citizens "less opportunity to elect candidates of their choice than" White

citizens. (Doc. 198 at 33.) After analyzing the relevant factors, and based on the totality of the circumstances, the Court found that "the at-large districts of the Sumter County Board of Education dilute African-American voting strength in violation of Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301." (*Id.* at 37.) The Court determined that an alternative election plan would need to be enacted but, given that the General Assembly was still in session, ordered the Parties to first confer with Sumter County's legislative delegation regarding its inclination to enact a remedial plan before adjourning. (*Id.*)

After Defendant notified the Court that the Georgia General Assembly would be unable to pass legislation on Sumter County's redistricting during its 2018 session (Doc. 201), Plaintiff moved for an injunction of the May 2018 election. The Court determined that all three requirements for a permanent injunction had been met: Wright had prevailed on his claim, there was no adequate remedy at a law for a violation of Section 2 of the Voting Rights Act, and the loss of a meaningful right to vote created an irreparable harm. (Doc. 204 at 5.) The Court then enjoined the School Board's election scheduled for May 22, 2018 and reset it to November 6, 2018, ordering that voters be informed that races for the Sumter County Board of Education had been enjoined. (*Id.* at 7.) The Court stated that it would enter an order setting interim boundaries for the new districts by July 23, 2018. *Id.* Defendant appealed that order and the Court's order as to liability. (*See* Docs. 207 & 209.) The Court found that the notice of appeal conferred jurisdiction on the Eleventh Circuit and divested it of jurisdiction to set interim boundaries, a subject involved in the appeal, and therefore removed its self-imposed deadline to set interim boundaries. (Doc. 214 at 3).

On July 31, 2018, Plaintiff filed an Emergency Motion for an Injunction Pending Appeal (Doc. 218), and Defendant argued that the Court lacked jurisdiction to enjoin the election (an issue involved in the appeal) and that equities favored denying Plaintiff's motion. (Doc. 223.) The Eleventh Circuit subsequently remanded the case to this Court to issue a new map setting interim boundaries if feasible. (Doc. 225.) After hearing from the Parties, the Court "decline[d] to adopt one of the remedial plans proposed by Plaintiff[1], especially given

---

[1] Although the Court found that Plaintiff's proposed plans provide helpful information for developing a remedial plan, the Court never determined that one of Plaintiff's proposed plans should be implemented. (*See* Doc. 206 at 6.)

the strong objections to the plans announced by Defendant and the obligation of the Court to ensure that a remedial plan is constitutional." (Doc. 238 at 5.) The Court determined that a new interim map must be drawn and that there was insufficient time to do so before the next scheduled election in November given Defendant's assertion that the deadline to change ballots was August 17, 2018. *Id.* at 5-6. Instead, the Court enjoined that election. *Id.* at 11.

This case is now again before this Court on a limited remand authorizing this Court to devise a remedy in time for the regularly-scheduled school-board election in May 2020. (Doc. 250.) On June 12, 2019, the Court held a telephonic conference during which both Parties stated that deferral to the legislature was unwarranted and that a remedy should expeditiously be put in place. (*See* Doc. 254.) The Court directed the Parties to propose procedures the Court should use if it draws its own remedial map. *Id.* Consistent with the Parties' joint proposal (Doc. 252), the Court ordered the Parties to submit the names of persons that the Parties agreed were qualified to serve as a special master to assist the Court in drawing remedial districts. (Doc. 254.) The Court also asked Plaintiff to respond to two arguments that Defendant made regarding Plaintiff's proposed remedies: "(1) that in a district with a black voting-age population of less than 69%, black voters may not have an equal opportunity to elect their preferred candidate given low black voter turnout, and (2) that both proposals limit black voters in Sumter County to only three out of seven seats on the school board, even though the county is majority black." *Id.* at 2. After considering the Parties' supplemental arguments, the Court determined that "the best option for ensuring that an effective remedial plan is in place before the May 2020 elections is to choose the [Parties'] agreed-upon special-master candidate, Professor Bernard Groffman [sic]." (Doc. 261 at 1.) The Court determined that doing so "will prevent unnecessary delay that may result from referring this case to the Georgia legislature and will allow the Court to determine whether it is possible to craft remedial districts that would more effectively address the voting rights violations than those proposed by Plaintiff." *Id.* at 1-2.

On September 23, 2019, the Court entered the Parties' proposed order appointing Professor Grofman as special master, outlining his responsibilities, and requiring that he report at least one recommended remedial plan containing a color map, demographic data, and a

narrative analysis by November 25, 2019. (Doc. 267.) On November 22, 2019, Professor Grofman provided the Court his report identifying five remedial plans, each with a colored map. (Doc. 272.) The Parties provided response and reply briefs to the same. (Docs. 268, 269, 270, 271.) Further, the Court held a public hearing to hear from the Parties, Professor Grofman, and any other interested persons on January 13, 2020. (*See* Docs. 273 & 276.)

## **DISCUSSION**

Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C.A. § 1973 (West Supp. 1988). "Section 2 was enacted to enforce the Fifteenth Amendment's prohibition against denying a citizen the right to vote 'on account of race.'" *White v. Alabama*, 74 F.3d 1058, 1069 (11th Cir. 1996) (citation omitted). "A judicial remedy fashioned under section 2 must therefore enhance the ability of [] plaintiffs to *elect* their candidates of choice." *Id.* However, "equal access to the political process . . . is not to be confused with equal participation: 'Nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *Dillard v. Crenshaw Cty.*, 831 F.2d 246, 250 (11th Cir. 1987) (citations omitted).

Generally, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978). "[B]ut when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the 'unwelcome obligation' of the federal court to devise and impose a reapportionment plan

pending later legislative action." *Id.* at 540. Both Parties have stated that this Court should not defer to the legislature. (*See* Doc. 254.) The Court agrees. Given that the Court has twice sought the legislatures' involvement since 2018 and given the nature of the Circuit Court's limited remand to allow this Court time to fashion its own remedy (Doc. 250), this Court now finds it necessary to devise an appropriate remedy.[2]

"[W]hen devising election plans to remedy section 2 violations, federal courts 'should exercise traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.'" *United States v. Dall. Cty. Com.*, 850 F.2d 1433, 1437-38 (11th Cir. 1988) (citation omitted). "[T]here is very little specific guidance in the legislative history as to the proper evaluation of remedial schemes for violations under amended Section 2." *Dillard*, 831 F.2d at 250. But the Eleventh Circuit has determined that remedial plans must be evaluated "in part measured by the historical record, in part measured by difference from the old system, and in part measured by prediction." *Id.* Thus, this Court must thoroughly assess the differences between the existing plan and the remedial plan and not implement a map where "[e]nough of the [old] elements remain" that the section 2 violation has not been effectively cured. *See id.* at 252. In other words, "any proposal to remedy a Section 2 violation must itself conform with Section 2." *Id.* at 249. Further, the district court must "fashion a narrowly and well tailored remedy." *Id.* at 253.

### A.  Professor Grofman's Proposals

In appointing Professor Grofman as the special master, the Court ordered that he "devise a new election plan or plans for the seven-member Sumter County Board of Education that completely remedies the Section 2 violation identified in this Court's orders." (Doc. 267 at 2.) In submitting his subsequent report and plans, Professor Grofman never indicated that he was unable to comply with this primary instruction, but rather, he submitted five plans which he apparently believed would remedy the violation. The Court also ordered that he achieve "population equality with little more than *de minimis* variation," in conformance with

---

[2] The Court again reiterates that given Defendant's strong arguments against implementing one of Plaintiff's proposals, and now that the Court has the benefit of Professor Grofman's proposals, the Court does not find it appropriate to adopt Plaintiff's proposals.

the one-person, one-vote principal. *Id.* The Court ordered that single-member districts be used unless a different result was justified and that the Board have seven members with four-year terms. *Id.* at 3. The Court also ordered that any plans submitted "avoid pairing any incumbents who have not publicly announced an intention not to run for re-election, but only to the extent doing so does not interfere with remedying the Section 2 violation or otherwise complying with state and federal law." *Id.* at 3.[3]

Professor Grofman reports that he viewed his "central tasks as special master as preparing illustrative remedial maps for the Court to consider as alternatives[] and informing the Court as to the realistic opportunities for the minority community to participate in the electoral process and to elect candidates of choice in the various districts in these maps." (Doc. 272 at 4.) He pulled data entirely from the Court record and "information that is publicly available from two reliable sources: the U.S. Census Bureau and the office of the Georgia Secretary of State, with the exception of data on the home addresses of the incumbents." *Id.* at 5. In drawing the maps, his top three priorities were population equality across districts (no more than a plus or minus five percentage point deviation), district contiguity, and the preservation of existing political subunit boundaries to the greatest extent feasible. Doc. 272-4 at 1.

Professor Grofman proposes five maps[4] with seven single-member districts, which were each drawn using traditional and neutral districting criteria such as maintenance of city borders[5] and compactness (a measure of a district's border or area irregularity). (Doc. 272 at 6-7.) Other factors, such as race and incumbent location, were taken into account only in the final stage of the map-drawing process, at which point the maps were adjusted slightly to avoid inadvertently pairing incumbents and "to better satisfy equal protection concerns." *Id.*; Doc.

---

[3] "While protection of incumbents is perhaps not as high a priority as some other considerations in districting, it is still a part of the State of Georgia's traditional districting principles, which principles this Court is expected to defer to in drafting its remedial plan." *Smith v. Cobb Cty. Bd. of Elections & Registrations*, 314 F. Supp. 2d 1274, 1307 (N.D. Ga. 2002) (citing *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)).

[4] He also created a five-member plan, but the Court will not examine that plan as "the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." *Upham v. Seamon*, 456 U.S. 37, 43 (1982). Reducing the Board to five members is not necessary to cure the violation; thus, the Court will not examine Map 5.

[5] Professor Grofman notes that it is nearly impossible to draw plans using the city borders of Americus, Sumter County's largest city, because of the extreme irregularity of the city's borders. *Id.* at 6 n.16.

272-4 at 1.[6] Professor Grofman found that because the majority of Sumter County residents live in Americus and the majority of Americus is Black,[7] he was easily able to generate three districts in or near Americus with a Black voting-age majority. *Id.* at 7-8. All small cities and places were kept whole. Doc. 272-4 at 1. As the Court has previously found, Sumter County is approximately 51% Black and 41% White, with Blacks constituting slightly more of the voting-age population than Whites, 49.5% and 46.7%, respectively. (Doc. 198 at 8.)[8] Moreover, "[a]mong students in the schools that fall under the jurisdiction of the County School Board, 71.5% (=3,143/4,396) are non-Hispanic Black, 13.8% (=608/4,396) are non-Hispanic White, and 11.9% are Hispanic (=525/4,396). Thus, the non-White population of the schools is 86.2%." (Doc. 272-1 at 7.)

In four of the proposed maps (Maps 1a, 1b, 1c, and 3), at least three districts are "Minority Opportunity Districts," meaning a district in which African Americans in Sumter County have a realistic opportunity to elect a candidate of choice. Doc. 272 at 5 n.13; *id.* at 9. Professor Grofman concludes that where Black voters constitute 60.2% of a district, they have a realistic opportunity of electing their candidate of choice; thus, these are minority opportunity districts. (Doc. 272-2 at 6-7.) The following chart highlights the percentage of the Black Voting-Age Population ("BVAP") in each district in the currently enacted map, one of Plaintiff's proposed maps, and Professor Grofman's five proposed maps:

| Enacted | Plaintiff | Map 1a | Map 1b | Map 1c | Map 2 | Map 3 |
|---|---|---|---|---|---|---|
| 70.58% | 75.39% | 69.11% | 70.85% | 69.5% | 62.71% | 62.42% |
| 62.76% | 64.44% | 65.73% | 64.78% | 68.4% | 56.32% | 61.49% |
| 43.92% | 54.5% | 62.12% | 64.09% | 61.06% | 55.11% | 60.53% |
| 36.17% | 41.33% | 43.66% | 40.12% | 41.91% | 55.06% | 60.13% |
| 30.28% | 41.29% | 37.66% | 37.68% | 37.74% | 40.03% | 34.57% |
| (at-large) | 38.37% | 34.51% | 36.19% | 37.08% | 36.58% | 33% |
| (at-large) | 26.32% | 30.36% | 31.62% | 29.12% | 33.73% | 30.33% |

---

[6] Professor Grofman stated that "given home locations, some pairing of incumbents involving the incumbents now elected at-large is essentially unavoidable without compromising constitutional and legal priorities." (Doc. 272-1 at 1.)

[7] "Black" and "African-American" are used interchangeably in this Order.

[8] The Court used data from 2012-2016. *Id.* Professor Grofman's review of the 2010 U.S. Census Data was similar: "among those in the County who identify as either Black or White, the Black proportion is 55.1%." (Doc. 272-1 at 8.)

Rule 53 requires that courts decide *de novo* all objections to the special master's factual findings or legal conclusions. Fed.R.Civ.P. 53(f). Plaintiff objects to proposed Map 2[9] but argues that either Maps 1a, 1b, 1c, or 3 would be an appropriate Section 2 remedy. (Docs. 269 & 271.) Plaintiff posits that Map 3 should be chosen only if the elections are moved to November, presumably because the BVAPs are smaller in Map 3's majority black districts than in the other maps'. (Doc. 269.) Defendant makes no specific objections to these maps but instead argues that the proposals highlight what Defendant contends is the Court's error in its liability ruling because none of the maps "affords the black community an equal opportunity (as defined in the liability opinion) to win a majority." (Doc. 272 at 2.) Defendant asks the Court to select one of Professor Grofman's remedial maps so that it can proceed with prosecuting its appeal. (Doc. 270.) For the reasons that follow, the Court finds that Map 3 is the most appropriate map to adopt and that the school board's elections should be moved to November.[10]

### B.  The Best Remedial Plan

As an initial matter, the Court favors single-member districts for the school board's elections over at-large districts. The Court has specifically found that based on numerous factors,[11] "the elections for at-large seats do not give African Americans in Sumter County a meaningful opportunity to elect the candidates of their choice." (Doc. 198 at 33.) Indeed, "it is undisputed that no African American has ever been elected to an at-large seat on the School

---

[9] Plaintiff withdrew an objection to Map 1a after Professor Grofman submitted a corrected Map 1a showing that its third majority BVAP district would not have a white incumbent. (Doc. 271 at 1.)

[10] For clarity, it does not appear that any objections were made to Professor Grofman's findings or conclusions. Nonetheless, the Court addresses each objection herein.

[11] *E.g.*, "(1) the incredibly high rates of polarized voting in races that pit an African American candidate against a white candidate; (2) the glaring lack of success for African American candidates running for county-wide office, both historically and recently, despite their plurality in voting-age population; (3) the undisputed history of discrimination in Sumter County and throughout Georgia; (4) the lingering effects of that discrimination today, including the comparatively low income and education levels and high rates of poverty for African Americans in Sumter County; and (5) the low rate of African American turnout in these elections which—in the absence of evidence to the contrary—the Court attributes to the history of discrimination and the socioeconomic disparities." (Doc. 198 at 33.)

Board under the challenged plan." (Doc. 198 at 30.)[12] While at-large districts are not *per se* unconstitutional, given the history of the School Board's elections here, there is a strong likelihood that keeping at-large districts for the School Board's elections would "perpetuate[] rather than ameliorate[] the inequities which have resulted in an abridgement of [Sumter] County's black citizens' access to the political process." *Dall. Cty. Com.*, 850 F.2d at 1440 (holding that a court's remedial plan which contained an at-large district for school board elections did not comply with Section 2). Thus, without any evidence to support a different result, only single-member districts will be used here. While all of Professor Grofman's maps contain only single-member districts, Map 3 is superior to all other maps proposed to-date.

Map 3 is the only of Professor Grofman's maps that gives African Americans in Sumter County a realistic opportunity to elect board members to four out of seven seats. Although Map 2 has four majority BVAP districts, the Court agrees with Professor Grofman that only two of those districts are minority opportunity districts given the relatively low BVAP of 55% to 56% in three districts and the presence of a White incumbent in one district. (*See* Doc. 272-5 at 2.) In Map 3, however, the BVAP in the four majority BVAP districts is 60.13%, 60.53%, 61.49, and 62.42%. These percentages are significant. Professor Grofman found – and no party has objected – that a BVAP of 60.2% is generally sufficient to give Black voters a realistic opportunity to elect their candidate of choice.[13] (Doc. 272-2 at 6-7.) The district in Map 3 with 60.13% BVAP is only slightly below this threshold; more problematic for Black voters, is that it has a White incumbent. But Professor Grofman states that he would consider this district a minority opportunity district if the election were moved to November and no White incumbent was running for re-election in this district, thus giving Map 3 four minority

---

[12] Although it was stated at the remedial hearing that a recent Black clerk of court was elected in an at-large election, that is not compelling. The Court was provided no specific facts about the circumstances in that election, but has already noted that an African American was elected Clerk of Superior Court in 2016 where African Americans made up 81.9% of the electorate and the candidate did not face a general election opponent. (Doc. 198 at 30.) Then, as now, "[t]here is no evidence in the record of an African American in Sumter County winning a contested race for county-wide office." *Id.*

[13] Previously, the only testimony Plaintiff provided was that 54.5% would likely be sufficient. (Doc. 198 at 35.) Defendant then argued, presumably based on one district's election data, that 69% was necessary. (Doc. 200 at 20-21.) But Professor Grofman has clarified that a BVAP of 69% is not necessary for Black voters here to have a meaningful opportunity to elect their candidates of choice.  (Doc. 272-5 at 1.)

opportunity districts. (Doc. 272-1 at 3) ("I would certainly label this district as a *minority opportunity to elect* district, since it contains a majority Black electorate in the 2014, 2016, and 2018 November elections.")

Previously, Defendant argued that Plaintiff's proposed maps were inadequate because they would lock the Black majority of Sumter County into a permanent minority (three out of seven seats) on the School Board. The Court has never found that Black voters must have a majority in four districts for Section 2 to be satisfied. *Dillard*, 831 F.2d at 250 (""Nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."") (citations omitted). Nonetheless, it certainly seems incongruous that in a county which is majority Black (and for schools which are overwhelmingly Black), the Court would enter a remedy to a violation of Section 2 of the Voting Rights Act by limiting Blacks in Sumter County to only three out of seven seats on the School Board. The goal, after all, is to give minority voters an equal opportunity to elect the candidates of their choice. Map 3 achieves this goal, especially when the elections are moved to November.[14]

As the Court previously found, "[r]edrawn district lines are but one tool available for remedying a Section 2 violation." (Doc. 198 at 36) (citing *Holder v. Hall*, 512 U.S. 874, 880 (1994)). "The problem for African Americans in Sumter County is not the number of voters, but how often they turn out to cast votes;" thus, in considering a remedy, the Court stated it was important to determine whether there were any tools that "could meaningfully improve turnout such that African Americans have an equal opportunity to elect candidates of their choice." *Id.* Professor Grofman highlighted in his report the importance of moving the elections to November. He explains, "*Ceteris paribus*, the absence of a major top of the ticket election on the ballot, or some other election which would provide a strong incentive to vote, acts to depress turnout, and this is especially true for minority voters." (Doc. 272-3 at 3.) He states that the concept is "widely confirmed," and that as a result, minority turnout is expected to be lower in primary elections in May than in general elections in November. *Id.* Here, there

---

[14] Furthermore, Professor Grofman states that Map 3 is the most "compact," meaning that its districts are the least irregular. (Doc. 272-3 at 8-9, 272-4 at 2-3.) Map 3 is also the only map where four districts have a Sumter County school, compared to three or less in the other maps. (Doc. 272-3 at 10; 272-4 at 1.)

were "consistent turnout disparities between elections held in May and elections held in November in the Black share of the actual electorate," thus resulting in a "potential reduction in the number of districts that would be majority Black in turnout in May as compared to November." (Doc. 272-3 at 6.)

  The Court is further persuaded to change the election date because the same bill that enacted the current and unlawful five-two plan also moved the Board's elections from November to May. (Doc. 198 at 5-6.) In fact, the first time the Board obtained a black majority was in the November 2010 elections. *Id.* at 4. As such, November elections for the School Board would actually be more consistent with historical practice. Finally, the Court is especially persuaded based on Professor Grofman's analysis that if the elections were moved to November, "[t]here would have been four Black majority turnout districts in Illustrative Map 3 in each recent November election (2014, 2016, and 2018)." (Doc. 272-5 at 2.) If the elections remain in May, however, only 2 or 3 of the districts would have a Black majority turnout:

| Table 9 -- Majority-Minority Voting Turnout Districts by Election Timing | | | | | | |
|---|---|---|---|---|---|---|
| | **2014** | | **2016** | | **2018** | |
| | May | Nov | May | Nov | May | Nov |
| *Enacted* | 2 | 2 | 2 | 2 | 2 | 2 |
| *Plaintiffs* | 2 | 2 | 2 | 3 | 2 | 2 |
| *Map1a* | 3 | 3 | 3 | 3 | 3 | 3 |
| *Map1b* | 3 | 3 | 3 | 3 | 3 | 3 |
| *Map1c* | 3 | | 3 | | 3 | |
| *Map2* | 1 | 3 | 1 | 3 | 2 | 2 |
| *Map3* | 3 | 4 | 2 | 4 | 3 | 4 |
| *Map5* | 2 | 3 | 1 | 3 | 3 | 3 |

Note: *Number of districts calculated from GA voter history files. For a district to count as a majority-turnout district, it must have at least 50% of the voters be African-American.*

(Doc. 272-3 at 6.)

  Thus, to increase the efficacy of adopting Map 3, the Court also finds it necessary to move the School Board elections to occur regularly in November. Such a change is justified and appropriate to increase the turnout of African-American voters in Sumter County and give them a meaningful opportunity to elect their candidates of choice.

  Defendant objects that none of the proposed maps, including Map 3, "affords the black community an equal opportunity (as defined in the liability opinion) to win a majority." (Doc.

272 at 2.) [15] Defendant apparently believes that "equal opportunity" means "equal opportunity to win a majority." To be clear, neither this Court nor Section 2 require that Black voters have an equal opportunity to win a majority. Rather, Section 2 provides that minorities have an equal opportunity as "other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C.A. § 1973(b) (1994). That is all the Court's liability order required. (Doc. 198.) Further, the Court did not define "equal opportunity" or specify what BVAP (or any other metric) was necessary to give Black voters an equal opportunity; but in fact, entered the liability order even though Plaintiff had only presented a plan where Black voters could elect representatives to three seats on the Board. (*See id.*) "[W]hile proportionality . . . is obviously an indication that minority voters have an equal opportunity, . . . the degree of probative value assigned to proportionality may vary with other facts. No single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength." *Johnson v. De Grandy*, 512 U.S. 997, 1020-21 (1994). Where, as here, the minority population constitutes only a slight majority of the total population and only a plurality of the electorate, the Court is satisfied that a remedy that gives such voters a strong chance at three seats and a fair chance at a fourth is sufficient.[16]

As in all voting rights cases, there are multiple factors that can affect a minority population's ability to elect candidates (*see* Doc. 272-1), but the Court finds that adopting Map 3 and moving the School Board's elections to November completely remedies the Section 2 violation in existence and provides African American voters in Sumter County an equal opportunity to elect their candidates of choice. Furthermore, the Court finds that this plan fully complies with constitutional and statutory mandates. This plan does not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the

---

[15] As explained above, the Court disagrees with Defendant's assertion that Professor Grofman "admits that a plan affording the black community an equal opportunity to win a majority of the school-board seats is not possible through a seven single-member district regime in Sumter County." (Doc. 268 at 1.) By moving the elections to November, based on Professor Grofman's research and suggestion, it appears that Black voters in Sumter County would indeed have an equal opportunity to win a majority; in any event, that is not the legal standard to which the Court must adhere.
[16] While proportionality is not the goal, in any event, it is impossible to achieve exact proportionality of Black and White Board members here because the School Board consists of seven seats.

electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976). It adheres to the democratic governance principal of constitutionally drawing majority-minority districts where possible. *Bartlett v. Strickland*, 556 U.S. 19, 24 (2009) (plurality opinion). It is narrowly tailored to avoid running afoul of the constitutional right of one person, one vote guaranteed by the Equal Protection Clause of the Fourteenth Amendment. *See DeJulio v. Georgia*, 290 F.3d 1291, 1295 (11th Cir. 2002). And it avoids "intrud[ing] on state policy any more than is necessary" to uphold the requirements of the U.S. Constitution. *Upham*, 456 U.S. at 41-42 (citation omitted).

### C. The Court's Remedy

Considering the Court's findings herein and in its prior orders, the Court hereby issues the following remedy to the Section 2 violation:

1) The Court hereby **ADOPTS** Professor Grofman's proposed Map 3, attached hereto, as the interim remedial plan for all future Sumter County School Board elections;

2) The elections for the School Board shall be conducted in November of even-numbered years along with the scheduled November general and special elections;

3) The School Board members shall serve staggered four-year terms; and

4) For the benefit of any newly elected School Board members, the only School Board seats that shall be on the November 2020 ballot shall be those for Districts 1, 3, 5, and 7, as those representatives are currently serving holdover terms. The remaining Board members for District seats 2, 4, and (formerly at-large) 6, shall remain on the Board until after members are elected to these seats in 2022 and take office effective January 2023.[17]

---

[17] Current School Board members stated at the remedial hearing that maintaining staggered terms is preferred to replacing the entire School Board at once. The Court agrees. The Court is aware that H.B. 836 Section 5 prohibits representatives from remaining on the School Board if they no longer reside in their district. Notwithstanding this rule, the Court finds it necessary to require these Board members to continue representing Districts 2, 4, and 6, although they may not reside in their newly-drawn districts, in order to continue with the County's historic practice of staggered terms which enables experienced Board members to assist incoming Board members. Indeed, the Court's equity powers are broad, and the Court has required this change only insofar as is necessary to implement a complete remedy. *United States v. Paradise*, 480 U.S. 149, 183-84 (1987) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

**IT IS HEREBY ORDERED** that the Sumter County Board of Elections and Registration shall promptly implement the Court's redistricting plan for the November 2020 election for the Sumter County Board of Education and for all subsequent School Board elections until the Georgia General Assembly enacts applicable legislation for the School Board's elections. Defendant shall ensure that the qualifying fee and remedial map are adequately published to the residents of Sumter County sufficiently in advance of the qualifying period for the November 2020 election.[18] Except as modified by the remedial plan or this Order, all applicable federal, state, and local election-related laws remain in effect.

Having determined that all claims in this matter have been adjudicated, the Clerk of Court is **DIRECTED** to enter judgment accordingly, with costs cast upon Defendant. Plaintiff may submit a Bill of Costs in accordance with M.D.Ga. L.R. 54.2.[19] Defendant shall also pay the reasonable costs and expenses incurred by Professor Grofman in this matter, including his compensation at a rate of $400 per hour, as previously ordered by the Court. (Doc. 267 at 6.) Professor Grofman shall submit a Bill of Costs to the Court no later than Friday, February 14, 2020. Defendant may respond thereto no later than Friday, March 6, 2020. Thirty days after the Court's order approving the costs to be paid to Professor Grofman, Defendant shall remit full payment to Professor Grofman.[20]

---

[18] The Court is aware that the districts for School Board elections will no longer match the other voting districts, but that is unavoidable in order to give Black voters in Sumter County equal opportunity to elect school board representatives of their choice. The Court is hopeful, however, that voter confusion is minimized by the similarity of the areas encompassed in the former and new Districts 1 through 5 and the significant amount of time that remains for voters to become familiarized with their new districts before the November 2020 election.
[19] Plaintiff's counsel indicated at the final remedial hearing that they had sustained a hardship having not been paid attorney's fees during the pendency of this case.
[20] Professor Grofman stated that he would not bill for his or his research assistant's time on Map 5 if the Court did not examine it. (Doc. 272-5 at 3 n. 85.) As the Court has not examined it, time spent creating this plan should be removed.

The Court will retain jurisdiction to ensure that the remedial plan is properly implemented and that costs are paid.[21]

The Clerk of Court is **DIRECTED** to return the complete record of this case, including matters filed and entered after remand, to the United States Court of Appeals for the Eleventh Circuit.

**SO ORDERED**, this 29th day of January 2020.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[21] "Absent entry of a stay, a district court retains jurisdiction to enforce its judgment—via contempt or other means—during the pendency of an appeal." *United States CFTC v. Escobio*, No. 19-11027, 2020 U.S. App. LEXIS 185, at *16 (11th Cir. Jan. 6, 2020).